ACCEPTED
03-14-00510-CV
3762693
THIRD COURT OF APPEALS
AUSTIN, TEXAS
1/14/2015 11:07:21 AM
JEFFREY D. KYLE
CLERK

_____

## No. 03-14-00510-CV

_____

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
1/14/2015 11:07:21 AM
JEFFREY D. KYLE
Clerk

IN THE COURT OF APPEALS
THIRD JUDICIAL DISTRICT OF TEXAS
AT AUSTIN

_____

# Noah S. Bunker, Paul Carrell, Everett Brew Houston, Jr., W. Andrew Buchholz, Scott J. Leighty, Jad L. Davis, and Holly Clause,
*Appellants*

## v.

# Tracy D. Strandhagen,
*Appellee*

FROM THE DISTRICT COURT OF TRAVIS COUNTY,
353RD JUDICIAL DISTRICT, CAUSE NO. D-1-GN-13-002811,
THE HONORABLE ORLINDA NARANJO PRESIDING

# APPELLANTS' BRIEF

Amanda G. Taylor
ataylor@textaxlaw.com
Texas Bar No. 24045921
**MARTENS, TODD, LEONARD, TAYLOR & AHLRICH**
301 Congress Avenue, Suite 1950
Austin, Texas 78701
Tele: (512) 542-9898
Fax: (512) 542-9899

**ORAL ARGUMENT REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

| APPELLANTS | APPELLEE |
|---|---|
| Noah S. Bunker, Paul Carrell, Everett Brew Houston, Jr., W. Andrew Buchholz, Scott J. Leighty, Jad L. Davis, and Holly Clause | Tracy D. Strandhagen |
| Appellate Counsel: <br> Amanda G. Taylor <br> ataylor@textaxlaw.com <br> Texas Bar No. 24045921 <br> **MARTENS, TODD, LEONARD, TAYLOR & AHLRICH** <br> 301 Congress Avenue, Suite 1950 <br> Austin, Texas 78701 <br> Tele: (512) 542-9898 <br> Fax: (512) 542-9899 | Trial and Appellate Counsel: <br> Daniel Byrne <br> DByrne@FBHH.com <br> Lessie Fiztpatrick <br> LFitzpatrick@FBHH.com <br> Christine E. Burgess <br> CBurgess@FBHH.com <br> **FRITZ, BYRNE, HEAD & HARRISON, PLLC** <br> 98 San Jacinto Blvd, Suite 2000 <br> Austin, TX 78701 <br> Tele: (512) 476-2020 |
| Trial Counsel: <br> Kelly McDonald <br> kmcdonald@cmcdlaw.com <br> Carla Garcia Connolly <br> cconnolly@cmcdlaw.com <br> **CARLS, MCDONALD & DALRYMPLE, LLP** <br> 901 South MoPac Expressway <br> Barton Oaks Plaza <br> Building 1, Suite 280 <br> Austin, Texas 78746 <br> Tele: (512) 472-4845 <br> Fax: (512) 472-8403 | |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL .......................................................i

TABLE OF CONTENTS..............................................................................ii

INDEX OF AUTHORITIES ......................................................................... v

STATEMENT OF THE CASE ..................................................................... ix

RECORD ABBREVIATIONS....................................................................... x

STATEMENT REGARDING ORAL ARGUMENT......................................... xi

ISSUES PRESENTED ............................................................................. xii

STATEMENT OF FACTS........................................................................... 1

    I.     The Parties Entered a Series of Contracts Governing
           Their Medical Practice. ...................................................2

          A.     The Partners Promised to Stay With the Practice
                 for a Defined Period for Important Financial
                 Reasons.....................................................................4

          B.     The Partners Agreed to be Bound by a Liquidated
                 Damages Provision Regulating Early Departure
                 from their Practice. .................................................5

    II.    Strandhagen Departed the Practice Five Years Earlier
           than She had Contractually Agreed................................8

    III.   Strandhagen Filed Separate Proceedings Against the
           Company and her Physician Partners. .............................9

    IV.   The District Court Dismissed Part and Granted Part of
           the Declaratory Relief Strandhagen Sought Against the
           Physicians................................................................ 10

SUMMARY OF THE ARGUMENT............................................................ 12

ARGUMENT.................................................................................. 14

I.    The District Court Erred by Granting Strandhagen's
Motion for Summary Judgment...................................................... 14

    A.    Summary Judgment Standard of Review. .............................15

    B.    Strandhagen Failed to Satisfy her Summary-
Judgment Burden on the Essential Elements of
her Claim.......................................................................... 16

        1.    Strandhagen was required to conclusively
establish two elements. ..............................................17

        2.    Strandhagen conceded her inability to prove
the "difficulty of estimation" element......................... 22

        3.    Strandhagen failed to conclusively prove the
"unreasonable forecast" element................................. 23

            (a)    No evidence of actual damages. ........................ 23

            (b)    Plain language of contract shows
reasonable forecast. ..........................................30

            (c)    Fact issue exists regarding
modification. ....................................................... 33

    C.    Strandhagen Failed to Satisfy her Summary-
Judgment Burden Regarding the Physicians'
Status as Third-Party Beneficiaries. .................................... 35

        1.    The Operations Agreement Provides a
Direct Line of Liability................................................36

        2.    A Genuine Issue of Material Fact Remains
about the Physicians' Third-Party
Beneficiary Status....................................................... 37

II.    The District Court Erred by Denying Part of the
       Physicians' Plea to the Jurisdiction...............................................38

       A.    Texas Law Prohibits Advisory Declarations on
             Potential Defenses to Hypothetical Disputes. .....................38

       B.    Strandhagen's Claim Is Not Ripe.........................................43

PRAYER ......................................................................................................44

CERTIFICATE OF COMPLIANCE............................................................45

CERTIFICATE OF SERVICE.....................................................................45

APPENDIX:

       1.    Order Granting Summary Judgment (CR.212)

       2.    Order Granting in Part and Denying in Part Plea to the
             Jurisdiction (CR.184-185)

       3.    Order Denying Motion for New Trial (CR.271)

       4.    Operations Agreement (CR.162-183)

# INDEX OF AUTHORITIES

## CASES

*Alvarado v. Lexington Ins. Co.*,
   389 S.W.3d 544 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ....... 37

*Atmos Energy Corp. v. Abbott*,
   127 S.W.3d 852 (Tex. App.—Austin 2004, no pet.) ..........................40

*Baker v. Int'l Record Syndicate, Inc.*,
   812 S.W.2d 53 (Tex. App.—Dallas 1991, no writ)........................ 18, 25

*BHP Petro. Co. v. Millard*,
   800 S.W.2d 838 (Tex. 1990)............................................................42

*Brooks v. Northglen Ass'n*,
   141 S.W.3d 158 (Tex. 2004) .................................................. 39, 40, 41

*California Prods. v. Puretex Lemon Juice, Inc.*,
   334 S.W.2d 780 (Tex. 1960) ...........................................................40

*Chenault v. Phillips*,
   914 S.W.2d 140 (Tex. 1996) ............................................................39

*City of Euless v. Dallas/Fort Worth Int'l Airport Bd.*,
   936 S.W.2d 699 (Tex. App.—Dallas 1996, writ denied).....................39

*City of Pasadena v. Smith*,
   263 S.W.3d 80 (Tex. App.—Houston [1st Dist.] 2006, pet. denied)..39

*Farmers Ins. Exch. v. Rodriguez*,
   366 S.W.3d 216 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) 41

*Federal Deposit Ins. Corp. v. Lenk*,
   361 S.W.3d 602 (Tex. 2012)........................................................ 16, 17

*Flores v. Millennium Interests, Ltd.*,
  185 S.W.3d 427 (Tex. 2005)............................................................. 16

*GPA Holding, Inc. v. Baylor Health Care Sys.*,
  344 S.W.3d 467 (Tex. App.—Dallas 2011, pet. denied)............. *passim*

*Healix Infusion Therapy, Inc. v. Bellos*,
  No. 11-02-00346-CV, 2003 WL 22411873 (Tex. App.—Eastland
  Oct. 23, 2003, no pet.) ............................................................20, 24

*In re City of Dallas*,
  977 S.W.2d 51 (Tex. App.—Fort Worth 1998, orig. proceeding)........40

*In re Kasschau*,
  11 S.W.3d 305 (Tex. App.—Houston [14th Dist.] 1999,
  orig. proceeding) ............................................................................34

*In re Poly-Am., L.P.*,
  262 S.W.3d 337 (Tex. 2008) .............................................................33

*Khan v. Meknojiya*,
  No. 03-11-00580-CV, 2013 WL 3336874 (Tex. App.—Austin
  June 28, 2013, no pet.) ........................................................ 16, 19, 21

*Landry's Seafood Restaurants, Inc. v. Waterfront Cafe, Inc.*,
  49 S.W.3d 544 (Tex. App.—Austin 2001, pet. dism'd) .......................17

*LHR Enters., Inc. v. Geeslin*,
  No. 03-05-00176-CV, 2007 WL 3306492 (Tex. App.—Austin
  Nov. 7, 2007, pet. denied)...........................................................40, 42

*Murphy v. Cintas Corp.*,
  923 S.W.2d 663 (Tex. App.—Tyler 1996, writ denied) .......... 21, 28, 30

*Nexstar Broad., Inc. v. Gray*,
    No. 09-07-00364-CV, 2008 WL 2521967 (Tex. App.—Beaumont
    2008, no pet.) ....................................................................... 21, 41, 42

*Patterson v. Planned Parenthood*,
    971 S.W.2d 439 (Tex. 1998) ........................................................40

*Paulsen v. Texas Equal Access to Justice Found.*,
    23 S.W.3d 42 (Tex. App.—Austin 1999, pet. denied)........................40

*Phillips v. Phillips*,
    820 S.W.2d 785 (Tex. 1991).................................................16, 23, 24

*Sealock v. Texas Fed. Sav. & Loan Assoc.*,
    755 S.W.2d 69 (Tex. 1988)........................................................... 25

*Southern Union Co. v. CSG Sys., Inc.*,
    No. 03-04-00172-CV, 2005 WL 171349 (Tex. App.—Austin
    Jan. 27, 2005, no pet.) ............................................................ *passim*

*State v. Margolis*,
    439 S.W.2d 695 (Tex. Civ. App.—Austin 1969, writ ref'd n.r.e.)........ 42

*Tex. Ass'n of Bus. v. Tex. Air Control Bd.*,
    852 S.W.2d 440 (Tex. 1993) ........................................................ 39

*Texas Dep't of Pub. Safety v. Moore*,
    985 S.W.2d 149 (Tex. App.—Austin 1998, no pet.)........................... 39

*Texas Dept. of Crim. Justice-Cmty. Justice Assistance Div. v. Campos*,
    384 S.W.3d 810 (Tex. 2012)........................................................ 14

*Thomas v. Graham Mortg. Corp.*,
    408 S.W.3d 581 (Tex. App.—Austin 2013, pet. denied).....................15

*Transcont'l Realty Investors, Inc. v. Orix Capital Markets, LLC,*
    353 S.W.3d 241 (Tex. App.—Dallas 2011, pet. denied) ...................... 41

*Triton 88, LP v. Star Electricity, LLC,*
    411 S.W.3d 42 (Tex. App.—Houston [1st Dist.] 2013, no pet.) .....20, 24

*Valence Operating Co. v. Dorsett,*
    164 S.W.3d 656 (Tex. 2005) .............................................................15

*Waco Indep. Sch. Dist. v. Gibson,*
    22 S.W.3d 849 (Tex. 2000)...............................................................40

## STATUTES & RULES

TEX. CONST. art. II, § 1...................................................................40

Tex. R. App. P. 39.1 ....................................................................... xi

Tex. R. App. P. 39.2 ....................................................................... xi

Tex. R. App. P. 43.2 ...................................................................... 14

Tex. R. App. P. 43.3 ...................................................................... 14

Tex. R. App. P. 43.4 ......................................................................44

Tex. R. Civ. P. 139.........................................................................44

Tex. R. Civ. P. 166a.......................................................................15

Tex. R. Civ. P. 94 .......................................................................... 16

## OTHER AUTHORITIES

RESTATEMENT (SECOND) OF CONTRACTS § 356.........................................28, 29

## STATEMENT OF THE CASE

| | |
|---|---|
| **Nature of the Case** | This appeal arises from Appellee Dr. Tracy Strandhagen's declaratory judgment claims against seven of her former partners in the Austin Anesthesiology Group ("AAG"), Appellants Drs. Noah S. Bunker, Paul Carrell, Everett Brew Houston, Jr., W. Andrew Buchholz, Scott J. Leighty, Jad L. Davis, and Holly Clause (collectively, "the Physicians"). Strandhagen sought declarations against them that (1) she was terminated without cause, meaning the liquidated damages provision in the parties' contract would be inapplicable to her; and (2) the liquidated damages provision was an unenforceable penalty. (CR.4-9). |
| **Course of Proceedings** | The Physicians filed a Plea to the Jurisdiction seeking dismissal of Strandhagen's claims. (CR.77-84). The trial court granted the Plea as to ground (1) and denied it as to ground (2). (CR.184; Appx. 2).<br><br>Strandhagen then filed a Motion for Summary Judgment on ground (2). (CR.154-159). |
| **Trial Court Disposition** | The trial court granted Strandhagen's Motion, declaring the liquidated damages provision to be an unenforceable penalty. (CR.212; Appx. 1). This resulted in a Final Judgment.<br><br>The Physicians filed a Motion for New Trial, urging in regard to ground (2) of Strandhagen's claim that it was error to deny the Physicians' Plea and to grant Strandhagen's Motion. (CR.213-227). Following a hearing, the trial court denied the Physicians' Motion for New Trial. (CR.271; RR.1-29; Appx. 3). The Physicians timely perfected appeal. (CR.272-273). |

# RECORD ABBREVIATIONS

| Abbreviation | Meaning |
|---|---|
| **"CR"** | The primary Clerk's Record, pages 1-286, filed on 10/15/14. *A "supplemental" clerk's record was subsequently filed on 10/30/14 (for reasons unknown to the Physicians) containing duplicates of documents already in the primary CR.* *A second "supplemental" clerk's record was filed on 12/22/14 containing the order directing transfer of the sealed documents referenced below.* *The Physicians do not cite to either portion of the "supplemental" record.* |
| **"Sealed.CR"** | A sealed document (Strandhagen's Employment Agreement), filed as an original exhibit on 12/22/14. The Physicians' citations to the Sealed.CR correlate to the actual portions of the Employment Agreement, whether it be a numbered page of the contract or an Appendix thereto, because the District Clerk did not assign separate "record pages" to this original document. |
| **"RR"** | The Reporter's Record, pages 1-29, which was filed on 9/25/14. This is the transcript from the hearing on the Physicians' Motion for New Trial. |

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument should be granted because it will aid the decisional process by allowing the Court clarify and further develop the unique facts and legal issues in this case. *See* Tex. R. App. P. 39.1, 39.2.

This case presents unique facts borne from Strandhagen's decision to file a preemptive lawsuit against the Physicians while simultaneously pursuing a separate yet related claim in a different forum against their parent company. This case also presents important and unsettled legal questions as applied to these facts, including: (1) What elements of proof are required to prevail on an affirmative defense of "unenforceable penalty?", and (2) When is a declaratory judgment claim sufficiently ripe for review?

# ISSUES PRESENTED

**Issue 1:** Was it reversible error for the district court to grant Strandhagen's traditional motion for summary judgment declaring the parties' liquidated damages provision to be an unenforceable penalty?

**Issue 2:** Was it reversible error for the district court to deny the portion of the Physicians' Plea to the Jurisdiction contending that Strandhagen's claim was not yet ripe for decision?

## STATEMENT OF FACTS

Dr. Tracy Strandhagen, an anesthesiologist, left her medical practice group approximately five years prior to the expiration of the seven-year term that she had contractually agreed to work. (CR.160; Sealed.CR.12). Before Strandhagen's partners decided whether to sue her for breach of contract or other claims, Strandhagen filed this preemptive lawsuit seeking judicial declarations that would preclude her partners from recovering against her under the liquidated damages provision of the parties' contract if they decided to bring a future claim against her. (CR.4-9). Strandhagen named as defendants seven individual partners, who were the then-current members of the practice group's Advisory Board (Appellants Dr. Noah S. Bunker, Dr. Paul Carrell, Dr. Everett Brew Houston, Jr., Dr. W. Andrew Buchholz, Dr. Scott J. Leighty, Dr. Jad L. Davis, and Dr. Holly Clause) (collectively, "**the Physicians**"). (CR.1-3, 162, 179).[1] The trial court granted declaratory relief in favor of Strandhagen. (CR.212, 271). The Physicians urge this Court to reverse that decision.

---

[1]  Although Strandhagen appears to have chosen these defendants based on their prior service on the Board, she sued them in their individual capacities, not in their capacities as Board members.

## I. THE PARTIES ENTERED A SERIES OF CONTRACTS GOVERNING THEIR MEDICAL PRACTICE.

Tracy Strandhagen and approximately sixty other anesthesiologists were members of the Austin Anesthesiology Group ("**AAG**"). (CR.38, 160). In October 2011, they collectively decided to sell 100% of their outstanding interests in AAG to American Anesthesiology of Texas ("**AAT**" **or** "**the Company**")[2] pursuant to a Membership Interest Purchase Agreement ("**the Purchase Agreement**"). (CR.38, 77, 155, 162).[3] The anesthesiologists thereby became "physician partners" of AAT ("**the Partners**").[4] (CR.162). In connection with this transaction, the Company and the Partners entered two types of additional contracts. (CR.162, 186-187).

First, the Company and the Partners entered an Advisory Board and Internal Operations Agreement ("**the Operations Agreement**"). (CR.77, 162-183; Appx. 4). This agreement (1) established the duties, powers, and

---

[2]    AAT is an indirect subsidiary of a national medical services provider, Mednax, Inc. (CR.6, 80; Sealed.CR.11).

[3]    A copy of the Purchase Agreement is not included in the record. It is referenced, however, by the other contracts contained therein. (*See* CR.162; Sealed.CR.1).

[4]    Under the assorted agreements, the anesthesiologists are referred as the "Physicians," "Partners," and/or "Physician Partners." Herein, when referenced as an entire group, they will be called the "Partners." To distinguish this from references to the seven, individual physicians named as defendants in this lawsuit, the latter will be called the "Physicians."

procedures of the Partners' Advisory Board, Medical Director, and Partners' Representative; (2) identified the individuals who would serve the initial terms of those positions; and (3) set forth the obligations owed by each physician to the other Partners and the Company. (*Id.*).

Second, the Company entered separate **Employment Agreements** with each of the Partners "to protect the business interests and goodwill of [the Company] and to promote the effective administration and continuation of the Practice." (Sealed.CR.1, 3, 12; *see also* CR.111, 155, 166-167).[5]  As shown by Strandhagen's contract, the Employment Agreements set forth, *inter alia*, (1) the duties, services, and standards of conduct that the Partners promised to provide; (2) the parties' billing and compensation agreements; and (3) the terms of the Partners' non-competes. (Sealed.CR.1-12, 24).  Importantly, the Employment Agreements specified a set number of years that each Partner agreed to work for the practice ("**the Initial Term**").  (CR.167; Sealed.CR.12).  Strandhagen's contract specified that "the term of [the Employment Agreement] shall be a period of seven (7) years," which would expire in approximately October 2018. (Sealed.CR.12).[6]

---

[5]  Strandhagen's Employment Agreement was submitted as a sealed, *in camera* "Exhibit A-1" as part of the summary-judgment record and in connection with the Motion for New Trial.  (CR.146-147, 150-152, 271; Sealed.CR; RR.23-24, 28).

## A. The Partners Promised to Stay With the Practice for a Defined Period for Important Financial Reasons.

The Partners' agreements to stay with the practice for a designated period of time was tied to the amount of monetary consideration they received under the Purchase Agreement. (*See* CR.144, 167-168). Their collective agreements to stay for a designated number of years also had important financial implications for the practice. First, each of the physicians brought to the practice many years of experience and goodwill that could not be readily replaced in the event of an early departure. (*See* Sealed.CR.1). Strandhagen's Employment Agreement reflects that she, like her Partners, "ha[d] practiced medicine in the Specialty for many years and [] developed substantial personal goodwill, including business contacts, reputation, and other relationships in the health care industry." (Sealed.CR.1).

Beyond the Partners' goodwill value, the profitability of their practice also depended on each Partner working a designated shift schedule, as determined by the Medical Director. (CR.168; Sealed.CR.2-3). They worked in "units" to fulfill the schedule, which required the cooperation and dedication of each Partner. (Sealed.CR.2, 7, Annex A, B). Fulfillment

---

[6] It appears that the majority of the Partners, like Strandhagen, agreed to seven-year terms while seven of them negotiated shorter terms of employment. (*See* CR.168; Sealed.CR.12).

of these obligations allowed the practice to earn annual gross profits, which directly affected the Partners' ability to earn annual incentive bonuses. (CR.187; Sealed.CR.9, Annex A, B).

**B. The Partners Agreed to be Bound by a Liquidated Damages Provision Regulating Early Departure from their Practice.**

In recognition of the financial importance of the Partners remaining with the practice for the entire duration of their agreed-upon terms, they collectively agreed to be bound by a liquidated damages provision stating that, if a Partner departed the practice early, he or she would be liable to the remaining Partners for a specified amount of damages, subject to certain exceptions. (CR.168). More specifically, the Operations Agreement provided that—given (1) the consideration received by the Partners under the Purchase Agreement and the calculation of bonuses based upon the profits of the Company, and (2) the Partners' agreements to work for a specified Initial Term—if any Partner departed early, the others "may suffer harm, including, without limitation, increased workloads necessitated by such termination, material impairment of the ability of the Physicians to earn bonuses, . . . material impairment of the Physicians' relationships with hospitals and other [parties] . . ., and hiring and training costs related to replacement physicians." (CR.167-168, 187).

The Partners "acknowledge[d] and agree[d]" that such that damages would be difficult to prove, and that it would otherwise be inconvenient or non-feasible to obtain another adequate remedy. (CR.168). Thus, they agreed that if any Partner terminated his or her employment prior to the expiration of the Initial Term (with some exceptions, as discussed below), then he or she would pay the remaining Partners "**as liquidated damages and not as a penalty**, the amount set forth below." (CR.168) (emphasis added).

The majority of the sixty Partners agreed to be bound by a liquidated damage amount of $500,000. (CR.156, 168). Seven others negotiated individual liquidated damages amounts between $240,000 and $400,000, presumably tied to having negotiated shorter "Initial Terms" of employment. (CR.168). The Partners "each **acknowledge[d] and agree[d] that the Liquidated Damages Amount is reasonable** in light of the anticipated harm which would be caused by a Terminating [Partner's] breach of or default under this Agreement, the difficulty of proof of loss, the inconvenience and non-feasibility of otherwise obtaining an adequate remedy, and the value of the transactions to be consummated under the Purchase Agreement and the other Transaction Documents." (CR.168) (emphasis added).

The Partners agreed to several exceptions in which the liquidated damages provision would not be enforced.  First and foremost, a Partner would not be liable for liquidated damages if the Company terminated the Partner's employment without cause prior to expiration of the Initial Term.  (CR.168).  The Employment Agreement specified events that would provide the Company "cause" for termination.  (Sealed.CR.13-18). Second, a Partner would not be liable for liquidated damages if his or her employment ended early due to the Partner's death or disability, a down-sizing of the company, or similar specified exceptions.  (CR.169).  Finally, each Partner had the option of petitioning for permission by the majority to terminate his or her employment early without payment of liquidated damages in the event of "unforeseen circumstances" or "to provide other services to the Company or its Affiliates."  (CR.169).

The Partners expressly acknowledged the importance of these provisions.  The Operations Agreement states that their "agreement to be bound by the covenants set forth herein, which [] are narrowly tailored and necessary to protect the Physicians' legitimate interests as a group," constituted a "significant inducement to [the Partners] entering into the Purchase Agreement and consummating the transaction contemplated thereby." (CR.162).

## II. STRANDHAGEN DEPARTED THE PRACTICE FIVE YEARS EARLIER THAN SHE HAD CONTRACTUALLY AGREED.

Under Strandhagen's Employment Agreement, the initial seven-year term of her employment was not set to expire until approximately October 2018. (Sealed.CR.12). Strandhagen's employment was terminated five years early, between July-September 2013. (CR.88, 160, 187).

Strandhagen claimed she was constructively discharged on the basis of gender discrimination in July 2013. (CR.88, 93, 101). If that were true, it would provide a "terminated without cause" exception to her liability under the liquidated damages provision. (CR.168). To the contrary, the Company claimed that, following a series of disciplinary infractions, Strandhagen quit or was terminated with cause in September 2013. (CR.103, 144). Under that circumstance—whether Strandhagen resigned without first obtaining permission from the majority of her partners for an early departure or was rightfully terminated for engaging in detrimental conduct, failing or refusing to adhere to specified policies and standards, or breaching other terms of her Employment Agreement—Strandhagen would be liable for payment of liquidated damages. (CR.167-169; Sealed.CR.13-15).

## III. STRANDHAGEN FILED SEPARATE PROCEEDINGS AGAINST THE COMPANY AND HER PHYSICIAN PARTNERS.

In approximately December 2013, Strandhagen filed an employment-discrimination complaint against the Company with the Texas Workforce Commission, Civil Rights Division and the EEOC. (CR.39, 80, 85-87, 91-92). Despite having not made any representation of discrimination in connection with the buyout just two months earlier, Strandhagen now claimed that she had suffered such discrimination "for many years." (CR.93, 144). The primary issue in Strandhagen's proceeding against the Company was, therefore, whether she was terminated with or without cause (*i.e.*, whether Strandhagen's termination resulted from her misconduct or was based on gender discrimination).

While those administrative claims were pending, Strandhagen initiated this suit in the Travis County District Court against seven of her Partners: Drs. Bunker, Carrell, Houston, Buchholz, Leighty, Davis, and Clause ("the Physicians"). (CR.4). Strandhagen's sole cause of action was a declaratory judgment claim. (CR.40). She sought declarations that:

9

(1)     she was terminated without cause, meaning the liquidated damages provision is inapplicable to her; and

(2)     the liquidated damages provision is an unenforceable penalty because:

    (a)     the resulting harm from Strandhagen's early termination was not incapable or difficult of estimation,

    (b)     the liquidated damages amount is not a reasonable forecast of just compensation, and

    (c)     it purports to render her liable to the Physicians for a breach of her Employment Agreement to which they are not parties or third-party beneficiaries.

(CR.40-41).

## IV. THE DISTRICT COURT DISMISSED PART AND GRANTED PART OF THE DECLARATORY RELIEF STRANDHAGEN SOUGHT AGAINST THE PHYSICIANS.

The Physicians filed a Plea to the Jurisdiction seeking dismissal of both grounds of Strandhagen's declaratory judgment claim. (CR.70, 77). The Physicians argued: (1) Strandhagen's request to declare whether or not she was terminated for cause duplicated the primary issue pending before the TWC/EEOC, and she was required to exhaust her administrative remedies first; and (2) Strandhagen's challenge to the liquidated damages provision was not ripe because the Physicians had not made any demand nor sued her to collect such damages. (CR.79-80). The district court (the

10

Honorable Steven Yelenosky presiding) granted the first argument, thereby dismissing ground (1) of Strandhagen's declaratory judgment claim, and denied the second, maintaining jurisdiction over ground (2) of Strandhagen's claim. (CR.184). Strandhagen does not appeal the dismissal of ground (1) of her claim.

Strandhagen then moved for a traditional summary judgment granting ground (2) of her claim. In so doing, she abandoned her contention that (a) the resulting damages would be incapable or difficult of estimation, instead arguing only that the liquidated damages provision was unenforceable as a matter of law because (b) the amount to be paid was not a reasonable forecast of just compensation, and (c) the Physicians were not third-party beneficiaries of her Employment Agreement. (CR.154, 196). Following the Physicians' Response, further briefing by both parties, and a hearing, the district court (the Honorable Orlinda Naranjo presiding) granted Strandhagen's motion. (CR.186-212). Without specifying any grounds, the Court "declare[d] that the $500,000 purported liquidated damages clause in the . . . Operations Agreement is an unenforceable penalty," and denied all other relief not expressly granted. (CR.212). This resulted in a final judgment. (CR.212).

The Physicians filed a Motion for New Trial urging several reasons why the grant of summary judgment was improper, as argued below. (CR.213-250). The Court denied the motion following a hearing on its merits. (CR.271; RR.1-29). The Physicians appealed. (CR.272-78).

## SUMMARY OF THE ARGUMENT

This Court must decide whether to uphold the plain language of a contract that was mutually-agreed to by parties of equal sophistication or, instead, allow one of those parties (Strandhagen) to secure a premature avoidance of the contractual liability provision before any actual dispute has arisen and without sufficient evidence to support her request. The district court improperly refused to enforce the parties' contract and granted Strandhagen advisory relief. This Court should reverse those errors.

The first issue is whether the district court erred in granting Strandhagen a traditional summary-judgment when she failed to satisfy her burden of conclusively proving each element of her affirmative defense that the liquidated damages provision in the parties' Operations Agreement is an unenforceable penalty. The answer is yes. The summary-judgment order should be reversed.

Strandhagen failed to establish the two essential elements of her claim. She unequivocally abandoned the first element (that damages resulting from her breach would be difficult to estimate), and she failed to offer conclusive proof of the second element (that the liquidated amount was an unreasonable forecast of the actual damages). In regard to the latter, Strandhagen (a) offered no evidence of the actual damages to establish an unreasonable disparity; (b) her contentions ignore the plain language of the contract; and (c) in any event, a fact issue exists about whether the court should modify the liquidated amount rather than strike it all together.

Strandhagen also failed to establish that it was necessary for the Physicians to be third-party beneficiaries of her Employment Agreement to enforce the liquidated damages provision under their own Operations Agreement. Even had such status been required, Strandhagen did not satisfy her summary-judgment burden of conclusively negating its existence.

The second issue is whether the district court erred in denying the portion of the Physicians' Plea to the Jurisdiction arguing that Strandhagen's declaratory judgment claim was unripe. Again, the answer is yes. The partial denial of the Plea should be reversed. This presents an

alternative basis to reverse the summary judgment because such relief should not have been granted in the absence of jurisdiction. Strandhagen's claim misuses the Declaratory Judgment Act by seeking an advance ruling on a potential affirmative defense to a dispute that has not yet (and may never) come to exist. As such, the district court's grant of a declaration in her favor was advisory and improper.

## ARGUMENT

In two issues, the Physicians respectfully request that this Court reverse the district court's (1) grant of Strandhagen's traditional Motion for Summary Judgment on her declaratory judgment claim, and (2) partial denial of the Physician's Amended Plea to the Jurisdiction. If the latter is reversed, then a judgment dismissing Strandhagen's claims should be rendered in favor of the Physicians. *See Texas Dept. of Crim. Justice-Cmty. Justice Assistance Div. v. Campos*, 384 S.W.3d 810, 812 (Tex. 2012). Otherwise, the case should be remanded for further proceedings. Tex. R. App. P. 43.2, 43.3.

## I. THE DISTRICT COURT ERRED BY GRANTING STRANDHAGEN'S MOTION FOR SUMMARY JUDGMENT.

Strandhagen's Motion for Summary Judgment should have been denied because she failed to conclusively establish (1) the essential

14

elements of her claim and (2) that the status of the Physicians as third-party beneficiaries to her Employment Agreement had any impact on the enforceability of the liquidated damages provision. In any event, as argued under Issue 2, the court erred in granting summary judgment on a hypothetical (unripe) question because it lacked subject-matter jurisdiction to do so.

## A. Summary Judgment Standard of Review.

This Court reviews the grant of summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). Appellate courts "review the evidence presented in the motion and the response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Thomas v. Graham Mortg. Corp.*, 408 S.W.3d 581, 588 (Tex. App.—Austin 2013, pet. denied). "A movant is entitled to traditional summary judgment if (1) there are no genuine issues as to any material fact and (2) the moving party is entitled to judgment as a matter of law." *Id.* (citing Tex. R. Civ. P. 166a(c)).

**B.    Strandhagen Failed to Satisfy her Summary-Judgment Burden on the Essential Elements of her Claim.**

Strandhagen moved for a traditional summary judgment declaring that the liquidated damages provision in the Operations Agreement is an unenforceable penalty. (CR.154). "The term 'liquidated damages' ordinarily refers to an acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach." *Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427, 431 (Tex. 2005).

Although Strandhagen was the plaintiff, her declaratory judgment claim—which was filed preemptively in attempt to avoid potential liability under the liquidated damages provision—was in the nature of an affirmative defense. "Whether a contractual provision is an unenforceable penalty and not a liquidated damage clause is an affirmative defense." *GPA Holding, Inc. v. Baylor Health Care Sys.*, 344 S.W.3d 467, 471 (Tex. App.— Dallas 2011, pet. denied) (citing Tex. R. Civ. P. 94; *Phillips v. Phillips*, 820 S.W.2d 785, 789 (Tex. 1991)); *Khan v. Meknojiya*, No. 03-11-00580-CV, 2013 WL 3336874, *2 (Tex. App.—Austin June 28, 2013, no pet.) (same). When a movant seeks a traditional summary judgment on an affirmative defense, the movant carries the burden of demonstrating her entitlement to judgment as a matter of law by conclusively proving <u>each element</u> of the affirmative defense. *Federal Deposit Ins. Corp. v. Lenk*, 361 S.W.3d 602,

609 (Tex. 2012); *Landry's Seafood Restaurants, Inc. v. Waterfront Cafe, Inc.*, 49 S.W.3d 544, 547 (Tex. App.—Austin 2001, pet. dism'd).

Strandhagen agrees that she bore the burden of proof on her affirmative defense of penalty. (CR.195-196, 262). Strandhagen and the Physicians disagree, however, about which elements she was required to prove to be entitled to summary judgment. The Physicians argue she had to prove *two* elements, while Strandhagen claims she had to prove only *one or the other*. (CR.188-189, 196, 262).

Although the Texas Supreme Court has not definitively answered this legal question, several intermediate courts—*including this one*—have reached the conclusion urged by the Physicians. *See infra.* In any event, because Strandhagen failed to conclusively prove *both* elements, the orders granting her summary judgment and denying the Physicians' Motion for New Trial should be reversed. (RR.14).

**1. Strandhagen was required to conclusively establish two elements.**

The most on point opinion is *GPA Holding*, 344 S.W.3d at 476. Like Strandhagen, GPA moved for summary judgment urging that the liquidated damages clause in its contract with Baylor was an unenforceable penalty. *Id.* The Dallas Court held that, "[t]o obtain summary judgment on the

17

affirmative defense of penalty, GPA [as the party seeking to avoid enforcement of the provision] must prove **each element** of the defense." *Id.* (emphasis added). GPA's required elements were that: (1) the harm resulting from a breach was not incapable or difficult of estimation, and (2) the amount of liquidated damages provided by the contract was not a reasonable forecast of actual damages. *Id.*; *see also Baker v. Int'l Record Syndicate, Inc.*, 812 S.W.2d 53, 55 (Tex. App.—Dallas 1991, no writ) ("Evidence related to the difficulty of estimation and the reasonable forecast must be viewed as of the time the contract was executed.").

"**The difficulty (or lack of difficulty) in estimation as well as the unreasonableness of the damages estimate were GPA's to prove.** General statements about a 'more reasonable' or 'modest' rate are not evidence that the harm from late payment is difficult to estimate, or that the normal billed charges were an unreasonable forecast of the loss actually sustained." *GPA Holding*, 344 S.W.3d at 476 (emphasis added). "Because GPA did not meet its burden of establishing that the clause . . . was an unenforceable penalty," the trial judge did not err in denying GPA's motion for summary judgment on this issue." *Id.*

This Court reached the same conclusion following a jury trial in *Southern Union Co. v. CSG Systems, Inc.*, No. 03-04-00172-CV, 2005 WL

171349, *4 (Tex. App.—Austin Jan. 27, 2005, no pet.). Southern Union argued that the damages provision was an unenforceable penalty. *Id.* This Court held that "[t]he party challenging the award of liquidated damages has the **burden to establish that the two-prong test is not satisfied** and that, instead, the award of liquidated damages is an unenforceable penalty." *Id.* at *4 (emphasis added). The Court then discussed whether Southern Union satisfied the "first part of its burden" regarding "difficulty of estimation" and the "second part of its burden" regarding "reasonable forecast of just compensation." *Id.* at *4-6. Concluding that Southern Union failed to prove either essential element, the Court affirmed the award of liquidated damages, subject to a partial remittitur on another issue. *Id.* at *7-8.

More recently, in *Khan v. Meknojiya*, 2013 WL 3336874 at *2, Mekonjiya moved for summary judgment on the affirmative defense of penalty. In considering whether the district court properly denied that motion, this Court stated that, "to be entitled to summary judgment, Meknojiya had to conclusively establish **every element** of this defense," and then set forth the two elements regarding (1) incapable or difficult of estimation, and (2) reasonable forecast of compensation. *Id.* at *2-3

(emphasis added) (ultimately holding that the provision was not one for liquidated damages and thus the penalty analysis was inapplicable).

The Eastland Court of Appeals also held that a party seeking to avoid enforcement of a liquidated damages provision on summary judgment must prove both elements of the penalty affirmative defense. *Healix Infusion Therapy, Inc. v. Bellos*, No. 11-02-00346-CV, 2003 WL 22411873, *2 (Tex. App.—Eastland Oct. 23, 2003, no pet.). The Court held that "the burden Healix [as the party claiming penalty] must bear [is] that at the time the agreement was made damages could be easily ascertained **and** that the amount of the liquidated damages award was not a reasonable forecast of just compensation." *Id.* (emphasis added). Healix's contention "that the award of liquidated damages is disproportionate to actual damages" was insufficient on its own. *Id.* "Healix still must show that, at the time the agreement was made, the amount of the liquidated damages was not a reasonable forecast." *Id.* "Healix failed to meet his burden of proof on the penalty issue." *Id.* at *3.

Other courts have reached similar conclusions. *See Triton 88, LP v. Star Electricity, LLC*, 411 S.W.3d 42, 62 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (favorably citing *GPA Holding* and concluding "Triton failed to raise a fact question on its claim that the . . . clause constituted an

20

impermissible penalty," where Triton "did not present any evidence regarding the parties' ability to estimate actual damages . . . or what a reasonable forecast of damages would have been at the time the contract was formed."); *Murphy v. Cintas Corp.*, 923 S.W.2d 663, 666 (Tex. App.—Tyler 1996, writ denied) ("For the provision to be an unenforceable penalty, the uncertainty of the damages **and** the reasonableness of the stipulation must have existed at the time when the contract was executed." Where neither element was proven, the clause was held enforceable.) (emphasis added).

The Physicians acknowledge that contrary authority exists in which courts have not required proof of both elements before concluding the provision to be a penalty. *See, e.g., Nexstar Broad., Inc. v. Gray*, No. 09-07-00364-CV, 2008 WL 2521967 (Tex. App.—Beaumont 2008, no pet.) (holding liquidated damages provision to be an unenforceable penalty because it was an unreasonable forecast of just compensation without discussion of the difficulty of estimation element); (RR.9-10).

However—given the black-letter law that a movant seeking traditional summary judgment on its affirmative defense is required to prove <u>every</u> element of its defense, coupled with prior holdings of this Court (*Southern Union* and *Kahn*) and the case most on point (*GPA Holdings*) requiring

proof of both elements to prevail on the affirmative defense of penalty—the Physicians urge this Court to conclude Strandhagen was required to establish both elements, and decline to follow opinions to the contrary. Consequently, this Court should reverse the judgment if it concludes that Strandhagen failed to conclusively establish *either* one of the two required elements that (1) the harm resulting from a breach was not incapable or difficult of estimation (*i.e.*, the harm could be easily and accurately estimated), *or* (2) the amount of liquidated damages provided by the contract was not a reasonable forecast of actual damages (*i.e.*, the liquidated damages amount was excessive compared to the actual damages resulting from a breach).

But even if this Court were to conclude that Strandhagen was required to prove only one element of her affirmative defense, reversal of the judgment is still necessitated by the fact that Strandhagen failed to conclusively prove *both* of the foregoing elements.

### 2. Strandhagen conceded her inability to prove the "difficulty of estimation" element.

Strandhagen unequivocally admitted that "[s]he does not seek to negate the element concerning the difficulty of estimation . . .; she only seeks to negate the second element." (CR.196, 263). The record leaves no

doubt that Strandhagen failed to carry her burden of proof on this element. The summary judgment should be reversed accordingly.

### 3. Strandhagen failed to conclusively prove the "unreasonable forecast" element.

Strandhagen did not satisfy her summary-judgment burden of proving that the liquidated damages amount failed to reasonably forecast actual damages because (a) she offered no evidence to demonstrate what the actual damages were or that there was an excessive disproportion between the amounts; (b) to accept her argument, this Court must disregard the plain language of the contract; and (c) a genuine issue of material fact remains about whether the liquidated damages clause should be modified rather than struck as unenforceable.

### (a) No evidence of actual damages.

#### (i) *Texas law requires proof of actual damages.*

Although the question of "[w]hether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law for the court to decide, [s]ometimes . . . factual issues must be resolved before the legal question can be decided." *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991). Our supreme court identified a typical fact issue in connection with the "unreasonable forecast" element arising

from the movant's requirement to "prove what the actual damages were" in comparison to "the amount contracted for." *Id.* The party claiming the provision is a penalty "must prove actual damages, if any, to show that the actual loss was not an approximation of the stipulated sum." *Healix*, 2003 WL 22411873 at *2.

Where a party fails to offer <u>any</u> evidence of actual damages in comparison to the liquidated amount, the court may conclude that the party has failed to carry its burden of proof and uphold the liquidated damages provision. *See e.g., Triton*, 411 S.W.3d at 62 ("Triton did not present any evidence regarding what a reasonable forecast of damages would have been at the time the contract was formed, nor did it present any evidence of StarTex's actual damages. Thus, . . . [the] liquidated damages [clause] provided a reasonable forecast of just compensation.").

Additionally, vague averments of "unreasonableness" not supported by actual evidence will not suffice to establish the defense of penalty. The movant cannot meet its burden simply by claiming that the actual damages are not yet ascertainable and therefore tantamount to "zero." *Healix*, 2003 WL 22411873 at *2. And as noted by this Court, a liquidated damages amount awarding two to three times the amount of actual damages is not *per se* unreasonable. *Southern Union*, 2005 WL 171349 at *6 (citing

*Sealock v. Texas Fed. Sav. & Loan Assoc.*, 755 S.W.2d 69, 70 (Tex. 1988) ("uph[olding] a trial court's judgment awarding $790,000 in liquidated damages, which was twice the $395,000 found as actual damages"); *Baker v. Int'l Record Syndicate, Inc.*, 812 S.W.2d 53, 56 (Tex. App.—Dallas 1991, no writ) ("approv[ing] a liquidated damages award of $51,000, which was more than triple the $15,000 found as actual damages").

In *GPA Holding*, 344 S.W.3d at 476, the movant "offered evidence comparing the discounted rates to the hospital's normal billed rates for the charges at issue," including an affidavit with an attached chart showing "the percentage difference between the discounted rate and the normal billed charge for each of the charges at issue," and presented argument about an alternative damage calculation that the movant contended would be more reasonable. Even this was not enough. The court held that movant failed to carry its burden of proof on the "unreasonable forecast" element because it failed to attach evidence in support of the alternative calculation. *Id.*

       (ii) <u>Strandhagen offered no proof of actual damages, and her "one size fits all" argument fails</u>.

Strandhagen offered no evidence of what the Physicians' actual damages were or would be in the event that they brought a future suit against her for breach of contract nor did she establish any alternative

damages calculation that she would contend is more reasonable. Instead, Strandhagen claimed that, as a matter of law, the liquidated damage amount was unreasonable because it was a "one size fits all" provision, *i.e.*, the same amount of damages would be owed regardless of when she terminated her employment. (CR.157, 197-98, 264). This contention is insufficient without any proof of how the liquidated damage amount was calculated or what the actual damages were.

Strandhagen relied on cases holding that a liquidated damages provision may be unenforceable if it imposes the same amount of liability for breaches that are both trivial and severe. (CR.198). This is not the case under the Operations Agreement. Here, the liquidated damages provision applies to only one form of breach: a Partner's early departure from the practice. (CR.167-168). It does not apply, for example, to non-material breaches like the Advisory Board's failure to hold a regular meeting (CR.163) or its failure to take a written vote upon request (CR.164).

Strandhagen attempts to transform the *time* of the breach into a measure of its *materiality*. But Strandhagen presented no evidence to establish that the financial impact on the remaining Partners would be substantially greater or lesser depending on the timing of another Partner's early departure. As previously discussed, important financial reasons

supported the Partners' agreement to be bound by this liquidated damages clause, including the anticipated impact that one's early departure would have on the practice's gross profits and the Partners' abilities to earn annual bonuses, as well as the resulting loss of experience and goodwill, which could not be easily or quickly replaced. *Supra*, Statement of Facts Section I.A. These financial considerations could be the same whether Strandhagen quit on day 1 or day 1,000. Strandhagen offered no evidence to prove otherwise. Instead, she simply claimed that "the consequences of Dr. Strandhagen's employment terminating obviously varies over time." (CR.157). This unsupported allegation does not suffice to meet her burden.

Strandhagen's "one size fits all" contention also fails in light of the several exceptions to the liquidated damages provision. (CR.167-169). Several types of "early departures" were carved out from application off the provision. These exceptions eliminate the imposition of any liability for early termination scenarios that would not constitute a material breach of the contract (such as early termination based on disability or with permission by the majority). Hence, the clause was narrowly drafted, not an unenforceable "one size fits all" provision.

Moreover, relevant legal authorities are contrary to Strandhagen's contention. The fact that a liquidated damages provision awards a uniform

amount for the breach of a term agreement regardless of the date of the breach is not *per se* unreasonable. In *Murphy v. Cintas Corp.*, 923 S.W.2d 663, 666 (Tex. App.—Tyler 1996, writ denied), Murphy claimed that the liquidated damages provision was an unenforceable penalty because it imposed the same amount of damages for early cancellation of the parties' agreement whether it resulted from his failure to pay for *one* of the contemplated goods (at the end of the contract's term) or *all* of them (at the beginning). *Id.* The court rejected this argument and enforced the provision. *Id.* at 666-667.

The Restatement of Contracts regarding liquidated damages is consistent with *Murphy*. *See* RESTATEMENT (SECOND) OF CONTRACTS § 356, *Liquidated Damages and Penalties* (1981). Comment (b), "Test of Penalty," states that a liquidated damages amount "is reasonable to the extent that it approximates the actual loss that has resulted from the particular breach, even though it may not approximate the loss that might have been anticipated under other possible breaches." *Id.* (emphasis added). Thus, this Court needs to determine only whether Strandhagen conclusively established that the liquidated amount was an unreasonable forecast of the actual damages resulting from this particular breach (her

28

five-year premature departure from the practice).  Strandhagen offered no prove to establish this element.

According to Restatement Section 356, whether the liquidated amount reasonably forecast other breaches that may have occurred is not a basis to deny the provision's enforceability in this case.  *Id.*  This is confirmed by Illustration 2 to Section 356.  In that example, partners A, B, and C formed a veterinary practice promising to remain as a partnership for ten years.  *Id.*  The liquidated damages clause provided that, if one partner terminated early (and the others continued the business), and the terminating partner breached his duty of non-competition, he would be liable for $50,000.  This provision is enforceable because "[e]ven though $50,000 may be unreasonable in relation to the loss that may have resulted in other circumstances, it is not unreasonable in relation to the actual loss."  *Id.*

In the absence of any evidence from Strandhagen to support her claim that the liquidated damages amount was not a reasonable forecast of just compensation—and especially considering that all inferences must be construed in favor of the Physicians as nonmovants—the record fails to conclusively demonstrate that Strandhagen satisfied her burden of proof on

this element.  This Court should reject Strandhagen's facial challenge just as the court did in *Murphy*, 923 S.W.2d at 666.

### (b) Plain language of contract shows reasonable forecast.

Beyond the lack of evidence in support of Strandhagen's contention that the liquidated damages amount was an unreasonable forecast of the actual damages, the plain language of the parties' contract demonstrates that it was not.  The Court would be required to disregard or render meaningless certain portions of the contract to accept Strandhagen's argument.

In determining whether Strandhagen has satisfied her burden on the affirmative defense of penalty, this Court must keep in mind the basic rules of contract construction, as recognized in *GPA Holding*, 344 S.W.3d at 471. "The court's primary concern in interpreting a written contract is to determine the mutual intent of the parties as manifested in the contract, . . . and the agreement must be enforced as written." *Id.*  Terms should be given their plain and ordinary meaning, and interpretations that render any portion meaningless should be avoided.  *Id.*

This Court considered the plain language of the contract as a basis for rejecting a penalty defense and enforcing a liquidated damages provision in *Southern Union Co. v. CSG Systems, Inc.*, No. 03-04-00712CV, 2005 WL

171349, *4-6 (Tex. App.—Austin Jan. 27, 2005, no pet.). There, the contract stated that the damages provision was included "[b]ecause of the difficulty in ascertaining CSG's actual damages for a termination or other breach of the Agreement," and that "CSG would have been unwilling to provide the Services at the fees set forth in the Agreement" had Southern Union not promised "certainty of revenue" by obligating itself to pay the discontinuance fee in the event that it breached the contract." *Id*. at *4. The damages provision also "expressly state[d] that it 'is not a penalty' and that it 'is a reasonable estimation of the actual damages which CSG would suffer if CSG were to fail to receive the amount of processing business as contemplated by this Agreement.'" *Id*. at *6. The Court clarified that, "[a]lthough parties cannot avoid a challenge to a liquidated damages provision simply by characterizing it as 'reasonable,' such express language is instructive of the parties' intent when the terms are mutually bargained for between equally competent parties." *Id.*

This Court also put weight on the fact that the "provision was a bargained-for exchange, negotiated and approved by both companies." *Id*. "When a provision is mutually bargained for by equally competent parties, we give deference to its enforcement. . . . From the face of the contract, Southern Union understood at the time it entered the agreement that CSG's

31

damages would be difficult to estimate and therefore agreed a liquidated damages provision was necessary." *Id.*

Much like the Southern Union/CSG contract, the Operations Agreement between Strandhagen and her Partners expressly stated that the stipulated amount was to be paid "as liquidated damages, and not as a penalty," and that the amount was "reasonable in light of the anticipated harm which would be caused by a Terminating Physician's breach or default under this Agreement." (CR.168). Additionally, the Partners agreed that the contract's provisions were "narrowly tailored and necessary to protect the Physicians' legitimate interests as a group," and that they constituted a "significant inducement to [the Partners] entering into the Purchase Agreement, and consummating the transaction contemplated thereby." (CR.162).

Also like the Southern Union/CSG contract, Strandhagen and her Partners were mutually competent parties who voluntarily and knowingly entered this bargained-for exchange. (CR.162, 173-178). Hence, this Court should defer to the plain language of the Operations Agreement, which evidences the parties' mutual intent for the liquidated damages provision to be valid and enforceable, and not construed as a penalty. To do otherwise would impermissibly render meaningless the express provisions of the

32

contract stating that the damages provision was reasonable, narrowly-tailored, a necessary inducement, and not a penalty.

### (c)   Fact issue exists regarding modification.

Finally, to any extent the Court believes Strandhagen offered proof that the damages provision was not a reasonable forecast of actual damages, she has still failed to conclusively establish this element of her defense because the "Severability" clause in the parties' contract creates a genuine issue of material fact.

Section 7(f) of the Operations Agreement provides:

> Severability. . . . In the event that any provision of this Agreement shall be declared by a Court of competent jurisdiction to exceed the limits such court deems reasonable and enforceable, **said provisions shall be deemed modified to the minimum extent necessary to make such provisions reasonable and enforceable.**

(CR.171) (emphasis added).

"An illegal or unconscionable provision of a contract may generally be severed so long as it does not constitute the essential purpose of the agreement." *In re Poly-Am., L.P.*, 262 S.W.3d 337, 357, 360 (Tex. 2008) (recognizing that, pursuant to the parties' contract, the arbitrator "would be free to modify" terms found to be unconscionable rather than striking them altogether).   Severability is determined by the intent of the parties as

evidenced by the language of the contract. *In re Kasschau*, 11 S.W.3d 305, 313 (Tex. App.—Houston [14th Dist.] 1999, orig. proceeding).

Here, the liquidated amount could be modified in a narrow fashion without undermining the essential purpose of the parties' contract. The express purpose of the Operations Agreement was to "establish an Advisory Board and set forth certain understandings and agreements among themselves regarding the operations of their practice." (CR.162). The specific amount of liquidated damages applicable to any particular physician was not the "essential purpose" of the Agreement.

In light of the Severability clause, the district court erred by declaring the liquidated damages provision wholly unenforceable as a matter of law. Even if the court considered $500,000 to be an unreasonable liquidated amount, the court should have concluded that a genuine issue of material fact exists about what modified amount or calculation would be reasonable to enforce in its place, keeping with the parties' express intent to modify the term "to the minimum extent necessary." To do otherwise, the Court would have to impermissibly rewrite the parties' bargained-for exchange to strike out the final sentence of Paragraph 7(f), which is a mandatory provision voluntarily agreed to by the parties. Alternatively, if this Court

concludes the Severability clause is ambiguous, then it creates a genuine issue of material fact requiring reversal and remand. (RR.12-14, 22-23).

**C.** **Strandhagen Failed to Satisfy her Summary-Judgment Burden Regarding the Physicians' Status as Third-Party Beneficiaries.**

Strandhagen also moved for summary judgment based on her argument that the liquidated damages provision is unenforceable because it seeks to render her liable to the Physicians for a breach of her Employment Agreement, to which the Physicians are not parties or third-party beneficiaries. (CR.157-158). This did not provide a valid basis for summary judgment because (1) Strandhagen's liability for liquidated damages arises directly from the Operations Agreement between her and her Physician Partners, and does not require that the Physicians be third-party beneficiaries of her Employment Agreement; and/or (2) Strandhagen failed to conclusively establish that the Physicians were not third-party beneficiaries of the Employment Agreement.

### 1. The Operations Agreement Provides a Direct Line of Liability.

Paragraph 5 of the Operations Agreement provides:

> [I]f [any Partner] terminates his or her employment with the Company prior to the expiration of the Initial Term, the Physicians may suffer harm [as specified therein]. . . . In light of the foregoing, if a [Partner's] employment with the Company is terminated for any reason during the Initial Term . . . other than a termination without cause . . . then such [Terminating Partner] shall promptly pay . . . as liquidated damages and not as a penalty . . . the amount set forth below.

(CR.167-168).

This provision creates a direct line of liability for liquidated damages between an early-terminating physician and her remaining Partners based on the direct harm that will be suffered by the remaining Partners as a result of the early termination. (*Id.*). Under this provision, there is no need for the Physicians to be third-party beneficiaries of the Employment Agreement to enforce the liquidated damages clause. The Physicians (if they sued Strandhagen for breach of contract) would not be attempting to recover under the Employment Agreement as third-party beneficiaries. Rather, they would be seeking and are entitled to directly enforce the liability provisions contained within the four corners of their own contract with Strandhagen. (RR.10-11).

36

## 2. A Genuine Issue of Material Fact Remains about the Physicians' Third-Party Beneficiary Status.

Alternatively, even if the Court were to conclude that the Physicians are required to be third-party beneficiaries of Strandhagen's Employment Agreement to enforce the liquidated damages clause under the Operations Agreement, it was error to grant summary-judgment on this ground because Strandhagen did not conclusively establish the absence of such third-party beneficiary status.

Strandhagen's Motion for Summary Judgment states in a single, conclusory sentence that the Physicians "are [not] third-party beneficiaries" to the Employment Agreement. (CR.158). She did not provide any evidence or analysis about the intention of the Employer or herself (or any of the other Partners) when entering their Employment Agreements, nor about the meaning of the contract as a whole. Strandhagen failed to satisfy her traditional summary-judgment burden on this ground. *See Alvarado v. Lexington Ins. Co.*, 389 S.W.3d 544, 564 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ("It was Lexington's burden, as movant for summary judgment, to prove its entitlement to summary judgment against Alvarado as a matter of law. We hold that Lexington failed to carry its burden of conclusively negating Alvarado's status as a third-party beneficiary to the

Policy.  Thus, we hold that the trial court erred in rendering summary judgment in favor of Lexington.").

## II. THE DISTRICT COURT ERRED BY DENYING PART OF THE PHYSICIANS' PLEA TO THE JURISDICTION.

The Physicians' Amended Plea to the Jurisdiction argued, in part, that Strandhagen's request for a declaration that the liquidated damages provision was an unenforceable penalty was not yet ripe for decision because the Physicians had not yet decided whether to sue her for breach of contract, much less made a demand or filed suit on that basis.  (CR.79-80).  In the absence of a live, justiciable controversy, the court lacked subject-matter jurisdiction over Strandhagen's claim.  (CR.79-80).  On this basis, the district court erred by denying this portion of the Physician's Plea and by granting an advisory summary judgment on Strandhagen's unripe declaratory judgment claim, and by denying the opportunity to correct this error in response to the Motion for New Trial.  (CR.184-85, 212, 271).  This Court should reverse these decisions and render judgment dismissing Strandhagen's claims for a lack of jurisdiction.

### A. Texas Law Prohibits Advisory Declarations on Potential Defenses to Hypothetical Disputes.

In an action for declaratory relief, a plaintiff must allege facts that affirmatively demonstrate that the trial court has subject matter

jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993); *City of Pasadena v. Smith*, 263 S.W.3d 80, 86 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). "A request for declaratory relief alone does not establish jurisdiction in [the] Court. . . . [It is] merely a procedural device for deciding cases already within a court's jurisdiction." *Chenault v. Phillips*, 914 S.W.2d 140, 141 (Tex. 1996).

For a court to have jurisdiction to consider a declaratory-judgment action, there must be a "justiciable controversy as to the rights and status of" the parties, and the requested declaration "must actually resolve the controversy." *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 163-64 (Tex. 2004). "A justiciable controversy is one in which a real and substantial controversy exists involving a genuine conflict of tangible interests and not merely a theoretical dispute." *Texas Dep't of Pub. Safety v. Moore*, 985 S.W.2d 149, 153 (Tex. App.—Austin 1998, no pet.); *see also City of Euless v. Dallas/Fort Worth Int'l Airport Bd.*, 936 S.W.2d 699, 703 (Tex. App.—Dallas 1996, writ denied) (if there is no actual controversy between parties, declaratory judgment is improper).

"Section 37.004 does not . . . extend an open-ended invitation to parties seeking interpretation of their contracts. There must be some showing that litigation is imminent between the parties unless the

contractual uncertainties are judicially resolved." *Paulsen v. Texas Equal Access to Justice Found.*, 23 S.W.3d 42, 46 (Tex. App.—Austin 1999, pet. denied); *see also In re City of Dallas*, 977 S.W.2d 51, 57 (Tex. App.—Fort Worth 1998, orig. proceeding). The Declaratory Judgments Act does not permit litigants to "fish judicial ponds for legal advice." *California Prods. v. Puretex Lemon Juice, Inc.*, 334 S.W.2d 780, 781 (Tex. 1960).

"The need for a justiciable controversy is related to the jurisdictional concepts of standing and ripeness and does not supersede these concepts." *LHR Enters., Inc. v. Geeslin*, No. 03-05-00176-CV, 2007 WL 3306492, *4 (Tex. App.—Austin Nov. 7, 2007, pet. denied). Ripeness is a necessary component of subject matter jurisdiction. *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 850 (Tex. 2000); *Atmos Energy Corp. v. Abbott*, 127 S.W.3d 852, 857 (Tex. App.—Austin 2004, no pet.). "The requirement that a claim be ripe for review is based on the prohibition against issuing advisory opinions." *LHR Enters.*, 2007 WL 3306492 at *4 (citing *Patterson v. Planned Parenthood*, 971 S.W.2d 439, 442 (Tex. 1998); TEX. CONST. art. II, § 1 (separation of powers); *Brooks*, 141 S.W.3d at 164 (explaining that separation of powers provision bars issuance of advisory opinions)). "[T]here must be a concrete injury for the claim to be ripe." *Id.* "A claim is not ripe if it is based on hypothetical or contingent facts that

40

may not occur as anticipated or may not occur at all." *Id.*; *see also Farmers Ins. Exch. v. Rodriguez*, 366 S.W.3d 216, 223 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (declaratory claim was not ripe where parties' liability for damages depended on outcome of a separate proceeding, which had not yet finalized).

Based on these concepts, a "defendant may not use a declaratory judgment to prematurely adjudicate defenses to liability that may not yet exist. . . . [U]nder the federal constitution, [a] party may not use a declaratory judgment to get [an] advance ruling on an affirmative defense." *Transcont'l Realty Investors, Inc. v. Orix Capital Markets, LLC*, 353 S.W.3d 241, 245 (Tex. App.—Dallas 2011, pet. denied) (emphasis added) (noting that a declaratory claim seeking to "assess[] the success of a defense to a potential claim (breach-of-contract or otherwise) is generally the type of hypothetical question federal courts endeavor to avoid"). "The declaratory judgment was not intended to permit the piecemeal trial of lawsuits." *Id.* (holding the court lacked jurisdiction to issue a premature declaration regarding validity of contractual guarantee).

In *Nexstar Broad., Inc. v. Gray*, No. 09-07-00364-CV, 2008 WL 2521967, *2 (Tex. App.—Beaumont June 26, 2008, no pet.), the court held that it was an improper use of the DJA for a party with potential liability

under a contract to seek a declaration that simply restated the "penalty" affirmative defense and sought no relief beyond what that defense would afford (*i.e.,* avoidance of liquidated damages). This holding was based, in part, on the fact that the parties had <u>no</u> ongoing relationship—as contrasted from declarations in other cases that would settle future disputes of an ongoing relationship between the parties. *Id.* (citing *BHP Petro. Co. v. Millard,* 800 S.W.2d 838, 841-842 (Tex. 1990)).

Similarly, this Court held in *LHR Enterprises* that the district court lacked jurisdiction to declare the meaning of the Insurance Commission's conclusion that it "may impose an administrative penalty" in certain circumstances where there was no pending or impending action to seek such a remedy from plaintiff. 2007 WL 3306492 at *5; *see also State v. Margolis,* 439 S.W.2d 695, 697-98 (Tex. Civ. App.—Austin 1969, writ ref'd n.r.e.) (where plaintiff merely alleged, without any supporting proof, that defendant had "indicated an intention" to seek statutory penalty against plaintiff, and defendant denied that allegation in its pleadings, there was no evidence that a bona fide controversy existed giving rise to any justiciable issues between the parties; hence, declaratory judgment was improper).[7]

---

[7]  *LHR Enterprises* and *Margolis* involved statutory penalties available to the State in specified circumstances. While the cases are procedurally similar to the instant case in that they presented un-ripe claims for declaratory relief related to the enforcement of these remedies prior to a pending demand for their recovery, they are substantively

**B.    Strandhagen's Claim Is Not Ripe.**

The declaration sought by Strandhagen merely presents a hypothetical or contingent question about what damages *may* be available *if* the Physicians were to pursue a claim against her *in the future* for breach of contract.  Strandhagen only speculated that she has "learned . . . [the Physicians] and perhaps others are seeking to pursue her for collection," but she failed to offer any proof that a live, justiciable controversy actually existed. (CR.8, 112).  The Physicians generally denied all of Strandhagen's allegations, specifically pled that her claim has not matured, and moved for dismissal based on their specific contention to the contrary. (CR.74-75, 79). A potential breach of contract suit against Strandhagen is not a certain, imminent, or unavoidable controversy.  At best, it is hypothetical or contingent on other events.   Hence, there is not a sufficiently ripe dispute between these parties about which declaratory relief may be appropriately granted.  Strandhagen's attempt to misuse the Declaratory Judgment Act to obtain an advance ruling on her affirmative defense should be dismissed.

---

distinct in that they involved "penalties" rather than a liquidated damages clause as here.

## **PRAYER**

Based on the foregoing, Appellants respectfully pray that this Court sustain both of their issues on appeal and reverse the district court's grant of Strandhagen's Motion for Summary Judgment, its partial denial of the Physicians' Plea to the Jurisdiction, and its denial of the Physicians' Motion for New Trial. If the jurisdictional ruling is reversed, then this Court should render judgment in favor of the Physicians dismissing Strandhagen's claim in its entirety. Otherwise, this Court should remand to the district court for further proceedings.

Appellants further pray that this Court tax all costs against Strandhagen, both in this Court and below, and award the Appellants any such other relief at law or equity to which they may be justly entitled. Tex. R. App. P. 43.4; Tex. R. Civ. P. 139.

Respectfully submitted,

**MARTENS, TODD, LEONARD, TAYLOR & AHLRICH**

By: ___*/s/ Amanda G. Taylor*___
Amanda Garrett Taylor
ataylor@textaxlaw.com
Texas Bar No. 24045921
301 Congress Avenue, Suite 1950
Austin, Texas 78701
Tele: (512) 542-9898
Fax: (512) 542-9899

ATTORNEY FOR APPELLANTS

44

## CERTIFICATE OF COMPLIANCE

I certify that this Appellants' Brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i) because, according to the word-count tool of the computer program used to prepare this document, it contains **8,855 words**, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

/s/*Amanda Taylor*
Amanda Taylor

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this Appellants' Brief was filed electronically and served on all counsel via e-mail in compliance with Tex. R. App. P. 9.5(b) and L.R.3 on this 14th day of January, 2015.

Daniel Byrne
DByrne@FBHH.com
Lessie Fiztpatrick
LFitzpatrick@FBHH.com
FRITZ, BYRNE, HEAD & HARRISON, PLLC
98 San Jacinto Blvd, Suite 2000
Austin, TX 78701
Telephone: (512) 476-2020

/s/*Amanda Taylor*
Amanda Taylor

NOTICE SENT: FINAL INTERLOCUTORY NONE
DISP PARTIES: ALL
DISP CODE: CVD / CLS 4619
REDACT PGS: ___
JUDGE OLN CLERK Cjc

DC     BK14156 PG221

NO. D-1-GN-13-002811

| TRACY D. STRANDHAGEN | § | IN THE DISTRICT COURT |
|---|---|---|
| PLAINTIFF | § | |
| | § | |
| v. | § | |
| | § | |
| NOAH S. BUNKER, PAUL | § | 353rd JUDICIAL DISTRICT |
| CARRELL, EVERETT BREW | § | |
| HOUSTON, JR., W.ANDREW | § | |
| BUCHHOLZ, SCOTT J. LEIGHTY, | § | |
| JAD L. DAVIS, and HOLLY | § | |
| CLAUSE, | § | |
| | § | |
| DEFENDANTS | § | TRAVIS COUNTY, TEXAS |

Filed in The District Court of Travis County, Texas
MAY 20 2014
At 335 M.
Amalia Rodriguez-Mendoza, Clerk

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

On February 20, 2014, Plaintiff's Motion for Summary Judgment came on to be heard. After reading the pleadings, hearing the arguments presented by counsel, reviewing the case law, and considering the same, the Court finds that the Motion is GRANTED.

Therefore, IT IS ORDERED, ADJUDGED, AND DECREED that Plaintiff's Motion for Summary Judgment is GRANTED, and the Court DECLARES that the $500,000 purported liquidated damages clause in the Advisory Board and Internal Operations Agreement is an unenforceable penalty.

All relief not expressly granted is DENIED.

SIGNED on this the ___20___ day of May, 2014.

JUDGE ORLINDA L. NARANJO
419TH DISTRICT COURT

212

CAUSE NO. D-1-GN-13-002811

| | | |
|---|---|---|
| TRACY D. STRANDHAGEN, <br> PLAINTIFF, | § <br> § <br> § <br> § | IN THE DISTRICT COURT |
| v. | § <br> § <br> § | TRAVIS COUNTY, TEXAS |
| NOAH S. BUNKER, PAUL CARRELL, <br> EVERETT BREW HOUSTON, JR., <br> W. ANDREW BUCHHOLZ, SCOTT J. <br> LEIGHTY, JAD L. DAVIS, and <br> HOLLY CLAUSE <br> DEFENDANTS. | § <br> § <br> § <br> § <br> § <br> § <br> § | 353RD JUDICIAL DISTRICT |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' AMENDED PLEA TO THE JURISDICTION

On November 25, 2013 came on for hearing Defendants' Amended Plea to the Jurisdiction. After considering the same, the Court is of the opinion that the Amended Plea to the Jurisdiction is meritorious in part and should be granted in part and denied in part.

It is therefore ORDERED that:

1. Defendant's Amended Plea to the Jurisdiction is GRANTED as to Plaintiff's request for a declaratory judgment that she was terminated without cause and therefore the Termination Penalty Provisions (as defined in the Plaintiff's First Amended Petition) are inapplicable to her. The Court lacks jurisdiction over this claim, and it is therefore dismissed for lack of jurisdiction; and

2. Defendant's Amended Plea to the Jurisdiction is DENIED as to Plaintiff's request for declaratory judgment that the liquidated damages provision in the Termination Penalty Provisions is an invalid and unenforceable penalty. The Court has jurisdiction over this claim.

SIGNED AND ENTERED this _/0_ day of _Jan_, 2013.

_____
JUDGE STEPHEN YELENOSKY

184

APPROVED AS TO FORM:

FRITZ, BYRNE, HEAD & HARRISON, PLLC
98 San Jacinto Boulevard, Suite 2000
Austin, Texas 78701-4286
(512) 476-2020
(512) 477-5267 (fax)

By: _____
    Daniel H. Byrne
    State Bar No. 03565600
    Lessie G. Fitzpatrick
    State Bar No. 240122630

ATTORNEYS FOR PLAINTIFF
TRACY D. STRANDHAGEN


CARLS, McDONALD & DALRYMPLE, L.L.P.
Barton Oaks Plaza 1
901 S. Mopac Expressway, Suite 280
Austin, Texas 78746

By: _____
    Kelly A. McDonald
    State Bar Number 13551275
    Carla Garcia Connolly
    State Bar No. 07631100

ATTORNEYS FOR DEFENDANTS
NOAH S. BUNKER, PAUL CARRELL,
EVERETT DREW HOUSTON, JR.,
W. ANDREW BUCHHOLZ, SCOTT J. HEIGHTY,
JAD L. DAVIS and HOLLY CLAUSE

2

185

Filed in The District Court
of Travis County, Texas

JUL 30 2014

At____3:15pm____M.
Amalia Rodriguez-Mendoza, Clerk

CAUSE NO. D-1-GN-13-002811

| | | |
|---|---|---|
| TRACY D. STRANDHAGEN | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| NOAH S. BUNKER, PAUL | § | TRAVIS COUNTY, TEXAS |
| CARRELL, EVERETT BREW | § | |
| HOUSTON, JR., W. ANDREW | § | |
| BUCHHOLZ, SCOTT J. LEIGHTY, | § | |
| JAD L. DAVIS, and | § | |
| HOLLY CLAUSE, | § | |
| | § | |
| Defendants | § | 353rd JUDICIAL DISTRICT |

## ORDER DENYING DEFENDANTS'
## MOTION FOR NEW TRIAL

On this day came to be considered the Defendants' Motion for New Trial. The Court, having considered the grounds asserted in Motion, the Response, the arguments of counsel, the evidence on file, and the contents of the Court's file, determines that the Motion for New Trial should be DENIED.

Signed on this the ___30___ day of ___July___, 2014.

_____
JUDGE PRESIDING

*Page 1*

271

## ADVISORY BOARD AND
## INTERNAL OPERATIONS AGREEMENT

This ADVISORY BOARD AND INTERNAL OPERATIONS AGREEMENT (this "Agreement") is made and entered into this ___ day of October 2011, by and among the undersigned physicians who are employed by American Anesthesiology of Texas, Inc. (such employed physicians being referred to herein as the "Physicians"), a Texas non profit corporation certified as a health care organization by the Texas State Board of Medical Examiners (the "Company"), Noah Bunker, M.D., the Corporate Medical Director of the Company (the "Medical Director"), and Chi B. Vo, M.D., the Physician Partners' Representative under the Purchase Agreement (as defined below) (the "Partners' Representative").

### R E C I T A L S:

**WHEREAS,** as of the date hereof, the Company intends to acquire all of the issued and outstanding membership interests of Austin Anesthesiology Group, PLLC ("AAG"), pursuant to that certain Membership Interest Purchase Agreement, dated as of October 6, 2011, among the Company, AAG, AAG Holdings, AAG Sidecar LLC, those certain Physicians who are members of AAG, and the Physician Partners' Representative (the "Purchase Agreement") (unless the context shall otherwise require, capitalized terms used herein without definition shall have the respective meanings ascribed thereto in the Purchase Agreement);

**WHEREAS,** the Physicians desire to establish an Advisory Board and set forth certain understandings and agreements among themselves regarding the operations of their practice following the Closing under the Purchase Agreement; and

**WHEREAS,** a significant inducement to Physicians' entering into the Purchase Agreement, and consummating the transaction contemplated thereby, is the Physicians' agreement to be bound by the covenants set forth herein, which covenants are narrowly tailored and necessary to protect the Physicians' legitimate interests as a group.

**NOW THEREFORE,** in consideration of the foregoing recitals, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    Advisory Board.

(a)    The Physicians hereby establish a board (the "Advisory Board") to provide binding advice and guidance to the Medical Director on certain matters as further set forth herein. The Advisory Board shall consist of seven (7) members (each an "Advisory Board Member" and, collectively, the "Advisory Board Members"), each of whom must be a party to this Agreement, and one of which shall be the Medical Director. The Advisory Board Members (other than the Medical Director) will serve terms of three (3) years. Two (2) Advisory Board Members will be elected each year consistent with AAG's past practices for management committee elections. The Medical Director's term on the Advisory Board will be co-terminus with the term as Medical Director set forth in Section 3(a). The names of the Advisory Board

EXHIBIT

1 - A

162

Members to serve as such shall be evidenced on Exhibit A attached hereto and made a part hereof, as amended upon any change of the Advisory Board.

(b)     Any Advisory Board Member may resign at any time by giving written notice to all of the Physicians. The resignation of any Advisory Board Member shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

(c)     An Advisory Board Member may be removed, with or without cause, by the affirmative vote of at least a majority of the Physicians. Furthermore, the Advisory Board may by majority vote cast a vote of "no confidence" in an Advisory Board Member, in which case the Advisory Board shall refer the matter to the Physicians for a vote to remove such Advisory Board Member.

(d)     If an Advisory Board Member (the "Vacating Member") (i) is removed in accordance with Section 1(c) or (ii) resigns or otherwise vacates the position for any reason, the Physicians shall elect a new Advisory Board Member to replace the Vacating Member by the vote of a simple majority of the Physicians.

(e)     Unless otherwise prohibited by any officer or Affiliate of the Company, any Advisory Board Member may examine the books and records of the Company for a purpose reasonably related to such Advisory Board Member's position as an Advisory Board Member.

(f)     The Advisory Board Members will not receive any additional compensation from the Company for serving as Advisory Board Members.

(g)     The Advisory Board may designate one or more committees. Any such committee, to the extent determined by the Advisory Board, shall have and may exercise all authority determined by the Advisory Board, subject to any restrictions contained herein. The terms, qualifications and duties of the members of such committees shall be determined by the Advisory Board and shall be substantially consistent with the past practices of AAG.

(h)     Unless otherwise undertaken by an officer, director or other Affiliate of the Company, the Medical Director, with input from the Advisory Board, shall be responsible for implementing, documenting, carrying-out and enforcing the disciplinary procedures of the Company substantially consistent with the past practices of AAG.

2.     Meetings of the Advisory Board.

(a)     The Advisory Board may hold its meetings, both regular and special, in such manner as is determined by the Advisory Board from time to time.

(b)     At least four (4) of the Advisory Board Members shall be necessary to constitute a quorum for the transaction of business; provided, that every act or decision done or

2

163

made by the Advisory Board shall require the affirmative vote of at least four (4) Advisory Board Members.

(c) Advisory Board Members may participate in any meeting of the Advisory Board by means of conference telephone or similar communications equipment, provided all persons participating in the meeting can hear one another, and such participation in a meeting shall constitute presence in person at the meeting.

(d) All votes required of the Advisory Board hereunder may be by voice vote unless a written ballot is requested, which request may be made by one Advisory Board Member.

(e) Any action, which under any provision of this Agreement is to be taken at a meeting of the Advisory Board, may be taken without a meeting by written consent signed by not less than the number of Advisory Board Members necessary to take the action at a meeting of the Advisory Board at which all Advisory Board Members were present and voted. Such written consent will be kept with the records of the Advisory Board.

(f) A majority of the Advisory Board Members may adjourn any Advisory Board meeting to meet again at a stated day and hour or until the time fixed for the next regular meeting of the Advisory Board.


3.    Medical Director.

(a) The Physicians acknowledge and agree that Noah Bunker, M.D. has been appointed as the initial Medical Director of the Company pursuant to the Corporate Medical Director Agreement, dated as of the date hereof, by and between Noah Bunker, M.D. and the Company (the "Medical Director Agreement"). Notwithstanding the terms and conditions of the Medical Director Agreement, the initial Medical Director and each other Medical Director of the Company thereafter shall serve for single terms of four (4) years. Any Medical Director may seek re-election for subsequent term(s) of four (4) years each; provided, that the then-current Medical Director who is not re-elected must resign in accordance with the Medical Director Agreement with sufficient notice such that the Medical Director's term is limited to four (4) years. The Medical Director shall be elected by the affirmative vote of a simple majority of the Physicians.

(b) I In the event of a dispute between the Medical Director and the Advisory Board and/or the Physicians, a simple majority of the Physicians may cast a vote of "no confidence" in the Medical Director. In such event, the Medical Director shall have thirty (30) days from the date of such vote of no confidence to resolve the dispute with due notification to the Advisory Board and the Physicians of such dispute and the resolution thereof. Should the dispute remain unresolved following the expiration of such thirty (30) day cure period as determined by the Advisory Board in it sole discretion then upon the affirmative vote of a simple majority of the Physicians (excluding, for this purpose, the Medical Director), the Medical Director shall resign as the Medical Director. Furthermore, seventy-five percent (75%) or more of the Physicians (excluding, for this purpose, the Medical Director) (a "Supermajority of the

3

164

Physicians") may elect to remove the Medical Director at any time for any reason or for no reason; provided that the Physicians and the Medical Director understand and agree that such removal will be subject to the consent of the Company (such consent not to be unreasonably withheld or delayed). Any such resignation by or removal of the Medical Director pursuant to this Section 3(b) shall occur upon at least ninety (90) days' prior written notice to the Company and the Medical Director. The Physicians and the Medical Director also understand and agree that the Company may elect to remove the Medical Director for any reason or for no reason upon at least ninety (90) days' prior written notice to the Medical Director and the Partners' Representative. The Medical Director may voluntarily resign and terminate his or her services under the Corporate Medical Director Agreement for any reason or for no reason upon at least ninety (90) days' prior written notice to the Company and the Partners' Representative. A majority of the Physicians shall have the power and authority to appoint, by written notice to the Company, a replacement for any terminated Medical Director (a "Replacement Medical Director"), which replacement shall satisfy the qualifications set forth in Addendum 1 to the Corporate Medical Director Agreement ("Addendum 1") and otherwise be acceptable to the Company (such acceptance not to be unreasonably withheld or delayed). The parties acknowledge that under the terms of the Corporate Medical Director Agreement, if the Physicians fail to appoint a Replacement Medical Director who satisfies the qualifications set forth in such Addendum 1 and is otherwise acceptable to the Company (such acceptance not to be unreasonably withheld or delayed) on or before the ninety-first (91st) day following notice of the termination of the Medical Director or the date of death of the Medical Director, then the Company will have the power and authority to appoint a Replacement Medical Director in good faith. If, for any reason, there is a vacancy in the Medical Director position, then pending any replacement thereof in accordance with the terms hereof and the Corporate Medical Director Agreement, a majority of the Physicians shall have the right to immediately appoint a temporary successor to have responsibility for and authority to conduct the rights and duties granted to the Medical Director under the Purchase Agreement and the Physicans' Employment Agreements, which temporary successor shall satisfy the qualifications set forth in Addendum 1 and otherwise be acceptable to the Company (such acceptance not to be unreasonably withheld or delayed); provided that the Company shall appoint a temporary successor if none is appointed by a majority of the Physicians within ten (10) Business Days of any vacancy in the position of Medical Director. For the avoidance of doubt, the Advisory Board may at any time recommend to the Physicians that the Medical Director be removed upon the required vote of the Physicians specified above.

(c)     The parties acknowledge that under the Corporate Medical Director Agreement, the Medical Director will receive an annual service stipend from the Company or general group funds of the practice in an amount equal to Ten Thousand Dollars ($10,000). The Medical Director shall defray personal costs of all non-clinical work, including per diem coverage, from any such stipend received for his or her duties as the Medical Director. The Advisory Board may determine in its sole discretion that the Medical Director should receive additional compensation or benefits in consideration for the Medical Director's services in such role, and in such event the Advisory Board shall recommend to the Medical Director the source of such additional compensation or benefits.

4

(d)     The Medical Director shall abide by all of the terms and conditions of this Agreement. The Medical Director shall maintain his or her share of clinical responsibilities throughout his or her service term as Medical Director. The Medical Director is expected to be an effective liaison between the Company and the Physicians and is expected to faithfully and reciprocally communicate all expectations, demands and/or decisions as pertinent to the Company and the Physicians. The Medical Director shall not, and shall use commercially reasonable efforts to cause the Company not to, without seeking approval from the Advisory Board: (i) unilaterally hire or fire any Physicians, associate physicians or other professionals or office staff; (ii) unilaterally alter salaries of the Physicians, associate physicians or other professionals or office staff; (iii) unilaterally alter daily or monthly schedules; (iv) unilaterally alter physician service sites or times; or (v) make recommendations to the President of the Company on salary and bonus disbursement and the division and allocation of the "Performance Incentive Bonus," as defined in the Physicians' Employment Agreements; provided further, that the Medical Director shall make bonus disbursement reports available for inspection by the Physicians at the offices of the Practice. During the Initial Term of the Physicians' Employment Agreements and during the applicable period for negotiating the Renewal Term of the Physicians' Employment Agreements, the Medical Director shall not on behalf of the Company, either directly or indirectly, (i) negotiate, recommend, approve or offer any Physician employment terms and conditions inconsistent in any material respect with the employment terms and conditions of other Physicians (except for the pre-approval of Outside Activities (as defined in the Physicians' Employment Agreements)), or (ii) negotiate, recommend, approve or offer any Physician special incentives, bonuses or other benefits not offered to the other Physicians.

(e)     The Corporate Medical Director shall use commercially reasonable efforts to delegate appropriate duties and responsibilities to the Advisory Board from time to time. The Medical Director shall use commercially reasonable efforts to share information from or related to the Company with the Advisory Board.

(f)     Notwithstanding anything to the contrary herein, (i) in the event of any conflict between the terms of this Agreement and the Medical Director Agreement, then the terms of the Medical Director Agreement shall control; and (ii) in the event the Medical Director receives advice and/or directives from the Advisory Board and/or the Physicians that conflicts with advice and/or directives from the Company or its Affiliates, then the Physicians understand and agree that the Medical Director will follow the advice and/or directives from the Company and its Affiliates.

4.     Partners' Representative.

(a)     The Physicians acknowledge and agree that Chi B. Vo, M.D. has been appointed as the Partners' Representative pursuant to the Purchase Agreement and will act as an agent of the Physicians under the Purchase Agreement and is granted such powers as are delegated under the Purchase Agreement.

(b)     Notwithstanding the foregoing and the powers that are delegated to the Partners' Representative under the Purchase Agreement, the Partners' Representative shall

5

provide to the Physicians prompt notice and copies of all notices and communications transmitted to the Partners' Representative by the Buyer under the Purchase Agreement. In addition, the Partners' Representative shall not, without first consulting in good faith with and receiving prior written consent from, a majority of the Physicians:

        (A)    waive provisions of the Purchase Agreement or any other Transaction Document;

        (B)    resolve any dispute arising under the Purchase Agreement or any other Transaction Document, including, but not limited to, as contemplated by Section 6 of the Purchase Agreement;

        (C)    make any material decisions with respect to the defense of any litigation described in Section 6.3 of the Purchase Agreement;

        (D)    agree to, negotiate, enter into settlements and compromises of, or demand arbitration with respect to any such claims referenced in subparagraphs (ii) and (iii) above; or

        (E)    take or fail to take any other actions that would have an adverse impact on the rights of the Physicians, economic or otherwise, under the Purchase Agreement.

        (c)    The Partners' Representative may resign by delivering written notice to the Physicians with a copy to the Buyer, at least thirty (30) days prior to the effective date of such resignation. A majority of the Physicians may terminate the appointment of the Partners' Representative, by delivering written notice thereto, with a copy to the Buyer, which notice shall designate the effective date of such termination not earlier than five (5) Business Days after the Buyer's receipt of such notice. In the event of such resignation or termination, a successor Partners' Representative shall be appointed by a majority of the Physicians and written notice of such appointment shall be delivered to the Buyer. If, at any time, the Partners' Representative has resigned or has been terminated and a successor Partners' Representative has not been appointed in accordance with the foregoing sentence, then unless and until a successor Partners' Representative is so appointed, the Medical Director shall be deemed to be the successor Partners' Representative for purposes of this Agreement and the Purchase Agreement. After the appointment (or deemed appointment) of a person as a successor Partners' Representative, all references to such Partners' Representative shall be deemed to include such successor.

    5.    <u>Physician Obligations</u>.

        (a)    Each Physician understands and agrees that (i) in addition to the consideration under the Purchase Agreement, beginning on January 1, 2013, the Physicians are eligible for certain bonuses under the Company's Physician Performance Incentive Program based upon the profits of the Company, (ii) he or she has entered into an Employment Agreement with the Company to perform certain services for the Company for an initial term as set forth in his or her Employment Agreement (the "<u>Initial Term</u>") and (iii) <u>if he or she</u>

6

terminates his or her employment with the Company prior to the expiration of the Initial Term, the Physicians may suffer harm, including, without limitation, increased workloads necessitated by such termination, material impairment of the ability of the Physicians to earn bonuses under the Company's Physician Performance Incentive Program, material impairment of the Physician' relationships with hospitals and other health-care facilities, third-party payors and other stakeholders, and hiring and training costs related to replacement physicians.

(b)     In light of the foregoing, if a Physician's employment with the Company is terminated for any reason during the Initial Term of a terminating Physician's Employment Agreement other than a termination without cause by the Company, subject to Section 5(c) hereof, then such terminating physician (a "Terminating Physician") shall promptly pay to the non-terminating Physicians, but in any event within five (5) Business Days of the termination of such Terminating Physician's employment, as liquidated damages, and not as a penalty, the amount set forth below to be shared equally by the non-terminating Physicians (the "Liquidated Damages Amount"). If the Liquidated Damages Amount is not paid by the Terminating Physician within such five (5) Business Day period, then the Liquidated Damages Amount shall thereafter bear interest at the rate of ten percent (10%) per annum until such Liquidated Damages Amount, together with the accrued interest, is paid in full.

| Terminating Physician | Liquidated Damages Amount |
| --- | --- |
| Carolyn G. Biebas, M.D. | $400,000 |
| James C. Chapin, M.D. | $400,000 |
| Richard S. Himes, Jr., M.D. | $320,000 |
| Richard L. Laube, M.D. | $320,000 |
| Gary J. Mihm, M.D. | $240,000 |
| Sharon A. Oxford, M.D. | $400,000 |
| All other Physicians | $500,000 |

The Liquidated Damages Amount for Ann John, M.D. shall be (i) $375,000 if the termination date occurs prior to the two (2) year anniversary of employment with the Company, or (ii) $300,000 if the termination date occurs at anytime thereafter during the Initial Term of her Employment Agreement.

In addition to the Liquidated Damages Amount, the Terminating Physician shall reimburse the Company and the Physicians for all out of pocket costs and attorneys' fees incurred by the Company and/or the Physicians in any arbitration or litigation to enforce the Terminating Physician's Employment Agreement or this Agreement. The Physicians each acknowledge and agree that the Liquidated Damage Amount is reasonable in light of the anticipated harm which would be caused by a Terminating Physician's breach of or default under this Agreement, the difficulty of proof of loss, the inconvenience and non-feasibility of otherwise obtaining an adequate remedy, and the value of the transactions to be consummated under the Purchase Agreement and the other Transaction Documents.

7

168

(c)     Notwithstanding the foregoing and for the avoidance of doubt, it is hereby acknowledged and agreed that the provisions set forth in this Section 5 shall not apply to a Physician in the event (i) of the death of such Physician, (ii) such Physician suffers a permanent Disability (as defined in the Physician's Employment Agreement) or an "own occupation" disability, (iii) such Physician is terminated due to a Material Decline or Right-Sizing (as such terms are defined in the Physician's Employment Agreement), (iv) the Company's contract with St. David's Healthcare Partnership is terminated, (v) of Physician's Qualifying Termination (as defined in the Physician's Employment Agreement), or (vi) of an approved termination pursuant to Section 5(d) below. The Physicians also acknowledge and agree that unforeseen conditions may arise during the Initial Term that may prompt a Physician to terminate his or her employment with the Company. Under such circumstances, a Physician may petition the Advisory Board and upon receiving the written consent of a majority of the Advisory Board, may terminate his or her employment with the Company without being required to pay the Liquidated Damages Amount and the out of pocket costs and attorneys' fees referenced in Section 5(b) above.

(d)     Conflict of Interest. In the event that a Physician desires to voluntarily terminate his or her Employment Agreement in order to provide other services to the Company or its Affiliates, such Physician may petition the other Physicians to allow the termination of his or her employment with the Company, and upon receiving the written consent of at least a majority of the other Physicians, may terminate his or her employment with the Company without being required to pay the Liquidated Damages Amount and the out of pocket costs and attorneys' fees referenced in Section 5(b) above. During the Initial Term of the Physicians' Employment Agreements and during the applicable period for negotiating the Renewal Term of the Physicians' Employment Agreements, each Physician shall report to the Advisory Board the occurrence of any offer, negotiation or discussion whereby any such Physician would receive employment terms and conditions inconsistent in any material respect with the employment terms and conditions of other Physicians (except for the pre-approval of Outside Activities (as defined in the Physicians' Employment Agreements)), or any special incentives, bonuses or other benefits not offered to the other Physicians.

(e)     The Physicians acknowledge and agree that nothing contained in this Agreement shall in any way limit or impair the Company's rights under any Employment Agreements or other agreements with the Physicians.

6.  Indemnification.

(a)     Any person who at any time serves or has served as an Advisory Board Member shall have a right to be indemnified by the Physicians to the fullest extent permitted by law against (i) reasonable expenses, including attorneys' fees, actually and necessarily incurred by him or her in connection with any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (and any appeal therein), and whether or not brought by or on behalf of the Physicians, seeking to hold him or her liable by reason of the fact that he or she is or was acting in such capacity, and (ii) reasonable payments made by him or her in satisfaction of any judgment, money decree, fine, penalty or settlement for which he or she may have become liable in any such action, suit or proceeding; provided

8

however, that an Advisory Board Member shall only be entitled to indemnification pursuant to this Section 6 so long as such Advisory Board Member acted in good faith in carrying out the decisions or actions which were the subject or basis of liability as set forth above in items (i) and (ii); provided further, that no Advisory Board Member shall be entitled to indemnification in the event of such Advisory Board Member's gross negligence.

(b)     The Advisory Board shall take all such action as may be necessary and appropriate to require the Physicians to pay the indemnification required by this provision, including without limitation, to the extent needed, making a good faith evaluation of the manner in which the claimant for indemnity acted and of the reasonable amount of indemnity due him or her. The Physicians shall pay their Pro Rata Share of such indemnity claim to the claimant within ten (10) business days of receipt of notice of any such claim for indemnity. For purposes of this Section 6, the "Pro Rata Share" shall be an amount equal to the total amount of the indemnity claim approved by the Advisory Board divided by the then-current number of Physicians party to this Agreement. If a Physician's Pro Rata Share is not paid within ten (10) business days, then interest shall accrue at the rate of ten percent (10%) per annum until such Pro Rata Share, together with the accrued interest, is paid in full.

(c)     Any person who at any time after the adoption of this provision serves or has served on the Advisory Board shall be deemed to be doing or to have done so in reliance upon, and as consideration for, the right of indemnification provided herein. Such right shall inure to the benefit of the legal representatives of any such person and shall not be exclusive of any other rights to which such person may be entitled apart from the provision of this provision.

(d)     The Physicians shall (upon receipt of an undertaking by or on behalf of the Advisory Board Member involved) pay expenses (including attorneys' fees) incurred by such Advisory Board Member in defending any threatened, pending or completed action, suit or proceeding and any appeal therein whether civil, criminal, administrative, investigative or arbitrative and whether formal or informal or appearing as a witness at a time when he or she has not been named as a defendant or a respondent with respect thereto in advance of the final disposition of such proceeding.

7.     Miscellaneous.

(a)     Notices and Voting Procedures.  All notices and other communications hereunder shall be in writing and may be given by personal delivery, reputable express courier, registered or certified mail (return receipt requested), or by email, in the discretion of the Advisory Board.  Such notice shall be deemed effective when received if it is given by personal delivery, reputable express courier or email, and will be effective three (3) days after mailing by registered or certified mail, so long as it is actually received within five (5) days (and, if not so received within five (5) days, is effective when actually received), to the parties at the addresses specified on Exhibit B hereto or such other address of which notice is provided pursuant to this provision. Any vote, consent or approval of either the Advisory Board or the Physicians may be delivered and conducted by email ballot or any other means determined by the Advisory Board. Meeting minutes and voting records shall be recorded and disseminated by the Advisory Board in a manner substantially consistent with the past practices of AAG.

9

(b)     Enforcement. The Physicians agree that a breach or violation of the terms of this Agreement by any of them may cause irreparable damage to the other, the exact amount of which is impossible to ascertain, and for that reason the Physicians agree that the non-breaching parties will be entitled to a decree of specific performance of the terms of this Agreement or an injunction restraining further breach or violation thereof by the breaching party or parties, said right to be in addition to any other remedies of the parties.

(c)     Amendments. This Agreement may be amended only with the approval of at least a majority of the Physicians. Any amendments to this Agreement shall be binding on all Physicians, the Medical Director and the Partners' Representative.

(d)     No Third Party Beneficiaries. This Agreement is entered into solely for the benefit of the parties hereto and no term, provision or covenant hereunder shall confer or be deemed to confer a benefit on any other person, other than as may be set forth herein.

(e)     Assignment. No party hereto may assign, delegate or otherwise transfer any of such party's rights, interests or obligations under this Agreement.

(f)     Severability. Each provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall, to the greatest extent possible, not affect the legality or validity of the remainder of this Agreement. In the event that any provision of this Agreement shall be declared by a court of competent jurisdiction to exceed the limits such court deems reasonable and enforceable, said provisions shall be deemed modified to the minimum extent necessary to make such provisions reasonable and enforceable.

(g)     No Waiver. Neither the failure nor any delay on the part of any party hereto in exercising any right, power or privilege granted herein shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise of any other right, power or privilege which may be provided by law.

(h)     Counterparts; Delivery by Facsimile. This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one agreement. This Agreement and any amendments hereto, to the extent signed and delivered by means of a facsimile machine or by e-mail in PDF or similar format, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto, each other party hereto or thereto shall re-execute original forms of this Agreement and deliver them to all other parties. No party hereto shall raise the use of a facsimile machine or e-mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or e-mail as a defense to the formation of a contract and each such party forever waives any such defense.

10

(i)     Controlling Law. This Agreement has been entered into in the State of Texas, and this Agreement, including any rights, remedies, or obligations provided for hereunder, shall be construed and enforced in accordance with the laws of the State of Texas.

(j)     Non-Voting Physicians. Notwithstanding anything herein to the contrary, Richard S. Himes, Jr., M.D., Richard L. Laube, M.D. and Gary J. Mihm, M.D. (the "Non-Voting Physicians") shall not be entitled to vote on any matter set forth herein and are not eligible to serve on the Advisory Board; provided however, that such Non-Voting Physicians shall have all other rights, and be bound by all obligations, of the Physicians under this Agreement.

(k)     Additional Physicians. From time to time after the Effective Date of this Agreement, the Advisory Board may invite new physicians hired by the Company ("New Physicians") to participate in the benefits and become bound by the terms of this Agreement by signing a joinder to this Agreement in a manner determined by the Advisory Board. In such event, the Advisory Board will determine any and all conditions, rights and duties associated with any New Physician's joinder to this Agreement and such New Physicians shall thereafter be "Physicians" hereunder for all purposes; provided however, that New Physicians shall not be subject to the provisions of Sections 4 and 5(a) through 5(d) of this Agreement and shall not be considered a "Physician" for the purposes of such sections.

(l)     Replacement Medical Directors. Any Replacement Medical Director must become bound by the terms of this Agreement by signing a joinder to this Agreement in the form of Exhibit C hereto.

(m)     Spousal Consent. As a condition precedent to the effectiveness of the Agreement, each Physician's spouse shall execute a consent substantially in the form attached hereto as Exhibit D.

[Signature Pages Follow]

11

IN WITNESS WHEREOF, the undersigned have executed and delivered this Advisory Board and Internal Operations Agreement to be effective as of the date first above written.

PHYSICIANS:

_____
Erick S. Allen, M.D.

_____
Mark Archibald, M.D.

_____
Scott Bale, M.D.

_____
Shawn A. Barrett, M.D.

_____
T. Mark Bedillion, M.D.

_____
Carolyn G. Biebas, M.D.

_____
Ravneet K. Biring, M.D.

_____
Elizabeth L. Buchholz, M.D.

_____
W. Andrew Buchholz, M.D.

_____
Noah S. Bunker, M.D.

_____
Paul Carrell, M.D.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Advisory Board and Internal Operations Agreement to be effective as of the date first above written.

_____
James C. Chapin, M.D.


_____
Holly Clause, M.D.


_____
David J. Cross, M.D.


_____
William J. Crowley, III, M.D.


_____
B. Will Curtis, M.D.


_____
Jad L. Davis, M.D.


_____
Brian D. Dewan, M.D.


_____
Khoa Do, M.D.


_____
Allen D. Dornak, M.D.


_____
Cedric Dupont, M.D.


_____
Stanley R. Eckert, M.D.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Advisory Board and Internal Operations Agreement to be effective as of the date first above written.

_____
Joseph D. Eddings, M.D.


_____
William A. Eilers, III, M.D.


_____
S. Drake Fason, M.D.


_____
Troy W. Gras, M.D.


_____
Deborah L. Hamill, M.D.


_____
Christine Harrison, M.D.


_____
LD R. Herzog, M.D.


_____
Steven S. Hewitt, M.D.


_____
Richard S. Himes, Jr., M.D.


_____
Everett Brew Houston, Jr., M.D.


_____
Rima Jakstys, M.D.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Advisory Board and Internal Operations Agreement to be effective as of the date first above written.

_____
Zeeyoung T. Jang, M.D.


_____
Jeffrey M. Jekot, M.D.


_____
Ann John, M.D.


_____
Joe D. Kocks, Jr., M.D.


_____
Richard L. Laube, M.D.


_____
Jonathan J. Lee, M.D.


_____
Scott J. Leighty, M.D.


_____
Suzanne N. Lima, M.D.


_____
Shelby Marquardt, M.D.


_____
Gary J. Mihm, M.D.


_____
George M. Miller, M.D.

23502.2-688675 v1

176

IN WITNESS WHEREOF, the undersigned have executed and delivered this Advisory Board and Internal Operations Agreement to be effective as of the date first above written.

_____
Steven E. Miller, M.D.


_____
Martin C. Milliken, M.D.


_____
Paul B. Nelson, M.D.


_____
Jeffrey J. Nitzsche, M.D.


_____
Oliver E. Orth, M.D.


_____
Sharon A. Oxford, M.D.


_____
Dimpal R. Patel, M.D.


_____
M. Brett Pillow, M.D.


_____
Vijay K. Ravula, M.D.


_____
Jeffrey J. Rockwell, M.D.


_____
Kevin R. Shelly, M.D.

23502.2-688675 v1

177

IN WITNESS WHEREOF, the undersigned have executed and delivered this Advisory Board and Internal Operations Agreement to be effective as of the date first above written.

_____
Gary W. Smith, M.D.


_____
Tracy D. Strandhagen, M.D.


_____
Ryan Sturgeon, M.D.


_____
Chi B. Vo, M.D.


_____
David J. Walton, M.D.


MEDICAL DIRECTOR:

_____
Noah Bunker, M.D.

Address:


PARTNERS' REPRESENTATIVE:

_____
Chi B. Vo, M.D.

Address:

23502.2-688675 v1

178

## EXHIBIT A

## ADVISORY BOARD

Noah S. Bunker, M.D.                    (term expires on [October 6], 2015)
Paul Carrell, M.D.                         (term expires on December 31, 2012)
Jad L. Davis, M.D.                         (term expires on December 31, 2013)
LD R. Herzog, M.D.                        (term expires on December 31, 2011)
Everett Brew Houston, Jr., M.D.       (term expires on December 31, 2013)
Jonathan J. Lee, M.D.                     (term expires on December 31, 2012)
Jeffrey J. Rockwell, M.D.                (term expires on December 31, 2011)

23502.2-688675 v1

## EXHIBIT B

## NOTICE ADDRESSES

| Last | First | Full Address |
|---|---|---|
| Allen | Erick S. | |
| Archibald | Mark | |
| Bale | Scott | |
| Barrett | Shawn A. | |
| Bedillion | T. Mark | |
| Biebas | Carolyn G. | |
| Biring | Ravneet K. | |
| Buchholz | Elizabeth L. | |
| Buchholz | W. Andrew | |
| Bunker | Noah S. | |
| Carrell | Paul | |
| Chapin | James C. | |
| Clause | Holly | |
| Cross | David J. | |
| Crowley, III | William J. | |
| Curtis | B. Will | |
| Davis | Jad L. | |
| Dewan | Brian D. | |
| Do | Khoa | |
| Dornak | Allen D. | |
| Dupont | Cedric | |
| Eckert | Stanley R. | |
| Eddings | Joseph D. | |
| Eilers, III | William A. | |
| Fason | S. Drake | |
| Gras | Troy W. | |
| Hamill | Deborah L. | |
| Harrison | Christine | |
| Herzog | LD R. | |
| Hewitt | Steven | |
| Himes, Jr. | Richard S. | |
| Houston, Jr. | Everett B. | |
| Jakstys | Rima | |
| Jang | Zeeyoung | |
| Jekot | Jeffrey M. | |
| John | Ann | |
| Kocks, Jr. | Joe D. | |

| | |
|---|---|
| Laube | Richard L. |
| Lee | Jonathan J. |
| Leighty | Scott J. |
| Lima | Suzanne N. |
| Marquardt | Shelby |
| Mihm | Gary J. |
| Miller | George M. |
| Miller | Steven E. |
| Milliken | Martin C. |
| Nelson | Paul B. |
| Nitzsche | Jeffrey J. |
| Orth | Oliver E. |
| Oxford | Sharon A. |
| Patel | Dimpal R. |
| Pillow | M. Brett |
| Ravula | Vijay K. |
| Rockwell | Jeffrey J. |
| Shelly | Kevin R. |
| Smith | Gary W. |
| Strandhagen | Tracy D. |
| Sturgeon | Ryan |
| Vo | Chi B. |
| Walton | David J. |

## EXHIBIT C

## JOINDER TO ADVISORY BOARD AND
## INTERNAL OPERATIONS AGREEMENT

I hereby accept my appointment as Medical Director pursuant to the Advisory Board and Internal Operations Agreement dated October 6, 2011 (the "Agrement"), and agree to be bound by the terms of, and to comply with and fulfill all obligations, commitments, and agreements otherwise imposed upon the Medical Director thereunder.

_____, M.D.
"Replacement Corporate Medical Director"

23502.2-688675 v1

## EXHIBIT D

## FORM OF SPOUSAL CONSENT

## WRITTEN CONSENT
## OF SPOUSE OF
_____, M.D.

In connection with that certain Advisory Board and Internal Operations Agreement entered into on October __, 2011 (the "Advisory Board Agreement"), by, between and among the individual physicians, including the Signatory (as defined below), whose names are set forth on the signature pages thereto (collectively, the "Physicians"), the undersigned, being the lawful spouse of _____, M.D. ("Signatory") hereby certifies as follows:

1.　　I hereby consent to the execution by Signatory of the Advisory Board Agreement and the performance by Signatory of Signatory's obligations under the Advisory Board Agreement.

2.　　I have had an opportunity to review the Advisory Board Agreement.

3.　　I have had an opportunity to consult with an attorney and other advisors regarding the Advisory Board Agreement and the transactions contemplated thereunder prior to executing and delivering this written consent.

4.　　I hereby acknowledge and agree that the Physicians and their respective agents and affiliates are entitled to rely on the consent provided hereunder.

**IN WITNESS WHEREOF,** the undersigned has duly executed this Written Consent on October ____, 2011.


_____
Name:


_____
Witness


23502.2-688675 v1

389 S.W.3d 544
Court of Appeals of Texas,
Houston (1st Dist.).

Javier ALVARADO, Appellant
v.
LEXINGTON INSURANCE COMPANY, Appellee.

Nos. 01–10–00740–CV, 01–10–01150–CV. | Oct. 18, 2012.

**Synopsis**
**Background:** Mortgagor brought action against insurance company that issued "force-placed" insurance policy to mortgagee, for breach of contract, breach of the duty of good faith and fair dealing, and violations of the Insurance Code and the Deceptive Trade Practices Act, after insurance company rejected mortgagor's claim for property damage following a hurricane. The 11th District Court, Harris County, Mike Miller, J., granted insurance company's motion for summary judgment. Mortgagor appealed.

**[Holding:]** On rehearing, the Court of Appeals, Evelyn V. Keyes, J., held that mortgagor qualified as a third-party beneficiary under policy.

Reversed and remanded.

Jane Bland, J., dissented.

Opinion, 371 S.W.3d 417, superseded.

**Attorneys and Law Firms**

**\*546** Wyatt David Snider, Snider & Byrd, LLP, Beaumont, TX, Jacqueline M. Stroh, The Law Office of Jacqueline M. Stroh, San Antonio, TX, for Appellant.

William M. Briscoe, Eggleston & Briscoe, LLP, Michael F. Hord, Hirsch & Westheimer, P.C., Houston, TX for Appellee.

Panel consists of Justices KEYES, BLAND, and SHARP.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**OPINION ON REHEARING**

EVELYN V. KEYES, Justice.

Appellee, Lexington Insurance Company ("Lexington"), moved for rehearing of our April 19, 2012 opinion. We grant the motion for rehearing, withdraw our April 19, 2012 opinion and judgment, and issue this opinion and judgment in their stead. Our disposition remains the same. We dismiss Lexington's May 21, 2012 motion for en banc reconsideration as moot. [1]

Appellant, Javier Alvarado, sued Lexington for breach of contract, breach of the duty of good faith and fair dealing, and violations of the Texas Insurance Code and the Deceptive Trade Practices Act ("DTPA") after Lexington rejected Alvarado's claim for property damage following Hurricane Ike. The trial court rendered summary judgment in favor of Lexington. In one issue, Alvarado contends that the trial court erred in rendering summary judgment because Lexington did not conclusively negate Alvarado's status as a third-party beneficiary under the "force-placed" insurance policy issued by Lexington to Alvarado's mortgage lender.

We reverse and remand for further proceedings consistent with this opinion.

**Background**

Before May 2008, Alvarado maintained homeowner's insurance on his property with Columbia Lloyds. Alvarado testified by affidavit that when he refinanced his mortgage in May 2008 with Flagstar Bank ("Flagstar"), a Flagstar representative informed him that he had to cancel his policy with Columbia Lloyds and that Flagstar would obtain homeowner's insurance on his behalf. Flagstar obtained a "force-placed" insurance policy on Alvarado's property with Lexington ("the Policy"). [2] Alvarado's **\*547** monthly payments to Flagstar included the principal and interest on his mortgage, as well as taxes and the premiums on the Policy.

In September 2008, Alvarado's property sustained damage as a result of Hurricane Ike. Flagstar made a claim on the Policy, and Lexington paid Flagstar $4,410.49 in damages. According to Alvarado's affidavit, Flagstar did not provide any of these funds to Alvarado for the purpose of repairs, and it did not apply these funds to the balance of his mortgage. The application of these funds is not part of the record.

After Lexington denied his claim for damages, Alvarado sued Lexington for breach of contract, breach of the duty of good faith and fair dealing, and various violations of the Texas Insurance

Code and the DTPA. [3] Alvarado alleged that he was the owner of the Policy and that Lexington had "sold the policy, insuring the property to [Alvarado] or [Alvarado's] predecessors in interest." Among other allegations, Alvarado argued that Lexington "failed to perform [its] contractual duty to adequately compensate [Alvarado] under the terms of the policy" and that Lexington "misrepresented to [Alvarado] that the damage to the property was not covered under the policy, even though the damage was caused by a covered occurrence."

Lexington moved for traditional summary judgment. It argued that Alvarado could not recover on any of his claims because Lexington never entered into a contract with Alvarado; Alvarado was neither a named insured nor an additional insured on the Policy; Flagstar obtained the Policy "to protect its interest in the residence for which Flagstar was the mortgagee"; the Policy provided that all payments for damages were to be made solely to Flagstar; and the Policy "expressed no intent to benefit [Alvarado] in any way." Lexington contended that Alvarado did not qualify as a third-party beneficiary of the Policy and that, as a result, no legal relationship existed between it and Alvarado and Alvarado lacked standing to bring his claims. [4]

As summary judgment evidence, Lexington attached a copy of the Policy as Exhibit A. Lexington pointed out that the "Common Policy Declarations" in the Policy provide that "Flagstar Bank, FSB" is the "named insured" and that the "Mortgage Guard Property Policy" section further defines "named insured" as "the Lending Institution named on the Declaration Page" and "you" as "the Named Insured shown in the Declarations." It further pointed out that the Policy states, "In consideration of the premium to be charged we will (as shown on the Declaration Page) insure ... the Lending Institution (you, as shown on the Declaration Page) against direct physical loss resulting from destruction of or damage to your property...." It also pointed to language in the Policy stating that the Policy provides coverage for the dwelling, other structures on the property, personal property, and loss of use "in which the insured has a mortgage and/or owner interest." Lexington argued that, although the Policy covers personal property, that coverage is limited to the extent to which Flagstar, as **\*548** the named insured, has a mortgage or ownership interest in the property.

The Policy also includes the following "Mortgage Clause":

> Loss, if any, under this policy will be payable to the mortgagee (or trustee) as its interests may appear under all present or future mortgages upon the Covered Property described on the reporting forms in which mortgagee may have an interest as mortgagee (or trustee) in order of precedence of said mortgages.

Lexington pointed out that the "Loss Payable" clause provides, "Loss will be adjusted with and made payable to you unless another payee is specifically named." It observed that this clause does not provide that Alvarado, the borrower, is entitled to proceeds in excess of Flagstar's insurable

interest in the property, nor does it allow Alvarado to participate in the claim adjustment process. It emphasized that neither Alvarado nor his property is specifically mentioned in the Policy.

In response to Lexington's summary judgment motion, Alvarado argued that Endorsement # 12 to the Policy, entitled "Special Broad Form Homeowners Coverage," expressly provides homeowners' coverage for homeowners of properties specified on reporting forms referenced by the Policy. He argued that this endorsement directly benefits him and supports his third-party beneficiary status. Alvarado pointed to language in Endorsement # 12 defining "insured" as "[y]ou and residents of your household" and defining "insured location" as the "residence premises," which is further defined as "[t]he one family dwelling where you reside." He contended that this language refers to him and not to Flagstar, the mortgage company. Alvarado also pointed out that Endorsement # 12 provides coverage for direct physical loss to property, additional living expenses, personal property damage, personal liability for suits brought against the insured for bodily injury or property damage, and medical payments to others. He contended that this coverage could only apply to him and not to Flagstar. He also argued that Endorsement # 12 confers a benefit upon him because the endorsement's "Mortgage Clause" provides, "If a mortgagee is named in this policy, any loss payable under Coverage A or B will be paid to the mortgagee and you, as interests appear." According to Alvarado, "This clearly shows that the word 'you' in the Endorsement refers to [Alvarado] ... but it does not necessarily refer to the mortgagee which would be Flagstar Bank." Therefore, Alvarado contended, because Endorsement # 12 "was intended to confer a direct benefit" on him, he qualifies as a third-party beneficiary of the Policy.

Lexington replied and argued that Endorsement # 12 "only provides homeowners coverage for property and damages in which *Flagstar* has a mortgage and/or an ownership interest." (Emphasis in original.) Lexington contended that the

> Supplemental Declaration Page [to the Policy] qualifies *every statement* made about homeowner's insurance in the Policy, leaving no doubt that all homeowner's coverage statements and inclusions are meant *solely and exclusively* to pertain to the insured, Flagstar Bank's, interest. Any references [Alvarado] makes to the Homeowners Coverage Form are limited by the Supplemental Declaration Page.

(Emphasis in original.) Lexington argued that, under the supplemental declarations, any coverage provided pursuant to the Policy is limited to property or damages in which the named insured, which is defined in the Common Policy Declarations solely as Flagstar, has a mortgage or ownership interest. Lexington also argued that the Policy language clearly defines "you" as **\*549** the "Named Insured shown in the Declarations" and that Alvarado is not named as an insured, additional insured, or third-party beneficiary in any part of the Policy, including Endorsement # 12.

Neither Lexington nor Alvarado submitted any summary judgment evidence demonstrating whether or not Alvarado's property is specified on the reporting forms submitted by Flagstar to Lexington showing properties covered by Endorsement # 12. Nor is there any evidence as to what Flagstar's and Alvarado's interests in the property are. However, there is some evidence, in the form of Alvarado's affidavit, that Flagstar submitted a claim under the Policy to Lexington for damage to Alvarado's property and that Flagstar did not repair the damage, did not distribute the funds to Alvarado to repair the damage, and did not apply the funds to the balance of Alvarado's mortgage.

 **[1]**   On August 19, 2010, the trial court granted Lexington's motion for summary judgment. Because Alvarado's claims against Bower, Flagstar, and Proctor Financial remained pending, this was an interlocutory order that was not yet final and appealable. Alvarado, however, prematurely filed a notice of appeal, and the appeal was assigned to this Court and given appellate cause number 01–10–00740–CV. Alvarado filed a motion to sever his claims against Lexington, which the trial court granted, and the trial court then rendered judgment in favor of Lexington on November 19, 2010. After the trial court rendered this final judgment, Alvarado filed a second notice of appeal, which resulted in appellate cause number 01–10–01150–CV. We decide the first-filed appeal, appellate cause number 01–10–00740–CV, and dismiss appellate cause number 01–10–01150–CV. [5]

## Standard of Review

We review de novo the trial court's ruling on a summary judgment motion. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 848 (Tex.2009). To prevail on a traditional summary judgment motion, the movant must establish that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Little v. Tex. Dep't of Criminal Justice,* 148 S.W.3d 374, 381 (Tex.2004). When a defendant moves for summary judgment, it must either: (1) disprove at least one essential element of the plaintiff's **\*550** cause of action, or (2) plead and conclusively establish each essential element of its affirmative defense, thereby defeating the plaintiff's cause of action. *Cathey v. Booth,* 900 S.W.2d 339, 341 (Tex.1995).

If the movant meets its burden, the burden then shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *See Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995). The evidence raises a fact issue if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes,* 236 S.W.3d 754, 755 (Tex.2007) (per curiam). To determine if the nonmovant has raised a fact issue, we view the evidence in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not. *See Fielding,* 289 S.W.3d at 848 (citing *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005)). We indulge every reasonable inference and resolve any doubts in

the nonmovant's favor. *See Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002) (citing *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997)).


**Third–Party Beneficiary Status**

In his sole issue, Alvarado contends that the trial court erred in rendering summary judgment in favor of Lexington because Lexington failed to conclusively negate his status as a third-party beneficiary of the Policy. Lexington responds that this Court should overrule Alvarado's sole issue and affirm the summary judgment because Alvarado failed to plead his third-party-beneficiary status. It further argues that we should affirm the summary judgment because Alvarado failed to raise a genuine issue of material fact with respect to his third-party-beneficiary status.


*1. Alvarado's Right to Argue His Third–Party–Beneficiary Status*

**[2]** Before we address the merits of Alvarado's sole issue, we address Lexington's contention that Alvarado was required to plead third-party beneficiary status, and that, because he did not, we should affirm the trial court's summary judgment on that basis alone.


**[3]** Lexington's contention is without merit. Lexington itself raised the issue of Alvarado's third-party-beneficiary status by arguing in its summary judgment motion that Alvarado did not qualify as a third-party beneficiary to the Policy and therefore lacked standing. Standing is a jurisdictional issue that cannot be waived and may be raised at any time. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 445 (Tex.1993). Here, it was raised by Lexington as grounds for granting it summary judgment against Alvarado.

Rule 166a provides that a defendant against whom a claim is asserted "may, at any time, move with or without supporting affidavits for summary judgment in his favor as to all or any part thereof." TEX.R. CIV. P. 166a(b). The Rule further provides that summary judgment shall be granted if the motion and the summary judgment evidence "show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or other response." *Id.* 166a(c). Lexington moved for summary judgment on all of Alvarado's claims on the ground that he lacked standing to pursue them because he was neither a party to the insurance contract between Lexington and Flagstar nor **\*551** a third-party beneficiary of the contract. Alvarado responded to this issue in his summary judgment response. The issue of Alvarado's third-party-beneficiary status was thus squarely before the trial court in Lexington's motion and Alvarado's response. Lexington's contention that Alvarado may not seek to overturn a summary judgment on the very issue it presented to the trial court in its own motion as the basis for granting summary judgment is directly contrary to the express language of Rule 166a and is without merit.

We now turn to the merits of Alvarado's sole issue.

## 2. Third–Party–Beneficiary Status Under Force–Placed Insurance Policies

[4]  [5]  [6]  [7]  [8]  Insurance contracts are subject to the same rules of construction as ordinary contracts. *Archon Invs., Inc. v. Great Am. Lloyds Ins. Co.,* 174 S.W.3d 334, 338 (Tex.App.-Houston [1st Dist.] 2005, pet. denied) (citing *Trinity Universal Ins. Co. v. Cowan,* 945 S.W.2d 819, 823 (Tex.1997)). When a policy permits only one reasonable interpretation, we construe it as a matter of law and enforce it as written. *Id.* (citing *Upshaw v. Trinity Cos.,* 842 S.W.2d 631, 633 (Tex.1992)). When construing an insurance policy, "[w]e must strive to effectuate the policy as the written expression of the parties' intent." *Id.* (citing *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 433 (Tex.1995)). To discern the intent of the parties to a contract, the court examines and considers the entire writing to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless, no single provision taken alone will be given controlling effect, and all the provisions will be considered with reference to the whole instrument. *In re Serv. Corp. Int'l,* 355 S.W.3d 655, 661 (Tex.2011). If the term to be construed is unambiguous and susceptible of only one construction, we "give the words in the policy their plain meaning." *Archon,* 174 S.W.3d at 338 (citing *Devoe v. Great Am. Ins.,* 50 S.W.3d 567, 571 (Tex.App.-Austin 2001, no pet.)).

[9]  [10]  In determining whether a third party can enforce a contract, we look only to the intention of the contracting parties. *Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.,* 348 S.W.3d 894, 900 (Tex.2011); *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 651 (Tex.1999); *Union Pac. R.R. Co. v. Novus Int'l, Inc.,* 113 S.W.3d 418, 421 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). The fact that a person might receive an incidental benefit from a contract to which he is not a party does not give that person a right to enforce the contract. *Basic Capital Mgmt.,* 348 S.W.3d at 899–900; *MCI Telecomms.,* 995 S.W.2d at 651; *Union Pac.,* 113 S.W.3d at 421.

[11]  [12]  [13]  [14]  A third party may recover on a contract made between other parties only if the contracting parties intended to secure a benefit to the third party and only if the contracting parties entered into the contract directly for the third party's benefit. *Basic Capital Mgmt.,* 348 S.W.3d at 900; *MCI Telecomms.,* 995 S.W.2d at 651; *Union Pac.,* 113 S.W.3d at 421. The third party must show that he is either a donee or a creditor beneficiary of the contract, and not one who is only incidentally benefitted by its performance. *MCI Telecomms.,* 995 S.W.2d at 651; *Union Pac.,* 113 S.W.3d at 421. A party is a donee beneficiary if the promised performance will, when rendered, come to him as pure donation. *MCI Telecomms.,* 995 S.W.2d at 651; *Union Pac.,* 113 S.W.3d at 421. If that performance will come to him in satisfaction of a legal duty owed to him by the promisee, such as an "indebtedness, contractual obligation or other legally enforceable **\*552** commitment," he is a creditor beneficiary. *MCI Telecomms.,* 995 S.W.2d at 651; *Union Pac.,* 113 S.W.3d at 421.

**[15]** **[16]** **[17]** "We glean intent from what the parties said in their contract, not what they allegedly meant." *Union Pac.,* 113 S.W.3d at 421. We will not create a third-party beneficiary contract by implication. *Basic Capital Mgmt.,* 348 S.W.3d at 900; *MCI Telecomms.,* 995 S.W.2d at 651; *Union Pac.,* 113 S.W.3d at 422; *see also Tawes v. Barnes,* 340 S.W.3d 419, 425 (Tex.2011) ("[I]n the absence of a clear and unequivocal expression of the contracting parties' intent to directly benefit a third party, courts will not confer third-party beneficiary status by implication."). As the Texas Supreme Court held in *MCI Telecommunications,*

> The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied. Consequently, a presumption exists that parties contracted for themselves unless it "clearly appears" that they intended a third party to benefit from the contract.

995 S.W.2d at 651; *see also Basic Capital Mgmt.,* 348 S.W.3d at 900 (quoting same).

**[18]** **[19]** Due to the presumption against finding third-party beneficiaries to contracts, courts will generally deny third-party-beneficiary claims unless: (1) the obligation of the bargain-giver is fully spelled out, (2) it is unmistakable that a benefit to the third party was within the contemplation of the contracting parties, and (3) the contracting parties contemplated that the third party would be vested with the right to sue for enforcement of the contract. *Union Pac.,* 113 S.W.3d at 422. We resolve all doubts against conferring third-party-beneficiary status. *Tawes,* 340 S.W.3d at 425; *see also First Union Nat'l Bank v. Richmont Capital Partners I, L.P.,* 168 S.W.3d 917, 929 (Tex.App.-Dallas 2005, no pet.) ("If there is any reasonable doubt as to the intent of the contracting parties to confer a direct benefit on the third party, then the third-party beneficiary claim must fail.").

Texas's third-party beneficiary policy was recently examined and explained by the Texas Supreme Court in *Basic Capital Management.* 348 S.W.3d 894. In that case, Basic managed real estate investment trusts, including American Realty Trust, Inc. ("ART") and Transcontinental Realty Investors, Inc. ("TCI"). *Id.* at 896. Basic and Dynex signed a Commitment, in which Dynex agreed to loan funds to "single-asset, bankruptcy-remote entities" ("SABREs") owned by ART and TCI if Basic would "propose other acceptable SABREs to borrow $160 million over a two-year period." *Id.* at 896–97. The issue on appeal was whether ART and TCI could recover damages from Dynex for its alleged breach of the Commitment as third-party beneficiaries to the Commitment. *Id.* at 898.

The supreme court reasoned that, because the intention to confer a direct benefit to a third party must be clearly and fully spelled out in the contract for that party to have standing as a third-party beneficiary, "a presumption exists that parties contracted for themselves unless it clearly appears that they intended a third party to benefit from the contract." *Id.* at 900. Although only Dynex and Basic had signed the Commitment, "Dynex knew that the purpose of the Commitment was

to secure future financing for ART and TCI, real estate investment trusts that Basic managed and in which it held an ownership interest." *Id.* Not only was Basic not intended to be the borrower, but the Commitment expressly required that the borrowers be SABREs acceptable to Dynex, and Dynex knew that Basic would not own the SABREs. *Id.*

**\*553** The court concluded that this requirement was for Dynex's benefit, since SABREs are designed to provide more certain recourse to collateral in the event of default. *Id.* The court pointed out that "SABRE-borrowers provided a mechanism for ART and TCI to hold investment property directly but in a way that would provide Dynex greater security." *Id.* Thus, "if Dynex and Basic did not intend the Commitment to benefit ART and TCI directly, then the Commitment had no purpose whatsoever." *Id.* Moreover, the Commitment "clearly and fully spelled out the benefit to ART and TCI because their role was basic to Dynex's and Basic's agreement." *Id.* at 901. The court concluded, "The Commitment itself, and the undisputed evidence regarding its negotiation and purpose, establish that ART and TCI were third-party beneficiaries." *Id.*

Although Texas state courts have addressed whether a party may be a third-party beneficiary in the general insurance policy context, they have not addressed the specific issue of whether a homeowner-borrower qualifies as a third-party beneficiary under a force-placed insurance policy entered into between the insurance company and the mortgage company. *See, e.g., Paragon Sales Co. v. N.H. Ins. Co.,* 774 S.W.2d 659, 660–61 (Tex.1989) (holding distributor presented some evidence that it was third-party beneficiary of indemnity contract between insurance company and public motor carrier). As a result of Hurricanes Dolly, Katrina, and Rita, however, some federal courts within the Fifth Circuit Court of Appeals' jurisdiction, primarily in Louisiana, have addressed this issue and have reached differing conclusions as to the homeowner's third-party-beneficiary status according to the specific terms of the policy and the facts of the case.

When deciding whether a homeowner-borrower is a third-party beneficiary under a force-placed insurance policy, the federal courts applying state law, like the Texas courts, have looked to the language of the policy to determine whether any of the provisions clearly confer a direct benefit upon the borrower. Thus, for example, the Fifth Circuit has found third-party beneficiary status to exist (1) when the policy, although only listing the mortgage company as a named insured, contains a subrogation clause providing that the homeowner-borrower will not be liable to the insurance company for any loss paid to the named insured and (2) when the policy contains a provision allowing for temporary housing expenses to be paid to the homeowner-borrower. *See Palma v. Verex Assurance, Inc.,* 79 F.3d 1453, 1457–58 (5th Cir.1996) (subrogation clause case decided under Texas law).

In *Palma,* the Fifth Circuit held that the inclusion of the subrogation clause within the insurance policy demonstrated a clear intention on the part of the contracting parties to benefit the homeowner-borrower. *See id.* at 1458 ("[The subrogation clause] is written for the sole benefit of

the borrower.... We also find that the insurance contract was actually made, in part, for the benefit of Palma [the borrower]."); *see also Henderson v. Certain Underwriters at Lloyds, London,* Civil Action No. 09–1320, 2009 WL 3190710, at \*3 (E.D.La. Sept. 30, 2009) (slip op.) (noting that plaintiff's standing was limited solely to seeking temporary housing expenses because this was only clause in policy providing direct benefit to borrower).

Primarily, the federal district courts have focused on whether the policy contains one of two specific clauses that may benefit the borrower: (1) an "excess loss" or "residual payment" clause or (2) a clause providing that the insurer will adjust all personal property losses with, and pay any such proceeds to, the homeowner- **\*554** borrower. A common excess loss clause provides as follows:

> We will adjust all losses with you [the mortgagee and named insured]. We will pay you but in no event more than the amount of your interest in the "insured location." Amounts payable in excess of your interest will be paid to the "borrower" unless some other person is named by the "borrower" to receive payment....

*See, e.g., Turner v. Gen. Ins. Co. of Am.,* Civil Action No. 5:09cv00057–DCB–JMR, 2009 WL 3247302, at \*3 (S.D.Miss. Oct. 7, 2009) (slip op.). If the policy provides coverage for personal property, the insurance policy may include a clause providing that the insurer will adjust all losses to personal property with the homeowner-borrower and will pay the borrower any proceeds for such loss, unless the borrower has named another person to receive payment. *Id.*

A number of courts in the cases in which there were force-placed policies with such clauses have found third-party-beneficiary status for homeowners under the terms of the particular policy. For example, in *Lee v. Safeco Insurance Co. of America,* the United States District Court for the Eastern District of Louisiana held that the excess loss clause, which "clearly stipulate[d] that the portion of any loss payment exceeding the value of [the mortgagee's] interest in the property will be paid directly to [the homeowner-borrower]," manifested a "clear intent to benefit the borrower." Civil Action No. 08–1100, 2008 WL 2622997, at \*4 (E.D.La. July 2, 2008) (not designated for publication); *see Turner,* 2009 WL 3247302, at \*4; *Beck v. State Farm Fire & Cas. Co.,* No. 2:07 CV 1998, 2008 WL 4155301, at \*2 (W.D.La. Sept. 5, 2008) (not designated for publication) (finding third-party-beneficiary status when policy contained excess loss clause and provision allowing for adjustment of personal property losses with and payment of such losses to borrower); *Navarrete v. Gen. Ins. Co. of Am.,* Civil Action No. 07–4865, 2008 WL 659477, at \*2 (E.D.La. Mar. 7, 2008) (not designated for publication) (same); *Peters v. Safeco Gen. Ins. of Am.,* Civil Action No. 07–5612, 2008 WL 544226, at \*1 (E.D.La. Feb. 25, 2008) (not designated for publication) (same); *Martin v. Safeco Ins. Co.,* Civil Action No. 06–6889, 2007 WL 2071662, at \*3 (E.D.La. July 13, 2007) (not designated for publication) (same); *see also Hickman v. SAFECO Ins. Co. of Am.,* 695 N.W.2d 365, 370–71 (Minn.2005) (holding same when policy contained excess

loss clause, coverage for personal property, provision that insurer would adjust personal property losses with borrower and would pay borrower, and provision allowing borrower to seek arbitration of appraisal of covered loss).

The Eastern District of Louisiana has also held, however, that a homeowner-borrower was *not* a third-party beneficiary to an insurance policy containing an excess loss clause when the claimed damages did not exceed the mortgagee's interest in the property, as required by the terms of the policy for her to be considered an additional insured. *Graphia v. Balboa Ins. Co.,* 517 F.Supp.2d 854 (E.D.La.2007). In *Graphia,* the policy provided that the borrower "shall be considered an additional insured with respect to any residual amounts of insurance over and above [the mortgagee's] insurable interest." *Id.* at 857. The borrower claimed damages of $56,542.91, and she presented evidence that the balance remaining on her loan was $110,000. *Id.* The court noted that there was "no amount 'due for the loss' that exceeds [the mortgagee's] insurable interest." *Id.* The court concluded, "The contract does manifest a clear intention to benefit Graphia, but only to the extent that she has an insurable interest in the property. **\*555** The contract evidences no intent to give plaintiff personal rights in the insurance coverage for losses that do [not] exceed the mortgagee's insurable interest." *Id.* at 858. Because her losses did not exceed the mortgagee's interest in the property, Graphia received only an incidental benefit from this policy and, therefore, could not enforce the contract. *Id.; cf. Mingo v. Meritplan Ins. Co.,* No. 2:06 CV 1914, 2007 WL 4292026, at \*3 (W.D.La. Dec. 4, 2007) (not designated for publication) (denying insurer's motion to dismiss for lack of standing because parties disputed amount of loss and record did not reflect either amount of mortgage or mortgagee's interest in property).

The federal courts have also found the force-placed homeowner not to be a third-party beneficiary when the homeowner did not receive a direct benefit from the policy under the policy's own terms. Specifically, the federal courts have denied third-party beneficiary status when the insurance policy states (1) that it does not provide coverage for loss of use, personal liability, or personal property, (2) that the mortgagee is the sole insured, (3) that the policy is intended to protect the mortgagee's interest only and not the borrower's, or (4) that all losses will be adjusted with and made payable to the named insured, the mortgage company. *See Williams v. Certain Underwriters at Lloyd's of London,* 398 Fed.Appx. 44, 48–49 (5th Cir.2010) (not designated for publication) (policy specified that mortgagee was sole insured and all benefits were payable directly to mortgagee); *Lumpkins v. Balboa Ins. Co.,* 812 F.Supp.2d 1280, 1283–84 (N.D.Okla.2011) (policy provided no coverage for contents, personal effects, personal living expenses, fair rental value or liability and stated that contract was only with named insured and only intended to protect named insured's interest); *Barrios v. Great Am. Assurance Co.,* Civil Action No. H–10–3511, 2011 WL 3608510, at \*4 (S.D.Tex. Aug. 16, 2011) (slip op.) (policy specified that, unless homeowners coverage was specifically added by endorsement, homeowner-mortgagor was not insured under policy); *Williams v. Fid. Nat'l Ins. Co.,* Civil Action No. 07–4428, 2009 WL 2922310, at \*3 (E.D.La. Sept. 8, 2009) (not designated for publication) (policy specified that, despite insurable

interests of homeowner, only mortgagee was insured under policy); *Simpson v. Balboa Ins. Co.,* Civil Action No. 2:08cv281KS-MTP, 2009 WL 1291275, at *3–4 (S.D.Miss. May 7, 2009) (policy provided no coverage for loss of use, personal liability, or personal property and no right of borrower to participate in claim adjustment); *Jones v. Proctor Fin. Ins. Corp.,* Civil Action No. 06–9503, 2007 WL 4206863, at *3 (E.D.La. Nov. 21, 2007) (not designated for publication) (policy provided no coverage for personal property, and adjustment of and payment for loss would be made solely to mortgagee); *Paulk v. Balboa Ins. Co.,* No. 1:04CV97, 2006 WL 1994864, at *3 (S.D.Miss. July 14, 2006) (not designated for publication) (same); *see also Scheaffer v. Balboa Ins. Co.,* 1 So.3d 756, 759 (La.Ct.App.2008) (notice of premium informed borrower that he was not insured under policy, that he was not entitled to receive proceeds, and that policy protected only mortgagee's interest).

Mere payment of the force-placed-policy premiums by the homeowner-borrower, without more, does not necessarily confer third-party-beneficiary status on the borrower. *See Scheaffer,* 1 So.3d at 760; *Lee,* 2008 WL 2622997, at *3 ("Mere payment or reimbursement of insurance premiums by a plaintiff to an insurance provider does not create a right to recovery under an insurance policy when the plaintiff is not the named insured and is nowhere named in the policy.").

**\*556** *3. Alvarado's Status Under Flagstar's Force–Placed Policy*

On appeal, Alvarado argues that he has third-party-beneficiary status under the Policy. He contends that Endorsement # 12 to the Policy, which provides "Special Broad Form Homeowners Coverage," is analogous to an excess loss clause or a clause allowing for adjustment and payment of losses to the borrower. He argues that it demonstrates that Lexington and Flagstar clearly intended to benefit him because the terms of this endorsement provide the type of coverage that he, as the homeowner, would seek to obtain if he contracted directly with Lexington to procure homeowner's insurance and that these provisions are irrelevant to Flagstar as the mortgagee of the property. He points out that Flagstar required the Policy when it loaned him the money to purchase his house and took a mortgage on it. Alvarado paid the premiums on this force-placed Policy as a separate part of his monthly mortgage payments, and Endorsement # 3 to the Policy required a higher premium for the Special Broad Form Homeowners Coverage.

Lexington responds that Flagstar is the sole named insured in the Policy, that Alvarado is not mentioned in the Policy, and that the plain language of the Policy can reasonably be construed only as protecting Flagstar's mortgage interest in the property up to the extent of that interest, not as protecting Alvarado's interest. It argues, therefore, that the Policy cannot be construed as intended to benefit Alvarado, as a matter of law; that Alvarado is not a third-party beneficiary to the Policy under prevailing law construing force-placed insurance policies; and that Alvarado has failed to raise a material fact issue as to his third-party-beneficiary status.

We conclude that Lexington has failed to prove that Alvarado lacks third-party-beneficiary status as a matter of law.

### *a. The "Common Policy Declarations" and the "Supplemental Declaration Page" of the Policy*

As Lexington states, the "Common Policy Declarations" in the "Commercial Lines Policy" at issue list "Flagstar Bank, FSB" as the sole "Named Insured." These Declarations state that the Policy "consists of the following coverage parts for which a premium is indicated," namely, a "Mortgage Guard Property Coverage Part." The Common Policy Declarations then state:

> THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

For the "Form(s) and Endorsements(s) made part of this policy at time of issue," the Common Policy Declarations page states, "See attached Table of Contents." The Table of Contents lists as "[c]overage forms and endorsements forming a part of this policy" the "Mortgage Guard Property Policy" and a number of additional endorsements, including Endorsement # 12, a "Homeowners 3 Special Form" providing "Special Broad Form Homeowner's Coverage." The Common Policy Declarations state that the complete Policy consists not only of the common declarations and policy conditions, but also of the coverage part declarations, coverage part forms, and "the forms and endorsements, if any, issued to form a part" of the Policy. In this case, therefore, the Policy at issue includes not only the Common Policy Declarations and the Mortgage Guard Property Policy with its declarations, but also Endorsement **\*557** # 12, the Special Broad Form Homeowner's Coverage form, with its declarations.

In addition to the Common Policy Declarations, the Policy includes a "Supplemental Declaration Page" that sets out Lexington's "Limits of Liability" under the Common Policy:

| $1,000,000. | Per property | On Commercial or |
| --- | --- | --- |
| | | Residential Properties* |
| $500,000. | Per location | Mobile Home Properties* |
| $1,000,000. | Per property | Windstorm and Hail only* |

*Homeowners Coverage as reported as HO on the reporting form*

A. Dwelling-*$500,000.* Any one loss [*]

B. Other Structures-*$50,000.* Or 10% of the insured value, whichever is the lesser [*]

C. Personal Property-*$250,000.* Or 50% of the insured value, whichever is the lesser [*]

D. Loss of Use-*$100,000.* Or 20% of the insured value, whichever is the lesser [*]

Thus, the Policy provides that Lexington's liability is limited to $1,000,000 "per property." Additionally, coverage for properties with "Homeowners Coverage as reported as HO on the reporting form" is limited to $500,000 for "any one loss," plus the lesser of $50,000 or 10% of the insured value for any other structure on the property, plus the lesser of $250,000 or 50% of the insured value of any personal property, plus the lesser of $100,000 or 20% of the insured value for loss of use. An asterisk by each of these categories of covered loss limits Lexington's liability to properties "in which the Insured has a mortgage and/or owner interest and which is specifically described in the Reporting Mechanism agreed upon by the Company." Lexington has produced no summary judgment evidence that Alvarado's property was not among the properties with "Homeowners Coverage" reported by Flagstar on Lexington's reporting form and specifically described by Flagstar in Lexington's Reporting Mechanism at the time of the occurrence made the basis of his claim. However, it did produce the "Homeowners Coverage" part of the Policy, Endorsement # 12, as part of the Policy applicable to Alvarado, and Alvarado has averred that he paid premiums for this coverage. Therefore, we assume, for purposes of the summary judgment motion, that Alvarado did have Homeowners Coverage and therefore was included on Lexington's reporting forms. *See Sw. Elec. Power Co.,* 73 S.W.3d at 215.

### b. The "Mortgage Guard Property Policy"

The "Mortgage Guard Property Policy" provides that "[t]hroughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations," namely Flagstar, and that "[t]he words 'we', 'us' and 'our' refer to the Company providing this insurance," i.e., Lexington. The Mortgage Guard Property Policy sets out the agreement of Lexington and Flagstar with respect to this part of the Policy:

> In consideration of the premium to be charged we will (as shown on the Declaration Page) insure (but only in the event there is no other insurance applicable) the Lending Institution (you, as shown on the Declaration Page [here, Flagstar] ) against direct physical loss resulting from destruction of or damage to your property, reported by you on the reporting forms furnished by us, for the Covered Causes of Loss described in this policy.

The Mortgage Guard Property Policy thus protects Flagstar against physical loss to its property reported on Lexington's reporting **\*558** forms, but "only in the event there is no other insurance applicable."

The Mortgage Guard Property Policy identifies several types of interest the "Named Insured" lending institution, Flagstar, may have in a property and may report on Lexington's reporting forms. These include a "Loan" consisting of "an advance of funds or a loan secured by a note and first or second 'mortgage interest/loan balance' evidenced by a contract of sale for real property." Correspondingly, the Policy defines a "Borrower" as an individual "obligated on a 'loan' ... and [who] has ... an interest in the property securing such 'loan.' " The Mortgage Guard Property Policy states, "Loss will be adjusted with and made payable to you unless another payee is specifically named." The "Mortgage Clause" states, "Loss, if any, under this policy will be payable to the mortgagee [Flagstar] (or trustee) as its interests may appear under all present or future mortgages upon the Covered Property described on the reporting forms in which mortgagee may have an interest as mortgagee (or trustee) in order of precedence of said mortgages." Thus, the Mortgage Guard Property Policy, by its own terms, insures Flagstar against direct physical loss resulting from the destruction of or damage to "your property," i.e., property in which it has a mortgage or ownership interest and that is reported by Flagstar on Lexington's reporting forms, in the event there is no other insurance applicable.

The "Policy Conditions" for the Mortgage Guard Property Policy confirm the intent of the contracting parties to cover physical loss to covered property at described locations, stating, "Our liability for loss with respect to any property covered will not exceed the Limit of Liability stated in the Declarations as applicable, nor exceed, in any event, the lesser of the amount it would cost to repair or replace with material of like kind and quality, or the amount of insurance specified on each Covered Property at the Described Location on the reporting forms completed by you and furnished to us."

Provisions in the Mortgage Guard Property Policy specify the means by which Flagstar must report damage for property; they grant it permission, "[i]n the event of loss ... to make reasonable repairs ... provided the repairs are confined solely to the protection of the Covered Property from further damage and provided you keep an accurate record of the repair expenditures," to "be included in determining the amount of loss"; they impose duties of notice, reporting of damage, and protection of the covered property in the event of loss; they provide for the examination of Flagstar or its representative "about any matter relating to this insurance or a claim"; and, "*[i]n the event of a dual interest,*" they allow Lexington to require the agreement of "*any mortgagor claiming coverage or monetary benefit under this insurance* " to "submit to an examination under oath ... about any matter relating to this insurance or a claim." (Emphasis added.) These provisions thus recognize that the Mortgage Guard Property Policy covers payment for repairs to damaged

property within the scope of the Policy, and they also recognize that a mortgagor, as well as Flagstar, may claim "coverage or monetary benefit under this insurance."

There is no way to determine from the summary judgment evidence whether Alvarado is the owner of residential property described by Flagstar on Lexington's reporting forms, because those forms are not in the record. However, there is summary judgment evidence, in the form of Alvarado's affidavit, that Flagstar reported damage to Alvarado's property to Lexington. **\*559** It is also not possible to determine from the summary judgment record precisely what claims either Flagstar or Alvarado submitted to Lexington with respect to damage to the property or what amount of money for what losses was paid by Lexington to Flagstar. Nor is it possible to ascertain the extent of Flagstar's mortgage interest in Alvarado's property and the extent of Alvarado's interest. However, Alvarado avers that his property sustained damage as a result of Hurricane Ike in 2008, that Flagstar made a claim on the Policy, and that Lexington paid Flagstar $4,410.49 in damages. He further avers that Flagstar did not provide any of these funds to him for the purpose of repairs and that it did not apply these funds to the balance of his mortgage. We consider each of these uncontested facts as stated by Alvarado, the nonmovant, to be true, as we must under summary judgment law. *See Fielding,* 289 S.W.3d at 848; *City of Keller,* 168 S.W.3d at 827.

We conclude that the Policy manifests a clear intent to directly benefit both Flagstar and "any mortgagor claiming coverage or monetary benefit" for damage to property under the Policy, as their interests may appear as mortgagee or mortgagor of a covered property at the described locations listed by Flagstar on Lexington's reporting forms. We further conclude that Flagstar is the mortgagee of Alvarado's property and that Alvarado is a mortgagor with an ownership interest in a property described on Lexington's forms whose property was damaged and for which Flagstar submitted a claim and was paid. However, it is not possible to determine from the Mortgage Guard Property Policy whether Alvarado was a mortgagor who had a right to claim coverage under the Policy for damage to his property. Therefore, we turn to Endorsement # 12 of the Policy.

### c. Endorsement # 12: Special Broad Form Homeowners Coverage

 **[20]**  Endorsement # 12, titled "Special Broad Form Homeowners Coverage," is relied upon by Alvarado to show his third-party-beneficiary status under the Policy. It provides the type of coverage that an individual homeowner would generally seek from an insurance company, instead of the coverage that a mortgagee seeking solely to protect its monetary interest in the property would typically seek. Endorsement # 12 states, "It is understood and agreed [by Flagstar and Lexington] that the following coverages are added to this policy and that these coverages apply only to owner occupied properties reported as 'HO' property type by the Insured [Flagstar]: Special Broad Form Homeowners Coverage, Homeowners 3, Special Form, ED. 10–00 (HO–3, Ed. 10–00)." This statement is immediately followed by declarations specific to Endorsement # 12 that incorporate the property coverage limits from the Common Policy Declarations and Supplemental Declaration Page and add additional "Property Coverage," "Liability Coverages,"

and "Exclusions." The endorsement states, "All other terms and conditions remain unchanged." It is unclear, however, whether Endorsement # 12 formed a part of the Policy insuring Alvarado's property. Alvarado claims that it did, and Lexington included Endorsement # 12 as part of the Policy on Alvarado's property. Therefore, we take it as true for purposes of this summary judgment motion that Alvarado's property was listed by Lexington as a property carrying Homeowner's Insurance. [6] *See Sw. Elec. Power Co.,* 73 S.W.3d at 215.

**\*560** The Homeowners Coverage provided by Endorsement # 12 is spelled out on the Special Form. Section I, "Property Coverage," provides coverage up to the "[l]imit stated on the Declaration Page." This part of the Homeowners Coverage clearly references the limits for property damage for residences referred to on the Supplemental Declaration Page of the Policy. In addition, Section II, "Liability Coverages," provides coverage to the owners of the specified properties for "Personal Liability" of "$100,000 per person/$300,000 per occurrence" and coverage for "Medical Pay to others" of "$1,000 per person/ $25,000 per accident." This Homeowners Coverage part of the Policy further provides that "[t]he combined limit of liability under the policy for Special Broad Form Homeowners Coverage shall not exceed $1,000,000 for the policy period."

Endorsement # 12 also states that "[t]he earned premium for each daily period shall be calculated by multiplying the total amount of insurance specified on the reporting form furnished by the Company by the rate stated on the Rates and Deductibles Page." The Rates and Deductibles page—Endorsement # 3 to the Policy—specifies that, for "Special Broad Form Homeowners Coverage," "each claim for loss or damage (separately occurring) shall be adjusted separately," and it defines the deductible for different types of covered properties, including Occupied Residences. Endorsement # 3 charges a higher premium for Special Broad Form Homeowners Coverage. Finally, Endorsement # 12 specifies that the homeowner's coverage ceases to apply when a property becomes vacant or goes into foreclosure, and it further specifies that "[o]n the date the property status changes the regular residential coverage as indicated in the Residential Property Coverages policy section will apply to that property," i.e., the coverage indicated on the Supplemental Declaration Page of the Common Policy applies, and not the coverage indicated in Endorsement # 12.

The "Definitions" part of Endorsement # 12 defines the term "Insured" for the purpose of properties covered under the "Homeowners Coverage" addition to the Policy in terms that can reasonably refer only to the homeowner, not to Flagstar. Section A of the "Definitions" states, "In this policy, 'you' and 'your' refer to the 'named insured' shown in the Declarations and the spouse if a resident of the same household. 'We', 'us' and 'our' refer to the Company providing this insurance." Section B of the "Definitions" states, "In addition, certain words and phrases are defined as follows." Definition 5 defines "Insured" to mean, in pertinent part, "[y]ou and residents of your household who are ... [y]our relatives; or ... [o]ther persons under the age of 21 and in

the care of any person named above." Thus, the "insured" for purposes of Endorsement # 12 can reasonably be interpreted only as the homeowner of a covered property, and not as the "Named Insured" under the Common Policy, Flagstar, or as **\*561** the "insured" Lending Institution under the Mortgage Guard Property Policy, also Flagstar.

"Insured location" is defined to mean, in pertinent part, "the 'residence premises.' " "Residence premises" is further defined as "[t]he one family dwelling where you reside ... and which is shown as the 'residence premises' in the Declarations" and "other structures and grounds at that location."

"Occurrence" is defined to mean, in pertinent part, "an accident, including continuous or repeated exposure to substantially the same general harmful condition, which results, during the policy period, in ... [p]roperty damage," i.e., "physical injury to, destruction of, or loss of use of tangible property." The "Deductible" part of the endorsement states, "Unless otherwise noted in this policy, the following deductible provision applies: Subject to the policy limits that apply, we will pay only that part of the total of all loss payable under Section 1 ["Property Coverages"] that exceeds the deductible amount shown in the Declarations."

Subsection A of "Section 1—Property Coverages" of Endorsement # 12 expressly states, "We cover ... [t]he dwelling on the 'residence premises' shown in the Declarations, including structures attached to the dwelling; and ... [m]aterials and supplies located on or next to the 'residence premises' used to construct, alter or repair the dwelling or other structures on the 'residence premises.' " Subsections B, C, and D of Section 1 provide insurance coverage for, among other things, personal property, loss of use, which includes additional living expenses and fair rental value, debris removal, reasonable repairs, and credit card fraud.

Finally, "Section 1—Conditions" of Endorsement # 12 provides that, "[e]ven if more than one person has an insurable interest in the property covered, [Lexington] will not be liable in any one loss [t]o an 'insured' for more than the amount of such 'insured's' interest at the time of loss." The "Loss Payment" provision states: "We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment." Endorsement # 12 also includes a "Mortgage Clause" that provides, "If a mortgagee is named in this policy, any loss payable ... will be paid to the mortgagee *and you,* as interests appear." (Emphasis added.) "Section II—Liability Coverages" provides personal liability coverage for bodily injury or property damage, as well as coverage for medical payments to others.

All of these provisions of this endorsement are meaningful only if the "Insured" and "you" referenced in the Definitions and Property Coverages of Endorsement # 12 mean the homeowner of an owner-occupied property reported by Flagstar to Lexington on Lexington's reporting forms as having force-placed Homeowners Coverage and if the Homeowners Coverage part of the Policy is interpreted as directly insuring the homeowner against loss to property, both real and personal,

as well as insuring him against personal liability and certain other personal losses, such as loss of use of the property and additional living expenses.

We conclude that the language in Endorsement # 12 makes apparent the contracting parties' intent to confer a direct benefit on the homeowner of "owner occupied properties reported as 'HO' property type by the Insured" under the conditions specified in the Policy and that that benefit is made applicable to property owners when their property is "added to this policy" by Flagstar on Lexington's reporting forms. *See Basic Capital Mgmt.,* 348 S.W.3d at 900; **\*562** *MCI Telecomms.,* 995 S.W.2d at 651; *see also Palma,* 79 F.3d at 1457–58 (holding that homeowner-borrower was third-party beneficiary of force-placed insurance policy when policy contained provision that was for "sole benefit" of borrower); *Henderson,* 2009 WL 3190710, at \*3 (limiting standing to seeking temporary housing benefits because this was only clause in policy providing benefit to homeowner); *Beck,* 2008 WL 4155301, at \*2 (finding third-party-beneficiary status when policy contained excess loss clause and allowed adjustment of personal property damages with borrower); *Navarrete,* 2008 WL 659477, at \*2 (same); *Hickman,* 695 N.W.2d at 370–71 (same).

We further conclude that, because Alvarado pays the premiums on his policy directly to Flagstar, which forwards them to Lexington, and, in return, Alvarado receives the property and liability coverage provided by the Policy under the "Special Broad Form Homeowners Coverage" added by Endorsement # 12, Alvarado is a creditor beneficiary of the contract between Flagstar and Lexington. *See MCI Telecomms.,* 995 S.W.2d at 651 (stating that if performance will come to third party in satisfaction of legal duty owed to him by promisee, including "contractual obligation or other legally enforceable commitment," he is creditor beneficiary of contract).

Lexington argues, however, that the type of policy at issue in this case does not confer third-party-beneficiary status on homeowners. It refers us to a recent opinion from the United States District Court for the Southern District of Texas in a diversity case brought under Texas law, which addressed the effect of a "Special Broad Form Homeowners Coverage" endorsement on the homeowner-borrower's status as a third-party beneficiary in a case similar to the present one. *See Trevino v. Evanston Ins. Co.,* Civil Action No. M–11–18, 2011 WL 2709063, at \*3 (S.D.Tex. July 12, 2011). In that case, the homeowner made the same argument Alvarado makes here: because the endorsement provides coverage that is irrelevant to the mortgagee and that "could only inure to the benefit of [the homeowner]," the endorsement demonstrates the contracting parties' intent to confer a direct benefit on the homeowner. *Id.*

The federal district court noted that the insurance company, Evanston, "counters that these coverages [for personal liability, medical pay to others, personal property loss, and loss of use coverage] only become available when a mortgagee complies with the reporting provisions of the Mortgage Guard Policy, which require the mortgagee to notify Evanston of 'any change

of ownership or occupancy or increase of hazard,' *i.e.,* foreclosure, and to pay additional risk premiums." *Id.* The court concluded, without analysis of the language in the endorsement or the factual circumstances of the case, other than the plaintiff had "made a claim under the policy seeking coverage for roof and water damage sustained by the property as a result of Hurricane Dolly on July 23, 2008," that "the Policy language unambiguously manifests the intent to provide hazard coverage to [the mortgagee] to the extent of its interest in the property, and any benefit conferred to [the homeowner] as a result is incidental," and that the homeowner "has pointed to no provision that makes clearly apparent the contracting parties' intent to confer a direct benefit on Plaintiff." *Id.* The court ultimately held that the homeowner-borrower was not a third-party beneficiary under the insurance policy at issue and had no standing to pursue his claims. *Id.* at *1, *3.

In the instant case, by contrast, the Policy language does unambiguously manifest the contracting parties' intent to provide **\*563** coverage directly to the owners of the properties described by Flagstar on Lexington's reporting forms for property damage, including coverage for personal property damage and personal liability, when Special Broad Form Homeowners Coverage is added to the Policy by an endorsement, as spelled out in the Policy. *See Basic Capital Mgmt.,* 348 S.W.3d at 900; *MCI Telecomms.,* 995 S.W.2d at 651. Alvarado, unlike Trevino, did point to a provision in the Policy, Endorsement # 12, that makes apparent the contracting parties' intent to confer a direct benefit on owners of property reported by Flagstar on Lexington's reporting forms that meet certain conditions specified in the Policy, including owning a Homeowner's Policy. Thus, we find *Trevino* to be distinguishable and its legal conclusions to be inapplicable to this case.

The dissent, however, finds *Trevino* persuasive. It reasons that this case is more closely analogous to the Texas Supreme Court's decision in *MCI Telecommunications,* in which the court found no third-party-beneficiary status, than to its decision in *Basic Capital Management.* We disagree. In *MCI Telecommunications,* Texas Utilities contracted with the Missouri Pacific Railroad ("MoPac") to obtain a license to install an electric transmission line on MoPac's right-of-way. 995 S.W.2d at 648–49. Twelve years later, MCI contracted with MoPac to use the right-of-way to install a fiber optic cable. *Id.* at 649. MCI's contract with MoPac contained a provision requiring MCI to exercise its contract rights "in such a manner as not to interfere in any way with any existing prior rights," such as the rights of existing licensees. *Id.* The contract also included a provision explicitly stating that no provision of the contract "shall be construed as being for the benefit of any party not in signatory hereto." *Id.* at 649–50. The Texas Supreme Court reversed both the trial court and the Fort Worth Court of Appeals and held that Texas Utilities was not a third-party beneficiary of MCI's contract with MoPac. *Id.* at 651. The court reasoned that, although the contract included a provision protecting Texas Utilities' rights as an earlier licensee, the contract did not provide a direct benefit to Texas Utilities and no contractual language indicated that MCI and MoPac contracted for Texas Utilities' benefit. *Id.* at 651–52. At best, Texas Utilities was an "incidental beneficiary" of the contract. *Id.* at 652. The court also noted that the contract explicitly

stated that it "is not to be interpreted as conferring any benefits on nonsignatory parties" and that it "reflects the intention of the parties that there be no third-party beneficiary to the contract." *Id.*

Unlike the contract at issue in *MCI Telecommunications,* the Policy at issue in this case includes provisions directly benefitting the owners of properties reported on Lexington's forms—specifically including those set out in Endorsement # 12—and it does not include a comparable explicit provision restricting construction of the Policy to benefit only the signatories to the Policy. In fact, the Mortgage Guard Property Policy contains language contemplating that the homeowner-mortgagor may have a dual interest and may potentially claim coverage or a monetary benefit under the Policy. And Endorsement # 12 expressly states that it provides additional coverage to that provided by the rest of the Policy, spells out the protections that the additional coverage provides, and states where this coverage differs from the coverage in the Common Policy in terms that can apply only to the homeowner of a residential property, here Alvarado, reported to Lexington by a mortagee, here Flagstar, as having Special Broad Form Homeowners Coverage. It also defines **\*564** such a residential homeowner as the "insured" for purposes of homeowners' coverage. Finally, Endorsement # 12 expressly distinguishes the insured residential mortgagor from the mortgagee as a person having covered interests under the Policy and recognizes that they may have dual interests.

As the Texas Supreme Court noted in *MCI Telecommunications,* when interpreting a contract, "we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless." *Id.* at 652. We conclude, as in *Basic Capital Management,* that the additional coverage in Endorsement # 12 for which the homeowner is forced to pay additional premiums "ha[s] no purpose whatever" and is meaningless unless the "Special Broad Form Homeowners Coverage" was intended by Lexington, the insurer of the property, and Flagstar, the mortgagee, to directly benefit the mortgagors and homeowners of the properties specifically described by Flagstar on Lexington's reporting forms. *See Basic Capital Mgmt.,* 348 S.W.3d at 900.

It was Lexington's burden, as movant for summary judgment, to prove its entitlement to summary judgment against Alvarado as a matter of law. We hold that Lexington failed to carry its burden of conclusively negating Alvarado's status as a third-party beneficiary to the Policy. Thus, we hold that the trial court erred in rendering summary judgment in favor of Lexington.

We sustain Alvarado's sole issue.


### Conclusion

We reverse the judgment of the trial court in appellate cause number 01–10–00740–CV and remand that case for further proceedings consistent with this opinion. We dismiss appellate cause number 01–10–01150–CV.

Justice BLAND, dissenting.

## Footnotes

1     *See Brookshire Bros., Inc. v. Smith,* 176 S.W.3d 30, 40 & n. 2 (Tex.App.-Houston [1st Dist.] 2004, pet. denied).

2     A "force-placed," or "lender-placed," mortgage protection insurance policy "insures the lender's collateral when the borrower fails to maintain a specific type of insurance" and "allows the lender to protect its exposure on a property up to the amount of the mortgage on the date of issuance." *Williams v. Certain Underwriters at Lloyd's of London,* 398 Fed.Appx. 44, 45 (5th Cir.2010) (not designated for publication).

3     Alvarado also sued Michael Bower, the insurance adjuster who handled Alvarado's claim. Bower is not a party to this appeal.

4     After Lexington moved for summary judgment, Alvarado amended his petition to add claims against Flagstar and Proctor Financial, Inc., the insurance agent responsible for procuring the Policy. Alvarado subsequently non-suited his claims against Flagstar with prejudice. Neither Flagstar nor Proctor Financial is a party to this appeal.

5     Pursuant to Texas Rule of Appellate Procedure 27.1, Alvarado's first prematurely filed notice of appeal was effective and was deemed filed on the day of, but after, the event that began the period for perfecting the appeal: November 19, 2010, the day the trial court granted Alvarado's motion to sever and rendered a final judgment in favor of Lexington. *See* TEX.R.APP. P. 27.1(a); *Ganesan v. Reeves,* 236 S.W.3d 816, 817 (Tex.App.-Waco 2007, pet. denied) ("[Rule 27.1] is designed to make it clear that a notice of appeal filed before the final appealable judgment is rendered is nevertheless effective to invoke our appellate jurisdiction of such a judgment."); *Espalin v. Children's Med. Ctr. of Dallas,* 27 S.W.3d 675, 681 (Tex.App.-Dallas 2000, no pet.) ("[A] document filed in an attempt to appeal an interlocutory order that later becomes final serves to appeal the final judgment."). In a factually similar scenario, the El Paso Court of Appeals noted that the second notice of appeal, filed after the trial court rendered a final judgment, "was unnecessary to perfect appeal." *Lerma v. Forbes,* 144 S.W.3d 18, 20 (Tex.App.-El Paso 2004, no pet.). The El Paso court dismissed the later cause number on its own motion and consolidated the record with the first cause number. *Id.* We follow the El Paso Court of Appeals' decision in *Lerma* and hold that Alvarado's first notice of appeal invoked our appellate jurisdiction, and, thus, the second notice of appeal was unnecessary to perfect his appeal and is now moot. We therefore dismiss appellate cause number 01–10–01150–CV, which resulted from his second notice of appeal.

\*     in which the Insured has a mortgage and/or owner interest and which is specifically described in the Reporting Mechanism agreed upon by the Company.

6     Lexington attached to its motion for rehearing a document purporting to show that Alvarado's property was listed as a "Residential Owner" or "RO" on its reporting forms and claimed that this is a different type of coverage that does not extend the protections of "HO" coverage to Alvarado. This improper attempt to supplement the summary judgment record to change the facts of Alvarado's status on appeal is sufficient by itself to show that summary judgment was improperly granted. *See* TEX.R. CIV. P. 166a(c) ("The judgment sought shall be rendered forthwith if ... the pleadings, admissions, affidavits, stipulations of the parties, and authenticated or certified public records, if any, on file at the time of the hearing, or filed thereafter and before judgment with permission of the court, show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response.").

**End of Document**      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (6)

### Direct History (6)

🚩 1. Alvarado v. Lexington Ins. Co.
2010 WL 8749753 , Tex.Dist. , Aug. 10, 2010

*Reversed by*

🚩 2. Alvarado v. Lexington Ins. Co. 👓
389 S.W.3d 544 , Tex.App.-Hous. (1 Dist.) , Oct. 18, 2012

*Judgment Vacated Pursuant to Settlement, Opinion Not Withdrawn*

3. Alvarado v. Lexington Ins. Co.
2012 WL 6213457 , Tex.App.-Hous. (1 Dist.) , Dec. 13, 2012

🚩 4. Alvarado v. Lexington Ins. Co.
371 S.W.3d 417 , Tex.App.-Hous. (1 Dist.) , Apr. 19, 2012

*Opinion Withdrawn and Superseded on Rehearing by*

🚩 5. Alvarado v. Lexington Ins. Co. 👓
389 S.W.3d 544 , Tex.App.-Hous. (1 Dist.) , Oct. 18, 2012

*Judgment Vacated Pursuant to Settlement, Opinion Not Withdrawn*

6. Alvarado v. Lexington Ins. Co.
2012 WL 6213457 , Tex.App.-Hous. (1 Dist.) , Dec. 13, 2012

141 S.W.3d 158
Supreme Court of Texas.

Geneva BROOKS, et al, Petitioners,

v.

NORTHGLEN ASSOCIATION, Respondent.

No. 02–0492.    |    Argued Sept. 3, 2003.    |    Decided
June 25, 2004.    |    Rehearing Denied Sept. 3, 2004.

**Synopsis**

**Background:** Homeowners' association brought action for injunctive and declaratory relief against lot owners due to the lot owners' efforts to remove association's board of directors. Lot owners counterclaimed for declaratory relief pertaining to assessments and late charges. Association moved for summary judgment on the counterclaims. The 129th Judicial District Court, Harris County, Patrick W. Mizell, J., granted the motion. Lot owners appealed. The Texarkana Court of Appeals, Cornelius, C.J., 76 S.W.3d 162, affirmed in part and reversed in part. Review was granted.

**Holdings:** The Supreme Court, Jefferson, J., held that:

[1] the declaratory judgment could by entered without joining all lot owners;

[2] the assessments on some subdivisions could not exceed $10 per month or $120 per year;

[3] deed restrictions prohibited accumulation of unassessed increases over multiple years;

[4] the association could assess late charges in addition to interest; and

[5] foreclosure was not an appropriate remedy for a subdivision lot owners' failure to pay a late charge.

Affirmed in part, vacated in part, and reversed and rendered in part.

**Attorneys and Law Firms**

**\*160**  Sue Auclair, Houston, TX, pro se.

David Alfred Kahne, Law Office of David A. Kahne, Robin Rankin Willis, P.C., Houston, for Petitioner.

John Bradley Mitchell, Clayton Rowland Hearn, Marc D. Markel, Stephanie Lee Quade, Roberts Markel Guerry, P.C., Houston, for Respondent.

**Opinion**

Justice JEFFERSON delivered the opinion of the court.

This is a declaratory judgment action involving eight property owners' challenge to their homeowners association's attempt to increase and accumulate annual assessments and impose late fees. The trial court held that chapter 204 of the Texas Property Code [1] authorized the Board to raise assessments unilaterally. The court of appeals affirmed the trial court's judgment in part and reversed in part. Both parties petitioned this Court for review. We granted the petitions to review the interplay between Texas Property Code chapter 204 and Northglen Association's deed restrictions. We affirm the court of appeals' judgment in part, vacate in part, and reverse and render judgment in part.

## I

### Background

Northglen Association ("Northglen") is the homeowners association for six Harris County subdivisions or "sections" encompassing more than 1600 single-family residences. Each section is governed by a separate set of deed restrictions through which every property owner is a member of the Association. The restrictions subject each homeowner to an annual assessment that is deposited into a maintenance fund for such services as maintaining common areas, contracting for garbage disposal, and constructing parks.

 **\*161** In 1994, Northglen's Board of Directors amended the deed restrictions to expand the Board and to assess late fees on unpaid assessments. Geneva Brooks and other Northglen property owners ("Brooks") organized a committee, called the Committee to Remove the Board, to remove certain Board members who, they complained, acted outside the bounds of the deed restrictions by adopting the amendments. Northglen responded by suing for injunctive and declaratory relief. Northglen sought an order enjoining the eight homeowners from conveying the false impression that Brooks's committee was formed pursuant to Northglen's bylaws and from other conduct designed to disrupt the Board's activities. Northglen also sought a judgment declaring that its

actions in electing the Board and assessing late fees were valid exercises of its authority. Brooks counterclaimed for a declaratory judgment that Northglen had no authority to raise assessments or charge late fees without a vote of the property owners. Northglen eventually nonsuited its claims, and the case proceeded on Brooks's declaratory judgment action.

The trial court granted summary judgment for Northglen, declaring that, without a vote of the homeowners, Northglen had the authority to: (1) raise the assessment for Sections One, Two, and Three; (2) raise the assessment for Sections Four, Five, and Six by ten percent each year or accumulate and assess the increase after a number of years; and (3) charge delinquent homeowners a $35 late fee. Finding that both parties had pursued legitimate interests, the trial court elected not to award attorney's fees.

The court of appeals affirmed the trial court's judgment in part and reversed in part. 76 S.W.3d 162, 176. It reversed as to Sections One, Two, and Three, holding that the deed restrictions did not permit annual assessments exceeding $120. As to Sections Four, Five, and Six, the court of appeals held that because the deed restrictions contained no language expressly forbidding accumulation, Northglen could accumulate previous assessments under Property Code section 204.010(16). *Id.* at 167. The court also held that section 204.010(10) gave Northglen the right to assess a $35 late fee in addition to the interest charge permitted by the deed restrictions. *Id.* at 174. Because the property owners did not have prior notice of the late fee, the court of appeals held that Northglen could not foreclose on any homesteads to collect those fees. *Id.* at 175. The court of appeals affirmed the trial court's denial of attorney's fees. *Id.* at 176.

We hold that Northglen cannot accumulate unassessed fee increases because the language in the deed restrictions prevails over chapter 204, and we reverse that portion of the court of appeals' judgment. We affirm the portion of the court of appeals' judgment restricting increases in assessments to $120 and holding that Northglen has the authority to assess late charges for unpaid fees, in addition to the interest charges described in the deed restrictions. We conclude, however, that Northglen may not foreclose on the property if late charges are not paid. Finally, we affirm the court of appeals' judgment regarding attorney's fees.

## II

### Jurisdiction

We first consider Northglen's contention that the trial court lacked subject matter jurisdiction because Brooks did not join all Northglen property owners as parties. Northglen argues that Brooks was required to join all property owners in each affected section before the trial court could render

a declaratory judgment and, alternatively, **\*162** that the trial court was without jurisdiction to render a declaratory judgment interpreting the deed restrictions for Sections Three and Six because property owners from those sections were not represented in the lawsuit.

 **[1]**   We do not have the benefit of the lower courts' views on jurisdiction because Northglen did not raise the issue either in the trial court or the court of appeals. Northglen contends that the doctrine of fundamental error excuses it from "the usual requirements of preservation of the error or briefing of the ... argument" because the absence of jurisdiction may be raised for the first time on appeal. We disagree that the absence of parties within the represented sections deprived the court of jurisdiction and therefore reject Northglen's contention as to Sections One, Two, Four and Five; however, because no property owners in Sections Three or Six were joined in the suit, we agree with Northglen that any judgment affecting those sections would be advisory.


## A

 **[2]**   No one disputes that the trial court had jurisdiction to declare the "rights, status, and other legal relations" for the named homeowners, who are "interested under a deed, ... written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute...." Tex. Civ. Prac. & Rem.Code §§ 37.003(a) and 37.004(a). The question, then, is not "whether jurisdiction is lacking," as Northglen asserts, but whether the trial court should have refused to enter a judgment when a subset of the homeowners was not joined in the lawsuit. *See Cooper v. Tex. Gulf Indus., Inc.,* 513 S.W.2d 200, 204 (Tex.1974) ("[the] concern is less that of the jurisdiction of a court to proceed and is more a question of whether the court ought to proceed with those who are present"). To answer that prudential question, we turn to Rule 39, which governs joinder of persons under the Declaratory Judgment Act. Tex.R. Civ. P. 39; *Clear Lake City Water Auth. v. Clear Lake Util.,* 549 S.W.2d 385, 390 (Tex.1977) (applying Rule 39 to actions under the Declaratory Judgment Act).

Rule 39, like the Declaratory Judgment Act, mandates joinder of persons whose interests would be affected by the judgment. *See* Tex. Civ. Prac. & Rem.Code § 37.006 ("When declaratory relief is sought, *all persons who have or claim any interest that would be affected by the declaration must be made parties.*") (emphasis added); Tex.R. Civ. P. 39(a) ("A person who is subject to service of process *shall be joined as a party* in the action if ... he claims an interest relating to the subject of the action ....") (emphasis added). Rule 39 determines whether a trial court has authority to proceed without joining a person whose presence in the litigation is made mandatory by the Declaratory Judgment Act. *Clear Lake City Water Auth.,* 549 S.W.2d at 390.

Rule 39(a)(1) requires the presence of all persons who have an interest in the litigation so that any relief awarded will effectively and completely adjudicate the dispute. In this case, nothing

in the rule precluded the trial court from rendering complete relief among Northglen and the eight homeowners who had sued for a declaration of rights. Although the parties continue to litigate its correctness, the trial court's judgment represents a final and complete adjudication of the dispute for the parties who were before the court. *See Caldwell v. Callender Lake Prop. Owners Improvement Ass'n,* 888 S.W.2d 903, 907 (Tex.App.-Texarkana 1994, writ denied). Rule 39(a)(2) relates to situations in which the absent party:

> **\*163** [C]laims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

Tex.R. Civ. P. 39.

Section 37.006(a) of the Declaratory Judgment Act, which provides that a trial court's declaration does not prejudice the rights of any person not a party to the proceeding, dispenses with the first of these concerns. *See* Tex. Civ. Prac. & Rem.Code § 37.006(a). Any non-joined homeowner would be entitled to pursue individual claims contesting Northglen's authority to raise assessments or impose fees, notwithstanding the trial court's judgment in the current case.[2] *See Cooper,* 513 S.W.2d at 204 ("[I]t would be rare indeed if there were a person whose presence was so indispensable in the sense that his absence deprives a court of jurisdiction ...").

We appreciate the risk that, unless each homeowner is joined in one suit, Northglen may be subject to inconsistent judgments. Tex.R. Civ. P. 39(a)(2)(ii). Northglen's dilemma, however, is the product of its own inaction. Northglen could have sought relief at trial by urging the court, among other things, to abate the case, join absent homeowners, or grant special exceptions. *See, e.g., Pirtle v. Gregory,* 629 S.W.2d 919, 920 (Tex.1982); *Dahl v. Hartman,* 14 S.W.3d 434, 436 (Tex.App.-Houston [14th Dist.] 2000, pet. denied); *Adams v. Owens,* 519 S.W.2d 260, 261 (Tex.Civ.App.-Beaumont 1975, writ ref'd n.r.e.); *Pan Am. Petroleum Corp. v. Vines,* 459 S.W.2d 911, 912 (Tex.Civ.App.1970, writ ref'd n.r.e.); *Texaco, Inc. v. Lettermann,* 343 S.W.2d 726, 733 (Tex.Civ.App.-Amarillo, 1961, writ ref'd n.r.e.). Instead, it waited until the case reached this Court to first raise the specter of multiple or inconsistent judgments.

 **[3]** Northglen counters that the doctrine of fundamental error excuses its failure to preserve error. However, when Rule 39 was amended, a young law professor remarked:

> Henceforth, it will be rare indeed when an appellate court properly determines that the trial court lacked jurisdiction to adjudicate a dispute when the nonjoining person's absence is raised for the first time on appeal by one of the parties in the trial court, at least insofar as the judgment affects parties who participated in

the trial, directly or indirectly, or who purposely bypassed the proceedings. The doctrine of fundamental error should no longer protect persons from the binding force of judgments when they have had an opportunity to raise the absence of the nonjoined person and waived it.

*William V. Dorsaneo, III, Compulsory Joinder of Parties in Texas,* 14 Hous. L.Rev. 345, 369 (1977). We conclude that Northglen "had an opportunity to raise the absence of the nonjoined person and waived it." *Id.;* Tex.R.App. P. 33.1.

## B

[4]  [5]  [6]   Sections Three and Six present a different question — does a trial court have jurisdiction to declare the rights of parties who are not before the court? A declaratory judgment requires a justiciable **\*164**  controversy as to the rights and status of parties actually before the court for adjudication, and the declaration sought must actually resolve the controversy. *See, e.g., The M.D. Anderson Cancer Ctr. v. Novak,* 52 S.W.3d 704, 708 (Tex.2001); *Texas Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 517–18 (Tex.1995). A judicial decision reached without a case or controversy is an advisory opinion, which is barred by the separation of powers provision of the Texas Constitution. Tex. Const. art. II, § 1; *see Southwestern Elec. Power Co. v. Grant,* 73 S.W.3d 211 (Tex.2002); *Texas Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993). We must decide, then, whether there is a case or controversy with respect to these sections.

Because there are no "plaintiffs" from Sections Three and Six, there is no person in those sections for whom rights could be declared in this declaratory judgment action. As a consequence, the trial court was without jurisdiction to issue a judgment with respect to those sections, and any opinion interpreting those sections would be purely advisory. Accordingly, we vacate those portions of the lower courts' judgments relating to Sections Three and Six and dismiss those claims for want of jurisdiction.

Having resolved Northglen's appellate pleas to the jurisdiction, we reach the merits for Sections One, Two, Four and Five.

## III

### Sections One and Two

 [7]   We first decide whether the deed restrictions for Sections One and Two, which are identical, allow Northglen to assess additional maintenance fees above the restrictive covenant's express limitation. The restrictions provide:

> Each Lot in said Subdivision, when said Lot is certified by the Subdivision Engineer to be a completed building site, is hereby subjected to an annual maintenance charge and assessment not to exceed $10 per month or $120 per annum, for the purpose of creating a fund to be designated and and [sic] known as the "maintenance fund", [sic] which maintenance charge and assessment will be paid by the Owner or Owners of each Lot within said Subdivision, and any annexed areas, to Northglen Association in advance annually, commencing as to all Lots on the first day of the month following their certification of completion. The rate at which each Lot will be assessed will be determined annually by the Board of Directors of Northglen Association at least thirty (30) days in advance of each annual assessment. Said rate and when same is payable may be adjusted from year to year by said Board of Directors as the needs of the Subdivision may in the judgment of the Directors require.

The restrictions also outline requirements for amendment. Article VIII provides that "... the covenants and restrictions of this Declaration may be amended during the first forty (40) year period by an instrument signed by not less than ninety percent (90%) of the Lot Owners, and thereafter by an instrument signed by not less than seventy-five percent (75%) of the Lot Owners." Therefore, a small number of homeowners may exert enormous influence on the extent to which amendments will be adopted. [3]

 **\*165**   Although there are practical hurdles to persuading seventy-five or ninety percent of homeowners to modify the restrictions or agree to an additional assessment, it is clear that the restrictions provide a mechanism by which Northglen can assess an annual fee greater than $120. The court of appeals agreed, holding that because the deed restriction provided that the annual assessments were "not to exceed" $10 per month or $120 per annum, Northglen did not have the authority to exceed the stated limits without first obtaining the homeowners' consent in accordance with the restrictions. 76 S.W.3d at 174.

Northglen disputes this holding, arguing that the deed restrictions should be read in three steps. First, the restrictions create a maintenance fund, for which the assessment shall not exceed $10 per month or $120 per annum. Second, when the maintenance fund is created, the Board of Directors has discretion to determine the rate at which each lot will be assessed above the $120. Third, the assessment rate and date payable may be adjusted from year to year, as the needs of the subdivision require.

In support of its argument, Northglen cites *Samms v. Autumn Run Cmty. Improvement Ass'n.* 23 S.W.3d 398 (Tex.App.-Houston [1st Dist.] 2000, pet. denied). The *Samms* court held that a deed restriction with language similar to Section One and Two granted the homeowners association the authority, from year to year, to determine the rate at which property owners would be assessed. *Id.* at 402. The court held that the homeowners association had authority to raise the assessment without limitation because a phrase in the deed restriction said "the rate at which each Lot will be assessed ... will be determined annually by the Board of Directors...." *Id.* But the court did not discuss another provision of that deed restriction which stated explicitly that the assessment was "not to exceed" a particular amount.

The Northglen deed restrictions subject each property owner to "an annual maintenance charge *and assessment* not to exceed $10 per month or $120 per annum, for the purpose of creating ... the 'maintenance fund'...." (Emphasis added.) The restrictions further provide that "[t]he rate at which each Lot will be assessed will be determined annually" by Northglen, and that "[s]aid rate and when same is payable may be adjusted from year to year by [Northglen] as the needs of the Subdivision may in the judgment of [Northglen] require."

Northglen's argument does not survive the restrictions' plain language. First, the annual assessment is *not to exceed* $10 per month or $120 per year. The restrictions do not *require* that Northglen charge the maximum amount. Rather, Northglen may charge any amount so long as the amount does not exceed $120 per year. So, if Northglen had been assessing $50 per year and decided the next year that $120 was necessary, it has the authority to raise the rates unilaterally. Second, the deed restrictions neither contemplate nor permit an additional assessment once the maintenance fund is whole because the language says plainly that the assessment is not to exceed $10 per month or $120 per year. There is no language permitting an additional assessment beyond that which is included in the maintenance fund, aside from the special assessment for capital improvements.

**\*166** We hold that the court of appeals correctly concluded that Northglen cannot increase assessments beyond the $120 limitation set forth in the deed restrictions, and we affirm that part of the court of appeals' judgment.

## IV

### Sections Four and Five

[8] Northglen argues — and the court of appeals held — that the deed restrictions permit accumulation of unassessed increases in maintenance fees for Sections Four and Five. 76 S.W.3d at 167. Northglen contends, specifically, that Property Code section 204.010 allows it to accumulate

and assess a $430 single-year increase — raising the assessment from $120 to $550. That section provides:

§ 204.010. Powers of Property Owners' Association

(a) Unless otherwise provided by the restrictions or the association's articles of incorporation or bylaws, the property owners' association, acting through its board of directors or trustees, may:

...

(16) if the restrictions allow for an annual increase in the maximum regular assessment without a vote of the membership, assess the increase annually or accumulate and assess the increase after a number of years.

Tex. Prop.Code § 204.010.

The property owners counter that the trial court properly interpreted Sections Four and Five as to allowable increases. They argue that by limiting the annual assessment increase to ten percent, the deed restrictions "otherwise provide" that accumulation is not permitted. We examine the competing contentions first by analyzing the deed restrictions and then by determining the extent to which they are affected by the Property Code.

## A

Determining whether the statute applies requires an understanding of the deed restrictions. The deed restrictions for Section Four provide:

> Until January 1 of the year immediately following the conveyance of the first Lot to an Owner, the maximum annual assessment shall not exceed Ten ($10.00) Dollars per month, or One Hundred Twenty ($120.00) Dollars per annum, per lot; provided, however, that from and after January 1 immediately following the conveyance of the first Lot to an Owner, the Board of Directors of the Association shall be empowered to increase said rate as the needs of the Association require; except that **if any such increase shall cause the annual assessment to be greater than the aforesaid $120.00 plus the rise, if any, of the Consumer Price Index as published by the United States Department of Labor for the preceding month of July; or more than One Hundred Ten (110%) percent of the amount assessed in the preceding calendar year, whichever is greater, then shall such an increase require the vote of two-**

**thirds (2/3) of each class** of Members of the Association who are voting in person or by proxy, at a meeting duly called for that purpose.

(Emphasis added.)

Section Four thus permits an increase of ten percent more than the previous year's assessment, and a greater increase if the Consumer Price Index is higher. The restriction requires a vote of the homeowners to raise the assessment beyond those amounts.

The restrictions for Section Five are similar to Section Four:

> **\*167** Until January 1 of the year immediately following the date of commencement of the first annual assessment as determined by the Board of Directors, the maximum annual assessment shall be $120.00 per Lot. From and after the first day of January of the year immediately following the date of commencement of the first annual assessment, the maximum annual assessment may be increased by the Board of Directors of the Association, effective the first day of January of each year, in conformance with the rise, if any, in the *Consumer Price Index for Urban Wage Earners and Clerical Workers* published by the Department of Labor, Washington, D.C., or any successor publication, for the preceding month of July or alternatively, **by an amount equal to a ten percent (10%) increase over the prior years [sic] annual assessment,** whichever is greater, without a vote of the Members of the Association. The maximum annual assessment may be increased above that established by the Consumer Price Index formula or the above-mentioned percentage increase only by approval of two-thirds (2/3rds) of each class of Members in the Association present and voting at a meeting duly called for this purpose. In lieu of notice and a meeting of Members as provided by the By–Laws of the Association, a door to door canvass may be used to secure the written approval of two-thirds (2/3rds) of each class of Members for such increase in the annual assessment or in the special assessment for capital improvements as provided.... After consideration of current maintenance costs and future needs of the Association, the Board of Directors may fix the annual assessment at an amount not in excess of the maximum amount approved by the Members.

(Emphasis added.)

Both Sections Four and Five maintain an initial $120 per annum limit on assessments, followed by discretionary increases of up to ten percent or the rise in the Consumer Price Index, whichever is greater. Those increases are tied to the previous year's assessment.

## B

We now consider how the Texas Property Code applies to the preceding deed restrictions. One of the stated purposes in chapter 204 is to provide a mechanism "to readily facilitate increases in the amount of the regular or special assessments to allow the property owners' associations to better provide services to the subdivisions." Tex. Prop.Code § 204.001 historical note, [Act of May 27, 1995, 74th Leg., R.S., ch. 1040, § 1, 1995 Tex. Gen. Laws 5170, 5171]. The Legislature observed that severe restrictions on the ability to adjust regular assessments "may result in the inability of an ineffective property owners' association to maintain common area facilities, including swimming pools, tennis courts, clubhouses, greenbelt areas, or jogging trails, or to provide services, including streetlights, security, architectural control, and deed restriction enforcement." *Id.* Read in isolation, the legislature's preamble to section 204 offers some support for Northglen's argument that it has the authority to accumulate previously unassessed fee increases beyond the maximum stated in the restrictions to maintain common facilities or to provide services. The Legislature, however, inserted a caveat that governs here: the statutory provision permitting accumulation does not apply if the deed restrictions "otherwise provide." Tex. Prop.Code § 204.010.

In this case, the Northglen deed restrictions for Sections Four and Five "otherwise provide" that accumulation is not permitted. Section Four limits the ten **\*168** percent increase to "the amount assessed in the *preceding* calendar year." (Emphasis added.) Section Five also limits the "increase over the *prior years* [sic] annual assessment." (Emphasis added.) The natural consequence of each restriction's language is that if the annual assessment for this year is $120, then next year's assessment may not be raised to the $550 that Northglen seeks. Rather, next year's assessment may be no more than $132. By specifically tying any increase to the previous year's annual assessment, the deed restrictions do not permit accumulation over multiple years.

Additionally, in Section Four, Northglen may increase fees beyond the limits by receiving a "vote of two-thirds (2/3) of each class of Members of the Association who are voting in person or by proxy, at a meeting duly called for that purpose." In Section Five the Board must receive "approval of two-thirds (2/3rds) of each class of Members in the Association present and voting at a meeting duly called for this purpose." Although a two-thirds vote may be difficult to achieve, the deed restrictions offer Northglen a procedure for increasing fee assessments beyond the ten-percent limit other than accumulation. The voting mechanism, combined with the increase being tied to the previous year's assessment, establishes that the deed restrictions "otherwise provide."

Because we conclude that the statute does not permit accumulation or fee increases above the deed restrictions, we need not address Brooks's contention that the statute's accumulation provisions are unconstitutional.

## V

## Late Fees

We next consider whether section 204.010(a)(10) authorized Northglen to impose a $35 late charge, in addition to the interest charge included in the deed restrictions, for failure to pay the annual assessments, and if so, whether such a construction violates the Contract Clause of the U.S. or Texas Constitution. The trial court held that Northglen could charge a late fee under section 204.010(a)(10), and the court of appeals affirmed. Both courts noted that the deed restrictions did not expressly prohibit late fees nor limit penalties to the interest charge. We hold that Northglen may charge a $35 late fee and that such a charge is constitutional.

## A

 **[9]** The homeowners argue that permitting Northglen to unilaterally assess late charges would defeat the purpose of the deed restrictions, which already impose a six percent interest charge for nonpayment. Additionally, the homeowners argue that by expressly including the interest charge in the restrictions, the homeowners necessarily rejected late charges, under the doctrine of *expressio unius est exclusio alterius* (to include one thing implies the exclusion of the other). Black's Law Dictionary 602 (7th ed.1999).

The court of appeals disagreed with the homeowners' argument and held that Northglen could assess late charges. The court considered the language of section 204.010(a)(10), which provides, in pertinent part:

> (a) Unless otherwise provided by the restrictions or the association's articles of incorporation or bylaws, the property owners' association, acting through its board of directors or trustees, may:
>
> ...
>
> (10) impose interest, late charges, and, if applicable, returned check charges for **\*169** late payments of regular assessments or special assessments.

Tex. Prop.Code § 204.010(a)(10). The court held that this statutory language granted Northglen authority to assess the late charge in the absence of specific language to the contrary. Because the deed restrictions do not mention late charges specifically, the court held that silence could not mean "otherwise provide." 76 S.W.3d at 174.

We agree that nothing in the Northglen deed restrictions could be considered "otherwise providing." Each deed restriction contains the same provision for failing to pay assessments:

*Effect of Non-payment of Assessments: Remedies of the Association.* Any assessment not paid within thirty (30) days after the due date shall bear interest from the due date at the rate of six percent (6%) per annum. The Association may bring an action at law against the Owner personally obligated to pay the same, or foreclose the lien against the property. No Owner may waive or otherwise escape liability for the assessments provided for herein by non-use of any Common Area or abandonment of his Lot.

Contrary to Brooks's argument, the deed restrictions do not say the penalties are the exclusive remedies for late payments, nor do they say that late charges are not permitted. The deed restrictions only set the rate at which Northglen may charge interest on unpaid assessments.

 **[10]**   When construing a statute, the Court must presume that every word of the legislation has meaning. *Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169, 173 (Tex.1980). The statute unequivocally says the Board may impose both interest charges and late charges. That the deed restriction mentions interest charges but not late charges is not sufficient to "otherwise provide."

## B

Brooks argues that the assessment of a late fee would violate the U.S. [4] and Texas [5] Constitutions' impairment-of-contracts provisions because the deed restrictions do not provide for late fees. The court of appeals examined the constitutionality of the statute and held that Section 204.010 "is not directed to any specific kind of contracts, and it does not directly contradict any contractual provision...." 76 S.W.3d at 168. The court further noted that the statute is a permissible exercise of the State's police power because "it was enacted to promote the public welfare with regard to the property owners associations' ability to better provide services to the homeowners, maintain the common area facilities, and provide for the common security and restriction enforcement." *Id.* at 168–69. We agree and hold that the same rationale applies to the late fees imposed pursuant to chapter 204.

 **[11]**    **[12]**   A statute is presumptively constitutional. *Barshop v. Medina Cty. Underground Water Conservation Dist.,* 925 S.W.2d 618, 625 (Tex.1996). As such, we are obligated to avoid constitutional problems if possible. *Id.* In this case, we must consider two factors: first, whether the **\*170**  statute substantially impairs the contract; and second, if so, whether the Legislature acted within its police powers in enacting the legislation. *See Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244–45, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978).

**[13]** Section 204.010 does not substantially impair Northglen's deed restrictions. The statute operates only where the deed restrictions do not "otherwise provide." Tex. Prop.Code § 204.010. It does not serve to withdraw or remove any contractual obligation. If the statute required the assessment of late fees where late fees were expressly prohibited by the deed restrictions, this would likely be a different case. *See Travelers' Ins. Co. v. Marshall,* 124 Tex. 45, 76 S.W.2d 1007 (1934)(discussing statutes that declare a complete moratorium on particular contracts). We are not faced with that circumstance here. Thus, applying the statute to authorize a late fee is not unconstitutional.

# VI

## Foreclosure

**[14]** Because we hold that Northglen may charge late fees for unpaid fee assessments, we must address whether it has the authority to foreclose on the homestead if a property owner fails to pay the late fee. This Court has clarified that Texas' homestead laws authorize a homeowners association to foreclose on homesteads for the nonpayment of fee assessments. *Inwood Homeowners' Ass'n v. Harris,* 736 S.W.2d 632, 635–36 (Tex.1987). In *Inwood,* we considered whether the homestead laws of Texas protect a homeowner against foreclosure for failure to pay homeowners association assessments. *Id.* at 633. As a general rule, a homestead is protected against the debts of those who live in the homestead. *Id.* at 634. However, the deed restrictions for the subdivision included a vendor's lien permitting foreclosure on the homestead for failure to pay the fee assessment. *Id.* at 633. Because the property owner had notice when purchasing the property that a lien attached to the land, we held that foreclosure was permissible. *Id.* at 635–36.

The court of appeals, in our case, focused on the notice requirement and held that foreclosure was not a potential remedy against unpaid late charges. 76 S.W.3d at 175. The court noted that the lien to enforce the late charges attached to the property after the homestead was acquired because late charges were not included in the deed restriction. *Id.*

The court cited as authority an Attorney General opinion that said costs imposed upon property owners because of Chapter 204, which were not part of the deed restriction, could not be enforced through foreclosure. *Id.* (citing Tex. Att'y Gen. Op. LO–97–019 (1997)). The Attorney General concluded that, in determining whether foreclosure is a remedy, the issue is "whether the lien for those costs (i) attached to the property prior to the homestead right and (ii) is the result of a restriction that runs with the land." Tex. Att'y Gen. Op. LO–97–019. The court of appeals considered the two elements and held that because late charges were not part of the deed restrictions

but rather a function of the statute, Northglen could not foreclose for failure to pay late charges. 76 S.W.3d at 175–76.

Northglen argues that a developer has the authority to create liens to ensure the payment of fee assessments, and under *Inwood,* an appropriate remedy for failure to pay assessments is foreclosure. Northglen also contends that because property **\*171** owners were aware that delinquent assessments would be subject to late charges, in the form of an interest charge, the property owners had actual notice sufficient to satisfy *Inwood.* Thus, because the property owners had actual notice, Northglen asserts, the late charge should also run with the land as the interest charge does.

We disagree with Northglen and agree with the court of appeals. Northglen's argument essentially amends the deed restrictions to include both late fees and interest charges. But the restrictions did not provide any notice that a late fee would be imposed in addition to the interest charge. As a result, the property owners did not have notice of the late charge. Therefore, in light of *Inwood* 's notice requirement, foreclosure is not an appropriate remedy for a failure to pay the late charge. [6]

## VII

## Non-profit Corporation Act

 **[15]**   Northglen challenges that portion of the trial court's judgment providing that "the bylaws may only be amended by the members...." Northglen argues that, even absent Property Code chapter 204, it had the authority to increase assessments because it may amend the bylaws unilaterally under the Texas Non–Profit Corporation Act. Tex.Rev.Civ. Stat. art. 1396–1.01 *et seq.* That statute provides, among other things, that a board of directors has the authority to amend bylaws unless the articles of incorporation reserve the power exclusively to the members. We cannot reach this issue. Northglen did not file a notice of appeal from the trial court's judgment, did not notice a cross-appeal, and did not petition this court for review on the point. Accordingly, Northglen did not preserve this issue for our review. Tex.R.App. P. 25.1(c) ("[A] party who seeks to alter the trial court's judgment or other appealable order must file a notice of appeal.... The appellate court may not grant a party who does not file a notice of appeal more favorable relief than did the trial court except for just cause."), 53.1 ("A party who seeks to alter the court of appeals' judgment must file a petition for review."); *see also Dean v. Lafayette Place (Section One) Council of Co–Owners, Inc.,* 999 S.W.2d 814, 818 (Tex.App.-Houston [1st Dist.] 1999, no pet.).

# VIII

## Attorney's Fees

The final issue is whether the property owners should be awarded attorney's fees. The trial court declined to award attorney fees, finding that "the parties each had legitimate interests to pursue." The court of appeals affirmed, holding that "[i]n the judgment we render, neither side would be considered a prevailing party." 76 S.W.3d at 176. The Declaratory Judgment act permits a court to "award costs and reasonable and necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem.Code §§ 37.009. Although we reverse **\*172** part of the court of appeals' judgment, the basis for the trial court's decision for denying fees — that each side pursued legitimate interests — has not changed. Accordingly, we will not disturb the trial court's discretionary decision in that regard. We affirm the court of appeals' judgment on attorney's fees.

# IX

## Conclusion

We (1) affirm the court of appeals' judgment as to the increased assessments in Sections One and Two, the assessment of late fees, and foreclosure; (2) reverse the court of appeals' judgment and render judgment as to accumulation of fee increases under Sections Four and Five; (3) vacate the trial court's and the court of appeals' judgments as to Sections Three and Six and dismiss for want of jurisdiction Brooks's claim as to those sections; and (4) affirm the court of appeals' judgment regarding attorney's fees. Tex.R.App. P. 60.2(a), (c), (e).

## Parallel Citations

47 Tex. Sup. Ct. J. 719

Footnotes

1   Chapter 204 applies to residential real estate subdivisions in a county with a population of 2.8 million or more. Tex. Prop.Code § 204.002. According to the 2000 U.S. Census, of the 254 counties in Texas, only Harris County comes within the chapter's purview. 2000 United States Census, available at http://quickfacts.census.gov/qfd/states/48/48201.html.

2   Despite the notoriety this dispute engendered in the neighborhood, the record does not disclose that any other homeowners filed suit or were otherwise disposed to contest Northglen's actions.

3   A similar, though less onerous, supermajority is required to charge a special assessment in a given year. The restrictions provide that Northglen may:

[l]evy, in any assessment year, a special assessment applicable to that year only for the purpose of defraying, in whole or in part, the cost of any acquisition, construction, reconstruction, repair or replacement of a capital improvement ... *provided that* any such assessment shall have the assent of two-thirds (2/3rds) of the votes of each class of members....

(Emphasis in original.)

4     "No State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts...." U.S. Const. art. I, § 10.

5     "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts shall be made." Tex. Const. art. I, § 16.

6     We express no opinion on the court of appeals' holding that "any new type of assessment ... or attorney's fee that is imposed solely through the authority of Chapter 204 of the Texas Property Code cannot be enforced by foreclosure against a homestead." 76 S.W.3d at 175. Inasmuch as we have reversed the court of appeals' judgment regarding accumulation, we need not decide whether foreclosure would be an appropriate remedy for accumulated assessments. Similarly, attorney's fees imposed through Chapter 204 are not at issue in this case.

---

**End of Document**                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (9)

### Direct History (3)

🚩 1.  NORTHGLEN ASSOCIATION, v. GENEVA BROOKS D/B/A COMMITTEE TO REMOVE THE BOARD, Dianne Higgins, Pauline White, Don Yust Virginia Yust, Aurelio Ojada, Antony Mcbride and Susan Auclair.
1999 WL 34804055 , Tex.Dist. , June 25, 1999

*Judgment Affirmed in Part, Reversed in Part by*

🚩 2.  Brooks v. Northglen Ass'n
76 S.W.3d 162 , Tex.App.-Texarkana , Apr. 18, 2002 , review granted (2 pets.) ( Feb 13, 2003 )

*Affirmed in Part, Vacated in Part, Reversed in Part by*

🚩 3.  Brooks v. Northglen Ass'n 👓
141 S.W.3d 158 , Tex. , June 25, 2004 , rehearing denied ( Sep 03, 2004 )

### Related References (6)

4.  NORTHGLEN ASSOCIATION, v. GENEVA BROOKS D/B/A COMMITTEE TO REMOVE THE BOARD, Dianne Higgins, Pauline White, Don Yust Virginia Yust, Aurelio Ojada, Antony McBride and Susan Auclair.
1999 WL 34794783 , Tex.Dist. , Feb. 16, 1999

5.  NORTHGLEN ASSOCIATION, v. GENEVA BROOKS D/B/A COMMITTEE TO REMOVE THE BOARD, Dianne Higgins, Pauline White, Don Yust, Virginia Yust, Aurelio Ojada, Antony Mcbride and Susan Auclair.
1999 WL 34804056 , Tex.Dist. , Mar. 22, 1999

6.  NORTHGLEN ASSOCIATION, Plaintiff, v. GENEVA BROOKS D/B/A COMMITTEE TO REMOVE THE BOARD, Dianne Higgins, Pauline White, Don Yust, Aurelio Ojada, Anthony McBride, and Susan Auclair, Defendants.
1999 WL 34794782 , Tex.Dist. , Mar. 26, 1999

7.  Northglen Ass'n v. Geneva Brooks D/B/A Committee to Remove the Bd.
1999 WL 34855360 , Tex.Dist. , Aug. 02, 1999

8.  Northglen ASSOCIATION, v. GENEVA BROOKS D/B/A COMMITTEE TO REMOVE THE BOARD, Dianne Higgins, Pauline White, Don Yust, Virginia Yust, Aurelio Ojada, Antony Mcbride and Susan Auclair.
2000 WL 35528626 , Tex.Dist. , July 10, 2000

9.  Northglen Ass'n v. Geneva Brooks D/B/A Committee to Remove the Bd.
2000 WL 35606986 , Tex.Dist. , Nov. 29, 2000

160 Tex. 586
Supreme Court of Texas.

CALIFORNIA PRODUCTS, INC., et al., Petitioners,
v.
PURETEX LEMON JUICE, INC., Respondent.

No. A-7421.    |    March 23, 1960.    |    Rehearing Denied May 18, 1960.

Action for declaratory judgment to determine whether or not design of bottle in which plaintiff planned to market its lemon and lime juice would violate terms of an injunction which defendant had obtained in an earlier action enjoining plaintiff from marketing its product in bottles which resembled in appearance the bottles used by defendant. The 107th District Court, Willacy County, Hawthorne Phillips, J., entered judgment in favor of plaintiff and the defendant appealed. The San Antonio Court of Civil Appeals Fourth Supreme Judicial District, 324 S.W.2d 449, reversed and plaintiff brought error. The Supreme Court, Griffin, J., held that the adjudication sought was but an advisory opinion and therefore not a proper subject of declaratory judgment action.

Affirmed.

**Attorneys and Law Firms**

 **\*587   \*\*780**  Robert H. Kern, Jr., McAllen, James & Conner, Ft. Worth, for petitioners.

Strickland, Wilkins, Hall & Mills, Mission, for respondent.

**Opinion**

GRIFFIN, Justice.

Petitioners herein, hereafter called plaintiffs, filed this suit in the 107th District Court of Willacy County, Texas, against respondent herein, hereafter called defendant, seeking a declaratory judgment to determine whether or not a certain bottle in which plaintiffs expected to sell lemon and lime juice would violate a judgment of the 107th District Court entered June 3, 1952. The prior suit in the 107th District Court was between the same parties, except petitioners herein were defendants and respondent herein was plaintiff. In the first suit between the parties, Puretex, as plaintiff, recovered a permanent injunction against California Products and Davis prohibiting them from marketing their lemon and lime juice in bottles which resembled in appearance the bottles used by plaintiff. This judgment was an agreed judgment and there was no appeal taken from it and it became final. After the entry of the above decree, petitioner files this declaratory judgment suit.

**\*\*781** Trial was had before a jury and two special issues were answered by the jury. The first issue asked the jury to find from a preponderance of the evidence whether plaintiff planned to have bottles made of the kind set out in a blueprint introduced in evidence, such bottles to be used as containers in which to market its lemon and lime juice. The jury answered this issue in the affirmative which was favorable to the plaintiff. The second issue asked the jury to find from a preponderance of the **\*588** evidence whether the bottle and its markings which plaintiff proposed to use to market its lemon and lime juice 'will not so closely resemble in appearance the bottle of defendant and its markings as to be liable to deceive a reasonably prudent buyer, exercising such ordinary care and observation as shoppers generally may be expected to use so as to mislead such buyer into believing that this bottle contains Puretex lemon or lime juice.' The jury answered, 'It will not be likely to deceive.' On this verdict, the court rendered judgment for plaintiff-California California Products, Inc. The judgment entered by the trial court reads, in part, as follows:

'That the terms of the agreed judgment entered by this Court on June 3, 1952, in Cause No. 1860, entitled Puretex Lemon Juice, Inc. v. California Products, Inc., and Charles H. Davis, properly construed, do not prohibit the use by Plaintiffs herein, in the marketing of lemon and lime juices, of a bottle resembling the said bottle of Defendant in any respect whatsoever, but the purport and meaning thereof is to prevent the use by Plaintiffs of a bottle so resembling in appearance that of Defendant's bottle as to be calculated to mislead and deceive the buying public, and;

'That the use by Plaintiff, California Products, Inc. of its proposed bottle, above described in the marketing of its lemon and lime juices will not be violative of, or inconsistent with, the injunction issued by this Court in said Cause No. 1860.'

Defendant appealed to the Court of Civil Appeals. That Court reversed and rendered denying plaintiff and relief. The basis for the opinion of the Court of Civil Appeals was (1) plaintiffs had shown no justiciable interest, and were only seeking an advisory opinion from the Court and (2) the trial court had no right to modify and change the terms of the judgment entered some five years in the past. 324 S.W.2d 449.

We granted the petition for writ of error on plaintiffs' first point. This asserted error by the Court of Civil Appeals in holding there was not an actual, real, or bona fide controversy between the parties. Petitioners-plaintiffs also have points on the error of the Court of Civil Appeals in holding that the trial court had no right to modify and change the terms of the previous judgment.

[1] All parties agree that there must be a justiciable controversy between the parties before a declaratory judgment action **\*589** will lie. That is well settled law. Board of Water Engineers v. City of San Antonio, 1955, 155 Tex. 111, 283 S.W.2d 722(1); Parks v. Francis, Tex.Civ.App.1947, 202 S.W.2d 683(5), no writ history; Southern Traffic Bureau v. Thompson, Tex.Civ.App. 1950, 232 S.W.2d 742(10), ref., n.r.e.; Anderson, Declaratory Judgments, 2d Ed., Vol. 1, p. 38, s 9; 16 Am.Jur. 282, s 9; Hodges, General Survey of the Uniform Declaratory Judgments Act in Texas,

Vernon's Texas Civil Statutes, Vol. 8, p. VII. The Court of Civil Appeals has cited and discussed some additional authorities and we will not repeat them.

'The rule with respect to the necessity for a justiciable controversy may be stated in the vernacular in this wise: The Uniform Declaratory Judgments Act does not license litigants to fish in judicial ponds for legal advice.' Anderson, Declaratory Judgments, 2d. Ed., Vol. 1, p. 47, quoting from Lide v. Mears, 231 N.C. 111, 56 S.E.2d 404.

**\*\*782** The case nearest in point to the case at bar which we have been able to find is the case of Ladner v. Siegel, 1928, 294 Pa. 368, 144 A. 274, 275. Plaintiffs Ladners owned certain residences on land purchased from defendant Siegel. On the remaining land adjoining plaintiffs' residences, Siegel proposed to erect a shopping center. One of the buildings was to be occupied by a garage operated for the general repair and service of automobiles for the public. The Ladners brought suit against Siegel seeking to restrain him from erecting and occupying the garage as a violation of the residential district use. The Ladners won this suit and secured their injunction. That cause became final.

Thereafter Siegel filed a declaratory judgment action asking the court to fix his rights in the conduct of the garage in case it was carried on in such a way as not to constitute a private nuisance. The court was presented with the question of determining a method by which Siegel would operate the garage, and then asked to determine whether or not such method of operation would be permitted in this residential district. The trial court entered a judgment setting out a method whereby the garage could be operated so as not to constitute a private nuisance.

On appeal the Supreme Court of Pennsylvania says the crucial question is 'do the circumstances here disclosed give any jurisdiction to the court below to enter a declaratory judgment?' **\*590** The Court then quotes from the Declaratory Judgments Act which provides that courts of record 'within their respective jurisdictions, shall have power to declare rights, status, and other legal relations' between parties where there is a real matter in controversy. These are the identical provisions in our statute-art. 2524-1, Vernon's Ann.Civ.St. The Court then says the Declaratory Judgments Act gives the court no power to grant advisory opinions, or to determine matters not essential to the decision of the actual controversy although such questions may in the future require adjudication, or passing upon contingent or certain other situations. The court then says:

> '* * * In the present case, the question of whether the use of the garage as now contemplated would constitute an offensive business in the neighborhood, and a private nuisance, affecting not only complainants, but others residing near by, could not be determined until its actual operation at some future date.'

And the Court further says:

'* * * If such a proceeding (as sought) was to be countenanced, then approval would be given to applications in any like equity case to have a determination as to whether the court's order should be held ineffective, under stated facts depending on contingent and future events, with resulting confusion, and the decree would lack the finality which is contemplated in law. If petitioners believe the operation intended to be unobjectionable under the order made, they may proceed at their own risk. * * * 'Construction of a decree cannot be given until the question comes regularly before the court in proceedings requiring construction and application to acts alleged to have been done or omitted under it.' 21 C.J. 689.'

To the same effect see Shattuck v. Shattuck, 1948, 67 Ariz. 122, 192 P.2d 229(18); Glassford v. Glassford, 1953, 76 Ariz. 220, 262 P.2d 382(3); National Biscuit Co. v. Kellogg Co., D.C.Del.1938, 22 F.Supp. 801; J. Greenebaum Tanning Co. v. National Labor Relations Board, 7 Cir., 129 F.2d 487(2); 154 A.L.R. 740, et seq.,

In the case of Southern Traffic Bureau v. Thompson, Tex.Civ.App.1950, 232 S.W.2d 742, 751, ref., n. r. e., it was said:

'The Uniform Declaratory Judgments Act does not provide for the giving of merely advisory opinions on the part of courts. In government this is a duty of the executive branch. In private **\*591** business it is the function of **\*\*783** the legal profession. City and County of Denver v. Lynch, 92 Colo. 102, 18 P.2d 907, 86 A.L.R. 907.

'It is further a well established rule that a declaratory judgment should not be based upon facts which are particularly subject to mutation and change as are the facts here. Anderson on Declaratory Judgments, p. 195, s 72.'

 **[2]**   A declaratory judgment rendered herein would not settle the controversy between the parties. The permanent injunction in Cause No. 1860 is still outstanding. A violation of that judgment is subject to be punished for contempt in a proper proceeding. It cannot be determined whether or not a proposed bottle will be violative of the injunction issued on June 3, 1952 until California Products seeks to market its product in a bottle in the same market with Puretex. Only in this way can it be determined whether the California Products' bottle is of the size and appearance that it misleads and deceives the buying public into believing that it is securing Puretex products rather than California products.

We agree with the Court of Civil Appeals that this proceeding is one in which an advisory opinion is sought. Should we decide that the bottle proposed to be used by California Products did violate the injunction, we would settle nothing. California could continue indefinitely to propose bottles of different sizes, shapes and colors on which it could seek an equally indefinite number of advisory opinions as to whether such bottles violate the injunction. Such procedure would accomplish

nothing. California Products should propose a bottle which it thinks does not violate the injunction, use it and litigate the material issue on a contempt hearing.

We affirm the judgment of the Court of Civil Appeals.

GREENHILL, J., not sitting.

**Parallel Citations**

334 S.W.2d 780

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (2)

### Direct History (2)

1.  Puretex Lemon Juice, Inc. v. California Products, Inc.
324 S.W.2d 449 , Tex.Civ.App.-San Antonio , May 06, 1959

*Judgment Affirmed by*

2.  California Products, Inc. v. Puretex Lemon Juice, Inc.
160 Tex. 586 , Tex. , Mar. 23, 1960

914 S.W.2d 140
Supreme Court of Texas.

Bill CHENAULT et al., Relators,
v.
The Honorable Tom PHILLIPS, Dan Morales, John T. Adams,
and Martha Whitehead, In Their Official Capacities, Respondents.

No. 95–0865.    |    Jan. 11, 1996.

Attorneys filed original petition in Supreme Court seeking declaration that attorney occupation tax was unconstitutional, injunction against officials responsible for collecting tax, and writs prohibiting enforcement of tax. The Supreme Court held that action to challenge constitutionality of attorney occupation tax was not within original jurisdiction granted to Supreme Court.

Denied.

**Attorneys and Law Firms**

**\*141** Miles H. Appleberry, San Antonio, Roy Beene, Houston, William B. Chenault, III, San Antonio, for Relators.

Dan Morales, David S. Morales, Austin, for Respondents.

**Opinion**

**PER CURIAM.**

In this case we decide whether this Court, in exercising its original jurisdiction, may consider an original petition seeking relief from the Attorney Occupation Tax, Texas Tax Code §§ 191.141–.145. Without reaching the merits, we hold that this action is not within the original jurisdiction granted to this Court by either the Texas Constitution or the Legislature, and deny the motion for leave to file the petition because Relators have an adequate remedy at law.

Bill Chenault, Roy Beene, and Miles Appleberry (Relators) filed an original petition in this Court seeking a declaration that the attorney occupation tax is unconstitutional, an injunction against the officials responsible for collecting the tax, and writs prohibiting enforcement of the tax. [1] Relators, members of the State Bar of Texas, argue that the statute's enforcement provision, which automatically suspends the license of any attorney who does not timely pay the tax, deprives attorneys of their right to a full impartial hearing prior to the imposition of any sanction. Relators

further contend that the statute improperly infringes on this Court's inherent power to regulate the legal profession in Texas, and that it violates the separation of powers provision of Article II, section one of the Texas Constitution by delegating the tax collection powers of the executive branch to the judicial branch. Relators argue that this Court has jurisdiction over this original action under Article III of the Texas Constitution, sections 22.001–.002 of the Government Code, and Rules 121 and 122 of the Texas Rules of Appellate Procedure.

**[1]** **[2]** **[3]** This Court's jurisdiction, like that of all Texas courts, is conferred solely by the Texas Constitution and state statutes. We do not have jurisdiction to decide any case absent an express constitutional or statutory grant. *See Pope v. Ferguson,* 445 S.W.2d 950, 952 (Tex.1969), *cert. denied,* 397 U.S. 997, 90 S.Ct. 1138, 25 L.Ed.2d 405 (1970). A request for declaratory relief alone does not establish jurisdiction in this Court. We have held that the Uniform Declaratory Judgments Act, TEX.CIV.PRAC. & REM.CODE §§ 37.001–.011, is not a grant of jurisdiction, but "merely a procedural device for deciding cases already within a court's jurisdiction." *State v. Morales,* 869 S.W.2d 941, 947 (Tex.1994); *see also Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993). Likewise, we may not consider the merits of Relators' requests for injunctions, writs of prohibition, and other relief under Rules 121 and 122 in a case not otherwise properly before the Court. *See Texas Employers' Ins. Ass'n v. Kirby,* 137 Tex. 106, 152 S.W.2d 1073, 1073 (1941).

**[4]** **[5]** Relators also seek a writ of mandamus. Mandamus is an extraordinary remedy and generally is not available from any court in this state when a party has an adequate legal remedy. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992); *Holloway v. Fifth Court of Appeals,* 767 S.W.2d 680, 684 (Tex.1989); *State v. Walker,* 679 S.W.2d 484, 485 (Tex.1984). Relators may file their challenge to the Attorney Occupation Tax in district court and appeal any adverse ruling through the ordinary appellate process. They have not met their burden of showing that pursuing their claims first in the trial court will cause them to suffer any immediate harm that would entitle them to mandamus relief under the *Walker* standard.

**\*142** **[6]** **[7]** Moreover, this Court will not issue an original writ of mandamus absent a "compelling reason." TEX.R.APP.P. 121(a); *LaRouche v. Hannah,* 822 S.W.2d 632, 633–34 (Tex.1992); *Sears v. Bayoud,* 786 S.W.2d 248, 249–50 (Tex.1990). Relators assert as compelling reasons for the invocation of this Court's original jurisdiction the need to protect this Court's role as the ultimate supervisory authority over the State Bar of Texas, the presence of state officers as necessary parties in the suit, and the statewide importance of the issue. None of these proffered jurisdictional bases presents a compelling reason for this Court to exercise its original jurisdiction.

Relators cite *State Bar of Texas v. Gomez,* 891 S.W.2d 243 (Tex.1994), as authority for the relief they seek. In *Gomez,* several indigent litigants brought an action in district court to mandate that the State Bar of Texas or this Court require all Texas attorneys to provide pro bono legal services.

Central to our decision in that case was this Court's exclusive administrative authority to regulate the practice of law in Texas, an authority that "is derived from both statutory and inherent powers." *Id.* at 245. The State Bar, we held, is by itself powerless to address the harm alleged by the indigent litigants, as its authority in this regard is limited to proposing regulations to the Court. We then rejected any attempt to involve the district court in the regulation of the practice of law: "[T]o the extent the remedies are sought against the Supreme Court, they would clearly impinge on the Court's exclusive authority to regulate the practice of law.... No subordinate court in Texas has the power to usurp our authority or responsibility in this area." *Id.* at 246.

Relators interpret this language as this Court's assumption of exclusive original jurisdiction over any action affecting attorneys in Texas. In so doing, they misconstrue our decision in *Gomez.* First, we observed that the Court's inherent powers, such as the power to regulate the bar, are *administrative* powers, not *jurisdictional* powers. *Id.* at 245. We then held that a district court could not impose a new requirement on Texas attorneys because "a district court has no authority to assume this Court's authority to regulate the legal profession." *Id.* at 246. Unlike the plaintiffs in *Gomez,* Relators do not seek imposition of new regulations on lawyers in Texas, but rather challenge the constitutionality of a statute that affects lawyers. Yet, as we noted in *Gomez,* constitutional challenges to rules enacted by this Court must be brought in the district court and heard by this Court in the exercise of its appellate jurisdiction. "Had this Court actually promulgated rules establishing a pro bono program and had Gomez challenged the constitutionality of such rules, the district court would have jurisdiction to decide, in the first instance, whether such rules met constitutional standards.... Such a case would be justiciable because the district court would be capable of rendering a judgment that accords the parties complete relief, subject of course to appellate review." *Id.* at 246. Analogously, Relators must follow the same procedure in challenging the constitutionality of the Attorney Occupation Tax. A litigant may not bring such a claim in the first instance in this Court.

Accordingly, without hearing oral argument, *see* Texas Rule of Appellate Procedure 122, a majority of this Court overrules Relators' motion for leave to file an original petition for writ of mandamus and writs pursuant to Texas Rules of Appellate Procedure 121 and 122.

**Parallel Citations**

39 Tex. Sup. Ct. J. 204

## Footnotes

1    While the enforcement mechanisms for the various statutes differ, at the same time the Legislature imposed the Attorney Occupation Tax, it increased by $200 the fees assessed against numerous other license holders, including the following: physicians, TEX.REV.CIV.STAT.ANN. art. 4495b, §§ 3.10–.11A; dentists, TEX.REV.CIV.STAT.ANN. art. 4550c; optometrists, TEX.REV.CIV.STAT.ANN. art. 4552–3.03B; accountants, TEX.REV.CIV.STAT.ANN. art. 41a–1, § 9A; engineers,

TEX.REV.CIV.STAT.ANN. art. 3271a, § 13B; real estate brokers, TEX.REV.CIV.STAT.ANN. art. 6573a, § 11A; and securities dealers, TEX.REV.CIV.STAT.ANN. art. 581–41. The proceeds of these increases in fees, like the proceeds of the Attorney Occupation Tax, go into the foundation school fund and the general revenue fund. *Id.*

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

366 S.W.3d 216
Court of Appeals of Texas,
Houston (14th Dist.).

FARMERS INSURANCE EXCHANGE and Allstate
County Mutual Insurance Company, Appellants,
v.
Juan RODRIGUEZ, Appellee.

No. 14–10–00995–CV.   |   Feb. 16, 2012.   |   Rehearing Overruled May 9, 2012.

**Synopsis**
**Background:** Property owner's neighbor brought action against owner, owner's liability insurer, and neighbor's automobile insurer, seeking recovery for injuries allegedly sustained while removing deer stand from property owner's trailer and seeking declaratory judgment stating that homeowner's insurance policy provided liability coverage regarding neighbor's claims. Following a jury trial after neighbor was granted summary judgment against insurers, the 125th District Court, Harris County, Kyle Carter, J., entered judgment in favor of neighbor. Insurers appealed.

**Holdings:** The Court of Appeals, Martha Hill Jamison, J., held that:

[1] declaratory-judgment claim was not ripe;

[2] unloading of deer stand from trailer constituted use of trailer, for purposes of underinsured-motorist (UIM) coverage, and

[3] injuries that neighbor sustained arose out of use of trailer.

Affirmed in part and reversed and rendered in part.

**Attorneys and Law Firms**

**\*219** Nicole Shirley Bakare, Ronald J. Restrepo, Houston, Kent R. Chambers, Magnolia, for appellants.

Scott Rothenberg, Houston, for appellee.

Panel consists of Justices FROST, SEYMORE, and JAMISON.

## OPINION

MARTHA HILL JAMISON, Justice.

Appellee Juan Rodriguez was injured while helping his neighbor Michael Woodling remove a deer stand from Woodling's trailer. Rodriguez sued Woodling for negligence and, in the same case, Rodriguez's automobile insurer, appellant Allstate County Mutual Insurance Company, seeking coverage under an uninsured/underinsured motorist (UIM) policy. Rodriguez later amended his petition to add Woodling's insurer, appellant Farmers Insurance Exchange, seeking liability coverage for Woodling under his homeowner's policy. In a pre-trial partial summary judgment, the court declared the claims were covered by both insurance policies. At trial, the jury found no negligence on the part of Rodriguez, found that Woodling was negligent, and found that Woodling's negligence caused Rodriguez's damages. The primary issues on appeal pertain to the trial court's subject matter jurisdiction over the claims against Farmers and interpretation of standard form language in the Allstate automobile policy.

Farmers appeals the trial court's grant of summary judgment against Farmers in favor of Rodriguez, denial of Farmers' plea to the jurisdiction, and entry of declaratory judgment finding coverage under the Farmers insurance policy. In three issues, Farmers contends the trial court lacked subject matter jurisdiction over Rodriguez's claim against Farmers, the homeowner's policy issued by Farmers does not provide liability coverage for Woodling, and Rodriguez filed an impermissible direct action against Farmers without satisfying conditions precedent in Woodling's insurance policy. We hold the trial court erred by granting summary and declaratory judgments against Farmers and denying Farmers' plea to the jurisdiction because Rodriguez's claim against Farmers was not ripe when the court made its rulings. We therefore reverse and render judgment dismissing Rodriguez's claims against Farmers for lack of subject matter jurisdiction.

Allstate appeals the trial court's summary judgment in favor of Rodriguez against Allstate and declaratory judgment finding coverage under the UIM policy. In four issues, Allstate contends its policy does not cover Rodriguez's injury but the Farmers policy does. We hold the UIM provisions in Rodriguez's automobile policy provide coverage for his injury. We therefore affirm the trial court's summary judgment and declaratory judgment against Allstate.

### *Undisputed Factual Background*

The following facts are undisputed. Using a trailer hitched to his pickup truck, **\*220** Woodling [1] transported a deer stand from his deer lease to his residence. He pulled into his driveway and attempted to remove the deer stand from the trailer. He pushed the deer stand out of the trailer until the legs on the stand touched the driveway. He left the stand resting at a 30–degree angle against the trailer. He then attached a come-along [2] to a fence post and to the stand and attempted to raise the stand upright. Realizing he could not accomplish the task alone, he requested assistance from his neighbor, Rodriguez.

Rodriguez and Woodling decided to lift the stand manually by walking forward out of the trailer and onto the driveway. They began in the trailer, each using both hands to push the stand upward. Then they stepped onto the driveway and took "one or two" more steps. When the stand was no longer touching the trailer, Woodling realized it was too heavy and yelled, "Juan, I can't hold it. Jump." Woodling then jumped away, leaving Rodriguez alone to hold the stand, which weighed approximately 350 pounds. The stand fell, and Rodriguez was injured.

The liability provisions of the Farmers homeowners policy contain the following exclusion for bodily injury claims: "arising out of the ownership, maintenance, operation, use, loading or unloading of ... trailers [or] semi-trailers" except for "trailers or semitrailers while not being towed by or carried on a motor vehicle."

Rodriguez's Allstate automobile policy included UIM coverage for damages Rodriguez was "legally entitled to recover from the owner ... of an uninsured [or underinsured] motor vehicle [including any type of trailer] because of bodily injury sustained by [Rodriguez and] caused by an accident." Under the Allstate policy, the uninsured or underinsured owner's liability must "arise out of the ownership, maintenance or *use* of the uninsured motor vehicle." (Emphasis added.)

### *Procedural History*

Rodriguez filed suit against Woodling and Allstate on June 2, 2008, asserting a negligence claim against Woodling and a claim against Allstate for UIM coverage. Rodriguez amended his petition on September 16, 2008, adding Farmers as a defendant and seeking declarations that the exclusion from liability coverage in the Farmers policy did not apply or, alternatively, that Rodriguez's damages arose from the use of a trailer covered by the Allstate policy.

Farmers filed a motion to sever, contending Rodriguez's joinder of Farmers was improper. [3] Rodriguez moved for partial summary judgment against Farmers, seeking a declaration that Farmers had a contractual obligation to indemnify Woodling. Farmers moved for summary judgment based on improper joinder, lack of ripeness, and applicability of its "trailers or semi-

trailers" exclusion. Allstate moved for summary judgment, asserting that the accident did not arise out of the *use* of an uninsured motor vehicle so that the Allstate policy did not apply. The trial court granted Rodriguez's motion and denied motions filed by Allstate and Farmers. In a combined plea to the jurisdiction and motion to vacate the court's order granting partial summary judgment, Farmers reasserted its jurisdictional arguments **\*221** before trial of the underlying personal injury claim. The court denied the combined motion.

Before trial, Allstate, while contesting coverage under its policy, stipulated to be bound by the jury's findings on negligence and damages. The jury found Woodling 100% negligent and awarded damages to Rodriguez totaling $233,123.71. Rodriguez subsequently filed a motion for summary judgment against Allstate, seeking a declaration that his injuries were covered under the Allstate policy, which the trial court granted. After reducing the jury award based on the amount of Rodriguez's incurred medical expenses, the trial court entered judgment awarding Rodriguez $211,618.42, plus interest and costs, and declaring that Rodriguez's injuries were covered under both the Farmers and Allstate policies.

### *Standards of Review*

***Traditional Summary Judgment.***
To prevail on a traditional Rule 166a(c) summary-judgment motion, a movant must prove that there is no genuine issue regarding any material fact and that it is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Little v. Tex. Dep't of Criminal Justice,* 148 S.W.3d 374, 381 (Tex.2004). A plaintiff moving for a traditional summary judgment must conclusively prove all essential elements of its claim. *See Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex.1999).

A defendant may prevail by traditional summary judgment if it conclusively negates at least one essential element of a plaintiff's cause of action. *See IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex.2004). A movant seeking traditional summary judgment on an affirmative defense has the initial burden of establishing entitlement to judgment as a matter of law by conclusively establishing each element of his affirmative defense. *See Chau v. Riddle,* 254 S.W.3d 453, 455 (Tex.2008); *see also* Tex.R. Civ. P. 166a(b)-(c). A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *See City of Keller v. Wilson,* 168 S.W.3d 802, 816 (Tex.2005).

If the movant meets its burden, the burden then shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *See Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes,* 236 S.W.3d 754, 755 (Tex.2007).

On appeal, we review de novo a trial court's summary judgment ruling. *See Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 848 (Tex.2009). In our review, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex.2006). When, as here, the parties file competing motions for summary judgment and the trial court grants one motion and denies the other, this court should review both parties' summary-judgment evidence and determine all questions presented. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005); *English v. B.G.P. Int'l, Inc.,* 174 S.W.3d 366, 370 (Tex.App.-Houston [14th Dist.] 2005, no pet.).

### *Subject-matter jurisdiction.*

**[1]**   **[2]**   **[3]**   The absence of subject-matter jurisdiction may be raised by a plea to the **\*222** jurisdiction or another procedural vehicle such as a motion for summary judgment. *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554 (Tex.2000).[4] When a plea to the jurisdiction challenges jurisdictional facts, as here, we consider the evidence submitted by the parties. *Stinson v. Ins. Co. of Penn.,* 286 S.W.3d 77, 83 (Tex.App.-Houston [14th Dist.] 2009, pet. denied). The standard of review for a jurisdictional plea based on evidence generally mirrors that of a traditional motion for summary judgment. *Id.*

### *Declaratory judgment.*

**[4]**   **[5]**   In reviewing a declaratory judgment, we refer to the procedure for resolution of the issue at trial to determine the applicable standard of review on appeal. Tex. Civ. Prac. & Rem.Code § 37.010; *English,* 174 S.W.3d at 370; *see also Gen. Agents Ins. Co. of Am. v. El Naggar,* 340 S.W.3d 552, 557 (Tex.App.-Houston [14th Dist.] 2011, pet. denied). Here, because the trial court implicitly resolved the declaratory judgment issues by ruling on motions for summary judgment, we review the propriety of the trial court's grant of the declaratory judgments under the same standards applicable for review of summary judgments. *English,* 174 S.W.3d at 370. Therefore, we must determine whether the trial court properly granted Rodriguez's declaratory judgment requests and, if not, enter the judgment which should have been entered by the trial court. *Id.*

### *Jurisdiction over Claim against Farmers*

**[6]**   In its third issue, Fanners contends Rodriguez lacked standing to sue Farmers and Rodriguez's claim against Farmers was not ripe, depriving the trial court of subject-matter jurisdiction. We agree with Farmers that Rodriguez's claim was not ripe.[5]

 **[7]** **[8]** **[9]** **[10]** **[11]** Ripeness is a threshold issue that implicates subject-matter jurisdiction. *Robinson v. Parker,* 353 S.W.3d 753, 755 (Tex.2011). In evaluating ripeness, courts consider "whether, *at the time a lawsuit is filed,* the facts are sufficiently developed 'so that an injury has occurred or is likely to occur, rather than being contingent or remote.' " *Id.* (emphasis in orig.) (citation omitted). Although a claim is not required to be ripe at the time of filing, if a party cannot demonstrate a reasonable likelihood that the claim will soon ripen, the case must be dismissed. *Id.* A case is not ripe when resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass. *Id.* at 756 (citing *Waco Indep. Sch. Dist. v. Gibson,* 22 S.W.3d 849, 852 (Tex.2000)). "[T]he essence of the ripeness doctrine is to avoid premature adjudication ... [and] to hold otherwise would be the essence of an advisory opinion, advising what the law would be on a hypothetical set of facts." *Id.* (citing *Patterson v. Planned Parenthood of Houston and Se. Tex.,* 971 S.W.2d 439, 444 (Tex.1998)) (second alteration in original).

 **\*223** **[12]** **[13]** A tort claimant has no direct claim against the tortfeasor's liability insurer until the insured tortfeasor is adjudged liable to the tort claimant. [6] *Angus Chem. Co. v. IMC Fertilizer, Inc.,* 939 S.W.2d 138, 138 (Tex.1997) (per curiam); *State Farm Cnty. Mut. Ins. Co. of Tex. v. Ollis,* 768 S.W.2d 722, 723 (Tex.1989) (per curiam); *Great Am. Ins. Co. v. Murray,* 437 S.W.2d 264, 265 (Tex.1969). A party injured by the insured is a third-party beneficiary of a liability insurance policy, but he cannot enforce the policy directly against the insurer until it has been established, by final judgment or agreement, that the insured has a legal obligation to pay damages to the injured party. *Ollis,* 768 S.W.2d at 723. It is undisputed that when the trial court granted Rodriguez summary judgment against Farmers, Woodling's obligation to pay damages to Rodriguez had not been established by final judgment or by agreement. Therefore, Rodriguez's claim against Farmer's was not ripe when the trial court granted summary judgment. *See Certain Underwriters at Lloyds, London v. Four J's Cmty. Living Ctr., Inc.,* No. H–11–0713, 2011 WL 6026689, at \*1–2 (S.D.Tex. Dec. 2, 2011) (holding that, under Texas law, tort plaintiff did not yet have claim under tort defendant's insurance policy because final judgment had not yet been rendered upon jury verdict in plaintiff's favor); *Robinson,* 353 S.W.3d at 755–56 (holding that declaratory-judgment claims were not yet ripe because there was no showing that claimants had suffered a concrete injury); *Gibson,* 22 S.W.3d at 853 (noting that to allow premature adjudication of contingent situations would "eschew the ripeness doctrine" and "create an impermissible advisory opinion.").

Though a claim is not required to be ripe at the time of filing, if a party cannot demonstrate a reasonable likelihood that the claim will soon ripen, the case must be dismissed. *See Robinson,* 353 S.W.3d at 755. The record does not reflect any agreement establishing Woodling's obligation to pay Rodriguez damages. [7] Therefore, Rodriguez cannot demonstrate a reasonable likelihood that his claims against Farmers will soon ripen in the case under review, and these claims must be dismissed for lack of subject-matter jurisdiction. *See id.*

In *Firemen's Insurance Co. v. Burch,* the Supreme Court of Texas held that there can be no justiciable controversy regarding the insurer's duty to indemnify before a judgment has been rendered against an insured. 442 S.W.2d 331, 332–34 (Tex.1968). The supreme court has recognized a limited exception to this rule that applies "when the insurer has no duty to defend *and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify.*" *Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin,* 955 S.W.2d 81, 84 (Tex.1997) (emphasis in original); *see also D.R. Horton–Tex., Ltd. v. Markel Int'l Ins. Co.,* 300 S.W.3d 740, 744 (Tex.2009).

Rodriguez sued Farmers seeking payment based on Farmers' purported duty to indemnify Woodling. While generally acknowledging that a third party may not **\*224** sue an insurance company for payment under its policy without a judgment against the insured, Rodriguez argues the exception recognized in *Griffin* should be applied here because "undisputed facts pertaining to the duty to indemnify ... were included in the summary judgment record [and] are consistent with the factual record at trial and the fact-finder's disposition of the personal injury lawsuit." We find no merit in this argument.

 [14]    [15]    [16]    The holding in *Griffin* pertained to an underlying tort suit for injuries sustained in a drive-by shooting. *D.R Horton–Tex., Ltd.,* 300 S.W.3d at 744–45 (citing *Griffin,* 955 S.W.2d at 84). The policy in that case excluded coverage for intentional torts. *Griffin,* 955 S.W.2d at 83. The *Griffin* court thus concluded no "conceivable set of facts" could be developed in the underlying case that would transform the intentional shooting into an auto accident covered by the policy. *D.R. Horton–Tex., Ltd.,* 300 S.W.3d at 745. The court held that the duty to indemnify may be adjudicated before judgment is entered on the claim against the insured, when the facts negate both the duty to defend and the duty to indemnify. [8] *Griffin,* 955 S.W.2d at 84. Here, the duty to defend is not at issue. [9] More importantly, even though the parties do not dispute the underlying accident facts, the jury was required to decide and apportion liability before judgment could be entered. Thus, when the lawsuit was filed, coverage of Rodriguez's injury under the Farmers policy was contingent on the jury's future liability finding, if any, including apportionment between Woodling and Rodriguez. The *Griffin* exception is inapplicable. *See D.R. Horton–Tex., Ltd.,* 300 S.W.3d at 743–45 (distinguishing *Griffin* ); *Burlington Northern and Santa Fe Ry. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.,* 334 S.W.3d 217, 219–20 (Tex.2011) (same). We hold that Rodriguez's claims against Farmers were not ripe and that the trial court lacked jurisdiction to grant summary judgment against Farmers declaring coverage under the Farmers policy. The trial court erred in denying Farmers' plea to the jurisdiction, and the proper remedy is to reverse the trial court's judgment as to Rodriguez's claims against Farmers and render judgment dismissing these claims for lack of subject matter jurisdiction.

We sustain Farmers' third issue.

### *Coverage of Rodriguez's Injury by the Allstate Policy*

**[17]** In two issues, Allstate argues the trial court erred by denying its summary judgment motion against Rodriguez, granting summary judgment in favor of Rodriguez, and declaring that UIM language in his automobile policy provide coverage for his injury. In reference to the "use" exclusion, Allstate contends that "loading and unloading" a trailer is not *use* as contemplated under the Allstate policy, and even if it were, there is no coverage because Rodriguez's injury did not "arise out of" the use of the trailer. We are not persuaded by these arguments.

The Allstate policy specifies that liability of the owner of an uninsured or underinsured vehicle "must arise out of the ownership, **\*225** maintenance, or *use* of the uninsured motor vehicle." [10] (Emphasis added.) The term "use" is not defined in the policy. Allstate urges us to hold that "loading and unloading" is excluded because the "use" clause omits these activities as a matter of law. We decline to do so.

**[18]** **[19]** Automobile insurers in Texas are required to provide UIM coverage in all policies. The quoted language from the Allstate policy mirrors statutory requirements. *See* Tex. Ins.Code § 1952.101(a). The purpose of UIM coverage is to protect conscientious drivers from financial loss caused by irresponsible parties, and courts liberally construe the UIM statutes. *Tex. Farm Bureau Mut. Ins. Co. v. Sturrock,* 146 S.W.3d 123, 128 (Tex.2004); *Stracener v. United Servs. Auto. Ass'n,* 777 S.W.2d 378, 382 (Tex.1989). Texas state and federal courts applying Texas law have concluded that automobile liability policies may cover loading and unloading of a vehicle even when those terms are not specifically included in the policy. *See, e.g., EMCASCO Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.,* 438 F.3d 519, 525 (5th Cir.2006); *Panhandle Steel Prods. Co. v. Fidelity Union Cas. Co.,* 23 S.W.2d 799, 801 (Tex.Civ.App.-Fort Worth 1929, no writ) (holding injury of passerby that occurred after iron beam was unloaded from truck and was being carried across sidewalk was result of use of truck). The parties have not cited, and research has not revealed, any Texas cases construing UIM policies that have held the term "use" without a "loading and unloading" clause excludes coverage for loading and unloading.

**[20]** Allstate cites *Liberty Mutual Insurance Co. v. American Employers Insurance Co.,* 556 S.W.2d 242 (Tex.1977) for the proposition that the inclusion of a "loading and unloading" endorsement in an insurance policy expands coverage from the coverage afforded by the phrase "ownership, maintenance, or use." *Id.* at 244. But the court in *Liberty Mutual* did not construe UIM coverage or the "ownership, maintenance, or use" clause. [11] It analyzed whether injured workers were "borrowers" of the automobile to determine if they were insured persons under the policy. [12] *Id. Liberty Mutual* does not hold that the "use" of a vehicle may never include "loading and unloading" merely because the policy does not include those terms. *See id.* Moreover, the intent to

exclude coverage must be expressed in clear and unambiguous **\*226** language. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991). If Allstate intended to exclude loading and unloading from the scope of coverage, then it was incumbent upon it to expressly and clearly state the exclusion in the policy. *See Nat'l Auto. & Cas. Ins. Co. v. Glens Falls Ins. Co.,* 493 S.W.2d 909, 911–12 (Tex.Civ.App.-Tyler 1973, no writ) (holding clause expressly excluding "loading and unloading" of vehicle was effective). Having failed to do so, Allstate may not now complain. [13] *See Nat'l Union Fire Ins. Co.,* 811 S.W.2d at 555.

**[21]** **[22]** **[23]** Allstate further argues that Rodriguez's injuries did not "arise out of" any use of the trailer. We disagree. Texas courts broadly define "use" of a motor vehicle in the context of insurance policies. *Mid–Continent Cas. Co. v. Global Enercom Mgmt., Inc.,* 323 S.W.3d 151, 156 (Tex.2010). It is a "general catchall ..., designed and construed to include all proper uses of the vehicle." *Lyons v. State Farm Lloyds & Nat'l Cas. Co.,* 41 S.W.3d 201, 205 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (citing *State Farm Mut. Auto. Ins. Co. v. Pan Am. Ins. Co.,* 437 S.W.2d 542, 545 (Tex.1969)). "Use" means "to put into action or service; to employ for or apply to a given purpose." *Id.* (citing *LeLeaux v. Hamshire–Fannett I.S.D.,* 835 S.W.2d 49, 51 (Tex.1992)). In *Mid–Century Ins. Co. of Tex. v. Lindsey,* 997 S.W.2d 153 (Tex.1999), the court employed the following factors suggested in two insurance treatises [14] to help determine when a motor vehicle has been in "use" under a similar UIM insuring provision:

> For an injury to fall within the "use" coverage of an automobile policy (1) the accident must have arisen out of the inherent nature of the automobile, as such; (2) the accident must have arisen within the natural territorial limits of an automobile, and the actual use must not have terminated; (3) the automobile must not merely contribute to cause the condition which produces the injury, but must itself produce the injury. [15]

*Id.* at 157. [16]

Using the factors elucidated in *Lindsey* as a framework, and taking into consideration the broad definition of "use" recognized in Texas jurisprudence, we conclude that Rodriguez's injury resulted from use of the trailer as a matter of law.

**\*227** *Inherent nature.* It is in the inherent nature of a trailer that it will be used to haul and tow materials. *Cf. Mid–Continent Cas. Co.,* 323 S.W.3d at 155 ("[I]t is in the inherent nature of a 2000 Ford F–250 Super Duty pickup truck on a cell tower job site that it will be used to haul and tow materials."); *Panhandle Steel Prods. Co.,* 23 S.W.2d at 801 (holding, when delivery of material was main purpose of haul, "loading and unloading were as necessary to accomplish that purpose as was the driving of the truck from plaintiff's place of business to the point of delivery"). That process includes not only the immediate action of loading and unloading materials from the trailer

but also moving them from their starting point to their destination. [17] *See Liberty Mut. Ins. Co., 556 S.W.2d at 244; Travelers Ins. Co. v. Emp'r's Cas. Co., 380 S.W.2d 610, 612 (Tex.1964); Panhandle Steel Prods. Co., 23 S.W.2d at 801.* Using a trailer in this manner is "not an unexpected or unnatural use of the vehicle." *See Mid–Continent Cas. Co., 323 S.W.3d at 155* (citing *Lindsey, 997 S.W.2d at 158); Commercial Standard Ins. Co., 455 S.W.2d at 717.*

*Natural territorial limits.* The accident was within the "natural territorial limits" of the trailer, even though Woodling and Rodriguez had taken a few steps out of the trailer. In *Mid–Continent Casualty Company* and *Lindsey,* this factor was satisfied even though both accidents occurred outside the insured vehicles. *See Mid–Continent Cas. Co., 323 S.W.3d at 155* (holding injuries sustained when rope that was anchored on one end to the truck broke arose from use of truck); *Lindsey, 997 S.W.2d at 160* (holding injury arose out of use of truck when child entered through sliding rear window and accidentally discharged loaded shotgun mounted over rear window, injuring person in nearby vehicle, because child did not stray from purpose of entering truck by playing with gun or trying to shoot it).

 **[24]**   **[25]**   The Supreme Court has adopted the complete operation doctrine, which defines the terms "loading and unloading" in the context of an insurance policy. " '[L]oading and unloading' embraces not only the immediate transference of the goods to or from the vehicle, but also the complete operation of transporting the goods between the vehicle and the place from or to which they are being delivered." *Liberty Mut. Ins. Co., 556 S.W.2d at 244; Travelers Ins. Co., 380 S.W.2d at 612.* [18] Any activities involved in moving the goods to their final physical destination are themselves included in the term "unloading" and thus qualify as a use of the vehicle for insurance purposes. *See Travelers Ins. Co., 380 S.W.2d at 613–14.* The court noted, "[w]hen a vehicle is being unloaded it is being used to the same extent as if it were being driven, and the person doing the unloading is entitled to the same protection as the owner or operator." *Id.* at 614; *see also Commercial* **\*228** *Standard Ins. Co. v. Am. Gen. Ins. Co., 455 S.W.2d 714, 716–17 (Tex.1970)* (quoting *Travelers Ins. Co.).* We conclude under these circumstances that Woodling and Rodriguez were using the trailer when the accident occurred.

 **[26]**   *Cause.* The third factor is whether the vehicle produced the injury. *Lindsey, 997 S.W.2d at 157.* The Supreme Court of Texas has stated that the causation inquiry in this context involves "but for" causation. *Mid–Continent Cas. Co., 323 S.W.3d at 156.* A but for cause is "one without which the event would not have occurred." *Transcon. Ins. Co. v. Crump, 330 S.W.3d 211, 223 (Tex.2010).*

Rodriguez's accident would not have occurred if Rodriguez had not been assisting Woodling in unloading the deer stand from the trailer. *See Mid–Continent Cas. Co., 323 S.W.3d at 156* (holding rope would not have broken causing injuries if truck had not been used to hoist headache ball). The accident did not merely happen near the trailer: Woodling and Rodriguez could not have

accomplished the same result without the presence of the trailer, and, as we have noted, the use of a trailer includes unloading materials. *See id.; Panhandle Steel Prods. Co.,* 23 S.W.2d at 802. [19] The trial court properly found the "use" clause in Allstate's policy covered Rodriguez's injury.

This case is not controlled by the cases cited by Allstate in support of its argument that the accident was not caused by the use of a trailer as such. The cases cited by Allstate regarding UIM policies involved *intentional* shootings from one vehicle into another that were held to be incidental to the use of the vehicles. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Whitehead,* 988 S.W.2d 744, 745 (Tex.1999); *Collier v. Emp'rs Nat'l Ins. Co.,* 861 S.W.2d 286, 289 (Tex.App.-Houston [14th Dist.] 1993, writ denied). Here, as we have held, Rodriguez was injured while he was unloading the trailer—which was a proper use—so his injury was not merely incidental to the use of the trailer.

 **[27]**    **[28]**    *National Union Fire Insurance Co. v. Merchants Fast Motor Lines, Inc.,* 939 S.W.2d 139 (Tex.1997) involved a duty to defend. An insurer's duty to defend is determined from the four corners of the pleadings and the language of the insurance policy. *Id.* at 141. In such cases, if the petition does not allege facts within the scope of coverage, the insurer is not required to defend a suit against its insured. *Id.* The petition in *National Union* alleged only that a driver was operating the insured's truck when he negligently discharged a firearm injuring the plaintiff. *Id.* at 142. The insurance policy only covered claims where the injury was caused by an accident *resulting from* the *use* of a covered auto. *Id.* Accordingly, the allegations did not give rise to a duty to defend by the insurer. *Id.; see also Mid–Continent Cas. Co.,* 323 S.W.3d at 156. Here, we are not dealing with the duty to defend; thus, the same pleading standard does not apply. [20]

 **\*229**   **[29]**    The other two cases cited by Allstate were not insurance coverage cases, but instead involved claims under the Texas Torts Claims Act (TTCA). The TTCA waives governmental immunity for "property damage, personal injury, or death aris[ing] from the operation or use of a motor driven vehicle." [21] *LeLeaux,* 835 S.W.2d at 51 (citing Tex. Civ. Prac. & Rem.Code § 101.021(1)(A)). The required "operation or use" under the TTCA is by the governmental employee. *Id. LeLeaux* involved a school bus that was not in operation when a student jumped up from where she had been sitting in the open rear doorway of the empty school bus and hit her head on the door frame. 835 S.W.2d at 51. The court held that the injury did not arise from the use of the bus because the driver was not aboard when the injury occurred—in other words, the injury did not arise from the school district's or its driver's operation or use of the bus—and immunity was not waived. *Id.* at 52. *Brown v. Houston Independent School District,* 123 S.W.3d 618 (Tex.App.-Houston [14th Dist.] 2003, pet. denied),* involved an officer who pulled over a woman in his patrol car and sexually assaulted her *in her own vehicle. Id.* at 619. Thus, the assault did not occur in the patrol car, but in a vehicle which was not operated by the officer. *Id.* at 622; *see also Mid–Continent Cas. Co.,* 323 S.W.3d at 156. Here, by contrast, the use of the vehicle covered by the Allstate policy was not similarly limited to a particular user. Moreover, Rodriguez's injury arose

from using the trailer as a trailer while he was unloading it. *See Mid–Continent Cas. Co.,* 323 S.W.3d at 155; *Lindsey,* 997 S.W.2d at 160.

We hold that the trial court did not err by rendering summary judgment against Allstate in favor of Rodriguez and by declaring that Woodling's liability arose from the use of the trailer. We overrule Allstate's first and second issues.

## *Conclusion*

We hold that Rodriguez's claims against Farmers were not ripe and thus the trial court did not have jurisdiction to enter a judgment against Farmers. Therefore, as to the claims against Farmers, we reverse the trial court's judgment and render judgment that these claims be dismissed for lack of subject-matter jurisdiction.

We further hold that the trial court did not err by entering summary judgment and declaratory judgment in favor of Rodriguez against Allstate. We affirm that portion of the declaratory judgment finding Woodling's liability arose from "use" of the trailer and finding coverage over Rodriguez's injury under the Allstate policy.

## Footnotes

1　Woodling is not a party to this appeal.

2　A come-along is a tool used for moving heavy loads or for tightening wire. COLLINS ENGLISH DICTIONARY (2003 ed.).

3　The record does not show whether the trial court ruled on that motion.

4　Thus, it was appropriate for Farmers to assert in its summary-judgment motion that the trial court lacked subject-matter jurisdiction. *See Blue,* 34 S.W.3d at 554. Farmers subsequently filed a plea to the jurisdiction on the same jurisdictional grounds.

5　Accordingly, we do not reach the other issues presented by Farmers regarding whether Rodriguez's injury was covered by the Farmers policy, whether Rodriguez filed an impermissible direct action against Farmers without first satisfying conditions precedent in the policy, or whether Rodriguez had standing to bring his claim against Farmers. We likewise do not reach two of Allstate's issues asserting that Rodriguez's injuries are covered under the Farmers policy (issues three and four).

6　This principle applies where the insurance policy contains a so-called "no action" provision. *See Struna v. Concord Ins. Servs., Inc.,* 11 S.W.3d 355, 359 (Tex.App.-Houston [1st Dist.] 2000, no pet.). Section I, ¶ 11 of the Farmers policy is a "no action" provision.

7　Rodriguez cannot obtain a final judgment against Woodling until Rodriguez's claim against Farmers is adjudicated because Farmers and Woodling are both parties. But Rodriguez's claim is not ripe and cannot be adjudicated until after Rodriguez obtains a final judgment against Woodling.

8　The duty to indemnify requires payment of all covered claims and judgments against an insured, whereas the duty to defend requires tender of a defense in any lawsuit brought against the insured that seeks damages for an event potentially covered by the policy. *D.R. Horton–Tex., Ltd.,* 300 S.W.3d at 743. An insurer's duty to defend is justiciable before the entry of judgment on a claim against the insured. *See English,* 174 S.W.3d at 371.

9　Rodriguez's injury, moreover, did not arise from an intentional tort.

10　The policy defines "uninsured motor vehicle" to include underinsured motor vehicles.

11　The commercial policy in Liberty Mutual included "loading and unloading."

*Liberty Mutual* involved competing automobile and general liability policies. *Id.* at 243. The automobile policy excluded nonemployees of the insured unless they were "borrowers" of vehicles owned by the insured. *Id.* A "borrower" was defined by the court as "someone who has, with permission of the owner, temporary possession and use of the property of another for his own purposes." *Id.* at 244. Before the addition of the loading and unloading endorsement to the standard automobile liability policy, neither the automobile policy nor the standard liability policy defined which insurer had liability coverage for injuries sustained upon the premises of one who was insured under a general liability policy during the loading and unloading of a vehicle not owned or hired by the general liability insured. *Id.* The court concluded the policy exclusion for persons who were unloaders but not "borrowers" of the vehicle was intended to limit the insurer's liability for injuries of nonemployees who were not borrowers of the vehicle. *Id.* at 245. By contrast, the Allstate policy covers injuries to Rodriguez caused by the owner or operator of an uninsured or underinsured motor vehicle, including "trailer[s] of any type." It does not expressly limit Allstate's liability based on whether an injured party is a "borrower" of a vehicle.

Allstate also cites an unreported federal district court's opinion that held a "use" clause (without "loading and unloading" language) would not cover injuries sustained by a patient who travelled in an ambulance to the hospital. *See St. Paul Fire & Marine Ins. Co. v. Am. Int'l Surplus Lines Ins. Co.,* No. 3:95–CV–0790–D, 1997 WL 160192, at *3–4 (N.D.Tex. Mar. 31, 1997). The court held that "the acts of providing emergency medical care and of carrying a person from some location to an ambulance are ... a necessary incident to the operation of an ambulance service, but are not fairly described as the use of an ambulance." *Id.* at *3. The inclusion of a loading and unloading clause would not alter the court's reasoning or result.

*See* 6B JOHN A. APPLEMAN, INSURANCE LAW AND PRACTICE § 4317, at 367–69 (Buckley ed. 1979); 8A COUCH ON INSURANCE 3d § 119:37, at 119–56 (2005).

The *Lindsey* court noted this is not an "absolute test," but the factors are helpful in focusing the analysis. 997 S.W.2d at 157–58; *see also Mid–Continent Cas. Co.,* 323 S.W.3d at 155 n. 4. The test is only a conceptual framework to analyze the inclusion or exclusion at issue. *Mid–Continent Cas. Co.,* 323 S.W.3d at 155 n. 4

The court acknowledged that the third factor may be difficult to define because it is not always clear how the vehicle, as opposed to other things, contributed to an accident. *Lindsey,* 997 S.W.2d at 157; *see also Mid–Continent Cas. Co.,* 323 S.W.3d at 156.

Here, the parties do not dispute that the deer stand did not reach its final destination.

The cited cases that apply the complete operation doctrine involved third party claims arising from liability provisions of standard automobile insurance policies, whereas this case involves a liability claim arising under a UIM provision. *Liberty Mutual* and *Travelers Insurance Company,* however, both construe language in standard automobile policies that is identical to the language in the Allstate UIM provision providing coverage for injuries "aris[ing] out of the ownership, maintenance, or use" of the insured vehicle. *See Liberty Mut. Ins. Co.,* 556 S.W.2d at 243 n. 1; *Travelers Ins. Co.,* 380 S.W.2d at 612. The UIM policy, moreover, expressly covers as an "[u]ninsured motor vehicle" "a land motor vehicle or *trailer of any type.*" (Emphasis added.) Thus, the same principles apply here.

[S]ince the act of unloading was one of the natural and necessary steps to the undertaking to deliver the [truck's contents], and followed in natural sequence the use of the truck to that end, which use was specifically contemplated and covered by the policy, we believe that the conclusion is unavoidable that the use of the truck was the primary and efficient cause of the injury, even though it should not be held to be the proximate cause.

*Panhandle Steel Prods. Co.,* 23 S.W.2d at 802.

*Lindsey,* by contrast to *National Union,* was not a duty-to-defend case, but involved an action to recover UIM benefits, as in this case. *See* 997 S.W.2d at 154. Thus, the allegations in the petition were not at issue. The plaintiff proved the vehicle was in use at the time of the accident because the child's "sole purpose was to gain entry into the truck" through the back window and he did not stray from that purpose. *Lindsey,* 997 S.W.2d at 158. He did not play with the gun or try to shoot it. *Id.; see also Mid–Continent Cas. Co.,* 323 S.W.3d at 154–55.

Waivers of sovereign immunity must be construed narrowly. *LeLeaux,* 835 S.W.2d at 51.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (1)

### Direct History (1)

1. Farmers Ins. Exchange v. Rodriguez
366 S.W.3d 216 , Tex.App.-Hous. (14 Dist.) , Feb. 16, 2012 , rehearing overruled ( May 09, 2012 ) , review denied ( Apr 19, 2013 )

361 S.W.3d 602
Supreme Court of Texas.

FEDERAL DEPOSIT INSURANCE CORP. as Receiver for Guaranty Bank, Petitioner,

v.

Christa C. LENK, Administrator of the Estate of John Albert Thompson, Respondent.

No. 08–0908.    |    March 9, 2012.

**Synopsis**

**Background:** Administrator of intestate account holder's estate brought action against bank for breach of deposit agreement after bank, which had closed account after imposter who had presented false letters of administration to bank gained access to account and depleted funds. The Probate Court No. 1, Bexar County, Polly Jackson Spencer, J., denied administrator's motion for partial summary judgment and granted bank's motion. Administrator appealed. The San Antonio Court of Appeals, 360 S.W.3d 511, reversed in favor of administrator. Review was granted.

**Holdings:** The Supreme Court, Guzman, J., held that:

[1] bank breached deposit agreement when it refused administrator's demand for payment of funds in account;

[2] statute requiring bank to provide account statements to account holder did not authorize bank to provide statements to imposter who presented false letters of administration upon account holder's death;

[3] sixty-day contractual statute of repose on claim for breach of deposit agreement began to run when administrator was appointed and account statements were made available to administrator;

[4] order denying administrator's motion for partial summary judgment was final, appealable order; and

[5] administrator failed to preserve for appellate review cross-petition for attorney fees.

Affirmed.

Hecht, J., filed dissenting opinion in which Green, J., joined.

See also, 323 S.W.3d 199.

**Attorneys and Law Firms**

**\*604** Michael L. Dinnin, Tricia Robinson DeLeon, Bracewell & Giuliani LLP, Dallas, TX, J. Brett Busby, Bracewell & Giuliani, LLP, Houston, TX, for Federal Deposit Insurance Corporation.

Don Krause, Bayne Snell & Krause, S. Mark Murray, S. Mark Murray, Inc., San Antonio, TX, for Christa C. Lenk.

Karen Sue Neeley, Cox Smith Matthews Incorporated, Austin, TX, for Amicus Curiae Independent Bankers Association of Texas.

B. Scott Daugherty, Texas Bankers Association, Austin, TX, for Amicus Curiae The Texas Bankers Association.

Ellen B. Mitchell, Cox Smith Matthews Inc., San Antonio, TX, for Amicus Curiae Jefferson State Bank.

**Opinion**

Justice GUZMAN delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice WAINWRIGHT, Justice MEDINA, Justice JOHNSON, Justice WILLETT, and Justice LEHRMANN joined.

When a party fails to preserve error in the trial court or waives an argument on appeal, an appellate court may not consider the unpreserved or waived issue. In this suit for an alleged breach of a deposit agreement, we review a court of appeals judgment in favor of an estate administrator, as well as the estate administrator's cross-petition concerning attorney's fees. Because many of the arguments raised by the parties invoke issues of error preservation or waiver, we decline to grant either party the relief it seeks.

**\*605** Petitioner Guaranty Bank [1] asks us to review the court of appeals' judgment in favor of respondent Christa Lenk, and, in a cross-petition, Lenk seeks a remand to the trial court for a determination of attorney's fees. The facts of this case closely mirror those of *Jefferson State Bank v. Lenk,* 323 S.W.3d 146 (Tex.2010). In both cases, bank customers died intestate. Shortly thereafter, Melvyn Spillman, a former Bexar County probate clerk and former employee of the county medical examiner, presented false letters of administration to both banks and gained access to both deceased customers' accounts. Spillman subsequently used both accounts to make several transactions, ultimately withdrawing most of the accounts' funds. [2] Unlike Jefferson State

Bank, Guaranty Bank closed the decedent's account in 2001 when the balance was depleted due to Spillman's withdrawals and bank service charges. Spillman was eventually arrested for perpetuating these frauds.

In September 2003, the probate court appointed Lenk administrator of both decedents' estates. Though aware of Spillman's fraudulent activities when she was appointed, Lenk made no attempt to recover funds from either bank until June 2005, when she demanded that each bank return the full amounts withdrawn by Spillman. Both banks refused to comply, and, on June 27, 2005, Lenk filed identical causes of action against the banks. In each pleading, she claimed the bank breached the deposit agreement by refusing her payment demand. Lenk also argued that she was entitled to all sums in each account since the time of the decedent's death. [3]

In each suit, the bank and Lenk moved for summary judgment, and the trial court granted each bank's motion and denied Lenk's. The court of appeals reversed in favor of Lenk in both matters. *See Lenk v. Jefferson State Bank,* 323 S.W.3d 199, 203 (Tex.App.-San Antonio 2009), *rev'd,* 323 S.W.3d 146 (Tex.2010); 360 S.W.3d 511, 514 (Tex.App.–San Antonio 2008). This Court granted review of Jefferson State Bank's petition and reversed the court of appeals' judgment, holding that the statute of repose set forth in Texas Business and Commerce Code section 4.406 barred Lenk's claims because she failed to notify Jefferson State Bank of the unauthorized transactions within sixty days of her appointment as estate administrator. [4] *Jefferson State Bank,* 323 S.W.3d at 149–50.

Because Lenk filed the exact same cause of action against both banks, the only material distinction between this case and *Jefferson State Bank* is the theories and **\*606** defenses asserted by the banks. The resolution of both appeals, however, turns on this distinction. Jefferson State Bank raised numerous defenses in the trial court, including the statute of repose under section 4.406, a theory on which it prevailed in this Court. *See id.* Conversely, Guaranty Bank chose not to raise a statute of repose defense in the trial court. Instead, Guaranty Bank decided to argue that (1) it did not breach the deposit agreement because Thompson's account was closed when Lenk filed her suit, and (2) it did not substantially cause Lenk's injuries.

In this Court, Guaranty Bank's arguments relate solely to its central contention that it did not breach the account agreement. Specifically, Guaranty Bank claims that it did not breach the agreement because (1) the account was closed prior to Lenk's payment demand, (2) Lenk acquiesced in Spillman's unauthorized withdrawals by waiting almost two years after her appointment to dispute them, and (3) the bank was entitled to rely on Spillman's forged letters of administration. Guaranty Bank also argues that the court of appeals improperly reviewed the denial of Lenk's motion for partial summary judgment. In a cross-petition, Lenk contends we should remand the case to the trial court for a determination of attorney's fees. Because we conclude Guaranty Bank breached the deposit agreement, but failed to raise any affirmative defenses compelling a judgment in its favor,

we affirm the court of appeals' judgment. We additionally deny Lenk's cross-petition because Lenk failed to properly raise the issue of attorney's fees in the court of appeals.

## I. Accrual of Breach Action

 **[1]**   Guaranty Bank argues it did not breach the deposit agreement when Lenk demanded payment in 2005 because the agreement terminated when the account was closed in 2001. Guaranty Bank further asserts that any cause of action for a breach of the deposit agreement would have accrued in 2000 and early 2001 when the bank denied liability by providing statements to Spillman. Guaranty Bank maintains that Lenk filed a demand-based claim simply as a way to evade the applicable statutes of limitations or repose, which would have barred alternative claims, such as a wrongful payment claim, Lenk chose not to pursue. We disagree.

 **[2]**    **[3]**   It is well-settled that a general deposit, such as that at issue here, creates a debtor-creditor relationship between a bank and its customer. *Sears v. Cont'l Bank & Trust Co.,* 562 S.W.2d 843, 844 (Tex.1977); *Upper Valley Aviation, Inc. v. Mercantile Nat'l Bank,* 656 S.W.2d 952, 955 (Tex.App.-Dallas 1983, writ ref'd n.r.e.); *Meador v. Rudolph,* 218 S.W. 520, 526 (Tex.Civ.App.-Amarillo 1919, writ dism'd w.o.j.) (describing the "well-recognized principle of law that the deposit is a debt owing by the bank to the party in whose name the deposit is made"). Given this relationship, a bank may only pay out money in accordance with a customer's order, and also bears the burden of demonstrating proper payment. *Sears,* 562 S.W.2d at 844 ("The bank must justify its withdrawal from the depositor's account when the depositor proves the balance in his account and sues the bank for that amount."); *Mesquite State Bank v. Prof'l Inv. Corp.,* 488 S.W.2d 73, 75 (Tex.1972) (observing that "the burden of proving payment under authority from the depositor is on the bank" (citing *L.G. Balfour Co. v. State Trust & Sav. Bank of Dallas,* 120 S.W.2d 477, 479 (Tex.Civ.App.-Waco 1938, no writ))); **\*607** *Peavy–Moore Lumber Co. v. First Nat'l Bank of Beaumont,* 133 Tex. 467, 128 S.W.2d 1158, 1162 (Tex.Comm'n App.1939) (noting that when a person makes a deposit in the name of another, "the bank becomes the debtor of the person for whom and in whose name the deposit is made, and the money cannot be withdrawn by him who made the deposit unless it is proven that he, rather than the person in whose name the deposit was made, is the true owner"). While a bank's wrongful payment of a general deposit does not breach the deposit agreement, a bank's refusal to pay such funds to the rightful account holder will. *Hodge v. N. Trust Bank of Tex., N.A.,* 54 S.W.3d 518, 525–26 (Tex.App.-Eastland 2001, pet. denied).

 **[4]**   Here, the bank refused to pay general deposit funds to the rightful account holder (Lenk), and so the bank breached the deposit agreement. Even if Lenk could have sued separately for wrongful payment, she was also entitled to sue for breach when the bank refused her demand for payment. *See id.; see also Upper Valley Aviation,* 656 S.W.2d at 955 (observing that a bank deposit creates a debtor/creditor relationship, and thus a person must sue for breach of the depository contract to

recover the deposit); *Canyon Lake Bank v. New Braunfels Utils.,* 638 S.W.2d 944, 949 (Tex.App.-Austin 1982, no writ) (discussing demand-based claim); *Hinds v. Sw. Sav. Ass'n of Houston,* 562 S.W.2d 4, 4–5 (Tex.Civ.App.-Beaumont 1977, writ ref'd n.r.e.) (same); *First State Bank of Seminole v. Shannon,* 159 S.W. 398, 401 (Tex.Civ.App.-Amarillo 1913, writ ref'd) (same). Given the debtor-creditor relationship between a bank and a customer and the corresponding requirement that the bank must repay *any* deposits to the customer, *see Sears,* 562 S.W.2d at 844, a breach action for such a refusal includes funds that were wrongfully paid out by a bank. A customer, after all, will always seek the funds that *should* be on deposit in an account. *See Mesquite State Bank,* 488 S.W.2d at 75 ("In suits against a bank to recover deposits, the burden of proving payment under authority from the depositor is on the bank."). Indeed, Lenk sued for all funds on deposit since Thompson's death (*i.e.,* those funds wrongfully paid out by the bank), not merely for those nonexistent funds in the closed account at the time she made her demand. Thus, Lenk's claim for breach of the deposit agreement fairly encompasses any wrongful payment claim she may have had. *See id.*

 **[5]**   Because there was a breach, we must next determine when the breach accrued. "A cause of action for denial of deposit liability on a deposit contract ... does not accrue until the bank has denied liability and given notice of the denial [by providing an account statement] to the account holder." TEX. FIN.CODE § 34.301(b). Thus, as a general matter, a bank's refusal to pay funds on a customer's demand commences the accrual of a demand-based cause of action. *See Hodge,* 54 S.W.3d at 525–26. But, importantly, section 34.301(b) goes on to state: "A bank that provides an account statement ... to the account holder is considered to have denied liability and given the notice as to any amount not shown on the statement...." TEX. FIN.CODE § 34.301(b). Guaranty Bank urges us to hold that any cause of action for breach of the deposit agreement thus accrued when it denied liability by sending account statements to Spillman in 2000.

*Jefferson State Bank* precludes this holding. In that case, we unconditionally rejected Jefferson State Bank's contention that it satisfied its burden of sending or making available statements when it sent them to the imposter Spillman. *Jefferson State Bank,* 323 S.W.3d at 149 (concluding that "sending Spillman the statements could not fulfill the Bank's obligation to **\*608** provide account statements 'to a customer' " (citing TEX. BUS. & COM.CODE § 4.406(a))). While *Jefferson State Bank* concerned the statute of repose under section 4.406 of the Business and Commerce Code, the rationale and logic of that opinion apply equally here. As we observed in Jefferson State Bank, any reliance Jefferson State Bank may have had on Spillman's fraudulent letters of administration would not have altered the fact that Spillman was not the bank's customer. *See id.; see also* TEX. BUS. & COM.CODE § 4.406(a), (f) (precluding a bank customer "from asserting against the bank [an] unauthorized signature" if the customer does not timely "discover and report the customer's unauthorized signature" after the bank "sends or makes available to a customer a statement of account").

Similarly, a bank may not deny liability by providing account statements to an imposter estate administrator when section 34.301(b) of the Finance Code specifically provides that a bank must provide account statements "*to the account holder.*" TEX. FIN.CODE § 34.301(b). Spillman, an imposter administrator, was not the account holder. Under Guaranty Bank's reasoning, Lenk's demand-based cause of action would have accrued when Guaranty Bank began sending statements to Spillman in 2000, three years before Lenk—the legitimate estate administrator—was even appointed. In *Jefferson State Bank,* we held that in the event of a customer's death, a bank satisfies its section 4.406 burden of making an account statement available by retaining statements at a bank, but that the customer's burden to report unauthorized signatures does not arise until an estate representative is appointed. *Jefferson State Bank,* 323 S.W.3d at 149–50. The same logic should apply when determining when a bank denies liability in the face of a demand-based claim. We thus conclude that Guaranty Bank denied liability once Lenk was appointed administrator in 2003. *See id.* [5] At that point, Lenk would have had the opportunity to review any statements for the account prior to its closing and bring a timely demand-based claim.

 **[6]** Guaranty Bank's speculative argument that Lenk sued for breach of the deposit agreement in order to circumvent the applicable statute of repose under section 4.406 is also devoid of any merit. As mentioned previously, Lenk filed the exact same cause of action—on the same day—in this case as she did in *Jefferson State Bank.* In *Jefferson State Bank,* we held that the statute of repose barred Lenk's claim. *Jefferson State Bank,* 323 S.W.3d at 150.

 **[7]** **[8]** The statute of repose requires a person to report unauthorized transactions to a bank within one year of account statements being made available. *See* TEX. BUS. & COM.CODE § 4.406(f). If a person fails to report the unauthorized transaction, the **\*609** person is barred from bringing a claim for payment. *See id.* The statute of repose demands that a person report unauthorized transactions as a condition precedent to bringing suit. *See, e.g., Am. Airlines Emps. Fed. Credit Union v. Martin,* 29 S.W.3d 86, 95 (Tex.2000) (observing that section 4.406 places a duty on bank customers to discover and report account irregularities and is similar to a condition precedent); *Nat'l Title Ins. Corp. Agency v. First Union Nat'l Bank,* 263 Va. 355, 559 S.E.2d 668, 671 (2002) (observing that the statute of repose constitutes a condition precedent to a customer's right to file claims against a bank). Unlike a statute of limitations, the statute of repose is an absolute bar to suit and "runs from a specific date *without regard to the accrual of a cause of action.*" *Jefferson State Bank,* 323 S.W.3d at 147 n. 2 (emphasis added) (citing *Holubec v. Brandenberger,* 111 S.W.3d 32, 37 (Tex.2003) and *Trinity River Auth. v. URS Consultants, Inc.-Tex.,* 889 S.W.2d 259, 261 (Tex.1994)); *see Sandoe v. Lefta Assocs.,* 559 A.2d 732, 736 n. 5 (D.C.1989) (stating that "[a] statute of repose ... establishes an absolute time period within which legal proceedings must be initiated, *regardless of when a cause of action accrues* " (emphasis added)). "A statute of repose is therefore a substantive definition of rights, rather than a procedural limitation." *Jefferson State Bank,* 323 S.W.3d at 147 n. 2 (quoting *Trinity River Auth.,* 889 S.W.2d at 261). As in *Jefferson State Bank,* the repose time period began to run when Lenk was appointed in 2003, regardless of

the accrual date of her cause of action. [6] Lenk had one year from the date of her appointment to report the unauthorized transactions to the bank, and she failed to do so. *See id.* at 147.

 **[9]** **[10]** **[11]** But Guaranty Bank failed to raise the statute of repose as an affirmative defense in the trial court, and, in this Court, the bank expressly disclaims reliance on the statutes of repose and limitations as independent grounds for summary judgment. It is settled that "[a] court cannot grant summary judgment on grounds that were not presented." *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 204 (Tex.2002) (citing *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 912 (Tex.1997)). [7] Moreover, as an affirmative defense, the statute of repose is only available to parties that properly raise it in the trial court. *See* TEX.R. CIV. P. 94. "When a defendant moves for summary judgment based on an affirmative defense, such as the statute of repose, the defendant, as movant, bears the burden of proving each essential element of that defense." *Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 121 (Tex.1996) (per curiam); *see also Jefferson State Bank,* 323 S.W.3d at 148–50 (explaining that, *when raised as a defense,* the statute of repose begins to run when an administrator is appointed). Thus, we will not analyze Guaranty Bank's petition in light of any such defenses. *See* **\*610** TEX.R. CIV. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal.").

The dissent agrees that under section 34.301(b) of the Finance Code, Lenk's cause of action began to accrue in 2003. *See* 361 S.W.3d at 613 (Hecht, J., dissenting) ("Lenk was appointed the representative of Thompson's estate in September 2003. Under Section 34.301(b), her action against the bank accrued then, not in June 2005."). The dissent parts company by believing that demand-based claims do not exist. *Id.* at 614 ("The problem with the claim Lenk asserts is not that it is time-barred; the problem is that under Section 34.301(b), the claim does not exist, and for good reason."). This statement either ignores the fact that we have consistently recognized demand-based claims since 1913, *see Shannon,* 159 S.W. at 401, or that section 34.301(b) changed only when those demand-based claims begin to accrue for limitations purposes. Section 34.301(b) limits when demand-based claims may be brought but it does not eliminate them. Unlike limitations, repose does not depend on when a cause begins to accrue. *Jefferson State Bank,* 323 S.W.3d at 147 n. 2. Repose here required Lenk to sue within one year of being appointed administrator in 2003, TEX. BUS. & COM.CODE § 4.406(f); *Jefferson State Bank,* 323 S.W.3d at 147, rather than the limitations requirement of suing within four years of being appointed administrator in 2003, TEX. FIN.CODE § 34.301(b) (defining accrual as when bank denies liability by making account statements available); TEX. CIV. PRAC. & REM.CODE § 16.051 (establishing residual four-year limitations period). Because Lenk sued two years after being appointed administrator, limitations would not bar her claim and is not at issue in this case. TEX. FIN.CODE § 34.301(b); TEX. CIV. PRAC. & REM.CODE § 16.051. The dissent relies on a statute that is not relevant to Lenk's claim to attempt to explain that the claim never existed in the first place.

The dissent also believes that our decision "will be significant to the entire financial industry in Texas" and will result in a windfall to the estate here. 361 S.W.3d at 614 (Hecht, J., dissenting). Banks have been on notice since at least 1913 that demand-based claims exist. *Shannon,* 159 S.W. at 401. And they also have the protection of various defenses. Our decision today gives full effect to these claims and defenses. Further, there is no evidence in the record identifying the source of the additional funds and there is certainly no evidence to suggest they came from somewhere other than the estate.

Lenk's cause of action for breach of the deposit agreement began to accrue when she was appointed in 2003, and thus was able to access the estate's account statements for the first time. However, Guaranty Bank did not raise a viable defense that compels judgment in its favor. Accordingly, we hold that Guaranty Bank breached the deposit agreement and that it raised no defense that negates its liability.

## II. Estoppel by Acquiescence

 **[12]**   Guaranty Bank argues that Lenk acquiesced to any unauthorized withdrawals by failing to dispute them for nearly two years after her appointment. In doing so, Guaranty Bank relies on *L.G. Balfour Co.,* a 1938 court of appeals decision. We reject this argument. *L.G. Balfour* merely states the statute of repose rule later codified in section 4.406 of the Business and Commerce Code. Thus, the theory of estoppel by acquiescence is not distinct from the affirmative defense of section 4.406 which, as previously mentioned, Guaranty **\*611** Bank did not rely on in the trial court or at this Court. *Compare, e.g., Oak Cliff Bank & Trust Co. v. Aetna Cas. & Sur. Co.,* 436 S.W.2d 165, 169 (Tex.Civ.App.-Dallas 1969, no writ) (explaining that a bank customer has a duty to examine bank statements and notify a bank of forged signatures within a reasonable time, or else the customer "may be said to have acquiesced in the correctness of the statement[s]"), with TEX. BUS. & COM. CODE § 4.406(c)–(d) (stating that a customer may be precluded from asserting a claim for unauthorized signature or alteration if a bank proves the customer failed to reasonably examine a statement and alert the bank of any irregularities).

Even assuming estoppel by acquiescence is a distinct theory, Guaranty Bank did not preserve that argument in the trial court because it did not raise it as an affirmative defense.[8] *See* TEX.R. CIV. P. 94 (requiring parties to plead estoppel, statute of frauds, statute of limitations, waiver, "and any other matter constituting an avoidance or affirmative defense").[9] Accordingly, Guaranty Bank failed to preserve error on its acquiescence argument. *See* TEX.R. CIV. P. 166a(c).

## III. Reliance on Forged Letters of Administration

**[13]**  Guaranty Bank next claims that, under Texas Probate Code section 186, it was entitled to rely on Spillman's apparently valid letters of administration when it allowed Spillman to access Thompson's account. In *Jefferson State Bank,* we did not reach this issue because Lenk's claim was barred by the statute of repose. 323 S.W.3d at 147 n. 3. We decline to consider the section 186 argument here because Guaranty bank did not raise this issue at the trial court, and therefore failed to preserve error. *See* TEX.R. CIV. P. 166a(c).

## IV. Review of Motion for Partial Summary Judgment

**[14]**  **[15]**  Guaranty Bank argues the court of appeals erred in reviewing the trial court's denial of Lenk's motion for partial summary judgment. It contends that, because Lenk failed to move for summary judgment on her request for attorney's fees, the trial court's order denying her motion is not a final order subject to appellate court review. But, Lenk correctly responds that:

> When both parties move for partial summary judgment on the same issues and the trial court grants one motion and denies the other, as here, the reviewing court considers the summary judgment evidence presented by both sides, determines all questions presented, and if the reviewing court determines that the trial court erred, renders the judgment the trial court should have rendered.

*Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005) (citing *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex.2000)). Here, the parties moved for summary judgment on the same issues, and the trial court granted Guaranty Bank's motion, denied Lenk's, **\*612**  and stated that all relief not granted was denied. As Guaranty Bank correctly points out, the only other pending issue not raised in the motions was Lenk's claim for attorney's fees, and, as we discuss below, Lenk waived this issue on appeal. Moreover, the trial court's order disposed of all issues in the case not only by virtue of the language of the order, but also because Lenk's attorney's fees claim was necessarily disposed of when the trial court ruled in Guaranty Bank's favor. Accordingly, the court of appeals' review of the summary judgment motions was proper.

## V. Cross–Petition for Attorney's Fees

**[16]**  Lenk filed a cross-petition seeking a remand to the trial court to determine an award of attorney's fees. Lenk claims that, because this issue was not addressed in her motion for partial summary judgment, it should now be reviewed by the trial court. Guaranty Bank responds that

Lenk waived this argument by not briefing it at the court of appeals. The bank argues that both parties chose to narrow their appellate arguments, and should be limited to the issues briefed and the relief requested below. We agree with Guaranty Bank.

In her motion for partial summary judgment, Lenk sought damages for Guaranty Bank's breach and asked that the sole remaining issue for determination in the case be her request for attorney's fees. The trial court issued a final judgment denying Lenk's motion. On appeal, Lenk focused on her breach claim, and asked the court of appeals to reverse and render in her favor, which the court did. Later, Lenk raised the issue of attorney's fees in a motion for rehearing, which the court of appeals denied. We decline to address Lenk's claim for attorney's fees because she did not properly raise the issue at the court of appeals. *See, e.g.,* TEX.R.APP. P. 53.2(f) (explaining that, when a party files a petition for review in the Supreme Court, "[i]f the matter complained of originated in the trial court, it should have been ... assigned as error in the court of appeals"). Thus, we deny Lenk's cross-petition.

## VI. Conclusion

Lenk's claim for breach of the deposit agreement began to accrue in 2003, when Lenk was appointed as estate administrator. Because the bank breached the deposit agreement, yet failed to raise viable affirmative defenses against Lenk's breach claim, we will not render judgment in its favor. Lenk's cross-petition for attorney's fees was not properly raised in the court of appeals, and thus we reject this claim as well. Accordingly, we grant Guaranty Bank's petition for review and, without hearing oral argument, TEX.R.APP. P. 59.1, affirm the court of appeals' judgment.

Justice HECHT filed a dissenting opinion, in which Justice GREEN joined.

Justice HECHT, joined by Justice GREEN, dissenting.
John Albert Thompson died in January 2000 with about $3,000 on deposit in a Guaranty Bank checking account. A few weeks later, Mel Spillman falsely represented to the Bank that he was Thompson's nephew and estate administrator, and directed that he be named on Thompson's account. The Bank complied. Spillman then deposited around $167,000 to the account, and over the next several months proceeded to withdraw all but a small amount that was eaten up in service charges. The Bank closed the account on September 13, 2001.

Spillman was a fraud. He forged letters of administration in dozens of estates like **\*613** Thompson's. In June 2002, he was sentenced to ten years in prison.

In September 2003, Christa Lenk was appointed administrator of Thompson's estate and several others Spillman had defrauded. In June 2005, Lenk demanded that the Bank repay the funds Spillman had withdrawn from Thompson's account years earlier. The Bank refused, and Lenk sued. The trial court granted summary judgment for the Bank; the court of appeals reversed, holding that summary judgment should have been granted for Lenk. [1]

The first sentence of Section 34.301(b) of the Texas Finance Code states: "A cause of action for denial of deposit liability on a deposit contract without a maturity date does not accrue until the bank has denied liability and given notice of the denial to the account holder." [2] Lenk contends that her action against the Bank for allowing unauthorized withdrawals from Thompson's checking account until January 2001 accrued in June 2005, when she demanded that the Bank return the money, and the Bank refused. The Court agrees that this is Lenk's contention—"[Lenk] claimed the bank breached the deposit agreement by refusing her payment demand" [3]—and that it is correct —"the bank refused to pay general deposit funds to the rightful account holder (Lenk), and so ... breached the deposit agreement." [4]

But Lenk's claim ignores the second sentence of Section 34.301(b): "A bank that provides an account statement or passbook to the account holder is considered to have denied liability and given the notice as to any amount not shown on the statement or passbook." [5] In *Jefferson State Bank v. Lenk,* we held that a bank that makes account statements available at its offices is considered to have denied liability for, and given notice of, unauthorized withdrawals from a deceased customer's checking account when a representative is appointed for the decedent's estate. [6] Lenk was appointed the representative of Thompson's estate in September 2003. Under Section 34.301(b), her action against the Bank accrued then, not in June 2005.

The Court observes that suit based on a claim that accrued in September 2003 would be timebarred [7] and faults the Bank **\*614** for not making that argument. But the Bank argues, and the Court specifically acknowledges, that Lenk's claim is for the Bank's refusal of her June 2005 demand. Lenk pleaded in her petition:

> On June 4, 2005, [Lenk] made demand upon [the Bank] for the payment of [unauthorized withdrawals] from the account, and [the Bank] has failed and refused to pay over to [Lenk] the sums due and owing from the account.
> \* \* \*
>
> Under the terms of the depositor's agreement with [Thompson] and applicable law, [the Bank] was required to pay sums on deposit to [Lenk] on demand or to her order to such persons as she may direct. [The Bank] failed and refused to pay to [Lenk] the sums deposited upon her demand.

Accordingly, [Lenk] is entitled to judgment in the amount of all sums which were deposited in the name of [Thompson] or his representative since the date of his death.

She asserted in her motion for summary judgment:

On June 4, 2005, [Lenk] made written demand upon [the Bank] for the sums deposited into [Thompson's] account, and [the Bank] has failed and refused to pay the sums deposited into the account to [Lenk].

[The Bank's] failure and refusal to pay to [Lenk] the sums deposited into the account of [Thompson] breached the terms of the depositor's agreement. Accordingly, [Lenk] is entitled to judgment....

She argued to the court of appeals:

In Plaintiff's Original Petition, [Lenk] stated that [her] cause of action is based upon the requirements of the depositors agreement and [the Bank's] refusal to pay [Lenk] the sums deposited into Mr. Thompson's account after her demand.

Lenk could not have been clearer. She alleged that her June 2005 demand triggered her claim. She sued the Bank days later. An assertion by the Bank that her claim for its refusal of her demand was time-barred would have been frivolous.

The problem with the claim Lenk asserts is not that it is time-barred; the problem is that, under Section 34.301(b), the claim does not exist, and for good reason. Allowing a bank customer to create a cause of action merely by writing a demand letter, as Lenk contends, would circumvent all time limitations on claims for unauthorized withdrawals. That is what the Court has done in this case.

It bears comment that the Court hands Lenk a windfall. Not only does she recover the $3,000 Spillman stole from Thompson's account, Lenk recovers about $145,000 of the money that Spillman laundered through the account, using letters of administration the Bank had no reason to know were forged, on a claim filed nearly four years after the account was closed and nearly two years after she was on notice of all the transactions. But the consequences of the Court's misapplication of Section 34.301(b), in this case decided without argument, will be significant to the entire financial industry in Texas.

I respectfully dissent.

## Parallel Citations

77 UCC Rep.Serv.2d 50, 55 Tex. Sup. Ct. J. 409

Footnotes

1    The Federal Deposit Insurance Corporation (FDIC) was substituted as a party for Guaranty Bank on October 2, 2009. For ease of reference, we refer to the FDIC as Guaranty Bank throughout this opinion.

2    In this case, Spillman gained access to an account belonging to John Albert Thompson, who died on January 30, 2000. After Spillman deposited and withdrew various amounts from the account, Lenk alleged that he stole $148,430.28 from Thompson's estate.

3    Lenk specifically asserted in each petition:
     Under the terms of the depositor's agreement with Decedent and applicable law, Defendant was required to pay sums on deposit to Plaintiff on demand or to her order to such persons as she may direct. Defendant failed and refused to pay to Plaintiff the sums deposited upon her demand. Accordingly, Plaintiff is entitled to judgment in the amount of all sums which were deposited in the name of Decedent or his representative since the date of his death.

4    The statute sets a one-year period of repose, which was contractually shortened to sixty days in that case.

5    The fact that the account was closed when Lenk demanded payment does not change our analysis. Under the bank's rationale, a bank could wrongfully pay out an account's entire balance to an imposter, as happened here, then unilaterally close the account to avoid liability to the account holder or proper estate administrator. Further, as discussed above, in a situation such as this where the bank has paid out sums to an imposter, a plaintiff in Lenk's position will naturally seek to withdraw the amount of funds that *should* be on deposit, not the actual account balance after the wrongful withdrawals. Given the debtor-creditor relationship between a bank and its customer and the requirement that a bank must repay any deposits to a customer on her order, it follows that a person is entitled to demand payment for amounts that should be on deposit, not the amount actually in the account after wrongful withdrawals, even if the bank has unilaterally closed the account. *See Mesquite State Bank,* 488 S.W.2d at 75.

6    As explained *supra,* section 34.301(b) of the Finance Code indicates that Lenk's cause of action began to accrue in 2003 when Lenk was appointed administrator.

7    *See also* TEX.R. CIV. P. 166a(c) (instructing that a "motion for summary judgment shall state the specific grounds therefor"); *McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993) ("[A] motion for summary judgment must itself expressly present the grounds upon which it is made. A motion must stand or fall on the grounds expressly presented in the motion."); *Westchester Fire Ins. Co. v. Alvarez,* 576 S.W.2d 771, 772–73 (Tex.1978), *overruled on other grounds by City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979)) ("The purpose of [Rule 166a(c) ] is to provide the opposing party with adequate information for opposing the motion, and to define the issues for the purpose of summary judgment.").

8    Guaranty Bank devoted two sentences concerning acquiescence in its final post-hearing filing in the trial court. However, in those sentences, Guaranty Bank did not assert it as a defense. Instead, the bank argued Spillman was the cause of Lenk's damages.

9    *See also Curtis & Windham Architects, Inc. v. Williams,* 315 S.W.3d 102, 104 (Tex.App.-Houston [1st Dist.] 2010, no pet.) (stating that acquiescence is an affirmative defense); *Calkins v. Goette,* No. 05–03–01022–CV, 2004 WL 1950366, at *1 (Tex.App.-Dallas Sept. 23, 2004, no pet.) (same); *Chase v. Watling,* No. 05–99–00265–CV, 2000 WL 10301, at *4 (Tex.App.-Dallas Jan. 7, 2000, pet. denied) (same); *Green v. Parrack,* 974 S.W.2d 200, 202–03 (Tex.App.-San Antonio 1998, no pet.) (same).

1    360 S.W.3d 511 (Tex.App.-San Antonio 2008).

2    TEX. FIN.CODE § 34.301(b).

3    *Ante* at 605.

4    *Ante* at 607.

5    TEX. FIN.CODE § 34.301(b). Lenk relies heavily on a sentence in *Hodge v. Northern Trust Bank of Texas,* 54 S.W.3d 518, 526 (Tex.App.-Eastland 2001, pet. denied): "It is when the bank refuses a demand for payment of the general deposit that the bank breaches its relationship with the depositor." But the court was only speaking generally and not construing Section 34.301(b), which it noted did not apply because the case involved a certificate of deposit with a maturity date. *Id.* at 524.

6    323 S.W.3d 146, 149–150 (Tex.2010) ("Accordingly, we conclude that in the event of a customer's death, banks can satisfy their [statutory] burden [to make account statements available to a customer] by retaining statements at the bank, but the customer's burden to report unauthorized signatures does not arise until an estate representative is appointed.").

7    UCC Section 4.406(f) provides that "[w]ithout regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer ... discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration." TEX. BUS. & COM.CODE § 4.406(f). In *American Airlines Employees Federal Credit Union v. Martin,* 29 S.W.3d 86, 89 (Tex.2000), we held that this one-year repose period could be shortened by agreement to sixty days.

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (2)

### Direct History (2)

1.  Lenk v. Guaranty Bank

360 S.W.3d 511 , Tex.App.-San Antonio , July 02, 2008 , rehearing overruled ( Sep 15, 2008 )

*Review Granted, Judgment Affirmed by*

2.  Federal Deposit Ins. Corp. v. Lenk

361 S.W.3d 602 , Tex. , Mar. 09, 2012

344 S.W.3d 467
Court of Appeals of Texas,
Dallas.

GPA HOLDING, INC., Appellant,

v.

BAYLOR HEALTH CARE SYSTEM [1], Appellee.

No. 05–09–00586–CV.   |   May 18, 2011.   |   Rehearing Overruled Aug. 9, 2011.

**Synopsis**
**Background:** Health care services provider brought action against third party administrator that provided claims handling services and administrative support to health plans for failure to pay for health care services it provided to members of certain health care plans that were administered by administrator. The 298th Judicial District Court, Dallas County, Emily Tobolowsky, J., entered summary judgment in favor of provider. Administrator appealed.

**Holdings:** The Court of Appeals, Moseley, J., held that:

[1] administrator was a payor under, and, thus, bound by, hospital services agreement (HSA) between provider and operator of preferred provider organization (PPO);

[2] administrator did not meet its burden of establishing that damages clause was an unenforceable penalty; and

[3] administrator's obligation did not change when subscriber acknowledgment form was amended.

Affirmed.

**Attorneys and Law Firms**

**\*470** David Michael Walsh, IV, Chamblee & Ryan, P.C., Dallas, TX, for Appellant.

Ben Taylor, Jeff Cody, Melissa A. Davis, Tate A. Seideman, Fulbright & Jaworski L.L.P., Dallas, TX, for Appellee.

Before Justices MORRIS, MOSELEY, and MYERS.

## OPINION

Opinion By Justice MOSELEY.

In this breach of contract case, appellant GPA Holding, Inc. challenges the trial court's summary judgment awarding damages to appellee Baylor Health Care System based on GPA's obligation to pay certain health care claims. Because we conclude the trial judge correctly interpreted the three written contracts governing the parties' relationship, we affirm the trial court's judgment.

## I. BACKGROUND

Baylor provides health care services to individual patients. Many of Baylor's patients are members of health plans. Baylor has many contracts with health benefit entities, including insurance companies and preferred provider organizations (PPOs), through which individual patients gain access to Baylor's hospitals and services at discounted rates.

Private Healthcare Systems, Inc. (PHCS) operates a network of PPOs. PHCS enters into contracts known as preferred provider agreements with health care providers (such as Baylor) to negotiate discounts from the providers' full charges for health care services. PHCS also enters into contracts known as subscriber services agreements with insurance companies, employer health plans, managed care organizations, and third-party administrators, to provide them and their members access to health care services at the discounted rates established by the preferred provider agreements.

GPA is a third-party administrator; its customers are self-funded health plans. Third-party administrators provide claims handling services and administrative support to health plans. By contracting with various PPO networks, such as PHCS, GPA also offers its customers—and their members—access to medical services from a network of providers (e.g. Baylor) at discounted rates.

Baylor sued GPA for failure to pay for health care services Baylor provided to members of certain health care plans administered by GPA. GPA in turn filed a third-party action against PHCS. Both Baylor and GPA moved for summary judgment; Baylor in fact filed several motions for partial summary judgment. The trial judge granted Baylor's motions and denied GPA's motion. The parties then entered into an agreed final judgment and severance, by which GPA's third-

party claims against PHCS were severed into a separate cause, and final judgment was entered for Baylor. GPA appeals the judgment in favor of Baylor. PHCS is not a party to this appeal.

## II. STANDARD OF REVIEW

 **[1]** **[2]** The standards for reviewing summary judgments are well-established, **\*471** and we follow them in reviewing this appeal. *See Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985) (summary judgment standards of review). When both parties move for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 356 (Tex.2000). When the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both parties and determine all questions presented. *Id.* The reviewing court should render the judgment that the trial court should have rendered or reverse and remand if neither party has met its summary judgment burden. *Id.*

 **[3]** **[4]** If a defendant moves for summary judgment on an affirmative defense, it must conclusively establish each essential element of the affirmative defense. *Selz v. Friendly Chevrolet, Ltd.,* 152 S.W.3d 833, 836 (Tex.App.-Dallas 2005, no pet.) ("To prevail on summary judgment, a defendant as movant must either disprove at least one element of each of the plaintiff's theories of recovery or plead and conclusively establish each essential element of an affirmative defense, thereby rebutting the plaintiff's cause of action."). Similarly, if a party seeks to avoid summary judgment by way of an affirmative defense, it must come forward with summary judgment evidence sufficient to raise a fact issue on each element of its affirmative defense. *See Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex.1984). Whether a contractual provision is an unenforceable penalty and not a liquidated damage clause is an affirmative defense. *See* TEX.R. CIV. P. 94; *Phillips v. Phillips,* 820 S.W.2d 785, 789 (Tex.1991) ("Although penalty is not among the affirmative defenses enumerated in Rule 94, TEX.R. CIV. P., the listing in that rule is not exclusive. Penalty is, in the language of the rule, a 'matter constituting an avoidance or affirmative defense' [citations omitted].")

 **[5]** **[6]** **[7]** **[8]** **[9]** **[10]** The interpretation of an unambiguous contract is a question of law for the court. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 650–51 (Tex.1999). The court's primary concern in interpreting a written contract is to determine the mutual intent of the parties as manifested in the contract. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). The parties' intent must be taken from the agreement, and the agreement must be enforced as written. *Wells Fargo Bank, Minn., N.A. v. N. Cent. Plaza I, L.L.P.,* 194 S.W.3d 723, 726 (Tex.App.-Dallas 2006, pet. denied). We favor an interpretation that affords some consequences to each part of the agreement so that none of the provisions will be rendered meaningless. *Coker,* 650 S.W.2d at 394. Unless the agreement shows that the parties used a term in a technical or different sense,

we give the terms their plain, ordinary, and generally accepted meaning. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996). Under generally accepted principles of contract interpretation, all writings that pertain to the same transaction will be considered together, even if they were executed at different times and do not expressly refer to one another. *DeWitt Cnty. Elec. Co-op., Inc. v. Parks,* 1 S.W.3d 96, 102 (Tex.1999). This rule, however, is a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily. *Id.*

## III. DISCUSSION

### A. The Contracts

Baylor relies on three written contracts to establish its claim against GPA. First, Baylor relies on a Subscriber Services Agreement between PHCS and GPA dated April 17, 1998, amended by an Amendment, **\*472** Assignment, and Assumption of the Subscriber Services Agreement with effective dates of September 1, 2002 and January 1, 2003. Under the Subscriber Services Agreement, GPA [2] became a subscriber to PHCS's "comprehensive medical management system." [3] As a subscriber to PHCS's network, GPA could offer its customers access to PHCS's network of medical care providers at the discount rates negotiated by PHCS.

Second, Baylor relies on a Hospital Services Agreement (HSA) between Baylor and PHCS dated January 1, 2002. Under the HSA, Baylor became a "Preferred Provider" in PHCS's network. It agreed to provide—at discounted rates [4]—health care services ("Covered Services") to persons ("Members") covered by "Health Plans" (including PPOs) created or sponsored by a "Payor" (a defined term in the HSA). As part of the HSA, PHCS warranted that its contracts with each Payor obligate the "Payor (or its designee) to comply with the duties and obligations of [the HSA], including, but not limited to, paying for Covered Services rendered to Members in accordance with the provisions of Article IV of [the HSA]."

Third, Baylor relies on a Subscriber Acknowledgment between GPA and PHCS effective January 1, 2003. The Subscriber Acknowledgment refers to both the Subscriber Services Agreement and the HSA, reciting that GPA and PHCS have entered into the Subscriber Services Agreement and that PHCS has entered into contracts with health care providers for participation in its network. The Subscriber Acknowledgment requires GPA "to pay or arrange to pay PHCS Preferred Providers [which would include Baylor] in accordance with the PHCS Preferred Provider Agreement for such Preferred Provider, for the markets and the networks for which [GPA] has purchased provider network Services from PHCS." (First brackets added.)

### B. Is GPA a "Payor"?

In its first issue, GPA contends the trial court erred in granting Baylor's motion for summary judgment because GPA is not a "payor" under the HSA. At the outset, GPA makes a procedural argument that summary judgment was improper because Baylor did not move for summary judgment on this issue. We disagree.

 **\*473** Baylor filed four motions for partial summary judgment. In its first motion, Baylor requested that the trial court interpret the three contracts at issue and "find, as a matter of law, that GPA is bound by the terms and conditions of the HSA with respect to the health care claims at issue in this case, including the requirements of Section 4.4(a)." In its own motion for summary judgment, GPA argued, "GPA is not a 'Payor' obligated to pay under the terms of the Baylor/PHCS Agreement," and Baylor filed a summary judgment response again arguing that GPA was bound by the terms of the agreement.

 **[11]** The trial court granted Baylor's motion and denied GPA's, necessarily deciding that GPA was a "Payor" bound by the provisions of the HSA, including section 4.4(a). We reject GPA's argument that the issue was not presented to and decided by the trial court.

Turning to GPA's substantive argument, GPA asserts the HSA defines "Payor" very narrowly. It argues the evidence established that GPA's clients—and not itself—were "Payors" under the HSA. It contends that as a third party administrator, it did not actually pay claims but only offered administrative services to facilitate payment of claims by the employer-funded health plans that were GPA's clients. Because the HSA's payment provisions apply only to "Payors" and GPA is not a Payor, GPA contends it is not responsible to pay for Baylor's services, and thus that the trial court erred in entering summary judgment in favor of Baylor.

The HSA defines a "Payor" as

> an insurance company, employer health plans, Taft–Hartley fund, plan sponsors or other similarly situated entities or organizations which are obligated (directly or through its designee) to pay for Covered Services for Members in accordance with such Health Plans.

GPA offered the affidavits of Kathy Enochs, the chief operating officer of GPA, and Madalyn Straughn, the vice president of operations for GPA, to establish that GPA is not an insurance company, employer health plan, Taft–Hartley fund, or plan sponsor. Enochs also testified that GPA was not a "payor" under the definition in the contract.

GPA does not dispute it is a party to the Subscriber Services Agreement and the Subscriber Acknowledgment. In fact, Enochs testified GPA could not access PHCS's preferred providers at a discount without the Subscriber Services Agreement and the Subscriber Acknowledgment. She

testified GPA entered into the agreement with PHCS "to market their network to our plans that we administer."

In Exhibit J to the Subscriber Services Agreement, under "Duties of the Subscriber," paragraph 2(b) provides, "The Subscriber [i.e. GPA] shall abide by the terms of any agreement with a Participating Provider [e.g. Baylor] entered into by PHCS on behalf of the Subscriber with regard to the provision of PPO services." (Brackets added.) In the Subscriber Acknowledgment, GPA "agrees to pay or arrange to pay PHCS Preferred Providers in accordance with the PHCS Preferred Provider Agreement for each such Preferred provider, for the markets and the networks for which Subscriber has purchased provider network Services from PHCS."

The discounts offered to GPA's customers were the result of the relationships among the parties to all three agreements. If PHCS did not contract with Baylor under the HSA, there would be no discount to PHCS's subscribers on the fees for Baylor's services. If GPA did not in turn contract with PHCS to take advantage of the discounts offered in the HSA, those **\*474** discounts would not have been available to GPA's customers.

 **[12]**    In *Baylor University Medical Center v. Epoch Group, L.C.,* 340 F.Supp.2d 749, 755 (N.D.Tex.2004), similar contracts were held to "constitute a single, unified contract" requiring a claims supervisor to timely pay Baylor's clean claims. While we are not bound by a decision of a federal district court, we may consider federal precedent when it is well-reasoned and helpful. *See Davenport v. Garcia,* 834 S.W.2d 4, 20 (Tex.1992) ("With a strongly independent state judiciary, Texas should borrow from well-reasoned and persuasive federal procedural and substantive precedent when this is deemed helpful, but should never feel compelled to parrot the federal judiciary.").

As here, there were three contracts in *Epoch Group:* a HSA between PHCS and Baylor, a subscriber services agreement between PHCS and Epoch, and a payor acknowledgment between PHCS and Epoch. *Epoch Group,* 340 F.Supp.2d at 752. Discussing its conclusion that the three documents constituted a single, unified contract, the court reasoned:

> Indeed, all three instruments were required to complete the relationship between the parties. The Subscriber Services Agreement, which provided discounts from PHCS to Payors, could not operate effectively without PHCS contracting with providers through hospital services agreements. The very foundation of the discounts offered in [the] Subscriber Services Agreement appears to be the agreements between PHCS and providers such as Baylor. Moreover, Payor Acknowledgments serve no apparent purpose other than to commit Payors to comply with the terms and conditions of the provider agreements.

*Id.* at 755 (citation omitted).

GPA distinguishes *Epoch Group,* arguing the court did not decide the question whether Epoch was a "payor" under the HSA. Perhaps because Epoch signed a document called "payor acknowledgment" instead of "subscriber acknowledgment," the issue whether Epoch was a "payor" for purposes of the agreements was not presented to the *Epoch Group* court. Regardless of the titles of the two agreements, however, their substance was the same: to commit the payor or subscriber "to comply with the terms and conditions of the provider agreements," so that provider discounts set forth in hospital services agreements could be extended to the subscriber's customers. *See id.* at 755.

 **[13]**  We conclude, as did the trial court, that GPA is bound by the HSA. Reading the three agreements together, GPA committed to abide by the terms of the HSA and to pay or arrange to pay Baylor in accordance with the HSA. Even though the summary judgment evidence showed that GPA was not an "insurance company, employer health plan[ ], Taft–Hartley fund, [or] plan sponsor[ ]," we conclude the evidence (i.e. the three contracts) proves as a matter of law that GPA falls within the contractual definition of "other similarly situated entities or organizations which are obligated (directly or through its designee) to pay for Covered Services for Members in accordance with such Health Plans." We overrule GPA's first issue.

## B. "Liquidated Damages" or "Penalty"?

The HSA also contains terms regarding payment of claims:

### 4.4 *Claim Processing*

(a) Payor (or its designee) shall pay all Clean Claims for Covered Services **\*475**  within forty-five (45) calendar days of receipt of a Clean Claim containing the information set out in *Section 4.3* from Hospital in accordance with the applicable reimbursement rates attached on *Schedule 1. ...* If Payor (directly or through its designee) does not pay within forty-five (45) days of receipt of a Clean Claim, Payor shall no longer be eligible for the rates set forth on *Schedule 1* and shall be obligated to pay Hospital at Hospital's Normal Billed Charges and hospital may elect to terminate this Agreement....

In its second issue, GPA contends the trial court erred in denying its motion for summary judgment because the amount of damages awarded against it under this provision constituted an unenforceable liquidated damages penalty.

GPA complains that the above section, by requiring payors to pay the hospital's "Normal Billed Charges" unless the payor pays a Clean Claim within 45 days, "fixes compensation for breach in advance of the breach," and is thus an impermissible penalty.

 **[14]** **[15]** "The term 'liquidated damages' ordinarily refers to an acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach." *Flores v. Millennium Interests, Ltd.,* 185 S.W.3d 427, 431 (Tex.2005); *see also Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 664 (Tex.2005) ("[l]iquidated damages clauses fix in advance the compensation to a party accruing from the failure to perform specified contractual obligations"). Whether a contract term is a liquidated damages clause is a question of law for the court. *Valence Operating Co.,* 164 S.W.3d at 664.

 **[16]** **[17]** If a court determines that a contract term is a liquidated damages clause, the court may then determine whether the clause is enforceable, or whether it is an unenforceable penalty. The policy underlying the prohibition against penalties is to ensure that a party to a contract receives "just compensation," that is, "neither more nor less than his actual damages." *Phillips,* 820 S.W.2d at 788 (quoting *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 485–86 (1952)). In order to enforce a liquidated damages provision and determine the provision is not a penalty, "the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." *Phillips,* 820 S.W.2d at 788 (quoting *Rio Grande Valley Sugar Growers, Inc. v. Campesi,* 592 S.W.2d 340, 342 n. 2 (Tex.1979)).

Baylor argues that section 4.4 is neither a liquidated damages provision nor a penalty. Baylor asserts that section 4.4 "does not fix in advance compensation for GPA's failure to perform," but rather "provides a two-tiered pricing structure that grants GPA discounts (often substantial) if claims are paid within forty-five days." Baylor further contends that even if section 4.4 is a liquidated damages provision, it is enforceable under Texas law and is not a penalty because damages are difficult or impossible to estimate, and Baylor's normal billed charge is a reasonable forecast of just compensation.

For purposes of this opinion, we will assume without deciding that section 4.4(a) of the HSA is a liquidated damages provision, and examine whether the clause is also an unenforceable penalty under the factors set forth in *Phillips.*

 **[18]** **[19]** The party asserting that a liquidated damages clause is an unenforceable penalty (here, GPA) bears the burden of proof. *Urban Television Network Corp.* **\*476** *v. Liquidity Solutions, L.P.,* 277 S.W.3d 917, 919 (Tex.App.-Dallas 2009, no pet.) (citing *Murphy v. Cintas Corp.,* 923 S.W.2d 663, 665–66 (Tex.App.-Tyler 1996, writ denied)). GPA moved for summary judgment on the issue whether section 4.4(a) of the HSA is an unenforceable penalty. To obtain summary judgment on the affirmative defense of penalty, GPA must prove each element of the defense. *See Brownlee,* 665 S.W.2d at 112; *Selz,* 152 S.W.3d at 836; *see also Phillips,* 820 S.W.2d at 789. GPA argues the payment of "Normal Billed Charges" is not a reasonable forecast of just compensation, and the harm caused by late payment is not incapable or difficult of estimation. *See Phillips,* 820

S.W.2d at 788. In support of its motion for summary judgment, GPA offered evidence comparing the discounted rates to the hospital's normal billed rates for the charges at issue. GPA offered a chart attached to the affidavit of Madalyn Straughn that showed the percentage difference between the discounted rate and the normal billed charge for each of the charges at issue. GPA notes "the overwhelming majority of the percentage charges are 33% or more."

In response to GPA's motion for summary judgment, Baylor offered evidence regarding the difficulty of estimation and the reasonableness of the charges. Baylor offered the affidavit of Janda Edwards to explain that Baylor's normal billed charge "is the amount Baylor charges for services and supplies to entities or individuals who do not have access to a discount through a contract with Baylor." Edwards explained Baylor's normal billed charge "is established by each facility and is based upon an analysis of many factors including the service provided, the amount of personnel time needed to provide the service, the amount of capital equipment needed to provide the service, the amount of routine equipment needed to provide the service, the overhead, and market value." Edwards also testified that Baylor's normal billed charge is a reasonable amount for the health care services and supplies provided in the charges at issue in this case.

[20] [21] GPA quotes from Edwards's affidavit and argues, "Baylor offered no justification attempting to show how the changed billing rate was a reasonable estimate of the cost associated with payments being untimely." GPA posits that a "more reasonable" calculation would be "a $30 service fee and 18% annual interest," and argues, "our society routinely deals with late payments by a modest service fee and interest, and thus Baylor's damages were calculable." GPA does not offer evidence to support these arguments, however. The difficulty (or lack of difficulty) in estimation as well as the unreasonableness of the damages estimate were GPA's to prove. *Urban Television Network Corp.,* 277 S.W.3d at 919. General statements about a "more reasonable" or "modest" rate are not evidence that the harm from late payment is difficult to estimate, or that the normal billed charges were an unreasonable forecast of the loss actually sustained. *See Phillips,* 820 S.W.2d at 788. GPA also emphasized that Baylor itself referred to the normal billed charge as a "penalty." The substance of the provision controls, however. *See Arthur's Garage, Inc. v. Racal– Chubb Security Systems, Inc.,* 997 S.W.2d 803, 810 (Tex.App.-Dallas 1999, no pet.) (provision entitled "liquidated damages" was actually a limitation of liability provision, so penalty analysis was not appropriate). Because GPA did not meet its burden of establishing that the clause requiring payment of normal billed charges after 45 days was an unenforceable penalty, the trial judge did not err in denying GPA's motion for summary judgment on this issue. We overrule GPA's second issue.

## *477 C. Claims arising before 2003

In its third issue, GPA argues the trial judge erred by awarding damages for the period of time before GPA signed the Subscriber Acknowledgment Form. While GPA admits signing the Subscriber Services Agreement in 1998, it argues that it did not agree to "pay or arrange to pay"

until the 2003 amendments set forth in the Subscriber Acknowledgment. Therefore, GPA argues, any claims arising in 2002 or before were included improperly in the trial court's judgment.

Baylor counters that GPA's obligations were set forth in the Subscriber Services Agreement, including the agreement to abide by any agreement between PHCS and a hospital, and those obligations did not change in 2003. Because GPA accepted the benefits of the agreements before 2003, Baylor argues, it must also accept the obligations.

 **[22]**   We agree with Baylor that GPA's obligation to abide by the HSA did not change in 2003. While the "pay or arrange to pay" language does not appear in the Subscriber Services Agreement, GPA did agree at that time to abide by the provisions of the HSA, and, as noted in *Epoch Group,* "the very foundation" of the discounts offered to GPA's customers are "the agreements between PHCS and providers such as Baylor." *Epoch Group,* 340 F.Supp.2d at 755. The *Epoch Group* court commented that the payor acknowledgments "serve no apparent purpose other than to commit Payors to comply with the terms and conditions of the provider agreements." *Id.* The contractual relationship among the parties was established when GPA signed the Subscriber Services Agreement and began to take advantage of the discounted rates offered under the HSA. The trial court did not err in awarding damages for the period of time before GPA signed the Subscriber Acknowledgment. We overrule GPA's third issue.

## CONCLUSION

We overrule GPA's issues and affirm the trial court's judgment.

Footnotes

1   The trial court's judgment recites that the full name of the plaintiff is "Baylor Health Care System, on behalf of Baylor All Saints Medical Center, Baylor Heart and Vascular Hospital, Baylor Specialty Hospital, Baylor Institute for Rehabilitation, Baylor University Medical Center, Baylor Medical Center at Garland, Baylor Regional Medical Center at Grapevine, Baylor Medical Center at Irving, Our Children's House at Baylor, Baylor Regional Medical Center at Plano, and Baylor Medical Center Ellis County."

2   The Subscriber Services Agreement was actually between PHCS and a Texas corporation named "Group & Pension Administrators, Inc." The parties entered into a Rule 11 agreement that "[f]or purposes of this case, G & P Administrators, Inc, and GPA Holding, Inc. agree that they can be treated as one entity for the purpose of discovery and liability." In accordance with this agreement, in this opinion we will refer only to GPA.

3   The Subscriber Services Agreement recites its purpose:
     A. PHCS is in the business of providing provider networks and a comprehensive medical management system, including utilization review, quality assurance, and other cost containment related services throughout the United States.
     B. Plans offered and managed by Subscriber [GPA] provide health benefits and/or services to eligible participants under health benefit plans.
     C. Plans offered and managed by Subscriber generally include financial incentives to encourage eligible participants to choose treatment from providers who have contracted with entities, such as preferred provider organizations and exclusive provider organizations, who are in the business of offering provider discounts and other managed medical benefits.

D. Subscriber is interested in and intent upon becoming a subscriber for services of PHCS, thus availing itself of the PHCS comprehensive medical management system.

4    Except as discussed herein.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (9)

### Direct History (2)
1. Baylor Health Care System v. GPA Holding, Inc.
2009 WL 1489945 , Tex.Dist. , Apr. 23, 2009

*Affirmed by*

2. GPA Holding, Inc. v. Baylor Health Care System ⌐
344 S.W.3d 467 , Tex.App.-Dallas , May 18, 2011 , rehearing overruled ( Aug 09, 2011 ) , review denied ( Dec 14, 2012 ) , rehearing of petition for review denied ( Mar 01, 2013 )

### Related References (7)
3. Baylor Health Care System v. GPA Holding, Inc.
2006 WL 6267271 , Tex.Dist. , Dec. 27, 2006

4. Baylor Health Care System v. GPA Holding, Inc.
2008 WL 6150217 , Tex.Dist. , Dec. 17, 2008

5. Baylor Health Care System v. GPA Holding, Inc.
2009 WL 1489941 , Tex.Dist. , Jan. 12, 2009

6. Baylor Health Care System v. GPA Holding, Inc.
2009 WL 1489943 , Tex.Dist. , Apr. 03, 2009

7. Baylor Health Care System v. GPA Holding, Inc.
2009 WL 1489944 , Tex.Dist. , Apr. 23, 2009

8. Baylor Health Care System v. GPA Holding, Inc.
2010 WL 7086831 , Tex.Dist. , Oct. 05, 2010

9. Baylor Health Care System v. AssureCare Claims
2011 WL 3022149 , Tex.Dist. , Feb. 08, 2011

2003 WL 22411873
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

**Memorandum Opinion**
**Not designated for publication.** *See***TEX.R.APP.P. 47.2(a) .**
Court of Appeals of Texas,
Eastland.

HEALIX INFUSION THERAPY, INC., Appellant,

v.

Nicholaos C. BELLOS, M.D., P.A., Appellee.

No. 11−02−00346−CV.    |    Oct. 23, 2003.

Doctor brought action against corporation for breach of settlement agreement. The trial court, Dallas County granted summary judgment in favor of doctor. Corporation appealed. The Court of Appeals, Jim R. Wright, J., held that doctor was entitled to liquidated damages from corporation for breach of confidentiality in settlement agreement.

Affirmed.

Appeal from Dallas County.

**Attorneys and Law Firms**

Murphy Klasing, Kenneth Moursund Jr., for Healix Infusion Therapy, Inc.

Cathy Hendrickson, Kevin A. Kinnan, Jeffrey Hellberg Jr., Ryan Downton, Bruce Howell, for Nicholaos C. Bellos, M.D.

Panel consists of ARNOT, C.J., and WRIGHT, J., and McCALL, J.

**Memorandum Opinion**

JIM R. WRIGHT, Justice.

**\*1** The trial court granted a motion for summary judgment filed by Nicholaos C. Bellos, M.D., P.A. and enforced a contractual liquidated damages clause against Healix Infusion Therapy, Inc. The trial court awarded Dr. Bellos $10,000.00 in his suit against Healix. The trial court also awarded attorney's fees to Dr. Bellos. In two issues on appeal, Healix argues that the liquidated damages clause is an unenforceable penalty and that there are genuine issues of material fact regarding damages. [1] We affirm.

Dr. Bellos sued Healix in another lawsuit; the parties reached a settlement in that suit. Both parties agreed not to disclose the nature of the settlement agreement. The agreement provided for $10,000.00 in liquidated damages in the event of a breach by either party. After the settlement agreement was signed, Methodist Hospitals of Dallas (Methodist), where Dr. Bellos practiced, sent $6,385.13, which it owed to Dr. Bellos, because it mistakenly believed that Healix held a lien against Dr. Bellos. Healix sent a letter and a copy of the settlement agreement to Methodist to show that there was no lien. Dr. Bellos claimed that Healix breached the settlement agreement when Healix furnished the agreement to Methodist, and he sued Healix to recover under the liquidated damages provision of the agreement.

A trial court must grant a motion for summary judgment if the moving party establishes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. TEX.R.CIV.P. 166a(c); *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991). Once the movant establishes a right to a summary judgment, the non-movant must come forward with evidence or law that precludes summary judgment. *City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671, 678–79 (Tex.1979). When reviewing a summary judgment, the appellate court takes as true evidence favorable to the non-movant. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor. *American Tobacco Company, Inc. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997); *Nixon v. Mr. Property Management Company, Inc.,* 690 S.W.2d 546, 548–49 (Tex.1985). In order to succeed on an affirmative defense in a summary judgment proceeding, a defendant must establish every element of the affirmative defense. *American Tobacco Company, Inc. v. Grinnell, supra.*

Courts will enforce liquidated damages provisions in contracts when the court finds that the harm resulting from a breach of the contract is incapable or difficult to estimate and when it also finds that the amount provided as liquidated damages is a reasonable forecast of just compensation. *Rio Grande Valley Sugar Growers, Inc. v. Campesi,* 592 S.W.2d 340, 342 n. 2 (Tex.1979). The "difficulty of estimation" and "reasonable forecast" questions must be determined from evidence of the circumstances which existed at the time the parties executed the agreement. *Baker v. International Record Syndicate, Inc.,* 812 S.W.2d 53 (Tex.App.-Dallas 1991, no writ). Courts will not enforce liquidated damages clauses which do not meet those criteria because the clauses would constitute unenforceable penalties. *Phillips v. Phillips,* 820 S.W.2d 785 (Tex.1991). Determining

whether a liquidated damages clause is enforceable or whether it is an unenforceable penalty is a question of law. *Phillips v. Phillips, supra.*

**\*2** In this case, the initial burden was on the movant. However, when a party raises the affirmative defense of penalty, that party assumes the burden to conclusively establish the defense. *Baker v. International Record Syndicate, Inc., supra.*Therefore, the burden was upon Healix to prove that the contractual liquidated damages was an unenforceable penalty.

The settlement agreement offered as summary judgment evidence by Dr. Bellos showed that the parties agreed to keep the nature of the settlement agreement confidential. The parties further agreed that a breach of the confidentiality clause would result in imminent and irreparable harm and that the damages for a breach of confidentiality would be $10,000.00. Healix admitted in its response to Dr. Bellos's request for admissions that it agreed to the confidentiality of the agreement and that it agreed to the $10,000.00 liquidated damages clause. Dr. Bellos's affidavit reflected that he agreed to the confidential nature of the agreement and that he had performed all acts required of him under the settlement agreement. His affidavit further showed that Methodist subjected him to a re-credentialing process every two years. He was unaware of how the disclosure of the agreement would affect the re-credentialing process, but states that he has been harmed in a manner that is "incapable of or difficult of estimation."

As part of its proof, Healix attached the affidavit of Heather Hughes–Glass, the corporate risk manager for Healix. In her affidavit, Heather Hughes–Glass stated that, as soon as she became aware of the confidentiality provision of the agreement that was sent to Methodist, she contacted Dean Matthys, the corporate risk manager for Methodist, to have him destroy the agreement. She further stated that Matthys indicated that only he and his assistant were aware of the settlement agreement. Also included in the summary judgment evidence was an affidavit given by Matthys as well as a letter from Matthys to Healix. These documents indicated that the copy of the settlement agreement was destroyed soon after it was received by Methodist and that the only two people to see the agreement, Matthys and his assistant Lisa Irby, were not involved with the re-credentialing process at Methodist. Finally, Healix offered as summary judgment evidence Dr. Bellos's response to a request for disclosure that any economic damages suffered by Dr. Bellos were difficult to estimate.

This evidence does not meet the burden Healix must bear: that at the time the agreement was made damages could be easily ascertained and that the amount of the liquidated damages award was not a reasonable forecast of just compensation. Healix contends that the award of liquidated damages is disproportionate to the actual damages suffered by Dr. Bellos because Dr. Bellos did not have any actual damages. To emphasize this point, Healix relies on *Baker.*"If the liquidated damages are shown to be disproportionate to the actual damages, then the liquidated damages can be declared a penalty and recovery limited to actual damages proven."*Baker v. International Record Syndicate,*

*Inc., supra* at 55.Healix still must show that, at the time the agreement was made, the amount of the liquidated damages was not a reasonable forecast. To prove this defense, Healix must prove actual damages, if any, to show that the actual loss was not an approximation of the stipulated sum.*Baker v. International Record Syndicate, Inc., supra.*That damages are not yet ascertainable is not tantamount to evidence of "zero" damages.

**\*3** The summary judgment evidence establishes that there was an agreement between Healix and Dr. Bellos that prohibited the disclosure of the nature of the settlement agreement and that Dr. Bellos performed all the required acts under the agreement. Healix breached the agreement by sending a copy of the agreement to Methodist. Because we find that Healix failed to meet its burden of proof on the penalty issue and because Healix failed to raise a genuine issue of material fact, we hold that the trial court did not err when it granted Dr. Bellos's motion for summary judgment. Healix's issues on appeal are overruled.

The judgment of the trial court is affirmed.

Footnotes

1     The award of attorney's fees is not contested in this appeal.

**End of Document**                                            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

11 S.W.3d 305
Court of Appeals of Texas,
Houston (14th Dist.).

In re Richard Allen KASSCHAU, Relator.

No. 14–99–00737–CV.   |   Dec. 16, 1999.   |   Rehearing Overruled Feb. 14, 2000.

Wife brought divorce action against husband, requesting dissolution, conservatorship of two children, and division of community estate. Before judgment was entered on court-approved mediated settlement agreement, wife nonsuited divorce petition. Unaware of nonsuit, husband filed counter-petition for divorce, seeking enforcement of settlement, denying paternity of second child, and asserting various tort claims. Wife filed new petition for divorce. Ultimately, the 312th District Court, Harris County, James D. Squier, J., denied husband's motion to reinstate counter-petition and set aside settlement agreement. Husband filed petition for writ of mandamus. The Court of Appeals, Frost, J., held that: (1) by failing to explain why trial court's refusal to reinstate his counter-petition for divorce, which was originally filed after wife nonsuited her divorce petition, could not be remedied by an appeal, petitioner failed to establish justification for mandamus relief; (2) trial court that approved mediated settlement agreement at divorce, but never rendered judgment on the agreement, had no ministerial duty to enter judgment, and thus did not violate a duty imposed by law, such that mandamus relief was available; and (3) trial court's setting aside of entire mediated settlement agreement at divorce on grounds of illegality, rather than just severing illegal portion, was not an abuse of discretion.

Writ denied.

**Attorneys and Law Firms**

**\*308** Linda Marshall, Houston, for relator.

Shawn Russel Casey, Houston, for respondent.

Panel consists of Justices YATES, FOWLER and FROST.

## OPINION ON REHEARING

KEM THOMPSON FROST, Justice.

Relator's motion for rehearing is overruled. The court's opinion of November 10, 1999, is withdrawn and this opinion is substituted in its place.

In this original proceeding, relator seeks a writ of mandamus directing the trial court to vacate two orders in the underlying divorce case: (1) denying reinstatement of an "original counter petition" for divorce, and (2) setting aside a mediated settlement agreement. Because the first order is not reviewable by mandamus and the second order was not a clear abuse of discretion, we deny the writ.

## Background

Luckmi Kasschau ("Luckmi"), the real party in interest, sued relator, Richard Allan Kasschau ("Richard"), for divorce in the 312th District Court of Harris County. In her petition, Luckmi sought not only dissolution of the marriage, but also conservatorship and support of their two children and division of the community estate. Richard answered the suit with a general denial, a plea for confirmation of his separate property, and a request for reimbursement, attorney's fees, and expenses. The parties subsequently agreed to mediation. The parties settled all issues at mediation and the court approved the settlement. [1]

Before the court entered judgment, however, Luckmi nonsuited her divorce petition. Unaware of the nonsuit, Richard filed an "original counter-petition" for divorce. In his counter-petition, Richard sought enforcement of the mediated settlement agreement, denied paternity of the second child born during the marriage, and asserted various tort claims against Luckmi and Shivi Kumar Pawa ("Shivi"), the alleged father of the second child. Luckmi subsequently filed in the same court a new petition for divorce, seeking the same relief sought in her first suit. Luckmi also denied Richard's paternity of the second child and sought various temporary orders.

Meanwhile, back in the first suit, Richard filed a motion to reinstate his counter-petition for divorce and to consolidate the two divorce actions. He also asked the court to enter judgment on the mediated settlement agreement. Luckmi opposed the motion for judgment, asserting that: (1) certain conditions precedent to judgment had not been satisfied; namely, Shivi had not filed an intervention as contemplated **\*309** by the settlement agreement, and (2) the settlement agreement was void because it required Richard to turn over certain audiotape recordings of Luckmi for destruction by the parties' attorneys, an act Luckmi claimed would be illegal. *See* TEX. PEN.CODE ANN. §§ 16.02(b)(1), 37.09(a)(1) (Vernon 1994).

At a hearing on these motions, the trial court granted the motion to consolidate the two divorce actions based on its conclusion that Luckmi's nonsuit did not defeat the mediated settlement agreement. The court, however, denied Richard's motion to reinstate the counter-petition, finding

that only Richard's claim for attorney's fees survived the nonsuit. The court withdrew its approval of the mediated settlement agreement, finding the agreement void and unenforceable because it required performance of an illegal act. The court put its first two rulings in writing by order signed the same day as the hearing.

After the hearing, Richard filed a request to enforce the terms of the mediated settlement agreement, except for the allegedly illegal provision. In the meantime, Shivi filed an intervention seeking to establish paternity, conservatorship and support of the second child. After the trial court signed an order setting aside the entire mediated settlement agreement, Richard filed this petition for writ of mandamus. [2]

## Mandamus

 **[1]**   Mandamus relief is available if the trial court violates a duty imposed by law or clearly abuses its discretion, either in resolving factual issues or in determining legal issues when there is no adequate remedy at law. *See Walker v. Packer,* 827 S.W.2d 833, 839–40 (Tex.1992). A trial court clearly abuses its discretion by making an arbitrary and unreasonable decision that amounts to a clear and prejudicial error of law. *See Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985). Richard complains the trial court violated a duty imposed by law by refusing to reinstate his counter-petition and declining to enter judgment on the mediated settlement agreement. We address each of these complaints and the question of whether Richard has an adequate remedy by appeal.

## Reinstatement of the Counter–Petition

 **[2]**    **[3]**    **[4]**   Richard first contends the trial court violated a ministerial duty by refusing to reinstate his "original counter-petition," even though it was filed after Luckmi's nonsuit. Under Texas Rule of Civil Procedure 162, a plaintiff has an absolute, unqualified right to take a nonsuit before she introduces all her evidence, as long as the defendant has not made a claim for affirmative relief. *See BHP Petroleum Co., Inc. v. Millard,* 800 S.W.2d 838, 840 (Tex.1990); *General Land Office v. OXY U.S.A., Inc.,* 789 S.W.2d 569, 570 (Tex.1990); *Greenberg v. Brookshire,* 640 S.W.2d 870, 871 (Tex.1982) (per curiam). The trial court's refusal to grant a nonsuit in the absence of a defendant's claim for affirmative relief violates a ministerial duty and can be corrected by mandamus. *See Quanto Int'l Co., Inc. v. Lloyd,* 897 S.W.2d 482, 485 (Tex.App.—Houston [1st Dist.] 1995, orig. proceeding). Similarly, the trial court's reinstatement of a case after the court has lost jurisdiction because of a nonsuit may also be reviewed by **\*310**  mandamus. *See id.* (citing *Johnson v. Harless,* 651 S.W.2d 259, 260 (Tex.1983). Neither of these situations is present here.

**[5]** **[6]** **[7]** **[8]** **[9]** The trial court did not refuse to grant a nonsuit nor did it attempt to reinstate the case without jurisdiction to do so. Instead, the court merely refused to consider Richard's counter-petition for divorce. We can see no reason to remedy the court's ruling by mandamus rather than by an appeal. The requirement that a person seeking mandamus relief establish the lack of an appellate remedy is a "fundamental tenet" of mandamus practice. *See In re Masonite Corp., 997 S.W.2d 194, 199–201 (Tex. 1999)* (J. Baker dissenting) (and cases cited therein). An appellate remedy is not inadequate merely because it may involve more expense or delay than obtaining mandamus. *See id.* Although, on rare occasions, exceptional circumstances may justify mandamus relief despite the presence of a generally adequate appellate remedy, such circumstances do not exist when a trial court's ruling is merely incidental to the trial process and does not permanently deprive a party of substantial rights. *See id. at 199–201.* Furthermore, the mere fact that a trial court's erroneous order will result in an eventual reversal on appeal does not mean that trial will be a "waste of judicial resources." *See id.* Rather, mandamus should issue only in situations involving manifest and urgent necessity and not for grievances to which other remedies may apply. *See id. at 198–99.* Because Richard neglects to explain why the court's ruling on his motion to reinstate cannot be remedied by an appeal, we decline to address the court's ruling by mandamus.

### Judgment on the Mediated Settlement Agreement

Richard also contends the trial court violated a ministerial duty by refusing to enter judgment on the mediated settlement agreement. Sections 6.602(b) and 153.0071(d) of the Family Code state that "a mediated settlement agreement is binding on the parties if the agreement: (1) provides in a separate paragraph that the agreement is not subject to revocation; (2) is signed by each party to the agreement; and (3) is signed by the parties' attorney, if any, who is present at the time the agreement is signed." Section 157.0071(d) adds the requirement of "an underlined statement that the agreement is not subject to revocation." Finally, subsections (c) and (e) of these statutes provide that "a party is entitled to judgment" on a mediated settlement agreement that meets the above requirements "notwithstanding Rule 11 ... or another rule of law."

**[10]** It is undisputed that the mediated settlement agreement in the underlying case meets the requirements of sections 6.602(b) and 153.0071(d). Relying on these Family Code provisions, Richard argues that Luckmi could not revoke her consent to the agreement by nonsuiting her divorce action and that the trial court violated a ministerial duty by refusing to enter judgment on the agreement. Citing the noted arbitration case, *Jack B. Anglin v. Tipps, 842 S.W.2d 266, 271–73 (Tex.1992),* Richard also argues that without mandamus relief, he will be deprived of the rapid, inexpensive alternative to litigation provided by the Family Code. We need not compare mediated settlement agreements under the Family Code to arbitration agreements. Instead, we conclude that Richard lacks an adequate remedy from the trial court's ruling because he will be deprived of the

settlement's benefits if forced to expend further time and resources litigating a suit that may have been settled. *See, e.g., Mantas v. Fifth Court of Appeals,* 925 S.W.2d 656, 659 (Tex.1996) (holding that relator who settled case on appeal lacked adequate remedy for appellate court's refusal to abate appeal pending suit to enforce settlement agreement); *see also Harris County Appraisal Dist. v. Johnson,* 889 S.W.2d 531, 533–34 (Tex.App.—Houston [14th Dist.] 1994, orig. proceeding) (mandamus **\*311** is appropriate to compel a district judge to proceed to trial and judgment).

 **[11]** While we find the court's refusal to enter judgment on the mediated settlement agreement is a proper subject for mandamus, we conclude that the trial court did not violate a ministerial duty in this case. One of the two reported cases addressing section 153.0071 of the Family Code holds that subsection (e) requires the trial court to enter judgment on a mediated settlement agreement that meets the requirements of subsection (d). *See Alvarez v. Reiser,* 958 S.W.2d 232, 234 (Tex.App. —Eastland 1997, writ denied).<sup>3</sup> In *Alvarez,* the husband sued the wife for divorce. 958 S.W.2d at 233. The wife answered and filed a cross-petition for divorce. *See id.* At mediation, the parties reached a settlement agreement that complied with the requirements of section 153.071(d). *See id.* The trial court entered judgment on the mediated settlement agreement even though the wife had withdrawn her consent to the agreement. *See id.* The wife appealed and the appellate court affirmed, concluding that: (1) a party's unilateral withdrawal of consent does not negate the enforceability of a mediated settlement agreement that complies with section 153.0071(d), and (2) "a separate suit for enforcement of a contract [i]s not necessary." *Id.* at 234.

Here, the issue is not whether Luckmi could revoke her consent to the mediated settlement agreement, but whether the agreement itself was valid and enforceable. Notably, the lower court did not rule that Luckmi had revoked her consent to the mediated settlement agreement by taking a nonsuit. To the contrary, in consolidating the two divorce actions, the court expressly stated that Luckmi's nonsuit did not defeat the agreement. Instead of immediately entering judgment on the mediated settlement agreement, however, the trial court reviewed the agreement and concluded it was void.

 **[12]** **[13]** **[14]** Neither the plain language of the Family Code nor the holding in *Alvarez* foreclose the court's action. First, as noted, sections 6.602 and 153.0071 of the Family Code provide that "a party is entitled to judgment" on a mediated settlement agreement if certain requirements of those statutes are met. Where, as here, the legislature has not defined the terms in the statute, we must apply their ordinary meaning. *See In re Clark,* 977 S.W.2d 152, 156 (Tex.App.—Houston [14th Dist.] 1998, orig. proceeding). "Entitle" means in part "to grant a legal right to or qualify for." *See* BLACK'S LAW DICTIONARY 553 (7th ed.1999). That a party has a "right to" judgment, or "qualifies for" judgment on a mediated settlement agreement does not deprive the court of discretion to review an agreement before entering judgment. Second, while *Alvarez* precludes a party from revoking consent to a mediated settlement agreement that complies with section 153.0071, it does not hold that the court's duty to enter judgment on such

an agreement is ministerial. A court's duty to enter judgment on a settlement agreement becomes ministerial only after it has first rendered judgment on that agreement. *See In re Bland,* 960 S.W.2d 123, 124 (Tex.App. Houston [1st Dist.] 1997, orig. proceeding) (J. O' Connor dissenting) (citing *Dunn v. Dunn,* 439 S.W.2d 830, 832 (Tex.1969)); *see also In the Marriage of Beavers,* 648 S.W.2d 729, 732 (Tex.App.—Amarillo 1983, no writ). Here, the trial court approved the settlement agreement, but never rendered judgment on the agreement. *See, e.g., S & A Restaurant Corp.* v. Leal, 892 S.W.2d 855, 857–58 (Tex.1995) (holding that approval of a settlement does not necessarily constitute a rendition of judgment in the absence of a clear intent to render judgment). As a **\*312** result, the court had no ministerial duty to enter judgment and thus, did not violate such a duty.

Notwithstanding this legal conclusion, the facts of the underlying case demonstrate that the parties did not intend for the court to immediately enter judgment on the settlement agreement. Specifically, the mediated settlement agreement expressly contemplates certain contingencies in connection with Shivi's intervention. It states that the court would likely require an intervention to resolve certain issues regarding the second child and that entry of a decree would be delayed, and agreed temporary orders entered while these issues were resolved. Thus, the facts of this case establish the trial court's discretion to review the agreement before entering judgment. Accordingly, we hold that the trial court did not violate a ministerial duty by refusing to enter judgment on the mediated settlement agreement.

## Legality of the Mediated Settlement Agreement

 **[15]**    **[16]**    **[17]**    **[18]**    Finally, Richard contends the trial court clearly abused its discretion by setting aside the entire mediated settlement agreement on grounds of illegality. "A contract to do a thing which cannot be performed without violation of the law" violates public policy and is void. *See Lewis v. Davis,* 145 Tex. 468, 199 S.W.2d 146, 148–49 (1947); *see also Montgomery v. Browder,* 930 S.W.2d 772, 778 (Tex.App.—Amarillo 1996, writ denied). The rationale behind the rule is not to protect or punish either party to the contract, but to benefit and protect the public. *See Montgomery,* 930 S.W.2d at 778; *see also Plumlee v. Paddock,* 832 S.W.2d 757, 759 (Tex.App.-Fort Worth 1992, writ denied). Because of the presumption in Texas that contracting parties are knowledgeable of the law and contract accordingly, courts will generally leave the parties as they find them. *See id.* Thus, "where the illegality does not appear on the face of the contract, it will not be held void unless facts showing its illegality are before the court." *See Lewis,* 199 S.W.2d at 149. Here, the trial court concluded from the facts before it that the settlement agreement called for the performance of an illegal act. *See* TEX. PEN.CODE ANN. § 16.02(a)(1) (Vernon 1994) (" a person commits an offense if he intentionally intercepts ... a wire, oral, or electronic communication").

At the hearing on Richard's motions, the court heard uncontroverted testimony that Richard secretly tape recorded Luckmi's phone conversations with various third persons. [4] Aware of these tape recordings at the time of mediation, the parties put the following provision in their settlement agreement:

> Husband ordered to deliver all tape recordings of Wife and transcripts and all copies thereof to Linda Marshall [husband's attorney] by 5:00 p.m., five days after entry of decree. Attorneys to meet, inspect, and destroy all of same. Parties enjoined from disseminating or distributing a copy of tapes or transcripts.

[19] [20]   Taking into account that Shivi and others might urge authorities to bring criminal charges against Richard, the court concluded that this provision illegally required the parties to destroy evidence in a potential criminal proceeding brought at the instance of non-parties to the settlement agreement. [5]  **\*313** Section 37.09(d)(1) of the Penal Code states that "a person commits an offense if the person knowing that an offense has been committed, alters, destroys, or conceals any record, document or thing with intent to impair its verity, legibility or availability as evidence in any *subsequent* investigation or official proceeding." TEX. PEN.CODE ANN. § 37.09(d)(1) (Vernon Supp.1999) (emphasis added). This statute makes it a crime to alter or destroy evidence of a crime even before the commencement of a criminal proceeding. Richard argues the provision in question is legal because it does not require *immediate* destruction of the tapes and correspondingly prohibits dissemination of them. The Penal Code does not provide a time after which a person, knowing that an offense has been committed, may legally destroy evidence. Richard contends, however, that "if they waited until the statute of limitations expired ... the agreement would be fully and lawfully performed." We reject the notion that once the statute of limitations on the state wire tap law runs, destruction of the tapes would no longer violate § 37.09(d)(1), and, therefore, could not be characterized as an illegal act. [6] Richard's argument incorrectly assumes that the mere passage of time transforms an illegal act into a legal one. The statute of limitations is an affirmative defense; it does not bar prosecution for violation of a statute. *See Proctor v. State,* 967 S.W.2d 840, 844 (Tex.Crim.App.1998) (defense created by statute of limitations is forfeited if not asserted before the guilt/innocence stage of trial). An act prohibited by § 37.09(d)(1) does not magically become legal upon the expiration of the statute of limitations. While the running of the limitations period provides the accused with a potential defense to any prosecution for violation of the statute, it does not change the nature or character of the act. For this reason, we are unable to find that the trial court committed a clear and prejudicial error of law by declaring the settlement agreement illegal and unenforceable based on its finding that the agreement, on its face, called for a violation of § 37.09(d)(1).

[21] [22] [23]   Nevertheless, Richard argues the court abused its discretion in refusing to eliminate any illegal provision and enforce the remainder of the settlement agreement. As a general rule, where part of the consideration for an agreement is illegal, the entire agreement is void if the

contract is entire and indivisible. *See Montgomery,* 930 S.W.2d at 778. The doctrine of severability is an exception that applies in circumstances in which the original consideration for the contract is legal, but incidental promises within the contract are found to be illegal. *See id.* In such a case, the court may sever the invalid provision and uphold the valid portion, provided the invalid provision does not constitute the main or essential purpose of the agreement. *See Rogers v. Wolfson,* 763 S.W.2d 922, 925 (Tex.App.—Dallas 1989, writ denied). Severability of the contract is determined by the intent of the parties as evidenced by the language in the contract. *See Montgomery,* 930 S.W.2d at 778–79; *see also McFarland v. Haby,* 589 S.W.2d 521, 524 (Tex.App.—Austin 1979, writ ref'd n.r.e.). The issue is whether the parties would have entered into the agreement absent the illegal parts. *See Rogers,* 763 S.W.2d at 925; *see also McFarland,* 589 S.W.2d at 524. Therefore, we must determine the central and essential purpose of the settlement agreement.

Richard argues that the resolution of the various issues related to divorce, not the destruction of the tapes, was the essential purpose of the settlement agreement. In contrast, Luckmi argues that the destruction **\*314** of the tapes was the consideration for her release of claims against Richard and, thus, was an essential purpose of the agreement. Given the structure of the settlement agreement and its interrelated terms and provisions, we cannot say that the trial court acted without reference to guiding rules and principles in concluding that the agreement is entire and indivisible. Because the court found part of the consideration for the settlement agreement illegal, it was justified in finding the entire agreement void and unenforceable. Therefore, we find the trial court did not abuse its discretion by declaring the entire agreement void and refusing to enforce it.

 **[24]**   **[25]**   Lastly, Richard argues that Luckmi is estopped from questioning the agreement's validity because she accepted a $1000 cash payment under its terms. A void contract cannot be rendered enforceable by estoppel. *See Reyes v. Storage & Processors, Inc.,* 995 S.W.2d 722, 725 n. 3 (Tex.App.—San Antonio 1999, pet. filed) (holding that employee who accepted benefits of void agreement limiting worker's compensation benefits was not estopped from complaining about agreement). Thus, Luckmi is not estopped from questioning the agreement's validity. Therefore, we find no clear abuse of discretion by the trial court in setting aside the entire agreement.

## Conclusion

In conclusion, we recognize that there are competing public policy interests at stake here. On the one hand, courts are responsible for carrying out this state's policy of encouraging the peaceable resolution of disputes involving the parent-child relationship through voluntary settlement procedures. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 154.002, 154.003 (Vernon 1997). On the other hand, public policy prohibits courts from enforcing illegal contracts. *See Lewis,* 199 S.W.2d at 151; *see also Montgomery,* 930 S.W.2d at 778. Here, we are unable to find the trial court violated the public policy encouraging settlements by refusing to enforce a settlement

agreement that it found contained an illegal provision. Accordingly, because the trial court neither violated a duty imposed by law nor clearly abused its discretion by refusing to enter judgment on the mediated settlement agreement, we deny mandamus relief.

## Footnotes

1      The copy of the mediated settlement agreement provided by Richard is neither file-stamped nor signed by the court. Nevertheless, the reporter's record from a later hearing establishes that the court signed and approved the agreement.

2      Luckmi objects to the documents included in the appendix to the petition. These were the only documents provided in support of mandamus relief. A petition for writ of mandamus must contain an appendix, which must include "a certified or sworn copy of any order complained of, or any other document showing the matter complained of." *See* TEX.R.APP. P.2.3(j). The orders of which Richard complains are included in the appendix and appear to be signed by the trial court, but are not file-stamped. The verification of Richard's counsel states only "that the pleadings contained in the appendix are true and correct copies." While the verification makes no mention of "orders, motions or other documents," we construe "pleadings" in this instance to include all the documents in the appendix.

3      *Spinks v. Spinks,* 939 S.W.2d 229 (Tex.App.—Houston [1st Dist.] 1997, no writ) is the only other reported case addressing section 153.0071. In that case, the court held that a party could revoke a mediated settlement agreement that did not comply with section 153.071(d). *See id.* at 230.

4      Luckmi testified that after filing for divorce, she discovered a recording device attached to a phone in the garage of the house where she and Richard lived. She testified that the device also contained a tape of her conversations with others including, her mother, Shivi, and friends. Luckmi testified that she was unaware of the recording device or the tape and that she did not give permission to anyone to record her conversations. Luckmi also testified that when she confronted Richard, he acknowledged installing the device and making the recordings. When Richard was questioned on this topic, his counsel invoked the Fifth Amendment on Richard's behalf and instructed him not to answer.

5      These non-parties include Shivi. Under the settlement agreement, Richard agreed to release Shivi of all claims, except for child support. However, the release was conditioned on Shivi releasing claims against Richard.

6      We note that § 37.09(d)(1) applies to the destruction of evidence that might be used in "any subsequent investigation or official proceeding" and is not limited to a violation of the state wire tap laws.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (2)

### Direct History (2)

⚑ 1. In re Kasshau

1999 WL 1015703 , Tex.App.-Hous. (14 Dist.) , Nov. 10, 1999

*Opinion Withdrawn and Superseded on Overruling of Rehearing by*

⚑ 2. In re Kasschau ☞

11 S.W.3d 305 , Tex.App.-Hous. (14 Dist.) , Dec. 16, 1999 , rehearing overruled ( Feb 14, 2000 )

262 S.W.3d 337
Supreme Court of Texas.

In re POLY–AMERICA, L.P., Ind. and d/b/a Pol–Tex
International, and Poly–America GP, L.L.C., Relators.

No. 04–1049.    |    Aug. 29, 2008.

**Synopsis**

**Background:** Former employee sought mandamus relief from order of the 344th District Court, Chambers County, Carroll E. Wilborn, Jr., J., granting employer's motion to compel arbitration and to stay employee's action for wrongful discharge and retaliation for filing a workers' compensation claim. The Houston Court of Appeals, First District, 175 S.W.3d 315, conditionally granted a writ. Review was granted.

**Holdings:** The Supreme Court, Harriet O'Neill, J., held that:

[1] provisions of arbitration agreement, eliminating two types of remedies available under anti-retaliation provisions of Texas Workers' Compensation Act, were substantively unconscionable;

[2] fee-splitting provision of arbitration agreement was not substantively unconscionable;

[3] as a matter of first impression, discovery limits in arbitration agreement were not substantively unconscionable; and

[4] substantively unconscionable provisions of arbitration agreement were severable.

Writ conditionally granted.

Scott Brister, J., filed a dissenting opinion.

**Attorneys and Law Firms**

**\*343** Erica W. Harris, Susman Godfrey L.L.P., Houston, Craig T. Enoch, Winstead PC, Austin, Adam Brian Ross, Poly–America, LP, Grand Prairie, TX, for Relator.

Scott Fiddler, Law Office of G. Scott Fiddler, P.C., Houston TX, for Real Party in Interest.

Jeffrey C. Londa, Ogletree Deakins Nash Smoak & Stewart, P.C., Houston, Audrey Elaine Mross, Davis Munck Butrus, P.C., Kirk L. Pittard, Durham & Pattard, LLP, Dallas, Peter M. Kelly, Law Office Of Peter M. Kelly, P.C., Houston TX, for Amicus Curiae.

Justice O'NEILL delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice WAINWRIGHT, Justice MEDINA, Justice GREEN, and Justice JOHNSON joined.

## Opinion

 **\*344** HARRIET O'NEILL, Justice.

In this retaliatory-discharge case, the employee's employment contract contains an arbitration agreement that requires the employee to split arbitration costs up to a capped amount, limits discovery, eliminates punitive damages and reinstatement remedies available under the Workers' Compensation Act, and imposes other conditions on the arbitration process. We must decide whether any or all of these provisions are unconscionable and, if they are, whether the contract's severability clause preserves the arbitration right. We hold that the trial court did not abuse its discretion in allowing the arbitrator to assess the unconscionability of the agreement's fee-splitting and discovery-limitation provisions as applied in the course of arbitration. We further hold that the arbitration agreement's provisions precluding remedies under the Workers' Compensation Act are substantively unconscionable and void under Texas law. However, those provisions are not integral to the parties' overall intended purpose to arbitrate their disputes and, pursuant to the agreement's severability clause, are severable from the remainder of the arbitration agreement, which we conclude is otherwise enforceable. Accordingly, we conditionally grant the petition for mandamus.

### I. Facts

Johnny Luna began his employment with Pol–Tex International, d/b/a Poly–America, L.P., in October 1998. Upon his hiring, Luna signed an agreement to submit "all claims or disputes" to arbitration. Approximately four years later, Luna signed an amended agreement to arbitrate that contained substantially the same provisions. Both the 1998 and 2002 agreements provide that they are governed by the Federal Arbitration Act (FAA). 9 U.S.C. §§ 1–14. Additionally, both agreements contain a series of requirements for the arbitration between the parties. All claims must be asserted within a maximum of one year from the occurrence of the event from which the claim arises. Fees associated with arbitration—including but not limited to mediation fees, the arbitrators' fees, court reporter fees, and fees to secure a place for a hearing—are to be split between the parties, with the employee's share capped at "the gross compensation earned by the Employee

in Employee's highest earning month in the twelve months prior to the time the arbitrator issues his award." Each side is permitted limited forms of discovery: twenty-five interrogatories (including sub-parts), twenty-five requests for production or inspection of documents or tangible things, and one oral deposition of no more than six hours. Parties may not use written depositions or requests for admission; the agreement prohibits discovery of either party's financial information except for the employee's earnings if the employee seeks lost wages, back pay, and/or front pay; and all aspects of the arbitration are deemed confidential. Finally, the arbitrator is stripped of authority to award punitive, exemplary, or liquidated damages, or to order reinstatement of employment.

In December 2002, Luna suffered a work-related neck injury when he accidentally hit his head on a pipe. Poly–America's company doctor examined Luna and diagnosed him with an acute cervical spine flexion injury. Luna subsequently filed a workers' compensation claim and began receiving physical therapy. Approximately two weeks later, Luna returned to work on a release for light duty; however, Luna continued to suffer pain and utilized previously scheduled vacation time to recover from his injury. After being warned by the company doctor that he needed to return to work and get off of workers' compensation if he wanted to keep his job, **\*345** Luna returned to work without restrictions on January 10, 2003. Upon his return, Luna noticed that another person was already being trained for his position, and he claims that his supervisor began to harass him. One month later, Luna told his supervisor that his neck continued to bother him and that he needed to return to the company doctor; the next day that Luna was scheduled to work, he was fired.

Luna filed this suit asserting claims for unlawful retaliatory discharge under section 451.001 of the Labor Code ("the Workers' Compensation Act"). TEX. LAB.CODE § 451.001–.003. Claiming that Poly–America acted with malice, ill will, spite, or specific intent to cause injury, Luna sought both reinstatement and the imposition of punitive damages. He additionally sought a declaratory judgment that the arbitration agreement was unenforceable because, among other reasons, its provisions violated public policy and were unconscionable. Luna submitted two affidavits—his own, and that of an expert witness—in support of his claims. Poly–America responded with a motion to compel arbitration which, after a hearing, the trial court granted.

Luna sought a writ of mandamus in the court of appeals, reasserting his argument that provisions of the arbitration agreement were substantively unconscionable. The court of appeals held that, in light of the fee-splitting provisions and limitations on remedies, the arbitration agreement as a whole was substantively unconscionable. 175 S.W.3d 315, 318. Poly–America sought review in this Court. We hold that the arbitration agreement's provision that eliminates available remedies under the Workers' Compensation Act is unenforceable, but we find that provision severable from the arbitration agreement as a whole and conditionally grant Poly–America's writ of mandamus.

## II. Standard of Review

**[1]** **[2]** Mandamus is the proper means by which to seek review of an order compelling arbitration under the FAA. *In re Am. Homestar of Lancaster, Inc.,* 50 S.W.3d 480, 483 (Tex.2001). In *In re Palacios,* we recognized that it is "important for federal and state law to be as consistent as possible" in enforcement and review of provisions under the FAA. 221 S.W.3d 564, 565 (Tex.2006) (per curiam) (quoting *In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 739 (Tex.2005)). Federal courts may not review orders compelling arbitration and staying litigation ("compel-and-stay orders") by interlocutory appeal. *See* 9 U.S.C. § 16(b)(1) ("[A]n appeal may not be taken from an interlocutory order ... granting a stay of any action under Section 3 of this title."). Accordingly, as we noted in *Palacios,* it would be inappropriate to exercise our own mandamus power in a manner inconsistent with the federal courts' practice. *See Palacios,* 221 S.W.3d at 565. Although mandamus review is generally available in federal courts to review non-appealable interlocutory rulings, mandamus is granted only in exceptional cases. *See generally Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 288–90 & n. 13, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988) (holding that, where a particular order is not appealable, mandamus is available and "will be appropriate in exceptional cases"). As we acknowledged in *Palacios,* federal courts have applied this template to orders that cannot be appealed under the FAA, although they almost never grant mandamus relief. 221 S.W.3d at 565–66 ("Even after *Green Tree [Financial Corp.—Alabama v. Randolph,* 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000)], the Fifth Circuit has held that federal mandamus review of an order staying a case for arbitration may still be available if a party can meet a 'particularly **\*346** heavy' mandamus burden to show 'clearly and indisputably that the district court did not have the discretion to stay the proceedings pending arbitration.' ") (quoting *Apache Bohai Corp. v. Texaco China, B.V.,* 330 F.3d 307, 310–11 (5th Cir.2003)). This general rule has been broadly applied to unappealable ancillary interlocutory orders in proceedings under the FAA, *see, e.g., Georgiou v. Mobil Exploration & Prod. Servs., Inc. U.S.,* 190 F.3d 538, 1999 WL 642871 at *3 (5th Cir. July 27, 1999) (dismissing appeal of order staying litigation in favor of arbitration proceeding in foreign forum, and denying mandamus because plaintiffs failed to carry the "particularly heavy burden" to warrant mandamus relief from such an order); *Cofab Inc. v. Phila. Joint Bd., Amalgamated Clothing & Textile Workers Union, AFL–CIO–CLC,* 141 F.3d 105, 110 (3d Cir.1998); and appears to also apply to compel-and-stay orders under section 16(b)(1), *see Douglas v. U.S. Dist. Court,* 495 F.3d 1062, 1065 (9th Cir.2007) (granting mandamus relief from compel-and-stay order); *Manion v. Nagin,* 255 F.3d 535, 538–40 & n. 4 (8th Cir.2001) (dismissing appeal of various interlocutory orders, including order compelling arbitration, and denying mandamus because Manion had not made "any showing that he [was] entitled to such extraordinary relief"); *McDermott Int'l, Inc. v. Underwriters at Lloyds Subscribing to Memorandum of Ins. No. 104207,* 981 F.2d 744, 748 (5th Cir.1993) ("This court has recognized that [mandamus review of an order compelling arbitration] may be available [but] McDermott has failed to satisfy [the] demanding standard."). [1]

 **[3]**   **[4]**   **[5]**   Although federal precedent in this area is not uniformly clear, it appears a federal court would be permitted—albeit not compelled—to address the merits of the mandamus arguments in this case. If such review were categorically unavailable and unconscionability determinations the sole realm of arbitrators, as the dissenting Justice proposes, development of the law as to this threshold issue would be substantially hindered if not precluded altogether. Nevertheless, federal precedent counsels against granting relief unless the stringent requirements for mandamus are met. *See Gulfstream,* 485 U.S. at 289, 108 S.Ct. 1133. Federal courts grant mandamus only upon demonstration of a "clear and indisputable" right to issuance of the writ: "First, the party seeking the issuance of the writ must have no other adequate means to attain the relief he desires.... Second, the petitioner must satisfy the burden of showing that his right to issuance of the writ is clear and indisputable. Third ... the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Court,* 542 U.S. 367, 380–81, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004). Our own mandamus standard is similar, requiring a demonstration that **\*347** the trial court clearly abused its discretion by failing to correctly analyze or apply the law and a determination that the benefits of mandamus outweigh the detriments such that an appellate remedy is inadequate. *See In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135–36 (Tex.2004). Because arbitration is intended to provide a lower-cost, expedited means to resolve disputes, mandamus proceedings will often, if not always, deprive the parties of an arbitration agreement's intended benefits when a compel-and-stay order is at issue; accordingly, courts should be hesitant to intervene. With these standards in mind, we turn to the compel-and-stay order in this case.

### III. Unconscionability and the Federal Arbitration Act

 **[6]**   **[7]**   Poly–America argues that the FAA's "strong presumption" favoring arbitration applies in this case, and furthermore that the FAA preempts all state public-policy grounds for finding the agreement to arbitrate unenforceable. *See In re R & R Personnel Specialists of Tyler, Inc.,* 146 S.W.3d 699, 705 (Tex.App.—Tyler2004) (holding that the FAA preempts "any public policy underlying the Texas workers' compensation statutes that is contrary to the enforceability of arbitration agreements"). Because neither this presumption nor federal preemption applies in a state court's assessment of whether parties have entered into a valid and enforceable agreement to arbitrate under state contract law, we disagree.

 **[8]**   Section 2 of the FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract.*" 9 U.S.C. § 2 (emphasis added). Thus, an agreement to arbitrate is valid under the FAA if it meets the requirements of the general contract law of the applicable state. *In re AdvancePCS Health L.P.,* 172 S.W.3d 603, 606 (Tex.2005) (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S.

938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). In determining the validity of an agreement to arbitrate under the FAA, courts must first apply state law governing contract formation. *See* 9 U.S.C. § 2; *First Options,* 514 U.S. at 944, 115 S.Ct. 1920.

 **[9]** **[10]** The United States Supreme Court has repeatedly emphasized that "state law, whether of legislative or judicial origin, is applicable [to the determination of the validity of an agreement to arbitrate] if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Perry v. Thomas,* 482 U.S. 483, 493 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987). Thus, courts "may not ... invalidate arbitration agreements under state laws applicable *only* to arbitration provisions." *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996); *see also Perry,* 482 U.S. at 493 n. 9, 107 S.Ct. 2520 ("A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with [section 2].").

 **[11]** **[12]** However, the purpose and language of the FAA require only that agreements to arbitrate be placed "upon the *same* footing as other contracts." *Doctor's Assocs.,* 517 U.S. at 687, 116 S.Ct. 1652 (quoting *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)) (emphasis added); *see also* H.R. REP. NO. 68–96, at 1 (1924) (noting that by enacting section 2, Congress sought to place agreements to arbitrate "upon the same footing as other contracts, where [they] belong[ ]"). *Perry* makes clear that state courts may not fashion special rules regarding the enforceability **\*348** of arbitration contracts *per se. See Perry,* 482 U.S. at 492 n. 9, 107 S.Ct. 2520. Furthermore, once an enforceable contract to arbitrate is found, there is a strong federal presumption in favor of arbitration such that myriad doubts—as to waiver, scope, and other issues not relating to enforceability—must be resolved in favor of arbitration. *See, e.g., In re FirstMerit Bank,* 52 S.W.3d 749, 752 (Tex.2001); *Prudential Sec. Inc. v. Marshall,* 909 S.W.2d 896, 898–99 (Tex.1995). However, a state court must initially determine—through the neutral application of its own contract law—whether an enforceable agreement exists in the first instance, and whether "generally applicable contract defenses ... may be applied to invalidate arbitration agreements without contravening" the policies of the FAA. *Doctor's Assocs.,* 517 U.S. at 687, 116 S.Ct. 1652. Thus, in this case, if a contract limiting damages or restricting other remedies under the Workers' Compensation Act is *generally* unenforceable under Texas law, an arbitration contract with these same limitations will also be unenforceable.

 **[13]** **[14]** Nevertheless, under Texas law, as with any other contract, agreements to arbitrate are valid unless grounds exist at law or in equity for revocation of the agreement. The burden of proving such a ground—such as fraud, unconscionability or voidness under public policy—falls on the party opposing the contract. *See FirstMerit Bank,* 52 S.W.3d at 756. Thus, while we reject Poly–America's assertions that we must apply a presumption favoring arbitration in assessing whether the parties entered into an enforceable agreement under Texas law and that the FAA preempts Texas public policies that may make certain contractual provisions generally

unenforceable, Luna nevertheless bears the burden to establish that the challenged provisions are unenforceable.

## IV. Arbitration and Unconscionability Under Texas Law

### A. General Standard

**[15]**    Agreements to arbitrate disputes between employers and employees are generally enforceable under Texas law; there is nothing *per se* unconscionable about an agreement to arbitrate employment disputes and, in fact, Texas law has historically favored agreements to resolve such disputes by arbitration. *See Advance PCS,* 172 S.W.3d at 608; *EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 90 (Tex.1996); *Cantella & Co. v. Goodwin,* 924 S.W.2d 943, 944 (Tex.1996).

**[16]   [17]   [18]   [19]**   Unconscionable contracts, however—whether relating to arbitration or not —are unenforceable under Texas law. A contract is unenforceable if, "given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract." *FirstMerit Bank,* 52 S.W.3d at 757; *see also In re Halliburton Co.,* 80 S.W.3d 566, 571 (Tex.2002) ("[S]ubstantive unconscionability ... refers to the fairness of the arbitration provision itself."). Unconscionability is to be determined in light of a variety of factors, which aim to prevent oppression and unfair surprise; in general, a contract will be found unconscionable if it is grossly one-sided. *See* DAN B. DOBBS, 2 LAW OF REMEDIES 703, 706 (2d ed.1993); *see also* RESTATEMENT (SECOND) OF CONTRACTSS § 208, cmt. a (1979) ("The determination that a contract or term is or is not unconscionable is made in the light of its setting, purpose, and effect. Relevant factors include weaknesses in the contracting process like those involved in more specific rules as to contractual capacity, fraud, and other invalidating causes; the policy also overlaps with rules which render particular **\*349** bargains or terms unenforceable on grounds of public policy."). Although not subject to precise doctrinal definition, *see Sw. Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 498 (Tex.1991) (GONZALEZ, J., concurring), unconscionability— as delineated by the above principles—has been recognized and applied by this Court for well over a century. *See, e.g., Flanagan v. Pearson,* 61 Tex. 302, 307 (1884); *Fowler v. Stoneum,* 11 Tex. 478, 493 (1854); *Hemming v. Zimmerschitte,* 4 Tex. 159, 166 (1849); *Luckett v. Townsend,* 3 Tex. 119, 131 (1848).

**[20]   [21]**   Whether a contract is contrary to public policy or unconscionable at the time it is formed is a question of law. *Hoover Slovacek LLP v. Walton,* 206 S.W.3d 557, 562 (Tex.2006). Because a trial court has no discretion to determine what the law is or apply the law incorrectly,

its clear failure to properly analyze or apply the law of unconscionability constitutes an abuse of discretion. *See Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

### B. Arbitration and Statutory Rights

**[22]  [23]  [24]**  An arbitration agreement covering statutory claims is valid so long as the arbitration agreement does not waive the substantive rights and remedies the statute affords and the arbitration procedures are fair, such that the employee may "effectively vindicate his statutory rights." *In re Halliburton,* 80 S.W.3d at 572. Federal courts, analyzing the enforceability of arbitration provisions relating to federal statutory claims, have noted that such contracts are not enforceable when a party is forced to "forgo the substantive rights afforded by the statute," as opposed to merely "submit[ting] to resolution in an arbitral, rather than a judicial, forum." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). In the context of federal claims, either an expression of federal intent to exclude certain categories of claims from arbitration, *see Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), or the excessive waiver of statutory rights, *see Mitsubishi,* 473 U.S. at 628, 105 S.Ct. 3346, may render a particular dispute un-arbitrable. State courts, bound by the FAA under the supremacy clause, have more limited power, as the FAA preempts state laws that specifically disfavor arbitration. *Perry,* 482 U.S. at 492 n. 9, 107 S.Ct. 2520; *see Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 271 (Tex.1992) (holding that the FAA preempts state statutes to the extent they are inconsistent with the FAA's purpose to require courts to compel arbitration when the parties have so provided in their contracts).

**[25]**  However, where a particular waiver of substantive remedies or other provision of a contract is unconscionable—independent of the agreement to arbitrate—it will be unenforceable even though included in an agreement to arbitrate. *See Gilmer,* 500 U.S. at 33, 111 S.Ct. 1647 ("[A]rbitration agreements are enforceable, 'save upon such grounds as exist at law or in equity for the revocation of any contract.' ") (quoting 9 U.S.C. § 2). To determine the permissibility of restrictions on a particular worker's access to statutory rights, we analyze the provisions of the actual statute at issue; thus, to analyze the enforceability of the various restrictions and waivers in the employment contract at issue in this case, we turn to the retaliatory-discharge provisions of the Texas Workers' Compensation Act, TEX. LAB.CODE §§ 451.001–.003.

### C. Purpose and Structure of the Texas Workers' Compensation Act's Anti–Retaliation Provisions

**[26]  [27]  [28]**  The Texas Workers' Compensation Act was enacted to protect Texas **\*350** workers and employees. *Fid. & Cas. Co. of N.Y. v. McLaughlin,* 134 Tex. 613, 135 S.W.2d 955,

956 (1940). The Texas Legislature enacted the original Workers' Compensation Act in 1913 in response to the needs of workers who, despite a growing incidence of industrial accidents, were increasingly being denied recovery. *Kroger Co. v. Keng,* 23 S.W.3d 347, 350 (Tex.2000); *Tex. Workers' Compensation Comm'n v. Garcia,* 893 S.W.2d 504, 510 (Tex.1995). In order to ensure compensation for injured employees while protecting employers from the costs of litigation, the Legislature provided a mechanism by which workers could recover from subscribing employers without regard to the workers' own negligence, *see Kroger,* 23 S.W.3d at 351, while limiting the employers' exposure to uncertain, possibly high damage awards permitted under the common law, *see Reed Tool Co. v. Copelin,* 689 S.W.2d 404, 407 (Tex.1985). In light of the purposes of the Workers' Compensation Act as a whole, "[i]t is the settled policy of this State to construe liberally the provisions of the ... [l]aw, in order to effectuate the purposes for which it was enacted." *Huffman v. S. Underwriters,* 133 Tex. 354, 128 S.W.2d 4, 6 (1939) (citations omitted). As we have recently noted, "[b]ecause we should liberally construe the Workers' Compensation Act in favor of the injured worker, a strained or narrow construction of [the Act] would be improper. Moreover, it would be injudicious to construe the statute in a manner that supplies by implication restrictions on an employee's rights that are not found in ... [the] plain language." *Kroger,* 23 S.W.3d at 349.

**[29]  [30]**    The Texas Workers' Compensation Act provides that a subscriber to the workers' compensation system may not "discharge or in any other manner discriminate against an employee because the employee has ... filed a workers' compensation claim in good faith." TEX. LAB.CODE § 451.001–.001(1). The Legislature's purpose in enacting section 451.001 was to protect persons entitled to benefits under the Act and to prevent them from being discharged for seeking to collect those benefits. *See Tex. Steel Co. v. Douglas,* 533 S.W.2d 111, 115 (Tex.Civ.App.-Fort Worth 1976, writ ref'd n.r.e.). Since recovery of benefits under the Workers' Compensation Act is the exclusive remedy available to injured employees of subscribing employers, *see* TEX. LAB.CODE § 408.001(a), the availability of remedies for retaliatory discharge protects employees' exercise of their statutory rights to compensation under the Act. *See Padilla v. Carrier Air Conditioning,* 67 F.Supp.2d 650, 664 (E.D.Tex.1999); *Mid–South Bottling Co. v. Cigainero,* 799 S.W.2d 385, 389 (Tex.App.-Texarkana 1990, writ denied). In accordance with these principles, the anti-retaliation provisions of the Act must protect employees even before they have actually filed a claim, because otherwise "the law would be completely useless and would not accomplish the purpose for which it was enacted.... [A]ll the employer would have to do in order to avoid the consequences of the statute would be to fire the injured workman before he filed the claim." *Tex. Steel Co.,* 533 S.W.2d at 115.

**[31]**    "The decisions of this State do not look with favor upon contracts waiving rights arising under the Workmen's Compensation Law." *Huffman,* 128 S.W.2d at 6. Such waivers affect not only the individual employee subject to the waiver, but also the public, which bears the cost of the workers' compensation program. *See Holt v. Cont'l Group, Inc.,* 708 F.2d 87, 91 (2d Cir.1983) ("A retaliatory discharge carries with it the distinct risk that other employees may be deterred

from protecting their rights under the Act."). Therefore, we **\*351** have invalidated contracts that purport to relieve employers of their obligations under the Workers' Compensation Act. *See James v. Vernon Calhoun Packing Co.,* 498 S.W.2d 160, 162 (Tex.1973) (noting that "[w]e are much impressed with the idea that there is a large element of public interest in the administration of [the Workers' Compensation Act]"); *Hazelwood v. Mandrell Indus. Co.,* 596 S.W.2d 204, 206 (Tex.Civ.App.-Houston [1st Dist.] 1990, writ ref'd n.r.e.) ("If ... this balance [established by the Act] is tipped so that the employee's benefits under the statute are substantially reduced, the clear intent of the legislature is thwarted."). We have likewise held unenforceable contracts that explicitly relieve employers of tort liability, relying either on common law prohibitions against such contracts, *see Barnhart v. Kansas City M. & O. Ry. Co. of Tex.,* 107 Tex. 638, 184 S.W. 176, 179 (1916), or upon the Workers' Compensation Act, *see Petroleum Cas. Co. v. Smith,* 274 S.W.2d 150, 151 (Tex.Civ.App.-San Antonio 1954, writ ref'd) (noting that "[t]he right to workmen's compensation is statutory, and cannot be abridged by private agreements or special applications for employment"); *Clevenger v. Burgess,* 31 S.W.2d 675, 678 (Tex.Civ.App.-Beaumont 1930, writ ref'd); *Tex. Employers Ins. Ass'n v. Peppers,* 133 S.W.2d 165, 167 (Tex.Civ.App.-Galveston 1939, writ dism'd) ("[T]he courts will not enforce contracts which are either expressly or impliedly prohibited by the [Workers' Compensation] Act.").

This case concerns the validity of a subscribing employer's use of an agreement that, in the course of requiring arbitration between the parties in work-related disputes, imposes a series of procedural and substantive limits on the employee's rights. We must analyze the challenged limitations in light of the policies underlying the Workers' Compensation Act, and the purposes of its anti-retaliation provisions, to determine whether they improperly shift the cost of injury from a subscribing employer onto its employees in contravention of the Act's provisions. *Cf. Lawrence v. CDB Servs., Inc.,* 44 S.W.3d 544, 550 (Tex.2001) (noting that the agreements did not "shift the risk of on-the-job injuries to the employees"); *see also Gentry v. Superior Court,* 42 Cal.4th 443, 456, 64 Cal.Rptr.3d 773, 782, 165 P.3d 556 (2007), *cert. denied* 552 U.S. 1296, 128 S.Ct. 1743, 170 L.Ed.2d 541 (2008) (noting that under California law, when an employee is bound by a predispute arbitration agreement to adjudicate nonwaivable statutory employment rights, the arbitration agreement may not limit damages, discovery must be sufficient to arbitrate the claim, there must be a written arbitration decision, and the employer must pay all costs "unique to arbitration").

## V. The Challenged Arbitration Provisions

### A. Limitation of Remedies

**[32]** **[33]** The Workers' Compensation Act specifies that "[a] person who violates section 451.001 is liable for reasonable damages incurred by the employee as a result of the violation," and that "[a]n employee discharged in violation of section 451.001 is entitled to reinstatement in the former position of employment." TEX. LAB.CODE § 451.002(a)-(b). We have previously explained that "reasonable damages" are not limited to actual damages, *see Azar Nut Co. v. Caille,* 734 S.W.2d 667, 669 (Tex.1987), but may include future damages, as well as exemplary or punitive damages when it is shown that the employer acted with actual malice in retaliating against the employee for filing a workers' compensation claim. *See Cont'l Coffee Prods. v. Cazarez,* 937 S.W.2d 444, 454 (Tex.1996); **\*352** *Carnation Co. v. Borner,* 610 S.W.2d 450, 454–55 (Tex.1980). The arbitration agreement in this case eliminates two types of remedies available under the anti-retaliation provisions of the Workers' Compensation Act, prohibiting the arbitrator from ordering reinstatement or awarding punitive damages. *See* TEX. LAB.CODE § 451.002 (providing for reinstatement and an award of reasonable damages). Luna contends these limitations render the agreement unconscionable and unenforceable because they prevent him from effectively vindicating his statutory rights in arbitration, thus undercutting the basic assumptions of the FAA. *See Gilmer,* 500 U.S. at 28, 111 S.Ct. 1647 (noting that claims under other federal statutes are appropriate for arbitration so long as the litigant can effectively vindicate any statutory rights). The court of appeals agreed with Luna. 175 S.W.3d at 323–24. Although it noted other courts' decisions upholding punitive-damages waivers, *id.* at 323, and further noted that preclusion of statutory remedies may not always portend unconscionability, *id.,* the court held that the preclusion of remedies here interfered with Luna's ability to bring his retaliatory-discharge claim under the Workers' Compensation Act and thus weighed toward the contract's unconscionability, *id.*

Poly–America argues that the court of appeals' decision conflicts with *Pony Express Courier Corp. v. Morris,* 921 S.W.2d 817, 822 (Tex.App.-San Antonio 1996, no writ), and decisions of other courts indicating that limitations of remedies are permissible, *e.g., Inv. Partners v. Glamour Shots Licensing, Inc.,* 298 F.3d 314, 318 n. 1 (5th Cir.2002). Because we view the anti-retaliation provisions of the Workers' Compensation Act as a non-waivable legislative system for deterrence necessary to the nondiscriminatory and effective operation of the Texas Workers' Compensation system as a whole, we agree with Luna that the provisions eliminating key remedies under the statute are unenforceable.

**[34]** An arbitration agreement covering statutory claims is valid so long as "the arbitration agreement does not waive substantive rights and remedies of the statute and the arbitration procedures are fair so that the employee may effectively vindicate his statutory rights." *In re Halliburton,* 80 S.W.3d at 572. " '[B]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.' " *Gilmer,* 500 U.S. at 26, 111 S.Ct. 1647 (quoting *Mitsubishi,* 473 U.S. at 628, 105 S.Ct. 3346). In this case, Luna contends Poly–America acted with actual malice in unlawfully discharging him, a claim for which the Workers' Compensation

Act allows punitive damages. *See* TEX. LAB.CODE § 451.002; *Azar Nut Co.,* 734 S.W.2d at 668. Permitting an employer to contractually absolve itself of this statutory remedy would undermine the deterrent purpose of the Workers' Compensation Act's anti-retaliation provisions. In creating the Texas Workers' Compensation Act, the Legislature carefully balanced competing interests— of employees subject to the risk of injury, employers, and insurance carriers—in an attempt to design a viable compensation system, all within constitutional limitations. *See Garcia,* 893 S.W.2d at 521. Were we to endorse Poly–America's position and permit enforcement of these remedy limitations, a subscribing employer could avoid the Act's penalties by conditioning employment upon waiver of the very provisions designed to protect employees who have been the subject of wrongful retaliation.

Our decision in *Lawrence,* 44 S.W.3d 544, is fully consistent with this view. There, employees of a non-subscribing employer **\*353** elected, after they were hired, to participate in an employer benefit plan that would provide injured employees with specified benefits in lieu of common law remedies. *Id.* at 545–46. We refused to void the agreement on public-policy grounds, discerning "no clear legislative intent to prohibit agreements such as those presented." *Id.* at 545. We emphasized that participation in the workers' compensation program is voluntary for employers in Texas, and that courts are ill equipped to weigh whether a non-subscribing employer's particular benefits plan would undermine the purposes of the Workers' Compensation Act. *See id.* at 551– 53.[2] Our decision was specifically tailored to *non-subscribing* employers who elected *not* to participate in the workers' compensation program. Importantly, we distinguished cases involving contracts imposed as a condition of employment, emphasizing that "[t]he distinction between an employment contract that requires a prospective employee, as a condition of the receipt or retention of employment, to agree to limit the employer's liability ... and a voluntary occupational insurance program, in which the employee has the option to enroll ... is decisive." *Lawrence,* 44 S.W.3d at 550 (quoting *Brito v. Intex Aviation Servs., Inc.,* 879 F.Supp. 650, 654 (N.D.Tex.1995)) (citing *Clevenger,* 31 S.W.2d at 678; *Barnhart,* 184 S.W. at 176)).

This case presents just such a liability-limiting provision, imposed as a condition of employment, which we suggested in *Lawrence* would violate public policy. *See id.* Such waivers would allow subscribing employers to enjoy the Act's limited-liability benefits while exposing workers to exactly the sort of costs—of injuries paid for by the employee for fear of retribution for making a claim—that the Act is specifically designed to shift onto the employer. The balance established by the Act is thus "tipped so that the employee's benefits under the statute are substantially reduced, [and] the clear intent of the legislature is thwarted." *Hazelwood,* 596 S.W.2d at 206. As we have previously refused to enforce private agreements that allow subscribing employers to reap the system's benefits while burdening employees with the cost of injury, so too we find the provisions of the present contract—which substantively limit Poly–America's liability for wrongful retaliation and thereby undermine the deterrent regime the Legislature specifically

designed to protect Texas workers—void under Texas law. *See Tex. Steel,* 533 S.W.2d at 115; *Holt,* 708 F.2d at 91.

## B. Fee–Splitting Provision

The arbitration agreements provide that, in the event of a claim, all fees related to arbitration—including but not limited to mediation fees, the arbitrators' fees, costs of procuring a location for a hearing, and court reporter fees—will be split equally between the employer and the employee, with the employee's contribution capped at an amount equal to "the gross compensation earned by the Employee in Employee's highest earning month in the twelve months prior to the time the arbitrator issues his award." The court of appeals held that this provision "weigh[ed] heavily toward a finding of substantive unconscionability." 175 S.W.3d at 322. Poly–America argues that this was clear error: first, because the court of appeals improperly inferred that Luna could not afford likely arbitration costs based solely on subjective evidence and, second, because it failed to compare such costs to the **\*354** expected costs of litigation. [3] Luna responds that it was Poly–America that failed to present evidence of the comparative cost of litigation and that the evidence presented was sufficient to allow an objective determination that the likely costs of arbitration were beyond Luna's financial means. We begin with the evidentiary challenge.

## 1. Evidentiary Challenge

 [35]    [36]   Poly–America claims that the court of appeals, by crediting Luna's factual allegations concerning his financial inability to share arbitration costs, improperly applied a new evidentiary standard that will require all parties seeking to compel arbitration to engage in expensive discovery whenever a resisting party submits cursory and subjective evidence that arbitration costs are "unaffordable." This evidentiary burden, Poly–America argues, is contrary to Texas law and policy that supports summary disposition of motions to compel arbitration. In response, Luna contends the facts upon which the court of appeals relied could have been controverted by affidavit or cross-examination, which Poly–America failed to do; consequently, the court of appeals based its ruling on the undisputed facts established by Luna's affidavits. Both parties cite *Anglin,* 842 S.W.2d at 269, to support their respective positions. There, we defined the proper circumstances under which a trial court should hold a full evidentiary hearing on a motion to compel arbitration:

> Because the main benefits of arbitration lie in expedited and less expensive disposition of a dispute, and the legislature has mandated that a motion to compel arbitration be decided summarily, we think it unlikely that the legislature intended the issue to be resolved following a full evidentiary hearing in all cases. We also envision that the hearing at which a motion to compel arbitration

is decided would ordinarily involve application of the terms of the arbitration agreement to undisputed facts, amenable to proof by affidavit. With these considerations in mind, we hold that the trial court may summarily decide whether to compel arbitration on the basis of affidavits, pleadings, discovery, and stipulations. However, if the material facts necessary to determine the issue are controverted, by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts.

*Id.* Because the only facts Luna presented on the motion to compel were uncontroverted under this standard—Luna's affidavits accompanying his original petition were neither contradicted nor challenged in Poly–America's response—we believe the court of appeals acted properly in crediting those facts on appeal.

Luna attached to his original petition his own affidavit and that of an expert witness providing detailed estimates of the likely cost of arbitration in Luna's case, and Luna's expected share under the agreement's capped fee-splitting provision based on his monthly salary (approximately $3,300.00) as a Poly–America supervisor. Luna described his anticipated share of the arbitration costs as "way more money than I can afford," and averred that, if he **\*355** had to pay such an amount to have his claim determined, he would be unable to pursue his claim against the company unless he could find an attorney willing to pay those fees. Luna recounted that he had attempted to retain two attorneys, but they had refused to represent him on a contingent-fee basis because of the arbitration agreement.

Poly–America did not dispute these facts but asserted legal arguments in its pleadings that the cost provisions, as written or as applied, were not unconscionable under Texas law. At the hearing on its motion to compel, Poly–America again asserted only legal arguments in response to Luna's challenge to the cost-splitting provision. There is no indication in the record that the trial court discredited or otherwise viewed the facts recited in Luna's affidavits as insufficient; rather, on the basis of Poly–America's legal arguments, the trial court granted the motion to compel. This disposition was consistent with our statements in *Anglin* in which we indicated that motions to compel should be decided summarily unless disputed issues of fact require a full evidentiary hearing. *See id.*

However, the court of appeals clearly differed from the trial court in its view of the law. It held that the trial court's granting of the motion to compel—in light of Luna's averred inability to afford his likely arbitration costs and the agreement's other limitations—was an abuse of discretion. 175 S.W.3d at 318–20. In doing so, the court of appeals properly credited the undisputed facts contained in Luna's affidavits as to the total expected cost of arbitration and Luna's anticipated share based upon his pre-termination monthly income. *Id.* at 319–20. Poly–America contends the court of appeals improperly ruled based on Luna's subjective, and thus practically incontrovertible,

belief that he could not afford arbitration, which does not satisfy this Court's requirements of "specific" evidence to support claims of unconscionably expensive arbitration. *See In re U.S. Home Corp.,* 236 S.W.3d 761, 764 (Tex.2007). However, the court of appeals relied not solely upon Luna's belief but upon his and his expert's specific monetary estimates, which provided objective support for Luna's uncontroverted claim that arbitration costs would preclude his pursuit of the lawsuit. *See* 175 S.W.3d at 319. The court of appeals did not, therefore, rely solely on subjective and incontrovertible allegations.

## 2. Unconscionability of Fee–Splitting Provisions

Poly–America alternatively challenges the court of appeals' conclusion that the agreement's cost-allocation provisions favor a finding of unconscionability because the court did not consider the relative costs that Luna would likely incur if the case were litigated in court—costs that, based on Poly–America's estimates, would greatly exceed the capped cost of arbitration—and Luna failed to provide any evidence of the actual cost of arbitration that he would bear. Although we have no doubt that some fee-splitting provisions may operate to discourage employees like Luna from seeking vindication of their rights under the Workers' Compensation Act, we must agree with Poly–America that the trial court did not abuse its discretion in ordering arbitration in this case.

Courts across the country have universally condemned the use of fee-splitting agreements in employment contracts that have the effect of deterring potential litigants from vindicating their statutory rights in an arbitral forum. *See Green Tree,* 531 U.S. at 90–91, 121 S.Ct. 513. Some courts have gone so far as to find fee-sharing agreements unenforceable *per se. See, e.g., Cole v. Burns Int'l Sec.* **\*356** *Servs.,* 105 F.3d 1465, 1483–85 (D.C.Cir.1995), *cited in Halliburton,* 80 S.W.3d at 572; *Shankle v. B–G Maint. Mgmt. of Colo., Inc.,* 163 F.3d 1230, 1233–35 (10th Cir.1999); *Paladino v. Avnet Computer Techs., Inc.,* 134 F.3d 1054, 1062 (11th Cir.1998). These courts reason that "an employee can never be required, as a condition of employment, to pay an arbitrator's compensation in order to secure the resolution of statutory claims.... [T]his would surely deter the bringing of arbitration and constitute a *de facto* forfeiture of statutory rights." *Cole,* 105 F.3d at 1468; *accord Shankle,* 163 F.3d at 1235 ("Such a result clearly undermines the remedial and deterrent functions of ... anti-discrimination laws.").

 [37]    [38]   We agree that fee-splitting provisions that operate to prohibit an employee from fully and effectively vindicating statutory rights are not enforceable. *See Halliburton,* 80 S.W.3d at 572. However, this Court joins the majority of other courts which—though recognizing the same policy concerns articulated by courts holding fee-splitting arrangements *per se* unconscionable—require *some evidence* that a complaining party will likely incur arbitration costs in such an amount as to deter enforcement of statutory rights in the arbitral forum. *See U.S. Home Corp.,* 236 S.W.3d at 764; *FirstMerit Bank,* 52 S.W.3d at 756–57. As federal courts have likewise recognized:

> [I]n some cases, the potential of incurring large arbitration costs and fees will deter potential litigants from seeking to vindicate their rights in the arbitral forum.... [I]f the fees and costs of the arbitral forum deter potential litigants, then that forum is clearly not an effective, or even adequate, substitute for the judicial forum.... [T]he burden of demonstrating that incurring such costs is likely under a given set of circumstances rests, at least initially, with the party opposing arbitration.

*Morrison v. Circuit City Stores, Inc.,* 317 F.3d 646, 659–60 (6th Cir.2003); *accord Bradford v. Rockwell Semiconductor Sys., Inc.,* 238 F.3d 549, 556 (4th Cir.2001); *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 170 F.3d 1, 16 (1st Cir.1999).

 **[39]** Luna contends the magnitude of the fee he could incur under the arbitration agreement, which he estimates to be as high as $3,300, will prevent him from pursuing his claim. Poly–America counters that litigation costs would be much higher, and therefore the arbitration agreement's capped cost-splitting provision benefits the employee and cannot be unconscionable. It is true that in evaluating the enforceability of fee-splitting provisions, some courts take into account the relative costs of arbitration versus litigation. *See, e.g., Bradford,* 238 F.3d at 556 n. 5 (focusing upon "a claimant's expected or actual arbitration costs and his ability to pay those costs, measured against a baseline of the claimant's expected costs for litigation and his ability to pay those costs"). However, at this stage of the proceedings, much of this evidence is necessarily speculative, and thus counsels against a court's *ex ante* interference with arbitration.

We do not doubt that arbitration costs might be so high in a given case as to preclude access to the forum. But "the 'risk' that [a claimant] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." *Green Tree,* 531 U.S. at 91, 121 S.Ct. 513. Luna has not demonstrated that the ability to pursue his claim in the arbitral forum hinges upon his payment of the estimated costs; to the contrary, depending upon the circumstances, Luna may not have to bear any cost at all, and **\*357** Poly–America has presented some evidence that the capped cost-splitting arrangement may even benefit Luna. The fee-splitting provision in Luna's arbitration agreement caps his share of costs at "the gross compensation earned by Employee in Employee's highest earning month in the *twelve months prior to the time the arbitrator issues his award.*" (Emphasis added). Luna, however, presented evidence of his "highest monthly salary *in the year preceding [his] termination from the company,*" a period necessarily earlier than that relevant under the arbitration agreement. The record contains no fact-based estimation of Luna's wages in the relevant time period and, thus, no evidence of his likely share of arbitration costs.

Just as we allow litigants who demonstrate an inability to pay costs to proceed with their claims in court, however, we see nothing that would prevent arbitrators from fairly adjusting employee cost provisions when necessary to allow full vindication of statutory rights in the arbitral forum. *See*

TEX.R. CIV. P. 145. The contract presented in this case specifically provides that the arbitrator may modify unconscionable terms; if the cost provisions precluded Luna's enforcement of his non-waivable statutory rights, they would surely be unconscionable for the reasons we have explained and the arbitrator would be free to modify them. The arbitrator is better situated to assess whether the cost provision in this case will hinder effective vindication of Luna's statutory rights and, if so, to modify the contract's terms accordingly. *See Halliburton,* 80 S.W.3d at 572. We conclude the trial court did not abuse its discretion in refusing to declare the contract's cost-splitting provision unconscionable and nullify the arbitration agreement.

## C. Discovery Limitations

 **[40]**   The 2002 agreement provides that each party may serve on the other a single set of twenty-five interrogatories (including sub-parts) and one set of twenty-five requests for production or inspection of documents or tangible things. Additionally, the agreement includes limitations alleged by Luna to be unconscionable: (1) a limitation of each party to a single, six-hour deposition; (2) a prohibition on requests for admission; (3) a ban on inquiry into Poly–America's finances; and (4) a confidentiality provision requiring confidentiality of the parties and their attorneys regarding all aspects of the arbitration. Luna contends these limitations make it virtually impossible for him to prove his claim of retaliatory discharge and render the arbitration agreement unconscionable.

Although an issue of first impression in this Court, several courts around the country have analyzed the enforceability of similar arbitration provisions limiting parties' access to various forms of discovery. Applying a rule functionally equivalent to that used to analyze fee-splitting provisions, these courts refuse to enforce such limitations when adequate evidence is presented that a plaintiff's ability to present his or her claims in an arbitral forum is thereby hindered. *See, e.g., Hulett v. Capitol Auto Group, Inc.,* No. 07–6151–AA, 2007 WL 3232283, at *4–*5 (D.Or. Oct.29, 2007) (holding discovery restrictions that prohibited requests for admission or interrogatories and limited parties to three depositions unconscionable because they "serve to unreasonably withhold information from plaintiff that would otherwise be available through discovery, thus hindering her ability to present her claims in an arbitration forum"); *accord Ostroff v. Alterra Healthcare Corp.,* 433 F.Supp.2d 538, 547 (E.D.Pa.2006). Courts upholding arbitration provisions containing discovery limitations have done so in recognition of the same principle, but determined that a particular **\*358**  party failed to provide adequate evidence that the provisions "prove insufficient to allow ... claimants ... a fair opportunity to present their claims." *Gilmer,* 500 U.S. at 31, 111 S.Ct. 1647; *see, e.g., In re Cotton Yarn Antitrust Litig.,* 505 F.3d 274, 286–87 (4th Cir.2007); *Amisil Holdings, Ltd. v. Clarium Capital Mgmt.,* No. C06–05255MJJ, 2007 WL 2768995, at *4 (N.D.Cal. Sept.20, 2007) ("[Claimant] has not adequately demonstrated why arbitration under the AAA rules would deny it a fair opportunity to present its claims.").

**[41]** **[42]** We agree with these courts that, where the underlying substantive right is not waivable, *ex ante* limitations on discovery that unreasonably impede effective prosecution of such rights are likewise unenforceable. However, because the relevant inquiry depends upon the facts presented in a given case and the particular discovery limitations' effect upon the relevant statutory regime, we are doubtful that courts—assessing claims and discovery limitations before arbitration begins—are in the best position to accurately determine which limits on discovery will have such impermissible effect.

In this case, Luna's expert witness testified that in most employment-discharge cases the employer only needs to take the plaintiff's deposition, while the plaintiff generally needs testimony from a number of witnesses to disprove the employer's likely defense that termination was based on poor performance. Additionally, the expert stated, the employee will likely wish to depose additional witnesses to show a pattern or practice of discrimination, whereas the employer typically has a ready pool of available employees and managers to assist in preparing for the arbitration. For these reasons, the expert concluded, the arbitration agreement's discovery limitations "significantly reduce the plaintiff's ability to prevail in arbitration, regardless of how strong a plaintiff's case is on the merits."

We agree that if the discovery limitations the arbitration agreement imposes operate to prevent effective presentation of Luna's claim they would be unenforceable. But at this point in the proceedings, without knowing what the particular claims and defenses—and the evidence needed to prove them—will be, discerning the discovery limitations' potential preclusive effect is largely speculative. The assessment of particular discovery needs in a given case and, in turn, the enforceability of limitations thereon, is a determination we believe best suited to the arbitrator as the case unfolds. As with cost-sharing, discovery limitations that prevent vindication of non-waivable rights or "prove insufficient to allow [Luna] a fair opportunity to present [his] claims," *Gilmer,* 500 U.S. at 31, 111 S.Ct. 1647, would be unconscionable and thus not binding on the arbitrator, as the agreement in this case specifically acknowledges. At this point in the proceedings, though, we cannot conclude that the evidence presented to the trial court compelled a finding that the discovery limitations were *per se* unconscionable. Thus, the trial court did not abuse its discretion.

### D. Prohibition on Inquiry into "Good Cause"

**[43]** Luna claims the arbitration provision that prohibits the arbitrator's ability "to apply a 'just cause' or 'good cause' standard to claims relating to Employee's claims concerning his employment or separation therefrom" is substantively unconscionable because it prohibits, in a retaliatory-discharge case, inquiry into whether the employer had a valid, nondiscriminatory reason for firing the employee. Poly–America contends the contract cannot be read as Luna

claims, and in fact does not **\*359** prevent such an inquiry. We agree with Poly–America, and with the court of appeals, that this prohibition does not operate as Luna asserts; rather, the prohibition simply emphasizes that the contract relates to at-will employment. *See Montgomery County Hosp. Dist. v. Brown,* 965 S.W.2d 501, 502 (Tex.1998). Thus, the prohibition prevents the arbitrator from substituting a "good cause" requirement for the "at will" standard. The provision does not, however, prohibit inquiry into whether Poly–America improperly terminated Luna in retaliation for his filing of a workers' compensation claim. Because we read the provision merely to articulate an accepted rule of employment contracts, and not to restrict a necessary inquiry into the motivations behind Poly–America's termination of Luna in this case, we agree with the court of appeals that the provision is not unconscionable. *See In re Palm Harbor Homes, Inc.,* 195 S.W.3d 672, 678 (Tex.2006) (rejecting a claim that an arbitration provision was substantively unconscionable where the challenged provision "effectively incorporate[d] established provisions of contract law").

### E. One–Year Limitations Period

The arbitration agreement includes a clause that requires written notice of a claim to be filed within a maximum of one year from the events giving rise to an arbitrable claim. Luna contends this provision unconscionably shortens the two-year statute of limitations applicable to claims of retaliatory discharge. *See Johnson & Johnson Med., Inc. v. Sanchez,* 924 S.W.2d 925, 927 (Tex.1996). However, as Luna filed this case well within the one-year period and thus suffered no prejudice from this provision, it is immaterial to Luna's claims of substantive unconscionability.

### F. Lifetime Application

Finally, Luna argues that the arbitration agreement unconscionably applies even to claims that may arise after Luna's employment with Poly–America has ended and which may have nothing to do with Luna's employment. While we can imagine circumstances that might present a closer question, Luna's claims here concern his employment and termination, the central focus of the agreement. We thus agree with the court of appeals that this provision does not render the arbitration agreement *per se* unconscionable. *See* 175 S.W.3d at 326.

### VI. Severability

 **[44]**   The arbitration agreement in this case contains a severability clause, which provides as follows:

> Should any term of this Agreement be declared illegal, unenforceable, or unconscionable, the remaining terms of the Agreement shall remain in full force and effect. To the extent possible, both Employee and Company desire that the Arbitrator modify the term(s) declared to be illegal, unenforceable, or unconscionable in such a way as to retain the intended meaning of the term(s) as closely as possible.

Poly–America argues that, even if elements of its arbitration agreement with Luna are unconscionable, arbitration is nevertheless required because the unconscionable provisions are severable from the general agreement to arbitrate.[4] Luna **\*360** contends the unconscionable provisions are integral to the entire contract and are therefore not severable. The court of appeals agreed with Luna, stating that the fee-splitting and remedies-limitation provisions "together deprive Luna of his opportunity to vindicate his claim in the arbitral forum" and concluding that "those provisions are integral to the purpose of the agreement and cannot be severed." 175 S.W.3d at 328. The court of appeals came to this conclusion, it appears, by identifying the fee-splitting and remedies-limitation provisions as weighing in favor of unconscionability "as a whole," but the court did not identify any particular provision that, by itself, would defeat the agreement's purpose. *See id.* at 322, 324. We have determined, however, that the remedies-limitation provisions are individually unconscionable and void, and see no reason why they cannot be easily excised from the contract without defeating its underlying purpose.

 **[45]** **[46]** **[47]** An illegal or unconscionable provision of a contract may generally be severed so long as it does not constitute the essential purpose of the agreement. *See Williams v. Williams,* 569 S.W.2d 867, 871 (Tex.1978); *see also Hoover Slovacek,* 206 S.W.3d at 565 (citing RESTATEMENT (SECOND) OF CONTRACTS § 208 (1981)). Whether or not the invalidity of a particular provision affects the rest of the contract depends upon whether the remaining provisions are independent or mutually dependent promises, which courts determine by looking to the language of the contract itself. *See John R. Ray & Sons, Inc. v. Stroman,* 923 S.W.2d 80, 86 (Tex.App.-Houston [14th Dist.] 1996, writ denied) (citing *Hanks v. GAB Bus. Servs., Inc.,* 644 S.W.2d 707, 708 (Tex.1982)). The relevant inquiry is whether or not parties would have entered into the agreement absent the unenforceable provisions. *See Patrizi v. McAninch,* 153 Tex. 389, 269 S.W.2d 343, 348 (1954); *see also City of Beaumont v. Int'l Ass'n of Firefighters, Local Union No. 399,* 241 S.W.3d 208, 215 (Tex.App.-Beaumont 2007, no pet.) (citing *Rogers v. Wolfson,* 763 S.W.2d 922, 925 (Tex.App.-Dallas 1989, writ denied)); *Stroman,* 923 S.W.2d at 86 (citing *Frankiewicz v. Nat'l Comp. Assocs.,* 633 S.W.2d 505, 507–08 (Tex.1982)). We have previously allowed severance of illegal contract provisions where the invalid provisions were "only a part of the many reciprocal promises in the agreement" and "did not constitute the main or essential purpose of the agreement." *Williams,* 569 S.W.2d at 871.

The 2002 version of the arbitration agreement in this case is over five pages long and contains numerous provisions not challenged by Luna as imposing any unconscionable burdens: procedures for mediation, selection of a neutral arbitrator, filing of motions, and other general provisions governing arbitration procedures. We agree with Poly–America that the intent of the parties, as expressed by the severability clause, is that unconscionable provisions be excised where possible. Furthermore, it is clear by the contract's terms that the main purpose of the agreement is for the parties to submit their disputes to an arbitral forum rather than proceed in court. *See id.* Excising the unconscionable provisions we have identified will not defeat or undermine this purpose, which we have upheld in the context of agreements to arbitrate employment disputes. *See AdvancePCS,* 172 S.W.3d at 608; *EZ Pawn Corp.,* 934 S.W.2d at 90; *Cantella & Co.,* 924 S.W.2d at 944.

## VII. Conclusion

We hold invalid, as substantively unconscionable and void, provisions of the parties' **\*361** contract that prohibit the award of punitive damages or reinstatement and thus inhibit effective vindication of Luna's retaliatory-discharge claim in an arbitral forum. We further hold that the trial court did not abuse its discretion in allowing the arbitrator to determine whether the fee-splitting agreement and discovery limitations—as applied in the course of arbitration—are unconscionable. Because we find the invalid remedies-limitation provisions severable from the agreement to arbitrate, which we conclude is otherwise enforceable, the trial court did not abuse its discretion in compelling arbitration. Accordingly, we conditionally grant the writ of mandamus.

Justice BRISTER filed a dissenting opinion.

Justice WILLETT did not participate in the decision.

Justice BRISTER, dissenting.

The hard thing about granting mandamus relief is knowing when to stop. This Court has tried over the years to set mandamus boundaries through various tests, all of which soon generated exceptions, and most of which were met with objections that the "established" boundaries of mandamus were being ignored.

Only two years ago, we held in *In re Palacios* that mandamus review was available for "orders that *deny* arbitration, *but not* orders that *compel* it." [1] We noted that this was a reversal of previous practice, [2] but was necessitated by the Supreme Court's 2000 opinion in *Green Tree Financial Corp. v. Randolph,* which said that orders compelling arbitration "would not be appealable" unless they included final dismissal of the case. [3] Today the Court comes full circle, saying once again that

mandamus review of orders compelling arbitration is "proper," though courts should be "hesitant" about it. [4] Apparently, so long as one expresses qualms, *Palacios* is a dead letter.

Of course, firm rules governing mandamus are made to be broken, as issuance of the writ is primarily a matter of judgment and prudence. [5] As the United States Supreme Court said in 2004, mandamus is appropriate if a party shows a clear right, no alternative remedy, and that mandamus is "appropriate under the circumstances." [6] This test (especially the last prong) defies precise application, but years of judicial effort have failed to produce a better one. As a result, reasonable judges will sometimes **\*362** disagree whether mandamus is "prudent" or "appropriate under the circumstances," and sometimes decide differently in one case than the next. But departing from *Palacios* is neither prudent nor appropriate for at least five reasons.

First, Congress amended the Federal Arbitration Act in 1988 so that it "permits immediate appeal of orders *hostile* to arbitration, ... but bars appeal of interlocutory orders *favorable* to arbitration." [7] Texas law is to the same effect. [8] As the trial court's order here was favorable to arbitration, we should defer to the cost-benefit analysis already conducted by the federal and state legislatures. [9] We cannot simply substitute mandamus when interlocutory appeal is prohibited without running into serious Supremacy Clause problems; [10] "[f]requent pre-arbitration review would inevitably frustrate Congress's intent to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." [11]

Second, the trial court ordered these parties to arbitration five years ago. Had mandamus proceedings not intervened, this dispute would have long since been concluded. Surely the time and expense incurred arbitrating this case would have been less than that incurred in mandamus review. And now that mandamus review is concluded, the parties must go to arbitration anyway. Given our state's strong public policy favoring freedom of contract, [12] claims that a contract is unconscionable are asserted far more often than they are sustained. After today's decision, it is hard to see how any arbitration cannot be stopped in its tracks by alleging unconscionability.

Third, today's opinion is purely advisory; if an arbitrator ignores it, there is little we can do. Both federal and state law require courts to enforce an arbitrator's decision, no matter what it is, with very few exceptions. [13] The allowable exceptions concern extrinsic or procedural matters like corruption, fraud, or refusing to hear evidence; [14] they do not include (as the Supreme Court just held) disregarding the law, even if a legal error is "manifest." [15] What is the benefit of mandamus review if the resulting order can be ignored?

**\*363** Fourth, even if most arbitrators would comply with an appellate court's mandamus rulings, issuing them creates a hybrid procedure unknown to the arbitration acts. As already noted, those

statutes commit matters concerning the law and the merits to the arbitrators and foreclose judicial review of the details of the result. This also appears to violate the parties' agreement in this case, which authorized the arbitrator to address unconscionability:

> Should any term of this Agreement be declared illegal, unenforceable, or unconscionable, the remaining terms of the Agreement shall remain in full force and effect. To the extent possible, both Employee and Company desire that the Arbitrator modify the term(s) declared to be illegal, unenforceable, or unconscionable in such a way as to retain the intended meaning of the term(s) as closely as possible.

Telling the arbitrators in advance what legal rulings they should make (as the Court does today) is an improper way to circumvent these restrictions.

Fifth and finally, the Court decides an important question in the abstract that the arbitration may render moot. The Court concedes that unconscionability of the fee-splitting and discovery-limiting clauses should be deferred to the arbitrator. But unconscionability of the remedy-stripping clause is just as fact-based, and just as speculative until all the facts are arbitrated. The fairness of such clauses is not as one-sided as the Court suggests; many employees might actually *prefer* cash for lost wages (and no appellate delays) rather than reinstatement or a long shot at punitive damages. As the Court notes, several courts have held that such "limitations of remedies are permissible." [16] Twice in 2003 the Supreme Court declined to hold that a remedy-stripping arbitration clause violates the FAA—each time deferring the question until after arbitrators had addressed it. [17] We should do the same here.

We have never held (as the Court holds repeatedly today) that an arbitration agreement is invalid unless an employee can "effectively vindicate his statutory rights." [18] We did not say so in *In re Halliburton Co.* (as the Court's citations aver), where that phrase appears only in a parenthetical describing an opinion by an intermediate appellate court in Michigan, an opinion we neither approved nor adopted. [19] Nor does the Court's judgment comply with this new standard. Despite the remedy limits imposed here, an arbitrator could still award Johnny Luna 50 years of future lost wages, which would certainly seem to "effectively vindicate his statutory rights." Even more than the fee-splitting or discovery-limiting provisions, it is simply too early to tell whether the remedy-stripping provisions will be unfair to Luna at all.

Such an important and controversial question should not be decided in such an offhanded and abstract way. We should instead wait to see whether the arbitration **\*364** award makes such a decision necessary; "if it is not necessary to decide more, it is necessary not to decide more." [20]

The Court overlooks all these problems on the ground that mandamus "has been broadly applied" by federal courts to review orders compelling arbitration. [21] But the string citations that follow do not support that claim. Of the five cases cited, three predated *Green Tree,* [22] and a fourth did not involve a trial court order favorable to arbitration. [23] The single case granting mandamus relief from an order favorable to arbitration was by the Ninth Circuit, the court widely recognized as the "most hostile," [24] "far to the left of center," [25] and "renegade" court in the country in employment arbitration cases. [26] Even so, mandamus was granted in that case only because arbitrating the single class representative's case could moot the class action he had brought, wiping it out without appellate review. [27] In short, there is no "broad" consensus for doing precisely the opposite of what Congress and the Texas Legislature intended.

 **\*365** It is certainly true that leaving matters like unconscionability to arbitrators will mean development of the law is "substantially hindered," [28] but the same could be said of arbitration in *all* cases. It is hard to see the allure of a system in which decision-makers can ignore the law, unless of course one is planning to ignore the law oneself. Based on its popularity, few arbitrators apparently go that far. But even carefully selected judges and jurors make mistakes, and carefully selected arbitrators are surely no less fallible. Nevertheless, these are policy matters that only Congress can address or amend; we cannot disregard the express legislative limits on interlocutory review merely by calling it mandamus when we think the questions are important and the issues well-briefed.

While appeal from arbitration awards is very limited, that appeal is an adequate remedy unless the benefits of mandamus outweigh the costs. [29] Considering the costs expended so far, I doubt Johnny Luna would consider them outweighed by getting the right to seek reinstatement in arbitration (which employees rarely request) and punitive damages (which they rarely get). Accordingly, I agree with the Court that the court of appeals erred in reviewing and reversing the trial court's order compelling arbitration. But I disagree that we have any place reviewing those matters either. To that extent, I respectfully dissent.

**Parallel Citations**

156 Lab.Cas. P 60,669, 28 IER Cases 140, 51 Tex. Sup. Ct. J. 1237

Footnotes

1    While it is true that several of these cases pre-date the Supreme Court's decision in *Green Tree,* they do not pre-date the authority on which the Supreme Court relied in noting that an order compelling arbitration and staying rather than dismissing the underlying litigation "would not be *appealable.*" 531 U.S. at 87 n. 2, 121 S.Ct. 513 (citing 9 U.S.C. § 16(b)(1)) (emphasis added). Unlike the present case, the two cases in which the courts denied mandamus relief from compel-and-stay orders did not involve claims that enforcement of the arbitration provisions would prevent the plaintiffs from vindicating important statutory rights. *See Manion,* 255

F.3d 535; *McDermott Int'l, Inc.,* 981 F.2d 744. In *Douglas,* the Ninth Circuit granted mandamus relief, concluding that a choice-of-law provision in the arbitration agreement would not allow enforcement of the agreement under circumstances that the forum state would deem unconscionable. *Douglas,* 495 F.3d at 1068.

2   The Texas Legislature, exercising its policy-making role, responded immediately and outlawed such plans. *See* TEX. LAB.CODE § 406.033(e).

3   The Society for Human Resource Management Texas State Council submitted an *amicus* brief supporting Poly–America's arguments, arguing that the court of appeals wrongfully failed to compare Luna's alleged costs with the prospective cost of litigation. The Texas Trial Lawyers Association likewise submitted an *amicus* brief supporting Luna, arguing that unconscionability should be determined by comparing "the general financial condition of the claimant's peer group" to estimated arbitration costs.

4   The Court received briefs from *amici curiae* the Texas Association of Business and the Society for Human Resource Management Texas State Council, both of which argue that the court of appeals erred in refusing to sever the provisions it deemed unconscionable from the remainder of the arbitration agreement. The brief submitted by *amicus curiae* the Texas Trial Lawyers Association argues that such severance would be improper.

1   221 S.W.3d 564, 566 (Tex.2006) (emphasis added).

2   *Id.* at 565 (noting abrogation of *Freis v. Canales,* 877 S.W.2d 283, 284 (Tex.1994)).

3   531 U.S. 79, 87 n. 2, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000).

4   262 S.W.3d 337, 347.

5   *See, e.g., CSR Ltd. v. Link,* 925 S.W.2d 591, 597 (Tex.1996) ( "Because of the size and complexity of the asbestos litigation, the most *prudent* use of judicial resources in this case is to permit a preliminary resolution of the fundamental issue of personal jurisdiction by writ of mandamus.") (emphasis added); *In re Dean,* 527 F.3d 391, 396 (5th Cir.2008) ("The decision whether to grant mandamus is largely prudential."); *In re Atlantic Pipe Corp.,* 304 F.3d 135, 140 (1st Cir.2002) (concluding mandamus was "prudent under the circumstances"); *In re Chimenti,* 79 F.3d 534, 539 (6th Cir.1996) (noting availability of interlocutory appeal was merely one of several factors affecting court's "prudential considerations" regarding issuance of mandamus).

6   *Cheney v. U.S. Dist. Court for Dist. of Columbia,* 542 U.S. 367, 380–81, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004) (holding mandamus should issue when there is (1) no other adequate remedy, (2) a "clear and indisputable" right, and (3) "the writ is appropriate under the circumstances").

7   *Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 86, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000) (construing 9 U.S.C. § 16) (emphasis added).

8   *See* TEX. CIV. PRAC. & REM.CODE § 171.098; *In re Palacios,* 221 S.W.3d 564, 566 (Tex.2006).

9   *In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, ——, 2008 WL 4051053, at *1 (Tex.2008) ("Although mandamus review is generally a matter within our discretion, our place in a government of separated powers requires us to consider also the priorities of the other branches of Texas government.").

10   *See* U.S. CONST. art. VI, cl. 2 ("[T]he Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

11   *Perry Homes v. Cull,* 258 S.W.3d 580, 599 (Tex.2008) (quoting *Preston v. Ferrer,* 552 U.S. 346, ——, 128 S.Ct. 978, 169 L.Ed.2d 917 (2008) and *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 22, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)) (internal quotations omitted).

12   *Fairfield Ins. Co. v. Stephens Martin Paving, LP,* 246 S.W.3d 653, 664 (Tex.2008); *Fortis Benefits v. Cantu,* 234 S.W.3d 642, 649 (Tex.2007); *Lawrence v. CDB Servs., Inc.,* 44 S.W.3d 544, 553 (Tex.2001).

13   *See* 9 U.S.C. §§ 9–11; TEX. CIV. PRAC. & REM.CODE §§ 171.087–171.088, 171.091.

14   *Id.*

15   *Hall St. Assocs., L.L.C. v. Mattel, Inc.,* 552 U.S. 576, ——, 128 S.Ct. 1396, 1404, 170 L.Ed.2d 254 (2008).

16   262 S.W.3d at 352.

17   *See PacifiCare Health Sys., Inc. v. Book,* 538 U.S. 401, 406–07, 123 S.Ct. 1531, 155 L.Ed.2d 578 (2003) (holding that "since we do not know how the arbitrator will construe the remedial limitations" barring treble damages, "the proper course is to compel arbitration"); *Green Tree Fin. Corp. v. Bazzle,* 539 U.S. 444, 454, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003) (remanding for arbitrator to determine whether contracts prohibited class arbitration).

18   262 S.W.3d at 349, 352, 352, & 356.

19   80 S.W.3d 566, 572 (citing *Rembert v. Ryan's Family Steak Houses, Inc.,* 235 Mich.App. 118, 596 N.W.2d 208, 226 (1999)).

*PDK Labs. Inc. v. U.S. D.E.A.,* 362 F.3d 786, 799 (D.C.Cir.2004) (Roberts, J., concurring).

262 S.W.3d at 346.

*Georgiou v. Mobil Exploration & Prod. Servs., Inc. US,* 190 F.3d 538 (5th Cir.1999); *Cofab Inc. v. Phil. Joint Bd., Amalgamated Clothing & Textile Workers Union,* 141 F.3d 105 (3d Cir.1998); *McDermott Intern., Inc. v. Underwriters at Lloyds Subscribing to Memorandum of Ins. No. 104207,* 981 F.2d 744 (5th Cir.1993).

*Manion v. Nagin,* 255 F.3d 535, 540 (8th Cir.2001) (involving injunction to obtain salary payments pending arbitration); *see also Cofab,* 141 F.3d at 110 (involving temporary stay of motion to enforce arbitration award pending NLRB review of related matter).

*See* Adam Borstein, *Arbitrary Enforcement: When Arbitration Agreements Contain Unlawful Provisions,* 39 LOY. L.A.L.REV.. 1259, 1275 (2006) ("This combination of finding unconscionability and favoring public policy over enforcement of the FAA has made the Ninth Circuit more hostile towards unlawful arbitration provisions than any other federal circuit."); Michael G. McGuinness & Adam J. Karr, *California's "Unique" Approach to Arbitration: Why This Road Less Traveled Will Make All the Difference on the Issue of Preemption Under the Federal Arbitration Act,* 2005 J. DISP. RESOL. . 61, 91–92 (2005)("[T]he conclusion that California courts—and the Ninth Circuit—are imposing their own biases against arbitration is inescapable."); Steven M. Warshawsky, *Gilmer, the Contractual Exhaustion Doctrine, and Federal Statutory Employment Discrimination Claims,* 19 LAB. LAW. 285, 303 n. 180 (2004) ("The Ninth Circuit continues to be hostile to mandatory arbitration agreements."); Dennis R. Nolan, *Employment Arbitration After Circuit City,* 41 BRANDEIS L.J. 853, 890 (2003) ( "[D]espite Congress's broad endorsement of arbitration in the FAA and the Supreme Court's repeated confirmation of that policy, many judges (not all of them on the Ninth Circuit) remain deeply skeptical if not openly hostile."); *Hai Jiang, Do We Allow Contract Law to Administer Civil Rights Remedies? Casenote on Haskins v. Prudential Insurance Co.,* 2003 L.REV. MICH. ST. U. DET. C.L. 251, 260 (2003) ("The Ninth Circuit is the most hostile to arbitration of employment discrimination claims among the circuit courts....").

*See* Earl Greene III, Note, *Armendariz v. Foundation Health Psychcare Services, Inc.: The California Supreme Court Searches For a Middle Ground,* 1 J. AM. ARB. 105, 108–09 (2001) ("On a mandatory arbitration agreement enforcement continuum, the Ninth Circuit would be sitting far to the left of center as it seems to be more concerned with protecting the statutory rights of employees than toeing the line with the Supreme Court.").

*See* Jennifer LaFond, Notes, *The Private Enforcement of Public Laws in Armendariz v. Foundation Health Psychcare Servs.,* 29 PEPP. L.REV. . 401, 414 n. 127 (2002) ("The Ninth Circuit is the renegade circuit with respect to ... [whether] employees can be compelled to arbitrate statutory claims.").

*Douglas v. U.S. Dist. Court,* 495 F.3d 1062, 1068–69 (9th Cir.2007).

262 S.W.3d at 346.

*In re BP Products N. Am., Inc.,* 244 S.W.3d 840, 845 (Tex.2008); *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 136 (Tex.2004).

**End of Document**                           © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (3)

### Direct History (3)

🚩 1. In re Luna
175 S.W.3d 315 , Tex.App.-Hous. (1 Dist.) , Sep. 09, 2004 , rehearing overruled ( Nov 05, 2004 )

*Mandamus Granted by*

🚩 2. In re Poly-America, L.P. 👓
262 S.W.3d 337 , Tex. , Aug. 29, 2008

*AND Order Withdrawn by*

3. In re Luna
275 S.W.3d 537 , Tex.App.-Hous. (1 Dist.) , Sep. 03, 2008

2013 WL 3336874
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

*MEMORANDUM OPINION*
Court of Appeals of Texas,
Austin.

Liaquat Ali KHAN, Appellant
v.
Nizarali MEKNOJIYA, Appellee.

No. 03–11–00580–CV.  |  June 28, 2013.

From the District Court of Travis County, 200th Judicial District, No. D–1–GN–08–001931; Lora J. Livingston, Judge Presiding.

**Attorneys and Law Firms**

D. Todd Smith, Smith Law Group, P.C., Austin, TX, for Liaquat Ali Khan.

Timothy J. Herman, Howry Breen & Herman, L.L.P., Austin, TX, for Nizarali Meknojiya.

Before Chief Justice JONES, Justices GOODWIN and FIELD.

*MEMORANDUM OPINION*

SCOTT K. FIELD, Justice.

**\*1** Landlord Liaquat Ali Khan sued tenant Nizarali Meknojiya for breach of the parties' commercial lease. In the suit, Khan sought damages pursuant to the lease's holdover provision, contending that Meknojiya became a holdover tenant as a result of Khan's termination of the lease. Meknojiya moved for summary judgment on the sole ground that Khan's recovery under the holdover provision is barred as a matter of law because it represents an unenforceable penalty in the form of "double-rent." The trial court granted partial summary judgment in favor of Meknojiya, and following a bench trial only on attorney's fees, the court rendered a final judgment that Khan take nothing on his claims and that Meknojiya recover attorney's fees. Because we conclude that the holdover provision is not an unenforceable penalty, we reverse the trial court's judgment and remand the case for further proceedings.

## BACKGROUND

Khan owns commercial property located in Austin, Texas. In 1996, Khan and Meknojiya entered into a written lease agreement, and Meknojiya began operating a convenience store on the leased premises. The parties renegotiated their lease ("the lease") in March 2002. The renegotiated lease required Meknojiya to pay $4,500 per month in "base rent" and included the following paragraph, which the parties refer to as a "holdover provision":

> 2.07 *Holding Over.*If Tenant does not vacate the Leased Premises upon the expiration or earlier termination of the Lease, Tenant shall be a tenant at sufferance for the holdover period and all of the terms and provisions of this Lease shall be applicable during that period, except that Tenant shall pay Landlord (in addition to additional rent payable under this Lease and any other sums payable under this Lease) as base rental for the period of such holdover an amount equal to two times the base rent which would have been payable by Tenant had the holdover period been a part of the original terms of the Lease (without waiver of Landlord's right to recover damages as permitted by law).

According to Khan, Meknojiya committed a series of breaches following execution of the 2002 lease. For instance, Khan contends that Meknojiya (1) failed to obtain or renew required insurance, (2) failed to provide the required insurance documentation, and (3) permitted a corporation owned by other individuals to operate the convenience store without obtaining Khan's prior written consent. Khan notified Meknojiya in writing, through counsel, that Meknojiya was in default of the lease and that Khan was exercising his option to terminate the lease effective May 1, 2002. Nevertheless, despite additional notices of default, Meknojiya continued to occupy the premises and to pay $4,500 per month until January 2, 2007, the date the lease was set to have expired by its own terms.

Khan subsequently sued Meknojiya for breach of the lease, asserting that upon Meknojiya's breach of the lease and Khan's notification that the lease was terminated, Meknojiya occupied the property as a tenant at sufferance. *See ICM Mortg. Corp. v. Jacob,* 902 S.W.2d 527, 530 (Tex.App.-El Paso 1994, writ denied) (citing Restatement (First) of Property § 22 (1936)) ("A tenant at sufferance is a person who has been in lawful possession of property but who wrongfully remains as a holdover after his right to possession has expired."). Khan sought damages in an amount equal to the difference that Meknojiya actually paid during the alleged holdover period and the amount that Meknojiya was required to pay for the same time period under paragraph 2.07.

**\*2** Khan moved for partial summary judgment, asserting that he conclusively established all elements of his claim for breach of the lease. [1] Meknojiya filed a response and subsequently moved for summary judgment asserting that Khan's recovery was barred as a matter of law because the double-rent rate under paragraph 2.07 constitutes an unenforceable penalty. After conducting a hearing, the trial court granted Meknojiya's motion for summary judgment but denied Khan's motion. Following a bench trial on Meknojiya's remaining counterclaim for attorney's fees, the trial court rendered a final judgment incorporating the trial court's order granting summary judgment in favor of Meknojiya and ordering Khan to pay $60,191.71 in attorney's fees. [2] In three issues on appeal, Khan argues that the trial court erred in granting summary judgment in favor of Meknojiya and consequently, in awarding Meknojiya attorney's fees as the prevailing party.

## STANDARD OF REVIEW

We review a trial court's ruling on summary judgment de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). A moving party is entitled to summary judgment if (1) there are no genuine issues of material fact and (2) the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c). A party who moves for traditional summary judgment on another party's claim is entitled to summary judgment when he negates at least one essential element of that claim or conclusively establishes each element of an affirmative defense. *Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997). When reviewing the trial court's summary judgment ruling, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co.,* 164 S.W.3d at 661.

In part, Khan's arguments on appeal raise matters of contract construction. In construing a written agreement, we must ascertain and give effect to the parties' intentions as expressed in the agreement. *Frost Nat'l Bank v. L & F Distribs., Ltd.,* 165 S.W.3d 310, 311–12 (Tex.2005) (per curiam). We consider the agreement as a whole and attempt to harmonize and give effect to all provisions of the contract. *Id.* If the contract language can be given a certain or definite legal meaning, then the language is not ambiguous, and this Court will construe the contract as a matter of law. *SAS Inst., Inc. v. Breitenfeld,* 167 S.W.3d 840, 841 (Tex.2005) (quoting *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983)).

## DISCUSSION

Meknojiya moved for traditional summary judgment on the sole ground that the lease's holdover provision, calling for double rent, is an unenforceable liquidated-damages provision, i.e. a penalty.

This assertion by Meknojiya is an affirmative defense that he had the burden of pleading and proving. *See Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991). As a result, to be entitled to summary judgment, Meknojiya had to conclusively establish every element of this defense. *See Ryland Grp., Inc. v. Hood,* 924 S.W.2d 120, 121 (Tex.1996) (per curiam).

 **\*3** "The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained."*Phillips,* 820 S.W.2d at 788. Accordingly, a liquidated-damages provision is not enforceable if, in effect, it is a penalty. *See id.*("Whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law for the court to decide."). A liquidated-damages provision is enforceable only if a court finds that (1) the harm caused by the breach is incapable or difficult of estimation, and (2) the amount of liquidated damages called for is a reasonable forecast of just compensation.*Id.* Whether a liquidated-damages provision is an unenforceable penalty is a question of law for the court, although sometimes factual issues must be resolved before the court can decide the legal question. *Id.*

In his first and second issues on appeal, Khan argues that the trial court erred in granting Meknojiya's summary-judgment motion because Meknojiya failed to conclusively establish the essential elements of his affirmative defense of penalty. Specifically, Khan argues that, as a matter of law, paragraph 2.07 is not an unenforceable penalty provision because it is not a liquidated-damages provision at all. Instead, according to Khan, paragraph 2.07 simply sets forth the parties' agreed rental rate for any holdover period. Based on the unambiguous language of the lease, we agree.

Whether a contract term is a liquidated-damages provision is a question of law for the court. *Valence Operating Co.,* 164 S.W.3d. at 644. "The term 'liquidated damages' ordinarily refers to an acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach."*Flores v. Millennium Interests, Ltd.,* 185 S.W.3d 427, 431 (Tex.2005). Here, paragraph 2.07 sets an agreed-upon rental rate for situations in which the tenant has failed to surrender the leased premises upon expiration of the lease term or earlier termination by one of the parties. The provision itself describes the amount due during the holdover period as "base rental for the period of such holdover."Further, paragraph 2.07 states that payment of such rental amounts do not waive the landlord's right to recover "damages as permitted by law." In other words, based on the plain language of the lease, there is no indication that the parties intended the amounts owed under paragraph 2.07 as a means of forecasting damages in the event of a breach. And, while rent under paragraph 2.07 may, in certain circumstances, form the basis of measuring damages, it does not independently set a damages amount or attempt to calculate damages. Simply put, any amount owed under paragraph 2.07 does not equate to a stipulated measure of damages; rather, it is an agreed-upon rental amount that is due under particular circumstances.

Our conclusion that paragraph 2.07 of the lease is not a liquidated-damages provision, and therefore is not a penalty, is consistent with that of our sister court of appeals in Dallas in analyzing whether a similar clause operated as a penalty provision. *See Meridien Hotels, Inc. v. LHO Fin. P'ship I, L.P.,* 255 S.W.3d 807 (Tex.App.-Dallas 2008, no pet.). In *Meridien Hotels,* the landlord leased hotel space to the tenant under a lease that required the tenant to pay 1.5 times the base rental amount if the tenant remained in the space upon termination of the lease by one of the parties or the lease term's expiration.[3] *Id.* at 822.The landlord sent the tenant a notice of termination of the lease, but the tenant remained in the hotel space anyway. *Id.* at 814.The landlord eventually sued the tenant, seeking multiple types and amounts of damages, including $2,130,136 in holdover rent, plus prejudgment interest, all of which the trial court awarded. *Id.*

**\*4** The tenant appealed, claiming that the holdover rent provision was an unlawful penalty and that, as a result, the trial court erred in awarding pre-judgment interest on that amount. *Id.* at 822.Concluding that the holdover rental rate did not constitute a penalty, the court of appeals concluded that the provision "does not punish appellants; it instead requires that if appellants make the decision to hold over beyond the term of the lease, they must pay a higher rate for doing so. Appellants were on notice that [the landlord] considered the lease terminated, yet they chose to stay, having agreed in the lease to pay 1.5 times the usual rent for doing so."*Id.*

Likewise, in this case, paragraph 2.07 of the parties' lease agreement sets out in advance the rent to be paid should the tenant choose to remain on the premises after one of the parties terminates the lease or the lease expires by its own terms, creating a tenancy at sufferance. Upon expiration or termination of the lease, the tenant must decide whether to (1) leave the leased premises (assuming he is not forcibly removed) or (2) hold over under the lease as a tenant at sufferance and pay additional rent at the agreed holdover rate. Such additional rent is not a penalty; in fact, it does not represent liquidated damages at all. Rather, the additional rent is the agreed-to, bargained-for amount of rent due and owing in the event of a holdover.[4]

Because paragraph 2.07 of the parties' lease agreement is not a liquidated-damages provision, it cannot be an unenforceable penalty, as a matter of law. We therefore conclude that the trial court erred in granting summary judgment in favor of Meknojiya on this ground. In addition, because Meknojiya should not have prevailed on summary judgment, it follows that he was not entitled to attorney's fees. We sustain appellant's first and second issues on appeal.[5]

## CONCLUSION

Because we conclude that the trial court erred in granting summary judgment, we reverse the trial court's judgment and award of attorney's fees in favor of Meknojiya. We remand the case to the trial court for further proceedings consistent with this opinion.

## Footnotes

1    Khan also asked the trial court to render summary judgment that he was entitled to attorney's fees, but to reserve judgment on the amount of fees for a separate hearing.

2    Paragraph 13.03 of the lease states:

> *Attorney's Fees.*The prevailing party in any legal proceeding brought under or with a relation to this agreement shall be entitled to recover form the non-prevailing party, their reasonable attorney['s] fees, court costs and expenses, including but not limited to travel and witness costs.

3    Specifically, the lease at issue in *Meridien Hotels, Inc. v. LHO Financing Partnership I, L.P.,* contained the following provision:

> Any holding over by Tenant after the expiration or sooner termination of this Agreement shall be treated as a daily tenancy at sufferance at a rate equal to one and one-half (1.5) times the Rent and other charges herein provided (prorated on a daily basis).
>
> 255 S.W.3d 807, 822 (Tex.App.-Dallas 2008, no pet.)

4    Meknojiya relies on *Phillips v. Phillips,* 820 S.W.2d 785 (Tex.1991), for the proposition that a contractual provision in which one party agrees to pay the other some multiple of damages is an unenforceable penalty. *Phillips* is a classic illustration of a liquidated-damages provision that constitutes an unlawful penalty. In the midst of divorce proceedings, a husband and wife agreed to create a limited partnership rather than divide their substantial assets. *Id.* at 786–87.The agreement contained the following provision: "If the general partner breaches his trust hereunder, he shall pay to the limited partner as liquidated damages ten times the amount she loses as a result of such breaches of trust."*Id.* at 787.In other words, once actual damages were established for breach of the parties' contract, they would be multiplied by ten to reach the damages award. *Id.* at 789.The supreme court held that this provision was an unenforceable penalty provision, rather than an enforceable liquidated damages provision. *Id.*

> Meknojiya's reliance on *Phillips* in this case is misplaced. First, unlike paragraph 2.07, the provision at issue in *Phillips* was undisputedly a liquidated-damages provision. As previously discussed, paragraph 2.07 is not a liquidated-damages provision at all, but instead is a rental amount that is triggered if and when the lease expires or is terminated. Second, the liquidated-damages provision at issue in *Phillips* was an unenforceable penalty on its face because the amount awarded by the provision was computed by multiplying actual damages (once established).*See id.* at 789.Here, paragraph 2.07 does not require a separate determination of damages or the application of any multiplier to that amount. Thus, even if we were to conclude that paragraph 2.07 is a liquidated-damages provision, unlike the court in *Phillips* we could not conclude that it constitutes a penalty on its face.

5    In his third issue on appeal, Khan argues that, even if the double-rent rate set forth in paragraph 2.07 represents liquidated damages, Meknojiya failed to satisfy his burden to establish that it is an unenforceable penalty. Having sustained Khan's first and second issues on appeal, we do not address this issue. *See*Tex.R.App. P. 47.1.

**End of Document**          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (4)

### Direct History (4)

🚩 1.  Khan v. Meknojiya
2011 WL 11671835 , Tex.Dist. , May 11, 2011

*Reversed and Remanded by*

2.  Khan v. Meknojiya 🐎
2013 WL 3336874 , Tex.App.-Austin , June 28, 2013

---

🚩 3.  Khan v. Meknojiya
2011 WL 11671836 , Tex.Dist. , Aug. 10, 2011

*Reversed and Remanded by*

4.  Khan v. Meknojiya 🐎
2013 WL 3336874 , Tex.App.-Austin , June 28, 2013

49 S.W.3d 544
Court of Appeals of Texas,
Austin.

LANDRY'S SEAFOOD RESTAURANTS, INC.
and Landry's Crab Shack, Inc., Appellants,
v.
WATERFRONT CAFE, INC. and Michael R. Young, Appellees.

No. 03–00–00381–CV.    |    June 7, 2001.    |    Rehearing Overruled Aug. 9, 2001.

Prospective sublessee brought action against restaurant alleging tortious interference with contract and business relations when restaurant blocked landlord's grant of permission for sublease. The 126th Judicial District Court, Travis County, John K. Dietz, J., granted summary judgment for restaurant. Prospective sublessee appealed. The Court of Appeals, Yeakel, J., held that restaurant had a contractual right to interfere.

Affirmed.

**Attorneys and Law Firms**

**\*545** Julie A. Ford, Haynes and Boone, LLP, Austin, for Appellants.

Craig S. Comeaux, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Austin, for Appellees.

**\*546** Before Justices YEAKEL, PATTERSON and POWERS. [*]

**Opinion**

YEAKEL, Justice.

Appellants Landry's Seafood Restaurants, Inc. and Landry's Crab Shack, Inc. (together "Landry's") appeal from the district court's summary judgment in favor of appellees Waterfront Cafe, Inc. and Michael R. Young (together "Waterfront"). Landry's sued Waterfront for tortious interference with contract and business relations. We will affirm the district court's summary judgment in favor of Waterfront.

**FACTUAL AND PROCEDURAL BACKGROUND**

Oyster Investment Corporation ("Oyster") leases from the University of Texas a commercial property on Lake Travis in Austin called "Oyster Landing." Oyster subleases two adjoining restaurant spaces in Oyster Landing to third parties. In 1993 Oyster subleased one restaurant space to Waterfront. At that time Oyster was subleasing the other space to Stillwater, Inc. ("Stillwater"), which was operating a restaurant known as "The Lodge at Lakeview" in the subleased space. Under the terms of the sublease contract, Stillwater could not assign its interest in the sublease without Oyster's consent. In its subleased space, Waterfront began operating a restaurant called "Chuy's Hula Hut." Waterfront's sublease provides that the restaurant in the other space must be "of substantially different character" from the Hula Hut. Waterfront describes the Hula Hut as "nautically-themed."

Landry's operates a chain of restaurants known as "Joe's Crab Shack." In 1996 Landry's began negotiations with Stillwater to assume Stillwater's sublease and operate a Joe's Crab Shack restaurant in the space occupied by The Lodge at Lakeview. Waterfront learned of Landry's plan and voiced its objection to Oyster that a Joe's Crab Shack restaurant would not be "of substantially different character" from the Hula Hut. The sublease between Waterfront and Oyster included an arbitration clause, and the two parties entered into arbitration. The arbitrators issued a decision in May 1997, which found that Joe's Crab Shack was not "of substantially different character" from the Hula Hut. Landry's did not participate in the arbitration and apparently was not invited to do so. As a result, Oyster declined to approve Stillwater's assignment of its sublease to Landry's.

In June 1997 Landry's brought this suit against Waterfront and Oyster for "tortiously interfer[ing] with the contractual relationship between it and Stillwater," "maliciously [and] intentionally interfering with and preventing [a] business relationship [with Stillwater] from occurring and continuing," acting in a "conspiracy to tortiously interfere with a contract and a business relationship," and entering "into a combination or conspiracy in restraint of trade." Landry's also filed suit against Stillwater. Waterfront filed a traditional motion for summary judgment. *See* [Tex.R. Civ. P. 166a(b)](). Landry's did not respond. The district court granted Waterfront's motion and severed Landry's claims against Waterfront from those against Oyster and Stillwater. The court denied Landry's motion for new trial. By five issues, Landry's appeals the district court's summary judgment in favor of Waterfront and the court's denial of Landry's motion for new trial.

## DISCUSSION

### *Summary Judgment*

**[1]** **[2]** **[3]** Summary judgments must stand on their own merits. *[Rhone–Poulenc, Inc.](* **\*547** *[v. Steel,](* [997 S.W.2d 217, 223 (Tex.1999)](). Accordingly, on appeal the nonmovant need not have answered or responded to the motion to contend that the movant's summary-judgment proof is insufficient as a matter of law to support summary judgment. *[Id.]()* The failure of the nonmovant to

respond to the summary-judgment motion does not allow the trial court to grant the motion when the movant's summary-judgment proof is insufficient. *Id.* (citing *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979)). But when the nonmovant fails to file a response, the sole issue on appeal is whether the movant's proof entitles it to judgment as a matter of law. *Clear Creek Basin Auth.,* 589 S.W.2d at 678.

 **[4]**  **[5]**  A traditional motion for summary judgment is properly granted when the movant establishes that there are no genuine issues of material fact to be decided and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Rhone–Poulenc,* 997 S.W.2d at 222; *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991). All doubts are resolved against the movant, and the reviewing court must view the evidence in the light most favorable to the nonmovant. *Lear Siegler,* 819 S.W.2d at 471. When a defendant moves for summary judgment based on an affirmative defense, the defendant, as movant, bears the burden of conclusively proving each essential element of its defense. *See Rhone–Poulenc,* 997 S.W.2d at 223; *Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 121 (Tex.1996).

By its first three issues, Landry's complains that the district court erred in granting Waterfront's motion for summary judgment because Waterfront "completely failed to establish the elements of its affirmative defense, and the burden to respond never shifted to Landry." Waterfront moved for summary judgment based on the affirmative defense of legal justification. The supreme court has held that justification is an affirmative defense to a claim of tortious interference with contract. *Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 210 (Tex.1996).

Waterfront and Landry's dispute what Waterfront must prove to prevail. Waterfront relies on *Texas Beef Cattle,* which established that the defense of justification is based on either the exercise of (1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken. *See id.* at 211. Waterfront does not dispute that it provided no evidence that its actions were done in good faith; therefore, to have prevailed on this defense, it must have conclusively proved that it was exercising its own legal right. If the trial court found as a matter of law that the defendant, in exercising a legal right, interfered with a contract, then the defendant has conclusively established the justification defense. *Id.* Waterfront asserts that it was exercising a right provided it under its sublease with Oyster. The sublease states that Oyster will only lease the adjoining space to a restaurant of substantially different character and provides for arbitration between Oyster and Waterfront in the event of a sublease dispute.

Landry's counters that a party seeking summary judgment on the affirmative defense of justification must conclusively prove that (1) "the acts of interference were not in themselves tortious and or unlawful," (2) "the acts of interference were consistent with protecting the right at issue," and (3) "the contractual right to interfere exists as a matter of law pursuant to an unambiguous contract." Landry's relies on *Prudential Insurance Co. of America v. Financial*

*Review Services,* **\*548** *Inc.,* 29 S.W.3d 74 (Tex.2000), [1] as support for its claim that Waterfront must prove that its acts were not tortious or unlawful. In *Financial Review Services,* the supreme court observed that an otherwise legitimate privilege may not be exercised by resorting to illegal or tortious means, and that a defendant, under the guise of exercising a privilege, may not say or do whatever it sees fit. *Id.* at 81. Thus, Landry's concludes, "The obvious and fatal flaw in Waterfront's summary judgment motion was that it filed no evidence whatsoever as to its own acts of interference. Without such evidence it could not conclusively establish that those acts were lawful and consistent with the right being asserted."

However *Financial Review Services* does not relieve Landry's of pleading *acts* by Waterfront that constitute tortious interference.

> Generally, justification is established as a matter of law when *the acts the plaintiff complains of as tortious interference* are merely the defendant's exercise of its own contractual rights.
>
> ... Thus, if *the plaintiff pleads and proves methods of interference that are tortious in themselves,* then the issue of privilege or justification never arises.

*Id.* (emphasis added). Landry's has failed to make any specific allegation as to what actions Waterfront took that interfered with its business and contractual relations. Even construing the petition liberally in favor of Landry's, *see Roark v. Allen,* 633 S.W.2d 804, 809 (Tex.1982), the only claims are that Waterfront "engaged in conduct to prevent the sale by Stillwater of its leasehold interest to Landry's" and "knowingly and unlawfully interfered with the contractual and prospective business relationship between Stillwater, Inc. and Landry's." There are no specific allegations of any actions on the part of Waterfront.

Waterfront, however, has provided summary-judgment proof that, pursuant to its sublease, it engaged in arbitration with Oyster. This is the only evidence in the record of any actions on the part of Waterfront. In *Financial Review Services,* Financial Review Services' ("FRS") pleadings disclosed no fewer than five specific factual allegations of how Prudential disparaged FRS and interfered with its contracts and business relations. *Financial Review Servs.,* 29 S.W.3d at 81. "To raise an issue of whether Prudential interfered with FRS's contract by tortiously disparaging FRS, there must be evidence that Prudential made statements rising to the level of trade disparagement. To do so, *FRS must first present evidence that Prudential made false statements of fact about FRS.*" *Id.* at 82 (emphasis added) (citing *Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 766 (Tex.1987)). Landry's presented no evidence that would raise an issue that Waterfront committed any acts other than relying on the provisions of its sublease with Oyster.

 **[6]**   Landry's also claims that a party asserting justification must prove that its acts of interference "were consistent with protecting the right at issue." In addition to *Financial Review Services,* Landry's directs this Court to two federal cases to support its proposition. *See Access Telecom,*

**\*549** *Inc. v. MCI Telecomms. Corp.,* 197 F.3d 694, 710 (5th Cir.1999); *Wardlaw v. Inland Container Corp.,* 76 F.3d 1372, 1379 (5th Cir.1996).[2] Without addressing whether Landry's assertion is a correct statement of the law, we note that Waterfront has proven that the arbitration between it and Oyster, the only Waterfront act detected in the record, concerned the sublease's language that the adjoining space would not be occupied by a restaurant of substantially similar character.

[7] [8] [9] [10] [11] Finally, Landry's asserts that any contractual right to interfere must exist "as a matter of law pursuant to an unambiguous contract." We agree that this is a correct statement of the law. *See Friendswood Dev. Co. v. McDade + Co.,* 926 S.W.2d 280, 282 (Tex.1996). However, we disagree with Landry's contention that the Oyster–Waterfront sublease is an ambiguous contract. Section 4.2 of the sublease reads, "Landlord [Oyster] covenants and agrees that the two full service restaurants shall be of substantially different characters [sic] and offer substantially different menus to provide a diversity of food service for the customers visiting [Oyster Landing]." Landry's argues that "the exact meaning of ['substantially different characters'] is uncertain, making the provision ambiguous," and "[where] the contract is ambiguous, the asserted legal right cannot be established as a matter of law."[3] Whether a contract is ambiguous is a question of law for the court to decide. *Id.* (citing *National Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995); *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex.1983)). A contract is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. *Coker,* 650 S.W.2d at 393. "If a contract is worded in such a manner that it can be given a definite or certain legal meaning, then it is not ambiguous." *Friendswood Dev.,* 926 S.W.2d at 282 (citing *CBI Indus.,* 907 S.W.2d at 520; *Coker,* 650 S.W.2d at 393). Interpreting the sublease according to its plain meaning, *see Northern Natural Gas Co. v. Conoco, Inc.,* 986 S.W.2d 603, 606 (Tex.1998), it is not rendered ambiguous by its use of the word "character." "Character" has a meaning from common usage; it is understood to mean an entity's features, traits, and qualities.[4] The character of a restaurant includes its interior and exterior appearance, its menu, its atmosphere, and the attire of employees, among other things.

Here, the sublease separates "character" from "menu" and provides that, in the two restaurants located in Oyster Landing, *both character and menu* are to be "substantially different." If the menu is not included in the sublease's use of "character," what remains of a restaurant's character can only be the decor and atmosphere. This is the intention expressed in the language used by Oyster and Waterfront. *See Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 529 (Tex.1987) ("The interpretation of a written contract is a quest for the intention of the parties to it."). We hold that the use of "character" in the sublease between Oyster and Waterfront is not uncertain nor is it reasonably **\*550** susceptible to more than one meaning; the sublease is not ambiguous.

Landry's next attacks Waterfront's evidence. As summary-judgment proof, Waterfront submitted to the district court (1) a certified copy of Landry's first amended petition, (2) an affidavit of

Michael R. Young (Waterfront's custodian of records) identifying and authenticating an attached copy of the sublease between Oyster and Waterfront, and (3) an affidavit of William C. Bryant (one of the arbitrators) identifying and authenticating an attached copy of the arbitrators' memorandum in the proceeding between Oyster and Waterfront.

Section 10.17 of the sublease allows the parties to the sublease, Waterfront and Oyster, to submit a "dispute or matter" arising under the sublease to binding arbitration. Bryant's affidavit and attached memorandum reflect that Waterfront and Oyster arbitrated the question of whether a Joe's Crab Shack restaurant would be substantially different in character from the Hula Hut. Outside of its formal preface and conclusion, Bryant's affidavit states:

"My name is William C. Bryant. I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

"In the spring of 1997, I acted as one of the arbitrators in a matter entitled 'Arbitration Proceeding Between Oyster Boat Town[e] Landing, Ltd. And Waterfront Café, Inc. (The "Oyster–Waterfront Proceeding")'. Attached hereto as Exhibit 1 is a true and correct copy of a Memorandum signed by me and issued on or about May 22, 1997 in which Dean Blaine and I, acting as arbitrators with the consent of both parties, announced our findings in the Oyster–Waterfront Proceeding."

The arbitrators' memorandum attached to Bryant's affidavit contains the only summary-judgment proof that describes the "character" of the Hula Hut and proposed Joe's Crab Shack and concludes that the two restaurants would not be substantially different in character. [5]

**\*551** **[12]** The rules of civil procedure provide that affidavits in support of a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Tex.R. Civ. P. 166a(f). Defects in summary-judgment proof fall into two categories—defects in form and defects in substance. Substantive defects can be asserted for the first time on appeal, but formal defects are waived if not raised in the trial court. *See id.; Life Ins. Co. v. Gar–Dal, Inc.,* 570 S.W.2d 378, 381 (Tex.1978); *Youngstown Sheet & Tube Co. v. Penn,* 363 S.W.2d 230, 233–34 (Tex.1962).

**[13]** **[14]** Bryant's affidavit states that the attachment is a true and correct copy of the arbitrators' memorandum, but it does not state that the facts contained in the memorandum are true and correct. Landry's neither filed a response to Waterfront's motion for summary judgment nor objected to Bryant's affidavit. This Court has determined that the failure to object to the form of an affidavit on the ground that it does not show personal knowledge waives the complaint on appeal. *McBride v. New Braunfels Herald–Zeitung,* 894 S.W.2d 6, 8 (Tex.App.—Austin 1994, writ denied). The failure of Bryant's affidavit to attest that the facts contained in the arbitrators' memorandum

were true and correct is a formal defect that Landry's waived by not objecting in the district court. *Cf. id.* (stating that failure to object to form of affidavit on ground that it does not show personal knowledge waives complaint on appeal) (citing Tex.R. Civ. P. 166a(f); Tex.R.App. P. 52(a); *Garcia v. John Hancock Variable Life Ins. Co.,* 859 S.W.2d 427, 433 (Tex.App.—San Antonio 1993, writ denied)); *Mid–Texas Tel. Co. v. First Nat'l Mobile Home Sales,* 506 S.W.2d 728, 730 (Tex.Civ.App.—Austin 1974, no writ) (holding failure to object at trial-court level on grounds that proof requirements were not satisfied because summary-judgment movant did not show how affiant gained personal knowledge of underlying facts results in waiver of formal defect). Furthermore, copies of documents attached to a properly prepared affidavit are sworn copies within the meaning of rule 166a(f). *Republic Nat'l Leasing Corp. v. Schindler,* 717 S.W.2d 606, 607 (Tex.1986); *McBride,* 894 S.W.2d at 8. "Rule 166a(f) does not require that the affiant have personal knowledge of the contents of attached sworn exhibits." *McBride,* 894 S.W.2d at 8.

 **[15]**   The only question that remains is whether the arbitrators' memorandum proves that the Hula Hut and Landry's Crab Shack would not be of substantially different character. The evidence before the district court and this Court is sparse. Waterfront produced little summary-judgment proof. However, Landry's produced no controverting evidence. A nonmovant must present summary-judgment proof when necessary to establish a fact issue. *Clear Creek Basin Auth.,* 589 S.W.2d at 678. Waterfront provided evidence as to the decor and atmosphere of the two restaurants, elements that we have determined were intended in the sublease's use of "character." The arbitrators' memorandum, in the absence of any controverting evidence, establishes that the Hula Hut and Landry's Crab Shack were not substantially different in character.

We hold that the uncontroverted summary-judgment proof conclusively establishes **\*552** that Waterfront's alleged actions were done in the exercise of its own legal right provided by its sublease with Oyster. We overrule Landry's first three issues.

### *Motion for New Trial*

By its last two issues, Landry's complains that the district court erred in denying its motion for new trial. Landry's claims that the district court treated Waterfront's motion for summary judgment as a no-evidence summary judgment. *See* Tex.R. Civ. P. 166a(i). Landry's continues that because it had no notice that Waterfront was seeking a no-evidence summary judgment, the summary judgment granted by the district court was a default summary judgment. Landry's contentions are without merit because Waterfront established its right to a traditional summary judgment as a matter of law by proving its affirmative defense of justification. Waterfront was not seeking, nor was it granted, a no-evidence summary judgment. We overrule Landry's final two issues.

# CONCLUSION

Having overruled all of Landry's issues, we affirm the district court's summary judgment.

## Footnotes

\*     Before John E. Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).

1     *Financial Review Services* involved whether the defendant had conclusively established a justification defense in a tortious-interference case. *See Prudential Ins. Co. of Am. v. Financial Review Servs.,* 29 S.W.3d 74 (Tex.2000). The defendant had been granted a partial summary judgment on some issues and a directed verdict on the remaining issues. *Id.* at 76. The supreme court held that because the plaintiff had presented "at least some evidence" of improper conduct by the defendant, the defendant "did not establish its justification defense as a matter of law." *Id.* at 83.

2     We note that although this Court may consider the decisions of federal courts of appeals, we are not bound by them. *See Newth v. Adjutant General's Dep't,* 883 S.W.2d 356, 359 (Tex.App.—Austin 1994, writ denied).

3     Landry's neither pleaded nor argued ambiguity in the district court

4     Webster's defines character as "distinctive differentiating mark," the "aggregate of distinctive qualities" of a thing, and an "outward and visible quality or trait." *Webster's Third New International Dictionary* 376 (Philip B. Gove ed., 1986).

5     The memorandum provides, in pertinent part, the following:

> We have been asked to decide the following question:
>
>> "Is a Joe's Crab Shack restaurant substantially different in character from the Chuy's Hula Hut restaurant presently operated by Waterfront at [Oyster Landing]?"
>
> It is our decision that the answer to that question is no. To the contrary, it is our opinion that a Joe's Crab Shack restaurant is substantially similar in character to the Chuy's Hula Hut restaurant presently operated by Waterfront at the Facility.
>
> The requirements in Section 4.2 of the Oyster–Waterfront sublease that the restaurants be of substantially different characters is separate and independent from the requirement that they offer substantially different menus. We do not believe the [sub]lease should be interpreted to make superfluous the requirement of substantially different characters. In addition, the requirement is not just that the restaurants be of different characters but that they be of *substantially* different characters.
>
> We view the requirement of substantially different characters to require the restaurants to have substantially different characteristics, distinguishments, structures, functions and qualities—not just menu items. In that regard Hula Hut is described by its owner as a typical beach hut, surf shack or old wharf boat house typical along sea coasts everywhere. The building is built out of salvaged lumber and old boats, motors, surfboards, fishing nets, wooden fish and pictures of Hawaiian scenes are randomly hung or placed within the restaurant.
>
> Landry's Seafood Restaurant, Inc.'s Form 10K describes the character of a Joe's Crab Shack as "an old fishing camp with a wood facade, tin roof and a raised outside deck. The Crab Shack restaurants feature a casual, nautical theme ..." Various articles describe Joe's Crab Shack as having fish nets, sea shells, and other fake bounty from the sea, and a weatherbeaten facade giving the impression of a Gulf fishing camp. Apart from menu, the characteristics of the two restaurants appear nearly identical. Photographs that have been supplied to us also indicate that the characters appear to be very similar and not of a substantially different nature.

---

**End of Document**      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (5)

### Direct History (5)

1.  LANDRY'S SEAFOOD RESTAURANTS, INC. and Landry's Crab Shack, Inc., v. WATERFRONT CAFE, INC. and Michael R. Young.
2000 WL 35463906 , Tex.Dist. , May 01, 2000

*New Trial Denied by*

2.  LANDRY'S SEAFOOD RESTAURANTS, INC. and Landry's Crab Shack, Inc., v. WATERFRONT CAFE, INC. and Michael R. Young.
2000 WL 35463907 , Tex.Dist. , July 19, 2000

*AND Judgment Affirmed by*

3.  Landry's Seafood Restaurants, Inc. v. Waterfront Cafe, Inc. 🔖
49 S.W.3d 544 , Tex.App.-Austin , June 07, 2001 , rehearing overruled ( Aug 09, 2001 ) , review dismissed ( Dec 13, 2001 )

4.  LANDRY'S SEAFOOD RESTAURANTS. INC. and Landry's Crab Shack, Inc., v. WATERFRONT CAFE, INC. and Michael. R. Young.
2000 WL 35490340 , Tex.Dist. , May 01, 2000

*Judgment Affirmed by*

5.  Landry's Seafood Restaurants, Inc. v. Waterfront Cafe, Inc. 🔖
49 S.W.3d 544 , Tex.App.-Austin , June 07, 2001 , rehearing overruled ( Aug 09, 2001 ) , review dismissed ( Dec 13, 2001 )

2007 WL 3306492
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

*MEMORANDUM OPINION*
Court of Appeals of Texas,
Austin.

LHR ENTERPRISES, INC.; Task Services, Inc.; Business Staffing, Inc .;
Harry Sewill; Rick Chapman; and Transglobal Mortgage, Inc., Appellants
v.
Mike GEESLIN, in His Official Capacity as Commissioner of Insurance
for the State of Texas; Texas Department of Insurance; and State
Office of Administrative Hearings for the State of Texas, Appellees.

No. 03-05-00176-CV.   |   Nov. 7, 2007.

From the District Court of Travis County, 345th Judicial District, No. GN402881; Suzanne Covington, Judge Presiding.

**Attorneys and Law Firms**

Bogdan Rentea, Rentea & Associates, Austin, for Appellant.

Kristofer S. Monson, Asst. Solicitor General, Austin, for Appellee.

Before Justices PATTERSON, PURYEAR and PEMBERTON.

*MEMORANDUM OPINION*

DAVID PURYEAR, Justice.

 **\*1** The procedural history of this case is complicated by its relationship to another case before the Department of Insurance ("Department"). Although we will discuss the various proceedings in more detail later in the opinion, we will briefly summarize the proceedings here. The Commissioner of Insurance became concerned that LHR Enterprises, Inc.; Transglobal Mortgage, Inc.; Business Staffing, Inc.; Task Services, Inc.; Rick Chapman; and Harry Sewill (cumulatively "the appellants") were engaged in the unauthorized practice of insurance and referred the matter to the State Office of Administrative Hearings ("SOAH"). In response, the appellants filed a

declaratory-judgment action in district court seeking declarations that the Commissioner did not have the authority to refer the matter for a hearing before SOAH. Shortly thereafter, the Commissioner and the Department filed a plea to the jurisdiction contending that the district court did not have jurisdiction over the case because the appellants had failed to show a valid waiver of sovereign immunity. The district court granted the plea, and the appellants appealed the judgment of the district court. We will dismiss this case for want of subject-matter jurisdiction.

## BACKGROUND

**Proceedings Before SOAH**

The case presently before us is related to another case involving the appeal of an administrative order. Because it is helpful in explaining the outcome of this appeal, we will briefly review some of the facts of the related case.

In 2004, the staff of the Department of Insurance ("Staff") became concerned that several companies and individuals, including the appellants, were engaged in the unauthorized business of insurance. *See* Tex. Ins.Code Ann. §§ 101.051 (specifying what constitutes business of insurance), .102 (prohibiting unauthorized business of insurance) (West Supp.2006). In particular, the Staff believed that the appellants and others were improperly engaged in the business of providing various companies' employees with workers' compensation insurance coverage.

After formalizing their concerns, the Staff filed a report with the Commissioner that detailed the allegations against the appellants and others. The report also contained the Staff's recommendation that the Commissioner order that all the parties investigated (1) be held jointly and severally liable for any unpaid workers' compensation claims, (2) pay monetary penalties, and (3) cease practicing the business of insurance in Texas. *See id.* §§ 84.041 (providing that if Staff determines that insurance violations have occurred, they have the authority to file report with Commissioner that specifies facts forming basis of their conclusion and also specifies any penalty that they feel should be imposed), .021 (West Supp.2006) (authorizing Commissioner to impose penalty on individual who violates insurance law, rule, or order).

In July 2004, the Commissioner referred the matter to SOAH for a contested-case hearing to determine whether the appellants and others had engaged in the unauthorized business of insurance and whether a cease-and-desist order prohibiting the parties from engaging in the allegedly improper actions should be issued. *See, e.g., id.* §§ 31.021(a) (requiring Commissioner to "administer and enforce" insurance code), 40.002 (requiring SOAH to conduct hearing when required under insurance code), 101.151 (West Supp.2006) (authorizing Commissioner to set hearing to determine whether cease-and-desist order should be imposed if, among other things, Commissioner has reason to believe that individual has violated insurance provision or rule).

**\*2** During the proceedings, the investigated parties, including the appellants, filed pleas to the jurisdiction and a motion for summary disposition. The administrative law judge overseeing the case denied the motions, and the investigated parties appealed the administrative law judge's ruling to the Commissioner. The Commissioner denied the appeal. Subsequently, a hearing was scheduled before SOAH.

### Declaratory-Judgment Action

Soon after the Commissioner requested a hearing before SOAH, the appellants filed a petition for declaratory relief in the district court. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 37.001-.011 (West 1997 & Supp.2006) (Uniform Declaratory Judgments Act). The propriety of the district court's judgment is the subject of this appeal.

In their petition, the appellants sought, among other things, a declaration that the Commissioner did not have the authority to require a hearing before SOAH. Specifically, they sought a declaration that the Commissioner has no authority to require a hearing or impose administrative penalties on individuals that are neither licensed to engage in the business of insurance nor regulated by the insurance code. *See* Tex. Ins.Code Ann. § 84.021 (West Supp.2006) (authorizing Commissioner to impose administrative penalties on individuals who are "licensed or regulated" under insurance code or another Texas insurance law).

In addition, the appellants also sought a declaration that the Commissioner may not refer a matter to SOAH for a determination of whether a cease-and-desist order should be issued to stop an individual from engaging in certain activities when the statutory time for requesting a hearing has expired. *See id.* §§ 101.151(a) (authorizing Commissioner to set hearing concerning issuance of cease-and-desist order and specifying that Commissioner is required to provide notice of hearing), .152 (providing that unless parties agree otherwise, hearing must be held "not earlier than the fifth day or later than the 30th day after" notice was given), .153 (West Supp.2006) (allowing Commissioner to issue cease-and-desist order after hearing has been held).

In response to the appellants' petition, the Commissioner and the Department filed a plea to the jurisdiction. In their plea, they argued that because this case is essentially a suit against state agencies, the appellants had the burden of proving a waiver of sovereign immunity. Further, the Commissioner and the Department contended that because the appellants failed to plead and prove a waiver, the district court did not have jurisdiction over the appellants' claims.

Ultimately, the district court granted the plea to the jurisdiction, and the appellants appeal the district court's judgment.

## DISCUSSION

The appellants raise three issues on appeal. First, they argue that the district court erred when it granted the plea to the jurisdiction. Specifically, they contend that their suit does not implicate sovereign immunity because it seeks declaratory and injunctive relief against state officials acting beyond their statutory authority. *See Texas Natural Res. Comm'n v. IT-Davy,* 74 S.W.3d 849, 855 (Tex.2002) (explaining that "[p]rivate parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority" but that "such suits are not 'suits against the State' ... because suits to compel state officers to act within their official capacity do not attempt to subject the State to liability" and, therefore, "do not implicate the sovereign-immunity doctrine" (citation omitted)). Second, the appellants argue that the district court erred by failing to declare that the Commissioner does not have the authority to impose administrative penalties on individuals who are not licensed or regulated under the provisions of the insurance code. Finally, the appellants insist that the district court erred when it failed to declare that the Commissioner may not refer a matter to SOAH for a hearing if the referral is not made within the time allowed by statute.

**\*3** After the appellants filed this appeal, the SOAH hearing for determining whether the appellants and the other investigated parties had engaged in the unauthorized practice of insurance was held. After the hearing concluded, the Commissioner issued a final order, which specified that none of the appellants had violated any insurance provision or regulation and that, accordingly, no sanction or penalty should be imposed upon them. Shortly thereafter, the Commissioner and the Department filed a motion to dismiss this appeal. [1] In their motion, the Commissioner and the Department argue that because a final order has been issued absolving the appellants of any wrongdoing, this Court no longer has subject-matter jurisdiction over the appellants' declaratory claims. Because our resolution of the motion to dismiss is dispositive of this appeal, we will now turn to the various arguments made by the parties regarding the motion to dismiss.

The appellants seek relief under the Uniform Declaratory Judgment Act. *See* Tex. Civ. Prac. & Rem.Code Ann. § 37.001-.011. The Act allows an individual "whose rights, status, or other legal relations are affected by a statute" to "have determined any question of construction or validity arising under the ... statute ... and obtain a declaration of rights, status, or other legal relations thereunder."*Id.* § 37.04(a) (West 1997). In this case, the appellants seek declarations concerning the authority of the Commissioner. This Court has previously recognized that individuals may request declaratory relief regarding whether state agencies or officers have acted beyond their statutory authorities. *See, e.g., Texas Dep't of Ins., Div. of Workers' Comp. v. Lumbermens Mut. Cas. Co.,* 212 S.W.3d 870, 874-75 (Tex.App.-Austin 2006, pet. denied) (holding that claimant may seek declaration that agency's issuance of advisories was outside agency's statutory authority). However, while individuals may employ the Act to challenge actions as beyond an agency's or

officer's authority, a court must still have subject-matter jurisdiction over the case before it may properly issue a declaration. Subject-matter jurisdiction may be considered for the first time on appeal, and appellate courts may raise that issue on their own accord. *See Aguilar v. Weber,* 72 S.W.3d 729, 731 (Tex.App.-Waco 2002, no pet.). The Act does not expand the scope of a trial court's subject-matter jurisdiction but merely authorizes a court "to declare rights, status, and other legal relations" when subject-matter jurisdiction is already present. *See*Tex. Civ. Prac. & Rem.Code Ann. § 37.003(a) (West 1997) (court may act "within its jurisdiction"); *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993). Although the Act does not expand the jurisdiction of a trial court, "[a] suit under the [Act] is not confined to cases in which the parties have a cause of action apart from the Act itself."*Texas Dep't of Pub. Safety v. Moore,* 985 S.W.2d 149, 153 (Tex.App.-Austin 1998, no pet.).

**\*4** In order for a court to have jurisdiction to consider a declaratory-judgment action, there must be a "justiciable controversy as to the rights and status of" the parties, and the requested declaration "must actually resolve the controversy." *Brooks v. Northglen Ass'n,* 141 S.W.3d 158, 163-64 (Tex.2004)."A justiciable controversy is one in which a real and substantial controversy exists involving a genuine conflict of tangible interests and not merely a theoretical dispute."*Moore,* 985 S.W.2d at 153;*see also City of Euless v. Dallas/Fort Worth Int'l Airport Bd.,* 936 S.W.2d 699, 703 (Tex.App.-Dallas 1996, writ denied) (explaining that if there is no actual controversy between parties, declaratory judgment is improper). However, a person seeking declaratory relief need not have yet incurred an actual injury of the sort for which consequential relief might be granted. *See Bexar Metro. Water Dist. v. City of Bulverde,* 156 S.W.3d 79, 88 (Tex.App.-Austin 2004, pet. denied). Instead, the Act is intended to provide a means to determine, before any wrong has actually occurred, the rights of parties when a controversy has arisen and is remedial in nature. *Id.*

The need for a justiciable controversy is related to the jurisdictional concepts of standing and ripeness and does not supersede these concepts. *See Texas Dep't of Ins v. Reconveyance Servs., Inc.,* No. 03-06-00313-CV, ---S.W.3d ----, ----, 2007 Tex.App. LEXIS 7262, at \*38, 2007 WL 2462043 (Tex.App.-Austin Aug. 31, 2007, no pet. h.). Ripeness is a necessary component of subject-matter jurisdiction, *Atmos Energy Corp. v. Abbott,* 127 S.W.3d 852, 857 (Tex.App.-Austin 2004, no pet.), and concerns when a claim may be made, *Patterson v. Planned Parenthood,* 971 S.W.2d 439, 442 (Tex.1998). The requirement that a claim be ripe for review is based on the prohibition against issuing advisory opinions. *Id.; see also*Tex. Const. art. II, § 1 (separation of powers); *Northglen Ass'n,* 141 S.W.3d at 164 (explaining that separation of powers provision bars issuance of advisory opinions). A claim is ripe if the facts involved demonstrate that "an injury has occurred or is likely to occur."*Patterson,* 971 S.W.2d at 442;*see also City of Waco v. Texas Natural Res. Comm'n,* 83 S.W.3d 169, 175 (Tex.App.-Austin 2002, pet. denied) ("In determining whether a cause is ripe for judicial consideration, we look to see if the facts have sufficiently developed to show that an injury has occurred, or is likely to occur"). In other words, there must be a concrete injury for the claim to be ripe. *See Atmos Energy Corp.,* 127 S.W.3d at 858. A claim

is not ripe if it is based on hypothetical or contingent facts that may not occur as anticipated or may not occur at all. *See Waco Indep. Sch. Dist. v. Gibson,* 22 S.W.3d 849, 852 (Tex.2000).

In this case, there is no concrete dispute to resolve. The appellants pled the following, relevant jurisdictional facts as the basis for their suit:

**\*5** On June 24, 2004, pursuant to section 84.041 of the insurance code, the Staff delivered to the Commissioner a report "in which it alleged that these Plaintiffs engaged in activities in the State of Texas in violation of the Texas Insurance Code, and recommended that administrative penalties be assessed against them in the aggregate amount of $2,000,000."

> "[T]he Staff, on July 16, 2004, filed with SOAH and served on these Plaintiffs a Notice of Hearing, thereby initiating a contested case ... [which] was assigned Docket No. 454-4-75940H."

The pleadings then recount that the appellants filed a plea to the jurisdiction and general denial in the SOAH proceeding, that the Staff filed a response asserting various statutory bases for jurisdiction, that the administrative law judge denied the appellant's plea to the jurisdiction and summary disposition motion, and that they appealed the decision to the Commissioner, who upheld it.

The appellants pled that they "have not and will not voluntarily subject themselves to the [Department]'s jurisdiction" and sought a declaration that "the Commissioner as a matter of law does not have jurisdiction over the Plaintiffs to take the action contemplated by the July 16, 2004 Notice of Hearing."

Subsequently, as previously discussed, the Commissioner issued a final order in the complained-of contested-case proceeding. The Commissioner's order concluded that none of the appellants were engaged in the unauthorized practice of insurance or had violated any insurance provisions or regulations and that, therefore, no penalty should be imposed upon the appellants. As the State argues, these developments resolve the controversy on which Appellants' suit is based, i.e., the subject matter of the July 16, 2004 Notice of Hearing has been resolved in Appellants' favor.

Appellants nonetheless urge that a justiciable controversy remains because the Commissioner's order states a conclusion of law that, "Under Tex. Ins.Code § 84.021, the Commission may impose an administrative penalty on a person, including an entity, that is licensed or regulated under and who violates the Insurance Code or rules adopted or orders issued thereunder."However, absent another impending hearing or other action by the Department adversely impacting the appellants in some concrete way, the Commissioner's legal conclusion amounts to a bare, abstract statement of legal opinion, and any judicial determination regarding the conclusion would necessarily be no more than a mere abstract advisory opinion. *Cf. Waco Indep. Sch. Dist.,* 22 S.W.3d at 852

(explaining that "ripeness doctrine allows courts to avoid premature adjudication, and serves the constitutional interests in prohibiting advisory opinions").

We conclude that we do not have subject-matter jurisdiction over this appeal and, therefore, grant the Commissioner and the Department's motion to dismiss the case. *See* Tex.R.App. P. 43 .2 (explaining that one of permissible types of appellate judgments is to dismiss appeal); *South Tex. Water Auth. v. Lomas,* 223 S.W.3d 304, 308 (Tex.2007) (dismissing case after determining court did not have subject-matter jurisdiction over case).

## Footnotes

1      As part of their motion to dismiss, the Commissioner and the Department attached a copy of the final order.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (1)

### Direct History (1)

1.  LHR Enterprises, Inc. v. Geeslin &#9756;
    2007 WL 3306492 , Tex.App.-Austin , Nov. 07, 2007 , review denied ( Feb 22, 2008 )

923 S.W.2d 663
Court of Appeals of Texas,
Tyler.

R.K. MURPHY a/k/a Ken Murphy d/b/a Murphy's
Exxon and d/b/a Murphy's Chevron, Appellant,
v.
CINTAS CORPORATION, Appellee.

No. 12–94–00371–CV.   |   Feb. 23, 1996.   |   Rehearing Overruled March 14, 1996.

Uniform lessor sued lessee service-station owner, alleging failure to pay in accordance with parties' agreement. After nonjury hearing, the County Court at Law No. 2, Smith County, Randall L. Rogers, J., rendered judgment for lessor, and lessee appealed. The Court of Appeals, Holcomb, J., held that: (1) as matter of law, suit was for breach of contract, and was not one on sworn account; (2) some evidence supported award of liquidated damages; and (3) liquidated damages provision was enforceable.

Affirmed.

**\*664**  Appeal from County Court at Law No. 2, Smith County; Randall L. Rogers, Judge.

**Attorneys and Law Firms**

H.L. McGee, for appellant.

Ronnie Horsley, Tyler, for appellee.

**Opinion**

HOLCOMB, Justice.

Ken Murphy appeals from a judgment awarding Cintas Corporation $6,167.30 for breach of a uniform rental agreement. In the first six points of error, Murphy challenges the legal sufficiency of the evidence to support the court's award of liquidated damages. In his seventh point, Murphy contends that the court erred when it awarded liquidated damages because the stipulated damage clause in the contract was an unenforceable penalty, as a matter of law. In his last point, Murphy contends that the court erred when it refused to set aside the judgment and render a take-nothing judgment in his favor. In one cross-point, Cintas contends that the court erred when it permitted

Murphy to file a trial amendment after the court had taken the case under advisement. We will affirm.

Cintas Corporation is a national company that rents uniforms, towels and mats to businesses on a weekly basis. Murphy owns and **\*665** operates an Exxon and Chevron service station in Tyler, Texas. From 1988 until 1991, Murphy and Cintas entered into a series of contracts to rent uniforms. Initially, Cintas filed suit against Murphy alleging that he had failed to pay in accordance with their agreements which resulted in $8,724.59 in damages. As exhibits to its petition, Cintas attached the contracts, the invoices and Cintas's affidavit stating that the claim against Murphy was just and true, that it was due, and that all just and lawful credit had been allowed. TEX.R.CIV.P. 185.

Murphy answered by an unsworn denial, but alleged that Cintas "fail[ed] to furnish clean, high quality garments and fail[ed] to replace torn, damaged and worn garments when requested." Murphy also alleged that Cintas was not entitled to recover liquidated damages because the liquidated damage provision was an unenforceable penalty. After a non-jury hearing, the court rendered judgment in favor of Cintas. Neither party requested findings of fact and conclusions of law.

In points one, two, three, four, five, six and eight, Murphy challenges the legal sufficiency of the evidence to support the court's award of liquidated damages. According to Murphy, the record is void of any evidence regarding the amount of monetary loss that Cintas actually suffered as a result of the breach or the reasonableness of the liquidated damage provision. He also argues that the record is void of any evidence that the amount of liquidated damages was a reasonable forecast of just compensation. Therefore, Murphy concludes that the court erred when it awarded damages in accordance with the liquidated damage provision of the contract rather than awarding damages in accordance with common law contract law. We do not agree.

 **[1]**   **[2]**   **[3]**   When findings and conclusions are neither requested nor filed, the trial court is presumed to have made all of the findings necessary to support its judgment. *Roberson v. Robinson,* 768 S.W.2d 280, 281 (Tex.1989). All questions of fact are presumed found in support of the judgment and the judgment will be upheld on any legal theory raised by the evidence. *Point Lookout West, Inc. v. Whorton,* 742 S.W.2d 277, 278–79 (Tex.1987). Further, Murphy's points of error are "no evidence" points. In deciding a "no evidence" point, we must consider only the evidence and inferences tending to support the finding and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988).

 **[4]**   **[5]**   **[6]**   **[7]**   Here, we have a dispute between the parties about whether the court rendered judgment on a suit on sworn account or breach of contract. TEX.R.CIV.P. 185. To be a valid suit on sworn account, the account or liquidated money demand must involve a claim for goods, wares, merchandise, personal services rendered, labor done or labor or materials furnished. *Great–*

*Ness Prof. Serv. v. First Nat. Bank of Louisville,* 704 S.W.2d 916, 917 (Tex.Civ.App.—Houston [14th Dist.] 1986, no writ). Had Cintas properly filed a suit on a sworn account in accordance with Rule 185, and Murphy had failed to file a written denial under oath, Murphy could not have denied Cintas's claim, he could not have disputed that he received the services, and he could not have disputed the correctness of the stated charges. *Vance v. Holloway,* 689 S.W.2d 403, 404 (Tex.1985); *Airborne Freight Corp. v. CRB Marketing, Inc.,* 566 S.W.2d 573, 575 (Tex.1978). However, a lawsuit involving a breach of a lease agreement is not a valid claim on sworn account because a lease agreement does not involve a purchase and sale, and title to personal property has not passed from one party to another. *Id.* Thus, we hold that Cintas's cause of action against Murphy is not a suit on sworn account as a matter of law. *Id.*

 **[8]**   **[9]**   Having determined that the court rendered judgment in favor of Cintas under a breach of contract, we will determine whether there is any evidence to support the damage award. Murphy argues that, because Cintas did not offer proof of its actual damages, there was no evidence in the record to show that the liquidated damage provision in the contract was reasonable. As an affirmative defense to Cintas's claim for liquidated damages, Murphy pled penalty. TEX.R.CIV.P. 94; **\*666** *Phillips v. Phillips,* 820 S.W.2d 785, 789 (Tex.1991). In doing so, Murphy not Cintas had the burden to prove that the liquidated damage provision was unreasonable and a penalty. *Gorman v. Life Ins. Co. of North America,* 811 S.W.2d 542, 546 (Tex.1991). Murphy did not offer any evidence to prove the amount of Cintas' actual damages. Accordingly, points one, two, three, four, five, six and eight are overruled.

 **[10]**   In his seventh point, Murphy contends that the court erred when it awarded Cintas liquidated damages because the contractual provision was, as a matter of law, an unenforceable penalty. The disputed liquidated damage clause stated:

> In the event of cancellation of this service agreement by the Customer prior to the termination date, other than for failure of the Company to perform under its guarantee, the Customer will pay the greater of 50% of the weekly service charge per person per week for the unexpired term, or buy back all of the garments in inventory at the rates listed above as replacement value.

Citing *Servisco v. Tramco Inc.,* 568 S.W.2d 434, 437 (Tex.App—Texarkana 1978, writ ref'd n.r.e); *Mayfield v. Hicks,* 575 S.W.2d 571, 575 (Tex.App.—Dallas 1978, writ ref'd n.r.e.) and *Bethel v. Butler Drilling Co.,* 635 S.W.2d 834, 837 (Tex.App.—Houston 1982, writ ref'd n.r.e), Murphy argues that a contract provision is a penalty and is unenforceable if it provides for unreasonable payments for a minor breach. In *Servisco,* the court held that "a sum stipulated to be paid under an agreement should be treated as an unenforceable penalty if the agreement contains several matters of different degrees of importance and the sum stipulated is payable for the breach of any, even the least." Murphy argues that, under the language of the Cintas–Murphy agreement, Murphy could have been liable for the same amount of damages whether he breached the agreement by failing to

pay the rental for all of the uniforms, by failing to pay for one shirt or by violating any of the other obligations contained in the contract. Murphy also contends that the harm caused by the breach must not be capable of estimation or difficult to estimate to be an enforceable liquidated damage stipulation. Because employees of Cintas testified that documentation of the actual damage that Cintas incurred as a result of the breach were available at the time of trial, Murphy concludes that Cintas admitted that the liquidated damage provision was unenforceable.

In *Stewart v. Basey,* the Supreme Court considered the difference between an enforceable liquidated damage provision and an unenforceable penalty. *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484 (1952). More recently, the courts have restated this two-part *Stewart* test when analyzing the validity of a contractual damages provision:

> In order to enforce a liquidated damage clause, the court must find:
>
> (1) that the harm caused by the breach is incapable or difficult of estimation; and
>
> (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation.

*Phillips,* 820 S.W.2d at 788. For the provision to be an unenforceable penalty, the uncertainty of the damages and the reasonableness of the stipulation must have existed at the time when the contract was executed. *Oetting v. Flake Uniform & Linen Service,* 553 S.W.2d 793, 796 (Tex.Civ.App.— Ft. Worth 1977, no writ). Even though Murphy contends that the actual damage incurred by Cintas could have been calculated at the time of trial, such testimony was long after the contract between Cintas and Murphy had been executed. To forecast the actual damages to Cintas as a result of Murphy's termination of the contract sixty months in advance would be fraught with uncertainty. Further, similar contracts for liquidated damages have been approved in *Liberty Sign Co. v. Newsom,* 426 S.W.2d 210 (Tex.1968); *Blakeway v. National Credit Corporation,* 439 S.W.2d 155 (Tex.Civ.App.—Austin 1969, writ ref'd n.r.e.); *Blakeway v. General Electric Credit Corporation,* 429 S.W.2d 925 (Tex.Civ.App.—Austin 1968, writ ref'd n.r.e.); *Hyde v. Claude Neon Federal Co.,* 157 S.W.2d 952 (Tex.Civ.App.—Eastland 1941, writ dism'd); *White v. Wilbanks,* 144 S.W.2d 941 (Tex.Civ.App.—Amarillo 1940, no writ). Accordingly, we hold that the liquidated **\*667** damage clause is enforceable. Point seven is overruled.

 **[11]**   In his last point of error, Murphy contends that the court erred when it refused to set aside the judgment and render a take-nothing judgment in his favor. However, he failed to cite any authority to support his position. Under Rule 74(f), Murphy's point is not preserved for our review. TEX.R.APP.P. 74(f); *Tobias v. Univ. of Texas at Arlington,* 824 S.W.2d 201, 206–07 (Tex.App. —Fort Worth 1991, writ denied).

**[12]**   In one cross-point, Cintas contends that the court erred when it allowed Murphy to file a trial amendment after the case had been heard by the court. According to Cintas, Murphy had failed to plead the defense of penalty to the contract action under Rule 94 until after both parties had closed and the court had taken the case under advisement. TEX.R.CIV.P. 94. However, the only answer in the transcript is Defendant's Second Amended Original Answer. The record before us does not contain any of the answers that precede Murphy's last amended answer, from which Cintas complains. Accordingly, we cannot determine from the record to what extent Murphy amended his prior pleadings. To complain of error on appeal, it is incumbent upon the complaining party to submit evidence in the record to support his claim. TEX.R.APP.P. 50(d). Cintas's cross-point is overruled.

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (1)

### Direct History (1)

1. Murphy v. Cintas Corp. ✎
923 S.W.2d 663 , Tex.App.-Tyler , Feb. 23, 1996 , rehearing overruled ( Mar 14, 1996 ) , writ denied ( Sep 26, 1996 ) , rehearing of writ of error overruled ( Nov 15, 1996 )

2008 WL 2521967

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.
**MEMORANDUM OPINION**
Court of Appeals of Texas,
Beaumont.

NEXSTAR BROADCASTING, INC. d/b/a KBTV NBC 4, Appellant

v.

Jennifer GRAY and KTBS, Inc., Appellees.

No. 09-07-364 CV.  |  Submitted on March 13, 2008.  |  Decided June 26, 2008.

On Appeal from the 60th District Court, Jefferson County, Texas, Trial Cause No. B-174,467, Gary Sanderson, J.

**Attorneys and Law Firms**

William L. Davis, Esq., Jackson Lewis LLP, Dallas, for appellant.

Wyatt D. Snider, Jason M. Byrd, Snider & Byrd, L.L.P., Beaumont, Scott Louis Zimmer, Shreveport, LA, for appellee.

Before McKEITHEN, C.J., GAULTNEY and HORTON, JJ.

**MEMORANDUM OPINION**

DAVID GAULTNEY, Justice.

**\*1** Nexstar Broadcasting, Inc. d/b/a KBTV NBC 4 appeals a judgment rendered in a lawsuit filed against former employee Jennifer Gray for breach of contract and against Gray's subsequent employer, KTBS, Inc., for interference with the contract. A jury awarded Nexstar $1 in nominal damages from Gray on the breach of contract claim, and $2,000 in actual damages from KTBS on the tortious interference with the contract claim. The trial court granted Gray a declaratory judgment, ruling that a liquidated damages provision in the contract was an unenforceable penalty as a matter of law. The trial court ruled that Nexstar was not entitled to attorney's fees and awarded attorney's fees to Gray. The court granted KTBS's motion for judgment notwithstanding the verdict on the ground that there was no evidence of damages and rendered judgment that Nexstar take nothing from KTBS.

Nexstar asserts eight issues for appellate review. KTBS raises a cross-point attacking the sufficiency of the evidence to support the jury's finding of $2,000 in damages. *See*TEX.R. CIV. P. 324(c). We reverse the trial court's judgment. The cause is remanded for a new trial.

## BACKGROUND

Gray was originally hired by Nexstar as a reporter in 2003 and signed an employment contract. In 2004, Gray signed another contract with Nexstar as an on-air performer for a term of employment from April 11, 2004, to May 31, 2006. The contract contained a provision titled "Remedies and Procedure for Remedying Disputes," which stated:

> In the event Employee elects to breach this Agreement and leave employment prior to the conclusion of the term, the Company may accept as liquidated damages for said breach the amount of $10,000. In the event the Company determines that the liquidated damages amount described above is insufficient to cover all of its damages, the Company may seek to obtain additional compensatory and consequential damages by pursuing an action under paragraph 7(a) herein.

In February 2005, Gray gave notice that she would be resigning from her position. Nexstar sent her a letter reminding her of her continuing obligations under the contract. The letter informed Gray she would have to pay $10,000 if she left her employment. Nexstar learned that KTBS was interested in hiring Gray and sent KTBS a letter stating that Gray was still under contract.

Gray stopped appearing as an on-air performer for Nexstar in March 2005. Within two weeks of Gray's departure, she began working for KTBS.

## THE DECLARATORY JUDGMENT AND ATTORNEY'S FEES

Nexstar's lawsuit against Gray sought "liquidated damages from Gray and/or all actual and consequential damages proximately caused by her breach of contract."Gray filed a counterclaim seeking a declaratory judgment that the liquidated damages provision in the contract was an unenforceable penalty as a matter of law.

The trial court found that the liquidated damages provision in the employment contract was an unenforceable penalty. The jury awarded Nexstar $1.00 in nominal damages from Gray for the breach of contract. Nexstar and Gray stipulated to the amount of reasonable attorney's fees, but not to entitlement to attorney's fees. The trial court awarded Gray attorney's fees.

**\*2** In issue one, Nexstar argues the trial court erred in granting the declaratory judgment, because Gray had simply re-asserted an affirmative defense as a request for declaratory judgment. In issue six, Nexstar contends the trial court erred in awarding Gray attorney's fees because Gray asserted the declaratory judgment counterclaim merely to recover attorney's fees that were otherwise not recoverable.

The purpose of the Declaratory Judgments Act is to "settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations[.]"TEX. CIV. PRAC. & REM.CODE ANN. § 37.002(b) (Vernon 1997). A declaratory judgment is appropriate only if there is a justiciable controversy and the declaration sought will resolve the controversy. *Bonham State Bank v. Beadle,* 907 S.W.2d 465, 467 (Tex.1995). The Act is not available to settle disputes already pending before the court.*BHP Petroleum Co. v. Millard,* 800 S.W.2d 838, 841 (Tex.1990).

A trial court may allow a counterclaim seeking a declaratory judgment if it is more than a mere denial of the plaintiff's cause of action and has greater ramifications than the original lawsuit. *See id.* at 842.Generally, a counterclaim will have greater ramifications than the original claim if it would have the effect of settling future disputes between the parties. *See, e.g., id.*(allowing declaratory judgment counterclaim that defined the parties' obligations under an ongoing contract for the foreseeable future); *Winslow v. Acker,* 781 S.W.2d 322, 328 (Tex.App.-San Antonio 1989, writ denied) (holding trial court did not err in allowing declaratory judgment counterclaim that would settle all future disputes regarding royalties under deed). The counterclaim must seek affirmative relief and allege that the defendant has a cause of action, independent of the plaintiff's claim, on which the defendant could recover benefits, compensation, or relief. *Millard,* 800 S.W.2d at 841; *HECI Exploration Co. v. Clajon Gas Co.,* 843 S.W.2d 622, 638-39 (Tex.App.-Austin 1992, writ denied). A counterclaim that presents no new controversy may not be asserted simply to recover attorney's fees. *Hitchcock Props. Inc. v. Levering,* 776 S.W.2d 236, 239 (Tex.App.-Houston [1st Dist.] 1989, writ denied).

Gray sought a declaration that the remedies provision in the contract was an unenforceable penalty and void as a matter of law. This requested declaration is essentially a restatement of the "penalty" affirmative defense asserted in Gray's answer. *See Phillips v. Phillips,* 820 S.W.2d 785, 789 (Tex.1991) (noting that "penalty" is an affirmative defense to an award of damages under a liquidated damages provision). She sought no greater relief in her counterclaim than she asserted in her affirmative defense; Gray denied Nexstar's entitlement to liquidated damages. *See Millard,* 800 S.W.2d at 842. Gray and Nexstar have no ongoing relationship. *See HECI Exploration Co.,* 843 S.W.2d at 639. Gray's declaratory judgment counterclaim presented no new controversy. Under the circumstances, the award of attorney's fees to Gray under the Declaratory Judgments Act was unauthorized. *See Hitchcock Props.,* 776 S.W.2d at 239. We sustain issues one and six. [1]

## LIQUIDATED DAMAGES

**\*3** In issue two, Nexstar argues the trial court erred in failing to award liquidated damages because Nexstar prevailed on the breach of contract claim, and the contract provision was enforceable as a matter of law. Nexstar argues that liquidated damages are appropriate because damages were difficult or incapable of estimation at the time the contract was signed, and $10,000 was a reasonable forecast of just compensation.

"Whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law[.]"*Phillips,* 820 S.W.2d at 788. A liquidated damages provision may be enforceable if the harm caused by the breach is difficult to estimate and the amount of liquidated damages is a reasonable forecast of just compensation. *Id.* Evidence that the harm caused is difficult to estimate, and that the amount of liquidated damages is a reasonable forecast, must be viewed as of the time the parties executed the contract. *Baker v. Int'l Record Syndicate, Inc.,* 812 S.W.2d 53, 55 (Tex.App.-Dallas 1991, no writ).

Generally, a contractual provision that does not exclude further liability for actual damages is not a reasonable forecast of just compensation and is an unenforceable penalty. *Robert G. Beneke & Co., v. Cole,* 550 S.W.2d 321, 322 (Tex.Civ.App.-Dallas 1977, no writ). The provision must make clear that the amount of liquidated damages will be in lieu of other damages. *Birdwell v. Ferrell,* 746 S.W.2d 338, 340 (Tex.App.-Austin 1988, no writ).

The provision in this case provided for $10,000 as liquidated damages, but also stated that "[i]n the event the Company determines that the liquidated damages amount described above is insufficient to cover all of its damages, the Company may seek to obtain additional compensatory and consequential damages by pursuing an action under paragraph 7(a) herein."This provision does not limit Nexstar's recovery to liquidated damages or make clear that liquidated damages will be recovered in lieu of actual damages; under the provision, Nexstar could claim the "liquidated" damages and then claim any additional damages by taking the dispute to an arbitrator under paragraph 7(a). The trial court did not err in failing to award $10,000 as "liquidated" damages. Issue two is overruled.

## ACTUAL DAMAGES

In issue three, Nexstar asserts the evidence conclusively established that Nexstar suffered damages in excess of the $1 awarded by the jury. Nexstar argues it provided undisputed evidence that it incurred $14,615.49 in actual damages; we understand Nexstar to argue in issue three that it proved

$14,615.49 in damages as a matter of law. In the alternative, Nexstar argues in issue four that the jury's finding of $1 in actual damages is against the overwhelming weight of the evidence.

In issue eight, Nexstar argues the trial court erred in disregarding the jury's finding on damages against KTBS for tortious interference with the contract. A judgment notwithstanding the verdict is proper when no evidence supports the jury's finding. *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990). Nexstar contends the evidence supported a finding of at least $2,000 in damages, the amount found by the jury. KTBS argues by cross-point that the $2,000 finding is unsupported by the evidence.

 **\*4**  A party attacking the legal sufficiency of evidence concerning an adverse finding on an issue on which it has the burden of proof must demonstrate that the evidence conclusively established all vital facts in support of the issue. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001). If the proposition contrary to the verdict is established as a matter of law, an appellate court must render judgment for that proposition.*Id.*

In a factual sufficiency review, the appellate court considers and weighs all of the evidence and will set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.*

Nexstar points out the jury instructions on damages for interference with the contract and breach of the contract were the same: "out of pocket" damages. The jury found $2,000 in "out of pocket" damages resulted from the interference with contract, but $1 in damages resulted from the breach of contract. Nexstar argued in a post-judgment pleading that it was entitled to contract damages, at the least, in "the same $2,000 awarded against Defendant KTBS." In its claim against Gray, Nexstar argues on appeal "it is clear that the jury improperly failed to consider the undisputed evidence regarding Nexstar being 'out of pocket' $2,000 for the speech pathologist/talent coach because it found Nexstar was 'out of pocket' this amount in its answer to the damages question against KTBS." [2]

Nexstar also contends it paid $7,000 to promote a new morning show format that featured Gray as a meteorologist. The news director testified regarding this expense as follows:

[Plaintiff's Counsel]: And how much was that total cost?

[News Director]: I need to look. I'm not positive off the top of my head.

[Q]: Well, just give me your best estimate.

[A]: I believe it ran about $7,000.

[Q]: Okay.

Nexstar did not show that it promoted the morning show format only because of Gray. At the time of trial, Nexstar still aired the morning show with the same format.

Nexstar also argues that it is entitled to the $146.31 in makeup expenses it paid to Gray. The employment contract states that Gray would be reimbursed for makeup expenses for up to $50 per month. Nexstar presented two checks spent in makeup reimbursements: $73.61 paid in November 2004; and $73.70 paid on April 20, 2004. KBTV's news director testified that Gray used the makeup while she worked for Nexstar. Nexstar would have paid these expenses even had Gray fully performed under the contract.

Nexstar asserts that it reimbursed Gray $3,110.07 for her meteorology school tuition. Gray acknowledged that Nexstar paid for her to attend meteorology school. KBTV's news director testified that Nexstar did not normally pay for meteorology school but agreed to pay Gray's tuition because she had "great potential." The trial court admitted into evidence the checks issued by Nexstar for Gray's tuition: $1,431.50 paid on January 16, 2004; $1,194.07 paid on June 1, 2004; and $484.50 paid on July 28, 2004. The last two tuition checks, for $1,194.07 and $484.50, were paid during the term of employment under the March 2004 contract. However, Nexstar was not required to reimburse Gray for her meteorology school tuition expenses under the March 2004 contract.

 **\*5** Nexstar argues that it paid $2,000 to a speech pathologist, or talent coach, who provided Gray with voice training. The talent coach trained all of the on-air performers. KBTV's news director would set a day planner for the coach and would allocate how much time each individual would spend with the coach. The time an individual would spend with the coach varied according to how long the individual worked with the station and how much potential they had. KBTV's general manager testified that when Gray first started working with the station, the coach spent more time with Gray to improve her voice. However, Nexstar did not present evidence showing how much time Gray spent with the coach, nor did it segregate Gray's time with the coach from the time the other on-air performers trained with the coach. The record does not show whether the training occurred when Gray was first hired under the original contract, or during the term of the second contract.

Finally, Nexstar also contends it incurred costs in hiring Gray's replacement and paid for an on-air performer to fill in for Gray. While Nexstar sought candidates to replace Gray, Gray's meteorology duties were covered by the station's chief and weekend meteorologists. Nexstar paid Gray's meteorology replacement $191.30 in traveling expenses, $750 in moving expenses, and $607.81 for a plane ticket. Nexstar also paid $810 to a freelance reporter who covered some of Gray's reporting duties. KTBS argues Nexstar would have been required to replace Gray at the

end of her contract in any event and would have incurred the costs even without the alleged interference.

## THE JURY'S FINDINGS

The findings by the jury, that Nexstar suffered $1 in out of pocket damages as a result of Gray's breach and $2,000 in out of pocket damages as a result of KTBS's tortious interference, address the same material fact. The measure of damages under the interference with contract claim is the same as that under the breach of contract claim in this case. *See Am. Nat'l Petroleum Co. & Oil Invs., Ltd. v. Transcon. Gas Pipe Line Corp.,* 798 S.W.2d 274, 278 (Tex.1990).

The trial judge found no evidence to support the $2,000 damage finding and signed a judgment notwithstanding the verdict. There is legally sufficient evidence in this record of some damages, however. Though this record may not support an award of all of the costs of finding a replacement, the jury could reasonably conclude some of the costs incurred in covering Gray's job duties, hiring a freelance reporter, and finding a replacement on short notice could have been avoided if KTBS had not interfered with the contract. *See Guevara v. Ferrer,* 247 S.W.3d 662, 670 (Tex.2007) ("[W]hen there is evidence to support some damages it is not appropriate to render judgment."). But the jury made conflicting jury findings on conflicting evidence concerning the same material fact. The jury also found the same evidence did not support more than $1 in damages for the breach of contract. On this record, a coherent judgment cannot be rendered. A new trial is required. [3]

## CONCLUSION

**\*6** The trial court's judgment is reversed. The cause is remanded for a new trial.

REVERSED AND REMANDED.

**Parallel Citations**

27 IER Cases 1872

Footnotes

[1]    In issue seven, Nexstar also argues the trial court abused its discretion in awarding attorney's fees. We need not address this issue because of our resolution of issues one and six.

[2]    We address the arguments made and issues raised despite Nexstar's failure to object to the asserted conflict before the jury was discharged. *See generally C. & R. Transport, Inc. v. Campbell,* 406 S.W.2d 191, 195-96 (Tex.1966); *Little Rock Furniture Mfg. Co.*

*v. Dunn,* 148 Tex. 197, 222 S.W.2d 985 (1949).*But see Columbia Med. Ctr. of Las Colinas v. Bush,* 122 S.W.3d 835, 861 (Tex.App.-Fort Worth 2003, pet. denied); *Coastal Chem, Inc. v. Brown,* 35 S.W.3d 90, 99 (Tex.App.-Houston [14th Dist.] 2000, pet. denied).

3    In issue five, Nexstar argues the trial court erred in denying its request for attorney's fees because it prevailed on its breach of contract claim against Gray. Because we reverse and remand the cause for a new trial, we do not reach this issue.

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (4)

### Direct History (4)

🚩 1.  NEXSTAR BROADCASTING, INC. d/b/a KBTV NBC 4, v. Jennifer GRAY and KTBS, Inc.
2007 WL 1510498 , Tex.Dist. , Apr. 18, 2007

*Judgment Reversed by*

2.  Nexstar Broadcasting, Inc. v. Gray 👓
2008 WL 2521967 , Tex.App.-Beaumont , June 26, 2008

🚩 3.  NEXSTAR BROADCASTING, INC. d/b/a KBTV NBC 4, Plaintiff, v. Jennifer GRAY and KTBS, Inc., Defendant.
2007 WL 1510499 , Tex.Dist. , Apr. 18, 2007

*Judgment Reversed by*

4.  Nexstar Broadcasting, Inc. v. Gray 👓
2008 WL 2521967 , Tex.App.-Beaumont , June 26, 2008

23 S.W.3d 42
Court of Appeals of Texas,
Austin.

James W. PAULSEN; Independent Bankers Association of Texas; Texas Bankers Association; and Texas Savings & Community Bankers Association, Appellants,
v.
TEXAS EQUAL ACCESS TO JUSTICE FOUNDATION, Appellee.

No. 03–98–00709–CV.    |    Dec. 2, 1999.    |    Rehearing Overruled March 23, 2000.

Attorney and bank associations brought action against legal service foundation which supported by interest on lawyers trust accounts (IOLTA) funds, seeking declaratory judgment that IOLTA accounts are general accounts and interest earned on IOLTA account is property of banks which may be used in IOLTA program without liability to attorney's clients. Following trial, the District Court, Travis County, 353rd Judicial District, Margaret A. Cooper, J., denied all requests for relief, and attorney and associations appealed. The Court of Appeals, Jones, J., held that: (1) attorney's declaratory judgment action did not state justiciable controversy, and (2) association failed to establish existence of imminent contractual dispute between banks and foundation, sufficient for declaratory judgment action.

Vacated and dismissed.

**Attorneys and Law Firms**

 **\*43** James Walter Paulsen, Houston, Mark Schwartz, Howard Nirken, Jenkens & Gilchrest, Austin, for appellant.

Darrell E. Jordan, Hughes & Luce, L.L.P., Dallas, for appellee.

Before Justices JONES, YEAKEL and PATTERSON.

**Opinion**

J. WOODFIN JONES, Justice.

Appellants James W. Paulsen (Paulsen), Independent Bankers Association of Texas, Texas Bankers Association, and Texas Savings and Community Bankers Association (collectively, Bankers) sued the Texas Equal Access to Justice Foundation (the Foundation), appellee, seeking declaratory and injunctive relief. The trial court denied all requested relief. The Texas Supreme

Court then declined to hear a direct appeal. Before this Court, appellants have abandoned the request for injunctive relief and now seek only a declaration that (1) IOLTA ("interest on lawyers trust account") accounts generally and in this particular case are "general" not "special" accounts; (2) the relationship between an attorney-depositor and the financial institution that administers an IOLTA account is that of creditor and banker, respectively; (3) the financial institution holds legal title to all sums deposited in the IOLTA account at issue in this case; (4) the financial institution incurs no legal liability to third parties, including the attorney's clients, solely because it participates in the IOLTA program; and (5) Paulsen is not subject to professional discipline for failure to participate in the Texas IOLTA program, pending definitive resolution of that program's constitutionality. We will vacate the trial court's judgment and dismiss the cause for lack of a justiciable controversy.

## FACTUAL AND PROCEDURAL BACKGROUND

The Texas IOLTA program, like similar programs instituted in almost every other state, was established to raise money to provide legal assistance to low-income Texans. The "Rules Governing the Operation of the Texas Equal Access to Justice Program" oblige attorneys to participate, subject to suspension of their law licenses. *See* Tex.R. Equal Access to Justice Prog. 24 (State Bar Rules art. 11). When an attorney holds client funds, the money should ordinarily be deposited into a trust account to earn interest for the client. But where the amount held is nominal, such that it could not be expected to earn enough interest to offset the cost of maintaining a separate trust account, the funds are required to be deposited into an IOLTA account. *See* Tex.R. Equal Access to Justice Prog. 4, 6. The IOLTA account pools all such deposits from the attorney; collectively, the sums generate interest where no individual deposit could. The interest is then paid to the Foundation, which distributes the interest received from all IOLTA accounts in Texas to low-income legal services. *See* Tex.R. Equal Access to Justice Prog. 4, 10.

A constitutional takings challenge to Texas's IOLTA program was brought in *Phillips v. Washington Legal Foundation,* which resulted in a 1998 United States Supreme Court decision holding that interest **\*44** earned on an IOLTA account is the private property of the clients of the attorney who established the account. 524 U.S. 156, 172, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998). That case is now on remand to the United States District Court for the Western District of Texas for further proceedings to determine whether those funds have been "taken" by the state without just compensation. While *Phillips* did not decide the ultimate issue of whether compliance with the IOLTA program effectuates a governmental taking of client property, it is fair to say that the constitutionality of the program is uncertain in the wake of the Supreme Court's decision. It is that uncertainty that appellants hope to resolve in this action.

The *Phillips* decision left many questions unanswered, in part because of the procedural framework in which the case was brought. That case was an appeal from the trial court's grant of summary judgment and so arrived before the Supreme Court without the benefit of discovery. Since the record was essentially devoid of details, the *Phillips* decision made no reference to banking law or the particulars of an IOLTA contract between an attorney and bank. The *Phillips* decision therefore makes no reference to the distinction recognized in Texas banking law between "general" and "special" accounts; this distinction, appellants assert, would have led to a different ruling. Appellants urge us to clarify what they characterize as the Supreme Court's misstatement of Texas law and to hold that both the principal and the interest earned on "general" accounts—and IOLTA accounts are apparently all "general"—are the property of the *bank* and not the *client*. Since the interest earned is bank property, appellants argue, there is no unconstitutional taking involved when the bank pays that interest to the Foundation.

All parties to this suit agree on the constitutionality of IOLTA. Appellant Paulsen is an attorney who has received a $1,000 retainer from a client and claims uncertainty as to his rights and obligations with respect to this money. The Equal Access to Justice Rules require him to deposit the $1,000 in an IOLTA account or risk suspension of his license to practice law, yet he claims the *Phillips* decision exposes him to liability to his client for breach of fiduciary duties if he does deposit the funds. Bankers are the principal trade organizations for Texas financial institutions. They claim that the contracts signed by their members and attorneys establishing IOLTA accounts are brought into question by the *Phillips* decision. While the banks are contractually obligated to pay IOLTA interest to the Foundation, they also fear liability from threatened lawsuits should they continue to participate in the IOLTA program.

Appellee, the Foundation, does not disagree with appellants as to the constitutionality of the IOLTA program. In fact, the Foundation has vigorously defended the IOLTA program as a defendant in the ongoing *Phillips* litigation. It apparently disagrees with appellants only as to how far this Court should go in deciding the ultimate constitutional issues involved. This lack of adversarial debate between the parties was noted in an amicus brief tendered by David Furlow, an attorney who disputes the constitutionality of the IOLTA program.

## DISCUSSION

**[1]** The Uniform Declaratory Judgments Act gives courts the power to "declare rights, status, and other legal relations whether or not further relief is or could be claimed." Tex. Civ. Prac. & Rem.Code Ann. § 37.003 (West 1997). The determination of jurisdiction over a declaratory judgment action is a question of law and so is subject to *de novo* review. *See Texas Dep't of Pub. Safety v. Moore,* 985 S.W.2d 149, 153 (Tex.App.—Austin 1998, no pet.).

 **[2]**  **[3]**  An action for declaratory relief is subject to the same jurisdictional requirements **\*45** as any other action brought in our courts. "Subject matter jurisdiction requires that the party bringing the suit have standing, that there be a live controversy between the parties, and that the case be justiciable." *State Bar of Tex. v. Gomez,* 891 S.W.2d 243, 245 (Tex.1994) (plurality opinion) (citing *Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 443–46 (Tex.1993)). The parties before us cannot satisfy these threshold jurisdictional requirements. Because the trial court lacked subject matter jurisdiction over this case, we will vacate that court's judgment and dismiss the cause.

### *Appellant Paulsen*

 **[4]**  Paulsen seeks declaratory judgment because, by refusing to deposit a $1,000 client retainer in his IOLTA account, he claims he faces the imminent suspension of his law license. It is not at all clear from the record that the suspension of Paulsen's license is inevitable or imminent. In a post-submission brief, however, Paulsen attached a letter he received from the Foundation informing him that disciplinary action will be initiated if he does not comply with IOLTA rules. Assuming without deciding that we can consider this letter, and further assuming that the letter confers standing on Paulsen, we nonetheless conclude that his suit must be dismissed for want of jurisdiction, for he has not demonstrated any justiciable controversy with his putative opponent in this case.

The crux of the claimed dispute between Paulsen and the Foundation lies in the interpretation of the Supreme Court's *Phillips* decision. Paulsen argues that if we accept as a correct statement of Texas law the *Phillips* holding that interest earned in IOLTA accounts is client property,[1] then the decision places him in an ethical quandary. If he continues to participate in the IOLTA program, Paulsen believes he breaches his ethical duty to his client when he contracts with his bank to turn IOLTA interest over to the Foundation. On the other hand, if he does not give the interest to the Foundation, he breaches professional ethics rules and stands to lose his law license. The Foundation disagrees with Paulsen only as to whether *Phillips* creates ethical uncertainty. It believes that *Phillips* answered only the question of whether a client could *ever* have a property right in interest that would not exist without the IOLTA program; the Foundation believes *Phillips* did not establish conclusively that IOLTA interest is *always* client property. That question will be decided by the federal district court on remand. This dispute, then, centers on how broadly *Phillips* can be read.

 **[5]**  What is troubling about this appeal is that the parties *all* believe that an attorney can ethically participate in the Texas IOLTA program. Paulsen merely claims that someone else might construe *Phillips* differently, and that such an alternate interpretation would put him in an ethical bind. With no true opponent in the Foundation, what Paulsen seeks, in essence, is an advisory opinion interpreting a decision from the Supreme Court to resolve his doubts about the IOLTA program.

But, of course, the separation of powers doctrine prevents us from complying with this request. Neither the legislature nor the constitution has vested us with the authority to render an advisory opinion. *See* Tex. Const. art. II, § 1; *Olson v. Commission for Lawyer Discipline,* 901 S.W.2d 520, 522 (Tex.App.—El Paso 1995, no writ). We therefore hold that Paulsen has presented **\*46** no justiciable controversy between himself and the Foundation.

### *Appellant Bankers*

 **[6]**　Bankers claim to have standing in this declaratory relief action because they are faced with uncertainty and insecurity in their performance of current contracts with the Foundation.[2] The Uniform Declaratory Judgments Act specifically provides that "a contract may be construed either before or after there has been a breach." Tex. Civ. Prac. & Rem.Code Ann. § 37.004(b) (West 1997); *see also In re City of Dallas,* 977 S.W.2d 798, 804 (Tex.App.—Fort Worth 1998, no pet.); *Hasty Inc. v. Inwood Buckhorn Joint Venture,* 908 S.W.2d 494, 499 (Tex.App.—Dallas 1995, writ denied). Section 37.004 does not, however, extend an open-ended invitation to parties seeking interpretation of their contracts. There must be some showing that litigation is imminent between the parties unless the contractual uncertainties are judicially resolved. *See Reuter v. Cordes–Hendreks Coiffures, Inc.,* 422 S.W.2d 193, 196 (Tex.Civ.App.—Houston [14th Dist.] 1967, no writ).

 **[7]**　Bankers have not demonstrated any imminent contractual dispute with the Foundation. As primary proof of their grounds for uncertainty, Bankers cite a letter from Michael Mazzone[3] to appellant banking groups warning that the banks could face liability for the tort of conversion for any interest paid by them to the Foundation after the *Phillips* decision. In the letter, Mazzone ominously warned that he has "personal knowledge that there are lawyers who are planning a class action lawsuit against a number of banks."

Mazzone's letter is insufficient to support an action for declaratory judgment. It amounts to a threat from a stranger to this action who refers to unnamed sources who may be contemplating a lawsuit at some point in the future. Bankers' feared liability to theoretical litigants is simply too remote to support a claim for declaratory relief. Further, it does not appear that the litigation the Bankers fear would even involve the Foundation. Mazzone's letter warned banks that they could be liable for the tort of conversion if they continue to pay IOLTA interest to the Foundation. In that event, any liability for conversion would be to the clients of the depositing attorneys and not to the Foundation.

Bankers, as evidenced by their briefs, strongly believe that IOLTA is constitutional and apparently intend to honor their contracts establishing IOLTA accounts unless and until a court declares the IOLTA program unconstitutional. Even assuming that the Foundation would have standing to protect its right as third-party beneficiary to the interest earned on IOLTA accounts, there is no

justiciable controversy where, as here, there is an absence of any real threat or intention to breach a contract. *See id. (citing Spradley v. Whitehall,* 314 S.W.2d 615, 619 (Tex.Civ.App.—Fort Worth 1958, no writ)). The trial court, therefore, lacked jurisdiction to grant the relief sought by Bankers.

### *True Controversy*

The only issue on which the parties to this case seem to disagree is how broadly *Phillips* should be read. Appellants paint a doomsday picture that throws all banking practices into uncertainty unless we hold that the Supreme Court misstated Texas law, grant declaratory relief reiterating the distinction between "general" and "special" accounts, and explicitly hold that IOLTA is constitutional. Appellants assert in the alternative that if, despite their arguments to the contrary, we believe *Phillips* is correct, we should hold IOLTA expressly unconstitutional. The Foundation thinks the *Phillips* holding is **\*47** more narrow than appellants read it; they have no qualms with a declaration from this Court that IOLTA is constitutional, but they urge us to refrain from deciding IOLTA is unconstitutional on the strength of the *Phillips* decision. They otherwise have no dispute with appellants' position and encourage us to grant the declaratory relief sought.

 **[8]** We must not decide a case that amounts to no more than a disagreement on how broadly the *Phillips* decision can be read. "A mere difference of opinion, not involving the assertion of adverse interests, is not sufficient to support an action for declaratory judgment." *Reuter,* 422 S.W.2d at 196 (*quoting* 26 C.J.S. *Declaratory Judgments,* § 29 (1956)). In spite of the injuries and uncertainties appellants claim they will suffer, it seems they have no real dispute with the Foundation. This case has been marked throughout by a near-total lack of true controversy between the parties. The trial below was very brief. Paulsen was the only witness who testified, and cross-examination by the Foundation's lawyer was perfunctory, consisting of only three questions to confirm that the *Phillips* court did not determine the ultimate constitutionality of the IOLTA program. On appeal, the Foundation has not even raised the strongest reasons in support of the trial court's judgment— those jurisdictional issues we have detailed above; indeed, appellee's brief is a mere seven pages long. They are seven well-written and thoughtful pages, to be sure, but the brevity underscores the lack of true controversy in this case.

Whatever dispute appellants claim to have with the Foundation is clearly secondary to their desire to have this Court effectively overrule the U.S. Supreme Court, declaring that the Court misinterpreted Texas law in its *Phillips* ruling. Appellants' briefs focus almost exclusively on the constitutionality of IOLTA, paying only minor attention to the claimed dispute with the Foundation.

We are not unsympathetic to appellants' arguments. The *Phillips* decision does appear to have at least overlooked, if not misstated, a large body of Texas banking law that distinguishes between "general" and "special" accounts. *See, e.g., Texas Commerce Bank v. Townsend,* 786 S.W.2d 53 (Tex.App.—Austin 1990, writ denied). In a general account, Texas law is clear that the financial

institution holds title to the funds deposited. *See id.* at 54. Paulsen's contract with his bank establishing an IOLTA account expressly states that it is a general account. Since the *Phillips* court stated that "interest follows principal," *Phillips,* 524 U.S. at 165–66, 118 S.Ct. 1925, the natural conclusion would be that the interest earned in an IOLTA account belongs to the banks as well. This appears to be in direct conflict with the actual *Phillips* holding that interest earned in an IOLTA account is the property of the attorney's client. *See id.* at 172, 118 S.Ct. 1925.

Whatever our impressions of the constitutional arguments in support of IOLTA, however, this particular case provides a singularly inappropriate context for deciding those issues. Both appellants and the Foundation are committed to upholding the constitutionality of the IOLTA program. In its brief the Foundation candidly admits that it does not contest the central legal premises of appellants' argument, and emphasizes that the Foundation is making the same pro-IOLTA arguments in the ongoing *Phillips* litigation in the federal district court.

In their arguments, the parties attempt to demonstrate that they are not in unanimous agreement on how far this Court might go if we were to agree with the Supreme Court, but neither side ever seriously argues that IOLTA could be anything but constitutional. The hair-splitting difference between the parties' positions hardly presents the sort of robust debate a court should expect and demand when a major constitutional ruling is at issue. At core, both appellants and the Foundation **\*48** are in total agreement that IOLTA should be declared constitutional. It would be inappropriate for us to decide an issue of such gravity where there has been no genuine debate. In fact, the Supreme Court has expressly held that where both litigants agree on the constitutionality of a statute being challenged and desire the same result, there is no case or controversy before the court. *See Moore v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 47, 48, 91 S.Ct. 1292, 28 L.Ed.2d 590 (1971).

Truly, the appropriate forum for deciding the issues at the heart of this appeal is in the federal district court, where the *Phillips* litigation is now pending on remand and the court is faced squarely with the constitutionality of IOLTA. If the facts of this case were altered only slightly, we would be *required* to defer to that court's proceeding, for there is a wide body of law that would prevent us from deciding this declaratory judgment action if another action were pending between the same parties which would adjudicate the issues involved in the present action. *See Texas Liquor Control Bd. v. Canyon Creek Land Corp.,* 456 S.W.2d 891, 895 (Tex.1970); *Tucker v. Graham,* 878 S.W.2d 681, 683 (Tex.App.—Eastland 1994, no writ); *Southern Traffic Bureau v. Thompson,* 232 S.W.2d 742, 750 (Tex.Civ.App.—San Antonio 1950, writ ref'd n.r.e.). Because the parties before us are not identical to those involved in the *Phillips* litigation, that doctrine cannot squarely dispose of this case.[4] The parties before us could, however, have intervened in the *Phillips* suit and presented their constitutional arguments in a more direct fashion to the district court. That case has been hotly contested and is certain to involve a much fuller and more balanced debate than has developed in the present cause. For that reason, the ongoing *Phillips* litigation would

be a more appropriate forum for settling the question of whether the IOLTA program creates an unconstitutional taking of client property.

## CONCLUSION

We hold that appellants have not presented this Court or the trial court with a justiciable controversy. Paulsen seeks an advisory opinion from this Court interpreting a United States Supreme Court opinion. Bankers face no imminent litigation over their IOLTA contracts, and their claimed uncertainty as to their rights and obligations is insufficient to present the court with a justiciable action. For these reasons, the trial court lacked subject matter jurisdiction over the action presented; we therefore vacate that court's judgment and dismiss the cause.

## Footnotes

1    Of course, Paulsen does not *really* want us to accept this as true at all. He frames the issue in these terms to attempt to create a justiciable controversy between himself and the Foundation. The real goal of the litigation is apparently to have this Court decide that the U.S. Supreme Court was wrong in so holding, and that consequently IOLTA is constitutional under Texas law. We discuss *infra* why the present case is an inappropriate one for deciding that issue.

2    In an IOLTA contract, the Foundation is declared to be a third-party beneficiary to the contract between the financial institution and the attorney who establishes the account.

3    Mazzone is a named plaintiff in the *Phillips* litigation.

4    Paulsen is not a party to the *Phillips* case, but he was involved in the case to the extent that he drafted the *amicus curiae* briefs tendered to the Fifth Circuit Court of Appeals on behalf of the state bars of Texas, Mississippi, and Louisiana in support of IOLTA. The Foundation is a party to the ongoing *Phillips* litigation, but Bankers are not.

**End of Document**                                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (4)

### Direct History (1)

1. Paulsen v. Texas Equal Access to Justice Foundation
23 S.W.3d 42 , Tex.App.-Austin , Dec. 02, 1999 , rehearing overruled ( Mar 23, 2000 ) , review dismissed ( Jan 18, 2001 ) , order withdrawn ( Apr 26, 2001 ) , rehearing of petition for review denied ( Apr 26, 2001 ) , review denied ( Apr 26, 2001 )

### Related References (3)

2. Paulsen v. State Bar of Texas
2001 WL 23180 , Tex.App.-Austin , Jan. 11, 2001

*Opinion Withdrawn and Superseded on Rehearing by*

3. Paulsen v. State Bar of Texas
2001 WL 300142 , Tex.App.-Austin , Mar. 29, 2001

*Opinion Withdrawn and Superseded on Rehearing by*

4. Paulsen v. State Bar of Texas
55 S.W.3d 39 , Tex.App.-Austin , June 14, 2001 , rehearing overruled ( Oct 04, 2001 ) , review denied ( Jun 06, 2002 ) , rehearing of petition for review denied ( Dec 12, 2002 )

820 S.W.2d 785
Supreme Court of Texas.

Martha Jean PHILLIPS, Petitioner,
v.
Harry S. PHILLIPS, et al., Respondents.

No. D–0107.   |   Dec. 11, 1991.   |   Rehearing Overruled Jan. 29, 1992.

Limited partner sued general partner for breach of partnership agreement. The 114th Judicial District Court, Smith County, Galloway Calhoun, J., granted judgment, and appeal was taken. The Tyler Court of Appeals, 792 S.W.2d 269, reversed and remanded, and further appeal was taken. The Supreme Court, Hecht, J., held that: (1) clause in partnership agreement calling for payment of ten times actual damages to limited partner if agreement was breached by general partner was unenforceable penalty, rather than enforceable liquidated damages provision, and (2) general partner did not waive affirmative defense of penalty by failing to plead it, in that such defense was apparent on face of petition and established as matter of law.

Affirmed.

Gonzalez, J., dissented and filed opinion in which Mauzy and Doggett, JJ., joined.

**Attorneys and Law Firms**

 **\*786**  Michael S. Wilk, Anna L. Stock, Jay N. Gross, Houston, for petitioner.

Patrick Kelley, Otis Carroll, Tyler, for respondents.

**OPINION**

HECHT, Justice.

We granted the applications for writ of error in this case to decide whether a contractual provision that requires payment of a multiple of actual damages for breach of trust is an unenforceable penalty, and if so, whether the defense of penalty was waived because it was not pleaded. The trial court and court of appeals refused to enforce the provision. 792 S.W.2d 269 (Tex.App.1990). We affirm the judgment of the court of appeals.

During 32 years of marriage, Harry and Martha Phillips accumulated over $18 million in community property, primarily through the oil and gas business Harry managed. When they divorced, rather than break up their oil and gas holdings, they created Phillips & Phillips, Ltd., a limited partnership, and transferred the bulk of their assets to it. Each had an equal interest in the partnership. Harry, the only general partner, agreed to work for the partnership full-time without salary and to offer Martha the option to participate in any business opportunities he pursued outside the partnership. Martha, the only limited partner, agreed that she would have no right to participate in Harry's business decisions for the partnership and that she would leave each of her four children by Harry at least one-sixth of her estate.

The partnership agreement required Harry to pay himself and Martha each a minimum **\*787** of $21,000 per month for 24 months, and then minimum monthly distributions adjusted for inflation and for oil and gas prices. It also required Harry to furnish Martha certain financial information about the partnership and to cooperate with her in auditing its affairs. The agreement contained the following provision: "If the general partner breaches his trust hereunder, he shall pay to the limited partner as liquidated damages ten times the amount she loses as a result of such breaches of trust. Errors of judgment shall not be considered breaches of trusts."

The value of the partnership increased under Harry's management, but Harry did not fully comply with the terms of the written agreement. In particular, after the first 20 months Harry distributed much less than the required minimum amounts, never actually calculating what payments the agreement required. He also failed to provide timely annual statements of operations and refused to cooperate fully with Martha's attempts to audit the partnership.

Martha eventually sued Harry for dissolution of the partnership and damages based upon Harry's breach of contractual and fiduciary duties. The case was tried to a jury, who found that Harry breached the partnership agreement by favoring himself in paying his personal expenses and encumbering partnership assets, thus endangering partnership distributions. The jury also found that Harry breached both the partnership agreement and his fiduciary duty to Martha by failing to keep current and complete partnership books, failing to prepare required annual statements, and interfering with Martha's efforts to examine partnership books and records. [1] The jury assessed Martha's actual damages at $300,000. None of the jury's findings are challenged by the parties on appeal.

During the trial the parties stipulated that a reasonable fee for legal services necessary for Martha's prosecution of the case was $235,302.14. The jury was aware of this stipulation, and the trial court surmised that the jury included this amount in its $300,000 finding. Accordingly, the trial court rendered judgment for Martha for a total of $300,000, $235,302.14 against the partnership and $64,697.86 against Harry, and refused to award Martha any additional amount for attorney fees. The trial court also ordered the partnership dissolved.

Martha appealed; Harry did not. The court of appeals held that the trial court erred in refusing to award Martha the $235,302.14 stipulated attorney fees in addition to the $300,000 damages found by the jury, but that the trial court did not err in refusing to award Martha decuple damages under the partnership agreement. Consequently, the appeals court reversed the judgment of the trial court in part and rendered judgment against Harry for a total of $535,302.14, plus interest. [2]

**\*788** Martha contends that she is entitled to recover liquidated damages equal to ten times the actual damages found by the jury, as provided by the limited partnership agreement. Harry contends that the contractual provision is not an enforceable agreement for liquidated damages but an unenforceable penalty. Martha argues that even if Harry is correct, he has waived any defense of penalty by failing to plead it as an affirmative defense.

**[1]** We first considered the difference between an enforceable liquidated damages provision and an unenforceable penalty in *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 485–486 (1952). There we explained:

> Volumes have been written on the question of when a stipulated damage provision of a contract should be enforced as liquidated damages and when enforcement should be denied because it is a penalty provision.... All agree that to be enforceable as liquidated damages the damages must be uncertain and the stipulation must be reasonable.

. . . . .

> The right of competent parties to make their own bargains is not unlimited. The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained. By the operation of that rule a party generally should be awarded neither less nor more than his actual damages. A party has no right to have a court enforce a stipulation which violates the principle underlying that rule.

More recently, in *Rio Grande Valley Sugar Growers, Inc. v. Campesi,* 592 S.W.2d 340, 342 n. 2 (Tex.1979), we restated the two-part *Stewart* test for determining whether to enforce a contractual damages provision as follows: "In order to enforce a liquidated damage clause, the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." *Cf.* TEX.BUS. & COM.CODE § 2.718(a). [3]

**[2]** Whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law for the court to decide. *Farrar v. Beeman,* 63 Tex. 175, 181 (1885); *see Lefevere v. Sears,* 629 S.W.2d 768, 771 (Tex.Civ.App.—El Paso 1981, no writ); *Muller v. Light,* 538 S.W.2d 487, 488 (Tex.Civ.App.—Austin 1976, writ ref'd n.r.e.); *Schepps*

*v. American Dist. Telegraph Co.,* 286 S.W.2d 684, 690 (Tex.Civ.App.—Dallas 1955, no writ); *Zucht v. Stewart Title Guar. Co.,* 207 S.W.2d 414, 418 (Tex.Civ.App.—San Antonio 1947, writ dism'd); *Bourland v. Huffhines,* 244 S.W. 847, 849 (Tex.Civ.App.—Amarillo 1922, writ dism'd). Sometimes, however, factual issues must be resolved before the legal question can be decided. For example, to show that a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for, a defendant may be required to prove what the actual damages were. *See Johnson Eng'rs, Inc. v. Tri–Water Supply Corp.,* 582 S.W.2d 555, 557 (Tex.Civ.App.—Texarkana 1979, no writ); *Oetting v. Flake Uniform & Linen Serv., Inc.,* 553 S.W.2d 793, 796–797 (Tex.Civ.App.—Fort Worth 1977, no writ); **\*789** *Smith v. Lane,* 236 S.W.2d 214, 215 (Tex.Civ.App.—San Antonio 1950, no writ); *Southern Plow Co. v. Dunlap Hardware Co.,* 236 S.W. 765, 766–767 (Tex.Civ.App.—Dallas 1922, no writ); *Walsh v. Methodist Episcopal Church,* 212 S.W. 950, 952 (Tex.Comm'n App.1919, judgm't adopted).

 **[3]**  **[4]**   The enforceability of the contractual provision in this case involves no fact issues. A contractual provision like the one here by which one party agrees to pay the other some multiple of actual damages for breach of the agreement does not meet either part of the legal test for an enforceable liquidated damages provision. It cannot meet the first prong of the test because the harm caused by the breach of the contract is not incapable or difficult of estimation. The provision assumes actual damages can and will be determined, indeed must be determined, before the prescribed multiplier can be applied. The provision cannot meet the second prong of the test because, instead of attempting to forecast actual damages, it calls for them to be determined and then multiplied. *Cf. Robert G. Beneke & Co. v. Cole,* 550 S.W.2d 321 (Tex.Civ.App.—Dallas 1977, no writ) (contract provision which fixes liquidated damages without excluding additional liability for actual damages is not a reasonable forecast of just compensation and therefore a penalty). A contractual provision like the one in this case is thus, on its face, an unenforceable penalty.

 **[5]**  **[6]**   Harry, however, did not plead penalty as an affirmative defense to an award of damages under the liquidated damages provision in the partnership agreement. Although penalty is not among the affirmative defenses enumerated in Rule 94, TEX.R.CIV.P., the listing in that rule is not exclusive. Penalty is, in the language of the rule, a "matter constituting an avoidance or affirmative defense." *Johnson,* 582 S.W.2d at 557; *Oetting,* 553 S.W.2d at 795–796; *Robinson v. Granite Equip. Leasing Corp.,* 553 S.W.2d 633, 637 (Tex.Civ.App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.); *Walter E. Heller & Co. v. B.C. & M., Inc.,* 543 S.W.2d 696, 697 (Tex.Civ.App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.); *LoBue v. United Serv. Planning Ass'n,* 467 S.W.2d 574, 576 (Tex.Civ.App.—Fort Worth 1971, writ dism'd); *Young v. J.F. Zimmerman & Sons, Inc.,* 434 S.W.2d 926, 927 (Tex.Civ.App.—Waco 1968, writ dism'd); *Smith v. Waite,* 424 S.W.2d 691, 693 (Tex.Civ.App.—Waco 1968, writ ref'd n.r.e.); *Smith,* 236 S.W.2d at 215; *Southern Plow,* 236 S.W. at 766–767; *Walsh,* 212 S.W. at 952. As a general rule, an affirmative defense must be pleaded or it is waived. TEX.R.CIV.P. 94.

 **[7]**    One exception to this rule is the defense of illegality, a defense specifically listed in Rule 94. "[I]f the illegal nature of the document to be relied upon or sought to be enforced is apparent from the plaintiff's pleadings, it is not necessary that illegality be specially pleaded by the defendant in order to rely upon it as a defense." *Lewkowicz v. El Paso Apparel Corp.,* 625 S.W.2d 301, 303 (Tex.1981); *accord Niles v. Harris County Fresh Water Supply Dist.,* 339 S.W.2d 562, 563 (Tex.Civ.App.—Waco 1960, writ ref'd); *Reid v. Associated Employers Lloyds,* 164 S.W.2d 584, 585–586 (Tex.Civ.App.—Fort Worth 1942, writ ref'd); *Montgomery Ward & Co. v. Lusk,* 52 S.W.2d 1110 (Tex.Civ.App.—Waco 1932, writ ref'd); *Texas & P. Coal Co. v. Lawson,* 89 Tex. 394, 34 S.W. 919, 921 (1896). Two principles support this exception to the general rule that affirmative defenses are waived if not pleaded. One is that "[w]hen a plaintiff in his pleadings anticipates defensive matters and pleads them, a defendant may rely upon the defenses though his only pleading is a general denial." *Raney v. White,* 267 S.W.2d 199, 200 (Tex.Civ.App.—San Antonio 1954, writ ref'd). Pleading an agreement illegal on its face in effect anticipates the defense. The other principle is that the courts will not enforce a plainly illegal contract even if the parties do not object. *Lawson,* 34 S.W. at 921. Enforcement of an illegal agreement violates public policy. *Id.*

 **[8]**    For the same reasons, we hold that the defense of penalty is not waived by the failure to plead it if it is apparent on the face of the petition and established as a matter of law. Enforcement of a penalty, like enforcement of an illegal contract, violates **\*790**  public policy. RESTATEMENT (SECOND) OF CONTRACT § 356; *see State v. Alpha Oil & Gas, Inc.,* 747 S.W.2d 378 (Tex.1988). It should not be done, even if the parties do not object. In this case Martha pleaded that she was "entitled to damages ... in the amount of ten (10) times all losses suffered". Inasmuch as Martha's own pleading establishes that the contractual provision she relies upon is an unenforceable penalty under our decisions in *Stewart* and *Campesi* as a matter of law, Harry was not required to plead penalty as an affirmative defense.

Contrary to the dissent's very exaggerated alarms, we do not hold that the affirmative defense of penalty need never be pleaded. Whenever the defense is not clearly established on the face of the pleadings, as it is here, it must be pleaded. We do not "resurrect[ ] trial by ambush", *post,* at 790, or "retreat from ... encouraging full disclosure during discovery", *post,* at 792. We apply a narrow but necessary exception, long and well established, to the general requirement that affirmative defenses be pleaded. We do not hold that penalty "can be asserted as a defense for the first time on appeal", *post,* at 792, in violation of Rule 52(a), TEX.R.APP.P. The record in this case reflects that the issue of penalty was raised in the trial court, and that the trial court refused to enforce the penalty provision of the partnership agreement.

\* \* \* \* \* \*

Accordingly, we conclude that Martha is not entitled to recover ten times her actual damages. Finding no error in the judgment of the court of appeals, we affirm it.

GONZALEZ, Justice, dissenting.

Despite the clear language of TEX.R.CIV.P. 94 and the collective wisdom of every court of appeals of this state that has considered the issue, the majority holds that a defendant need not affirmatively plead the defense of "penalty" in a contract action. This holding resurrects trial by ambush and rejects the notion that parties are entitled to know what theories of law they will face at trial. I would hold that by failing to plead it, Mr. Phillips waived his right to assert that the contract he entered into with his wife is unenforceable. Furthermore, since Mr. Phillips waived the penalty defense by failing to affirmatively plead it, I would not reach the question of whether the contractual provision in question is, on its face, an unenforceable penalty. I thus would reverse the judgment of the court of appeals and remand this cause to the trial court for entry of a judgment that enforces the provision.

Mr. and Mrs. Phillips were married for 32 years prior to getting a divorce. With the assistance of counsel, they entered into a pre-divorce agreement, whereby they transferred about $18 million of their assets into a partnership which Mr. Phillips would manage. Mr. Phillips in effect said to his soon-to-be ex-wife: "Trust me." As a disincentive to cheating or short changing Mrs. Phillips, Mr. Phillips pledged that he would pay her 10 times the amount of the losses if he violated the contract. [1] The agreement also recited that Mr. Phillips owed Mrs. Phillips a fiduciary duty, a higher standard of care than normally exists between parties to a contract. [2]

Eight years later, Mrs. Phillips sued Mr. Phillips, alleging that he violated the agreement. **\*791** Mr. Phillips entered a general denial and asserted the affirmative defenses of limitations, laches, and equitable estoppel. In a unanimous verdict, the jury found that Mr. Phillips breached the agreement by interfering with Mrs. Phillips right to examine the books and records of the partnership, and by willfully underpaying Mrs. Phillips and overpaying himself.

**AFFIRMATIVE DEFENSE**

Rule 94 enumerates specific affirmative defenses which are waived if not pleaded, such as accord and satisfaction, arbitration and award, fraud, illegality, statute of frauds, statute of limitations, "and any other matter constituting an avoidance or affirmative defense." TEX.R.CIV.P. 94. An affirmative defense does not tend to rebut factual propositions asserted by a plaintiff, but seeks to establish an independent reason why the plaintiff should not recover. *Gorman v. Life Ins. Co. of North America,* 811 S.W.2d 542, 546 (Tex.1991). Asserting the defense of penalty does not deny the facts pleaded by the plaintiff; instead, it is an independent reason why the contract should

not be enforced as written. In other words, if the defendant asserts facts that defeat in whole or in part the plaintiff's claim, such assertion amounts to an affirmative defense that must be pleaded or it is waived. "Penalty" is a classic affirmative defense; in my view, it clearly falls within the purview of Rule 94.

The majority implies that as long as the issue does not depend upon evidence or findings, no purpose is served by requiring that it be specifically pleaded. But there is a valid purpose to serve, namely, the need for notice and fair play, so as to avoid trials by ambush.

The court refers to *Lewkowicz v. El Paso Apparel Corp.,* 625 S.W.2d 301, 303 (Tex.1981), for its holding that pleading is not necessary if the affirmative defense appears on the face of the plaintiff's pleadings. That case is distinguishable because it involved the defense of illegality of contract. The defense of illegality is a special situation and a poor choice from which to draw a rule of general applicability. The rule that a court will not enforce an illegal contract is for the public's benefit rather than contending parties. *Lewis v. Davis,* 145 Tex. 468, 199 S.W.2d 146, 151 (1947). A strong policy reason supports the illegality exception. That is, courts should not have to validate contracts that are illegal on their face merely because a defendant has failed to plead illegality.

Here, the court seems to be saying that pleading and proof are not necessary, because the issue of whether the liquidated damages provision is a penalty is a question of law. In some contracts it may be possible to determine from their four corners that they impose a penalty. The classic example is the lease that assesses the same liquidated damages for every breach, regardless of how trivial. *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 486 (1952). But, in most cases, proof will be necessary. *Commercial Union Ins. Co. v. La Villa I.S.D.,* 779 S.W.2d 102, 106–107 (Tex.App. —Corpus Christi 1989, no writ); *See* D. WENDORF, ET AL., TEXAS RULES OF EVIDENCE MANUAL, I–38 (3rd ed. 1991).

A good example of the need for proof is *Presnal v. TLL Energy Corp.,* 788 S.W.2d 123, 127 (Tex.App.—Houston [1st Dist.1990], writ denied). In that case, a mineral lease provided that the lessee was required to drill a second well or pay $75,000, which the defendant contended was a penalty. There is no way a court could possibly know if this provision is a reasonable forecast of damages and therefore not a penalty, unless pleadings and proof develop the issue. It would be patently unfair not to require defendant to notify the plaintiff that the possible existence of penalty would be an issue and this is contrary to well established case law.

Every intermediate appellate court considering this issue has held that penalty is an affirmative defense under Rule 94 which is waived if not pleaded. *Bethel v. Butler Drilling Co.,* 635 S.W.2d 834, 838–839 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.); **\*792** *Robinson v. Granite Equip. Leasing Corp.,* 553 S.W.2d 633, 637 (Tex.Civ.App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.); *Walter E. Heller & Co. v. B.C. & M., Inc.,* 543 S.W.2d 696, 697 (Tex.Civ.App.—Houston

[1st Dist.] 1976, writ ref'd n.r.e.); *LoBue v. United Serv. Planning Ass'n,* 467 S.W.2d 574, 576 (Tex.Civ.App.—Fort Worth 1971, writ dism'd); *Young v. J.F. Zimmerman & Sons, Inc.,* 434 S.W.2d 926, 927 (Tex.Civ.App.—Waco 1968, writ dism'd); *Smith v. Waite,* 424 S.W.2d 691, 693 (Tex.Civ.App.—Waco 1968, writ ref'd n.r.e.).

There is no compelling reason for this court now to reject by implication the well-grounded pleading practice and disagree with the cases cited above that hold that as a rule penalty is an affirmative defense which must be pleaded or it is waived. In my view, this is a retreat from this court's recent trend towards encouraging full disclosure during discovery of all witnesses, facts and legal theories upon which a party intends to rely at trial. This trend not only encourages litigants to be well prepared for trial, but also enables disputes to be resolved on their true merits and not on "mere technicalities." It makes no sense to me to subject parties to a severe sanction for failing to disclose witnesses or to supplement discovery responses, but not require them to plead the legal theory upon which they intend to rely to defeat their opponent's claim. The majority has created an exception to Rule 94 that has a visceral appeal, but collapses on its own logic. The court says that the contractual provision in issue is a penalty as a *matter of law,* and thus need not be pleaded (and can be asserted as a defense for the first time on appeal). But a defendant likewise may defeat a contract claim under a statute of limitations defense. And while the defendant may be entitled to a judgment as a *matter of law,* we nevertheless require affirmative pleading of the statute of limitations defense. The court ultimately rationalizes its de facto modification of Rule 94 by relying on the RESTATEMENT (SECOND) OF CONTRACTS § 356 to assert that public policy demands the result. The court expands the public policy exception to Rule 94's pleading requirement beyond the exception for illegal contracts to include contracts that allegedly impose a penalty. This is a faulty rationale. First, this is not a case where pure contract principles apply. Mr. Phillips agreed to a higher standard of care (namely, a fiduciary's standard) than he normally would have owed Mrs. Phillips in a standard contractual relationship. Courts impose damages on parties who violate a fiduciary duty in order to punish the party's breach of trust. I agree with the Restatement § 356's directive that the "central objective behind the system of contract remedies is compensatory, not punitive." RESTATEMENT (SECOND) OF CONTRACTS § 356 comment a (1979). But Mr. Phillips entered into this agreement with his eyes open, accepting a higher than normal standard of care and devising and adopting a measure of damages for his breach of that standard. I do not see how the it advances the best interest of the public to bail him out of his bargain. I would hold that penalty is an affirmative defense that must be pleaded and that Mr. Phillips waived this defense by failing to plead it. For the above reasons, I dissent.

MAUZY and DOGGETT, JJ., join this opinion.

Footnotes

1 The jury also found that Harry breached the partnership agreement by failing to calculate the amount of distributions required to be paid the partners and by failing to make all the distributions required by the agreement, but that Martha ratified Harry's actions in making distributions other than as called for by the agreement.

2 Harry contends that the court of appeals should not have disturbed the trial court's damage award. As a rule, however, the judgment in a case tried by a jury must conform to the verdict. *See* TEX.R.CIV.P. 301. The trial court properly did not ask the jury to include in its determination of Martha's actual damages a reasonable fee for legal services necessary to her prosecution of the case. *See Hammonds v. Hammonds,* 158 Tex. 516, 313 S.W.2d 603, 605 (1958). We must assume that the jury followed the trial court's instructions and answered the question put to them. *See Turner, Collie & Braden v. Brookhollow, Inc.,* 642 S.W.2d 160, 167 (Tex.1982). Given that assumption, we must conclude that the jury's answer of $300,000 to the trial court's question did not include attorney fees.

Harry argues that, logically, the jury must have arrived at their $300,000 finding by adding $37,585 accounting fees which Martha testified she incurred to the stipulated $250,000 in attorney fees. However plausible Harry's explanation of the jury's reasoning process may be, it cannot substitute for the jury's finding. What the jury found, not why the jury found it, is the relevant inquiry absent jury misconduct. *First Nat'l Bank v. Zimmerman,* 442 S.W.2d 674, 678 (Tex.1969).

Under Rule 301, the trial court could properly have rendered judgment awarding Martha less than the $300,000 found by the jury as actual damages only if the finding had no support in the evidence. *See Burt v. Lochausen,* 151 Tex. 289, 249 S.W.2d 194, 199 (1952). *See also* 4 R. MCDONALD, TEXAS CIVIL PRACTICE IN DISTRICT AND COUNTY COURTS § 17.32 nn. 7–8 (rev. 1984). Harry does not argue here that there is no evidence to support the jury's finding. Thus, we conclude that the court of appeals was correct in rendering judgment against Harry for the actual damages found by the jury plus stipulated attorney fees.

Harry also complains of the court of appeals' judgment that he, rather than the partnership, pay Martha's attorney fees. This point, however, was not raised in Harry's motion for rehearing in the court of appeals and is therefore not preserved. *See* TEX.R.APP.P. 131(e); *Oil Field Haulers Ass'n v. Railroad Commission,* 381 S.W.2d 183, 189 (Tex.1964).

3 "Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty."

1 At trial, Mr. Phillips testified as follows:

Q There's another interesting provision in [the partnership agreement] that says if Mrs. Phillips can show that you have breached your fiduciary duty to her that you will be obliged to pay her 10 times any amount that she proves. Are you familiar with that?
A Yes sir.
Q How in the world did that get in there?
A I wanted her to let me-wanted to prove to her that I would not do anything wrong.
Q So—
A So I put it in myself.
Q Was it your idea?
A Yes, sir.

2 The partnership agreement provides:

16.1 *Fiduciary Capacity.* "The general partner shall act in a fiduciary capacity with respect to the limited partner."

16.2 *Damages.* "If the general partner breaches his trust hereunder, he shall pay to the limited partner as liquidated damages ten times the amount she loses as a result of such breach. Errors of judgment shall not be considered breaches of trusts".

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (4)

### Direct History (2)
⚑ 1.  Phillips v. Phillips
792 S.W.2d 269 , Tex.App.-Tyler , June 26, 1990 , writ granted ( Oct 03, 1990 )

*Judgment Affirmed by*

⚑ 2.  Phillips v. Phillips 👓
820 S.W.2d 785 , Tex. , Dec. 11, 1991 , rehearing of cause overruled ( Jan 29, 1992 )

### Related References (2)
⚑ 3.  Matter of Phillips
966 F.2d 926 , 5th Cir.(Tex.) , July 02, 1992 , rehearing denied ( Aug 10, 1992 )

*On Remand to*

⚑ 4.  In re Phillips
175 B.R. 901 , Bankr.E.D.Tex. , Sep. 08, 1994

2005 WL 171349
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

*MEMORANDUM OPINION*
Court of Appeals of Texas,
Austin.

SOUTHERN UNION COMPANY, Appellant
v.
CSG SYSTEMS, INC., Appellee.

No. 03-04-00172-CV.   |   Jan. 27, 2005.

From the District Court of Travis County, 201st Judicial District, No. GN-100403; Paul Davis, Judge Presiding.

**Attorneys and Law Firms**

Cynthia Keely Timms, W. Scott Hastings, Locke Liddel & Sapp LLP, Dallas, John L. Foster, Minton, Burton, Foster & Collins, Jennifer Ramsey, Cantey & Hanger, L.L.P., Austin, for appellant.

Scott S. Cooley, Patton G. Lochridge, Travis C. Barton, McGinnis, Lochridge & Kilgore, LLP, Austin, for appellee.

Before Justices KIDD, PATTERSON and PURYEAR.

*MEMORANDUM OPINION*

JAN P. PATTERSON, Justice.

 **\*1** Southern Union Company, a gas utility provider, contracted with CSG Systems, Inc., a printing company, to outsource Southern Union's print-and-mail operations. The conversion of services was more problematic than anticipated, causing Southern Union to cease operations and sue CSG for breach of contract. Following trial, the jury found in favor of CSG. Accordingly, the trial court entered a final judgment awarding damages to CSG. Southern Union appeals only the amount of damages awarded and does not challenge liability. Because there is legally sufficient evidence in the record to support the judgment, we affirm the award except as modified.

# BACKGROUND

Beginning in the late 1990's, Southern Union experienced technological difficulties and realized that its computer system was no longer capable of printing and mailing approximately one million bills per month to its customers. [1] Southern Union investigated companies to which it could outsource these operations and then requested proposals from several potential vendors. CSG responded to Southern Union's request in February 2000. Southern Union selected CSG's bid from the field of candidates, and the two companies engaged in formal negotiations from April until September.

A contract was finalized and signed by representatives from both Southern Union and CSG as of October 13, 2000. The contract contained a "discontinuance fee" provision, obligating Southern Union to pay a specified amount of damages to CSG in the event that Southern Union terminated the agreement before its five-year term expired. The parties agree that the provision was intended as a liquidated damages provision.

After the contract was finalized, CSG provided Southern Union with a written project plan contemplating December 1, 2000 as the date for CSG to "go live" with the print-and-mail operations. In the months leading up to that deadline, implementation problems arose on both sides and the conversion fell behind schedule. The companies continued discussions in an attempt to solve the problems until the first week of January 2001, when Southern Union ceased work on the project. Southern Union filed suit against CSG on February 7, asserting breach of contract among other causes of action.

In its verdict, the jury found that Southern Union and CSG were both in breach of the agreement, but that CSG's breach was excused, and that CSG would be fairly and reasonably compensated by an award of $2.1 million for the discontinuance fee; $111,000 for the cost of paper and envelopes purchased by CSG; $1,045,944 for CSG's lost profits; and $140,000 for the cost of software licenses provided by CSG to Southern Union. Beneath the last element of damages, the jury wrote "upon return of 300 licenses to CSG, the answer would be $0."The trial court determined that, as a matter of law, it was proper to award liquidated damages in lieu of actual damages, and therefore entered a final judgment in conformance with the jury's verdict, for a total amount of $2,351,000, plus interest and attorney's fees.

# ANALYSIS

**\*2** On appeal, Southern Union challenges the award of damages to CSG Systems, claiming that CSG should not be awarded any liquidated damages pursuant to the discontinuance fee provision, but rather that CSG's recovery should be confined to $1,045,944 in lost profits. Southern Union first asserts that, based on the timing of its breach, the proper calculation of the fee results in a zero sum. Alternatively, Southern Union asserts that even if the proper calculation is $2.1 million, CSG is not entitled to recover the award because that amount constitutes an illegal penalty. Southern Union also claims that prejudgment interest should not be awarded on CSG's damages for the discontinuance fee or lost profits. Finally, Southern Union urges that it is entitled to a remittitur of $140,000 because it returned the software licenses to CSG.

**The Discontinuance Fee Provision**

Southern Union's first issue, asserting that the timing of Southern Union's breach results in zero damages for the discontinuance fee, turns on a construction of the provision's terms. We agree with the parties that the provision is unambiguous. We therefore review this issue as a matter of law, looking only to the contract's four corners and interpreting its plain meaning. *See French v. Chevron U.S.A., Inc.,* 896 S.W.2d 795, 796-97 (Tex.1995). The discontinuance fee provision states:

> The parties have mutually agreed upon the fees for the Services to be provided hereunder based upon certain assumed volumes of processing activity, and the length of the term of Agreement. Customer [2] acknowledges and agrees that, without the certainty of revenue promised by the commitments set forth in this Agreement, CSG would have been unwilling to provide the Services at the fees set forth in the Agreement. Because of the difficulty in ascertaining CSG's actual damages for a termination or other breach of the Agreement by Customer resulting in a termination of this Agreement before the expiration of the then-current term, Customer agrees that prior to such termination and in addition to all other amounts then due and owing to CSG, Customer will pay to CSG (as a contract and not as a penalty) an amount equal to a percentage of the total Subscriber Statement Minimum for the remaining term of the Agreement, as defined in Schedule C, times the then current ESP Processing Fees for the First Physical Page, as defined in Schedule C beginning with the calendar month in which termination occurs ("Discontinuance Fee"). If any such termination occurs prior to the first anniversary of the Effective Date of this Agreement, the percentage shall be fifty percent (50%). If between the first and second anniversary of the Effective Date it shall be thirty percent (30%) and if following the second anniversary of the Effective Date it shall be ten percent (10%). Customer acknowledges and agrees that the Discontinuance Fee is a reasonable estimation of the actual damages which CSG would suffer if CSG were to fail to receive the amount of processing business contemplated by this Agreement.

> Customer shall not be required to pay the Discontinuance Fee if CSG terminates this Agreement other than as a result of Customer's breach of its obligations hereunder or if Customer terminates the Agreement for a material, uncured breach by CSG. The Discontinuance Fee shall be CSG's sole remedy resulting from a termination or other breach of this Agreement by Customer resulting in a termination of this Agreement before the expiration of the then-current term. In the event of a sale or transfer of all or substantially all of Southern Union Company's assets to a third party, the percentages used to calculate the Discontinuance Fee shall be twenty-five percent (25%), fifteen percent (15%) and five percent (5%), respectively.

**\*3** (Emphasis added.)

The parties agree that, given the plain meaning of the relevant language, the proper way to calculate the discontinuance fee for a breach within the first year of signing the agreement is to multiply the applicable "Subscriber Statement Minimum" by the applicable "ESP Processing Fees" and then take fifty percent of that total. The parties disagree, however, on how to determine one factor of this equation: the Subscriber Statement Minimum. Southern Union asserts that, pursuant to Schedule C, the minimum does not accrue until after the "commencement date." [3] Because Southern Union breached this agreement prior to the commencement date, [4] it claims that the minimum was zero, and that the total calculation should therefore be zero.

CSG interprets the provision to mean that, although Schedule C prevents Southern Union from having to pay the monthly minimum until after the commencement date, that time restriction does not apply to Southern Union's liability under the discontinuance fee provision. CSG asserts that Southern Union's interpretation is wrong because it allows Southern Union to breach the contract without consequence, so long as it does so within ninety days of the commencement date, regardless of the significant time and money invested by CSG during the implementation phase. According to CSG, the liquidated damages provision is most necessary during this initial time period because of the parties' unequal contributions and because of the difficulty in calculating potential damages before any actual profits have been made.

We agree with CSG's reading of the contract. Nothing in the provision limits its applicability to a breach occurring after the commencement of services. The provision specifies the circumstances in which Southern Union is excused from paying the discontinuance fee, and none impose such a timing limitation. To the contrary, the provision's express terms state that Southern Union shall be liable for the discontinuance fee, at a rate of fifty percent, should it cause "*any* termination" within one year of signing the contract.

Testimony of witnesses from both Southern Union and CSG also supports CSG's assertion that the provision was intended to apply during the implementation phase, to protect the significant up-front contributions made by CSG before it had received any profits from the agreement. Pamela Vanlandingham, CSG's Senior Vice President and General Manager of the statement processing center, testified that during November and December, the CSG team "worked around the clock" to complete the project, which included working "very hard over the holidays," and that "CSG [had] expended right at 500 to 600 hours" when Southern Union breached the contract. Southern Union officials confirmed that the nature of this contract required front-loaded efforts by CSG and that, prior to terminating the agreement, they were aware of the money CSG invested on supplies and equipment, and of the hours CSG put toward programming, testing, and implementing the new system. David Kvapil, the Chief Financial Officer for Southern Union, testified that he knew CSG had worked "well beyond the number of hours they were going to dedicate to the project," that CSG had provided a "significant batch of bills" to Southern Union for approval, and that CSG had spent over $100,000 on envelopes and paper by the end of December 2000. Christine Shores, a business analyst for Southern Union's mail services division, testified that Southern Union approved the order for paper and envelopes prior to CSG placing it, and that Southern Union was aware of the time and money spent by CSG in its efforts to commence live operations.

**\*4** Based on the plain meaning of the provision, as supported by the witnesses' testimony, Southern Union's liability for the discontinuance fee is not limited to a breach occurring after the commencement of live operations. Southern Union is liable under the discontinuance fee for its breach of the agreement during the implementation phase. The amount of fair and reasonable damages pursuant to the discontinuance fee was therefore properly calculated by the jury, and affirmed by the trial court, as $2.1 million. Southern Union's first issue is overruled.

**Liquidated Damages**

Southern Union claims in its second issue that, if the discontinuance fee is properly calculated as $2.1 million, then CSG is not entitled to any recovery of that amount because it constitutes an improper penalty. For the purposes of this case, the parties agree that the discontinuance fee should be treated as an award of liquidated damages.

A liquidated damages provision may only be enforced when the court finds "(1) that the harm caused by the breach is incapable or difficult of estimation and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." *Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991). The party challenging the award of liquidated damages has the burden to establish that the two-prong test is not satisfied and that, instead, the award of liquidated damages is an unenforceable penalty. *See Dominzo v. Progressive County Mut. Ins. Co.,* 54 S.W.3d 867, 875 (Tex.App.-Austin 2001, pet. denied). Whether the liquidated damages provision is enforceable is a question of law. *Phillips,* 820 S.W.2d at 788.

### Difficulty of Estimation

Southern Union seeks to satisfy the first part of its burden by claiming that CSG's damages were easy to estimate. Southern Union bases this claim on a "price projection" document prepared by CSG before entering the agreement, which anticipated that CSG would earn a total profit of $1,045,944 over the five-year term of its contract with Southern Union. Because the jury ultimately awarded this exact amount to CSG as lost profits, Southern Union argues that CSG was capable of precisely estimating its damages, and therefore the liquidated damages provision is an unenforceable penalty from which CSG is not entitled to recover. The record, however, shows otherwise.

The language of the discontinuance fee provision supports the trial court's determination that an award of liquidated damages was proper because CSG's actual damages were not easy to estimate. The provision expressly states that it was included in the contract "[b]ecause of the difficulty in ascertaining CSG's actual damages for a termination or other breach of the Agreement," and that "CSG would have been unwilling to provide the Services at the fees set forth in the Agreement" had Southern Union not promised "certainty of revenue" by obligating itself to pay the discontinuance fee in the event that it breached the contract. This provision was a bargained-for exchange, negotiated and approved by both companies.

**\*5** When a provision is mutually bargained for by equally competent parties, we give deference to its enforcement. *See Shel-al Corp. v. American Nat'l Ins. Co.,* 492 F.2d 87, 94 (5th Cir.1974). Stanley Mayer, Southern Union's Chief Information Officer, testified that the provision's terms were negotiated between attorneys representing both companies. From the face of the contract, Southern Union understood at the time it entered the agreement that CSG's damages would be difficult to estimate and therefore agreed a liquidated damages provision was necessary.

"[T]he fundamental purpose of a valid liquidated damages provision is to provide a reasonable measure of compensation in the event of a breach where, at the time the provision is agreed to the damages are indeterminable or will be otherwise difficult to prove."24 Williston on Contracts § 65:3, at 250 (4th ed.2002). It is well established that lost profits can be inherently difficult to estimate. *See Texas Inst., Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex.1994). Frequently, lost profits are too speculative to recover because their calculation depends on "uncertain and changing conditions, such as market fluctuations," and this uncertainty is heightened where no profits have been made at the time the contract is breached. *Id.* The contract reflects that Southern Union and CSG sought to avoid such speculation in agreeing to the liquidated damages provision. The sliding scale of damages recognized the front-loaded value to be provided by CSG. As argued by CSG, had there not been a discontinuance fee to rely on, in the event of a breach by Southern Union-particularly early in the contract term-then CSG would have risked being unable to recover because of the uncertainty in calculating its lost profits.

That CSG prepared a projection of its prices, and that the jury looked to the projection as a reasonable calculation for lost profits, does not satisfy Southern Union's burden. The purpose of the document was not to define CSG's potential damages. Rather, as Vanlandingham testified, the projection was an internal tool used by CSG to outline the prices it anticipated charging for its print-and-mail services, so that CSG could make an informed bid in response to Southern Union's request for proposal. Vanlandingham also testified that the projection was prepared with a "conservative accounting approach to pricing." CSG excluded several items from its calculations because, prior to entering the contract, the parties had not assigned a value to these items. This increased the difficulty of estimating damages. CSG's expert confirmed the difficulty of this estimation by explaining several different ways that CSG's lost profits could be calculated, with the results ranging between approximately $1 million to $4 million. After hearing this evidence, the jury determined that $1,045,944 was a reasonable award of lost profits. But their verdict does not establish that the estimation was either an easy or precise one to make. Given the mutually agreed-upon terms of the provision, and the evidence in support of its plain meaning, we are unpersuaded by Southern Union's assertion that CSG's damages were easy to estimate.

### Reasonable Forecast of Just Compensation

**\*6** Southern Union seeks to satisfy the second part of its burden by showing that the discontinuance fee provision is an unenforceable penalty because the amount awarded to CSG as liquidated damages is unreasonable. Southern Union claims that this is established simply by the fact that the $2.1 million awarded to CSG pursuant to the discontinuance fee is double the amount found by the jury as lost profits. A liquidated damages provision will be considered an unenforceable penalty if the amount awarded is so disproportionate to the actual or anticipated damages that it in effect punishes the breach, thereby coercing performance of the contract by making it too costly to not adhere to its terms. 24 Williston on Contracts § 65:3, at 249 (4th ed.2002); *see also Kothe v. R.C. Taylor Trust,* 280 U.S. 224, 226, 50 S.Ct. 142, 74 L.Ed. 382 (1930).

But Southern Union fails to cite, and we are unaware of, any cases in support of its claim that a two-to-one ratio of liquidated-to-actual damages is unreasonable *per se.* There is, however, authority to the contrary. In *Baker v. International Record Syndicate, Inc.,* our sister court approved a liquidated damages award of $51,000, which was more than triple the $15,000 found as actual damages. 812 S.W.2d 53, 56 (Tex.App.-Dallas 1991, no writ). The Texas Supreme Court also upheld a trial court's judgment awarding $790,000 in liquidated damages, which was twice the $395,000 found as actual damages. *Sealock v. Texas Fed. Sav. & Loan Assoc.,* 755 S.W.2d 69, 70 (Tex.1988).

Southern Union seeks to distinguish such cases by urging that, even if it is normally reasonable to award liquidated damages in an amount that is double the actual damages, this ratio is unreasonable in a case where the amount at issue involves millions rather than thousands of dollars, as here.

Again, while no cases support Southern Union's claim, there is authority to the contrary. In a case involving high-end commercial real estate, the Fifth Circuit held that a liquidated damages award of $5 million was reasonable, despite an internal memorandum stating that the anticipated damages were $1.4 million. *Thanksgiving Tower Partners v. Anros Thanksgiving Partners,* 64 F.3d 227, 232 (5th Cir.1995). Thus, as a matter of law, it is not unreasonable *per se* to award liquidated damages in an amount that is double the actual damages. Moreover, in this case, the reasonableness of CSG's award is supported by the record.

The discontinuance fee expressly states that it "is not a penalty" and that it "is a reasonable estimation of the actual damages which CSG would suffer if CSG were to fail to receive the amount of processing business as contemplated by this Agreement."Although parties cannot avoid a challenge to a liquidated damages provision simply by characterizing it as "reasonable," such express language is instructive of the parties' intent when the terms are mutually bargained for between equally competent parties. *See Shel-al Corp.,* 492 F.2d at 94; *Loggins Constr. Co. v. Stephen F. Austin State Univ. Bd. of Regents,* 543 S.W.2d 682, 685 (Tex.App.-Tyler 1976, writ ref'd). Southern Union's own witnesses testified that the language of the discontinuance fee provision was bargained for and intended by the parties, and that the amount awarded under the discontinuance fee was reasonable. In response to questions on cross-examination, Stanley Mayer agreed that the provision was mutually negotiated, that he approved its terms, and that he knew Southern Union would be responsible for paying the fee if it breached the contract. When David Kvapil was asked whether he was aware at the time Southern Union filed suit against CSG "that the calculation of the discontinuance fee would be approximately $2 million," he responded that, "Yeah. I think that's what it calculates to."Kvapil further agreed that Southern Union understood the purpose of the discontinuance fee was "to compensate CSG for all the work they have done and all their expectation" and that this was "fair."

**\*7** The jury was asked to determine what amount would be "fair and reasonable" to award CSG pursuant to the discontinuance fee, and it responded "$2.1 million." A jury's findings on damages should be upheld if there is sufficient evidence in the record to show that the amount is fair and reasonable compensation. *Dillard Dep't Stores, Inc. v. Silva,* 148 S.W.3d 370, 371 (Tex.2004). Here, the jury was entitled to make this finding based on both the express language of the contract and on the testimony of Southern Union's witnesses. We find that this is sufficient evidence from which the jury could determine that it was reasonable to award CSG $2.1 million in liquidated damages. Southern Union's second issue is overruled.

**Prejudgment Interest**

Southern Union urges in its third issue that, regardless of whether CSG is awarded lost profits or the discontinuance fee, CSG is not entitled to recover prejudgment interest on either award because both encompass elements of future damages, and section 304.1045 of the finance code, as amended in 2004, specifically prohibits recovery of prejudgment interest on awards of future damages.

Tex. Fin.Code Ann. § 304.1045 (West Supp.2004-05). CSG counters that the finance code does not prevent prejudgment interest in this case because, by its express terms, the provision only applies to cases involving "wrongful death, personal injury, or property damage."Tex. Fin.Code Ann. §§ 304.101, .1045 (West 1998 & Supp.2004-05). Southern Union asserts in response that, despite its express terms, section 304.1045 prevents prejudgment interest here based on the Texas Supreme Court's holding that the statutory framework should be applied to all cases, not just those involving "wrongful death, personal injury, and property damage."*Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 514, 530 (Tex.1998). CSG argues, however, that even if section 304.1045 prevents prejudgment interest on future damages in a breach-of-contract case, it is still proper for CSG to recover prejudgment interest on the amount awarded as the discontinuance fee because it is an award of liquidated, not future, damages. We review the trial court's award of prejudgment interest for an abuse of discretion. *Purcell Const., Inc. v. Welch,* 17 S.W.3d 398, 402 (Tex.App.-Houston [1st Dist.] 2000, no pet.).

Southern Union and CSG agree that the discontinuance fee was intended to be a liquidated damages provision. Liquidated damages are given *in lieu of* actual damages and thus they are not considered "future damages," even though aspects of the liquidated award may compensate the party for what would have otherwise been recovered as future losses. *See Lafarge Corp. v. Wolff, Inc.,* 977 S.W.2d 181, 188 n. 13 (Tex.App.-Austin 1998, pet. denied); *Eberts v. Businesspeople Personnel Servs., Inc.,* 620 S.W.2d 861, 864-65 (Tex.App.-Dallas 1981, no writ). Liquidated damages are distinct from future damages because the measure of liquidated damages is stipulated to before the occurrence of a breach and thus, unlike future damages, the amount of liquidated damages can be immediately ascertained at the time of the breach. *See Phillips,* 820 S.W.2d at 788. It is permissible for a trial court to award prejudgment interest when a contract "provides the conditions on which liability depends and ... fixes a measure by which the sum payable can be ascertained with reasonable certainty."*Wheat v. American Title Ins. Co.,* 751 S.W.2d 943, 944-45 (Tex.App.-Houston [1st Dist.] 1988, no writ); *see also Sealock,* 755 S.W.2d. at 70 (upholding award of prejudgment interest on liquidated damages); *Perry Roofing Co. v. Olcott,* 744 S.W.2d 929, 932 (Tex.1988) (Wallace, J., dissenting) ("The Legislature has given contracting parties notice that if they enter into and subsequently breach agreements in which damages are liquidated or otherwise ascertainable, they may be held liable for prejudgment interest. Parties to contracts have always had this corresponding obligation and right....").

 **\*8** We decline to reach the issue of whether the finance code prevents recovery of prejudgment interest on future damages in a breach-of-contract case because we agree with CSG's argument that liquidated damages are distinct from future damages and, as such, section 304.1045 does not prohibit the recovery of prejudgment interest on liquidated damages. The trial court therefore did not abuse its discretion in awarding prejudgment interest to CSG on the $2.1 million it recovered pursuant to the discontinuance fee.

## Remittitur

In its final issue, Southern Union asserts that the judgment should be modified to remit $140,000 of CSG's damages. The jury expressly stated in the verdict that if Southern Union returned the software licenses provided to it by CSG, then CSG would be entitled to zero damages for the licenses. It is undisputed that Southern Union returned the licenses. The trial court awarded CSG $140,000 for the licenses, over Southern Union's objection. CSG does not oppose a remittitur of $140,000. Southern Union's fourth issue is sustained and we modify the judgment accordingly. In all other respects, the trial court's judgment is affirmed.

Justice KIDD not participating.

### Footnotes

1    At the time, Southern Union had a contract with Pitney Bowes for that company to package the mailings after Southern Union processed and printed them, but that contract was set to expire in December 2001.

2    The provision refers to Southern Union as "Customer."

3    Schedule C states that, within the first year of the contract, the "minimums begin ninety (90) days ... following the initiation date of services ('Commencement Date')...." The contract defines the commencement date as "the first day of the calendar month in which the Services commence."Schedule D discusses "services" as including a list of activities related to the printing, inserting and mailing of customer bills in a specified carrier envelope, during specified billing cycles.

4    CSG agrees that the commencement date had not yet occurred at the time of Southern Union's breach.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (1)

### Direct History (1)

1. Southern Union Co. v. CSG Systems, Inc. ↪
2005 WL 171349 , Tex.App.-Austin , Jan. 27, 2005 , rule 53.7(f) motion granted ( Mar 14, 2005 )

439 S.W.2d 695
Court of Civil Appeals of Texas.
Austin.

The STATE of Texas, Appellant,
v.
Harry W. MARGOLIS et al., Appellees.

No. 11654. | March 26, 1969. | Rehearing Denied April 16, 1969.

Suit seeking a declaration that plaintiffs, by operating a merchandising conception designed to avoid restraints of a penal statute making it unlawful for any person to sell certain goods on both Saturday and Sunday, did not violate state statutes prohibiting monopolies, trusts or conspiracies in restraint of trade. The 167 District Court of Travis County, Herman Jones, P.J., entered declaratory judgment in favor of plaintiffs, and state appealed. The Court of Civil Appeals, O'Quinn, J., held that plaintiffs failed to establish a justiciable controversy between themselves and the state, thus precluding (on ground an unlawful advisory opinion was being requested) judicial consideration of the suit, where no evidence was introduced of a bona fide threat by the state to proceed against plaintiffs in accordance with the aforementioned statutes.

Cause dismissed for want of jurisdiction.

**Attorneys and Law Firms**

**\*696** Crawford C. Martin, Atty. Gen., Nola White, First Asst. Atty. Gen., A. J. Carubbi, Jr., Exec. Asst. Atty. Gen., J. C. Davis, W. O. Shultz, Pat Bailey, Asst. Attys. Gen., Austin, for appellant.

**\*697** Berman & Fichtner, Harold B. Berman, Dallas, for appellees.

**Opinion**

O'QUINN, Justice.

Appellees sought and obtained a declaratory judgment in district court holding that they did not violate State statutes, prohibiting monopolies, trusts, or conspiracies in restraint of trade, by operating a merchandising conception designed to avoid the restraints of a penal statute making it unlawful for any person to sell certain goods on both of the two consecutive days of Saturday and Sunday.

The State of Texas, defendant below, has appealed from this judgment and contends that appellees are engaged in a monopoly or trust that fixes, maintains, affects, or controls prices and that their activity tends to lessen competition. The State also urges that the statute under which this suit was brought for a declaratory judgment violates provisions of the State Constitution forbidding the rendition of advisory opinions by the courts.

Appellees are individuals and corporations engaged in an arrangement under which Sundaco, Inc., a retail store entity organized for the purpose of making the arrangement, is open for business only on Sundays, and the other appellee corporations are open only on Mondays through Saturdays. The purpose of this system of merchandising is to avoid violation of Article 286a, Vernon's Ann . Texas Penal Code, which makes unlawful the sale by any person of certain goods on both Saturday and Sunday. The plan operates by means of contracts under which Sundaco each Saturday night acquires from the other appellee corporations all merchandise in their stores and, after conducting business through Sunday, returns the stores to the corporations that operate the remaining days of the week. Profits made on Sunday are divided between Sundaco and the other corporations.

Appellees brought suit for declaratory judgment under Section 15.12 of the Texas Business and Commerce Code, V.T.C.A. which purports to authorize suit when petitioner is '* * * uncertain of whether or not his action Or proposed action violates or Will violate the prohibition contained in Section 15.04 of this code * * *' (Emphasis supplied). Section 15.04 of the code prohibits all monopolies, trusts, and conspiracies in restraint of trade and declares such combinations illegal.
 **[1]** We have decided that because there is absent from the record any showing that a presently justiciable controversy exists between the State and the appellees, any judgment under the record would be an advisory opinion the courts are not authorized to render. We do not reach the State's points of error as to price control and lessening competition, and will notice only briefly the point under which validity of Section 15.12 is challenged. We will order the cause dismissed.

Appellees alleged the following with regard to the existence of a presently justiciable controversy:

> 'The Defendant, The State of Texas, acting under its Attorney General and/or District Attorney of Tarrant County, Texas, and other Counties in which a corporate Plaintiff has operations, has contended that the actions and/or proposed actions of all of the Plaintiffs, their agents and employees, violate or will violate the prohibitions contained in Section 15.04 of the Business and Commerce Code. It is contended by said Defendant that said actions or proposed actions of the Plaintiffs, their employees and agents, constitute a monopoly, trust, and/or conspiracy in restraint of trade, as defined in Section 15.01, 15.02, and 15.03, of the Business and Commerce Code. That by reason of said actions and/or proposed actions, the Plaintiffs are subject to the civil and criminal penalties provided for in Section 15.29 through Section 15.33 of the Business and Commerce Code. Further, said

Defendant has indicated its intention to **\*698** proceed against the Plaintiffs pursuant to said penalty provisions of said Code, which has given rise to a bona fide controversy and created justiciable issues which the Court has authority to determine.'

At the trial no evidence was introduced and none was offered by appellees to prove any of the allegations set out above. If the State had 'indicated its intention to proceed against the plaintiffs' and invoke the penalty provisions of the code, as appellees alleged in their petition, such intention is not reflected in the record. The State filed an answer to the petition, specially denying numerous allegations, and generally denied each and every allegation in the petition. The State by its answer did not seek penalties, nor did the State pray for injunctive relief to restrain appellees. The State's answer was in all respects purely defensive.

 **[2]** **[3]** The State's general denial put appellees in the position of having to prove every material fact of their cause of action. Boswell v. Handley, 397 S.W.2d 213 (Tex.1965). The burden was upon appellees to establish that the trial court had authority to entertain the suit by proving that a justiciable controversy existed. Reuter v. Cordes-Hendreks Coiffures, Inc., 422 S.W.2d 193 (Tex.Civ.App., 1967, Houston (14th Dist.), no writ).

 **[4]** **[5]** **[6]** Section 15.12, in which it is provided that a person '* * * uncertain of whether or not his action or proposed action violates or will violate * * *' Section 15.04 of the code is authorized to file suit against the state for declaratory judgment, cannot confer upon the courts power to render an advisory opinion to the person who is 'uncertain' as to the legality of his actions or proposed actions. Even in declaratory actions, the courts may render opinions only if there exists a justiciable controversy between the parties. California Products, Inc. v. Puretex Lemon Juice, Inc., 160 Tex. 586, 334 S.W.2d 780 (1960); Lee v. Calvert, 356 S.W.2d 840 (Tex.Civ.App., 1962, Austin, writ ref. n.r.e.). It is the duty of the court to decide whether a justiciable controversy exists. Ainsworth v. Oil City Brass Works, 271 S.W.2d 754 (Tex.Civ.App., 1954, Beaumont, no writ).

 **[7]** The Supreme Court recently declared, 'In the absence of a constitutional provision authorizing the Texas courts to render advisory opinions, such power does not exist and may not be conferred by agreement of the parties.' Firemen's Insurance Company of Newark, New Jersey v. Burch, 12 Tex.Sup.Ct.Jour. 49 (October 11, 1968).

The State contends that Section 15.12 of the Business and Commerce Code is unconstitutional in providing for declaratory judgments where there is a lack of justiciable controversy. 'The provisions of Section 15.12,' the State argues, 'which authorize the courts to consider the prospective actions of an individual expressly negates the necessity of their (there) being a justiciable controversy ripe for determination.'

 **[8]** **[9]** We agree with the State that insofar as Section 15.12 purports to empower courts to pass on prospective actions, the statute contravenes the provisions of Section 1, Article II, of our State Constitution, Vernon's Ann.St. prescribing separation of powers. The courts of this State, because of this provision of the Constitution, are prohibited from rendering advisory opinions and the power may not be conferred by the Legislature. Morrow v. Corbin, 122 Tex. 553, 62 S.W.2d 641, 646 (1933).

Appellees argue in response to the State's contention, that the State's '* * * argument is made * * * after ten continuous months of litigation before the trial court, both in pretrial procedures and in trial and post trial procedures, after a trial of approximately three and a half days, filling approximately four hundred and forty-five pages of a statement of facts and after the preparation of a brief * * *' in this Court. 'The justiciable **\*699** controversy,' appellees say, 'between the appellant had the appellees is obvious from the record before this Court.'

We do not agree with appellees that a justiciable controversy, required to be pleaded and proved, is obvious from the record. As we have observed, appellees alleged in their petition, as a basis for showing a justiciable controversy, that the State 'the indicated its intention to proceed against the Plaintiffs pursuant to said penalty provisions of said Code, which has given rise to a bona fide controversy and created justiciable issues which the Court has authority to determine.'

It is obvious from the record that appellees filed their petition seeking advice from the courts because they were 'uncertain of whether or not (their) action or proposed action' in carrying on the Sundaco scheme 'violates or will violate' Section 15.04 prohibiting monopolies, trusts, and conspiracies in restraint of trade. Even if all but the prospective aspects of Section 15.12 are valid, and we do not decide that question, the suit for declaratory judgment will not lie unless proof is made of a bona fide threat of interference by the State invoking the anti-trust laws.

Discretion rests with the Attorney General as to whether anti-trust suits will be brought by the State to interdict the Sundaco operations and invoke penalties. The record is devoid of any showing that appellees had been ordered to discontinue their operations. There is no evidence of a threat to interfere with Sundaco activities as a violation of Section 15.04. No threat of interference by the State with the rights of appellees appears beyond that implied by the existence of the statute and the State's answer defending against the petition for declaratory judgment. Appellees may not compel the Attorney General to exercise his discretion by filing suit for declaratory judgment.

The power of courts to pass upon the 'uncertainty' appellees have with regard to their actions will arise only when the interest of appellees require the use of judicial authority for their protection against actual interference. A threat that is only hypothetical is not enough. United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct . 556, 91 L.Ed. 754 (1947). In Hitchcock v. Kloman, 196 Md. 351, 76 A.2d 582 (1950) the Court of Appeals of Maryland refused to entertain suit for declaratory

judgment in the absence of a threat to interfere with activities of petitioner, although the attorney general had delivered opinions that similar activities came within the state statute petitioner asked the court to construe. There it was held that mere existence of the statute did not pose such a threat as to present a justiciable controversy.

In the absence of proof that there existed a justiciable controversy, the courts are without jurisdiction. For the reasons we have stated, this cause is dismissed for want of jurisdiction.

Dismissed for want of jurisdiction.

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (1)

### Direct History (1)

1. State v. Margolis ⌐
439 S.W.2d 695 , Tex.Civ.App.-Austin , Mar. 26, 1969 , writ refused n.r.e. ( Jul 23, 1969 )

852 S.W.2d 440
Supreme Court of Texas.

TEXAS ASSOCIATION OF BUSINESS, Appellant,

v.

TEXAS AIR CONTROL BOARD and Texas Water Commission, Appellees.

No. C–9556. | March 3, 1993. | Rehearing Overruled May 5, 1993.

Business association sought declaratory judgment that statutes authorizing administrative agencies to assess fines for violation of environmental laws are unconstitutional. The 250th District Court, Travis County, upheld statutes, and direct appeal was taken. The Supreme Court, Cornyn, J., held that: (1) statutes authorizing Air Control Board and Water Commission to assess fines prior to judicial review violate open courts guarantee of Texas Constitution, but (2) statutes do not violate constitutional right to jury trial.

Affirmed in part and reversed in part.

Doggett, Gammage, and Spector, JJ., concurred, dissented, and filed opinions.

**Attorneys and Law Firms**

**\*441** R. Kinnan Golemon, James W. Checkley, Jr., Albert R. Axe, Jr., Scott R. Kidd and Douglas W. Alexander, Austin, for appellant.

Douglas G. Caroom, Mary E. Kelly, Dan Morales, Nancy N. Lynch, William D. Dugat, III and Amy R. Johnson, Austin, for appellees.

**OPINION**

CORNYN, Justice.

The Texas Association of Business (TAB), on behalf of its members, brought this declaratory judgment action seeking a ruling that statutes empowering two state administrative agencies to levy civil penalties for violations of their regulations conflict with the open courts and jury trial provisions of the Texas Constitution. The administrative agencies denied TAB's claims, and along with two Intervenors, [1] filed counterclaims seeking a declaration **\*442** that the same statutes and regulations comport with those constitutional provisions.

Following a bench trial, the trial court denied the relief sought by TAB, and as requested by the State and Intervenors, declared that section 4.041 of the Texas Clean Air Act, sections 26.136 and 27.1015 of the Texas Water Code, and section 8b of the Texas Solid Waste Disposal Act, as well as the rules and regulations promulgated under those statutes, are constitutional with regard to the open courts and jury trial provisions. We affirm the trial court's judgment as it relates to TAB's jury trial challenge and reverse its judgment as to TAB's open courts challenge.

An overview of the regulatory scheme enacted by the legislature and these agencies is essential to an understanding of this case. In 1967, the Texas Legislature enacted the Clean Air Act of Texas. Clean Air Act of Texas, 60th Leg., R.S., ch. 727, 1967 Tex.Gen.Laws 1941. The Clean Air Act was designed to safeguard the state's air resources without compromising the economic development of the state. *Id.* at § 1. The Act created the Texas Air Control Board and granted it the authority to promulgate regulations to accomplish the Act's goals. *Id.* at § 4(A)(2)(a). In the event the Air Control Board determined that a violation of its regulations had occurred, it was authorized to enforce those regulations in district court. Upon a judicial determination that a violation of the Air Control Board's regulations had occurred, two cumulative remedies were available, injunctive relief to prohibit further violations and assessment of a fine ranging from $50 to $1,000 for each day the violations persisted. *Id.* at § 12(B).

In 1969, the Texas Legislature enacted the Solid Waste Disposal Act. Solid Waste Disposal Act, 61st Leg., R.S., ch. 405, 1969 Tex.Gen.Laws 1320. The express purpose for this legislation was to protect public health and welfare by regulating the "collection, handling, storage, and disposal of solid waste." *Id.* at § 1. The Texas Water Quality Board was designated the primary agency to effectuate the Disposal Act's purpose. *Id.* at § 4(f). Like the Air Control Board, the Water Quality Board was authorized to enforce its rules and regulations in state district court. The Solid Waste Disposal Act provided the same remedies as the Clean Air Act. *See id.* at § 8(c).

In the last of the relevant statutory enactments, in 1969, the Texas Legislature promulgated a revised version of the Water Quality Act. Water Quality Act—Revision, 61st Leg., R.S., ch. 760, 1969 Tex.Gen.Laws 2229. By that Act, the Water Quality Board was given the power to develop a statewide water quality plan, to perform research and investigations, and to adopt rules and issue orders necessary to effectuate the Act's purposes. *Id.* at § 3.01–3.10. The Water Quality Act provided the same remedies as the Solid Waste Management Act and the Clean Air Act. *See id.* at § 4.02.

Originally, neither the Water Quality Board nor the Air Control Board had the power to levy civil penalties directly in the event it determined that its regulations or orders had been violated. Instead, each board was required first to file suit against the violator in district court. Only the district court had the power to assess civil penalties.

The legislature substantially changed this enforcement scheme in 1985. That year the Air Control Board and the Water Commission (formerly the Water Control Board) were granted the power to assess civil penalties directly of up to $10,000 per day per violation.[2] Both administrative bodies also retained the option to pursue civil penalties in district court. **\*443** TEX.HEALTH & SAFETY CODE §§ 361.224, 382.081; TEX.WATER CODE § 26.123. This was the regulatory scheme in effect when the district court rendered judgment in this case.[3]

After the Air Control Board or Water Commission assesses a penalty, the offender must either timely pay the penalty or file suit in district court. However, a supersedeas bond or cash deposit paid into an escrow account, in the full amount of the penalty, is a prerequisite to judicial review. TEX.HEALTH & SAFETY CODE §§ 382.089(a), (b), 361.252(k), (*l* ); TEX.WATER CODE § 26.136(j). A party who fails to make a cash deposit or file a bond forfeits all rights to judicial review. TEX.HEALTH & SAFETY CODE §§ 361.252(m), 382.089(c); TEX.WATER CODE § 26.136(k).

TAB alleges that it is a Texas not-for-profit corporation, that its members do business throughout Texas, and that it is authorized to represent its members on any matter that may have an impact on their businesses.

TAB filed this suit under the Uniform Declaratory Judgments Act, TEX.CIV.PRAC. & REM.CODE §§ 37.001–37.011, alleging that some of its members had been subjected to civil penalties assessed by either the Air Control Board or the Water Commission. TAB further alleged that all of its other members that operate their businesses pursuant to the pertinent provisions of the Texas Clean Air Act, the Texas Water Code, or the Texas Solid Waste Disposal Act or any rules or orders issued pursuant to those provisions were put at "substantial risk (if not certainty)" of being assessed civil penalties by the Air Control Board or the Water Commission. Thus this suit does not challenge specific instances of the Air Control Board's or the Water Commission's exercise, or threatened exercise, of the civil penalty power. Instead, TAB's suit is a facial challenge to the constitutionality of this administrative enforcement scheme under the Texas Constitution.

The Defendants and Intervenors counterclaimed seeking a declaratory judgment that the statutes, rules, and regulations challenged by TAB do not, on their face, conflict with the open courts and jury trial provisions of our constitution. The trial court granted the Defendants' and Intervenors' requested declaratory judgment and denied TAB's request for a declaratory judgment. The court also denied TAB's request for injunctive relief.

TAB appealed directly to this court. *See* TEX.GOV'T CODE § 22.001(c);[4] TEX.R.APP.P. 140. In this court, TAB has limited its challenges to claims of unconstitutional denial of a jury trial and violation of our constitution's open courts provision.

## *I. Standing*

Before we reach the merits of this case, we first consider the matter of the trial court's jurisdiction, as well as our own; specifically we determine whether TAB has standing to challenge the statutes and regulations in question. Because TAB's standing to bring this action is not readily apparent, and because our jurisdiction as well as that of the trial court depends on this issue, we requested supplemental briefing on standing at the oral argument of this case. In response, the parties insist that any question of standing has been waived in the trial court and cannot be raised by the court for the first time on appeal. We disagree.

**[1]** Subject matter jurisdiction is essential to the authority of a court to decide a case. Standing is implicit in the concept of subject matter jurisdiction. The standing requirement stems from two limitations on subject matter jurisdiction: the separation of powers doctrine and, in Texas, the open courts provision. Subject matter jurisdiction **\*444** is never presumed and cannot be waived. [5]

**[2] [3]** One limit on courts' jurisdiction under both the state and federal constitutions is the separation of powers doctrine. *See* TEX.CONST. art. II, § 1; *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 471–74, 102 S.Ct. 752, 757–60, 70 L.Ed.2d 700 (1982); *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975); *see also,* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers,* 18 SUFFOLK U.L.Rev. 881, 889 n. 69 (1983) (noting that the dicta of *Flast v. Cohen,* 392 U.S. 83, 100, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968), suggesting that standing is unrelated to the separation of powers doctrine has since been disavowed). Under this doctrine, governmental authority vested in one department of government cannot be exercised by another department unless expressly permitted by the constitution. Thus we have construed our separation of powers article to prohibit courts from issuing advisory opinions because such is the function of the executive rather than the judicial department. [6] *Firemen's Ins. Co. v. Burch,* 442 S.W.2d 331, 333 (Tex.1969); *Morrow v. Corbin,* 122 Tex. 553, 62 S.W.2d 641, 644 (Tex.1933). Accordingly, we have interpreted the Uniform Declaratory Judgments Act, TEX.CIV.PRAC. & REM.CODE §§ 37.001–.011, to be merely a procedural device for deciding cases already within a court's jurisdiction rather than a legislative enlargement of a court's power, permitting the rendition of advisory opinions. *Firemen's Ins. Co.,* 442 S.W.2d at 333; *United Serv. Life Ins. Co. v. Delaney,* 396 S.W.2d 855, 863 (Tex.1965); *California Prods., Inc. v. Puretex Lemon Juice, Inc.,* 160 Tex. 586, 334 S.W.2d 780 (1960).

**[4] [5]** The distinctive feature of an advisory opinion is that it decides an abstract question of law without binding the parties. *Alabama State Fed'n of Labor v. McAdory,* 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945); *Firemen's Ins. Co.,* 442 S.W.2d at 333; *Puretex Lemon Juice,*

*Inc.,* 160 Tex. at 591, 334 S.W.2d at 783. An opinion issued in a case brought by a party without standing is advisory because rather than remedying an actual or imminent harm, the judgment addresses only a hypothetical injury. *See Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Texas courts, like federal courts, have no jurisdiction to render such opinions.

 **[6]**   The separation of powers doctrine is not the only constitutional basis for standing. Under federal law, standing is also an aspect of the Article III limitation of the judicial power to "cases" and "controversies." *Sierra Club v. Morton,* 405 U.S. 727, 731, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). To comport with Article III, a federal court may hear a case only when the litigant has been threatened with or has sustained an injury. *Valley Forge Christian College,* 454 U.S. at 471, 102 S.Ct. at 758. Under the Texas Constitution, standing is implicit in the open courts provision, which contemplates access to the courts only for those litigants suffering an injury. Specifically, the open courts provision provides:

> All courts shall be open, and every person for an **injury** done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

TEX. CONST. art. I, § 13 (emphasis added). Because standing is a constitutional prerequisite to maintaining a suit under both federal and Texas law, we look to the more extensive jurisprudential experience of the federal courts on this subject for any guidance it may yield.

Under federal law, a lack of standing deprives a court of subject matter jurisdiction because standing is an element of such **\*445** jurisdiction. *Carr v. Alta Verde Indus.,* 931 F.2d 1055, 1061 (5th Cir.1991); *Simmons v. Interstate Commerce Comm'n,* 900 F.2d 1023, 1026 (7th Cir.1990); *M.A.I.N. v. Commissioner, Maine Dept. of Human Serv.,* 876 F.2d 1051, 1053 (1st Cir.1989); *Haase v. Sessions,* 835 F.2d 902, 908 (D.C.Cir.1987); *Page v. Schweiker,* 786 F.2d 150, 153 (3d Cir.1986); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Heckler v. Mathews,* 465 U.S. 728, 737, 104 S.Ct. 1387, 1394, 79 L.Ed.2d 646 (1984); *Warth,* 422 U.S. at 511, 95 S.Ct. at 2211. Other states have followed this analysis in construing their own constitutions. [7] *See e.g., Prudential–Bache Sec., Inc. v. Commissioner of Revenue,* 412 Mass. 243, 588 N.E.2d 639, 642 (1992); *Bennett v. Board of Trustees for Univ. of N. Colorado,* 782 P.2d 1214, 1216 (Colo.App.1989), *cert. denied,* 797 P.2d 748 (Colo.1990); *Pace Constr. Co. v. Missouri Highway and Transp. Comm'n,* 759 S.W.2d 272, 274 (Mo.App.1988); *Terracor v. Utah Bd. of State Lands & Forestry,* 716 P.2d 796, 798–99 (Utah 1986); *State by McClure v. Sports and Health Club, Inc.,* 370 N.W.2d 844, 850 (Minn.1985), *appeal dism'd,* 478 U.S. 1015, 106 S.Ct. 3315, 92 L.Ed.2d 730 (1986); *Smith v. Allstate Ins. Co.,* 483 A.2d 344, 346 (Me.1984); *Ardmare Constr. Co. v. Freedman,* 191 Conn. 497, 467 A.2d 674, 675 n. 4, 676–77 (1983); *Horn v. County of Ventura,* 24 Cal.3d 605, 156 Cal.Rptr. 718, 726, 596 P.2d 1134, 1142 (1979); *Stewart v. Board of County Comm'rs of Big Horn County,* 175 Mont. 197, 573 P.2d 184, 186, 188 (1977); *State ex rel. Albritton v. Moore,* 238 La. 728, 116 So.2d 502, 504 (1959).

**[7]** Subject matter jurisdiction is an issue that may be raised for the first time on appeal; it may not be waived by the parties. *Texas Employment Comm'n v. International Union of Elec., Radio and Mach. Workers, Local Union No. 782,* 163 Tex. 135, 352 S.W.2d 252, 253 (1961); RESTATEMENT (SECOND) OF JUDGMENTS § 11, comment c (1982). This court recently reiterated that axiom in *Gorman v. Life Insurance Co.,* 811 S.W.2d 542, 547 (Tex.), *cert. denied,* 502 U.S. 824, 112 S.Ct. 88, 116 L.Ed.2d 60 (1991). Because we conclude that standing is a component of subject matter jurisdiction, it cannot be waived and may be raised for the first time on appeal. [8]

**[8]** If we were to conclude that standing is unreviewable on appeal at least three undesirable consequences could result. First and foremost, appellate courts would be impotent to prevent lower courts from exceeding their constitutional and statutory limits of authority. Second, appellate courts could not arrest collusive suits. Third, by operation of the doctrines of res judicata and collateral estoppel, judgments rendered in suits addressing only hypothetical injuries could bar relitigation of issues by a litigant who eventually suffers an actual injury. We therefore hold that standing, as a component of subject matter **\*446** jurisdiction, cannot be waived in this or any other case and may be raised for the first time on appeal by the parties or by the court.

We are aware that this holding conflicts with *Texas Industrial Traffic League v. Railroad Commission,* 633 S.W.2d 821, 823 (Tex.1982) (per curiam). [9] The analysis that leads us to the conclusion we reach here, however, compels us to overrule *Texas Industrial Traffic League* and disapprove of all cases relying on it to the extent that they conflict with this opinion. [10] Although our concern for the rule of stare decisis makes us hesitant to overrule any case, when constitutional principles are at issue this court as a practical matter is the only government institution with the power and duty to correct such errors. *See Payne v. Tennessee,* 501 U.S. 808, —— – ——, 111 S.Ct. 2597, 2609–11, 115 L.Ed.2d 720 (1991) (observing that reexamination of constitutional decisions is appropriate when "correction through legislative action is practically impossible").

Consequently, we proceed to determine here, on our own motion, whether TAB has standing to bring this suit.

**[9]** **[10]** Because standing is a component of subject matter jurisdiction, we consider TAB's standing under the same standard by which we review subject matter jurisdiction generally. That standard requires the pleader to allege facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Richardson v. First Nat'l Life Ins. Co.,* 419 S.W.2d 836, 839 (Tex.1967). When reviewing a trial court order dismissing a cause for want of jurisdiction, Texas appellate courts "construe the pleadings in favor of the plaintiff and look to the pleader's intent." *Huston v. Federal Deposit Ins. Corp.,* 663 S.W.2d 126, 129 (Tex.App.—Eastland 1983, writ ref'd n.r.e. 1984); *see*

*also* W. Wendell Hall, *Standards of Appellate Review in Civil Appeals,* 21 ST. MARY'S L.J. 865, 870 (1990).

 **[11]**   Here, however, we are not reviewing a trial court order of dismissal for want of jurisdiction, we are considering standing for the first time on appeal. A review of only the pleadings to determine subject matter jurisdiction is sufficient in the trial court because a litigant has a right to amend to attempt to cure pleading defects if jurisdictional facts are not alleged. *See* TEX.R.CIV.P. 80. Failing that, the suit is dismissed. When an appellate court questions jurisdiction on appeal for the first time, however, there is no opportunity to cure the defect. Therefore, when a Texas appellate court reviews the standing of a party sua sponte, it must construe the petition in favor of the party, and if necessary, review the entire record to determine if any evidence supports standing.

 **[12]**   TAB asserts standing on behalf of its members. The general test for standing in Texas requires that there "(a) shall be a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought." *Board of Water Engineers v. City of San Antonio,* 155 Tex. 111, 114, 283 S.W.2d 722, 724 (1955). Texas, however, has no particular test for determining the standing of an organization, such as TAB. *See e.g.,*  **\*447** *Touchy v. Houston Legal Found.,* 432 S.W.2d 690, 694 (Tex.1968); *Texas Highway Comm'n v. Texas Ass'n of Steel Importers, Inc.,* 372 S.W.2d 525, 530–31 (Tex.1963). While we agree with the statement of the general test for standing set out in *Board of Water Engineers,* we foresee difficulties in relying on it alone to determine the standing of an organization like TAB. For instance, when members of an organization have individual standing, but the organization was not established for the purpose of protecting the particular interest at issue, it is not necessarily in the members' best interest to allow such a disinterested organization to sue on their behalf. Furthermore, an organization should not be allowed to sue on behalf of its members when the claim asserted requires the participation of the members individually rather than as an association, such as when the members seek to recover money damages and the amount of damages varies with each member.

 **[13]**   The United States Supreme Court has articulated a standard for associational standing that lends itself to our use. We adopt that test today. In *Hunt v. Washington State Apple Advertising Commission,* the Court held that an association has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *see also New York State Club Ass'n v. City of New York,* 487 U.S. 1, 9, 108 S.Ct. 2225, 2231, 101 L.Ed.2d 1 (1988); *International Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Brock,* 477 U.S. 274, 282, 106 S.Ct. 2523, 2528, 91 L.Ed.2d 228 (1986). This standard incorporates the standing analysis we adopted in *Board of Water Engineers,* yet addresses the additional concerns we have noted.

 **[14]**   We now apply the *Hunt* standard to the case before us. Reviewing the record in its entirety for evidence supporting subject matter jurisdiction, and resolving any doubt in TAB's favor, we conclude that TAB has standing to pursue the relief it seeks in this case.

The first prong of the *Hunt* test requires that TAB's pleadings and the rest of the record demonstrate that TAB's members have standing to sue in their own behalf. This requirement should not be interpreted to impose unreasonable obstacles to associational representation. In this regard the United States Supreme Court stated that "the purpose of the first part of the *Hunt* test is simply to weed out plaintiffs who try to bring cases, which could not otherwise be brought, by manufacturing allegations of standing that lack any real foundation." *New York State Club Ass'n,* 487 U.S. at 9, 108 S.Ct. at 2232. We are satisfied that TAB has not manufactured this lawsuit. A comparison of the association's membership roster with the list of businesses subjected to state penalties indicates individual TAB members have been assessed administrative penalties pursuant to the challenged enactments. Additionally, TAB has alleged that other of its members remain at substantial risk of penalty. A substantial risk of injury is sufficient under *Hunt. See e.g., Pennell v. City of San Jose,* 485 U.S. 1, 7 n. 3, 108 S.Ct. 849, 855 n. 3, 99 L.Ed.2d 1 (1988) (concluding that association of landlords had standing based on pleadings that individual members would likely be harmed by rent ordinance). Thus TAB satisfies the first prong of the *Hunt* test.

The second prong of *Hunt* requires that TAB's pleadings and the rest of the record demonstrate that the interests TAB seeks to protect are germane to the organization's purpose. TAB was chartered to "represent the interests of its members on issues which may impact upon its members' businesses." Considering a very similar question in *New York State Club Association,* the United States Supreme Court held that: "[T]he associational interests that the consortium seeks to protect are germane to its purpose: appellant's certificate of incorporation states that its purpose is 'to promote the common business interests of its **\*448**  [member clubs].' " 487 U.S. at 10 n. 4, 108 S.Ct. at 2232, n. 4 (bracketed language in original). Likewise, the interests TAB desires to protect are germane to the organization's purpose, and thus the second prong is met.

Under the third and final prong of the *Hunt* test, TAB's pleadings and the record must demonstrate that neither the claim asserted nor the relief requested require the participation of individual members in the lawsuit. The Supreme Court has interpreted this prong as follows:

> [W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.

*Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441 (quoting *Warth,* 422 U.S. at 515, 95 S.Ct. at 2213).

By seeking damages on behalf of its members, necessitating that each individual prove lost profits particular to its operations, the organization in *Warth* lacked standing to sue; rather, each individual member had to be a party to the suit. These facts are distinguishable from *Brock,* in which the union challenged an administrative interpretation of statutory provisions relating to unemployment compensation. 477 U.S. 274, 106 S.Ct. 2523. Recognizing that the suit raised "a pure question of law," and that "the individual circumstances" of any aggrieved member were not in issue, the Court held that the UAW had standing to challenge the government's actions. *Id.* at 287–88, 290, 106 S.Ct. at 2531–32, 2533; *see also Pennell,* 485 U.S. at 7 n. 3, 108 S.Ct. at 855 n. 3 (facial challenge to rent ordinance does not require participation of individual landlords). Here, TAB seeks only prospective relief, raises only issues of law, and need not prove the individual circumstances of its members to obtain that relief, thus meeting the third prong of *Hunt.*

Having found that TAB meets all three prongs of the *Hunt* test, we conclude that TAB has standing to pursue the relief it seeks in this case.

## II. Open Courts

TAB contends that the forfeiture provisions of the statutes and regulations in question violate the open courts provision of the Texas Constitution by unreasonably restricting access to the courts. After the agency has found a party to be in violation of any of these statutes and regulations, the offender must either tender a cash deposit or post a supersedeas bond in the full amount of the penalties assessed, or forfeit the right to judicial review. [11]

Historically, we have recognized at least three separate constitutional guarantees emanating from our open courts provision. First, courts must actually be open and operating, so that, for example, the legislature must place every county within a judicial district. *Runge & Co. v. Wyatt,* 25 Tex.Supp. 294 (1860). Second, citizens must have access to those courts unimpeded by unreasonable financial barriers, so that the legislature cannot impose a litigation tax in the form of increased filing fees to enhance the state's general revenue, *LeCroy v. Hanlon,* 713 S.W.2d 335, 342 (Tex.1986). Finally, meaningful legal remedies must be afforded to our citizens, so that the legislature may not abrogate the right to assert a well-established common law cause of action unless the reason for its action outweighs the litigants' constitutional right of redress. *Sax v. Votteler,* 648 S.W.2d 661, 665–66 (Tex.1983).

 **[15]**   Here the second guarantee is applicable. This is not a question of the abrogation of any well-established common law **\*449** cause of action, [12] just as it is not a question of the physical absence of a court to which a complaint may be brought. The issue before us is access to the courts. In previous cases involving this issue, we did not predicate our decision on whether the

party whose access had been restricted was attempting to assert a common law cause of action. In *LeCroy,* for example, the court did not permit increased filing fees for statutory causes of action while denying them for common law claims. 713 S.W.2d 335. Likewise in *Dillingham v. Putnam,* when the court struck down a statute requiring a supersedeas bond as a condition of appeal, the court did not concern itself with whether the particular appeal being restricted involved a common law or statutory claim. 109 Tex. 1, 14 S.W. 303 (1890). Similarly, in the present case, the issue is simply whether the prepayment requirement is an unreasonable financial barrier to access to the courts in light of the state interest involved.

The stated purpose of the regulatory statutes at issue here is to protect our state's natural resources. [13] There is no question that this is an important state interest. [14] The state argues that the prepayment provisions further this interest by increasing the deterrent effect of the penalties and by aiding in their collection. The state maintains that a violator will be less deterred by an administrative penalty if it can delay payment without bond while appealing the case in the courts. The state also argues that delay may render the penalty uncollectible, as the violator may become insolvent.

In considering these rationales, we note that the prepayment provisions actually consist of two elements. First, the assessed penalty must be paid, or financial security provided, within thirty days; enforcement is not stayed pending any period of judicial review. [15] Second, if payment is not made or financial security provided within the thirty-day period, the right to judicial review is forfeited. We agree that the rationales advanced by the state justify the first of these elements. Requiring expeditious payment of the administrative penalties increases their effectiveness. The legislature, however, could have imposed the first element without the second. It could have provided the agency with the right to collection of assessed penalties unless a supersedeas bond is posted, yet provided for judicial review. The requirement of immediate payment, without the corresponding forfeiture provision, would not have implicated the open courts provision, as the charged party could have obtained judicial review regardless of payment. This approach would have been in accordance with the usual procedure governing appeals of trial court judgments. *See* TEX.R.APP.P. 40. Any litigant may appeal without superseding the trial court's judgment, but the mere pendency of an appeal does not stay enforcement of the judgment. [16] **\*450** Our specific focus for purposes of our open courts analysis, therefore, is not whether the requirement of immediate payment is reasonable, but whether the forfeiture of the right of judicial review, if the penalties are not superseded, is reasonable.

We conclude that the forfeiture provision is an unreasonable restriction on access to the courts. While the requirement of prepayment or the posting of a bond to stay enforcement furthers the state's important environmental interests by creating a strong incentive for timely payment of the assessed penalties, the forfeiture provision serves no additional interest. [17] The state may

accomplish its goals by enforcing the prepayment requirements without infringing on a party's right to its day in court. Accordingly, we hold that forfeiture sections of the statutes and regulations at issue facially violate our open courts provision. [18]

### III. Jury Trial

TAB also claims that the statutes empowering these agencies to assess civil penalties violate the right to a jury trial guaranteed by the Texas Constitution. [19] We disagree.

Article I, section 15 of our constitution [20] preserves a right to trial by jury for those actions, or analogous actions, tried to a jury at the time the constitution of 1876 was adopted. *E.g., State v. Credit Bureau of Laredo,* 530 S.W.2d 288, 291 (Tex.1975); *White v. White,* 108 Tex. 570, 196 S.W. 508 (1917); *Hatten v. City of Houston,* 373 S.W.2d 525 (Tex.Civ.App.—Houston 1963, writ ref'd n.r.e.); *Hickman v. Smith,* 238 S.W.2d 838 (Tex.Civ.App.—Austin 1951, writ ref'd). A jury trial is not mandated by this provision for any other judicial proceeding. *Id.*

 **[16]** In *Credit Bureau,* we concluded that a suit for civil penalties for violation of an injunction issued pursuant to the Texas Deceptive Trade Practices Act was analogous to the common law action for debt, tried to a jury at the time our constitution was adopted. 530 S.W.2d at 293. Thus, we held that the right to a jury trial for that action remained inviolate. *Id.* We observed in *Credit Bureau,* however, that in certain types of adversary proceedings the constitutional right to a jury trial does not attach. Among the proceedings we referred to are appeals from administrative decisions. [21] *Id.* (citing *State v. De Silva,* 105 Tex. 95, 145 S.W. 330 (1912), and **\*451** *Texas Liquor Control Bd. v. Jones,* 112 S.W.2d 227 (Tex.Civ.App.—Houston 1937, writ ref'd n.r.e.)). Consistent with this noted exception in *Credit Bureau,* we conclude that these agencies' assessments of environmental penalties are not actions, or analogous actions, to those tried to a jury at the time the constitution of 1876 was adopted. To hold that these environmental statutes and regulations promulgated in the late 1960s merely parrot common law and statutory rights triable to a jury in 1876 would turn a blind eye to the emergence of the modern administrative state and its profound impact on our legal and social order. In the late 19th century, ours was primarily a sparsely-populated agrarian society. *See generally,* T.R. Fehrenbach, *Lone Star: A History of Texas and the Texans,* 279–324 (1983). By contrast, concentrated industrial activity and its by-products, including the wide-spread emission of pollutants, with their resulting potential for significant damage to our natural resources are phenomena of relatively recent origin. In response to such phenomena, regulatory schemes, such as those challenged here, were designed to balance mounting environmental concerns with our state's economic vitality. In 1876 no governmental schemes akin to these existed. [22] Thus, we conclude that the contested proceedings are not analogous to any action tried to a jury in 1876. Accordingly, we hold that no right to a jury

trial attaches to appeals from administrative adjudications under the environmental statutes and regulations at issue here. [23]

We should not be misunderstood to say that the legislature may abrogate the right to trial by jury in any case by delegating duties to an administrative agency. Here, we simply reaffirm what this court held almost a half century ago, in *Corzelius v. Harrell,* 143 Tex. 509, 186 S.W.2d 961 (1945). In *Corzelius,* we concluded that certain judicial functions, including fact finding, may be delegated constitutionally by the legislature to administrative agencies in furtherance of the preservation and conservation of the state's natural resources. The decision in *Corzelius* was based on article XVI, section 59(a) of our constitution, which provides in relevant part: "The conservation and development of all the natural resources of this State ... and the preservation and conservation of all such natural resources ... are each and all ... public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto." TEX. CONST. art. XVI, § 59(a). "By the use of the broad language used in Article XVI, Section 59(a)," the court stated, "the Legislature is authorized to enact such laws as are necessary to carry out the purposes for which such constitutional amendment was adopted." *Corzelius,* 186 S.W.2d at 964. [24]

**[17]** There is no doubt that the legislature delegated the power to assess these civil penalties to the Air Control Board and the Water Commission as a manifestation of the public's interest in preserving and conserving the state's air and water resources. That intent is apparent from the policy statements of the relevant statutes. [25] **\*452** We conclude, therefore, that the delegation of the fact-finding function by the legislature to the Air Control Board and the Water Commission under this statutory scheme was within the legislature's constitutional authority.

Of course, the fact that no jury trial is provided by the legislature to an alleged violator of these environmental protection laws does not mean that the agencies' power to assess penalties is unbridled. [26] The Air Control Board and the Water Commission may act only within constitutional and statutory parameters.

For the reasons set out above, we reverse that portion of the trial court's judgment declaring that section 4.041 of the Texas Clean Air Act, sections 26.136 and 27.1015 of the Texas Water Code, and section 8b of the Texas Solid Waste Disposal Act and the rules and regulations promulgated under those statutes comport with the open courts provision of our constitution, article I, section 13. We declare that the requirement of a supersedeas bond or cash deposit paid into an escrow account as a prerequisite to judicial review under TEX.HEALTH & SAFETY CODE §§ 361.252(m) (first clause), 382.089(c) (first sentence), and TEX.WATER CODE § 26.136(k) (first sentence) is unconstitutional. We affirm that portion of the trial court's judgment declaring that the listed statutes, rules, and regulations do not violate the jury trial provision of our constitution, article I, section 15.

Concurring and dissenting opinions by DOGGETT, GAMMAGE and SPECTOR, JJ.

HIGHTOWER, J., not sitting.

DOGGETT, Justice, concurring and dissenting.

### *"Don't Mess With Texas"*

*—A motto that captures the Texas spirit.*

Texans understand the directive "Don't Mess With Texas"; the majority does not. If the mess is big enough, if the stench is strong enough, no matter how great the danger to public health and safety, an industrial litterer can "mess" with Texas without fear of immediate punishment or legally effective citizen action.

And what an occasion for permitting polluters to "mess" with Texas air and water. Our state tops the nation in total toxic emissions and ranks dead last among the fifty states in important measures of environmental quality. [1] Although last in air **\*453** and water cleanliness, Texas today becomes the first state to strike down the imposition of penalties by administrative agencies to enforce statutes protecting the environment. I dissent from today's manipulation of the law to paralyze anti-pollution efforts, tragically announced at a time when protecting the quality of the air we breathe and the water we drink is so critical.

Today's opinion delivers a double whammy to protection of our natural resources. Polluters are first shielded from swift punishment for harming our environment, and then the courthouse door is slammed shut in the face of Texans who organize to object. Incredibly, this second punch was not even sought by the corporate organization that brought this challenge; it was wholly designed by the majority during the three years that this cause has lingered in this court. Announced today is an easily manipulable "friends in, foes out" rule to prevent further actions by those who organize to protect taxpayers, consumers or the environment.

Through its broad writing designed to eviscerate administrative enforcement of our state's environmental laws, the majority has also created significant new uncertainties for a wide range of state governmental activity—tax collection is imperiled, laws to protect nursing home residents are effectively voided, and even a leading weapon in the war on drugs is threatened. At a time of budgetary crisis exacerbated by the majority's great misadventure in public school finance, [2] today's opinion raises a substantial question of whether the State will be required to return to those

who despoil Texas millions of dollars in administrative penalties collected during the almost eight years this case has wandered through the judicial system.

This major blow to our environment is matched only by the threat to our system of justice lurking in the arcane language of today's opinion. Hidden within its lengthy legal mumbo-jumbo is an unprecedented blow to our jury system. The constitutional right of trial by jury, already suffering at the hands of this majority, is no longer inviolate; it may be abrogated at any time. Instead of walking into a courthouse, where a jury is guaranteed, citizens may be detoured to an administrative agency, to explain their problems to bureaucrats not directly answerable to the community.

Today precedent and tradition have been trampled as the majority's long-standing fear of ordinary people in our legal system has taken firm hold. The drafters of our Texas Constitution realized something that the majority has long ceased to appreciate—ordinary Texans can make an extraordinary contribution to our system of justice. The more their collective voice expressed in a jury verdict is disregarded, the more new barriers are contrived to shut them out of our system of justice, the less justice that system will offer.

## I. Open Courts

The ability of state agencies to enforce environmental laws through the assessment of administrative penalties is declared unconstitutional by the majority as contradicting our state guarantee of open courts. While concluding that TAB certainly has a right to judicial review on behalf of its members, I disagree that the statutory restrictions it challenges unreasonably restrict access to the courts.

Access to the courts is unquestionably a fundamental constitutional and common law right. Article I, section 13 of the Texas Constitution forms the nucleus of this protection:

> **\*454** The open courts provision specifically guarantees all litigants the right to redress their grievances—to use a popular and correct phrase, the right to their day in court. *This right is a substantial state constitutional right.*

*LeCroy v. Hanlon,* 713 S.W.2d 335, 341 (Tex.1986) (citations omitted). This court has a long history of assuring that the right of access remains guaranteed to Texas citizens. [3]

In *Sax v. Votteler,* 648 S.W.2d 661 (Tex.1983), we required a litigant alleging an unconstitutional denial of access to the courts to show that: (1) a cognizable common law cause of action is being restricted and (2) the limitation is unreasonable or arbitrary when balanced against the purpose

and basis of the statute. The majority today appropriately eliminates the first showing in certain cases. In some circumstances the distinction between common law and statutory causes of action clearly does not affect whether access to the courts has been denied.

The second part of the *Sax* test, however, continues to be applied in all open courts cases. [4] Thus, in determining whether the open courts provision of the Texas Constitution is violated by the requirement that administrative penalties be paid as a prerequisite to judicial review, we must balance two competing interests: the right of TAB's members to access to the courts and the state's concern with effective and timely enforcement of its laws protecting the environment. The majority today restates in rather vague terms this second prong: "whether the prepayment requirement is an unreasonable financial barrier to access to the courts in light of the state interest involved." 852 S.W.2d at 449. As we held in *LeCroy:*

> Because a substantial right is involved, the legislature cannot arbitrarily or unreasonably interfere with a litigant's right of access to the courts. Thus, the general open courts provision test balances the legislature's actual purpose in enacting the law against that law's interference with the individual's right of access to the courts. *The government has the burden to show that the legislative purpose outweighs the interference with the individual's right of access.*
> 713 S.W.2d at 341 (citations omitted; emphasis supplied).

Applying this test, we have permitted certain restrictions on access to the courts, while disallowing others. *Compare LeCroy,* 713 S.W.2d at 341 (court filing fee unreasonably restricts access to judicial system), and *Dillingham v. Putnam,* 109 Tex. 1, 14 S.W. 303 (1890) (supersedeas bond as prerequisite to appeal, without regard to ability to pay, unconstitutional), *with Clanton v. Clark,* 639 S.W.2d 929 (Tex.1982) (court may constitutionally dismiss suit for failure to timely file cost bond), and *Federal Crude Oil Co. v. Yount–Lee Oil Co.,* 122 Tex. 21, 52 S.W.2d 56 (1932) (requirement that franchise taxes be paid prior to filing suit upheld under article I, § 13); *compare Lucas v. United States,* 757 S.W.2d 687 (Tex.1988) (limitations on damages for medical malpractice unconstitutional), *with Rose v. Doctors Hosp.,* 801 S.W.2d 841 (Tex.1990) (same limitations upheld under open courts provision in wrongful death cases). I favor a more complete and predictable open courts analysis designed to discourage such anomalous results.

**\*455** Today's implementation of the second prong of the *Sax* test demonstrates its malleability. After perfunctorily reciting the purpose of administrative penalties, the majority, without any further analysis, concludes that: "the forfeiture provision is an unreasonable restriction on access to the courts," 852 S.W.2d at 450, and "the forfeiture provision serves no additional [state] interest." *Id.* at 450. Enacted by the Legislature as an important means of enforcing our state's environmental laws, these penalties are today judicially extinguished. The majority determines that these laudable legislative objectives are not sufficiently "important" to justify the possibility that the use of penalties may perhaps someday impose some slight financial strain on some hypothetical polluter.

Whether examined under either the vague test employed today or my more exacting formulation, the majority's conclusory analysis suffers from at least three major flaws: (1) a failure to recognize the compelling interest, grounded in our state constitution, served by administrative penalties, including prepayment provisions; (2) a disregard of the extensive statutory constraints on penalty usage which represents the least restrictive means to achieve this purpose; and (3) an assumption that the prepayment provision interferes with individual access to the courts unsupported by even a single specific instance of such a restrictive effect.

The balancing required by *Sax* mandates careful consideration of the rights being affected. The more significant the right the litigant asserts, the more onerous the government's burden becomes. TAB has asserted a right to judicial review of penalties imposed against its members. This interest is encompassed within the right of access to the courts, which we declared a "substantial state constitutional right." *LeCroy,* 713 S.W.2d at 341.

The State has met its burden by demonstrating a compelling interest in employing administrative penalties reflected in constitutionally-guaranteed protection of our state's natural resources. Although not critical in overcoming an open courts challenge, a constitutional predicate for the state's interest is a highly persuasive factor in the balancing process. As declared in article XVI, section 59(a)[5]:

> [T]he preservation and conservation of all ... natural resources of the State are each and all declared public rights and duties; and the Legislature shall pass all laws as may be appropriate thereto.
>
> This very mandate of the people, as well as protection of the public health and safety was effectuated in the Clean Air Act,[6] the Texas Water Code,[7] and the Solid Waste Disposal Act,[8] including the right to assess administrative penalties. Protection of Texas' air, water and land is undeniably a compelling interest.

 **\*456** The form of these particular administrative penalties has certainly been fashioned to serve this important state interest through the least restrictive means. Penalty usage is substantially limited and can in no way be said to be arbitrarily imposed. All three statutes at issue require that, once a violation is established, the agency assessing a penalty must consider such factors as the seriousness of the violation, including but not limited to the nature, circumstance, extent, and gravity of the prohibited acts; the hazard or potential hazard created to the public health or safety of the public; the history of previous violation; the amount necessary to deter future violations; and efforts to correct the violation.[9] There is thus statutory assurance that the amount of any resulting penalties will be directly related to the conduct.

Requiring that assessed penalties be paid, or a bond in the same amount be posted, prior to challenging the agency action in court is not unreasonable under these circumstances. Unlike the filing fee held violative of the open courts provision in *LeCroy,* the legislative purpose is not to raise money by making it more expensive for citizens to enforce their legal rights. Instead, the legislative objective is to *deter and punish* violations of the law that pose an environmental threat.

The wheels of justice grind slowly, with final resolution often years in reaching. Indeed, in this court they sometimes hardly grind at all. Clearly those willing to profit from polluting our natural resources will not hesitate to employ the delays in the judicial system to their advantage. A declaration of bankruptcy by a perhaps deliberately undercapitalized corporation during the pendency of a suit is likely to relieve the polluter of any responsibility to remedy the damage it has caused.

Showing no awareness of the purpose of and need for administrative penalties, the majority finds that "expeditious payment" is adequately guaranteed by the ability of the agency, through the attorney general, to initiate an enforcement action to collect the amount assessed. 852 S.W.2d at 449 & n. 15. In other words, the purpose of immediate deterrence of violation of environmental laws is ensured by the filing of a lawsuit that may take as many years to resolve as this case has. These agencies charged with protecting our natural resources have long had the ability to bring an enforcement action in state court. *See* Tex.Water Code § 26.123; Tex.Health & Safety Code § 382.081; *id.* § 361.224. The effort of the Texas Legislature to improve the effectiveness of enforcement through the use of administrative penalties is today rendered a nullity.

Given the time and expense that must be devoted to pursuing an enforcement action in court, the State will have the capability to proceed against only the most egregious wrongs. The vast majority of administrative penalties to date have been relatively small, reflecting technical yet important statutory violations. [10] In the absence of an administrative penalty power, most of these would have gone unpunished, even though collectively the environmental impact of small violations could be more profound than a major catastrophe. Relieving polluters from immediate sanctions dismantles the effectiveness of our laws protecting natural resources; no lesser means has been identified that provides for prompt enforcement. I would hold that the state has demonstrated a compelling interest in environmental protection that has been implemented by the least restrictive means, thus overriding any modest impediment that the prepayment of penalties may impose on access to the courts.

 **\*457** Not even the slightest evidence has been provided to this court to suggest any actual restrictive effect. No affidavit of any member of the Texas Association of Business appears in the record stating that an inability to pay an administrative penalty has barred judicial review. As to most of the penalties assessed, $5,000 or less in amount, it is doubtful that such a contention could be made. The majority necessarily concludes that imposing fines of $2,000 against Exxon

Chemical Company, Shell Oil Company and Union Carbide Corporation has left those entities financially unable to pursue an appeal. [11] While the enormity of some future penalty could in fact unconstitutionally bar judicial access, that is certainly not the case here. *See Jensen v. State Tax Comm'n,* 835 P.2d 965, 969 (Utah 1992) (payment of assessed taxes, penalties and interest as precondition to suit "not unconstitutional in all cases," but only those in which taxpayer financially barred from prosecuting appeal); *see also Morrison v. Chan,* 699 S.W.2d 205, 207 (Tex.1985) (medical malpractice statute of limitations not unconstitutional as applied to facts of case).

Eliminating the need to prove actual restrictive effect, the majority declares "irrelevant" that "the affected parties may be able to afford prepayment." 852 S.W.2d at 450 n. 18. Unexplained is how this statement can be reconciled with *Dillingham,* in which this court found of critical importance the failure to accommodate those financially unable to post a supersedeas bond as a prerequisite to judicial review. Opining that "the guarantee of constitutional rights should not depend on the balance in one's bank account," *id.,* the majority would accord our state's largest businesses the same treatment as indigents in avoiding financial responsibility for court and other litigation costs.

Nor is the majority restrained by Texas decisional law validating similar requirements. We long ago upheld against this same type of challenge the condition that a corporation pay its franchise taxes in order to file a court action. *Federal Crude Oil Co. v. Yount–Lee Oil Co.,* 122 Tex. 21, 52 S.W.2d 56 (1932); *accord Rimco Enterprises, Inc. v. Texas Elec. Svc. Co.,* 599 S.W.2d 362 (Tex.Civ.App.—Fort Worth 1980, writ ref'd n.r.e.). Various statutory requirements that taxes, penalties and interest be paid prior to contesting them in court have likewise sustained an open courts challenge. *See Filmstrips and Slides, Inc. v. Dallas Central Appraisal Dist.,* 806 S.W.2d 289 (Tex.App.—Dallas 1991, no writ) (property taxes); *Robinson v. Bullock,* 553 S.W.2d 196 (Tex.Civ.App.—Austin 1977, writ ref'd n.r.e.), *cert. denied,* 436 U.S. 918, 98 S.Ct. 2264, 56 L.Ed.2d 759 (1978) (sales taxes).

The majority also ignores the certainty that far more than three statutes are impacted by today's decision. A broad range of regulatory enforcement programs vital to protection of the public health and safety will be stripped of their most timely and effective sanctions to deter harmful conduct. Laws designed to protect the old—residents in nursing homes [12]—the young—our children away at camp [13]—the sick and the injured, [14] and those we have lost [15] will be substantially weakened. Others, ensuring the sanitariness of food, drugs and cosmetics, [16] as well as the slaughter and **\*458** disposition of dead animals, [17] will be similarly rendered less effective. [18] Even where such penalties have not been frequently enforced, their potential use may promote law enforcement.

The most widespread damage, however, from today's decision will be in the enforcement of laws protecting our environment, where the Legislature has determined again and again that such penalties are the most effective means of assuring compliance and preventing pollution of our

air, water and land. [19] The majority ensures that those who pollute will be brought to justice very slowly or not at all.

Other statutes that impose administrative penalties permit the filing of an affidavit of inability to pay in lieu of prepayment or the posting of a bond. [20] Because the majority's reasoning strikes down administrative penalties without reference to financial ability, 852 S.W.2d at 451, these statutes similarly cannot be enforced.

Today's writing poses a potentially crippling effect for collection of taxes. All of our state statutes in this area require that assessed taxes, penalty and interest be prepaid before a suit challenging them may be filed. *See generally* Tex.Tax Code §§ 112.051, 112.101. If such requirements are unconstitutionally void even to fulfill a constitutional mandate of environmental protection, their validity for tax collection is certainly subject to question. *See R Communications, Inc. v. Sharp,* 839 S.W.2d 947 (Tex.App.—Austin 1992, writ granted).

Nor has the majority sought to consider the consequences of its decision for a major weapon in the war against drugs, forfeiting *prior to judicial review* money, vehicles and other property alleged to have been used in violating our criminal laws. Tex.Crim.Proc.Code art. 59.02–.11. Most frequently invoked to seize assets from drug dealers, such as money and cars that could finance their defense, this statute provides for the return of property prior to trial only **\*459** on the posting of a bond for the full value. *Id.* art. 59.02(b).

Procedures within our judicial system are also threatened. Why is not the requirement that corporations and other organizations appear in court only through counsel a violation of the open courts provision, since the cost of retaining an attorney in most cases exceeds the average administrative penalty considered here?

Inadequately considered by the majority's opinion is its effect on the millions of dollars in administrative penalties that have already been paid under the statutes now declared unconstitutional. Yet, under the general rule that our decisions apply retroactively, past violators of environmental laws may stand to reap a substantial windfall. [21] In the firm grasp of this majority, "open courts" may have been rewritten to mean open coffers. While claiming that nothing in today's writing suggests that a refund is required, the majority apparently once again concludes that monies extracted by the state under the coercion of an unconstitutional system may be retained. *See Carrollton–Farmers Indep. Sch. Dist.,* 826 S.W.2d at 515–23 (holding tax unconstitutional, but requiring taxpayers to continue payment for two years).

The majority today throws a large wrench into the workings of the important administrative mechanism of our Texas government. By severely limiting enforcement powers, the majority leaves law enforcers little choice but to forego prosecution of law violators. Our laws designed

to protect and conserve our natural resources are substantially weakened at the time their strength is most needed.

## II. Trial by Jury

The harm caused to our environment by today's writing is equalled only by the severe blow struck against our fundamental right of trial by jury. In holding that TAB and its members have no right to a jury trial, the majority employs an analysis that has far-reaching ramifications. While I recognize the need to accommodate the evolution of the administrative state, the history of this important guarantee mandates that only the narrowest of exceptions be permitted.

The ability of each individual to have a case heard by other members of the community is a vital part of our heritage and law. Long ago, Texans emphasized the paramount importance of this guarantee, stating in their grievances against the Mexican government:

> It has failed and refused to secure, on a firm basis, the right of trial by jury, that palladium of civil liberty, and only safe guarantee for the life, liberty, and property of the citizen.

The Declaration of Independence of the Republic of Texas (1836), *reprinted in* Tex.Const.app. 519, 520 (Vernon 1955). A strong guarantee of this right had been unsuccessfully sought in an 1833 draft constitution,[22] which was submitted to Mexico by Stephen F. Austin[23] and was later incorporated in the 1836 Texas Independence Constitution.[24]

The central role of the jury as a democratic institution was firmly recognized, indeed celebrated, in our early jurisprudence by the Supreme Court of the Republic of Texas:

> The institution of jury trial has, perhaps, seldom or never been fully appreciated. It has been often eulogized in sounding **\*460** phrase, and often decried and derided. An occasional corrupt, or biased, or silly verdict is not enough for condemnation; and when it is said the institution interposes chances of justice and checks against venality and oppression, the measure of just praise is not filled. Its immeasurable benefits, like the perennial springs of the earth, flow from the fact that considerable portions of the communities at stated periods are called into the courts to sit as judges of contested facts, and under the ministry of the courts to apply the laws.... Let us then preserve and transmit this mode of trial not only inviolate, but if possible purified and perfected.

*Bailey v. Haddy,* Dallam 35, 40–41 (Tex.1841).[25]

In 1845, expanding the scope of this right was the subject of spirited debate in the deliberations over the new constitution for statehood. In addition to the previous guarantee, which was carried forward in a new Bill of Rights, [26] further protection was included in the Judiciary Article. Tex. Const. art. IV, § 16 (1845). While under our national Constitution and those of almost all of our sister states trial by jury is available only for those actions that could have been brought at common law, the Texas Constitution since 1845 has also preserved that right in cases that historically would have been brought in equity. Thus, even when a private party seeks injunctive relief that will inure to the public's benefit, any derogation of the right to a jury nonetheless violates the Texas Constitution.

Urging support of the additional Judiciary Article guarantee, Convention President Thomas Rusk declared:

> It is a dangerous principle to trust too much power in the hands of one man. Would it not be better to trust a power of this nature in the hands of twelve men, than to confide it to the breast of one?

William F. Weeks, *Debates of the Texas Convention* 268 (1846). He was opposed by John Hemphill, later the first Chief Justice of this court, who actually "preferred the civil law" system, *id.* at 271–73, and Jefferson County delegate James Armstrong, who insisted the new section would "operate very injuriously." *Id.* at 270. He declared:

> It would be better, in my opinion, to leave it to the legislature to apply these things; it is enough for us to say in the constitution that the trial by jury shall be preserved inviolate. If we intend the jury to determine every thing, it would be better to dispense with the judge altogether, as a useless appendage of the court.

*Id.* Today it is this same fear of juries, fortunately rejected in 1845, that now unfortunately prevails.

The original language providing for trial by jury in the Judiciary Article of 1845 was retained in later constitutions, Tex. Const. art. IV, § 16 (1861), Tex. Const. art. IV, § 20 (1866), but was thereafter extended to "all cases of law or equity." Tex. Const. art. V, § 16 (1869). It took its final form in our present Constitution of 1876, which continues to afford not one but two assurances on this vital subject:

> In the trial of all causes in the District Courts, the plaintiff or defendant shall, upon application made in open court, have the right to trial by jury....

Tex. Const. art. V, § 10.

The right of trial by jury shall remain inviolate.

Tex. Const. art. I, § 15. Rather than keeping it "inviolate," the majority today severely violates this right.

 **\*461**  Our heritage is now rejected by the majority in favor of a deliberately overbroad writing that treats trial by jury as a mere anachronism. This is consistent with the majority's increasing disfavor of decisionmaking by ordinary citizens composed as a jury. [27] Today's opinion insists that our constitutional assurance of trial by jury does not offer protection against legislative delegation of factfinding to an administrative bureaucracy. In essence, the majority engages in a massive redistribution of power from the people to the bureaucratic arm of state government. This extreme position is totally unjustified in view of the staunch legal and historical underpinnings of our constitutional commitment to afford Texans a jury of their peers.

Today's opinion accurately describes one element of the dual constitutional protection for this fundamental liberty:

> Article I, section 15 of our constitution preserves a right to trial by jury for those actions, or analogous actions, tried to a jury at the time the constitution of 1876 was adopted.

852 S.W.2d at 450 (footnote omitted). Then the majority grossly misconstrues this standard while making selective and misleading use of jurisprudence developed under the further guarantee of article V.

With its hangnail sketch of Texas history limited to one historian's very generalized description of Texas in the era "between 1835 and 1861", [28] 852 S.W.2d at 450, the majority ignores our longstanding concerns regarding threats to our natural resources. As early as 1860, the Legislature acted to penalize polluters, providing that:

> If any person ... shall in anywise pollute, or obstruct any water course, lake, pond, marsh or common sewer, or continue such obstruction or pollution so as to render the same unwholesome or offensive to the county, city, town or neighborhood thereabouts, or shall do any act or thing that would be deemed and held to be a nuisance at common law, shall be ... fined in any sum not exceeding five hundred dollars.... [29]

In an early decision considering whether a criminal nuisance was posed by a tallow factory near Galveston at which cattle were slaughtered and their carcasses and offal were allowed to accumulate, this court stated:

> It requires no aid of the common law to convince any one accustomed to pure air, and who has been brought by accident or necessity within the sickening

and malarious influence of one of our modern tallow and beef factories, that it is a disgusting and nauseous nuisance, even for miles around it ... [those] so offending should be indicted and punished to the extent of the law.

*Allen v. State,* 34 Tex. 230, 233–34 (1871). How significantly has this court's once vigorous enforcement of anti-pollution laws waned.

Defilement of the environment was not only made punishable as a crime, but also subject to a common law action for nuisance. *See generally* Horace Wood, Wood's Law of Nuisances 501–21, 576–692 (2d ed. 1883) (discussing nuisance recovery at common law for various forms of air and water pollution). Such actions were regularly brought in Texas before 1876 to halt activities harmful to our air and water. In 1856, this court recognized that "[w]hat constitutes a nuisance is well defined."[30]  **\*462** *Burditt v. Swenson,* 17 Tex. 489 (1856). Considering an action to enjoin operation of a livery stable on Congress Avenue in Austin because "manure and filth has already accumulated to such an extent, that it now causes an unhealthy and disagreeable effluvia, exceedingly offensive and prejudicial," *id.* at 492, this court concluded such "noisome smells" constituted a nuisance. *Id.* at 502–03. In *City of Fort Worth v. Crawford,* 74 Tex. 404, 12 S.W. 52, 54 (1889), an individual asserted that, because of the dumping of garbage, filth and bodies of dead animals on city land,

his home was rendered almost uninhabitable; his family and himself were kept in bad health; and he was, in the language of a witness, "a walking skeleton."

This court further observed that

The stench was so offensive that he had to shut the doors to eat and sleep.... The testimony shows that the filth on this place of deposit was so indescribable, and was so offensive as to make persons sick, and could be perceived a mile away.

*Id.* Affirming the judgment declaring the dump a common law nuisance, this court declared:

There is also no doubt that every person has a right to have the air diffused over his premises free from noxious vapors and noisome smells....

*Id.*[31]

The majority's suggestion that "pollutants ... are phenomena of relatively recent origin," 852 S.W.2d at 451, is contradicted by the nineteenth century legislative response of criminalizing pollution and the common use of the common law of nuisance to fight soiling of the air and water. With the ongoing construction of the railroads, the mining of coal and sulphur, the emergence of industry and the nascence of our oil and gas industry, our state's natural resources were by

no means pure and unthreatened in 1876. *See* James C. Cobb, Industrialization and Southern Society 1877–1984, 128 (1984) (describing pollution relating to increased rail usage, lumbering and urban sewage); *see also* Robert A. Calvert & Arnoldo De Leon, The History of Texas 186–191 (1990) (discussing the development of Texas industry in the late 1800's, including lumbering, beef processing and mining); Louis J. Wortham, 5 A History of Texas (1924) (examining industrial development in the nineteenth century). Only the scope and depth of the problem has changed. But even if the fouling of the environment were a recent technological "innovation" of the past century, that would be irrelevant. As I recently wrote in another context,

> The law is not irretrievably locked in the days before televisions and videocameras, nor limited to operators of telegraphs and horse-drawn carriages.

*Boyles v. Kerr* (Tex.1992) (Doggett, J., dissenting). There is nothing about technological change that has made trial by jury any less vital. [32]

But because there was no modern bureaucracy in 1876, the majority insists: "no governmental schemes akin to these existed." *Id.* at 451. While our laws and society have grown more complicated, the mandate **\*463** of our constitution has not. As we concluded in *State v. Credit Bureau of Laredo, Inc.,* 530 S.W.2d 288, 292 (Tex.1975): "The right to a trial by jury is not limited to the precise form of action ... at common law." If there was an analogous cause of action with a right to jury trial in 1876, then our article I jury trial guarantee requires it today. Yet the majority ignores the fact that even the earliest of pollution statutes was designed to deter and punish those who harm our environment. Our jury trial article is thus decreed as dependent on form, not substance; not analogy, but exactitude. Under the majority's analysis, *Credit Bureau* was wrongly decided since a regulatory prohibition against deceptive non-disclosure or ambiguous language with the capacity to deceive was beyond the "deceptive acts" of common law fraud or deceit as it existed in 1876.

Seizing upon the rather obvious proposition that the administrative state had not yet been created in 1876, the majority concludes that there is no right to trial by jury in judicial review of an administrative proceeding. But under article I it is the nature of the cause of action that controls, not the procedures under which it is enforced. Each of the three statutes considered today defines "pollution" of air, water or land to incorporate early nuisance concepts. Tex. Health & Safety Code § 382.003(3) (contaminants that "are or may tend to be injurious to or to adversely affect human health or welfare, animal life, vegetation or property [or] interferes with the normal use and enjoyment of animal life, vegetation, or property"); *id.* § 361.003(44) ( "contamination of any land land or surface or subsurface water in the state that renders the land or water harmful, detrimental, or injurious to humans, animal life, vegetation"); Tex. Water Code § 26.001(13) (contamination that "renders the water harmful, deterimental, or injurious to humans, animal life, vegetation, or property"). The majority fails to examine these provisions and makes no attempt to distinguish their substance from nuisance actions at the time the constitution was adopted. The focus must

be on the nature of civil and criminal nuisance actions as they existed in 1876, not on whether administrative agencies existed then to bring such actions. That the creation of some administrative agency was not contemplated in 1876 does not mean that any type of factfinding transferred to that agency in 1993 or hereafter is beyond the purview of a jury. With its new approach, the majority is only clearing the way for a steady expansion of factfinding and decisionmaking by bureaucracy at the expense of trial by jury.

Concluding that no common law action analogous to the assessment of administrative penalties existed in 1876, the majority professes a superficial limit on its holding tied to article XVI, § 59(a) of the Texas Constitution, as interpreted in *Corzelius v. Harrell,* 143 Tex. 509, 186 S.W.2d 961 (1945). 852 S.W.2d at 451 n. 24. Nothing in this provision affects the determination of whether a nuisance action for pollution is analogous to an enforcement action for the same conduct. Clearly, the majority's reasoning rests solely on the fact that no administrative agency was charged in 1876 with protecting the state's resources. Nor does *Corzelius* in any way address the right to jury trial. Under the majority's asserted "narrow" holding, the right to trial by jury can be immediately abrogated in any case in which natural resources are even remotely involved, including private disputes that this court has held are subject to jury trial, such as those involving mineral ownership, contract rights, or mineral lease terms. *See, e.g., Amarillo Oil Co. v. Energy–Agri Prod., Inc.,* 794 S.W.2d 20, 26 (Tex.1990).

The constitutional limitation on legislative power to delegate away the people's right to trial by jury was amply demonstrated by the writing of this court in *White v. White,* 108 Tex. 570, 196 S.W. 508 (1917). There a husband had his wife, who apparently did not contest that she was a "lunatic," committed to a state asylum. Commitment proceedings had been statutorily transferred to a "commission" appointed by a county judge and comprised of six members, "as many of [whom] shall be physicians as may be possible." Act of **\*464** April 8, 1913, 33rd Leg., ch. 163, art. 152, 1913 Tex.Gen.Laws 342. Although a review of decisions of other states and of federal practice indicated substantial support for what appeared to be a quite reasonable legislative attempt to entrust the determination of mental competency to the expertise of the medical profession, 196 S.W. at 514–15, this Court rightly concluded there that

> trial by jury means something more than a hearing before a commission....

*Id.* 196 S.W. at 511. Such "a hearing before a commission, in lieu of the time-honored trial by jury, is invalid." *Id.* 196 S.W. at 515. Moreover,

> [contrary] reasoning [in other jurisdictions] as to the right of the legislature to
> dispense with jury trials is not applicable to our judicial system and laws, and it
> is obnoxious to our [Texas] Constitution...."

*Id.* I maintain that the wholesale transfer of authority for factfinding from juries to the bureaucracy announced here is no less offensive to the rights our Constitution guarantees.

Beginning with the constitutional amendment that led to the creation of the Railroad Commission, [33] the use of administrative agencies in Texas has steadily increased. Today this arm of government implements broad legislative plans regulating many areas of public concern, including the conduct of public utilities, the development and conservation of energy resources, and the protection of the environment.

To preserve the workings of modern government, some exception for administrative proceedings may be necessary, but it should be drawn narrowly so as not to encompass every conceivable action that could arguably be assigned to some existing or future administrative body. And that is precisely what, until today, our Texas courts have usually done. In two decisions concerning administrative cancellation of a permit to sell liquor, courts narrowly recognized that no "cause of action" was involved. The court in *Bradley v. Texas Liquor Control Bd.,* 108 S.W.2d 300 (Tex.Civ.App.—Austin 1937, writ ref'd n.r.e.), specifically excluded from its ruling cases "based upon a civil right of [an individual] to compensation." Relying on *Bradley,* [34] the court in *Texas Liquor Control Bd. v. Jones,* 112 S.W.2d 227, 229–30 (Tex.Civ.App.—Texarkana 1937, no writ), noted that unlike other administrative proceedings that might involve rights of the same character as a "cause of action," the cancellation of a liquor license is a proceeding brought by the state pursuant to its police power to protect the "welfare, health, peace ... and safety of the people of Texas."

This concern for "the safety of the people of Texas"—the rights and needs of the public, *id.,* is not dissimilar from the doctrine of "public rights" rather imperfectly employed by the federal courts. State cancellation of a liquor license essentially represents a "public right." In *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977), the court distinguished between cases involving governmental action to protect the public health and safety and those involving only private rights:

> At least in cases in which "public rights" are being litigated—e.g., cases in which the government sues in its sovereign capacity to enforce public rights created by statutes ... [the constitutional right to a jury trial] does not prohibit ... assign[ment of] the factfinding function to an administrative forum with which the jury would be incompatible.

*Id.* at 450, 97 S.Ct. at 1266.

*Bradley* and *Jones* are also consistent with writings in other jurisdictions strictly excluding from any administrative public rights exception actions invoking private **\*465** rights for which the Constitution mandates a right to trial by jury:

> Although the award of general compensatory damages may have substantive effect, in that it deters violation of the regulatory scheme ... when the damages awarded advance a substantial private interest in remuneration that is disproportionate to the concept of public relief, the right to a jury trial is implicated and a jury is required.

*McHugh v. Santa Monica Rent Control Bd.,* 49 Cal.3d 348, 261 Cal.Rptr. 318, 344, 777 P.2d 91, 117 (1989) (Panelli, J., concurring); *Bishop Coal Co. v. Salyers,* 181 W.Va. 71, 380 S.E.2d 238, 246 (1989) (subjective determinations of damages are constitutionally entrusted to juries); *Broward County v. La Rosa,* 505 So.2d 422, 424 (Fla.1987) (constitutional right to jury precludes administrative awards of unliquidated damages).

Fortunately the rights of Texans are not constrained by whether the right to a jury trial was preserved in analogous actions in 1876. We have written quite clearly that an even broader right to trial by jury is afforded under article V, section 10 than under article I, section 15.[35] *State v. Credit Bureau of Laredo, Inc.,* 530 S.W.2d 288, 292 (Tex.1975). Relying on *Walsh v. Spencer,* 275 S.W.2d 220, 223 (Tex.Civ.App.—San Antonio 1954, no writ), which described the "much broader guarantee" of the Judiciary Article, and *Tolle v. Tolle,* 101 Tex. 33, 104 S.W. 1049, 1050 (1907), which said of the provision, "[l]anguage cannot be more comprehensive than this," we expressly disapproved of earlier cases "mistakenly" treating the two provisions

> as identical in meaning, that is, as protecting the right of trial by jury only as it existed at common law or by statutes in effect at the time of the adoption of the Constitution.
> 530 S.W.2d at 292 (citing *Hickman v. Smith,* 238 S.W.2d 838 (Tex.Civ.App.—Austin 1951, writ ref'd), as improperly assigning the two provisions equivalent meaning). We held that the Judiciary Article affords a unique right to trial by jury even for causes of action unknown at the time of the Constitution's adoption. *Id.*[36]

Instead of heeding this holding, the majority seizes upon a citation to a commentary in that writing as an excuse to rewrite the Constitution. In the discussion of the article V jury trial guarantee in *Credit Bureau,* which involved no administrative action, we noted a few "isolated" proceedings that do not constitute a "cause" that have been identified on a "case-by-case determination." *Id. at 293.* We made shorthand reference to a commentator's brief list of exceptions carved from the otherwise inviolate right to trial by jury. *Id.* (citing Whitney R. Harris, *Jury Trial in Civil Cases— A Problem in Constitutional Interpretation,* 7 Sw.L.J. 1, 8 (1953) (listing child custody by habeas corpus and adoption proceedings, election contests, and contempt proceedings)). Additionally,

Harris relied upon *Jones* for the broader proposition that proceedings originally brought before administrative agencies are excepted from constitutional jury rights. 7 Sw.L.J. at 12–13. [37]

 **\*466** Today the majority overexpands this exception before considering the rule it prefers that exception to swallow. In *Credit Bureau* we attributed "broad meaning [to] the word 'cause.' " 530 S.W.2d at 292. In defining it, we did not limit its meaning in the past, but turned to a relatively contemporary dictionary as well as older authority. *Id.* Clearly this term must adapt to modern developments; our understanding of a "cause" is not frozen in 1876. *See Davenport v. Garcia,* 834 S.W.2d 4, 19 (Tex.1992). Both the text of our Constitution and its historical backdrop demand that the right to trial by jury remain "inviolate." When, as here, however, changing circumstances require reexamination of the scope of this right in order to preserve the evolved workings of government, we must ensure that any exception does not destroy the guarantee. [38] We should instead follow the command of our Constitution in light of our contemporary situation, by limiting any exception in the most narrow way possible without completely undermining the administrative state.

I would accordingly clarify any existing exception for administrative proceedings to preserve the right to trial by jury in all suits except those in which the state is enforcing a regulation or statute protecting the public. If construed too broadly, however, even this exception limited to "public rights" could destroy our traditional reliance on the jury system. [39] Indeed, despite the writing in *Atlas Roofing,* such erosion has already begun at the federal level. [40] Properly limited, however, a "public rights" administrative exception to the right to trial by jury is both constitutionally sound and easy to apply. While perhaps far-reaching in other contexts, "public rights" that conflict with the right of each member of the public to have factual disputes resolved by a public jury must be narrowly construed. I would not permit the concept of "public rights" to be perverted to deny such a fundamental right. In this limited circumstance, I would define proceedings involving "public rights" as those in which the government, as a real party in interest, enforces a regulatory or statutory scheme. Contrary to the majority, I do not suggest that we follow its standard preference for copying a "federal test," 852 S.W.2d at 451 n. 24. Rather, I recommend a narrow and clear Texas standard that looks to Texas law predating *Atlas Roofing,* and which learns from the misapplication of this doctrine in the federal courts.

Here TAB's members are not entitled to a jury trial because the state is enforcing public regulations by imposing administrative penalties. Although this action is analogous to a common law nuisance claim, here the state is protecting the public's right to a clean environment rather than an **\*467** individual's use and enjoyment of private property.

The right to trial by jury is a critical state constitutional guarantee. Denigrating my concern with protecting this liberty, the majority dismisses my writing as "trumpeting." 852 S.W.2d at 451 n.

23. The trumpet call has sounded from the very earliest days of our Republic, heralding our right to trial by jury, a clarion to our citizens to shout out to preserve their heritage against attack. It demands that any intrusion on this right be narrow in scope, clearly-announced and thoughtfully considered. The majority's refusal to define with certainty its erosion of the right to trial by jury sounds a weak and shaky chord, reflecting a lack of commitment to this fundamental guarantee. Attempting to let the strong note drown the weak, the majority seeks to hide its equivocation by reference to my conclusion that a jury trial is not required under these anti-pollution statutes, *id.,* and by criticizing the narrow, clear and thoughtful exception I have drawn today. *Id.*

The inviolate nature of the right to trial by jury demands that this vital guarantee be circumscribed in only the most extraordinary circumstances and that any exception to it be clearly and narrowly construed. Although I do not disagree with the result announced by the majority, the analysis employed is designed to destroy one of our most precious freedoms as Texans. The alternative I offer would permit our administrative bodies to implement efficiently their regulations, while ensuring that efficiency concerns do not envelop a fundamental civil liberty. [41]

### III. Standing

The issue of standing is a stranger to this litigation. No party before this court has ever asserted that the Texas Association of Business lacked capacity to challenge the actions of state government. How rare the occasion when all litigants agree on the proper resolution of an issue, but how truly extraordinary is such unanimity when the parties are two state regulatory agencies, the Texas Association of Business, the Sierra Club and the League of Women Voters. This, nonetheless, is the exceptional circumstance in which we find ourselves today as all of these diverse parties have urged the court not to decide this matter in the manner adopted. Addressing the question of standing solely at the belated insistence of the majority, all parties asserted that this issue was not in dispute; that, under recent precedent, standing had been waived; [42] and, alternatively, that the record adequately demonstrated the right of the Texas Association of Business under Texas law to initiate this litigation. Why then does the majority insist on writing? Because it dare not pass up the opportunity to close access to our courts to those citizens who choose to challenge environmental degradation, neighborhood destruction and consumer abuse. Through a narrowly crafted test, the majority extends an invitation to TAB to come into the courts while telling other public interest groups to stay out.

While devoting over half of today's opinion to a nonissue in this litigation, the majority oddly limits its inquiry to only one of the three organizations asserting standing here. Nothing is said as to the League of Women Voters and the Sierra Club, both of which intervened in the trial court and were aligned as defendants with the State. Asserting the interests of its members in water and air quality, as well as its involvement in protecting the state's natural resources, the League of

Women Voters claimed standing to defend the challenged regulations. Similarly, the Sierra Club **\*468** based its standing on its purpose of environmental enhancement and conservation of natural resources. By completely ignoring whether these groups were proper parties and by embracing a federal standing test hostile to their participation, the majority erects new barriers to deny Texans access to Texas courts.

To achieve this result, the majority must overcome what, until recently, was viewed as a considerable obstacle—Texas law. This court has repeatedly held that the issue of standing may not be raised for the first time on appeal, either by the parties or by the court. In *Texas Industrial Traffic League v. Railroad Comm'n of Texas,* 633 S.W.2d 821, 822–23 (Tex.1982), we concluded:

> A party's lack of justiciable interest must be pointed out to the trial court ... in a written plea in abatement, and a ruling thereon must be obtained or the matter is waived.

> No plea challenging the standing of [the party] was filed in the district court. *The issue of standing was therefore waived, and the court of appeals erred in writing on the issue at all.*

(Emphasis supplied). The sole issue presented in *Coffee v. William Marsh Rice University,* 403 S.W.2d 340 (Tex.1966), was whether the court of appeals erred in dismissing a case, on its own motion, for want of standing. This court held that, because standing had not been challenged in the trial court, that issue could not deprive the court of appeals of subject matter jurisdiction. *Id.* at 347–48. Assuming that standing was lacking in *Sabine River Authority of Texas v. Willis,* 369 S.W.2d 348, 349–50 (Tex.1963),[43] this court nonetheless held that dismissal was erroneous, because the absence of a justiciable interest was not first raised in the trial court. We have repeatedly cited these decisions with approval. *See Central Educ. Agency v. Burke,* 711 S.W.2d 7, 8 (Tex.1986) (per curiam); *American General Fire & Casualty Co. v. Weinberg,* 639 S.W.2d 688 (Tex.1982); *Cox v. Johnson,* 638 S.W.2d 867, 868 (Tex.1982) (per curiam).

Time and time again, the courts of appeals have also refused to consider challenges to standing not first raised in the trial court.[44] Until today, the only criticism of our prior holdings to this effect has **\*469** consisted primarily of writings authored by one appellate judge.[45]

The majority has a simple way to deal with this venerable body of law—overrule only one case, making today's abrupt change in the law appear less drastic, while ignoring the rest. In fact, six Texas Supreme Court cases must be overruled and no less than twenty-five decisions of the courts of appeals must be disapproved to reach today's result. The concept of reliance on the prior decisions of Texas courts has long since ceased to offer the slightest restraint on this majority.[46]

Bulldozing a new path through this jurisprudential forest, the majority vaults standing to a new and remarkable prominence by suddenly discovering that it has not just *one* but *two* constitutional

bases. And what unusual constitutional pillars each of these new finds represents. First, the proscription of the separation of powers doctrine against issuance of advisory judicial opinions allegedly requires rigorous enforcement of standing even when no party debates its existence. This link between standing and separation of powers is not predicated on any directly relevant prior court decision, [47] but instead is entirely premised on an article openly antagonistic to standing for environmental groups. 852 S.W.2d at 444, citing Atonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers,* 17 Suffolk U.L.Rev. 881 (1983). The current majority may be the first in the nation to anchor standing on this constitutional theory.

The authorities addressing the prohibition on advisory opinions cited in support of this proposition, of course, in no way implicate the question of standing. This precedent-setting concern with advisory opinions contrasts markedly with the eagerness to issue this very type of writing within the last year. *See Edgewood Indep. Sch. Dist. v. Kirby,* 804 S.W.2d 491, 501 (Tex.1991) (Doggett, J., concurring); *Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489, 537 (Tex.1992) (Doggett, J., dissenting) (advisory opinions issued and retracted as necessary to thwart efforts to satisfy the constitutional command of equity and efficiency in our public schools). Writing on an issue not raised by any party, as the majority reaches out to revise the law of standing today, seems to me the very essence of an "advisory" opinion.

The second newly-announced constitutional basis is equally ironic—our state's vital guarantee that "[a]ll courts shall be open," Tex. Const. art. I, § 13, in some inexplicable way, mandates that they be closed to some and requires continual judicial monitoring of all who attempt to enter. No authority of any type is cited for this **\*470** proposition that "open" courts really means "closed" courts. Nothing in the history or text of the provision justifies this reading nor has any Texas court previously attempted such converse interpretation. This constitutional guarantee is used today as a two-edged sword: the majority invokes the open courts provision to bar environmental groups from seeking judicial assistance in enforcing the laws, while in the very same opinion misinterpreting this provision to allow continued violation of statutes protecting our precious natural resources. [48]

Then, with a final flourish, standing is conveniently classified as a nonwaivable component of subject matter jurisdiction. Until today, Texas followed the rule, adopted by many of our sister states considering the issue, that objections to a party's standing are waived if not first raised in the trial court. [49] No Texas case is cited for the proposition that standing is part of nonwaivable subject matter jurisdiction because, until today, this court had repeatedly stated precisely the very opposite—that standing is *not* jurisdictional. [50]

Texas has with good reason determined that standing is not excepted from traditional rules of appellate procedure. Our appellate system is predicated on the requirement of presentation of complaints to the lower court coupled with preservation and briefing in the reviewing court. *See*

Tex.R.App.P. 52; 74(d), 131(e). Appellate courts face considerable difficulties in deciding an issue not presented to the trial court; ordinarily, the necessary facts will not be fully developed. The unstated effect of today's opinion is to require trial courts to develop facts as to undisputed issues or risk subsequent appellate reversal. This is not an effective use of our limited judicial resources.

The requirement that issues first be presented to the trial court serves another function—preventing parties from "laying behind the log":

> The reason for the requirement that a litigant preserve a trial predicate for complaint on appeal is that one should not be permitted to waive, consent to, or neglect to complain about an error at trial and then surprise his opponent on appeal by stating his complaint for the first time.

*Pirtle v. Gregory,* 629 S.W.2d 919, 920 (Tex.1982). While this court has condemned "trial by ambush," **\*471** *Gutierrez v. Dallas Indep. School Dist.,* 729 S.W.2d 691, 693 (Tex.1987), today the majority promotes "ambush on appeal."

Three purported policy justifications for the majority's actions are offered, with not a single supporting authority. The first concern is that a strict standing rule is necessary to prevent collusive litigation. Under Texas law, the filing of a fictitious suit constitutes contempt by counsel, Tex.R.Civ.P. 13, and may serve as the basis for a host of sanctions, including dismissal with prejudice. Tex.R.Civ.P. 215 2b(5). Nor does our Texas judiciary lack the ability to reject collusive litigation. *Felderhoff v. Felderhoff,* 473 S.W.2d 928, 932 (Tex.1971) ("We believe that our laws and judicial system are adequate to ferret out and prevent collusion...."); *cf. Whitworth v. Bynum,* 699 S.W.2d 194, 197 (Tex.1985) (refusing to uphold Texas Guest Statute because of danger of collusion). Adhering to precedent today would in no way undermine the power to dismiss fraudulent suits.

The second virtue proclaimed for today's holding is the guarantee that the lower courts will be restrained from exceeding their jurisdictional powers. 852 S.W.2d at 445. This concern is derived solely from the federal law mandate that a federal appellate court is duty-bound to verify not only its own jurisdiction but that of the lower courts as well. Federal courts, however, have limited jurisdiction; Texas courts do not. Our Texas Constitution creates courts of general jurisdiction, investing them with all of the "judicial power of this State." Tex. Const. art. V, § 1. The differences are evident in our procedural rules. While a federal court must affirmatively ascertain jurisdiction over parties appearing before it, a Texas court's jurisdiction is presumed until proven lacking by a contesting party. *See* Tex.R.Civ.P. 120a.

Lastly, the majority expresses concern as to the res judicata effect on other potential litigants of a judgment rendered in the absence of genuine standing. 852 S.W.2d at 445–446. Aware of this concern, the very federal judiciary that this majority is so eager to emulate has failed to

perceive it as a problem of significance. *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock,* 477 U.S. 274, 290, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986). If representation is inadequate, or a conflict of interest between members exists, any judgment will have minimal preclusive effect. *Id.* Instead of completely barring access to the courts, procedural safeguards can ameliorate any potentially overbroad effects. *See generally* Charles A. Wright, Arthur R. Miller & Edward H. Cooper, 18 Federal Practice & Procedure § 4456 at 490–94 (1981 & Supp.1991).

The manufactured nature of the majority's concerns becomes all the more evident when the real world experience of Texas is considered. The majority is unable to point to a single example of collusion during the three decades our Texas rule, which allows the issue of standing to be waived, has been in place. During this period there have likewise been no examples of lower courts making a grab for extrajurisdictional power, nor of oppressed litigants shackled by the res judicata effect of contrived litigation.

In defining state requirements for standing, we are in no way bound by federal jurisprudence founded upon converse jurisdictional principles from our own. Texas courts can afford their citizens access to justice in circumstances where they would have been unable to establish standing in the federal courts. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 113, 103 S.Ct. 1660, 1671, 75 L.Ed.2d 675 (1983) ("state courts need not impose the same standing ... requirements that govern federal-court proceedings"); *Doremus v. Board of Education,* 342 U.S. 429, 434, 72 S.Ct. 394, 397, 96 L.Ed. 475 (1952) (state courts not restrained by "case or controversy" limitations of Federal Constitution); *Greer v. Illinois Housing Development Auth.,* 122 Ill.2d 462, 120 Ill.Dec. 531, 524 N.E.2d 561 (1988) ("We are not, of course, required to follow the Federal law on issues of justiciability and standing.").

The differences between our Texas Constitution and the Federal Constitution not only justify, but also require, that citizen groups be accorded a broader right of access **\*472** to our state courts. The Texas Constitution contains no express limitation of courts' jurisdiction to "cases" or "controversies," as provided by the federal charter. U.S. Const. art. III, § 2. Instead, it affirmatively protects the rights of litigants to gain access to our judicial system:

> All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

Tex. Const. art. 1, § 13. As this court has recognized,

> The provision's wording and history demonstrate the importance of the right of access to the courts.... The right of access to the courts has been at the foundation of the American democratic experiment.

*LeCroy v. Hanlon,* 713 S.W.2d 335, 339 (Tex.1986).

This constitutional mandate is reflected in decisions of this court adopting an "open courts" approach to standing in general and associational standing in particular. On several occasions, we have recognized the power of the Legislature to exempt litigants from proof of "special injury." *Scott v. Board of Adjustment,* 405 S.W.2d 55, 56 (Tex.1966) (standing may be shown even in the absence of particular damage); *Spence v. Fenchler,* 107 Tex. 443, 180 S.W. 597 (1915) (under statute, "any citizen" able to seek injunction, without showing particular interest or personal damage).[51] In enacting the Uniform Declaratory Judgments Act, the Texas Legislature has granted a broad right of standing: any person "whose rights, status or other legal relations *are affected by* a statute" may seek a declaration of those rights. Tex.Civ.Prac. & Rem.Code § 37.004 (emphasis supplied).

This court has previously extended its "open courts" approach to groups representing the interests of their members.[52] In *Texas Highway Comm'n v. Texas Ass'n of Steel Importers,* 372 S.W.2d 525, 530–31 (Tex.1963), we permitted a business association to challenge an administrative order. Although the order addressed only the import of foreign products for highway construction, this court recognized standing of an organization whose interest in foreign imports was not so limited:

> Some of [the respondents] are owners of imported foreign manufactured products suitable for highway construction purposes. All of them are actively engaged in the sale and use of imported manufactured products.... [S]uch parties clearly have the right and litigable interest to have the challenged ... Order declared null and void.
>
> *Id.* at 531. Similarly, in *Touchy v. Houston Legal Foundation,* 432 S.W.2d 690 (Tex.1968), the court considered whether an organization of attorneys had standing to maintain a suit against a charitable corporation to restrain violations of ethical canons governing the practice of law. Based solely on "the special interest attorneys have in their profession," the court held standing was established.

The "open courts" approach[53] of *Touchy* and *Texas Highway Commission* is quite sufficient to allow TAB access to the Texas **\*473** courts.[54] These two associational standing cases are all but ignored today, brushed aside as setting forth "no particular test." 852 S.W.2d at 446.

Yet in these cases in which the merits of standing are preserved for appellate court review, the Texas test applied has not been complicated. We simply look to whether a party has a stake in the action sufficient to ensure adversarial presentation of the issues and to whether the court's judgment will have any effect on those before it. *See Board of Water Engineers v. City of San Antonio,* 155 Tex. 111, 283 S.W.2d 722, 724 (1955) ("there shall be a real controversy between the

parties, which ... will be actually determined by the judicial declaration sought."). Because both of these considerations are met in the instant case, reference to federal law is wholly unnecessary.

Today, however, to justify meddling with Texas standing law, the majority declares that "we foresee difficulties" not here with TAB, but in future cases involving organizational standing. 852 S.W.2d at 446. To cure these perceived but as yet totally unrealized woes, the majority imposes a difficult to meet, easy to manipulate standard drawn from federal law "that lends itself to our use." *Id.* at 447. Never needing an invitation to impose more federal requirements on Texas citizens, the majority writes into our Texas law books the confused and troubling federal standing limitations. Not surprisingly, that law has taken a regressive turn, denying standing to public interest associations, including those seeking to protect the environment. *See* Gene R. Nichol, Jr., *Abusing Standing: A Comment on Allen v. Wright,* 133 U.Pa.L.Rev. 635, 659 (1985) ("One could perhaps be forgiven for confusing standing's agenda with that of the New Right.").

The benefits of permitting an association to represent the concerns of its members are manifest. As recognized in *United Auto Workers,* 477 U.S. at 290, 106 S.Ct. at 2533, "[T]he primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." Judicial economy is promoted when one litigant can, in a single lawsuit, adequately represent many members with similar interests, thus avoiding repetitive and costly actions. The wider range of resources often available for associations enhances their effectiveness in litigation:

> Special features, advantageous both to the individuals represented and to the judicial system as a whole, ... distinguish suits by associations on behalf of their members.... An association suing can draw upon a pre-existing reservoir of expertise and capital. "Besides financial resources, organizations often have specialized expertise and research resources relating to the subject matter of the lawsuit that individual plaintiffs lack." ... These resources assist both courts and plaintiffs.

*Id.* at 289–90, 106 S.Ct. at 2532–33. In some cases, an injury that is substantial as to many may have an individual financial impact too small to make a challenge economically feasible. Associational representation may be the only means of redressing conduct when the harm is limited in degree but substantial segments of society are affected. Additionally, in challenging policies of government, organizations are generally less susceptible than individuals to retaliation by the bureaucrats they challenge.

These benefits are ignored as the majority declares that henceforth the right of associations to bring suit in Texas courts will be constricted by a three-part federal test set forth in *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), requiring that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's **\*474** purpose; and (c) neither the

claim asserted nor the relief requested requires the participation of individual members in the lawsuit." [55]

Yet the *Hunt* test won't hunt in Texas. It is adopted purportedly because of the similarities between the state and federal constitutional underpinnings of the standing doctrine. Two critical factors are ignored: (1) the significant differences between the Texas and United States Constitutions and (2) the fact that much of federal standing doctrine is not mandated by the federal charter, but is imposed solely on the grounds of judicial "prudence." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) ("This [standing] inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.").

The majority works a grave disservice to our Texas Constitution by equating our open courts provision, affirmatively guaranteeing all Texans access to our judicial system, with an express federal constitutional limitation on the right to seek redress in court. Despite the fact that the two provisions are vastly different in language, history and purpose, the majority nonetheless determines to "look to the more extensive jurisprudential experience of the federal courts" to determine standing. This is clearly an erroneous course. *See Davenport v. Garcia,* 834 S.W.2d 4 (Tex.1992, orig. proceeding) (in blindly adhering to federal law, "based on different language, different history and different cases, "[f]rom our treasured state heritage, law and institutions ... [we] derive nothing....").

Even the federal constitutional constraint is a simple one, looking to whether "the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of the court's remedial powers on his behalf." *Warth,* 422 U.S. at 498, 95 S.Ct. at 2205, *quoting Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 1103, 7 L.Ed.2d 663 (1962). In fact, this bare-bones test closely resembles the approach that Texas courts have long chosen to follow. To the extent *Hunt* constructs additional barriers to access to our judicial system, they are wholly court-created. [56] No justification for their adoption is contained in the majority opinion.

Moreover, in turning to the federal law of standing, the majority invokes a doctrine that has been criticized more heavily and justifiably than perhaps any other. *See, e.g.,* Gene R. Nichol, Jr., *Rethinking Standing,* 72 Cal.L.Rev. 68, 68 (1984); Mark V. Tushnet, *The "Case or Controversy" Controversy,* 93 Harv.L.Rev. 1698, 1713–21 (1980). Even the United States Supreme Court has recognized that federal standing requirements have an "iceberg quality," *Flast v. Cohen,* 392 U.S. 83, 94, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968); yet the majority fails to navigate a course, not unlike the captain of the Titanic, that would steer Texas well away from this potential disaster.

The concept of standing is "employed to refuse to decide the merits of a legal claim." Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3531, at 338. Critics of the doctrine's complexity and uncertainty have recognized how subject it is to

manipulation: "standing ... is no more than a convenient tool to avoid uncomfortable issues or to disguise a surreptitious ruling on the merits." *Id.* at 348 (citing commentaries). [57] Important rights can be left unprotected **\*475** as a result. *Id.* at § 3531.3, 416–17 ("Standing decisions present courts with an opportunity to avoid the vindication of unpopular rights, or even worse to disguise a decision on the merits in ... opaque standing terminology.... Unarticulated and arbitrary predilection, cast as standing, defeats rights that deserve judicial protection.").

Even during the three years that this particular cause has been pending here, the federal courts have been hard at work to manipulate standing requirements to bar public interest groups from seeking judicial vindication of rights common to their members. In *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), a nationally-recognized environmental group challenged a new development classification for certain federal wilderness areas that allegedly violated several federal statutes. The suit was dismissed for lack of standing based upon a rigid construction of the requirement of injury to the association's members. This decision has been widely criticized as significantly impairing the ability of public interest groups to represent their members, particularly those that seek to protect this nation's environment and natural resources. [58] Today the majority eagerly positions itself to give the same treatment to those Texans who would petition our state courts to protect the public interest. The majority not only conspicuously relies on *Lujan,* 852 S.W.2d at 445, but also embraces the extremist anti-environmental stance propounded in an article openly critical of judicial opinions permitting citizens to complain of harm inflicted upon our natural resources. *Id.* at 443–444, citing Atonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers,* 17 Suffolk U.L.Rev. 881 (1983).

Rather than a careful consideration of our Texas precedent and our unique Texas Constitution, today Texans are handed yet another unthinking embrace of federal law. Claiming "guidance" from federal precedent, 852 S.W.2d at 445, the majority overrules all Texas cases treating standing as a procedural issue, then unnecessarily modifies all Texas precedent addressing the merits of standing. Without explanation, today's opinion simply photocopies into our Texas law books the federal law of standing with all of its much-criticized complexities. Once again the majority chooses more Washington wisdom for Texas when what we need is more Texas thinking in Washington. *See Bexar County Sheriff's Civ. Service Comm'n v. Davis,* 802 S.W.2d 659, 665 (Tex.1990) (Doggett, J., dissenting).

While today the corporate members of the Texas Association of Business are permitted to challenge the bureaucracy, tomorrow this same reasoning will be employed to bar public interest, neighborhood, environmental and consumer groups from vindicating the rights of their members. Today's opinion not only repudiates our past "open courts" approach to access to the judicial system but also eliminates the long-recognized appellate requirement that **\*476** error be preserved. The majority has charged well beyond traditional constraints in its writing.

To the extent this case is about standing, it is about standing still, about closing the courthouse door, once standing open. For today the majority extends a standing invitation to those who would harm our environment to act without fear of citizen challenge in the Texas courts.

### IV. Conclusion

Today the environment is the immediate victim. Those who pollute our rivers, release toxins into our air, and damage our land cannot be promptly penalized. Instead, only after the very slow wheels of our judicial system have creaked to a stop will violators of environmental protection laws be held accountable.

Yet the environment is not the whole story. Much as a river may seem pure and clear even at the place where illegal sewage is being pumped into it, the danger from a court's opinion may not be immediately apparent on its surface. Only after the reasoning is applied in other cases is the severity of the resulting harm to our system of justice revealed. Today's impairment of the ability of concerned citizens to vindicate the rights of many in our courts and the majority's knockout punch to the right of trial by jury will unfold in future cases to bar participation of ordinary citizens in Texas courts.

The mess in Texas is not only with our environment but with the misinterpretation of the law.

GAMMAGE, Justice, concurring and dissenting.

Though I would prefer not to write separately, I find I am unable to agree entirely with any single opinion of the court's other members. I must write this concurring and dissenting opinion because, while I agree with the disposition of this cause, I disagree with substantial portions of the reasoning and language in the majority's opinion and I agree with part of Justice Doggett's concurring and dissenting opinion.

I agree with the preliminary portion of Justice Cornyn's majority opinion, which correctly sets forth the regulatory scheme and basic dispute.

I agree *substantially* with Part II of Justice Doggett's opinion and his jury trial discussion. In my view, whether or not a suit is a "cause" for purposes of the right to a jury trial is not controlled by whether it was first determined by an administrative agency. I also agree with Part III of Justice Doggett's opinion relating to standing, which I will further address below. I agree with Part II of Justice Cornyn's majority opinion. The statutes may not condition access to the courts on prepayment of a *penalty.* The principle here is the same as for a supersedeas bond. The statute

may condition the right to restrain the prevailing party (the State) from executing (enforcing) its judgment (administrative order) on the posting of a bond for the full amount. It may not, however, condition the *right to appeal* the judgment on posting of the full *penalty* imposed. *Dillingham v. Putnam,* 109 Tex. 1, 5–6, 14 S.W. 303, 304 (1890). This is true even if that "judgment" takes the form of an administrative agency decision. Administrative agency decisions, for the most part, entitle an appellant to only "substantial evidence" as opposed to *de novo* review. To further burden those regulated with prepayment of the "judgment" as the only alternative to total loss of even substantial evidence review violates the basic concept of our constitutional open courts in Texas.

As to the issue (or non-issue) of standing, the majority in effect adopts the position of federal courts that standing is a *jurisdictional* question. Otherwise it cannot be fundamental error to be addressed when no party raises it. Standing was not raised and should not be addressed in this cause.

Even assuming standing is an element of subject matter jurisdiction, the court should not write on the issue in this case. Even though a judgment is void and subject to collateral attack at any point if there is an absence of subject matter jurisdiction, *see* **\*477** *Mercer v. Phillips Natural Gas Co.,* 746 S.W.2d 933, 936 (Tex.App.—Austin 1988, writ denied), unassigned error of lack of jurisdiction should be addressed only if jurisdiction is in fact lacking. Since the majority concludes there was standing in this case, and since no party raised its existence as an issue, there is no reason to address it at all, even if it would be *fundamental error* if *lacking.*

The basis for the majority's discussion is its sudden revelation that "[s]tanding is implicit in the concept of subject matter jurisdiction." 852 S.W.2d at 443. Their opinion then claims this implication comes from the separation of powers doctrine and the open courts provision of the Texas Constitution. It is a curiosity of legal scholarship, however, that in the 156 prior years of its existence, this court never before found standing "implicit" in those constitutional provisions, but in fact wrote that standing could be waived and hence was not fundamental error. *Texas Indus. Traffic League v. Railroad Comm'n,* 633 S.W.2d 821, 823 (Tex.1982). Justice Doggett's opinion adequately addresses why there is no implication from those provisions that standing is jurisdictional.

The majority's struggle to put standing in issue whenit is not prompts me to address two statements in its opinion which strike me as either misleading or just plain wrong. The majority asserts, without citation to authority, that "[s]ubject matter jurisdiction is never presumed," 852 S.W.2d at 443–444, and in a footnote repeats that assertion in urging that "Justice Doggett confuses subject matter jurisdiction with personal jurisdiction. Only the latter can be waived when uncontested. *See* TEX.R.CIV.P. 120a." 852 S.W.2d at 444 n. 5. The majority's claim that subject matter jurisdiction is never presumed is at its very best misleading.

Connected with this discussion is the implicit assertion in another footnote that there is a "jurisdictional standing" that is different from "objections to join a real party in interest or to a party's capacity to sue rather than jurisdictional standing." 852 S.W.2d at 445 n. 7. These remarks are made in an attempt to distinguish the cases cited by Justice Doggett from those of other states holding that standing is not jurisdictional. I suppose we should be encouraged to find out that there are some types of "standing" that will not be jurisdictional, but it occurs to me that by using the term "jurisdictional standing" the court is begging the question—if it is jurisdictional, then it must be fundamental. The problem is that the Texas cases, at least as I read them, define "standing" in terms of "the party's capacity to sue," [1] which is one example we are given of non-jurisdictional standing. The majority opinion is calculated—no, guaranteed—to cause confusion because apparently this court will henceforth tell litigants on a case-by-case basis whether the standing problems in their cases are "jurisdictional" or merely formal.

There is no need to create this confusion. The majority's fomenting it, however, requires that I address it to some extent. I will discuss the "subject matter never presumed" proposition first, then weave into the "jurisdictional standing" language.

I agree that subject matter jurisdiction is never presumed in one respect. Subject matter jurisdiction exists when the nature of the case falls within a general category of cases the court is empowered to adjudicate under the applicable constitutional and statutory provisions. *See Pope v. Ferguson,* **\*478** 445 S.W.2d 950, 952 (Tex.1969), *cert. denied,* 397 U.S. 997, 90 S.Ct. 1138, 25 L.Ed.2d 405 (1970); *Bullock v. Briggs,* 623 S.W.2d 508, 511 (Tex.App.—Austin 1981, writ ref'd n.r.e.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982). In this sense, there is no presumption because if the case is not one over which the court had constitutional and statutory authority to act one does not "presume" subject matter jurisdiction to make it valid. If a justice of the peace grants a divorce, the judgment is void because that is not the type of case the constitution and legislature entrusts to that court, and appellate courts will not "presume" the justice court had jurisdiction in order to make the judgment valid.

But what the majority addresses here under the rubric of "standing" is not a court assuming jurisdiction over a type of dispute for which the statutes do not grant it power. The district court undoubtedly had jurisdiction over the declaratory judgment and injunction action brought there, since district courts may entertain declaratory judgment and injunction actions. The question of standing the majority gratuitously addresses here is related to an incidental *party* issue.

This court has expressly held that some facts or similar matters relating to party issues *are presumed.* For example, for many years the subject matter jurisdiction for certain trial courts as set by the statutes has included a jurisdictional amount, sometimes as a minimum amount in controversy and sometimes as both a maximum and minimum. *Womble v. Atkins,* 160 Tex. 363, 370, 331 S.W.2d 294, 299 (1960). This court has held that jurisdiction, so far as the amount

in controversy is concerned, is determined by the pleadings unless facts disclose that a party fraudulently or in bad faith pleaded claims to make it appear there was jurisdiction over the case where there was not. *Brown v. Peters,* 127 Tex. 300, 94 S.W.2d 129, 130 (Tex.Comm'n App. B 1936). Despite the supposed requirement that the pleadings demonstrate jurisdiction, we have also held that unless the pleadings affirmatively show there is *no* jurisdiction, the court will *presume* the existence of jurisdiction in the trial court. *Peek v. Equipment Serv. Co.,* 779 S.W.2d 802, 804 (Tex.1989).[2] This is not the only sense in which subject matter jurisdiction is "presumed" as to collateral matters. If a defendant contests jurisdiction and alleges in a verified pleading that plaintiff's fraudulent pleading amount was for the purpose of conferring jurisdiction on the trial court, but the trial judge still renders judgment in the case, on appeal the fact issue of jurisdiction is *presumed* decided against the defendant. *Ellis v. Heidrick,* 154 S.W.2d 293, 294 (Tex.Civ.App.—San Antonio 1941, writ ref'd); *see also Maddux v. Booth,* 108 S.W.2d 329, 331 (Tex.Civ.App.—Amarillo 1937, no writ) (appeal bond from county court to district court did not show filemark making the appeal timely, held "the absence of such a question being made in the trial court the presumption is that the court had jurisdiction"). Further, if the very power of the judge who sits is in question, that authority too may be presumed. It is presumed that the assignment of a retired judge was properly made pursuant to all statutory requirements absent an express showing to the contrary in the record. *Texaco, Inc. v. Pennzoil Co.,* 729 S.W.2d 768, 855 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

There is a type of lack of standing that this court formerly held to be fundamental error. When there was a joint interest in property involved in the litigation, and the joint owner was not joined as a party, this court earlier held that the party defect was jurisdictional fundamental error that could be raised for the first time on appeal. The injustice which that rule caused prompted **\*479** this court to reduce those "*indispensable* " necessary parties to near nonexistence. *Petroleum Anchor Equip., Inc. v. Tyra,* 406 S.W.2d 891, 893–94 (Tex.1966); *see also Cooper v. Texas Gulf Indus., Inc.,* 513 S.W.2d 200, 203 (Tex.1974). It was no accident that this court listed the case which the majority today overrules, *Texas Indus. Traffic League v. Railroad Comm'n,* 633 S.W.2d 821 (Tex.1982), as one of the cases showing that "[f]undamental or unassigned error is a discredited doctrine" as applied to these collateral defect-in-party type claims. *Cox v. Johnson,* 638 S.W.2d 867, 868 (Tex.1982). After more than a hundred years of trying to narrow fundamental error exceptions, the majority today takes a quantum leap *backward.*

In an appeal of or other *direct attack* on a trial court default judgment, it is service on the defendant and related due process requirements which must affirmatively appear on the record. In such cases *personal* jurisdiction cannot be presumed. *Capitol Brick, Inc. v. Fleming Mfg. Co.,* 722 S.W.2d 399, 401 (Tex.1986); *Uvalde Country Club v. Martin Linen Supply Co.,* 690 S.W.2d 884, 885 (Tex.1985); *McKanna v. Edgar,* 388 S.W.2d 927, 928 (Tex.1965). Lack of personal jurisdiction can be waived by the party, and personal jurisdiction is presumed *in a collateral attack* on the judgment, whereas error in assuming constitutional or statutory jurisdiction not conferred upon

the court in question can be neither waived nor ignored. *See Crawford v. McDonald,* 88 Tex. 626, 631–32, 33 S.W. 325, 328 (1895). This court has long recognized that there may be party issues, i.e., the matter is "a mere matter of procedure" as opposed to the constitutional or statutory *power* of a court to render judgment, that may be presumed as to either type of jurisdiction. *Id.* at 630, 33 S.W. at 327.

The majority should not adopt the federal courts' position that "standing" is jurisdictional. There is a fundamental difference between federal law and state law that controls here. Federal courts are courts of *limited* jurisdiction. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 178–79, 2 L.Ed. 60 (1803). The parties asserting a claim must plead and prove (when not obvious) that jurisdiction exists. FED.R.CIV.P. 8(a). A party suing under a statute must establish his right to claim under that statute—his *standing* —in order to establish jurisdiction. *General Comm., Brotherhood of Locomotive Eng'rs v. Missouri–Kansas–Texas Ry. Co.,* 320 U.S. 323, 337–38, 64 S.Ct. 146, 152–53, 88 L.Ed. 76 (1943). Consequently, standing is a part of jurisdiction under federal procedure, related to the "case" or "controversy" requirement of the federal constitution. *Association of Data Proc. Serv. Orgs. v. Camp,* 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). But there is no "case" or "controversy" limitation language in the Texas Constitution. In state courts of general jurisdiction, the power to entertain any suit not prohibited by either the federal constitution or federal law is *presumed. Cincinnati v. Louisville & N. Ry. Co.,* 223 U.S. 390, 32 S.Ct. 267, 56 L.Ed. 481 (1912). State courts have all residual jurisdiction that federal courts lack. *Id.; see generally* 2 CHESTER J. ANTIEAU, MODERN CONSTITUTIONAL LAW § 10:1 at 4–5 (1969). We should continue to recognize that "standing," like other procedural issues, may be waived. There is no reason to overrule the *Texas Industrial Traffic League* case, or its related progeny.

SPECTOR, Justice, concurring and dissenting.

I agree with the substance of the concurring and dissenting opinion by Justice Doggett. I write separately, however, to explain why I would uphold the statutory requirement that those who run afoul of environmental laws make timely payment of administrative penalties before seeking judicial review.

In two other causes decided today, this court has considered open courts challenges to the statutory requirement that state mineral lessees prepay administrative deficiency assessments before seeking judicial review of those assessments. *State v. Flag–Redfern Oil Co.* and *State v. Rutherford Oil Corp.,* 852 S.W.2d 480 (Tex.1993) (considering Tex.Nat.Res.Code § 52.137). Our analysis in those cases focused on the **\*480** public interest at stake: the State's only interest in the prepayment requirement, we noted, was its financial interest in immediate access to disputed royalty payments. *Id.* at 485. Thus, we concluded that the prepayment requirement of section 52.137 was no different, in constitutional terms, from the litigation tax disapproved in *LeCroy v. Hanlon,* 713 S.W.2d 335, 342 (Tex.1986). *Id.*

The present case, in contrast, does not involve a litigation tax. The Clean Air Act, the Solid Waste Disposal Act, and the Water Quality Act embody this state's commitment to protect the environment; and the prepayment requirements struck down today were intended to give force to that commitment, *not* to raise revenue. Without the need to prepay administrative penalties, polluters will be left with little if any incentive to timely comply with environmental laws and regulations.

The effects of today's decision, though, extend far beyond the statutes at issue in this case. By rejecting these prepayment requirements, without regard to the state interest involved, the majority has struck a severe blow to this state's ability to enforce a broad range of regulations in the public interest. The similar statutory provisions identified in the opinion by Justice Doggett, 852 S.W.2d at 457, cannot be dismissed as minor technicalities; they are carefully-crafted measures that the legislature considered vital to protect the public from recalcitrant lawbreakers. Casting those provisions aside will seriously disrupt the effective operation of our state government.

The Texas Constitution cannot be construed in absolutes. The basic right of access to the courts must be balanced against the need to protect the public's health and safety. While the restriction at issue in this case may be substantial, I would hold that the public's interest in clean air and water, combined with the due process afforded to TAB's members in the administrative process, tips the balance in favor of the prepayment requirement. I therefore dissent.

## Footnotes

[1] The League of Women Voters and the Lone Star Chapter of the Sierra Club intervened in the suit and were aligned as defendants with the Texas Air Control Board and the Texas Water Commission. Justice Doggett contends that the standing of the Intervenors should be addressed along with TAB's. We disagree. Standing concerns a party's faculty to invoke the court's subject matter jurisdiction. Once it has been invoked by a plaintiff, a court's subject matter jurisdiction is not affected by the status of defendants or intervenors aligned in interest with defendants.

[2] Act of June 14, 1985, 69th Leg., R.S., ch. 637, § 33, 1985 Tex.Gen.Laws 2350, 2359 (amending Texas Clean Air Act codified at TEX.REV.CIV.STAT.ANN. art. 4.041 (Vernon 1976), currently codified as amended at TEX.HEALTH & SAFETY CODE § 382.088; Act of June 15, 1985, 69th Leg., R.S., ch. 795, § 6.001, 1985 Tex.Gen.Laws 2719, 2813 (amending Solid Waste Disposal Act codified at TEX.REV.CIV.STAT.ANN. art. 4477–7 (Vernon 1976), currently codified as amended at TEX.HEALTH & SAFETY CODE § 361.252; Act of June 15, 1985, 69th Leg., R.S., ch. 795, § 5.007, 1985 Tex.Gen.Laws 2719, 2806 (amending TEX.WATER CODE § 26.136).

[3] Although some amendments have been adopted since, they are not relevant to the issue presented in this case. *See* Diana C. Dutton, *ENVIRONMENTAL,* 45 SW. L.J. 389 (1991) (summarizing statutory developments).

[4] "An appeal may be taken directly to the supreme court from an order of a trial court granting or denying an interlocutory or permanent injunction on the ground of the constitutionality of a statute of this state." TEX.GOV'T CODE § 22.001(c).

[5] Justice Doggett confuses subject matter jurisdiction with personal jurisdiction. Only the latter can be waived when uncontested. *See* TEX.R.CIV.P. 120a.

[6] The analysis is the same under the federal constitution. *See e.g. Correspondence of the Justices,* Letter from Chief Justice John Jay and the Associate Justices to President George Washington, August 8, 1793 in Laurence H. Tribe, *American Constitutional Law* 73 n. 3 (2nd ed. 1988).

[7] Of the states listed by Justice Doggett, only Illinois, Iowa, Kentucky, New York, South Dakota, and perhaps Ohio, Pennsylvania and Washington actually treat jurisdictional standing as waivable. *See* 852 S.W.2d at 469. The other state cases cited deal with the waiver

of objections to join a real party in interest or to a party's capacity to sue rather than to jurisdictional standing. *See International Depository, Inc. v. State,* 603 A.2d 1119, 1122 (R.I.1992) (addressing real party in interest objection); *Princess Anne Hills Civ. League, Inc. v. Susan Constant Real Estate Trust,* 243 Va. 53, 413 S.E.2d 599, 603 n. 1 (1992) (addressing real party in interest objection); *Sanford v. Jackson Mall Shopping Ctr. Co.,* 516 So.2d 227, 230 (Miss.1987) (addressing real party in interest objection); *Jackson v. Nangle,* 677 P.2d 242, 250 n. 10 (Alaska 1984) (addressing real party in interest objection); *Poling v. Wisconsin Physicians Serv.,* 120 Wis.2d 603, 357 N.W.2d 293, 297–98 (App.1984) (addressing real party in interest objection); *Torrez v. State Farm Mut. Auto. Ins. Co.,* 130 Ariz. 223, 635 P.2d 511, 513 n. 2 (App.1981) (addressing real party in interest objection); *Brown v. Robinson,* 354 So.2d 272, 273 (Ala.1977); *Cowart v. City of West Palm Beach,* 255 So.2d 673, 675 (Fla.1971) (addressing capacity objection).

Justice Doggett disagrees that standing is a component of subject matter jurisdiction, yet he declines to explain what role standing plays in our jurisprudence. From his harsh critique of the doctrine, it seems that he not only objects to the conclusion that standing cannot be waived but also to the conclusion that standing is a requirement to initiate a lawsuit.

*Texas Industrial Traffic League* relied on two cases to support its holding that standing cannot be raised for the first time on appeal: *Coffee v. William Marsh Rice University,* 403 S.W.2d 340, 341 (Tex.1966), and *Sabine River Authority v. Willis,* 369 S.W.2d 348, 350 (Tex.1963). We need not overrule these two cases, however, because unlike *Texas Industrial Traffic League,* we believe that standing was present in the trial court in these cases. Our concern is with a party's right to initiate a lawsuit and the trial court's corresponding power to hear the case *ab initio.* Standing is determined at the time suit is filed in the trial court, and subsequent events do not deprive the court of subject matter jurisdiction. *Carr,* 931 F.2d at 1061.

Justice Doggett claims that we overrule three additional decisions of this court. *See Central Educ. Agency v. Burke,* 711 S.W.2d 7 (Tex.1986) (per curiam); *American Gen. Fire & Casualty Co. v. Weinberg,* 639 S.W.2d 688 (Tex.1982); *Cox v. Johnson,* 638 S.W.2d 867 (Tex.1982) (per curiam). We disagree. These cases hold that matters not raised in the trial court are waived. One exception noted by these decisions, however, is a lack of jurisdiction which may be raised by a party, or the court, for the first time on appeal. Justice Doggett does not believe that standing falls within that exception because he contends that standing is not jurisdictional.

In most other jurisdictions, such prepayment provisions are required only to stay execution of judgments and are not prerequisites to the right to appeal itself. *See* Gary Stein, *Expanding the Due Process Rights of Indigent Litigants: Will Texaco Trickle Down?,* 61 N.Y.U.L. REV. 463, 469 (1986).

Thus, contrary to Justice Doggett's reading of our opinion, the *Sax* test is inapplicable.

The Clean Air Act was implemented to "safeguard the state's air resources from pollution by controlling or abating air pollution and emissions of air contaminants...." TEX.HEALTH & SAFETY CODE § 382.002(a). The Texas Water Code was implemented to "maintain the quality of water in the state consistent with the public health and enjoyment ..." TEX.WATER CODE § 26.003.

The importance is evidenced by article XVI, section 59(a) of our constitution, which provides in relevant part that: "The conservation and development of all the natural resources of this State ... and the preservation and conservation of all such natural resources ... are each and all ... public rights and duties." TEX. CONST. art. XVI, § 59(a).

If the person charged does not make payment or post bond within thirty days, the agency may forward the matter to the attorney general for enforcement. TEX.HEALTH & SAFETY CODE § 382.089(c), § 361.252(m); TEX.WATER CODE § 26.136(k).

It has been argued that our procedure of allowing immediate enforcement of trial court judgments violates federal due process when the judgment debtor is financially unable to post a supersedeas bond and immediate enforcement will cause irreparable injury. *Texaco, Inc. v. Pennzoil Co.,* 784 F.2d 1133 (2d Cir.1986), *rev'd on other grounds,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). A similar argument could be fashioned under the Texas open courts provision, but TAB does not assert that argument here. TAB's open courts challenge centers not on the requirement of immediate payment, but on the forfeiture of judicial review if payment is not made.

Thus, contrary to Justice Doggett's assertion, we do not strike down the penalties themselves. Nothing in this opinion prohibits the state's collection of assessed penalties. We hold as violative of our open courts provision only the requirement that the penalties be paid as a condition to judicial review. Furthermore, nothing in our opinion requires that penalties already paid be refunded.

That the affected parties may be able to afford prepayment is irrelevant. The guarantee of constitutional rights should not depend on the balance in one's bank account.

TAB claims that the lack of a jury trial before the agency as well as the lack of a trial de novo violate article I, section 15. We limit our inquiry to the absence of a trial de novo because, as this court has said: "Trial by jury cannot be claimed in an inquiry that is non-judicial in its character, or with respect to proceedings before an administrative board." *Middleton v. Texas Power & Light Co.,* 108 Tex. 96, 185 S.W. 556, 561–62 (1916). Even if the right to a jury is denied before an administrative agency, the dispositive question is whether a trial de novo and the corresponding right to a jury trial is constitutionally required upon judicial review of the agency's decision. *See Cockrill v. Cox,* 65 Tex. 669, 674 (1886) ("The right of jury trial remains inviolate, though denied in the court of first instance [in civil cases], if the right to appeal and the jury trial on appeal are secured.") (bracketed language in original).

Article I, section 15, provides, in pertinent part:

The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency. * * *.

TAB has not presented in this court, as it did below, its complaint that the statutes and regulations also violate the right to jury trial under article V, section 10 of the Texas Constitution.

While the *Credit Bureau* court specifically referred to the broader jury trial provision in article V, section 10 when it discussed the administrative proceeding exception, that exception necessarily also applies to the narrower provision found in article I, section 15.

We do not consider nineteenth century criminal nuisance laws comparable to modern environmental regulations. *See* 852 S.W.2d at 461.

Despite Justice Doggett's trumpeting of our constitution's guarantee of trial by jury, he agrees that the right does not attach under the circumstances of this case.

Justice Doggett contends that the basis for our jury trial holding is overbroad. Instead, he would have us adopt the "imperfectly employed" federal test first enunciated in *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977). *Infra,* 852 S.W.2d at 464. The basis for our decision is more limited, arising as it does out of TEX. CONST. article XVI, section 59(a) and our decision in *Corzelius.*

The Clean Air Act proclaims:

The policy of this state and the purpose of this chapter to safeguard the air resources of the state from pollution by controlling or abating air pollution and emissions of air contaminants, consistent with the protection of public health, general welfare, and physical property of the people, including the aesthetic enjoyment of air resources by the public and the maintenance of adequate visibility.

TEX.HEALTH & SAFETY CODE § 382.002.

The Texas Water Code proclaims in relevant part:

It is the policy of this state and the purpose of the subchapter to maintain the quality of water in the state consistent with the public health and enjoyment

. . . . .

TEX.WATER CODE § 26.003.

The actions of the agencies involved in this proceeding are subject to the Administrative Procedure and Texas Register Act (APTRA), which specifically affords a "full panoply of procedural safeguards" to a party to contested case before those agencies. *Southwestern Bell Tel. Co. v. Public Util. Comm'n of Tex.,* 571 S.W.2d 503, 507 (Tex.1978). These procedural safeguards include the right to notice, the making of a full record of the proceeding before the agency, the taking of depositions, the right to subpoena witnesses, the application of the rules of evidence, the preparation of proposal for decision and the filing of exceptions and briefs, as well as separately stated findings of fact and conclusions of law. TEX.CIV.STAT.ANN. art. 6252–13a § 19 (Vernon Supp.1993). Judicial review is provided by section 19(e) under the substantial evidence rule, which directs a reviewing court to reverse and remand the agency adjudication if the agency decision is:

1) in violation of constitutional or statutory provisions;

2) in excess of the statutory authority of the agency;

3) made upon unlawful procedure;

4) affected by other error of law;

5) not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or

6) arbitrary and capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id.*

We have held that judicial review under APTRA based on the record developed before the agency "furnishes more assurance of due process and a surer means of determining whether an agency acted arbitrarily, capriciously and without due regard for the evidence." *Imperial Am. Resources Fund, Inc. v. Railroad Comm'n of Tex.,* 557 S.W.2d 280, 285 (Tex.1977); *see also, Southwestern Bell Tel. Co.,* 571 S.W.2d at 509.

Statistics compiled from data sent by companies to the Environmental Protection Agency show that in 1990 535.7 million pounds of toxic chemicals were released into the Texas environment, more than in any other state. Texas also ranked first in the release of chemicals known to cause both cancer and birth defects. *See* Texas Citizen Action, *Poisons in Our Neighborhoods, Toxic Pollution in Texas,* Sept. 1992, at 1; *see also* John Sharp, Texas Comptroller of Public Accounts, *Texas at Risk: Environmental Hazards Threaten State's Air, Land, and Water,* Fiscal Notes Aug. 1991 (noting the release of about 800 million pounds of toxic substances in 1989). Additionally, only two states ranked below Texas in the American Public Health Association's Pollution Standard Index, based on data gathered between 1989 and 1991. *See* American Public Health Ass'n, *America's Public Health Report Card: A State-by-State Report on the Health of the Public* 59 (1992).

2    *See Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489, 537 (Tex.1992) (Doggett, J., dissenting).

3    *See, e.g., H. Runge & Co. v. Wyatt,* 25 Tex.Supp. 291 (1860) (placement of counties within judicial districts); *Dillingham v. Putnam,* 109 Tex. 1, 14 S.W. 303 (1890) (striking requirement of supersedeas bond as a prerequisite to appeal); *Hanks v. City of Port Arthur,* 121 Tex. 202, 48 S.W.2d 944 (1932) (requirement that city be notified of street defect within twenty-four hours of accident unreasonable restriction on right of access to courts); *Sax v. Votteler,* 648 S.W.2d 661 (Tex.1983) (striking statute of limitations barring action of minor); *LeCroy,* 713 S.W.2d 335 (Tex.1986) (holding unconstitutional increased filing fees designed to generate state revenues).

4    Oddly, the majority asserts that "the *Sax* test is inapplicable" to today's open courts decision, 852 S.W.2d at 449 n. 12, even as it explicitly relies on the analysis used in *LeCroy,* which in turn applied the *Sax* test. Nor does the majority attempt to explain how its analysis today differs from that employed in *Sax* and *LeCroy.*

5    This natural resources provision receives conflicting treatment in today's opinion, amply demonstrating both the malleability of the *Sax* test as applied by the majority and the majority's disdain for the right to trial by jury. While declaring that article XVI, § 59(a) will not permit payment of even the most modest penalties under our open courts provision, the majority inexplicably finds that it forms an insurmountable barrier to the right to jury trial. The majority makes no attempt to reconcile its inconsistent analysis of these constitutional guarantees.

6    Tex.Health & Safety Code § 382.002, provides that:

It is the policy of this state and the purpose of this Act to safeguard the air resources of the state from pollution by controlling or abating air pollution and emissions of air contaminants, consistent with the protection of health, general welfare, and physical property of the people, including the aesthetic enjoyment of the air resources by the people and the maintenance of adequate visibility.

7    Tex.Water Code § 26.003, provides that:

It is the policy of this state and the purpose of this subchapter to maintain the quality of water in this state consistent with the public health and enjoyment, the propagation and protection of terrestrial and aquatic life, the operation of existing industries, and the economic development of the state....

8    Tex.Health & Safety Code § 361.002, declares that:

It is the policy of this state and the purpose of this Act to safeguard the health, welfare, and physical property of the people, and to protect the environment, through controlling the management of hazardous wastes, including the accounting for hazardous wastes generated.

9    Tex.Health & Safety Code § 382.088(c)(1–5) (Clean Air Act), § 361.251(c)(1–5) (Solid Waste Disposal Act); Tex.Water Code § 26.136(c). The Texas Water Code imposes additional considerations, including "the impact of the violation on a receiving stream or underground water reservoir, on the property owners ... and on water users," as well as the extent of previous violations, the degree of culpability involved, any good faith effort to correct the violation and any economic benefit gained as a result of the illegal conduct. Tex.Water Code § 26.136(c).

10   See Appendices to Brief of Appellees Texas Air Control Board and Texas Water Commission.

11   See Appendices to Brief of Appellees Texas Air Control Board and Texas Water Commission at 27, 44, 55.

12   *See* Tex.Health & Safety Code § 242.066 (administrative penalty for statutory violations "threaten[ing] the health and safety of a resident" of a convalescent or nursing home); *id.* § 242.069 (penalty must be prepaid or a bond posted prior to judicial review).

13   Tex.Health & Safety Code §§ 141.016–141.018 (providing for administrative penalties for violation of laws regulating youth camps and requiring their payment or the posting of a bond prior to judicial review).

14   Tex.Health & Safety Code §§ 773.065–.067 (administrative penalties to enforce Emergency Medical Services Act).

15   Tex.Rev.Civ.Stat.Ann. art. 4582b, § 6G (Vernon Supp.1992) (administrative penalties for violation of statutes governing funeral directing and embalming).

16   Tex.Health & Safety Code §§ 431.054–.056 (Texas Food, Drug & Cosmetic Act); *id.* § 466.043 (regulation of narcotic drug treatment programs).

17   Tex.Health & Safety Code §§ 433.094–.096 (Texas Meat & Poultry Inspection Act); *id.* §§ 144.081–.083 (Texas Renderers' Licensing Act).

18   *See also* Tex.Rev.Civ.Stat.Ann. art. 5069–51.17 (Vernon 1987 & Supp.1992) (administrative penalties for violation of the Texas Pawnshop Act).

19   Tex.Rev.Civ.Stat.Ann. art. 1446c, § 73A (Vernon Supp.1992) (permitting assessment of civil penalty for violation of Public Utility Regulatory Act "result[ing] in pollution of the air or water of this state or pos[ing] a threat to the public safety"); Tex.Rev.Civ.Stat.Ann. art. 4477–3a, § 16 (Vernon Supp.1992) (Texas Asbestos Health Protection Act); Tex.Rev.Civ.Stat.Ann. art. 5920–11, § 30 (Vernon

Supp.1992) (Texas Coal Mining and Surface Reclamation Act); Tex.Rev.Civ.Stat.Ann. art. 6053–2 (Vernon Supp.1992) (safety standards for transportation of gas and for gas pipeline facilities); Tex.Rev.Civ.Stat.Ann. art. 8905, § 9 (Vernon Supp.1992) (Water Well Pump Installers Act); Tex.Nat.Res.Code § 40.252 (Oil Spill Prevention and Response Act); *id.* § 81.0531–.0533 (assessment of penalties for violation of Railroad Commission statutes and rules "which pertain to safety or the prevention or control of pollution"); *id.* § 116.143–.145 (violation of laws relating to compressed natural gas "result[ing] in pollution of the air or water of this state or pos[ing] a threat to the public safety"); *id.* § 131.2661–.2663 (violations of Uranium Surface Mining and Reclamation Act "result[ing] in pollution of the air or water of this state or pos[ing] a threat to the public safety"); *id.* § 141.013–.015 (violation of geothermal resources regulations "pertain[ing] to safety or the prevention or control of pollution"); *id.* Tex.Water Code 13.4151 (regulation of water and sewer utilities); *id.* § 27.1013–.1015 (Injection Well Act); *id.* § 28.067 (regulation of water wells and mine shafts); *id.* § 29.047 (Salt Water Haulers Act); *id.* § 33.009 (regulation of water well pump installers); Tex.Health & Safety Code § 372.004 (water saving performance standards); *id.* § 401.389 (Texas Radiation Control Act).

20  Tex.Ag.Code § 12.020(*l* ) (violation of agricultural statutes); *id.* § 76.1555 (failure to comply with pesticide regulations); Tex.Water Code § 34.011 (irrigation regulation); Tex.Rev.Civ.Stat.Ann. art. 41a–1, § 21D(f) (Vernon Supp.1992) (public accounting); Tex.Rev.Civ.Stat.Ann. art. 135b–6, § 10B(k) (Vernon Supp.1992) (Structural Pest Control Act); Tex.Rev.Civ.Stat.Ann. art. 5155, § 5(h) (Vernon Supp.1992) (labor wage laws); Tex.Rev.Civ.Stat.Ann. art. 5282c, § 23A(k) (Vernon Supp.1992) (Professional Land Surveying Practices Act); Tex.Rev.Civ.Stat.Ann. art. 6573a, § 19A(k) (Vernon Supp.1992) (Real Estate License Act); Tex.Rev.Civ.Stat.Ann. art. 9100, § 17(m) (Vernon Supp.1992) (Texas Department of Licensing and Regulation).

21  Under recent and highly erratic writings determining retroactivity, of course, anything can happen. *See, e.g., Carrollton–Farmers Indep. Sch. Dist.,* 826 S.W.2d at 515–23; *Elbaor v. Smith,* 845 S.W.2d 240 (Tex.1992) (creating uncertainty by disapproval of a type of pre-trial agreements previously upheld by this court).

22  "The right of trial by jury, and the privilege of the Writ of Habeas Corpus shall be established by law, and shall remain inviolable." *Proposed Constitution for the State of Texas* art. 4 (1833), *reprinted in Documents of Texas History,* 80 (Ernest Wallace ed., 1963).

23  *See* Eugene C. Barker, *Stephen F. Austin, in The Handbook of Texas* 84 (Walter Prescott Webb ed., 1952).

24  Constitution of the Republic of Texas, Declaration of Rights, Section 9 (1836), *reprinted in* Tex. Const. app. 523, 536 (Vernon 1955), provided that "the right of trial by jury shall remain inviolate."

25  In our time this great constitutional principle continues to be reaffirmed:

> It is fundamental to our system of justice and the intention and policy of the law to permit all persons to have a trial by jury of disputed fact issues essential for a determination of [their rights]. The right of trial by jury is a valuable right which should be guarded jealously by all state courts.

> *Steenland v. Texas Commerce Bank Nat'l Ass'n,* 648 S.W.2d 387, 391 (Tex.App.—Tyler 1983, writ ref'd n.r.e.); *see also Lopez v. Lopez,* 691 S.W.2d 95, 97 (Tex.App.—Austin 1985, no writ) ("trial by jury should be granted zealously by all the courts of this state").

26  Tex. Const. art. I, § 12 (1845) (retaining identical language from 1836 provision).

27  *See, e.g., May v. United Services,* 844 S.W.2d 666, 674 (Tex.1992) (Doggett, J., dissenting); *Boyles v. Kerr,* 1992 WL 353277 (Tex.1992) (Doggett, J., dissenting); *Leleaux v. Hamshire–Fannett Indep. Sch. Dist.,* 835 S.W.2d 49, 55–56 (Tex.1992) (Doggett, J., dissenting); *Reagan v. Vaughn,* 804 S.W.2d 463, 491 (Tex.1991) (Doggett, J., concurring and dissenting); *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 527 (Tex.1990) (Doggett, J., dissenting).

28  T.R. Fehrenbach, Lone Star: A History of Texas and the Texans 279 (1983).

29  Act of Feb. 11, 1860, Tex.Gen Laws 97, a later version of which was referenced by this court in *Gulf, Colo. & Santa Fe Ry. v. Reed,* 80 Tex. 362, 15 S.W. 1105, 1107 (1891).

30  The court further stated: "The word means, literally, annoyance; in law, it signifies, according to Blackstone, 'anything that worketh hurt, inconvenience, or damage.'.... 'So closely (says Blackstone) does the law of England enforce that excellent rule of Gospel morality, of doing to others as we would they should do unto ourselves.' " *Id.* at 492. *Accord Miller v. Burch,* 32 Tex. 208, 210 (1869).

31  *See also Rhodes v. Whitehead,* 27 Tex. 304, 316 (1863) (remanding for trial a complaint against a dam across the San Antonio river, recognizing that the creation "of pools of stagnant and putrid water" or the "tendency to cause sickness in [the plaintiff's] family or immediate neighborhood," was sufficient to constitute a nuisance); *Jung v. Neraz,* 71 Tex. 396, 9 S.W. 344, 344–45 (1888) (nuisance properly alleged by claim that "interment of dead bodies in [proposed cemetery] would infect, poison, and injure [plaintiffs'] wells, and the use of low grounds, and further injure plaintiffs' health by the foul odors from the decomposition of said bodies.").

32  Although some critics allege that juries are not competent to deal with complex scientific and technological issues, empirical data demonstrates otherwise.

> Research shows ... that the opportunity exists for meaningful [juror] participation in a wide range of adjudicatory and regulatory proceedings.... To the extent that juries encounter difficulties, these difficulties often vex judges as well.... The full potential of lay participation in adjudication has not been realized.

> Joe Cecil, Valerie Hans, and Elizabeth Wiggins, *Citizen Comprehension of Difficult Issues: Lessons From Civil Jury Trials,* 40 Am.U.L.Rev. 727, 773–74 (1991).

*See* Tex. Const. art. X, § 2 and interp. commentary (Vernon 1955) (noting that the provision was added to authorize the Legislature to regulate railroads after the people had issued strong complaints against them).

*See also State v. De Silva,* 105 Tex. 95, 145 S.W. 330 (1912) (also holding that cancellation of liquor license is not a "cause").

In the commentary for recommended article V, section 14(e) of the proposed 1974 Constitution, the significance of holdings regarding this more expansive language was also noted:

> [T]he right of trial by jury guaranteed in Article V, Section 10 of the 1876 Constitution is not dependent on the existence of the right at the time the Constitution was adopted in 1876. The guarantee extends to any "cause" instituted in the district court. A "cause" is defined as a suit or action concerning any question, civil or criminal, contested before a court of justice.

> *See* Texas Constitutional Revision Commission, *A New Constitution for Texas: Text, Explanation, Commentary* 120–21 (1973).

The *Credit Bureau* opinion was authored for the court by now former Chief Justice Jack Pope, who had written previously, "[t]he struggle for survival by the institution we call the jury is truly the epic of our law." Jack Pope, *The Jury,* 39 Tex.L.Rev. 426 (1961). That struggle continues today.

Though he wrote in unnecessarily global terms regarding this exception, even Harris recognized that

> [t]he plain language of the Judiciary section conferring the right of trial by jury in all causes in the district courts would seem to entitle parties to jury trials irrespective of whether that right existed at the time of the adoption of the Constitution.

> Harris, *supra,* at 6–7.

The majority notes the existence of other statutory procedural protections, such as those contained in the Administrative Procedure and Texas Register Act, Tex.Rev.Civ.Stat. art. 6252–13a, § 19(e). 852 S.W.2d at 452, n. 26. While important, these measures certainly do not constitute a complete substitute for a jury trial. If the Texas Constitution guarantees a right to trial by jury, no lesser protection will suffice.

To some extent every action legislatively entrusted to an administrative agency involves a public right. At the same time even actions by private parties may have incidental regulatory effects and are unquestionably invested with a public interest. *See The Dallas Morning News, Inc. v. Fifth Court of Appeals,* 842 S.W.2d 655, 663 (Tex.1992, orig. proceeding) (Doggett, J., dissenting from overruling of motion for leave to file petition for writ of mandamus).

The "public rights" concept has been recently muddled by the federal courts. In *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), the court, although upholding the right to a jury trial for defendants sued for fraudulent conveyance by a trustee in bankruptcy, broadened the scope of its "public rights" exception to include all cases "involving statutory rights that are integral parts of a public regulatory scheme and whose adjudication Congress has assigned to an administrative agency." *Id.* at 55 n. 10, 109 S.Ct. at 2797 n. 10. *See also Thomas v. Union Carbide Agric. Prod. Co.,* 473 U.S. 568, 586, 105 S.Ct. 3325, 3335, 87 L.Ed.2d 409 (1985) (rejecting the view that the government must bring suit in order for litigation to involve "public rights"). I believe that such an expansive reading of "public rights" would not be consistent with the broad state constitutional protection of the right to trial by jury in Texas.

In view of recent attacks nationwide on the jury system, a recent study determined that

> Our central conclusion is that the civil jury system is valuable and works well.... It is [not] "broken," and therefore it need not be "fixed." The jury system is a proven, effective, an important means of resolving civil disputes.

> The Brookings Institution, *Charting a Future for the Civil Jury System* 2 (1992).

As the majority recognizes, "the parties insist that any question of standing has been waived in the trial court and cannot be raised by the court for the first time on appeal." 852 S.W.2d at 443–444.

Despite the clear statement in *Sabine River* that "[w]e assume without deciding that Sabine has no justiciable interest," 369 S.W.2d at 349, the majority today asserts that "standing was present" in the trial court in that case. 852 S.W.2d at 446 n. 9.

*See, e.g., Espiricueta v. Vargas,* 820 S.W.2d 17, 20 (Tex.App.—Austin 1991, writ denied); *Integrated Title Data Systems v. Dulaney,* 800 S.W.2d 336 (Tex.App.—El Paso 1990, no writ); *State v. Euresti,* 797 S.W.2d 296, 299 (Tex.App.—Corpus Christi 1990, no writ); *Cissne v. Robertson,* 782 S.W.2d 912, 917 (Tex.App.—Dallas 1989, writ denied); *Broyles v. Ashworth,* 782 S.W.2d 31, 34 (Tex.App.—Fort Worth 1989, no writ); *Horton v. Robinson,* 776 S.W.2d 260, 263 (Tex.App.—El Paso 1989, no writ); *L.G. v. State,* 775 S.W.2d 758, 760 (Tex.App.—El Paso 1989, no writ); *Wilson v. United Farm Workers of America,* 774 S.W.2d 760, 764 (Tex.App.—Corpus Christi 1989, no writ); *Smiley v. Johnson,* 763 S.W.2d 1, 4 (Tex.App.—Dallas 1988, writ denied); *Ex Parte McClain,* 762 S.W.2d 238, 242 (Tex.App.—Beaumont 1988, no writ); *Goeke v. Houston Lighting & Power Co.,* 761 S.W.2d 835, 837 n. 1 (Tex.App.—Austin 1988), *rev'd on other grounds,* 797 S.W.2d 12 (Tex.1990); *Group Medical and Surgical Service, Inc. v. Leong,* 750 S.W.2d

791, 794–95 (Tex.App.—El Paso 1988, writ denied); *City of Fort Worth v. Groves,* 746 S.W.2d 907, 913 (Tex.App.—Fort Worth 1988, no writ); *Barron v. State,* 746 S.W.2d 528, 530 (Tex.App.—Austin 1988, no writ); *Reynolds v. Charbeneau,* 744 S.W.2d 365, 367 (Tex.App.—Beaumont 1988, writ denied); *Champion v. Wright,* 740 S.W.2d 848, 851 (Tex.App.—San Antonio 1987, writ denied); *Texas Low–Level Radioactive Waste Disposal Authority v. El Paso County,* 740 S.W.2d 7, 8 (Tex.App.—El Paso 1987, writ dism'd w.o.j.); *S.I. Property Owners' Ass'n v. Pabst Corp.,* 714 S.W.2d 358, 360 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.); *Gonzales v. City of Lancaster,* 675 S.W.2d 293, 294–95 (Tex.App.—Dallas 1984, no writ); *Mabe v. City of Galveston,* 687 S.W.2d 769, 771 (Tex.App.—Houston [1st Dist.] 1985, writ dism'd); *Develo-cepts, Inc. v. City of Galveston,* 668 S.W.2d 790, 793 (Tex.App.—Houston [14th Dist.] 1984, no writ); *Griffith v. Pecan Plantation Owners Ass'n, Inc.,* 667 S.W.2d 626, 628 (Tex.App.—Fort Worth 1984, no writ); *City of Houston v. Public Utility Comm'n of Texas,* 656 S.W.2d 107, 110 n. 1 (Tex.App.—Austin 1983, writ ref'd n.r.e.); *Public Utility Comm'n v. J.M. Huber Corp.,* 650 S.W.2d 951, 955–56 (Tex.App.—Austin 1983, writ ref'd n.r.e.); *Vaughn Bldg. Corp. v. Austin Co.,* 620 S.W.2d 678 (Tex.Civ.App.—Dallas 1981), *aff'd,* 643 S.W.2d 113 (Tex.1982); *War–Pak, Inc. v. Rice,* 604 S.W.2d 498 (Tex.Civ.App.—Waco 1980, writ ref'd n.r.e.).

45 *Texas Dep't of Mental Health v. Petty,* 778 S.W.2d 156, 166 (Tex.App.—1989, writ dism'd w.o.j.) (opinion by Powers, J.); *Public Utility Comm'n v. J.M. Huber Corp.,* 650 S.W.2d 951, 954–56 (Tex.App.—Austin 1983, writ ref'd n.r.e.) (opinion by Powers, J.); *Hooks v. Texas Dep't of Water Resources,* 645 S.W.2d 874 (Tex.App.—Austin 1983, writ ref'd n.r.e.) (opinion by Powers, J.); *see also Kircus v. London,* 660 S.W.2d 869, 872 n. 3 (Tex.App.—Austin 1983, no writ) (opinion by Phillips, C.J.).

46 *See, e.g., Boyles v. Kerr* (Tex.1992) (Doggett, J., dissenting) (objecting to majority's overruling of landmark Texas Supreme Court decision permitting recovery for negligence resulting in emotional distress); *Walker v. Packer,* 827 S.W.2d 833, 835 (Tex.1992, orig. proceeding)* (Doggett, J., dissenting) (noting majority's "mass execution of precedent," encompassing "a dozen or more Texas Supreme Court cases and countless decisions of the courts of appeals"); *Carrollton–Farmers Branch Indep. Sch. Dist.,* 826 S.W.2d at 539 (Tex.1992) (Doggett, J., dissenting) (discussing rejection by majority of its own decision issued less than one year previously); *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 12 (Tex.1991) (Doggett, J., dissenting) (majority disregards its own recent precedent, looking instead to overruled case); *Rose v. Doctors Hosp.,* 801 S.W.2d 841, 852 (Tex.1990) (Doggett, J., dissenting) (disapproving of rejection of recent controlling precedent).

47 The United States Supreme Court has clearly stated that standing does not implicate separation of powers concerns. *See Flast v. Cohen,* 392 U.S. 83, 100, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968) ( "The question whether a particular person is a proper party to maintain the action does not, by its own force, raise separation of powers problems related to improper judicial interference in areas committed to other branches of ... Government.").

48 *See* section I, *supra.*

49 *See, e.g., Brown v. Robinson,* 354 So.2d 272, 273 (Ala.1977); *Jackson v. Nangle,* 677 P.2d 242, 250 n. 10 (Alaska 1984); *Torrez v. State Farm Mut. Auto Ins. Co.,* 130 Ariz. 223, 635 P.2d 511, 513 n. 2 (App.1981); *Cowart v. City of West Palm Beach,* 255 So.2d 673, 675 (Fla.1971); *Lyons v. King,* 397 So.2d 964 (Fla.App.1981); *Greer v. Illinois Housing Development Auth.,* 122 Ill.2d 462, 120 Ill.Dec. 531, 552, 524 N.E.2d 561, 582 (1988); *Matter of Trust of Rothrock,* 452 N.W.2d 403, 405 (Iowa 1990); *Tabor v. Council for Burley Tobacco, Inc.,* 599 S.W.2d 466, 468 (Ky.App.1980); *Sanford v. Jackson Mall Shopping Ctr. Co.,* 516 So.2d 227, 230 (Miss.1987); *Fossella v. Dinkins,* 66 N.Y.2d 162, 495 N.Y.S.2d 352, 1019, 485 N.E.2d 1017, 1019 (1985); *Public Square Tower One v. Cuyahoga County Bd. of Revision,* 34 Ohio App.3d 49, 516 N.E.2d 1280, 1281 n. 2 (1986); *Federman v. Pozsonyi,* 365 Pa.Super. 324, 529 A.2d 530, 532 (1987); *McMullen v. Zoning Board of Harris Township,* 90 Pa.Cmwlth. 119, 494 A.2d 502 (1985); *International Depository, Inc. v. State,* 603 A.2d 1119, 1122 (R.I.1992); *State v. Miller,* 248 N.W.2d 377, 380 (S.D.1976); *Princess Anne Hills Civ. League, Inc. v. Susan Constant Real Estate Trust,* 243 Va. 53, 413 S.E.2d 599, 603 n. 1 (1992); *Tyler Pipe Industries, Inc. v. State Dep't of Revenue,* 105 Wash.2d 318, 715 P.2d 123, 128 (1986); *Poling v. Wisconsin Physicians Serv.,* 120 Wis.2d 603, 357 N.W.2d 293, 297–98 (App.1984). The majority's odd attempt to distinguish some of these cases, all of which are predicated in terms of standing, as involving solely the question of whether the litigant was a proper "real party in interest" has never been drawn previously in the published decisions of any Texas court addressing the question of standing. *See* cases cited at notes 44, *supra,* and 50, *infra.*

50 *See Texas Industrial Traffic League,* 633 S.W.2d at 822–23; *Central Educ. Agency v. Burke,* 711 S.W.2d at 8; *American General Fire & Casualty Co. v. Weinberg,* 639 S.W.2d 688; *Cox v. Johnson,* 638 S.W.2d at 868. To avoid overruling these, the majority claims all three recognized that lack of subject matter jurisdiction can initially be raised on appeal. True, but ignored is the conclusion of each that subject matter jurisdiction cannot be waived while standing can be.

51 Our past acknowledgement of the legislative power to expand access to Texas courts is inconsistent with today's conclusion that we must narrowly limit access. *See* Mark V. Tushnet, *The New Law of Standing: A Plea for Abandonment,* 62 Corn.L.Rev. 663 (1977) (because court decisions do not question legislative power to confer standing by statute, they suggest that standing rules are not constitutionally grounded).

Despite the participation of associational litigants before this court, we have never before questioned standing on our own motion. *See, e.g., Austin Indep. Sch. Dist. v. Sierra Club,* 495 S.W.2d 878 (Tex.1973).

*See Safe Water Foundation of Texas v. City of Houston,* 661 S.W.2d 190, 193 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.) (recognizing precedent of this court as according broad right of standing), *app. dism'd,* 469 U.S. 801, 105 S.Ct. 55, 83 L.Ed.2d 6 (1984); *Texas Industrial Traffic League v. Railroad Comm'n of Texas,* 628 S.W.2d 187 (Tex.App.—Austin) (discussing Supreme Court's expansive approach to standing to allow access to Texas courts), *rev'd,* 633 S.W.2d 821 (Tex.1982) (per curiam), *overruled by Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440 (Tex.1993).

*Accord Hunt v. Bass,* 664 S.W.2d 323, 324 (Tex.1984) (recognizing statutorily-granted standing of litigants to seek mandamus to reduce substantial delays in court operations); *Safe Water Foundation of Texas v. City of Houston,* 661 S.W.2d 190 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.), *app. dism'd,* 469 U.S. 801, 105 S.Ct. 55, 83 L.Ed.2d 6 (1984) (drinking water consumer group had standing to contest fluoridation of city water).

These requirements are allegedly necessary to protect "the members' best interest." 852 S.W.2d at 447. Perhaps an organization's members are in a better position than this court to determine what is in their best interest.

Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure, § 3531.3, at 418 ("The problems [of standing] are difficult enough without the compounding effect of constitutional attribution.").

*See also, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 490, 102 S.Ct. 752, 768, 70 L.Ed.2d 700 (1982) (Brennan, J., dissenting); Abram Chayes, *The Supreme Court, 1981 Term—Foreword: Public Law Litigation and the Burger Court,* 96 Harv.L.Rev. 4, 23 (1982) (Having ritually recited the standing formula, "the Court then chooses up sides and decides the case."); Michael A. Wolff, *Standing to Sue: Capricious Application of Direct Injury Standard,* 20 St.L.U.L.J. 663, 678 (standing barrier "raised or lowered based on the degree of hostility to, or favoritism for, consideration of the issues on their merits"); Albert Broderick, *The* Warth *Optional Standing Doctrine: Return to Judicial Supremacy?* 25 Cath.U.L.Rev. 467, 504, 516–17 (1976).

*See* Katherine B. Steuer and Robin L. Juni, *Court Access for Environmental Plaintiffs: Standing Doctrine in* Lujan v. National Wildlife Federation, 15 Harv.Envtl.L.Rev. 187, 232–33 (1991); Sarah A. Robichaud, Note, Lujan v. National Wildlife Federation: *The Supreme Court Tightens the Reins on Standing for Environmental Groups,* 40 Cath.U.L.Rev. 443, 470–74 (1991); V. Maria Cristiano, Note, *In Determining an Environmental Organization's Standing to Challenge Government Actions Under the Land Withdrawal Review Program, the Use of Lands in the Vicinity of Lands Adversely Affected by the Order of the Bureau of Land Management Does Not Constitute Direct Injury*—Lujan v. National Wildlife Federation, 2 Seton Hall Const. L.J. 445 (1991); Michael J. Shinn, Note, *Misusing Procedural Devices to Dismiss an Environmental Lawsuit,* 66 Wash.L.Rev. 893, 904–12 (1991); Lynn Robinson O'Donnell, Note, *New Restrictions in Environmental Litigation: Standing and Final Agency Action After* Lujan v. National Wildlife Federation, 2 Vill.Envtl.L.J. 227, 251 (1991); Bill J. Hays, Comment, *Standing and Environmental Law: Judicial Policy and the Impact of* Lujan v. National Wildlife Federation, 39 Kan.L.Rev. 997, 1042–43 (1991).

Before it adopts a federal test and federal gloss, the majority asserts the "general test for standing in Texas" is what it quotes from *Board of Water Engineers v. City of San Antonio,* 155 Tex. 111, 114, 283 S.W.2d 722, 724 (1955). The majority overrules the *Texas Industrial Traffic League* case, which addressed standing in the context of "justiciable interest" discussed in the more recent cases of *Coffee v. William Marsh Rice University,* 403 S.W.2d 340 (Tex.1966), and *Sabine River Authority v. Willis,* 369 S.W.2d 348 (Tex.1963). The context of the cases differed from *Board of Water Engineers,* of course. The precise meaning of "standing" in fact depends on the context. The majority adopts a federal gloss, and the federal courts have stated, "Generalizations about standing to sue are largely worthless as such." *Association of Data Proc. Serv. Orgs. v. Camp,* 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). Using "standing" to mean a party's legal capacity to sue is my best description of the labyrinth of different cases the majority uses interchangeably.

*Richardson v. First Nat'l Life Ins. Co.,* 419 S.W.2d 836 (Tex.1967), relied upon by the majority for the proposition that pleadings must "affirmatively show that the court has jurisdiction to hear the cause," 852 S.W.2d at 446, was expressly distinguished in *Peek.* This unanimous opinion written for the Court by Chief Justice Phillips explained that *Richardson* really meant that if the pleadings affirmatively showed there was *no* jurisdiction, then the case should be dismissed, but otherwise there was a presumption that the amount omitted from the pleading would support jurisdiction. *Peek,* 779 S.W.2d at 804.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (1)

### Direct History (1)

🚩 1. Texas Ass'n of Business v. Texas Air Control Bd. ↝
852 S.W.2d 440 , Tex. , Mar. 03, 1993 , rehearing of cause overruled ( May 05, 1993 )

985 S.W.2d 149
Court of Appeals of Texas,
Austin.

TEXAS DEPARTMENT OF PUBLIC SAFETY, Appellant

v.

Charles V. MOORE, Appellee.

No. 03–98–00135–CV.  |  Nov. 30, 1998.

Unsuccessful candidate for promotion to position of Assistant Commander of the Criminal Intelligence Service sued Department of Public Safety for reverse discrimination under Human Rights Act, and later amended complaint to seek declaration under Uniform Declaratory Judgments Act (UDJA) that Department acted outside statutory authority in filling position and three others without competitive examination. The 250th Judicial District Court, Travis County, Paul R. Davis, Jr., J., granted cross-motions for summary judgment, dismissing discrimination claim for failure to exhaust administrative remedies, declaring Department failed to comply with statutory hiring procedure, ordering the four positions vacated, and awarding attorney fees to candidate. Department appealed. The Court of Appeals, Kidd, J., held that: (1) claim presented a justiciable controversy sufficient to invoke jurisdiction under UDJA; (2) claim was not barred by sovereign immunity; (3) Commander and Assistant Commander positions within Department had to be filled by competitive examination; but (4) injunctive relief should not have been made retrospective.

Affirmed in part and reversed in part.

**Attorneys and Law Firms**

**\*151** Dan Morales, Attorney General, Martin J. Thompson, Jr., Assistant Attorney General, Austin, for Appellant.

**\*152** Paul Dodson, White, Huseman & Pletcher, Corpus Christi, for Appellee.

Before Justices POWERS, JONES and KIDD.

**Opinion**

MACK KIDD, Justice.

Appellant, the Texas Department of Public Safety (the "Department"), failed to recommend appellee Charles Moore for promotion to the position of Assistant Commander of the Criminal Intelligence Service. Moore sued under the Human Rights Act claiming reverse discrimination and, by later amendment, under the Uniform Declaratory Judgments Act (the "UDJA") seeking a declaration that the Department acted outside its statutory authority in filling four high-ranking positions without examining applicants based on merit. The trial court granted summary judgment against Moore on the discrimination claim. The trial court also granted partial summary judgment in favor of Moore, declaring that the Department acted outside its statutory authority in filling the four positions, and ordered those positions vacated. The Department appeals. In its points of error, the Department challenges (1) the trial court's jurisdiction under section 411.007 of the Texas Government Code and the UDJA; (2) the trial court's decision to order the four positions vacated; and (3) the trial court's discretion in awarding attorney's fees. We will affirm the trial court's order in part and reverse in part.

## BACKGROUND

In October 1993, the Department announced a vacancy in the position of Assistant Commander of the Criminal Intelligence Service. Commander Don Plemons, the officer charged with making the recommendation for appointment to fill the vacancy, orally interviewed seven candidates. Among these candidates were Charles Moore, a white male, and Enrique Garcia, an Hispanic male. Plemons recommended Garcia, and Garcia was appointed to the position. Moore sued in district court.

**[1]** Moore originally brought suit under the Human Rights Act claiming he was the victim of reverse racial discrimination when he was denied promotion in favor of Garcia. [1] Moore later amended his petition to include a declaratory judgment claim based upon the Department's alleged failure to comply with section 411.007(b) of the Texas Government Code, which requires that the Department make promotions or appointments based upon merit determined by examination. *See* Tex. Gov't Code Ann. § 411.007(b) (West 1998). The trial court granted cross motions for summary judgment; declaring that the Department failed to comply with all the requirements of section 411.007(b) in promoting Garcia to Assistant Commander of the Criminal Intelligence Service, and dismissing Moore's discrimination claim for failure to exhaust the necessary administrative remedies. [2] Moore does not appeal the dismissal of his discrimination claim.

Before the trial court rendered final judgment, the Department filled the positions of Commander of the Criminal Intelligence Service, Commander of Narcotics, and Assistant **\*153** Commander of Narcotics; also by appointment, and also, allegedly, without a competitive examination. The trial court allowed amendment of Moore's petition to ask for declaratory relief regarding these

three additional positions. Subsequently, the trial court rendered final judgment declaring that the Department failed to comply with the competitive examination requirements of section 411.007(b) in hiring the four aforementioned positions, and ordered them vacated and filled through competitive examination. The trial court also awarded Moore attorney's fees. The Department brings this appeal.

## DISCUSSION

 **[2]**   The Department initially challenges the trial court's jurisdiction to hear Moore's claim. Specifically, the Department argues that section 411.007(b) only establishes norms for the Department in promoting its employees, and fails to create any cause of action in Moore. Additionally, the Department contends that the UDJA likewise fails to create a cause of action in Moore, and cannot be used as a vehicle to interpret section 411.007(b) of the Labor Code. The determination of jurisdiction under the UDJA is a question of law. *See Ainsworth v. Oil City Brass Works,* 271 S.W.2d 754, 760 (Tex.Civ.App.—Beaumont 1954, no writ). We will look first to the jurisdiction of the trial court before deciding whether the court erred in entering its order.

### *Jurisdiction and the Declaratory Judgments Act*

 **[3]**   Enacted in 1943, the UDJA confers on Texas courts the authority to "declare rights, status, and other legal relations whether or not further relief is or could be claimed." Tex. Civ. Prac. & Rem.Code Ann. § 37.003 (West 1997). The Legislature intended the UDJA to be remedial, to settle and afford relief from uncertainty and insecurity with respect to rights, and to be liberally construed. Tex. Civ. Prac. & Rem.Code Ann. § 37.002 (West 1997). Describing the subject matter available for relief, the UDJA provides:

> A person interested under a deed, will, written contract, or other writings constituting a contract or *whose rights, status, or other legal relations are affected by a statute,* municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

Tex. Civ. Prac. & Rem.Code Ann. § 37.004 (West 1998) (emphasis added).

 **[4]**   **[5]**   **[6]**   **[7]**   **[8]**   **[9]**   A suit under the UDJA is not confined to cases in which the parties have a cause of action apart from the Act itself. *Transportation Ins. Co. v. Franco,* 821 S.W.2d 751, 754 (Tex.App.—Amarillo 1992, writ denied). A declaratory judgment, however, is appropriate only if (1) a justiciable controversy exists as to the rights and status of the parties; and (2) the controversy will be resolved by the declaration sought. *See Bonham State Bank v. Beadle,* 907

S.W.2d 465, 467 (Tex.1995) (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 446 (Tex.1993)); *see also City of Austin v. L.S. Ranch, Ltd.,* 970 S.W.2d 750, 754, (Tex.App.—Austin 1998, no pet.). A justiciable controversy is one in which a real and substantial controversy exists involving a genuine conflict of tangible interest and not merely a theoretical dispute. *See Beadle,* 907 S.W.2d at 467. A justiciable controversy must be distinguished from an advisory opinion, which is prohibited under both the Texas and federal constitutions. *See Texas Air Control Bd.,* 852 S.W.2d at 444. A judgment under the UDJA depends on a finding that the issues are not hypothetical or contingent, and the questions presented must resolve an actual controversy. *Empire Life Ins. Co. v. Moody,* 584 S.W.2d 855, 858 (Tex.1979). A justiciable controversy, however, does not necessarily equate with a fully ripened cause of action:

> It is not necessary that a person who seeks a declaration of rights under this statute shall have incurred or caused damage or injury in a dispute over rights and liabilities, but it has frequently been held that an action for declaratory judgment would **\*154** lie when the fact situation manifests the presence of 'ripening seeds of a controversy.' Such appear where the claims of several parties are present and indicative of threatened litigation in the immediate future which seems unavoidable, even though the differences between the parties as to their legal rights have not reached the state of an actual controversy.

*Ainsworth,* 271 S.W.2d at 761.

The crux of this appeal concerns the application of section 411.007(b) to the advancement of personnel within the Department through appointment or promotion. In the section entitled "Officers and Employees," section 411.007(b) provides:

> Appointment or promotion of an officer or employee must be based on merit determined by examination under commission rules that take into consideration the applicant's age, physical condition, experience, and education. Each person who has an application on file for a position in the department shall be given reasonable written notice of the time and place of those examinations.

Tex. Gov't Code Ann. § 411.007(b) (West 1998). The Department originally contends that section 411.007(b) creates no cause of action in Moore, and, therefore, the trial court had no jurisdiction to hear the case. The trial court received its jurisdiction from the controversy created by the Department's application of section 411.007(b) to Moore, not from the words of the statute itself. The UDJA provides for a declaration of rights for persons "whose rights, status, or other legal relations are affected by a statute...." Tex. Civ. Prac. & Rem.Code Ann. § 37.004 (West 1998). Jurisdiction under the UDJA primarily depends on the nature of the controversy; whether the controversy is merely hypothetical or rises to the justiciable level. *See Empire Life Ins.,* 584 S.W.2d at 858.

Moore's interest in being treated according to statute when applying for vacant positions in the Department clearly implicates the UDJA's purpose of clarifying rights affected by statute. The controversy lies not in the actions of the Department in reviewing Moore's application for Assistant Commander of Criminal Intelligence, but in the Department's application of its promotional rules to future appointment vacancies. The Department has already taken an adverse stance to Moore's position by allegedly not requiring competitive examinations when filling the initial vacancy. The Department's repetition of the same behavior in filling three subsequent positions emphasizes the actuality of the controversy. There is clearly a justiciable controversy sufficient to invoke the court's jurisdiction through the UDJA to clarify Moore's, and any other applicant's, rights as they pertain to the Department's hiring procedure. Furthermore, the trial court's declaration resolves the controversy by informing the Department that its actions in filling Assistant Commander and Commander positions without examining applicants based on merit falls outside its statutory authority.

 **[10]**  **[11]**  The Department next argues that sovereign immunity shields the Department as an agency of the state. The Department argues that the UDJA does not act to waive the State's ordinary immunity from liability. Suits challenging an agency's action as being outside the scope of its delegated authority are not suits against the State requiring legislative or statutory authority. *Public Util. Comm'n v. City of Austin,* 728 S.W.2d 907, 911 (Tex.App.—Austin 1987, writ ref'd n.r.e.). Because Moore's suit under the UDJA sought a declaration that the Department acted outside its statutory authority in appointing various high-level positions without examining applicants based on merit, no explicit waiver by the State was necessary. Therefore, Moore's suit was not barred by sovereign immunity. We hold the trial court had jurisdiction to hear Moore's claim under the UDJA and overrule the Department's points of error in that regard.

### *The Requirement of "Merit–Based" Promotion*

 **[12]**  We must now determine whether the trial court erred in holding that the Department acted outside its statutory authority when filling the four vacancies. The enabling statutes of the Department clearly provide for merit-based promotion and appointment. *See*  **\*155** Tex. Gov't Code Ann. § 411.007(b) (West 1998). That same section further provides for a competitive examination of some sort, and provides that all applicants "shall receive notice of the time and place of such examinations." *Id.* While it is true that the statute, under the section entitled "Duties of Director," reserves for the Director's discretion some positions to be filled by "direct appointment," the section limits these direct appointments to *chiefs of bureaus. See* Tex. Gov't Code Ann. § 411.006(6) (West 1998) (emphasis added). [3] No other positions are mentioned.

 **[13]**  Pursuant to section 411.004(3), the Public Safety Commission (the "Commission") promulgated rules governing appointments and promotions. *See* Tex. Gov't Code § 411.004(3)

(West 1998). [4] These rules include the policy that the Department shall make *all* appointments based on merit. *See* 37 Tex. Admin. Code § 1.21(a) (1998). In keeping with the policy of making appointments based on merit, the rules provide that "examinations will be conducted for all positions *excepting* unskilled labor, trades, and *direct appointments* made by the Director." 37 Tex. Admin. Code § 1.27 (1998) (emphasis added). Reading the rule in conjunction with the statute, the rule exempts from competitive examination *only* unskilled labor, trades, and the chiefs of bureaus. However, despite the language of the statute restricting directorial appointments to bureau chiefs, and despite the Department's own rules advocating the policy of promotions based on merit, the Department seeks in its General Manual to expand the number of director appointments exempted from competitive examination:

> Positions of major division chief, assistant major division chief, division chief, regional commander, commander, assistant commander, senior Ranger captain, assistant supervisor of Rangers, Director and Assistant Director of Personnel and of Training, other positions deemed necessary and appropriate by the Director and positions of the Director's staff will be filled by direct appointment of the Director.
> Texas Department of Public Safety General Manual, Chap. 7, § 26.04(4).

[14] [15] The Department argues that the Assistant Commander and Commander positions are exempt from competitive examination by virtue of the discretion granted the Department by statute coupled with the listing of director appointments found in the Department's General Manual. In the alternative, the Department argues that, should the Assistant Commander position be subject to competitive examination, the oral interview by Commander Plemons given to applicants should suffice. While we agree with the Department that the statute does provide discretion to the Commission and the Department to create its own rules and to define examination based on merit for purposes of promotional appointments, we reject the notion that the Assistant Commander and Commander positions are exempt, or that the oral interview could fulfill the statutory requirement of a competitive examination. The language of the statute, and that of the Department's own rules, clearly envisions a merit-based promotional system for all those positions not specifically exempted as director appointments. And, according to statute and the rules promulgated by the Commission, Assistant Commander and Commander are not positions so exempted. Furthermore, the mere existence of section 26.04(4) in the Department's General Manual expanding the number of exemptions beyond statutory limits both exceeds the Department's authority and belies the Department's argument that the oral interviews given applicants fulfilled the requirement of a competitive examination.

[16] Moore argues that the statute contemplates *written* examinations as the proper manifestation of *competitive* examinations. To the extent that Moore seeks affirmation from this Court for his position, we reject it. The Department maintains the discretion to **\*156** create procedures for competitive examinations regarding promotive appointments, provided such procedures make

a good faith effort to comply with the statutory and agency requirement of "merit-based" promotions. The Department should bear in mind, however, that the written notice requirements of the statute regarding a stated time and location for the competitive examination seem to mandate some type of formalized and structured examination. [5] *See* Tex. Gov't Code Ann. § 411.007(b) (West 1998).

### The Injunctive Order

**[17]**  The Department next contends that even if the trial court had jurisdiction to declare that the Department failed to comply with section 411.007(b) in hiring Garcia and the others without resort to competitive examination, the trial court had no jurisdiction, or, alternatively, abused its discretion, in ordering the Department to vacate the four positions contested by Moore. We note initially that actions under the UDJA are *sui generis;* they are unique in that the declarations of "rights, status and other legal relations" are not truly legal or equitable. *See Cobb v. Harrington,* 144 Tex. 360, 190 S.W.2d 709, 713 (Tex.1945); *see also Texas Liquor Control Bd. v. Canyon Creek Land Corp.,* 456 S.W.2d 891, 895 (Tex.1970). We further note that, at the time of the trial court's rendition of final judgment, Moore's discrimination claim had been dismissed through summary judgment; thus the trial court's authority to act was based on the UDJA alone. Moore argues that the UDJA allows the trial court to grant the injunctive relief requested, namely the vacation of the four positions, as ancillary to the declaratory relief awarded. *See* Tex. Civ. Prac. & Rem.Code § 37.011 (West 1998); *see also Davis v. Pletcher,* 727 S.W.2d 29, 35 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.). Under the facts presented here, we disagree.

**[18]**  As Moore suggests, the UDJA allows for injunctive relief ancillary to a declaration of rights in some situations: "[F]urther relief based on a declaratory judgment or decree may be granted whenever necessary or proper. The application must be by petition to a court having jurisdiction to grant relief." Tex. Civ. Prac. & Rem.Code. Ann. § 37.011 (West 1998). [6] This power to grant ancillary relief is conditioned on such relief being *necessary and proper.* For the following reasons, such relief in this case is inappropriate.

**[19]**  Regarding Moore's original reverse discrimination claim, filing a complaint with the Human Rights Commission and exhausting administrative remedies was a mandatory prerequisite to filing a civil action alleging a violation of the Human Rights Act under the Texas Labor Code. *Schroeder v. Texas Iron Works, Inc.,* 813 S.W.2d 483, 488 (Tex.1991). The rationale for this result is that the Human Rights Act provides the *exclusive remedy* for alleged discrimination in administrative agency personnel decisions. *See Stinnett v. Williamson County Sheriff's Dep't,* 858 S.W.2d 573, 577 (Tex.App.—Austin 1993, writ denied). Thus, Moore's failure to exhaust his administrative remedies was a jurisdictional bar to filing a discrimination claim in district court, and the trial court properly granted summary judgment against Moore's claim. *Schroeder,* 813 S.W.2d at 488.

 **[20]** **[21]** **[22]** This procedural posture becomes important with regard to the trial court's award of injunctive relief based solely on jurisdiction under the UDJA because it allows Moore to circumvent the exclusive remedies provided for, and the purposes contained in, the Human Rights Act. **\*157** The Human Rights Act includes a provision for injunctive relief from unlawful employment practices. *See* Tex. Labor Code Ann. § 21.210 (West 1996). This provision represented Moore's exclusive injunctive remedy until his administrative remedies had been exhausted. Moore could have sought an injunction to halt the Department from promoting Garcia and the other three appointments had he followed the proper administrative procedures. He failed to do so. He sought and received in district court a declaration that the Department had misinterpreted and misapplied section 411.007(b). This declaration clarified Moore's rights and status regarding future vacancies in the Department. However, the order by the trial court retroactively vacating the four Assistant Commander and Commander positions rewarded Moore for failing to follow the exclusive remedies provided for him by law. Declaratory relief creates no substantive rights. *State v. Morales,* 869 S.W.2d 941, 947 (Tex.1994). It provides a procedural device for the determination of controversies which are already within the jurisdiction of the court. *Id.* The remedy afforded by the UDJA is additional and does not supplant any existing remedy. *Cobb,* 190 S.W.2d at 713; *Crow v. City of Corpus Christi,* 146 Tex. 558, 209 S.W.2d 922, 924 (Tex.1948). Because the exclusive remedy available to Moore regarding his reverse discrimination claim is the Human Rights Act, which contains the right to injunctive relief, the trial court erred in vacating the positions in the Department based solely on the ancillary injunctive power contained in the UDJA.

Furthermore, the trial court's order undercut the purpose of the Human Rights Act to create a comprehensive administrative review. *See Stinnett,* 858 S.W.2d at 577. The Human Rights Act was intended to embody the policies embedded in Title VII, 42 U.S.C. § 2000e *et seq.,* including "administrative procedures involving informal conference, conciliation and persuasion, as well as judicial review of administrative action." *Schroeder,* 813 S.W.2d at 487. Allowing the jurisdiction created by the UDJA to circumvent the procedures and remedies provided by the Human Rights Act could create a back door to district court not contemplated by the Legislature. The proper remedy for Moore is prospective. His declaratory judgment carries preclusive effect in any future lawsuit, whether administrative or judicial, should the Department fail to offer him notice and the opportunity for merit-based promotion as required by section 411.007(b). *See Valley Oil Co. v. City of Garland,* 499 S.W.2d 333, 335 (Tex.Civ.App.—Dallas 1973, no writ). Thus, the retroactive injunctive relief ordered by the trial court was not "necessary and proper" as required under the UDJA before ancillary injunctive relief could be awarded. We reverse the trial court's order vacating the Department's appointments of Assistant Commander of Criminal Intelligence Service, Commander of Criminal Intelligence Service, Commander of Narcotics, and Assistant Commander of Narcotics.

*Attorney's Fees*

**[23]**   The trial court awarded Moore attorney's fees under the UDJA. The UDJA provides that "[i]n any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem.Code Ann. § 37.009 (West 1997). The Texas Supreme Court has expressly held that "by authorizing declaratory judgment actions to construe the legislative enactments of governmental entities and authorizing awards of attorney fees, the [U]DJA necessarily waives governmental immunity for such awards." *Texas Educ. Agency v. Leeper,* 893 S.W.2d 432, 446 (Tex.1994). The grant or denial of attorney's fees in a declaratory judgment lies within the discretion of the trial court, and its judgment will not be reversed on appeal absent a clear showing that it abused that discretion. *Oake v. Collin County,* 692 S.W.2d 454, 455 (Tex.1985).

**[24]**   **[25]**   The Department argues that the UDJA may not be used solely as a vehicle for attorney's fees. *See HECI Exploration Co. v. Clajon Gas Co.,* 843 S.W.2d 622, 637 (Tex.App.—Austin 1992, writ denied). Since we have held that the trial court had jurisdiction to construe section 411.007(b) and that the trial court's construction of that statute favors Moore, Moore has achieved a declaration **\*158** of rights entitling him to seek the additional relief of attorney's fees. *See* Tex. Civ. Prac. & Rem.Code Ann. § 37.009 (West 1997). The Department's argument fails. The Department also objects to the award of attorney's fees in the final judgment based upon affidavits of the competing parties, claiming that the affidavits do not represent competent evidence that the attorney's fees were reasonable and necessary. *See Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10 (Tex.1991). We refuse to hold that this procedure for determining attorney's fees rises to the level of an abuse of discretion. We overrule the Department's point of error regarding attorney's fees.

### CONCLUSION

We affirm the order of the trial court declaring that the Department acted outside its statutory duty pursuant to section 411.007(b) in filling four Assistant Commander and Commander positions without examining applicants based on merit. We further affirm the order of the trial court awarding attorney's fees. We reverse the order of the trial court vacating the four Assistant Commander and Commander positions and hold that Moore's only injunctive relief must be prospective.

Footnotes

1       The relevant statute provides:
        An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:
        (1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or

(2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

Tex. Labor Code Ann. § 21.051 (West 1996).

2    An employee of the State of Texas who alleges employment discrimination must file a complaint with the Texas Commission on Human Rights not later than the 180th day after the date the alleged unlawful employment practice occurred. Tex. Labor Code Ann. § 21.202 (West 1996). Furthermore, any federal complaint of employment discrimination shall be filed with the Equal Employment Opportunity Commission within 180 days; except that if the employee files with a state agency then the employee has 300 days to file. 42 U.S.C.S. § 2000e–5(c) (1989).

A plaintiff's failure to file a complaint and pursue administrative remedies creates a jurisdictional bar to his claim. *See Schroeder v. Texas Iron Works,* 813 S.W.2d 483, 488 (Tex.1991).

3    The relevant section of the statute provides: "The director shall: ... appoint, with the advice and consent of the commission, the chiefs of bureaus provided for by this chapter." Tex. Gov't Code Ann. § 411.006(6) (West 1998).

4    The relevant section of the statute provides: "The commission shall ... adopt rules necessary for carrying out the department's work." Tex. Gov't Code Ann. § 411.004(3) (West 1998).

5    We reject, for example, the suggestion made by the Department at oral argument that an official with the Department could discharge the Department's responsibility to offer a competitive examination by merely *examining* the personnel records of the applicants.

6    Several courts, including this one, have interpreted section 37.011 of the UDJA as allowing parties to combine a request for declaratory relief with a request for injunction. *See Weaver v. AIDS Servs. of Austin, Inc.,* 835 S.W.2d 798, 803 (Tex.App.—Austin 1992, writ denied) (AIDS services group seeking declaration of rights and injunction barring protestors from interfering with workshops); *Davis,* 727 S.W.2d at 35 (purchaser of real property seeking declaration interpreting various property conveyances and injunction to halt triggering of acceleration clause).

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (1)

### Direct History (1)

⚑ 1. Texas Dept. of Public Safety v. Moore 👓
985 S.W.2d 149 , Tex.App.-Austin , Nov. 30, 1998 , rehearing overruled ( Mar 11, 1999 )

353 S.W.3d 241
Court of Appeals of Texas,
Dallas.

TRANSCONTINENTAL REALTY INVESTORS, INC., Appellant,

v.

ORIX CAPITAL MARKETS, LLC, Appellee.

No. 05–10–00655–CV.   |   Oct. 19, 2011.   |   Rehearing Overruled Nov. 21, 2011.

**Synopsis**
**Background:** Note holder brought declaratory judgment action against guarantor seeking declaration that guaranty was valid and enforceable, and that guarantor was obligated to pay note holder all expenses, attorney fees, and other costs incurred at all levels of litigation between note holder and guarantor's subsidiary. The 134th Judicial District Court, Dallas County, James M. Stanton, J., granted a declaratory judgment in favor of note holder, and guarantor appealed.

**[Holding:]** The Court of Appeals, O'Neill, J., held that District Court was without jurisdiction to declare guaranty valid.

Judgment vacated.

**Attorneys and Law Firms**

**\*242** Mitchell Madden, Thomas V. Murto, III, The Law Offices of Mitchell Madden, Dallas, TX, for Appellant.

Talmage Boston, Winstead, Secrest & Minick, P.C., Kent B. Pearson, Winstead PC, Nicola Hobeiche, Gregory D. May, Dallas, TX, for Appellee.

Before Justices MORRIS, O'NEILL, and FILMORE.

**OPINION**

Opinion By Justice O'NEILL.

Appellant Transcontinental Realty Investors, Inc. appeals a declaratory judgment granted in favor of Orix Capital Markets, LLC. In three issues, Transcontinental generally contends: (1) the trial court erred in granting declaratory relief because no justiciable controversy existed and because Orix had previously filed, but abandoned, a breach of contract claim raising the same contentions, (2) the declaratory judgment act did not authorize the award of attorneys' fees in this case, and (3) the attorneys' fees award was improper because Orix did not segregate the fees expended on the declaratory judgment claim from fees expended on the abandoned breach of contract claim. For the following reasons, we vacate the trial court's judgment and dismiss the cause.

This suit involves a Guaranty in which Transcontinental guaranteed payment of attorneys' fees Orix expended in a suit against a Transcontinental subsidiary, TCI 9033 Wilshire Boulevard, Inc. (TCI). TCI was the owner of commercial real estate subject to a mortgage loan serviced by Orix. A dispute arose as to whether Orix could require that TCI purchase terrorism insurance. Orix demanded that TCI purchase **\*243** such insurance and TCI refused. Orix then declared the loan in default and began charging interest at the default rate. TCI filed suit for breach of contract and declaratory relief. Orix counterclaimed—also for breach of contract and declaratory relief.

Meanwhile, a third party sought to purchase the TCI property. The mortgage documents required Orix to consent to any sale of the property. Before Orix would consent, it required TCI's parent company, Transcontinental, to guarantee any attorneys' fees that might be awarded to Orix in the TCI litigation, which was to continue. To facilitate the sale, Transcontinental agreed and signed the Guaranty.

Orix ultimately prevailed in the underlying litigation and obtained a judgment against TCI that included $241,380.39 in attorneys' fees as well as appellate costs and fees in the event TCI unsuccessfully appealed. TCI did appeal that judgment. A few months later, while the appeal was pending, Orix filed the instant suit. In its original petition, Orix alleged Transcontinental breached the Guaranty. Specifically, Orix contended that after the TCI judgment was signed, it made a demand upon Transcontinental to "comply with its obligations" under the agreement, but Transcontinental refused to "accept" its responsibilities and indebtedness created under the Guaranty. As damages, it alleged the $241,380.39 that had been awarded, as well as any additional appellate attorneys' fees that might later be incurred in the TCI appeal if Orix prevailed.

Transcontinental answered with a general denial and also asserted the affirmative defense of duress asserting the Guaranty was unenforceable. Transcontinental also filed a motion to abate or stay asserting the trial court should not determine the validity of the Guaranty until the TCI appeal was resolved because no determination could be made as to whether it was liable until Transcontinental's liability was first finally resolved.

Orix responded by amending its petition to abandon its breach of contract claim and replace it with a claim for declaratory relief. In its First Amended Petition, Orix sought a global declaration that the Guaranty was valid and enforceable and that Transcontinental was obligated to pay Orix all expenses, attorneys' fees, and other costs incurred at all levels of litigation of the TCI lawsuit as well as in any separate proceeding.

Orix filed a motion for summary judgment asserting the Guaranty was valid as a matter of law and was not procured by duress. Orix stated it was seeking a determination that Transcontinental was liable for the attorneys' fees ultimately awarded *if* they were affirmed on appeal. It asserted the pendency of the appeal in the underlying judgment should not prevent it from obtaining declaratory relief because it was not seeking to recover any attorneys' fees from the TCI lawsuit yet, but was only seeking a declaration of liability for such fees (and all additional appellate fees in that case) "if and when" the TCI appeal was concluded in Orix's favor. Orix also expressly requested the trial court to "extinguish" all affirmative defenses to the Guaranty. Transcontinental responded to the motion asserting the trial court lacked jurisdiction because whether any controversy about the Guaranty existed was not ripe for review.

The trial court granted declaratory relief declaring the Guaranty "valid and enforceable" to which Transcontinental had "no viable affirmative defense." The court also declared that Transcontinental was obligated to pay all attorneys' fees and costs awarded to Orix in the TCI litigation at all levels. In this appeal, Transcontinental asserts the trial court erred in **\*244** granting declaratory relief because validity of the Guaranty did not present a justiciable issue. We agree.

 **[1]**    A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, or ordinance, contract or franchise and obtain a declaration of rights, status, or other legal relations thereunder. TEX. CIV. PRAC. & REM.CODE ANN. § 37.004(a) (West 2008). The purpose of the Declaratory Judgments Act is "to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." TEX. CIV. PRAC. & REM.CODE ANN. § 37.002(b) (West 2008). It is "remedial" and "is to be liberally construed." *Id.*

 **[2]**    **[3]**    **[4]**    The Declaratory Judgments Act cannot be used to obtain an advisory opinion, which Texas courts lack subject-matter jurisdiction to give. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993). Declaratory judgment is appropriate only when a real controversy exists between the parties and the entire controversy may be determined by the judicial declaration. *Brooks v. Northglen Ass'n,* 141 S.W.3d 158, 163–64 (Tex.2004); *OAIC Commercial Assets, L.L.C. v. Stonegate Village, L.P.,* 234 S.W.3d 726, 745 (Tex.App.-Dallas 2007, pet. denied). The Act does not give a litigant the right to try a case piecemeal. *United Servs. Life Ins. Co. v. Delaney,*

396 S.W.2d 855, 858 (Tex.1965); *SW Airlines Co. v. Tex. High–Speed Rail Auth.,* 863 S.W.2d 123, 125 (Tex.App.-Austin 1993, writ denied).

 **[5]**   **[6]**   **[7]**   Ripeness is a requirement of justiciability. *Perry v. Del Rio,* 66 S.W.3d 239, 249 (Tex.2001); *Patterson v. Planned Parenthood of Houston & Se. Tex., Inc.,* 971 S.W.2d 439, 442 (Tex.1998). The ripeness doctrine conserves judicial time and resources for real and current controversies, rather than abstract, hypothetical, or remote disputes. *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998); *TCI West End, Inc. v. City of Dallas,* 274 S.W.3d 913, 918 (Tex.App.-Dallas 2008, no pet.). The doctrine prohibits suits involving "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Patterson,* 971 S.W.2d at 442. A case is not ripe if its resolution depends on contingent facts or upon events that have yet to come to pass. *See id.* at 443.

 **[8]**   The declaration sought in this case concerned validity of a Guaranty for payment for attorneys' fees awarded to Orix from TCI in underlying litigation. The Guaranty obligated Transamerica to pay these fees to Orix if TCI did not. Because Transcontinental's liability under the Guaranty in this case would arise only if TCI was found liable for attorney's fees, its liability can be compared to liability that arises in indemnity cases. In *Firemen's Insurance Co. v. Burch,* 442 S.W.2d 331, 332 (Tex.1968), the Texas Supreme Court held that a trial court cannot determine a claim for indemnity before liability is established in the underlying case because any such opinion would be purely advisory. *See also State Farm Lloyds v. C.M.W.,* 53 S.W.3d 877, 893 (Tex.App.-Dallas 2001, pet. denied). The Court later limited this holding in *Farmers Texas County Mutual Insurance, Co. v. Griffin,* 955 S.W.2d 81, 84 (Tex.1997), concluding that, under limited circumstances, a claim for indemnity could be litigated while the underlying litigation remained pending. Specifically, the Court held "the duty to indemnify is justiciable before the insured's liability is determined in the liability **\*245** lawsuit when the insurer has the duty to defend *and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify.*" *Griffin,* 955 S.W.2d at 84 (emphasis in original). It reasoned that under those circumstances, "no facts could be developed" in the underlying tort suit that could alter the court's conclusion no duty to indemnify existed. *Id.*

Here, Orix was seeking a general declaration of validity of the Guaranty and lack of viable defenses. Orix pleaded it was entitled to declaratory relief because Transcontinental had failed to "acknowledge" its liability under the Guaranty and because, in response to its abandoned breach of contract claim, it had pleaded duress. It was not seeking guidance with respect to what was then currently required under the Guaranty. Indeed, in oral argument Orix conceded that Transcontinental was not obligated until appeals concluded and admitted it sought declaratory relief to make collection efforts more expedient "*if* and when" the judgment was finally affirmed.

The issue presented in determining justiciability is whether all the facts surrounding the Guaranty and defenses to it were sufficiently developed such that Transcontinental's liability could not have been affected by subsequent events. In its motion for summary judgment, Orix admitted that Transcontinental's liability was triggered "assuming the Final Judgment is affirmed on appeal." It complained Transcontinental did not "acknowledge" its responsibility "in the event" the trial court's judgment is affirmed. Orix thus admits that if the underlying judgment was reversed, the entire proceedings—in the trial court and in this court—would be completely meaningless. Further, the declaration sought—and the declaration given—was that Transcontinental was responsible for any fees awarded in the TCI litigation at all trial and appellate levels. Thus, the trial court declared Transcontinental's liability for fees that had yet to even be expended. Moreover, this case concerned a guarantee of payment for fees TCI incurred and was liable for. Future events could certainly alter TCI's willingness or ability to pay its fees itself. Any such payment by TCI would effect Transcontinental's liability on the Guaranty.

 **[9]** Finally, and perhaps most importantly, Orix's attempt to "extinguish" any defenses to the Guaranty and get a declaration that no defenses existed was not proper. According to Orix's rationale, Transcontinental should be forced to litigate any potential defenses it might have to liability before liability has even been established. A defendant may not use a declaratory judgment to prematurely adjudicate defenses to liability that may not yet exist. *Cf. Calderon v. Ashmus,* 523 U.S. 740, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998) (under federal constitution, party may not use a declaratory judgment to get advance ruling on an affirmative defense); *see also Cohen v. Orthalliance New Image, Inc.,* 252 F.Supp.2d 761, 766 (N.D.Ind.2003) (assessing the success of a defense to a potential claim (breach-of-contract or otherwise) is generally the type of hypothetical question federal courts endeavor to avoid). Not all affirmative defenses depend upon facts that exist at the time of contract formation. Any determination that no defenses could exist would be completely advisory. Even if we could say Transcontinental's answer pleading duress may have put that specific defense in controversy, the declaratory judgment was not intended to permit the piecemeal trial of lawsuits. *Delaney,* 396 S.W.2d at 858. We conclude the trial court had no jurisdiction to declare the Guaranty valid and that Transcontinental had no defenses to **\*246** it. Consequently, we vacate the trial court's judgment and dismiss this cause.

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (3)

### Direct History (2)

🚩 1. Orix Capital Markets, LLC v. Transcontinental Realty Investors, Inc.
2010 WL 2024918 , Tex.Dist. , Apr. 26, 2010

*Judgment Vacated, Cause Dismissed by*

2. Transcontinental Realty Investors, Inc. v. Orix Capital Markets, LLC 👓
353 S.W.3d 241 , Tex.App.-Dallas , Oct. 19, 2011 , rehearing overruled ( Nov 21, 2011 ) , review denied ( Mar 02, 2012 )

### Related References (1)

3. Orix Capital Markets, LLC v. Transcontinental Realty Investors, Inc.
2009 WL 6490081 , Tex.Dist. , Dec. 15, 2009

411 S.W.3d 42
Court of Appeals of Texas,
Houston (1st Dist.).

TRITON 88, L.P. f/k/a Triton 88, L.L.C. and Triton 2000, L.L.C., Appellants
v.
STAR ELECTRICITY, L.L.C. d/b/a Startex Power, Appellee.

No. 01–10–00601–CV. | Aug. 13, 2013.

**Synopsis**

**Background:** Retail electricity provider (REP) brought action against commercial electric customer for breach of electric services agreement (ESA) and quantum meruit. The District Court, Harris County, Patricia J. Kerrigan, J., entered summary judgment in favor of provider, granted provider's motion for a turnover order, and appointed a receiver. Customer appealed.

**Holdings:** The Court of Appeals, Evelyn V. Keyes, J., held that:

[1] REP conclusively established its right to recover over $105,000 from customer for breach of ESA;

[2] customer was not excused from performance of ESA by REP's use of estimated billing;

[3] it was impossible to determine the actual harm that would have been caused to REP by customer's early termination, as required for liquidated damages clause to be enforceable;

[4] when viewed as of the time the ESA was executed, ESA's method for calculating liquidated damages was reasonable;

[5] early termination fee in ESA did not violate statute;

[6] attorney's affidavit in support of attorney fees award was sufficient to support claims such that REP was entitled to statutory presumption that fees were reasonable; and

[7] excessive demand exception to REP's statutory right to attorney fees did not apply.

Affirmed.

**Attorneys and Law Firms**

**\*46** Anthony L. Laporte, Benjamin C. Wilson, Kent M. Hanszen, Hanszen Laporte, L.L.P., Houston, TX, for Appellants.

Joshua Huber, Rodney Lee Drinnon, Ronald Edward Wright, Jr., Drinnon & Wright, PLLC, Houston, TX, for Appellee.

Panel consists of Justices KEYES, SHARP, and HUDDLE.

## OPINION

EVELYN V. KEYES, Justice.

Appellants, Triton 88, L.P. *f/k/a* Triton 88, L.L.C. and Triton 2000, L.L.C. (collectively, "Triton"), appeal the trial court's grant of summary judgment and a receivership order entered in favor of appellee, Star Electricity, L.L.C. *d/b/a* StarTex Power ("StarTex"). Triton presents fourteen issues for appellate consideration. In its first seven issues, Triton argues that (1) the trial court erred in granting summary judgment in favor of StarTex on its breach of contract claim because (2) the trial court misinterpreted and misapplied the law applicable to the claims and defenses asserted by the parties; (3) StarTex's summary judgment evidence did not establish that it was entitled to judgment as a matter of law on its breach of contract claim; (4) Triton's summary judgment evidence raised genuine issues of material fact as to one or more elements of StarTex's breach of contract claim; (5) genuine issues of material fact existed as to Triton's claims for offset and credit based on StarTex's use of improper and incorrect billing and StarTex's use of estimated billing; (6) genuine issues of material fact existed as to StarTex's billing practices and procedures and whether those procedures constituted a breach by StarTex of the parties' contract; and (7) genuine issues of material fact existed regarding whether Triton objected **\*47** to StarTex's billing practices and procedures and to invoices submitted to Triton by StarTex and whether StarTex failed to fulfill its legal obligations for handling such complaints.

Triton further argues that (8) StarTex's failure to comply with the legal requirements for handling complaints concerning retail electric service and Triton's pending complaint against StarTex before the Texas Public Utility Commission acted to stay the judgment and enforcement of the judgment. Triton attacks the trial court's damages award, arguing that the trial court erred in awarding StarTex (9) liquidated damages pursuant to the early termination provisions in the contract because such an award constitutes an impermissible and unenforceable penalty; (10) early termination fee damages based on unidentified and unproven monthly billings; (11) early

termination fee damages based on estimated billing and billings for periods outside the term of the contract that Triton allegedly terminated early; and (12) attorney's fees because the fees awarded were excessive and unreasonable, were for legal services not proven to be necessary, and were not properly proven by the summary judgment evidence. Finally, Triton appeals the order of the trial court appointing a receiver, arguing that (13) the trial court erred in appointing a receiver and ordering Triton to turn over to the receiver confidential records and all proceeds and revenue generated by Triton's businesses and that (14) Triton is entitled to immediate relief from the order appointing a receiver and is entitled to recover all records and revenue turned over pursuant to the order, including all funds that have been disbursed, paid, relinquished, distributed, or in any way disposed of by the receiver.

We affirm.

## Background

Texas deregulated its electric utility market beginning in 1999. *See* TEX. UTIL.CODE ANN. § 39.051(a) (Vernon 2007) ("On or before September 1, 2000, each electric utility shall separate from its regulated utility activities its customer energy services business activities that are otherwise also widely available in the competitive market."); *Tex. Indus. Energy Consumers v. CenterPoint Energy Houston Elec., LLC,* 324 S.W.3d 95, 97 (Tex.2010). The Utilities Code provides that electric utilities must separate their business activities from one another into three units: (1) a power generation company; (2) a retail electric provider; and (3) a transmission and distribution utility. TEX. UTIL.CODE ANN. § 39.051(b).

Retail electric providers, like StarTex, essentially buy electricity from a transmission and distribution utility and resell it to Texas consumers. *See AEP Tex. N. Co. v. Pub. Util. Comm'n of Tex.,* 297 S.W.3d 435, 439 (Tex.App.-Austin 2009, pet. denied) (citing Tex. Util.Code Ann. § 39.051). The transmission and distribution utility's rates are still regulated by the Texas Public Utility Commission ("PUC"). *Tex. Indus. Energy Consumers,* 324 S.W.3d at 97. Transmission and distribution utilities provide metering services, charge retail electric providers for "nonbypassable delivery charges" under rates approved by the PUC, and may also bill retail customers directly at the request of the retail provider. *Id.* at 97–98. Thus, Texas's electric utilities have "voluntarily interconnected their transmission systems" to form a single grid managed by the Electric Reliability Council of Texas ("ERCOT"). *Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio,* 53 S.W.3d 310, 312 (Tex.2001). Electricity is produced by a generating facility, transmitted to a point of interconnection with the ERCOT grid, **\*48** and then distributed to end users who purchase it from retail electric providers.

It is in this context that Triton, as owner of five commercial buildings, entered into an Electric Services Agreement ("ESA") in May 2006 with StarTex, a retail electricity provider. StarTex agreed to supply Triton with electricity, and Triton agreed to pay at a fixed rate for a term of twelve months. Regarding invoicing and payment, the ESA provided that

> [StarTex] shall render to Customer [Triton] on a monthly basis, or as mutually agreed by [StarTex] and Customer but not less frequent than monthly, an invoice that is due and payable fifteen (15) days from the date of the invoice. If the payment of all undisputed amounts is not received by the due date, Customer will be charged a late fee equal to five percent (5%) of the past due amount. Customer must provide to [StarTex] written notice setting forth in particular detail any disputed amount, including the calculations with respect to any errors or inaccuracies claimed. If it is subsequently determined that Customer owes [StarTex] any portion of the disputed amount, Customer shall remit to [StarTex] within five (5) business days following such resolution the outstanding balance plus interest .... Any amounts that may have been overpaid or underpaid shall be applied to the next monthly invoice.

The ESA also contained the following language:

**Early Termination Fee.** In the event that Customer terminates this agreement or Customer defaults as described [below], then an Early Termination Fee will be assessed. The Early Termination Fee shall be equal to the greater of a) the three months highest bills for Customer or b) any mark to market costs. For purposes of this fee the mark to market costs shall be calculated by multiplying the difference between the initial cost of power procured to satisfy the ESA and the final net liquidated value of said power at the time of termination by the total amount of power procured from the Customer Location for the remainder of the original term of the ESA....

....

**Customer Acknowledgments.** Customer acknowledges that [StarTex's] ability to invoice Customer is dependent on the [transmission and distribution provider (TDSP) ]'s or ERCOT's ability to furnish [StarTex] all necessary information including meter readings or recorded data, as applicable. In the absence of such information from the TDSP or ERCOT, [StarTex] may invoice Customer based on estimated meter reading according to the Usage Profile. As soon as practical, and after receipt of Customer's Energy Consumption and settlement charges from the TDSP and/or ERCOT, [StarTex] will reconcile on the next invoice any difference(s) between estimated and actual consumption and settlement charges.

....

**Event of Default.** An Event of Default occurs upon:

    a. failure of Customer to pay amounts due under the ESA within 5 business days of receipt of written notice of payment due;

    b. failure of either Party to perform a material term of this ESA[.]

    ....

In April 2007, Triton and StarTex extended their agreement, under modified terms, for another twelve months ("First Amendment"). Triton elected to replace the fixed-rate pricing schedule with the Market Clearing Price of Energy **\*49** ("MCPE"). The First Amendment provided:

1. PRICE FOR ENERGY: The term for this Amendment shall commence upon the Customer's normal meter read during the month of May 2007, and continue through the Customer's normal meter read during the month of May 2008. Customer agrees to purchase electricity from STARTEX at a variable rate based on the Electric Reliability Council of Texas ("ERCOT")'s Balancing Energy price ("Contract Price") for the Congestion Zone in which the Customer's location resides. The price calculated by ERCOT in the market for Balancing Energy is referred to as the Market Clearing Price for Energy ("MCPE") in the ERCOT protocols....

2. Except as herein changed and amended, the Agreement [ESA] shall remain in full force and effect as written. Any changes made in this Amendment that are disputed by Customer will be replaced by the original Agreement's terms and conditions.

In 2008, the parties again extended their agreement under the MCPE pricing terms for a term of thirty-six months ("Second Amendment"). The Second Amendment contained language identical to that in the First Amendment, except that the term of the Second Amendment commenced "upon the Customer's normal meter read during the month of May 2008 and continued through the Customer's normal meter read during the month of May 2011."

Triton objected to some of StarTex's billing practices. This eventually led to Triton's terminating its contract with StarTex in October 2008 and seeking electricity from a different retail electricity provider.

On September 14, 2009, StarTex filed suit against Triton alleging breach of contract, and, in the alternative, suit on a sworn account and quantum meruit. StarTex asserted that Triton owed it $319,094.11, consisting of unpaid utility service and contractual fees, interest, and liquidated damages. StarTex also sought attorney's fees under Civil Practice and Remedies Code chapter 38. StarTex attached to its petition an affidavit from Robert Verhage, its Collections Manager,

copies of the ESA and First and Second Amendments, copies of its unpaid invoices, and a claim presentment letter from its counsel to Triton demanding payment of the unpaid amounts.

On October 12, 2009, Triton answered. Triton generally denied StarTex's allegations and asserted that the liquidated damages provision was invalid and unenforceable and that the attorney's fees sought were not reasonable and necessary.

Triton also asserted that

> the account on which [StarTex] sues ... is not just and true, and all just and lawful offsets, payments, and credits have not been applied to [Triton's] account. [Triton] does not owe [StarTex] $319,094.11 in damages, because [StarTex] seeks to recover $197,323.95 in damages based on an invalid liquidated damages provision. Furthermore, based on the inaccuracies in [StarTex's] billing and estimates since 2007, [Triton] also challenge[s] [StarTex's] allegation that [it owes] $105,034.18 to [StarTex] for services rendered.

Attached to its answer, Triton provided the affidavit of Bill Bird, who averred:

> I am responsible for and have knowledge of Triton's business dealings with Plaintiff [StarTex]. Triton began doing business with Plaintiff in 2006. In the summer of 2007, Plaintiff began providing usage estimates to Triton, which reflected very high usage. Triton brought this issue to Plaintiff's attention, and the **\*50** issue was not resolved. Triton contests the validity of Plaintiff's account, and denies that it owes $105,034.18 to Plaintiff for services rendered.

On January 20, 2010, StarTex moved for summary judgment on its breach of contract claim. StarTex argued that the parties had a valid contract and that the First and Second Amendments of the contract required Triton to pay for the electricity received under the MCPE pricing schedule through May 2011. Copies of the ESA and First and Second Amendments were attached as summary judgment evidence. StarTex stated that "[t]he MCPE is a variable rate plan wherein the price changes every fifteen (15) minutes to reflect the supply and demand for power in a particular market."

StarTex argued,

> Due to the numerous price changes involved in an MCPE contract, StarTex had to customize its purchase to fit the particular consumption needs of Triton. Every customer's consumption needs differ, and StarTex must carefully time its purchases so that it has sufficient power for the customer during their peak usage hours and so that it does not over-purchase during down times. This is

referred to in the industry as the "shape" of a particular customer, and like a fingerprint, no two customers have an identical "shape." Triton's meters are located at commercial office buildings, and therefore, the "shape" of StarTex's purchase was designed to accommodate heavy usage from the hours of 8:00 a.m. to 5:00 p.m., with a slight decrease during the lunch hour, and minimal usage for the remaining hours of the day. Therefore, in order to service Triton's Contract, not only did StarTex commit to purchase sufficient power to cover the life of the Contract, but it also committed to make purchases every fifteen (15) minutes that mirror the kWh used by Triton during each fifteen (15) minute interval.

This argument was supported by the affidavit of Stephen Madden, the Senior Vice–President of Supply for StarTex.

StarTex asserted that it provided power to Triton throughout the term of the contract and submitted invoices to Triton "based on meter reads performed by CenterPoint Energy ("CenterPoint"), the Transmission and/or Distribution Services Provider ("TDSP") for the Houston area." StarTex further argued that:

On several occasions, StarTex was required to generate [Triton's] monthly invoice using estimated reads based on historical usage. This was a result of CenterPoint being unable to gain access to [Triton's] meters to obtain the actual usage amounts. All such estimated reads were reconciled on subsequent invoices once CenterPoint obtained access to the meters, such that the final invoice reflected only actual usage. All estimated reads and subsequent reconciliations were detailed on [Triton's] monthly invoices.

StarTex provided invoices and the affidavit of Robert Verhage, the Director of Credit and Collections for StarTex, substantiating these arguments. Verhage averred that the invoices attached as summary judgment evidence were true and correct copies of Triton's monthly invoices. Verhage testified that, after Triton terminated the ESA on approximately October 19, 2008, "StarTex generated one final invoice that contained the final, outstanding balance that was reconciled to correct all estimated reads." The final invoice reflected that Triton owed $155,034.18, and Verhage averred that Triton subsequently made $50,000.00 in payments, leaving $105,034.18 due and owing. Thus, StarTex argued that Triton breached the ESA **\*51** when it failed to pay for $105,034.18 worth of electricity provided under the ESA and subsequent amendments.

StarTex also asserted that Triton breached the ESA when it terminated the ESA early. StarTex stated in its motion, and Madden averred in his affidavit, that when StarTex entered into the Second Amendment extending the terms of the ESA through May 2011, it contracted with the electricity producer "to purchase enough power to service the entire thirty-six (36) month term of the Second Amendment and the purchases were tailored to fit Triton's particular 'shape'." Thus, the ESA

contained a liquidated damages clause for early termination of the contract which entitled StarTex to $197,323.95 in liquidated damages after Triton unilaterally terminated the contract on October 10, 2008, approximately thirty-one months before the contract term was set to expire in May 2011.

StarTex argued, based on Madden's statements in his affidavit, that this early termination clause was a valid liquidated damages provision because, "[i]n the case of an MCPE contract, it is impossible to calculate the total damages that stem from an early termination until the term of the breached contract has expired and StarTex has been able to complete its attempts at mitigating the damages." StarTex argued that it "must continue to purchase Triton's power from its supplier until May of 2011" and that it was required to "purchase this power in Triton's particular 'shape' " even though StarTex did not have another customer to sell it to because StarTex "would have to find a new customer who not only wants an MCPE contract, but has the exact same term and volume requirements and 'shape' as Triton." StarTex thus calculated its liquidated damages as $197,323.25, based on the sum of Triton's three highest monthly bills because the mark-to-market losses were incapable of calculation until May 2011.

Finally, StarTex argued that it was entitled to attorney's fees on its breach of contract claim. It argued that, under its fee agreement with its counsel, it would incur attorney's fees "in an amount equal to twenty-five percent (25%) of all amounts recovered from [Triton]," or $75,589.36, and that this amount was reasonable and necessary. The summary judgment motion was accompanied by the affidavit of Rodney Drinnon, counsel for StarTex, who averred to the specific services provided by his firm and stated that the services described were reasonable and necessary and that "twenty-five percent (25%) is a reasonable contingency fee for the services provided."

On January 28, 2010, Triton amended its answer, adding claims that StarTex "materially breached the contract, which was modified by agreement," that Triton "complied with the terms of the modified contract," that Triton was "discharged from performing under the contract after [StarTex] materially breached same," and that StarTex failed "to mitigate its damages as required under applicable law, limitation of warranty, limitation of liability, laches, and waiver." Triton also sought a continuance of the summary judgment hearing, which the trial court granted.

On April 5, 2010, Triton responded to StarTex's summary judgment motion. Triton did not contest StarTex's statements that the ESA and subsequent amendments were valid contracts. However, Triton asserted that StarTex "made several promises to [Triton] and [orally] modified the terms of the parties' agreements." Triton argued that Michael Gary, Triton's property manager, "had several discussions with John Bejger, a representative of StarTex, relating to StarTex's estimated usage and Triton's disputes over **\*52** the StarTex invoices." As supported by Gary's affidavit in Triton's summary judgment evidence, Gary represented to Bejger that the practice of estimating electricity usage for several consecutive months was causing damage to Triton because Triton could not bill its tenants based on estimated billing. Gary also averred that Triton had "done everything

in its power" to give CenterPoint access to the meters and that Triton would not continue the business relationship with StarTex "if the estimations and errors in billing continued on a month to month basis." Gary further averred that Bejger represented that the errors would be corrected, that StarTex was attempting to resolve the allegations that CenterPoint did not have access to Triton's meters, and "that StarTex's previous practice of estimating usage of consecutive months would not continue." Gary stated that Triton entered into the Second Amendment based on these representations by Bejger. Triton's response asserted that Gary's affidavit about his discussions with Bejger raised a disputed issue of material fact as to whether there was a meeting of the minds in reaching a valid modification.

Triton also argued that it was excused from performing under the ESA based on StarTex's material breach of the agreements "when it failed to provide [Triton] with accurate and correct billings for the electricity that it actually delivered." Triton's motion referenced the invoices sent by StarTex and provided details regarding which specific invoices were based on estimated usage, including several instances in which it was invoiced based on estimated usage in consecutive months.

Triton presented Gary's affidavit, averring that Gary first contacted StarTex to resolve the billing problems during the original term of the ESA and that StarTex responded by saying that CenterPoint could not access and read the electricity meters in Triton's buildings. Triton included in its summary judgment evidence various e-mails between Gary and StarTex in which Gary raised questions and disputes over the amounts billed in the invoices and StarTex provided information reconciling its charges. Gary's e-mails did not contain any specific calculations or amounts with regard to the alleged errors or inaccuracies. StarTex's e-mail reflects that it sent Triton a spreadsheet demonstrating how StarTex reconciled the bills and comparing Triton's usage and rates. Triton also included an e-mail from CenterPoint to StarTex, received in response to StarTex's inquiry regarding the difficulty of getting actual meter readings. The CenterPoint representative stated,

> I disagree that CenterPoint is at fault for the estimations. Triton does not provide us unencumbered, permanent, ongoing access to our meters. The estimation reasons are specific to each address, but on some accounts Triton has their meters locked inside a mechanical room to which we're supposed to go track down an employee and a key, apparently unsuccessfully at times, perhaps because the right employee can't be found. On other accounts, we're supposed to enter through a locked gate where the gate code we have on record has been changed. Triton has a responsibility to keep us updated if access arrangements change.

Triton's summary judgment evidence also included the affidavit of Jim Phillips, the Vice President of IEA Engineering, an energy engineering company. Phillips stated that he reviewed StarTex's billing invoices and Triton's historical electricity usage. He averred that he found

various and repeated errors and irregularities in the billings for the Triton **\*53** buildings. These errors include, without limitation:

• several errors in math (multiplication of energy consumption by the cost of energy);

• excessive estimated energy readings;

• estimated energy readings at one site (meter) while the next site (meter) was actually read in the same month, again repeatedly;

• three meters had a monthly load factor greater than 100%, which is an impossibility (LF is the maximum demand used over hours of the month—over 100% is more hours than in that month);

• several examples where the ending energy reading of one month did not match the beginning reading of the next month;

• energy costs are not consistent across meters in the same month;

• multiple corrections from earlier months' estimated energy reading make analysis difficult; and

• it is improbable that back to back months would have the same exact energy consumption readings and that demand would remain the same for several months in a row.

Phillips provided his opinion about other errors and problems with StarTex's billing practices, without providing specific contested amounts, and concluded:

> In summary, the total value of the errors I analyzed came to almost $97,000.00. This is not an inclusive value and with additional time to review the invoices and billing, this amount should significantly increase. The numbers and values I used assume that StarTex's numbers were correct; however, I found that some of these numbers and values were not correct when compared to each other. To this amount and the other uncalculated errors, taxes must be added since they are a percentage of the energy and [TDSP] charges. The error value is therefore compounded.

Thus, Triton argued that it "created a fact issue on each element of [its] affirmative defense" of prior material breach and that it raised a fact issue regarding whether StarTex conclusively proved the proper amount of damages.

WestlawNext® © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Triton further responded to StarTex's summary judgment motion by arguing that StarTex violated the ESA "by estimating Triton's electricity usage for no apparent justifiable reasons" and by estimating Triton's usage over consecutive months.

Triton also argued that summary judgment on the liquidated damages issue was not proper "because (1) a reasonable basis for estimating just compensation in an event of default does exist under the circumstances, and (2) there are factual issues that must be resolved before the legal question of liquidated damages is determined." Finally, Triton argued that StarTex was not entitled to recover attorney's fees because it "made an excessive demand on [Triton] before filing its lawsuit."

Triton also objected to Drinnon's affidavit, arguing that it "wholly fails to describe the time that was required and expended in prosecuting [StarTex's] claim, the hourly rate usually charged by [StarTex's] counsel, the novelty and difficulty of the questions involved in this lawsuit, and the skill required to perform the legal service properly under the circumstances." Triton also objected because Drinnon's affidavit was not supported by any documents other than the engagement letter.

On April 13, 2010, StarTex replied to Triton's response. StarTex presented the affidavit of John Bejger, contesting Gary's representations that the parties entered **\*54** into an oral modification of their agreement. StarTex also argued that, "because the TDSP [CenterPoint], not StarTex, is solely authorized by the State of Texas to provide actual and estimated readings [,] Bejger would not have made" any representations regarding discontinuing the use of estimated meter readings in the monthly invoices. Finally, StarTex argued that the parties entered into the Second Amendment after the alleged oral representations and thus Triton's argument that Texas law allows modification of a written agreement by later oral representations was inapplicable.

StarTex also argued that it did not breach the ESA. Specifically, StarTex argued that Phillips, Triton's energy engineer expert, did not specifically identify any breach by StarTex. StarTex argued that it was permitted by the ESA and Texas law to bill Triton based on estimated usage; that, under the terms of the ESA, it is irrelevant why CenterPoint provided Triton's estimated usage rather than actual usage; and that Triton did not follow the contractual provisions requiring it to pay undisputed portions of the invoice and to set forth in detail "calculations with respect to any errors or inaccuracies claims."

StarTex again argued that the liquidated damages provision was enforceable. Finally, StarTex argued that its original demand to Triton was not excessive, and thus that ground did not preclude it from recovering attorney's fees.

On April 16, 2010, following the summary judgment hearing, Triton filed its "Supplemental Response" to StarTex's summary judgment motion. StarTex objected to the supplemental response

and asked the trial court to strike it from consideration because it was filed outside the time permitted by Texas Rule of Civil Procedure 166a and without leave of the trial court. Triton also objected to the affidavit of John Bejger, attached to StarTex's reply to Triton's response.

On April 26, 2010, the trial court granted StarTex's motion. The trial court's order stated that it considered "the Motion, the response, the pleadings, the affidavits, other evidence on file with the Court, and arguments of counsel." The trial court awarded StarTex $105,034.18 "as actual damages for [Triton's] failure to pay for electricity provided by [StarTex]." The trial court awarded StarTex $197,323.25 "as liquidated damages for [Triton's] early termination of the [ESA]." Finally, the trial court awarded StarTex $12,000 as reasonable and necessary attorney's fees, as well as additional attorney's fees conditioned on an unsuccessful appeal by Triton.

On May 12, 2010, StarTex moved for a turnover order.

On May 25, 2010, Triton moved for reconsideration or a new trial. Triton supported this motion with new affidavits from Jim Phillips, Michael Gary, and Montague Morgan, attorney for Triton, who attempted to authenticate documents attached to Phillips' affidavit. StarTex objected to and moved to strike these affidavits on the ground that Triton did not timely file them and on the ground that Gary's affidavit was not based on his personal knowledge and was made in bad faith. The trial court granted StarTex's motion and struck the affidavits of Phillips, Gary, and Morgan that were attached to Triton's motion for new trial. [1]

**\*55** On June 21, 2010, the trial court denied Triton's motion for reconsideration/new trial and stated that it did not consider the stricken affidavits. On July 6, 2010, the trial court signed a modified order stating:

> On this day, after hearing [Triton's] Motion for Reconsideration/New Trial ("Motion"), the Court, relying solely [on] the summary judgment evidence on file, arguments of counsel and without considering the stricken, untimely supplement filed by [Triton], is of the opinion that [Triton's] Motion should be, in all things, DENIED.

> It is therefore ORDERED, ADJUDGED and DECREED that [Triton's] Motion is denied and that the Court's order of April 26, 2010, granting Plaintiff's Traditional Motion for Summary Judgment is hereby, in all things, REAFFIRMED.

On July 28, 2010, the trial court signed an order granting StarTex's motion for a turnover order and appointing a receiver. On September 9, 2010, the trial court signed another order requiring the receiver to pay to StarTex as the judgment creditor the balance of the rents collected during his receivership and any rents collected in the future until the full amount of the judgment is paid.

## Summary Judgment

### A. Standard of Review

**[1]** **[2]** **[3]** **[4]** **[5]** We review the trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). The movant must establish that no material fact issue exists and that it is entitled to judgment as a matter of law. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich,* 28 S.W.3d 22, 23 (Tex.2000). Thus, for a plaintiff to prevail on its motion for summary judgment, it must show that it is entitled to prevail on each element of its cause of action. *Hourani v. Katzen,* 305 S.W.3d 239, 248 (Tex.App.-Houston [1st Dist.] 2009, pet. denied) (citing *MMP, Ltd. v. Jones,* 710 S.W.2d 59, 60 (Tex.1986)). Only if the movant conclusively establishes its cause of action does the burden shift to the nonmovant to respond to the summary judgment. *Willrich,* 28 S.W.3d at 23. When reviewing a motion for summary judgment, we take the nonmovant's evidence as true, indulge every reasonable inference in favor of the nonmovant, and resolve all doubts in favor of the nonmovant. *Id.*

In its first through seventh issues, Triton argues that the trial court erred in granting summary judgment in favor of StarTex on its breach of contract claim. The trial court awarded StarTex summary judgment on both grounds of StarTex's breach of contract claim against Triton: that Triton breached (1) by failing to pay the invoices for electricity provided and (2) by wrongfully terminating the contract early.

### B. Summary Judgment on StarTex's Breach of Contract Claim for Triton's Failure to Pay for Invoiced Electricity

In its first and second issues, Triton argues that the trial court erred in granting summary judgment because it misinterpreted and misapplied the law applicable to StarTex's breach of contract claim and to Triton's defenses. In its third issue, Triton argues that StarTex's summary **\*56** judgment evidence did not establish that it was entitled to judgment as a matter of law.

**[6]** **[7]** To prevail on a breach of contract claim, a plaintiff must prove: (1) the existence of a valid contract; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of contract; and (4) the plaintiff's damages as a result of the breach. *Prime Prod., Inc. v. S.S.I. Plastics, Inc.,* 97 S.W.3d 631, 636 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). The interpretation or construction of an unambiguous contract is a matter of law to be determined by the court. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex.2003). Thus, StarTex had to conclusively establish that a valid contract existed between it and Triton, that it performed under that contract, that Triton breached the contract, and that StarTex suffered damages as a result of Triton's breach.

### *1. Evidence Establishing Elements of StarTex's Claim*

Attached to its summary judgment motion, StarTex included copies of the ESA and First and Second Amendments. Neither party disputes that these documents constitute a valid contract between them.

StarTex also provided summary judgment evidence, including multiple invoices and the affidavits of two corporate representatives, that it provided electricity to Triton. Triton does not dispute that StarTex provided it with electricity up until Triton terminated the ESA.

StarTex provided invoices and affidavits demonstrating that Triton owed $105,034.18 under the unpaid invoices. The account summary on the final invoice showed that Triton owed $155,034.18 as of November 15, 2008. Verhage's affidavit testimony provided that Triton subsequently made $50,000.00 in payments, leaving $105,034.18 due and owing.

 **[8]**   We conclude that StarTex conclusively established its right to recover $105,034.18 from Triton for Triton's breach of contract by failing to pay the invoices. Thus, the burden shifted to Triton to respond to the motion for summary judgment and present evidence raising a fact issue on at least one of the elements of StarTex's claim or to present a valid defense. *See Willrich,* 28 S.W.3d at 23.

### *2. Triton's Response*

In its fourth issue, Triton argues that it presented summary judgment evidence controverting StarTex's evidence and raising genuine issues of material fact as to one or more elements of StarTex's breach of contract claim. Triton does not dispute that StarTex provided electricity to its buildings throughout the term of the contract up until Triton terminated the agreement. Neither does Triton dispute that it did not pay amounts invoiced by StarTex for the electricity provided. However, Triton disputes (1) the terms of the contract as presented by StarTex, alleging that the parties orally modified their agreement; (2) StarTex's satisfactory performance under the contract and its own excuse from performance by StarTex's prior material breach; (3) the sufficiency of StarTex's evidence to support the amount of damages awarded by the trial court; and (4) the trial court's implicit determination that it was not entitled to any offsets or credits.

### *(a) The alleged oral modification of the contract*

Triton argues that, according to Gary's affidavit testimony, the agreement between the parties was orally modified by representations Bejger made prior to execution of the Second Amendment that invoices based on estimated usage would no longer be used. Gary testified that he **\*57** represented

to Bejger that the practice of estimating electricity usage for several consecutive months was causing damage to Triton because Triton could not bill its tenants based on estimated billing and that Triton would not continue the business relationship with StarTex if it continued to use estimations and make errors in the monthly invoices. Gary averred that Bejger represented that the errors would be corrected, that StarTex was attempting to resolve the allegations that CenterPoint did not have access to Triton's meters, and "that StarTex's previous practice of estimating usage of consecutive months would not continue." Gary stated that Triton entered into the Second Amendment based on these representations by Bejger. Thus, on appeal, Triton argues that it agreed to the Second Amendment "only after receiving assurances that the billing errors and repeated use of estimated billing would be addressed and corrected by [StarTex]."

 **[9]**   **[10]**   A written agreement not required by law to be in writing may be modified by a later oral agreement. *Double Diamond, Inc. v. Hilco Elec. Coop., Inc.,* 127 S.W.3d 260, 267 (Tex.App.-Waco 2003, no pet.); *Mar–Lan Indus., Inc. v. Nelson,* 635 S.W.2d 853, 855 (Tex.App.-El Paso 1982, no writ). However, this principle does not apply here. The statements Gary related in his affidavit as being made by Bejger and orally modifying the contract were made before the parties entered into the Second Amendment. Thus, the statements Triton asserts as oral modifications are, at most, extraneous evidence of negotiations prior to entering a written contract, which constitutes parol evidence. [2]

 **[11]**   **[12]**   **[13]**   "An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 450 (Tex.2008). Whether a contract is ambiguous is a question of law. *Id.* at 451. We may not use extrinsic evidence to contradict or vary the meaning of the explicit language of a written contract. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 521 (Tex.1995).

 **[14]**   Here, the Second Amendment expressly provided that, except for the extension of the term of the contract and the pricing scheme outlined in paragraph one, the ESA "shall remain in full force and effect as written." This includes the "Customer Acknowledgments" section of the ESA, which expressly stated that StarTex's "ability to invoice Customer is dependent on the [TDSP's] ability to furnish ... meter readings" and that StarTex "may invoice Customer based on estimated meter reading." As matter of law, we conclude that the Second Amendment is not ambiguous. It extended the terms of the ESA, including the express provision allowing StarTex to invoice Triton based on estimated meter readings, to the new 36–month term.

Triton failed to establish that the parties orally modified the contract.

### *(b) Triton's entitlement to be excused from performing under the contract*

Triton also argues it was excused from performance under the ESA and the subsequent **\*58** amendments by StarTex's prior material breach.

 **[15]**    **[16]**    "[T]he contention that a party to a contract is excused from performance because of a prior material breach by the other contracting party is an affirmative defense...." *See City of The Colony v. N. Tex. Mun. Water Dist.,* 272 S.W.3d 699, 746 (Tex.App.-Fort Worth 2008, pet. dism'd).* The burden of proving an affirmative defense is on the party asserting it. *See Am. Petrofina, Inc. v. Allen,* 887 S.W.2d 829, 830 (Tex.1994). Thus, Triton had to present evidence raising a fact question on each element of its defense to defeat StarTex's motion for summary judgment. *See id.* (holding, where "response was in the nature of an affirmative defense," that party asserting defense "could only have defeated summary judgment with sufficient evidence to raise a fact question for each of the elements" of defense).

 **[17]**    **[18]**    **[19]**    "It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co. v. Driver Pipeline Co.,* 134 S.W.3d 195, 196 (Tex.2004). A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform. *Henry v. Masson,* 333 S.W.3d 825, 835 (Tex.App.-Houston [1st Dist.] 2010, no pet.). The materiality of a breach—the question of whether a party's breach of a contract will render the contract unenforceable—generally presents a dispute for resolution by the trier of fact. *Id.* Here, however, because we determine that StarTex's actions did not breach the contract as a matter of law, we need not consider whether Triton raised a fact issue on materiality.

 **[20]**    To raise a material fact issue on every element of its affirmative defense, Triton had to raise a fact question on StarTex's prior breach of contract. Triton argues that StarTex's use of estimated billing was not proper under the contract because StarTex did not establish that the conditions precedent to using estimated billing had occurred because StarTex did not prove that CenterPoint was unable to access Triton's meters.

The ESA provides:

> **Customer Acknowledgments.** Customer acknowledges that [StarTex's] ability to invoice Customer is dependent on the [transmission and distribution provider (TDSP)]'s or ERCOT's ability to furnish [StarTex] all necessary information including meter readings or recorded data, as applicable. In the absence of such information from the TDSP or ERCOT, [StarTex] may invoice Customer based on estimated meter reading according to the Usage Profile. As soon as practical, and after receipt of Customer's Energy Consumption and settlement charges from the

TDSP and/or ERCOT, [StarTex] will reconcile on the next invoice any difference(s) between estimated and actual consumption and settlement charges.

Thus, the plain, unambiguous language of the ESA provided that StarTex could invoice Triton based on estimated usage in the absence of actual meter readings or other necessary information from CenterPoint, the TDSP. This contract provision is consistent with the legislatively mandated division of business activities in the electric utility market. *See* TEX. UTIL.CODE ANN. § 39.051(b) (providing that electricity utilities must separate their business activities into three units —power generation company, retail electric provider, and transmission and distribution utility); *Tex. Indus. Energy Consumers,* 324 S.W.3d at 97–98 **\*59** (observing that transmission and distribution service providers are responsible for providing metering services).

StarTex provided the affidavit of Robert Verhage, who averred that, on several occasions, it had to rely on estimated usage because CenterPoint did not provide Triton's actual meter usage. The summary judgment evidence also contained an e-mail from a CenterPoint representative stating that Triton was to blame for CenterPoint's failure to obtain actual meter readings. This e-mail shows that CenterPoint acknowledged that it provided StarTex with estimated usage rather than actual readings on several occasions and that StarTex was not at fault for CenterPoint's inability to access and read the meters.

The ESA expressly permits invoicing based on estimated usage. Triton did not present any summary judgment evidence that StarTex used estimates in its invoices on occasions when CenterPoint had provided actual meter readings. Thus, this argument is without merit.

**[21]** Triton also argues that, even if StarTex was permitted to use estimates in invoicing Triton for its electricity usage, StarTex was required to reconcile any charges based on estimated usage on the next bill. However, the plain language of the contract provides that StarTex must reconcile the estimated usage with the actual usage "[a]s soon as practical, and after receipt of Customer's Energy Consumption and settlement charges from the TDSP." Triton's argument that the actual usage was required to be reconciled on the next month's bill is not supported by the plain language of the contract.

Therefore, we conclude that Triton has not raised a fact issue on any element of its claim that StarTex committed a prior material breach of the contract.

### *(c) StarTex's alleged failure to prove damages*

In its fifth, sixth, and seventh issues, Triton argues that the invoices relied on by StarTex in establishing the amount of damages were inadequate estimates and were properly objected to and disputed by Triton. Thus, Triton argues that StarTex failed to prove its damages as a matter of law.

StarTex acknowledges that it used estimates in some of its bills, and we have already concluded that it was permitted to do so by the plain language of the contract. Furthermore, StarTex presented the actual invoices it sent Triton and Verhage's affidavit stating that the final invoice relied on in calculating the amount due and owing "contained the final, outstanding balance that was reconciled to correct all estimated reads."

Triton presented Gary's affidavit testimony that he disputed several invoices and objected to numerous charges. It also presented e-mail correspondence between Gary, Triton's property manager, and StarTex, in which Gary made general objections to several invoices without providing specific amounts or portions of the invoices that he believed were inaccurate. Triton also presented an expert affidavit pointing out general complaints about the invoices without specifying particular amounts in controversy.

Triton argues that StarTex was legally obligated to address Triton's objections to StarTex's billing practices before collecting on the unpaid invoices and that this evidence raises a fact question regarding the amount Triton owed to StarTex.

 **[22]**   The contract provides a method for disputing charges on invoices. The ESA provides that the "Customer must provide to [StarTex] written notice setting forth in particular detail any disputed **\*60**  amount, including the calculations with respect to any errors or inaccuracies claimed." The record contains no evidence that Triton complied with this procedure. Neither Gary's and Phillips' affidavit testimony nor the e-mails sent to StarTex contain specific amounts or calculations. Triton did not produce any evidence that it provided StarTex with written notice articulating the particular disputed amount or calculations regarding claimed inaccuracies.

Thus, Triton failed to present evidence raising a fact issue on the accuracy of the invoices StarTex used to support its claim for the unpaid amounts for electricity usage.

### (d) Triton's entitlement to offsets and credits

Triton also argues that it was entitled to $97,000 in offsets and credits, based on Phillips' affidavit.

 **[23]**   "The right of offset is an affirmative defense." *Brown v. Am. Transfer & Storage Co.,* 601 S.W.2d 931, 936 (Tex.1980). Triton must show its entitlement to an offset and the amount. *See id.* (holding that party asserting right of offset bears burden of pleading offset and proving facts

necessary to support it). Thus, Triton must present evidence raising a fact question on its offset defense to defeat StarTex's motion for summary judgment. *See Am. Petrofina,* 887 S.W.2d at 830.

 **[24]** Triton presented Phillips' affidavit, in which Phillips, as an electricity engineer, stated that the invoices contained errors entitling Triton to offsets and credits worth at least $97,000. However, as we have already stated, Triton did not provide a proper challenge to any particular charge or invoice. Phillip's conclusory statements in his affidavit, by themselves, do not support Triton's claim for offsets and credits. *See* TEX.R. CIV. P. 166a(f) (providing that supporting affidavit must set forth facts that would be admissible in evidence); *Wadewitz v. Montgomery,* 951 S.W.2d 464, 466 (Tex.1997) (holding that expert's testimony will support summary judgment only if it is "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted" and that conclusory statements by an expert are insufficient to support or defeat summary judgment).

Thus, we conclude that Triton failed to raise a fact issue on any element of StarTex's breach of contract claim against Triton for failure to pay the invoices. The trial court did not err in determining that Triton was entitled to summary judgment on this issue as a matter of law.

## C. Summary Judgment on StarTex's Breach of Contract Claim for Triton's Early Termination of the Contract

In parts of its first through seventh issues, Triton also argues that the trial court erred in granting summary judgment on StarTex's breach of contract claim for Triton's wrongful early termination of the agreement.

### 1. Evidence Establishing Elements of StarTex's Claim

As we have discussed, StarTex established the existence of a valid contract between itself and Triton, and it established that it performed under that contract. StarTex provided a copy of the Second Amendment, which provided that the parties agreed to extend the ESA through May 2011.

The ESA contained the following early termination provision:

> **Early Termination Fee.** In the event that Customer terminates this agreement **\*61** or Customer defaults as described [in the ESA], then an Early Termination Fee will be assessed. The Early Termination Fee shall be equal to the greater of a) the three months highest bills for Customer or b) any mark to market costs.

StarTex presented Verhage's affidavit testimony that Triton terminated the agreement on October 10, 2008, approximately thirty-one months earlier than the Second Amendment's contractual

termination date of May 2011, and Triton's final invoice reflecting a termination date in the middle of October 2008.

StarTex likewise provided Madden's affidavit testimony that StarTex was harmed by Triton's early termination. Madden averred that when StarTex entered into the Second Amendment extending the terms of the ESA through May 2011, it contracted with its electricity producer "to purchase enough power to service the entire thirty-six (36) month term of the Second Amendment and the purchases were tailored to fit Triton's particular 'shape'." After Triton unilaterally terminated the contract on October 10, 2008, StarTex was still obligated to continue to purchase power from its supplier through May 2011 "in Triton's particular 'shape,' " even though StarTex no longer had a customer to whom to sell it. Madden testified that it was almost impossible to sell that electricity to another customer because StarTex "would have to find a new customer who not only wants an MCPE contract, but has the exact same term and volume requirements and 'shape' as Triton." According to Madden, these particular characteristics of a MCPE payment arrangement made it very difficult to calculate the mark-to-market losses because StarTex had no way of knowing what the exact cost of the future electricity would be. StarTex thus calculated its liquidated damages as $197,323.25 based on the sum of Triton's three highest monthly bills.

### 2. Triton's response

Triton does not contest that it terminated the contract in October 2008, approximately thirty-one months before the termination date provided in the Second Amendment. Triton again argues that its early termination was excused by StarTex's prior breach by billing based on estimated usage. We have already concluded that StarTex did not breach the ESA when it invoiced Triton based on its estimated usage.

Triton also raises several issues specific to the early termination clause and the trial court's award of liquidated damages. In its ninth issue, Triton argues that the early termination fee clause is unenforceable as an impermissible penalty. Triton argues in its tenth and eleventh issues that even if the early termination fee clause is enforceable as a matter of law, StarTex did not present summary judgment evidence establishing the amount of the early termination fee in compliance with the contract's terms.

### (a) Enforceability of early termination clause

Triton argues that the early termination fee clause constitutes an impermissible penalty. Triton argues that it is impermissible both under the common law standard set out in *Phillips v. Phillips, 820 S.W.2d 785 (Tex.1991),* and under the Texas Business and Commerce Code.

[25]   [26]   [27]   [28]   Whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law for the court to decide. *Dorsett,* 164 S.W.3d at 664 (citing *Phillips,* 820 S.W.2d at 788). Valid liquidated damages clauses "fix in advance the compensation to a party accruing from the failure to **\*62** perform specified contractual obligations." *Dorsett,* 164 S.W.3d at 664. To enforce a liquidated damages clause, the court must find that (1) the harm caused by the breach is incapable or difficult of estimation and (2) the amount of liquidated damages called for is a reasonable forecast of just compensation. *Phillips,* 820 S.W.2d at 788; *GPA Holding, Inc. v. Baylor Health Care Sys.,* 344 S.W.3d 467, 475 (Tex.App.-Dallas 2011, pet. denied). The party asserting that the provision is unenforceable bears the burden of proof. *GPA Holding,* 344 S.W.3d at 475.

[29]   Triton argues that the harm caused by its breach is not incapable or difficult of estimation. Triton argues that StarTex "could determine the amount of electricity that would have been purchased by Triton but for the purported breach ... and determine what the electricity was sold for to an alternate customer versus what it would have been sold for to Triton." However, StarTex's Senior Vice–President of Supply, Stephen Madden, provided affidavit testimony that it is almost impossible to know what the cost of Triton's future energy use would have been because of the constantly fluctuating prices involved in the MCPE pricing structure. He averred that the price of electricity changes as often as every fifteen minutes, that StarTex committed to buy electricity in fifteen minute increments to meet its obligation to provide electricity conforming to Triton's unique "shape" of energy consumption, and thus it would be very difficult to find another consumer to use that energy. Accordingly, it was not possible to determine, at the time of Triton's early termination, the cost of the energy that would have been purchased by Triton but for the breach, and it was also very difficult for StarTex to predict whether it would find another consumer to purchase the electricity according to Triton's unique usage pattern, and if so, how much such a consumer would pay.

Triton did not present any evidence regarding the parties' ability to estimate actual damages when the contract was formed, and it did not controvert Madden's description of the pricing model applicable to the ESA and Second Amendment. Thus, we conclude that it was impossible to determine the actual harm that would be caused by early termination. *See Phillips,* 820 S.W.2d at 788.

Triton also appears to argue that the amount of the liquidated damages was not a reasonable forecast of StarTex's actual damages because it was unreasonably large. The ESA provided that the early termination fee "shall be equal to the greater of a) the three months highest bills for Customer or b) any mark to market costs." In this instance, due to the length of the term remaining on the terminated contract and the uncertainties of pricing, the "mark to market costs" could not be calculated. Thus, Madden testified that StarTex calculated its damages based on Triton's three highest monthly bills, which totaled $197,323.25.

 **[30]**   Triton did not present any evidence regarding what a reasonable forecast of damages would have been at the time the contract was formed, nor did it present any evidence of StarTex's actual damages. Thus, we conclude that, when viewed as of the time the contract was executed, the ESA's method for calculating the amount of liquidated damages provided a reasonable forecast of just compensation. *See id.*

 **[31]**   This same reasoning also demonstrates that Triton failed to show that the early termination fee violated Business and Commerce Code section 2.718. Section 2.718 provides that a liquidated damages clause is unenforceable if (1) the  **\*63**  agreed amount is unreasonable in light of the anticipated or actual harm caused by breach, (2) the proof of actual harm is not difficult, (3) obtaining an adequate remedy for breach is not inconvenient or not feasible, or (4) the agreed amount is unreasonably large. *See* TEX. BUS. & COM.CODE ANN. § 2.718 (Vernon 2009). As we have already discussed, the proof of actual harm is difficult, and obtaining an adequate remedy for breach is not feasible because StarTex could not have calculated the future cost of the electricity, nor could it predict the extent to which it could mitigate its damages. And, the agreed amount was not unreasonably large or unreasonable in light of the anticipated or actual harm. StarTex was obligated to buy thirty-one months' worth of electricity that it had no ability to resell. In that light, liquidated damages calculated from Triton's three highest monthly invoices are not unreasonable.

Triton failed to raise a fact question on its claim that the early termination fee clause constituted an impermissible penalty.

### (b) StarTex's proof of liquidated damages

Triton also argues that StarTex failed to prove the amount of liquidated damages permitted under the ESA. Several of Triton's arguments on this issue again challenge the accuracy of StarTex's billing and StarTex's use of estimates in its invoices. However, we have already determined that Triton has failed to raise a fact question regarding the accuracy or propriety of StarTex's invoices. Thus, we do not address those arguments again.

Triton argues that StarTex failed to identify which three invoices it relied on in calculating the liquidated damages. It also argues that no three invoices from the term of the Second Amendment add up to $197,323.95, and, thus, StarTex improperly used invoices dated prior to the execution of the Second Amendment to calculate the early termination fee. However, the early termination fee provision did not limit the time period from which the three highest bills could be taken, and Triton failed to present these arguments to the trial court. *See* TEX.R. CIV. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not

be considered on appeal as grounds for reversal."); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979) (holding that nonmovant could not raise for first time on appeal additional fact issue that was not raised in its response).

We hold that the trial court did not err in granting summary judgment and awarding StarTex $105,034.18 on its claim that Triton failed to pay for electricity provided under the ESA and $197,323.25 as liquidated damages on its claim for Triton's early termination of the ESA as extended by the Second Amendment.

We overrule Triton's first through seventh, ninth, tenth, and eleventh issues.

## Attorney's Fees

In its twelfth issue, Triton argues that the trial court erred in awarding StarTex $12,000 in attorney's fees because that amount was not properly proven and was excessive and unreasonable. Triton also argues that StarTex was not entitled to recover attorney's fees because it made an excessive demand prior to filing this lawsuit.

### A. Standard of Review

[32] [33] [34] The prevailing party in a breach of contract suit is entitled to attorney's fees. TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8) (Vernon 2008); *Haden v.* **\*64** *David J. Sacks, P.C.,* 332 S.W.3d 503, 510 (Tex.App.-Houston [1st Dist.] 2009, pet. denied). An award of attorney's fees must be supported by evidence that the fees are reasonable and necessary. *See Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10 (Tex.1991). A trial court determines the reasonableness of an attorney's fees award by considering the factors enumerated in *Arthur Andersen & Co. v. Perry Equipment Corp.* 945 S.W.2d 812, 818 (Tex.1997) (holding that evidence of contingency fee agreement alone does not support award of reasonable and necessary attorney's fees and that trial court must still consider other factors). The reasonableness of attorney's fees is generally a fact issue. *Haden,* 332 S.W.3d at 512. We review attorney's fees awards for an abuse of discretion. *Ridge Oil Co., Inc. v. Guinn Invs., Inc.,* 148 S.W.3d 143, 163 (Tex.2004).

[35] [36] An attorney's affidavit constitutes expert testimony that will support an award of attorney's fees in a summary judgment proceeding. *Haden,* 332 S.W.3d at 513; *see* TEX.R. CIV. P. 166a(c); *Gensco, Inc. v. Transformaciones Metalurgicias Especiales, S.A.,* 666 S.W.2d 549, 554 (Tex.App.-Houston [14th Dist.] 1984, writ dism'd). Civil Practice and Remedies Code section 38.003 provides that "usual and customary attorney's fees" are presumed to be reasonable. TEX. CIV. PRAC. & REM.CODE ANN. § 38.003 (Vernon 2008). Although the statutory presumption that usual and customary fees are reasonable is rebuttable, *see id.,* once triggered by an attorney's

supporting affidavit, the presumption of reasonableness remains in effect when there is no evidence submitted to challenge the affidavit proof of the summary judgment movant. *Haden,* 332 S.W.3d at 513.

## B. Analysis

[37] In its motion for summary judgment, StarTex sought $75,589.36 in attorney's fees, and its attorney, Rodney Drinnon, submitted an affidavit in support of an award for attorney's fees. Drinnon averred that the contingency fee agreement awarding twenty-five percent of damages recovered from any successful trial award constituted usual and customary attorney's fees; he provided a list of specific tasks he and his law practice undertook during the course of representing StarTex; and he stated that his fee was supported by several, listed *Arthur Andersen* factors. Drinnon's description was " 'clear, positive, and direct, otherwise credible' and [was] neither internally inconsistent nor [contradictory]" and could have been readily controverted by Triton. *See id.* at 514. Based on Drinnon's affidavit, submitted as evidence in support of the request for attorney's fees, StarTex was entitled to the statutory presumption that its attorney's usual and customary fees were reasonable. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 38.003; *see also Haden,* 332 S.W.3d at 514 (holding attorney's affidavit sufficient to warrant summary judgment when it (1) contained recitals establishing attorney's competency to swear to facts stated and other requirements of Rule of Civil Procedure 166a(f), (2) described work encompassed by the fees sought, and (3) specified factors that formed basis of his statement that amount claimed was reasonable and necessary, tracking seven of eight *Arthur Andersen* factors).

Triton filed a written objection to Drinnon's affidavit, arguing that it failed to describe the time required to prosecute StarTex's claim, to provide counsel's hourly rate, and to discuss two of the *Arthur Andersen* factors. We have already concluded that Drinnon's affidavit was sufficient **\*65** to support StarTex's claim for attorney's fees. *See Haden,* 332 S.W.3d at 514. Triton did not file a controverting affidavit or any other evidence disputing Drinnon's evidence. Because Triton did not present any controverting evidence, Triton cannot overcome the presumption of reasonableness accorded to Drinnon's affidavit in support of an award of attorney's fees. *See id.* at 514–16 (holding that because nonmovant "did not controvert [attorney's] affidavit or otherwise dispute the law firm's evidence, the law firm was ... entitled to the statutory presumption that the requested amount was both reasonable and necessary").

[38] [39] Triton also argues that StarTex is not entitled to attorney's fees on the basis of its affirmative defense that StarTex made an excessive demand on Triton prior to filing suit. *See Kurtz v. Kurtz,* 158 S.W.3d 12, 21 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). When a claimant makes an "excessive" demand and will not accept a lesser amount, the claimant is not entitled to attorney's fees expended in litigation thereafter, even if it prevails on its breach of contract claim. *See, e.g., McMillin v. State Farm Lloyds,* 180 S.W.3d 183, 209 (Tex.App.-Austin 2005, pet. denied) (citing *Findlay v. Cave,* 611 S.W.2d 57, 58 (Tex.1981)). Demand is not excessive

simply because it is greater than the amount eventually awarded. *See Findlay,* 611 S.W.2d at 58. The dispositive question is whether the claimant acted unreasonably or in bad faith in making the demand. *See Standard Constructors, Inc. v. Chevron Chem. Co.,* 101 S.W.3d 619, 627–28 (Tex.App.-Houston [1st Dist.] 2003, pet. denied).

 **[40]**    StarTex's demand letter requested $105,034.18 as principal on the unpaid invoices, $14,290.98 in interest and fees, $197,323.95 in liquidated damages, and $68,329.82 in attorney's fees. It stated that Triton should pay the listed amounts within thirty days or make arrangements to satisfy the debt. Thus, the amounts demanded by StarTex prior to filing suit were not so much greater than the amount it was eventually awarded as to be "excessive" or to indicate that the demand was made in bad faith. Triton presented no evidence that StarTex would have refused tender of the $314,358.13 awarded by the trial court. Triton has failed to establish that this exception to StarTex's statutory right to attorney's fees is met. *See Findlay,* 611 S.W.2d at 58; *McMillin,* 180 S.W.3d at 209.

We hold that the trial court did not err in awarding StarTex $12,000 in attorney's fees.

We overrule Triton's twelfth point of error.

## Other Issues

### A. PUC Rules and Procedures for Disputed Charges

 **[41]**    In its eighth issue, Triton argues that its pending claim against StarTex before the PUC acted to stay the judgment and enforcement of the judgment. In its brief, Triton also argues that StarTex failed to properly investigate Triton's complaints according to the PUC's rules and procedures. However, Triton did not present these arguments to the trial court. Furthermore, the only indication before this Court that Triton actually filed a complaint with the PUC is Triton's statement in its appellate brief. We conclude that these complaints are not properly presented for our review. *See* TEX.R. CIV. P. 166a(c); *Marek v. Tomoco Equip. Co.,* 738 S.W.2d 710, 712 (Tex.App.-Houston [14th Dist.] 1987, no writ) ("The trial court considers the record only as it properly appears when the motion for summary judgment is heard."); *see also* TEX.R.APP. P. 33.1(a) (providing that, "[a]s a prerequisite **\*66**  to presenting a complaint for appellate review, the record must show that ... the complaint was made to the trial court by a timely request, objection or motion").

We overrule Triton's eighth issue.

### B. Receivership and Turnover Order

In its thirteenth and fourteenth issues, Triton argues that, because the trial court erred in granting summary judgment, the trial court also erred in appointing a receiver and in ordering Triton to turn over to the receiver confidential records and all proceeds and revenues generated by its businesses. Thus, Triton argues that it is entitled to immediate relief from the order appointing a receiver and the turnover order, including return of all records and revenues turned over to or seized by the receiver. We have already concluded that the trial court did not err in granting summary judgment. Therefore, this argument fails.

We overrule Triton's thirteenth and fourteenth issues.

## Conclusion

We affirm the judgment of the trial court.

Justice SHARP concurring in the judgment only.

## Footnotes

1   StarTex moved this Court to strike the affidavits Triton submitted with its motion for reconsideration or new trial from the appellate record. Those affidavits were part of Triton's motion, and "any filing that a party designates to have included in the record" is a proper part of the clerk's record. TEX.R.APP. P. 34.5(a)(13). Therefore, we DENY StarTex's motion. We note, however, that the affidavits attached to Triton's motion for reconsideration or new trial are not relevant to our review of the trial court's summary judgment. *See* TEX.R. CIV. P. 166a(c); *Marek v. Tomoco Equip. Co.,* 738 S.W.2d 710, 712 (Tex.App.-Houston [14th Dist.] 1987, no writ) ("The trial court considers the record only as it properly appears when the motion for summary judgment is heard.").

2   StarTex also presented Bejger's affidavit testimony that he did not make the representations alleged by Gary. Triton objected to this evidence in the trial court, but it is not clear whether Triton is arguing on appeal that Bejger's affidavit should not be considered. However, it is unnecessary for us to consider Bejger's testimony as the terms of the contract are established as a matter of law.

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (4)

### Direct History (3)

1.  Star Electricity, L.L.C v. Triton 88. L.P.
2010 WL 8995562 , Tex.Dist. , Jan. 20, 2010

*New Trial Denied by*

2.  STAR Electricity, L.L.C. v. Triton 88, L.P.
2010 WL 9583454 , Tex.Dist. , Jan. 21, 2010

*AND Affirmed by*

3.  Triton 88, L.P. v. Star Electricity, L.L.C. ⌐
411 S.W.3d 42 , Tex.App.-Hous. (1 Dist.) , Aug. 13, 2013

### Related References (1)

4.  Star Electricity, L.L.C. v. Triton 88, L.P.
2010 WL 9585471 , Tex.Dist. , June 17, 2010

Restatement (Second) of Contracts § 356 (1981)

Restatement of the Law - Contracts

Database updated October 2014
Restatement (Second) of Contracts

Chapter 16. Remedies

Topic 2. Enforcement by Award of Damages

§ 356 Liquidated Damages and Penalties

Comment:
Reporter's Note
Case Citations - by Jurisdiction

**(1) Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.**

**(2) A term in a bond providing for an amount of money as a penalty for non-occurrence of the condition of the bond is unenforceable on grounds of public policy to the extent that the amount exceeds the loss caused by such non-occurrence.**

---

**Comment:**

*a. Liquidated damages or penalty.* The parties to a contract may effectively provide in advance the damages that are to be payable in the event of breach as long as the provision does not disregard the principle of compensation. The enforcement of such provisions for liquidated damages saves the time of courts, juries, parties and witnesses and reduces the expense of litigation. This is especially important if the amount in controversy is small. However, the parties to a contract are not free to provide a penalty for its breach. The central objective behind the system of contract remedies is compensatory, not punitive. Punishment of a promisor for having broken his promise has no justification on either economic or other grounds and a term providing such a penalty is unenforceable on grounds of public policy. See Chapter 8. The rest of the agreement remains enforceable, however, under the rule stated in § 184(1), and the remedies for breach are determined by the rules stated in this Chapter. See Illustration 1. A term that fixes an unreasonably small

amount as damages may be unenforceable as unconscionable. See § 208. As to the liquidation of damages and modification or limitation of remedies in contracts of sale, see Uniform Commercial Code §§ 2-718, 2-719.

*b. Test of penalty.* Under the test stated in Subsection (1), two factors combine in determining whether an amount of money fixed as damages is so unreasonably large as to be a penalty. The first factor is the anticipated or actual loss caused by the breach. The amount fixed is reasonable to the extent that it approximates the actual loss that has resulted from the particular breach, even though it may not approximate the loss that might have been anticipated under other possible breaches. See Illustration 2. Furthermore, the amount fixed is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss. See Illustration 3. The second factor is the difficulty of proof of loss. The greater the difficulty either of proving that loss has occurred or of establishing its amount with the requisite certainty (see § 351), the easier it is to show that the amount fixed is reasonable. To the extent that there is uncertainty as to the harm, the estimate of the court or jury may not accord with the principle of compensation any more than does the advance estimate of the parties. A determination whether the amount fixed is a penalty turns on a combination of these two factors. If the difficulty of proof of loss is great, considerable latitude is allowed in the approximation of anticipated or actual harm. If, on the other hand, the difficulty of proof of loss is slight, less latitude is allowed in that approximation. If, to take an extreme case, it is clear that no loss at all has occurred, a provision fixing a substantial sum as damages is unenforceable. See Illustration 4.

**Illustrations:**
**Illustrations:**

1. A and B sign a written contract under which A is to act in a play produced by B for a ten week season for $4,000. A term provides that "if either party shall fail to perform as agreed in any respect he will pay $10,000 as liquidated damages and not as a penalty." A leaves the play before the last week to take another job. The play is sold out for that week and A is replaced by a suitable understudy. The amount fixed is unreasonable in the light of both the anticipated and the actual loss and, in spite of the use of the words "liquidated damages," the term provides for a penalty and is unenforceable on grounds of public policy. The rest of the agreement is enforceable (§ 184(1)), and B's remedies for A's breach are governed by the rules stated in this Chapter.

2. A, B and C form a partnership to practice veterinary medicine in a town for ten years. In the partnership agreement, each promises that if, on the termination of the partnership, the practice is continued by the other two members, he will not practice veterinary medicine in the same town during its continuance up to a maximum of three years. A term provides that for breach of this duty "he shall forfeit $50,000 to be collected by the

others as damages." A leaves the partnership, and the practice is continued by B and C. A immediately begins to practice veterinary medicine in the same town. The loss actually caused to B and C is difficult of proof and $50,000 is not an unreasonable estimate of it. Even though $50,000 may be unreasonable in relation to the loss that might have resulted in other circumstances, it is not unreasonable in relation to the actual loss. Therefore, the term does not provide for a penalty and its enforcement is not precluded on grounds of public policy. See Illustration 14 to § 188.

3. A contracts to build a grandstand for B's race track for $1,000,000 by a specified date and to pay $1,000 a day for every day's delay in completing it. A delays completion for ten days. If $1,000 is not unreasonable in the light of the anticipated loss and the actual loss to B is difficult to prove, A's promise is not a term providing for a penalty and its enforcement is not precluded on grounds of public policy.

4. The facts being otherwise as stated in Illustration 3, B is delayed for a month in obtaining permission to operate his race track so that it is certain that A's delay of ten days caused him no loss at all. Since the actual loss to B is not difficult to prove, A's promise is a term providing for a penalty and is unenforceable on grounds of public policy.

*c. Disguised penalties.* Under the rule stated in this Section, the validity of a term providing for damages depends on the effect of that term as interpreted according to the rules stated in Chapter 9. Neither the parties' actual intention as to its validity nor their characterization of the term as one for liquidated damages or a penalty is significant in determining whether the term is valid. Sometimes parties attempt to disguise a provision for a penalty by using language that purports to make payment of the amount an alternative performance under the contract, that purports to offer a discount for prompt performance, or that purports to place a valuation on property to be delivered. Although the parties may in good faith contract for alternative performances and fix discounts or valuations, a court will look to the substance of the agreement to determine whether this is the case or whether the parties have attempted to disguise a provision for a penalty that is unenforceable under this Section. In determining whether a contract is one for alternative performances, the relative value of the alternatives may be decisive.

**Illustration:**
**Illustration:**

5. A contracts to build a house for B for $50,000 by a specified date or in the alternative to pay B $1,000 a week during any period of delay. A delays completion for ten days. If $1,000 a week is unreasonable in the light of both the anticipated and actual loss, A's

promise to pay $1,000 a week is, in spite of its form, a term providing for a penalty and is unenforceable on grounds of public policy.

*d. Related types of provisions.* This Section does not purport to cover the wide variety of provisions used by parties to control the remedies available to them for breach of contract. A term that fixes as damages an amount that is unreasonably small does not come within the rule stated in this Section, but a court may refuse to enforce it as unconscionable under the rule stated in § 208. A mere recital of the harm that may occur as a result of a breach of contract does not come within the rule stated in this Section, but may increase damages by making that harm foreseeable under the rule stated § 351. As to the effect of a contract provision on the right to equitable relief, see Comment *a* to § 359. As to the effect of a term requiring the occurrence of a condition where forfeiture would result, see § 229. Although attorneys' fees are not generally awarded to the winning party, if the parties provide for the award of such fees the court will award a sum that it considers to be reasonable. If, however, the parties specify the amount of such fees, the provision is subject to the test stated in this Section.

*e. Penalties in bonds.* Bonds often fix a flat sum as a penalty for non-occurrence of the condition of the bond. A term providing for a penalty is not unenforceable in its entirety but only to the extent that it exceeds the loss caused by the non-occurrence of the condition.

**Illustration:**
**Illustration:**

6. A executes a bond obligating himself to pay B $10,000, on condition that the bond shall be void, however, if C, who is B's cashier, shall properly account for all money entrusted to him. C defaults to the extent of $500. A's promise is unenforceable on grounds of public policy to the extent that it exceeds the actual loss, $500.

---

### Reporter's Note

This Section is based on former §§ 339 and 579, but Subsection (1) has been redrafted to harmonize with Uniform Commercial Code § 2-718(1). The Code's reference to "the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy" has been omitted as already being expressed by the language of Subsection (1), as explained in the Comment. See 5 Corbin, Contracts ch. 58 (1964 & Supp.1980); 5 Williston, Contracts §§ 776-89 (3d ed.1961); Clarkson, Miller & Muris, Liquidated Damages v. Penalties: Sense or Nonsense, 1978 Wis.L.Rev. 351; Goetz & Scott, Liquidated Damages, Penalties and the Just Compensation Principle: Some Notes on an Enforcement Model and a Theory of Efficient Breach, 77 Colum.L.Rev. 554 (1977); Macneil,

Power of Contract and Agreed Remedies, 47 Cornell L.Q. 495 (1962); Sweet, Liquidated Damages in California, 60 Calif.L.Rev. 84 (1972); The [English] Law Commission, Penalty Clauses and Forfeiture of Monies Paid (Law of Contract Working Paper No. 61, 1975). Notes, 45 Fordham L.Rev. 1349 (1977); 72 Nw.U.L.Rev. 1055 (1978).

*Comment b.* Illustration 1 is based on Illustration 1 to former § 339; H.J. McGrath Co. v. Wisner, 189 Md. 260, 55 A.2d 793 (1947). Illustration 2 is based on Illustration 2 to former § 339; Jaquith v. Hudson, 5 Mich. 123 (1858). It is supported by 5 Corbin, Contracts § 1066 (1964 & Supp.1980); McCormick, Damages § 151 (1935); and is consistent with the rationale behind § 184(2). But cf. Bauer v. Sawyer, 8 Ill.2d 351, 134 N.E.2d 329 (1956); Management, Inc. v. Schassberger, 39 Wash.2d 321, 235 P.2d 293 (1951). Illustration 3 is based on Illustration 3 to former § 339; United States v. Bethlehem Steel Co., 205 U.S. 105 (1907); Banta v. Stamford Motor Co., 89 Conn. 51, 92 A. 665 (1914); Dave Gustafson & Co. v. State, 83 S.D. 160, 156 N.W.2d 185 (1968). But cf. Priebe & Sons v. United States, 332 U.S. 407 (1947); Hungerford Constr. Co. v. Florida Citrus Exposition, Inc., 410 F.2d 1229 (5th Cir.), cert. denied, 396 U.S. 928 (1969). Illustration 4 is supported by Massman Constr. Co. v. City Council of Greenville, Miss., 147 F.2d 925 (5th Cir.1945); Northwest Fixture Co. v. Kilbourne & Clark Co., 128 F. 256 (9th Cir.1904); Norwalk Door Closer Co. v. Eagle Lock and Screw Co., 153 Conn. 681, 220 A.2d 263 (1966). It rejects the view of Illustration 7 to former § 339; Southwest Eng'r Co. v. United States, 341 F.2d 998 (8th Cir.), cert. denied, 382 U.S. 819 (1965); McCarthy v. Tally, 46 Cal.2d 577, 297 P.2d 981 (1956); cf. Bethlehem Steel Corp. v. Chicago, 350 F.2d 649 (7th Cir.1965). That the difficulties of proof of loss are to be determined at the time the contract is made, not at the time of the breach, see Hutchison v. Tompkins, 259 So.2d 129 (Fla.1972). As to whether the actual loss must be reasonably foreseeable, compare comment, 45 Fordham L.Rev. 1349, 1357 (1977), with 1 N.Y.L. Rev'n Comm'n, Study of the Uniform Commercial Code, Leg. Doc. (1955) No. 65, p. 581 n. 468.

*Comment c.* Illustration 5 is based on Illustration 5 to former § 339.

*Comment d.* Allowing attorneys' fees, see Puget Sound Mutual Sav. Bank v. Lillions, 50 Wash.2d 799, 314 P.2d 935 (1957), cert. denied, 357 U.S. 926 (1958). As to whether a specified sum as attorney's fees is a penalty, see Equitable Lumber Corp. v. IPA Land Dev. Corp., 38 N.Y.2d 516, 381 N.Y.S.2d 459, 344 N.E.2d 391 (1976).

*Comment e.* Illustration 6 is based on Illustration 8 to former § 339.

---

### Case Citations - by Jurisdiction

---

